# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

---

SAIO BARZEE,

                                        Plaintiff,

          v.                                        5:24-CV-1237
                                                    (DNH/MJK)

AARON M. WISON, JR., et al.,

                                        Defendants.

---

SAIO BARZEE, Plaintiff, pro se

MITCHELL J. KATZ, U.S. Magistrate Judge

TO THE HONORABLE DAVID N. HURD, U.S. DISTRICT JUDGE:

## ORDER and REPORT-RECOMMENDATION

The Clerk has sent to the court for review a complaint, together with an application to proceed in forma pauperis ("IFP"), filed by pro se plaintiff, Saio Barzee. (Dkt. Nos. 1, 6).

## I.    **IFP Application**

Plaintiff declares in his IFP application that he is unable to pay the filing fee. (Dkt. No. 2). After reviewing his application, this court finds that plaintiff is financially eligible for IFP status.

However, in addition to determining whether plaintiff meets the financial criteria to proceed IFP, the court must also consider the sufficiency of the allegations set forth in the complaint in light of 28 U.S.C. § 1915, which provides that the court shall dismiss the case at any time if the court determines that the action is (i) frivolous or

malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief.  28 U.S.C. § 1915 (e)(2)(B)(i)-(iii).

In determining whether an action is frivolous, the court must consider whether the complaint lacks an arguable basis in law or in fact.  *Neitzke v. Williams*, 490 U.S. 319, 325 (1989), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) and 28 U.S.C. § 1915.  Dismissal of frivolous actions is appropriate to prevent abuses of court process as well as to discourage the waste of judicial resources. *Neitzke*, 490 U.S. at 327; *Harkins v. Eldredge*, 505 F.2d 802, 804 (8th Cir. 1974). Although the court has a duty to show liberality toward pro se litigants and must use extreme caution in ordering sua sponte dismissal of a pro se complaint before the adverse party has been served and has had an opportunity to respond, the court still has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed.  *Fitzgerald v. First E. Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (finding that a district court may dismiss a frivolous complaint sua sponte even when plaintiff has paid the filing fee).

To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* (citing *Bell Atl. Corp.*, 550 U.S. at 555).

2

In addition, Fed. R. Civ. P. 8(a)(2) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Although Rule 8 does not require detailed factual allegations, it does "demand[] more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Houston v. Collerman*, No. 9:16-CV-1009 (BKS/ATB), 2016 WL 6267968, at *2 (N.D.N.Y. Oct. 26, 2016) (quoting *Iqbal,* 556 U.S. at 678). A pleading that contains allegations that "'are so vague as to fail to give the defendants adequate notice of the claims against them' is subject to dismissal." *Id.* (citing *Sheehy v. Brown*, 335 F. App'x 102, 104 (2d Cir. 2009)).

## II.  **Complaint**

Plaintiff's complaint concerns events alleged to have occurred between September and November 2023, giving rise to his underlying arrest and criminal prosecution. Plaintiff, a parolee, was hired and began working at Wendy's in September of 2023. (Complaint ("Compl.") at ¶ 1). Plaintiff alleges that, during the course of his employment at Wendy's in September and October 2023, he endured ongoing verbal and sexual harassment from his co-workers, including defendants Santina Rivera, Kari Wheeler, Michelle Murphy, Chris Gordon, Louis Rivera Jr. and Emily Roe. (*See generally* Compl. at ¶¶ 2-19). Plaintiff also describes offending conduct by non-Wendy's employee Aaron M. Wilson, Jr., Santina Rivera's boyfriend. (*See* Compl. at ¶ 16).

On or around October 29, 2023, plaintiff got into a verbal altercation with his co-worker, defendant Kari Wheeler. (Compl. at ¶¶ 20-21). In response, defendant Santina

Rivera, Ms. Wheeler's sister, "texted" Wendy's manager defendant Michelle Murphy[1] and informed her that Ms. Wheeler and plaintiff were "threatening each other with violence and gun violence." (*Id.* at ¶ 22). Plaintiff thereafter took a break outside the Wendy's store, at which time he noticed a suspicious dark colored vehicle that he felt to be threatening. (*Id.* at ¶¶ 23-24). Plaintiff alleges that he attempted to approach the vehicle, in which he "noticed a firearm and some weed smoking." (*Id.* at ¶ 24). Ms. Murphy then approached plaintiff and convinced him to go inside so she could "just simply talk to him and that there didn't have to be any problem." (*Id.* at ¶¶ 24-26).

After returning to the inside of the store and speaking to Ms. Murphy, plaintiff "started to go back to work only to then . . . be harassed again." (Compl. at ¶ 28). Specifically, plaintiff alleges that he was verbally harassed by a "Caucasian kid in his mid-twenties" at the cashier area of the store, and then later, after leaving his shift for the night, by other unidentified individuals outside of the store. (*See id.* at ¶¶ 28-32).

After that night, plaintiff informed his parole officer that "he was not going to go back to Wendy's because he did not feel welcomed." (Compl. at ¶ 33). Plaintiff alleges that he made "a couple more stops to Wendy's after that[,] but never got into any physical altercation . . . nor did [he] approach the defendants." (*Id.*). Plaintiff states that he went "simply to see if he could get the license plate of the people that had harassed him that night so that he could get a potential identification and or [sic] confirmation of the potential threat[.]" (*Id.* at ¶ 33).

---

[1] Defendant Michelle Murphy is Kari Wheeler and Santina Rivera's mother. (Compl. at ¶ 8).

Plaintiff then states that, on November 15, 2023, he went to Wendy's again "to inform the defendants that he was either going to commence with filing criminal charges against them and or [sic] file a lawsuit for the unjustifiable slander of his character." (Compl. at ¶ 33). Plaintiff thereafter alleges that he was "wrongfully arrested" that night. (*Id.* at ¶ 34). Although plaintiff generally refers to the "transactions" that occurred that night leading to his arrest, he conveniently fails to provide any detail surrounding the circumstances. According to contemporaneously published news articles,[2] Cicero Police responded to Wendy's that evening for a report of an ex-employee threatening to kill employees.[3] The articles further report that police were advised that the ex-employee displayed a handgun and made multiple threats to kill people before leaving the scene.

The remainder of plaintiff's complaint alleges the culpable behavior of the various defendants to the extent they are alleged to have violated his constitutional rights with respect to the October 29th and November 15th incidents. Specifically, plaintiff asserts that defendants Aaron M. Wilson, Jr., Kari Wheeler, Chris Gordon, and Santina Rivera lied and/or perjured themselves in the course of providing statements to,

---

[2] The Court may take judicial notice "of news articles discussing the conduct raised in the complaint[.]" *Stewart v. Loring Ests. LLC*, No. 18-CV-2283, 2020 WL 3002363, at *9 (E.D.N.Y. Feb. 26, 2020), *report recommendation adopted,* 2020 WL 1231783 (E.D.N.Y. Mar. 13, 2020) (quoting *In re Smith Barney Transfer Agent Litig.*, 765 F. Supp. 2d 391, 397 (S.D.N.Y. 2011)). It should be emphasized that the court does not accept the articles as evidence of the truth of the matters therein asserted.

[3] *See https://cnycentral.com/news/local/paroled-ex-employee-arrested-after-threatening-wendys-staff-in-cicero* (last visited Nov. 4, 2024); https://cnycentral.com/news/local/paroled-ex-employee-arrested-after-threatening-wendys-staff-in-cicero (last visited Nov. 4, 2024); https://www.localsyr.com/news/local-news/ex-employee-shows-up-at-cicero-wendys-threatens-to-kill-current-employees/ (last visited Nov. 4, 2024).

and otherwise assisting the responding law enforcement officers, during the investigation leading to plaintiff's arrest on November 15th. (*See* Compl. at ¶¶ 34-40).

Plaintiff further alleges the violation of his constitutional rights by the various law enforcement officers involved in the November 15th arrest and subsequent prosecution, including defendant Police Officers Ernes Merdanovic, Kyle Harrington, and John Baldini, as well as Sergeants ("Sgt.") Snell and Thomas Leo. For the sake of brevity, the court addresses the differing allegations against these officers in more detail in the analysis section.

Plaintiff next alleges that his defense attorney, defendant Susan C. Carey, "wrongfully deprived plaintiff of his . . . right to testify at the grand jury[,]" "wrongfully failed to adequately communicate with the plaintiff[,]" and "failed to inform the plaintiff about relevant matters pertaining to his criminal case and of every stage of his criminal proceeding." (Compl. at ¶¶ 47-48).

Plaintiff states that defendant Michael Wright, a "parole revocation specialist," "wrongfully [brought] up new parole violation charges against the plaintiff on the same day as the plaintiff's schedule[d] final parole revocation hearing . . . depriv[ing] the plaintiff of the opportunity to adequate[ly] prepare a defense against the [other] allegations brought up against him[.]" (Compl. at ¶ 50). Plaintiff further alleges that Michael Wright "wrongfully allow[ed] . . . defendant Aaron M. Wilson Junior to view photographic evidence of the firearm recovered by [defendant P.O. Harrington . . . ]"; was "more wrongfully worried about convicting the plaintiff th[a]n he was to upholding justice . . ."; "wrongfully attempted to influence plaintiff's attorney . . . to coerce the

6

plaintiff into accepting one of the maliciously framed offer[s] given by the board of parole . . ."; and "knew that the administrative law judge was being extremely bias[ed] and failed to uphold justice by bringing cure to the prejudicial injuries being suffered by the plaintiff."  (*Id*. at ¶¶ 51-54).

Finally, plaintiff alleges that defendant Tamara Danner, a firearm examiner, "violated his right to . . . due process by way of forgery when the defendant wrongfully certified . . . [and] presented falsified documentations which made it appear as if the firearm was indeed operable . . . which . . . was perjury[.]"  (Compl. at ¶ 56).

## III.    **Private Party Defendants**

### A.    **42 U.S.C. § 1983 Claims**

Plaintiff's § 1983[4] claims against defendants Wilson, Rivera, Wheeler, Murphy, Gordon, Rivera Jr., and Roe should be dismissed.  To state a claim under Section 1983, a litigant must allege both that: (1) a right secured by the Constitution or laws of the United States was violated, and (2) the right was violated by a person acting under the color of state law, or a "state actor." *See West v. Atkins*, 487 U.S. 42, 48-49 (1988). To state a claim for a Section 1983 conspiracy involving a private party, "a plaintiff must allege '(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal

---

[4] The Court recognizes that a defamation claim can be brought as a civil rights violation pursuant to 42 U.S.C. § 1983 "when a plaintiff can demonstrate 'a stigmatizing statement plus a deprivation of a tangible interest.' " *Gerrard v. Burns*, No. 7:14-CV-1235 (DNH), 2015 WL 1534416, at *3 (N.D.N.Y. April 6, 2015). "The action is one for violation of a liberty or property interest protected by due process." *Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d Cir. 2004).  Thus, to the extent plaintiff asserts a cause of action for defamation under the First Amendment (*See* Compl. at p. 16-17), which is typically raised as a defense in such a claim, it does not provide a basis for any § 1983 claim as pled.

causing damages.' " *Knopf v. Esposito*, 803 F. App'x 448, 452–53 (2d Cir. 2020)

(quoting *Ciambriello*, 292 F.3d 307, 324–25 (2d Cir. 2002). A private actor also acts

under the color of state law "when the private actor is a willful participant in joint

activity with the State or its agents." *Betts v. SHearman*, 751 F.3d 78, 84 (2d Cir. 2014)

(internal quotation marks and citation omitted).

A complaint that contains "only conclusory, vague, or general allegations that the

defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional

rights [is] properly dismissed; diffuse and expansive allegations are insufficient, unless

amplified by specific instances of misconduct." *Ciambriello*, 292 F.3d at 325 (internal

quotation marks omitted); *see also Jackson v. Nassau Cnty.*, 552 F. Supp. 3d 350, 381–

82 (E.D.N.Y. 2021) ("[T]he complaint must allege facts that plausibly suggest a

meeting of the minds, such that defendants entered into an agreement, express or tacit,

to achieve the unlawful end."). And while "conspiracies are by their very nature

secretive operations, and may have to be proven by circumstantial, rather than direct,

evidence," *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999) (internal quotation

marks and citation omitted), the plaintiff is still required to allege facts beyond

"conclusory, vague, or general allegations" to state a claim "that the defendants have

engaged in a conspiracy to deprive the plaintiff of his constitutional rights,"

*Ciambriello*, 292 F.3d at 325.

Here, plaintiff fails to allege any facts demonstrating that the private defendants

acted in concert with or conspired with the law enforcement officers affecting his arrest.

Liberally construed, plaintiff alleges that these private defendants were responsible for

8

harassing him at his place of work, and reporting false information to the police about the events that occurred on November 15th.  A private party's calling or summoning police officers does not constitute joint action with the officers that is actionable under § 1983. *See Rodriguez v. Winski*, 973 F. Supp. 2d 411, 422 (S.D.N.Y. 2013) (finding that a private party "summoning police or requesting that police take action . . . simply does not suffice to constitute joint action or to convert the private party into a state actor"); *Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268, 272 (2d Cir. 1999) (private party's "provision of background information to a police officer does not by itself make [the private party] a joint participant in state action under Section 1983"). This is the case even if the private defendants' reports to the law enforcement officers were, in fact, false. *See Rodriguez*, 973 F. Supp. at 422 ("[E]ven assuming that [defendant] had deliberately provided false information to police, such provision alone is not sufficient" to make him a state actor."); *Vazquez v. Combs*, No. 04-Civ-4189, 2004 WL 2404224, at *4 (S.D.N.Y. Oct. 22, 2004) ("[M]erely filing a complaint with the police, reporting a crime, requesting criminal investigation of a person, or seeking a restraining order, even if the complaint or report is deliberately false, does not give rise to a claim against the complainant for a civil rights violation.").

To the extent that plaintiff alleges defendant Wilson Jr. provided false testimony at plaintiff's final parole revocation hearing and during grand jury proceedings, this claim fails on multiple bases.  First, an allegation that a private individual gave false testimony in a judicial proceeding, without more, does not plausibly allege that the individual was acting under color of state law. *See Briscoe,* 460 U.S. at 329–30 ("It is

9

beyond question that, when a private party gives testimony in open court in a criminal trial, that act is not performed 'under color of law.' "); *Gordon v. City of New York,* No. 10–CV–5148, 2012 WL 1068023, at *12 (E.D.N.Y. Mar. 29, 2012) (dismissing Section 1983 claim based on private individual's allegedly false grand jury testimony); *see also Flores v.* Levy, No. 07–CV–3753, 2008 WL 4394681, at *7 (E.D.N.Y. Sept. 23, 2008) ("[T]he fact that [the private actor] . . . perjured herself as a witness at . . . trial does not transform her into a state actor."). Moreover, a witness in a judicial proceeding is entitled to absolute immunity against claims for damages arising out of his or her testimony. *See Briscoe,* 460 U.S. at 334 ("At least with respect to private witnesses, it is clear that § 1983 did not abrogate the absolute immunity existing at common law."); *see also San Filippo v. U.S. Trust Co. of N.Y., Inc.,* 737 F.2d 246, 254 (2d Cir. 1984) (extending *Briscoe's* holding to grand jury testimony); *accord* Gordon, 2012 WL 1068023, at *12.

Accordingly, plaintiff's § 1983 claims against these private defendants should be dismissed for failure to state a claim and/or immunity from suit.

## B.    State Law Claims[5]

"Defamation, consisting of the twin torts of libel and slander, is the invasion of the interest in a reputation and good name." *Hogan v. Herald Co.*, 84 A.D.2d 470, 474

---

[5] This court is recommending that certain of plaintiff's federal claims survive *sua sponte* review. (*See, infra,* p. 30). District courts have supplemental jurisdiction over all state law claims that are so related to federal claims over which they exercise original jurisdiction that they form part of the same case or controversy under Article III of the Constitution. 28 U.S.C. § 1367(a) (2000). Accordingly, the court will analyze those state law claims raised by plaintiff in his complaint, to the extent that the district court accepts my recommendation and recognizes supplemental jurisdiction.

(4th Dep't 1982), *aff'd* 58 N.Y.2d 630 (N.Y. 1982). "Generally, spoken defamatory words are slander; written defamatory words are libel." *Albert v. Loksen*, 239 F.3d 256, 264 (2d Cir. 2001).

"Under New York law a [libel] defamation plaintiff must establish five elements: (1) a written defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the defamatory statement, and (5) special damages or per se actionability." *Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019). In addition, "[u]nder New York law, to state a cause of action for slander, the plaintiff must allege facts plausibly suggesting (1) a defamatory statement of fact, (2) that is false, (3) published to a third party, (4) of and concerning the plaintiff, (5) made with the applicable level of fault on the part of the speaker, (6) that causes either special harm or constitutes slander per se, and (7) that is not protected by privilege." *Ryle v. Rehrig Pac. Co.*, 19-CV-1478, 2020 WL 6196144, at *8 (N.D.N.Y. Oct. 22, 2020) (citing *Albert*, 239 F.3d at 265-66). Slander per se includes "statements (i) charging plaintiff with a serious crime; [and] (ii) that tend to injure another in his or her trade, business or profession." *Whelan v. Cuomo*, 220 A.D.3d 979, 981 (2d Dep't 2023) (quoting *Liberman v. Gelstein*, 80 N.Y.2d 429, 435 (1992)).

Plaintiff's claim for libel against defendant Aaron M. Wilson Jr. for the testimony he gave at plaintiff's criminal proceedings (*see* Compl. at ¶¶ 61-63) should be dismissed for failure to state a claim. Moreover, under New York law, "[i]t is well-settled that statements made in the course of litigation are entitled to absolute privilege." *TRB Acquisitions LLC v. Yedid*, 215 A.D.3d 40, 43 (1st Dep't 2023) (quoting *Front, Inc. v.*

11

*Khalil*, 24 N.Y.3d 713, 718 (2015)).

Plaintiff further asserts a claim for slander per se against defendants Santina Rivera, Aaron M. Wilson Jr., and Luis Rivera Jr. for referring to plaintiff as a sex offender and a pedophile.  (*See* Compl. at ¶¶ 14, 16, 57-58).  These allegations further fail to state a claim.  To the extent plaintiff alleges that these statements were made in conversations between him and the defendants (*see, e.g.,* Compl. at ¶ 14), such allegations do not amount to slander because they were not published to a third party. *See McCollum v. Baldwin*, 688 F. Supp. 3d 117, 128 (S.D.N.Y. 2023) ("Plaintiffs' defamation claims that are based on [the defendant's] private communications with [the plaintiff] . . . are not actionable.").  Moreover, it was not slander per se for defendant Wilson to "report" to defendant P.O. Merdanovic that plaintiff "was under the assumption that people were slandering his character[.]"  (*See* Compl. at ¶ 58). Otherwise, as alleged plaintiff's allegations do not plausibly allege claims for defamation under New York Law.

Accordingly, plaintiff's state law defamation claims should be dismissed for failure to state a claim.

## IV.    <u>Law Enforcement Defendants</u>

Plaintiff explicitly declares in his complaint that he is not seeking to base his §1983 claims against the defendant law enforcement officers on a cause of action for false arrest, but is "asserting that the cruel and unusual punishment being wrongfully inflicted upon the plaintiff . . . are a violation of plaintiff's due process rights[.]"

(Compl. at ¶¶ 75-79, 93). He also asserts claims of perjury, falsifying reports and obstructing justice against these defendants. (*Id.* at ¶¶ 64-68).

At the outset, the court notes that plaintiff's claims arising under the Eighth Amendment right to be free from cruel and unusual punishment should be dismissed. As a parolee at the time of his arrest, any claims plaintiff raised to this effect would be "appropriately analyzed under the Fourteenth Amendment's Due Process Clause, not the Eighth Amendment." *Porath v. City of New York*, No. 22-CIV-1302, 2023 WL 9197680, at *5 n. 3 (S.D.N.Y. Dec. 21, 2023), *report and recommendation adopted,* 2024 WL 127025 (S.D.N.Y. Jan. 11, 2024) (quoting *Stovall v. Wilkins*, No. 15 Civ. 2163, 2016 WL 5478509, at *3 (S.D.N.Y. Sept. 29, 2016)).

Moreover, plaintiff's claims against the defendant law enforcement officers as they relate to the revocation of his parole may not proceed. "An individual convicted of a crime may not bring a section 1983 suit for damages that 'necessarily impl[ies] the invalidity of his conviction or sentence . . . unless [he] can demonstrate that the conviction or sentence has already been invalidated.' " *Opperisano v. P.O. Jones*, 286 F. Supp. 3d 450, 454 (E.D.N.Y. 2018) (quoting *Heck v. Humphrey*, 512 U.S. 477, 487 (1994)) (additional citations omitted). "*Heck's* limitation of section 1983 claims has come to be known as the 'favorable-termination' rule and applies to revocations of parole." *Opperisano*, 286 F. Supp. 3d at 454 (citing, *inter alia, Lee v. Donnaruma*, 63 Fed. App'x 39, 41 (2d Cir. 2003) ("Courts have applied *Heck* to prevent a state prisoner from bringing a Section 1983 action challenging a parole revocation unless that revocation decision is reversed or the underlying conviction is set aside.")). "A parolee

13

challenging a parole revocation must therefore demonstrate that his parole revocation has been 'reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus.' " *Id.* at 455 (quoting *Heck*, 512 U.S. at 486-87) (additional citations omitted).

In this case, plaintiff has alleged that as a result of the defendants' conduct, he was sentenced to the "maximum amount of imprisonment (two years)" for violating his parole. (Compl. at ¶ 42). The complaint does not allege that the determination at his parole revocation hearing has since been invalidated. Accordingly, plaintiff's claims related to the violation of probation proceedings are barred by *Heck* and should be dismissed.[6]  *See, e.g., Robinson v. Wright*, No. 5:21-CV-1098, 2023 WL 6122882, at *2 (N.D.N.Y. Sept. 19, 2023) (dismissing plaintiff's Fourteenth Amendment due process claims concerning perjured testimony and material omissions during parole revocation hearing as barred by *Heck*); *Harris v. New York Div. of Parole*, No. 9:18-CV-1435(LEK/TWD), 2019 WL 1958017, at *4 (N.D.N.Y. May 1, 2019) ("Since success on Plaintiff's malicious prosecution and due process claims require him to prove the invalidity of his parole revocation, *Heck* bars those claims unless state authorities reversed the revocation.") (citation omitted).

To the extent plaintiff's allegations may be construed to raise malicious prosecution claims against the law enforcement defendants, such claims should be

---

[6] Specifically, this includes plaintiff's claims that defendants P.O. Merdanovic and P.O. Harrington provided false testimony at his parole revocation hearing. (Compl. at ¶ 41).

14

dismissed.  Claims for malicious prosecution require the plaintiff to show a favorable termination of the underlying criminal case against him.  *See Barnes v. City of New York*, 68 F.4th 123, 128 (2d Cir. 2023) ("[A] Fourth Amendment claim under § 1983 for malicious prosecution requires the plaintiff to show a favorable termination of the underlying criminal case against him.").  Plaintiff affirmatively alleges in his complaint that he is a "pretrial detainee of [his] new pending case."  (Compl. at p. 1).  As plaintiff's criminal proceeding is allegedly ongoing, he necessarily cannot allege that it terminated in his favor.  *See Sabino v. Port Auth. Police Dep't*, No. 21-CV-5731, 2021 WL 3914092, at *2 (S.D.N.Y. Sept. 1, 2021) (citing *Bayan v. Sikorski*, No. 17-CV-4942, 2021 WL 1163653, at *5 (S.D.N.Y. Mar. 26, 2021) ("Because 'favorable termination is an element of a malicious prosecution claim, a plaintiff cannot state a claim if the relevant criminal proceeding is pending.' ")).

A Section 1983 "fair trial" claim is a claim for civil damages for violations of a criminal defendant's due process rights. *Ramchair v. Conway,* 601 F.3d 66, 73 (2d Cir. 2010) (quoting *Cone v. Bell,* 556 U.S. 449, 451 (2009)) ("The right to a fair trial [is] guaranteed to state criminal defendants by the . . . Due Process Clauses [of the Fifth and Fourteenth Amendments, defined] . . . largely through [ ]several provisions of the Sixth Amendment .") (citations and quotation marks omitted). A § 1983 claim for a violation of the right to a fair trial lies, *inter alia,* where a police officer "creates false information likely to influence a jury's decision and forwards that information to prosecutors." *Ricciuti,* 124 F.3d at 130. Such a fair trial claim can be sustained "even if the officer had probable cause to arrest in the first place." *Abreu v. City of New York,* 04 CV 1721,

15

2006 WL 401651, at *6 (E.D.N.Y. Feb. 22, 2006) (citing *Jocks v. Tavernier,* 316 F.3d

128, 138 (2d Cir.2007)). A fair trial claim can also arise where police or prosecutors

"withhold evidence that is 'material' to a criminal defendant's guilt or punishment."

*McCaffrey,* 2013 WL 494025, at *10 (citing *Brady v. Maryland,* 373 U.S. 83, 87

(1963)). "A plaintiff need not have proceeded to a full trial on the merits in order to

have an actionable section 1983 claim based on the denial of a fair trial." *Marom v. City*

*of New York*, No. 15-CV-2017, 2016 WL 916424, at *9 (S.D.N.Y. Mar. 7, 2016) (citing

*Ricciuti*, 124 F.3d at 127). To the extent plaintiff has raised allegations sounding in the

violation of his right to a fair trial, the court will address each defendant in turn.

### A.    P.O. Ernes Merdanovic

Plaintiff alleges that defendant P.O. Merdanovic "knew or should have known"

that defendant Wilson Jr. was lying about the events that occurred on November 15th,

but nevertheless "wrongfully filed the felony complaint which was later used as the

accusatory instrument brought up against plaintiff." (Compl. at ¶ 35). However,

plaintiff fails to plausibly allege what false information defendant Wilson Jr. provided

to defendant P.O. Merdanovic that was ultimately put in his report, much less facts

reasonably asserting how defendant P.O. Merdanovic should have known that said

information was false. A claim asserting deprivation of a right to a fair trial cannot

survive based only on broad and conclusory allegations that the officers created false

narratives. *Marom*, 2016 WL 916424, at *9 (citing *Abdul-Rahman v. City of New York*,

10-CV-2778, 2012 WL 1077762, at *12 (E.D.N.Y. Mar. 30, 2012) ). To this end,

cursory pleadings are not sufficient to plausibly allege a claim for denial of the to a fair

trial. *See, e.g., Hutchins v. Solomon*, No. 16-CV-10029, 2018 WL 4757970, at *16 (S.D.N.Y. Sept. 29, 2018) ("Conclusory statements that officers fabricated evidence do not suffice to state a claim for the denial of a fair trial."); *Longo v. Ortiz*, No. 15-CV-7716, 2016 WL 5376212, at *6 (S.D.N.Y. Sept. 26, 2016) (holding that the plaintiff failed to state denial of fair trial claim where he alleged "he was denied the right to a fair trial . . . when the defendants fabricated evidence, gave false testimony, and made false extrajudicial statements . . . to be used against [the plaintiff] at trial . . . ."); *Marom*, 2016 WL 916424, at *9 (explaining that plaintiff did not plausibly allege a deprivation of fair trial claim because he failed to assert how, in what way, or to what effect, the defendants specifically falsified information).

Plaintiff further alleges that body camera video footage recordings show defendant P.O. Merdanovic "maliciously whispering something to defendant Chris Gordon in an attempt to let the defendant know that his body camera was on and recording their conversation while [P.O. Merdanovic] continued to commit unprofessional police misconducts and acts . . . . Defendant [P.O. Merdanovic] is also captured telling [P.O.] Boyland[7] to write a report claiming to have found the gun, which the officer refused to do."  (*Id.* at ¶ 37).  Neither of these allegations plausibly amount to violations of constitutional proportion.  In particular, to the extent P.O. Merdanovic directed another officer to write a report (of a presumably false nature), plaintiff asserts that P.O. Boyland ultimately did not write said report.  Thus, he cannot satisfy the elements of a claim for the deprivation of the right to a fair trial.

---

[7] P.O. Boyland is not a named defendant in this action.

Plaintiff further alleges that defendant P.O. Merdanovic "lied in his report by asserting that [P.O.] Boyland saw the plaintiff throwing a bag even though video footage from the body worn cameras actually reveal that [P.O.] Boyland . . . never saw plaintiff in possession of the bag but rather . . . found a bag laying on the ground which the officer assumes that the plaintiff abandoned during the pursuit."  (Compl. at ¶ 38). Mindful of the requirement to liberally construe pro se pleadings, *see, e.g., Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008), the court recommends that plaintiff's fair trial claim against defendant P.O. Merdanovic concerning the false report indicating that plaintiff was observed throwing a bag survive sua sponte review and require a response. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

Plaintiff further asserts that defendant P.O. Merdanovic "wrongfully tamper[ed] with the firearm recovered on November 15th[,]" to the extent he apparently attempted to "unjam," or otherwise render safe, the firearm upon taking it into custody.  (*Id.* at ¶¶ 40, 44).  Nothing in these allegations against this defendant gives rise to a claim of constitutional proportion, or suggests misconduct on the part of P.O. Merdanovic.

### B.    P.O. Kyle Harrington

Plaintiff alleges that defendant P.O. Harrington "knew or should have known" that defendant Santina Rivera lied in her report concerning the events surrounding plaintiff's arrest.  (Compl. at ¶ 39).  Plaintiff further alleges that defendant P.O. Harrington "wrongfully tamper[ed] with the firearm recovered on November 15th, to the extent he apparently removed the firearm from defendant P.O. Baldini's vehicle, took

photographs of the firearm, and then attempted to "unjam" the firearm.  (*Id.* at ¶¶ 40, 44).  For the reasons previously set forth, plaintiff does not plausibly state a fair trial claim based on his conclusory allegation that defendant P.O. Harrington "knew or should have known" that defendant Santina Rivera was lying.  Nor do plaintiff's contentions surrounding P.O. Harrington's "tampering" with the firearm plausibly state a claim.

Plaintiff further alleges that defendant P.O. Harrington provided "testimony that was wrongfully used to indict the defendant" at his grand jury proceedings, as well as "perjury testimony" at a suppression hearing.  (Compl. at ¶ 42).  Specifically, plaintiff alleges that defendant P.O. Harrington falsely testified that "he could actually see what the plaintiff was wearing when the plaintiff was walking to his home" on the night of November 15th based on information that was provided to him and because of the photographs captured from the Wendy's surveillance cameras.  (*Id.*).  Plaintiff asserts that this was perjury because "neither the photograph nor the report that was relayed to [defendant P.O. Harrington] mentioned the facts which the defendant asserted[.]"  (*Id.*).  Mindful of the requirement to liberally construe pro se pleadings, *see, e.g., Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008), the court recommends that plaintiff's fair trial claim against defendant P.O. Harrington concerning his perjured testimony at the suppression hearing survive sua sponte review and require a response.  In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

### C.    P.O. John Baldini

Plaintiff alleges that defendant P.O. Baldini "wrongfully allowed [defendant P.O. Harrington] to remove the firearm from his vehicle and then allowed for [defendant P.O. Harrington] to first take photographs of the firearm and then . . . attempt[ ] to 'unjam' the firearm[.]" (Compl. at ¶ 44).  Plaintiff alleges that defendant P.O. Harrington then "pass[ed] the firearm to [defendant P.O. Merdanovic who] was also unsuccessful in unjamming the firearm." (*Id.*).  Plaintiff alleges that defendant P.O. Baldini was then "finally able to regain re-control of the firearm and thus the police report field by [defendant P.O. Baldini] must be deemed as forgery."  (*Id.*).  For the reasons previously set forth, Plaintiff's allegations surrounding the handling of the firearm do not plausibly state a claim under § 1983.

### D.    Sgt. Snell

Plaintiff alleges that defendant Sgt. Snell "wrongfully [went] into the storage locker area designated by the Cicero Police Department inorder [sic] to allegedly 'unjam' the firearm before then reporting that [defendant P.O. Harrington] . . . properly stored the firearm into the evidence store unit section of the police locker room." (Compl. at ¶ 45). For the reasons previously set forth, Plaintiff's allegations surrounding the handling of the firearm do not plausibly state a claim under § 1983.

### E.    Sgt. Thomas Leo

Plaintiff alleges that defendant Sgt. Leo "wrongfully allowed for the Cicero Police Officers (and the herein named defendants) to commit unprofessional actions in violation of the rules and regulations setforth [sic] by the Superintendent of the New

York State Police and subsequently allowed for the officer to forge reports which he endorsed." (Compl. at ¶ 46). Plaintiff alleges that these reports were the "essential accusatory instrument used in wrongfully prosecuting plaintiff[.]" (*Id.*).

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). "[D]irect participation as a basis of liability in this context requires intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (internal quotation marks omitted).

Courts in this circuit routinely hold that "the doctrine of respondeat superior cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement. Therefore, a [supervisory] official may not be found liable for a constitutional violation merely because of the acts of those under his control." *Kinch v. Artuz*, 97-CV-2419, 1997 WL 576038, at *2 (S.D.N.Y. Sept. 15, 1997) (citing *Colon v. Coughlin*, 58 F.3d 865, 874 (2d Cir. 1995); *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)). Thus, supervisory officials may not be held liable for their subordinates' constitutional violations merely because they are in a position of authority. *See Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996); *see also Colon*, 58 F.3d at 874 (holding that

21

the fact that the defendant occupied a high-ranking position in the New York prison hierarchy, without more, was insufficient to establish personal involvement).

In *Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020), the Second Circuit concluded that "there is no special rule for supervisory liability," and held that a "plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, had violated the Constitution.' " *Tangreti*, 983 F.3d at 618. The Second Circuit explained that, " 'the factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue' because the elements of different constitutional violations vary. The violation must be established against the supervisory official directly." *Id*. (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)).

Here, to the extent plaintiff seeks to impose liability on Sgt. Leo by virtue of his supervisory role alone, such a claim cannot withstand review.  To the extent plaintiff asserts that Sgt. Leo was personally involved in violating his constitutional rights, the allegations as plead do not meet the minimal pleading requirements of Federal Rule of Civil Procedure 8. The purpose of Rule 8 is to give adequate notice regarding the nature of the claim being asserted so that the defendant can prepare an adequate defense. *Powell v. Marine Midland Bank*, 162 F.R.D. 15, 16 (N.D.N.Y. 1995). The allegations here do not provide that notice, to the extent that plaintiff has not alleged what forged and/or false reports, authored by whom, defendant Sgt. Leo is alleged to have "endorsed."  Nor is it clear in what way defendant Sgt. Leo "endorsed" the forged reports, i.e. if this consisted of conduct, acts, or omissions beyond his general

supervisory role.  Accordingly, plaintiff's claims against Sgt. Leo should be dismissed for failure to state a claim.

## V.    Defense Counsel Susan Carey

Plaintiff may not proceed with a § 1983 action against defendant attorney Susan Carey. The law is well established that attorneys, whether privately-retained or court-appointed, do not act under color of state law when they perform traditional functions of counsel. *Polk County v. Dodson*, 454 U.S. 312, 325 (1981) ("[A] public defender does not act under color of state law when performing a lawyer's traditional functions as counsel to a defendant in a criminal proceeding."); *D'Amato v. Rattoballi*, 83 F. App'x 359, 360 (2d Cir. 2003) ("The district court properly concluded that [the plaintiff's] section 1983 claims against [the defendant] should be dismissed on the ground that [the defendant], a privately retained attorney, was not acting under the color of state law." (citing *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998))); *McCloud v. Jackson,* 4 F. App'x 7, 9-10 (2d Cir. 2001) ("To the extent that [the defense attorney] may have served as privately-retained counsel, rather than as a court-appointed attorney, he still could not be held liable under § 1983 because there was no showing that he worked with state officials to deprive [plaintiff] of federal rights."); *Harrison v. New York*, No. 14-CV-1296, 2015 WL 1413359, at *24 (E.D.N.Y. Mar. 20, 2015) ("[I]t is well-settled that private attorneys and law firms . . . do not act under color of state law." (citing cases)); *Shorter v. Rice*, No. 12-CV-0111, 2012 WL 1340088, at *4 (E.D.N.Y. Apr. 10, 2012) (holding that neither "public defenders . . . nor court-appointed counsel, nor private attorneys, act under the color of state law merely by virtue of their position").

Because plaintiff alleges that defendant Carey was his defense attorney, he fails to state a claim under § 1983.

Liberally construed, plaintiff also appears to be attempting to commence a state law claim for legal malpractice against defendant Carey. As previously set forth, the district court may exercise supplemental jurisdiction over plaintiff's legal malpractice claim, to the extent it accepts my recommendation that some of plaintiff's federal claims survive initial review. "The elements of a claim of legal malpractice under New York law are: (1) an attorney-client relationship at the time of the alleged malpractice; (2) attorney negligence; (3) proximate causation and (4) actual damage to the client." *Bryant v. Silverman*, 284 F. Supp. 3d 458, 470 (S.D.N.Y. 2018) (citing *Kirk v. Heppt*, 532 F. Supp. 2d 586, 591 (S.D.N.Y. 2008); *see also O'Callaghan v. Brunelle*, 84 A.D.3d 581, 582 (1st Dep't 2011); *Parola, Gross & Marino, P.C. v. Susskind*, 43 A.D.3d 1020, 1022 (2d Dep't 2007). An attorney is negligent if he or she fails to exercise that degree of care, skill and diligence commonly possessed and exercised by ordinary members of the legal community. *Rudolf v. Shayne, Dachs, Stanisci, Corker & Sauer*, 8 N.Y.3d 438, 442 (2007). Mindful of the requirement to liberally construe pro se pleadings, *see, e.g., Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008), the court recommends that plaintiff's New York State legal malpractice claim against defendant Carey survive sua sponte review and require a response. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

24

## VI.  <u>D.A. William Fitzpatrick</u>

Plaintiff has alleged various § 1983 claims against defendant William Fitzpatrick, the District Attorney of Onondaga County.  The only meaningful reference to defendant D.A. Fitzpatrick in the complaint is plaintiff's allegation that "employees working under the jurisdiction of Defendant William Fitzpatrick wrongfully allowed for" various errors to be made during plaintiff's criminal proceedings (*see* Compl. at ¶ 47).  To the extent plaintiff asserts liability against this defendant in his supervisory capacity, and in the absence of factual allegations sufficient to plausibly allege that defendant D.A. Fitzpatrick was personally involved in any conduct that violated plaintiff's constitutional rights, the complaint fails to state a claim against this defendant. *See O'Dell v. Bill*, No. 13-CV-1275, 2015 WL 710544, at *4 (N.D.N.Y. Feb. 18, 2015) ("[S]upervisory officials may not be held liable merely because they held positions of authority.").

Moreover, even if plaintiff had plausibly alleged that defendant D.A. Fitzpatrick was personally involved in plaintiff's criminal prosecution, it is well-settled that "[p]rosecutors sued under § 1983 enjoy absolute immunity 'from claims for damages arising out of prosecutorial duties that are intimately associated with the judicial phase of the criminal process.' " *Joyner v. Cty. of Cayuga*, No. 5:20-CV-1904088 (MAD/TWD), 2020 WL 1904088, at *9 (N.D.N.Y. Apr. 17, 2020) (quoting, *inter alia*, *Doe v. Phillips*, 81 F.3d 1204, 1209 (2d Cir. 1996) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976))). Prosecutorial immunity from § 1983 liability is broadly defined, covering "virtually all acts, regardless of motivation, associated with [the prosecutor's]

function as an advocate." *Hill v. City of New York*, 45 F.3d 653, 661 (2d Cir. 1995) (quoting *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994)). This includes "the decision to bring charges against a defendant, presenting evidence to a grand jury, and the evaluation of evidence prior to trial." *Moye v. City of New York*, No. 11 Civ. 316, 2012 WL 2569085, at *5 (S.D.N.Y. July 3, 2012) (quoting *Johnson v. City of New York*, No. 00 CIV 3626, 2000 WL 1335865, at *2 (S.D.N.Y. Sept. 15, 2000)). Immunity even extends to "the falsification of evidence and the coercion of witnesses," *Taylor v. Kavanagh*, 640 F.2d 450, 452 (2d Cir. 1981) (citing *Lee v. Willins*, 617 F.2d 320, 321-22 (2d Cir. 1980)), "the knowing use of perjured testimony," "the deliberate withholding of exculpatory information," *Imbler*, 424 U.S. at 431 n.34, the "making [of] false or defamatory statements in judicial proceedings," *Burns v. Reed*, 500 U.S. 478, 490 (1991), and "conspiring to present false evidence at a criminal trial," *Dory*, 25 F.3d at 83.

Accordingly, the district court should dismiss plaintiff's claims against defendant D.A. Fitzpatrick.

## VII.  <u>Tamara Danner</u>

Plaintiff's allegations do not plausibly state a cause of action against defendant Danner, to the extent she certified that the firearm was "operable."  (Compl. at ¶ 56). Plaintiff's own opinion that the firearm was not "operable" because it was "jammed" does not suffice to establish that defendant Danner falsified evidence pertaining to his criminal prosecution, or that her opinion to the contrary could not be reasonably supported.  *See, e.g., People v. Yarborough*, 158 A.D.3d 430, 431 (1st Dep't 2018)

("The evidence also supports the conclusion that the pistol was operable, notwithstanding that it had jammed").  Plaintiff otherwise provides no allegations, other than his own suppositions, that defendant Danner's representation was false and/or "forgery."

## VIII.  **Michael Wright**

Plaintiff fails to state a cause of action against defendant parole revocation specialist Michael Wright.  As previously set forth, plaintiff's Fourteenth Amendment due process claims concerning the evidence and conduct at his parole revocation hearing are barred by *Heck*.  Thus, because plaintiff's contentions that defendant Wright "wrongfully asked question to his witness in a manner that a competent person . . . would deem as of leading witness inorder [sic] to get a guilty favorable outcome, and . . . attempted to prevent the plaintiff from raising adequate points and bringing forth sufficient evidence" imply the invalidity of his parole revocation determination, his claims against defendant Wright are barred and must be dismissed. (Compl. at ¶ 80) *See Robinson v. Wright*, No. 5:21-CV-1098, 2023 WL 6122882, at *2 (N.D.N.Y. Sept. 19, 2023).

## IX.  **Injunctive and Declaratory Relief**

In addition to monetary relief, plaintiff seeks declaratory and injunctive relief pertaining to issues surrounding the continuing criminal prosecution against him in state court.  (Compl. at ¶¶ 86-88, 91, 92).  Plaintiff also asks this court to "render an injunction" directing defendant D.A. Fitzpatrick to commence a criminal investigation of the individuals "wrongfully slandering his character." (*Id.* at ¶ 89).  Last, plaintiff

seeks an injunction directing a criminal investigation of the conditions of confinement "of the plaintiff in the special housing unit." (*Id.* at ¶ 90).

In *Younger v. Harris*, 401 U.S. 37, 45 (1971), the Supreme Court endorsed "a strong federal policy against federal-court interference with pending state judicial proceedings absent extraordinary circumstances." *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 431 (1982). "[B]efore invoking *Younger*[,] a federal court may [also] appropriately consider . . . [w]hether there is (1) an ongoing state judicial proceeding that (2) implicates important state interests and (3) provides an adequate opportunity to raise federal challenges." *Cavanaugh v. Geballe*, 28 F.4th 428, 432 (2d Cir. 2022) (alterations, citation, and internal quotation marks omitted). "The *Younger* doctrine is as applicable to suits for declaratory relief as it is to those for injunctive relief; the Supreme Court held in a companion case to *Younger* that *Younger*'s policy would 'be frustrated as much by a declaratory judgment as it would be by an injunction.' " *Kirschner v. Klemons*, 225 F.3d 227, 235 (2d Cir. 2000) (quoting Samuels v. Mackell, 401 U.S. 66, 73 (1971)).  Here, insofar as plaintiff seeks the aforementioned declaratory and/or injunctive relief, the court abstains from intervening in the ongoing state criminal prosecution pursuant to *Younger. See, e.g.*, *Player v. Sini*, No. 21-CV-5613, 2021 WL 5084172, at *2 (E.D.N.Y. Nov. 1, 2021) (abstaining from adjudicating constitutional claims seeking injunctive relief regarding plaintiff's pending criminal case); *London v. Nassau County Dist. Attorney's Off.*, No. 20-CV-3988, 2020 WL 7699644, at *9 (E.D.N.Y. Dec. 28, 2020) (same).

Furthermore, this court does not have the authority to commence its own investigation, commence a criminal prosecution, compel a law enforcement agency to investigate suspected criminal activity, nor compel a prosecutor to prosecute. Prosecutors possess discretionary authority to bring criminal actions, and they are "immune for control or interference by citizen or court." *Conn. Action Now, Inc. v. Roberts Plating Co.*, 457 F.2d 81, 87 (2d Cir. 1972). Further, plaintiff does not have standing to compel any law enforcement agency to investigate or prosecute any suspected criminal acts as there is no private right of action to enforce state or federal criminal statutes. *See generally Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) ("[A] private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."); *see also Walker v. CIBC Ltd.*, 1:20-CV-1337 (TJM/CFH), 2021 WL 3518439 (N.D.N.Y. Apr. 13, 2021) ("It appears plaintiff is either seeking the criminal prosecution of an individual or individuals or a law enforcement investigation, which is beyond this Court's jurisdiction."); *McFadden v. Ortiz*, 5:12-CV-1244 (MAD/ATB), 2013 WL 1789593 (N.D.N.Y. Apr. 26, 2013).

## X.    **Other Claims**

On November 6, 2024, almost a month after plaintiff filed his complaint, plaintiff filed a letter with the court submitting approximately forty pages of "supportive legal documentation" for annexation in connection to this case.  (*See* Dkt. No. 9).  In his letter, plaintiff complains, generally, of the conditions of confinement at the Onondaga County Justice Center ("OCJC"), where he is currently being detained.  (*See id.*). Plaintiff also indicates that he intends to file a future § 1983 lawsuit in connection with

these complaints. (*Id.* at 2). Plaintiff's letter does not identify any named defendants nor otherwise conform to the pleading requirements of a complaint. Moreover, the exhibits attached to plaintiff's most recent submission have no relevance to the allegations raised in plaintiff's complaint. Accordingly, and in light of plaintiff's representation, the court does not construe plaintiff's letter as a request to supplement his complaint in *this* action with any claims in connection with his confinement at OCJC. To this end, plaintiff's request to annex the forty pages of exhibits attached to his most recent submission to the complaint in this action should be denied. (*See* Dkt. No. 9-1).

To the extent plaintiff seeks "for criminal charges to be prosecuted" against unnamed deputies at the OCJC in his most recent letter, (*see* Dkt. No. 9 at 3), the district court should deny this request for the reasons stated above.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that plaintiff's motion to proceed IFP (Dkt. No. 2) is **GRANTED**,[8] and it is further

**RECOMMENDED**, that the following claims **SURVIVE** *sua sponte* review: Plaintiff's (1) Fourteenth Amendment denial of the right to a fair trial claim against defendant P.O. Merdanovic relative to his allegedly false report that another officer observed plaintiff "throwing a bag," (2) Fourteenth Amendment denial of the right to a

---

[8] The court notes that although plaintiff's IFP application has been granted, plaintiff will still be required to pay fees that he may incur in the future regarding this action, including but not limited to copying and/or witness fees.

fair trial claim against defendant P.O. Harrington relative to the alleged false testimony he provided at the (a) grand jury proceedings on January 11, 2024, and (b) suppression hearing on June 28, 2024, and (3) legal malpractice claim under New York State law against defendant Susan Carey; and it is further

**RECOMMENDED,** that the following claims be **DISMISSED with prejudice:**[9] Plaintiff's (1) Eighth Amendment claims for cruel and unusual punishment, (2) § 1983 claim against defendant D.A. William Fitzpatrick based on his prosecutorial immunity, and (3) claims for injunctive and/or declaratory relief; and it is further

**RECOMMENDED,** that all remaining claims be **DISMISSED without prejudice**[10] pursuant to 28 U.S.C. § 1915(e)(2)(B) for failure to state a claim upon which relief may be granted; and it is further

**RECOMMENDED,** that plaintiff's request to attach the forty pages of exhibits at Dkt. No. 9-1 to the complaint in this action (Dkt. No. 1) be **DENIED**, and it is further

---

[9] Generally, when a district court dismisses a pro se action sua sponte, the plaintiff will be allowed to amend his action. *See Gomez v. USAA Fed. Savings Bank*, 171 F.3d 794, 796 (2d Cir. 1999). However, an opportunity to amend is not required where the defects in the plaintiff's claims are substantive rather than merely formal, such that any amendment would be futile. *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Pucci v. Brown*, 423 Fed. App'x 77, 78 (2d Cir. 2011).

[10] Should Plaintiff seek to pursue any of the claims dismissed without prejudice, he must file an amended complaint. Any amended complaint, which shall supersede and replace the original Complaint in its entirety, must allege claims of misconduct or wrongdoing against each named defendant which Plaintiff has a legal right to pursue, and over which jurisdiction may properly be exercised. Any amended complaint filed by Plaintiff must also comply with the pleading requirements of Rules 8 and 10 of the Federal Rules of Civil Procedure.

**ORDERED, that plaintiff must <u>wait until the District Court rules on this Order and Report-Recommendation before he files any proposed amended complaint</u>**, and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Order and Report-Recommendation on plaintiff by regular mail.[11]

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993)(citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated:  November 12, 2024

Mitchell J. Katz
U.S. Magistrate Judge

---

[11] The Clerk shall also provide plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

2015 WL 1534416
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Gerald T. GERRARD, Plaintiff,

v.

John BURNS; Jefferson County Sheriff Department;
and Jefferson County, New York, Defendants.

No. 7:14–CV–1235.
|
Signed April 6, 2015.

**Attorneys and Law Firms**

Gerald T. Gerrard, Black River, NY, pro se.

Jefferson County Attorney, Jefferson County Office Building,
David J. Paulsen, Esq., of Counsel, Watertown, NY, for
Defendants.

***MEMORANDUM–DECISION and ORDER***

DAVID N. HURD, District Judge.

**I. *INTRODUCTION***
 **\*1** Plaintiff Gerald T. Gerrard ("plaintiff" or "Gerrard")
brings a complaint against defendants John Burns ("Sheriff
Burns"), Jefferson County Sheriff Department ("the Sheriff's
Department"), and Jefferson County, New York asserting
claims for defamation, respondeat superior, and breach of the
right to privacy under New York Civil Rights Law section 50–
a. Plaintiff seeks $25 million in compensatory damages.

Defendants move to dismiss the complaint for lack of subject
matter jurisdiction under Federal Rule of Civil Procedure
("Rule ___") 12(b)(1). [1] No opposition was filed by plaintiff
despite requesting and being granted an extension of time in
which to respond.

[1]     Although the motion is made solely under Rule
        12(b)(1) and defendants argue lack of subject
        matter jurisdiction, they also argue the allegations
        are insufficient to state claims for defamation,
        respondeat superior, and violation of New York
        Civil Rights Law section 50–a. Accordingly, it is

fair to say the motion is also made under Rule 12(b)
(6) for failure to state a claim.

The motion was taken on its submissions and without oral
argument.

**II. *BACKGROUND***
The following facts, taken from the complaint, are assumed
true for purposes of the motions to dismiss. *See Chambers v.
Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir.2002).

Gerrard was employed by the Sheriff's Department from 1977
through 1992. Throughout his tenure, he was never subject
to any disciplinary action. In February 1991, derogatory
comments were made regarding plaintiff's sexuality. [2] When
he demanded that a written apology be placed in his personnel
file, the offending party refused to comply, but verbally
stated he or she was sorry. Following this incident, Gerrard
became the subject of ridicule and the target of the Sheriff's
Department and its employees.

[2]     Plaintiff also alleges that in 1989, an employee
        of the Sheriff's Department attempted to break
        into employee personnel records and subsequently
        resigned from her position. It is unclear how this
        relates to the derogatory comments made about
        plaintiff in 1991.

In September 1991, plaintiff injured his knee while working.
He underwent surgery and took over a year off from work.
The Sheriff's Department's policy at the time guaranteed an
employment position for injured workers for up to one year
after the date of an injury. Based on the policy, Gerrard was
not allowed to return to work after he was cleared by his
physicians. Despite the policy, other injured workers in the
preceding and following years who were forced to miss over
a year of work were allowed to return to employment at the
Sheriff's Department.

In the twenty-one years following his departure from the
Sheriff's Department, plaintiff repeatedly tried to return to a
position in the law enforcement field. When Gerrard applied
for a position as a driver for a tree-cutting service, an Under
Sheriff at the Sheriff's Department advised the potential
employer that plaintiff "was skizoid, had [his] gun taken
away, could deal with the public, and refused to return to
work." [3] Compl. ¶ 20. Despite his efforts, Gerrard was unable
to find work and suffered severe financial loss. He eventually
began looking for lower paying positions outside of the

field of law enforcement and returned to school to pursue a paralegal degree. He continued having problems finding employment.

3    Asserting that plaintiff "could deal with the public" is possibly a typo; presumably the Under Sheriff advised that plaintiff "could *not* deal with the public."

In October 2013, plaintiff considered applying for a security job at a National Aeronautics and Space Administration site. He suspected that someone at the Sheriff's Department was sabotaging his efforts to obtain employment, so he hired an individual to investigate how he was being portrayed by the defendants to potential employers. As a result of this investigation, Gerrard learned he was being portrayed as a mentally disturbed individual who was not a suitable employee.

### III. *DISCUSSION*

**\*2** As noted, Gerrard has not filed any opposition to defendants' motion. Pursuant to Local Rule 7.1(b)(3), "[w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement ... the non-moving party's failure to file or serve any papers ... shall be deemed as consent to the granting ... of the motion ... unless good cause be shown." Here, defendants' motion to dismiss is properly filed, plaintiff has failed to oppose it (despite being granted an extension of time to do so), and plaintiff has failed to show good cause. Therefore, it must be determined whether defendants have met their "burden to demonstrate entitlement" to dismissal. An inquiry into whether a movant has met its "burden to demonstrate entitlement" to dismissal under Local Rule 7.1(b)(3) is a more limited endeavor than a review of a contested motion to dismiss. *See e.g., Herring v. Tabor,* No. 9:12–CV–1739, 2014 WL 2946545, at \*5 (N.D.N.Y. June 30, 2014) (noting that where a defendant's motion to dismiss is unopposed, the "burden of persuasion is lightened such that, in order to succeed, the motion need only be 'facially meritorious.' ").

### A. *Rule 12(b)(1)*

A district court properly dismisses a case for lack of subject matter jurisdiction where it "lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000). Subject matter jurisdiction may be based on either a federal question or the

complete diversity of citizenship of the parties. 28 U.S.C. §§ 1331, 1332; *Perpetual Sec., Inc. v. Tang,* 290 F.3d 132, 136 (2d Cir.2002). Federal question jurisdiction exists where the complaint "establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Greenberg v. Bear, Stearns & Co.,* 220 F.3d 22, 25 (2d Cir.2000) (internal quotations omitted). The plaintiff bears the burden to prove the existence of subject matter jurisdiction by a preponderance of the evidence. *Makarova,* 201 F.3d at 113.

### B. *Rule 12(b)(6)* [4]

4    Although they have not specifically moved under 12(b)(6), defendants do attack the sufficiency of plaintiff's allegations. Further, as explained in detail below, the claims asserted in the complaint are, on their face, state law claims. However, construed liberally, some allegations could be read as asserting constitutional violations, but those claims would fail for the reasons discussed below. Therefore, in the interest of thoroughness, the standard for failure to state a claim upon which relief may be granted is included here.

To survive a Rule 12(b)(6) motion to dismiss, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007). Although a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Rule 8(a)(2), more than mere conclusions are required. Indeed, "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft v. Iqbal,* 556 U.S. 662, 679 (2009).

Dismissal is appropriate only where a plaintiff has failed to provide some basis for the allegations that support the elements of his claims. *See Twombly,* 550 U.S. at 570 (requiring "only enough facts to state a claim to relief that is plausible on its face"). When considering a motion to dismiss, the complaint is to be construed liberally, all factual allegations are to be deemed true, and all reasonable inferences must be drawn in the plaintiff's favor. *Chambers,* 282 F.3d at 152.

### C. *Pro Se Plaintiff*

**\*3** Submissions by pro se litigants are held to "less stringent standards than formal pleadings drafted by lawyers," *Ferran*

2015 WL 1534416

*v. Town of Nassau,* 11 F.3d 21, 22 (2d Cir.1993) (internal quotations omitted), and their pleadings are to be liberally construed "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999). The obligation to be lenient while reading a pro se plaintiff's pleadings "applies with particular force when the plaintiff's civil rights are at issue." *Jackson v. N.Y.S. Dep't of Labor,* 709 F.Supp.2d 218, 224 (S.D .N.Y.2010) (citing *McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004)). Nonetheless, pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law." *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (internal quotations omitted)); *see also Zapolski v. Fed. Republic of Germany,* 425 F. App'x 5, 6 (2d Cir.2011) (summary order) (pro se plaintiffs must plead sufficient facts to establish a plausible claim to relief and establish subject matter jurisdiction).

### D. Application

In his complaint, Gerrard does not invoke § 1331 or § 1332. [5] Nor does he identify any specific federal substantive law that defendants allegedly violated or that provides an independent cause of action. He instead asserts these claims: defamation against Sheriff Burns (Count I); respondeat superior against Jefferson County and the Sheriff's Department (Count II); respondeat superior against Jefferson County (Count III); and breach of the right to privacy under New York Civil Rights Law section 50–a against Sheriff Burns, Jefferson County, and the Sheriff's Department (Count IV).

[5]    Subject matter jurisdiction cannot be based on § 1332 as all parties are undisputably residents of New York.

### 1. Defamation (Count I)

"Generally, defamation is an issue of state, not of federal constitutional, law." *Vega v. Lantz,* 596 F.3d 77, 81 (2d Cir.2010). Under limited circumstances, a constitutional violation may be found when the defamation is committed by a government official. *Id.* A defamation claim can be brought as a civil rights violation pursuant to 42 U.S.C. § 1983 when a plaintiff can demonstrate "a stigmatizing statement plus a deprivation of a tangible interest." [6] *Id.* (quoting *Algarin v. Town of Wallkill,* 421 F.3d 137, 138 (2d Cir.2005)). To establish a "stigma plus" claim, a plaintiff must show: (1) "the utterance of a statement sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false," and (2) "a material state-

imposed burden or state-imposed alteration of the plaintiff's status or rights." *Sadallah v. City of Utica,* 383 F.3d 34, 38 (2d Cir.2004) (internal quotations omitted). The "state-imposed burden" or "alteration" of the plaintiff's status or rights must be in addition to the stigmatizing statement. *Id.* The Second Circuit has cautioned against conflating the "deleterious effects" of the defamation itself with the "additional state-imposed burden"-the "plus" "necessary for invoking the 'stigma plus' doctrine." *Id.* at 38–39.

[6]    Although no where in the complaint has plaintiff pleaded a claim pursuant to § 1983, or a "stigma plus" claim, such a claim will be considered as plaintiff has asserted a defamation claim against Sheriff Burns, a government official. As Gerrard is proceeding pro se, his pleadings must be liberally construed to raise the strongest arguments that they suggest.

*4 Here, although plaintiff plausibly alleges the "stigma" piece of his claim-that the Sheriff's Department and/or Burns' publication of false and defamatory statements to prospective employers prevented him from obtaining employment-he fails to allege the "plus." As plaintiff alleges he did not return to work due to an injury and the Sheriff's Department's policy regarding absences longer than a year, he cannot argue a plus stemming from the loss of government employment. *See Smith v. Town of Stony Point,* No. 13 CV 5000, 2014 WL 2217900, at *4 (S.D.N.Y. May 22, 2014) (citing *Siegert v. Gilley,* 500 U.S. 226, 234 (1991) (finding no liberty interest was implicated when alleged government defamation occurred subsequent to plaintiff's voluntary resignation from government employment); *Sadallah,* 383 F.3d at 38–39 (damage to reputation and resulting economic harm were direct "deleterious effects" of alleged defamation, and did not "satisfy the separate and independent 'plus' prong of the 'stigma plus' test")). Nor can plaintiff establish a "plus" based on his inability to continue to work in the field of law enforcement, as this is a direct consequence of the defamation itself. *See Smith,* 2014 WL 2217900, at *4.

Accordingly, plaintiff cannot state a federal constitutional law claim based on the alleged defamatory statements. Defamation is generally a state law claim, and to the extent Gerrard's assertions could be liberally read to allege a stigma plus claim, he fails to allege the plus. Therefore, *Count 1* cannot give rise to subject matter jurisdiction.

### 2. Respondeat Superior (Counts II and III)

2015 WL 1534416

Municipalities may be liable for common law torts committed by their employees under the doctrine of respondeat superior. *See e.g., L.B. v. Town of Chester,* 232 F.Supp.2d 227, 239 (S.D.N.Y.2002). *Count II* alleges respondeat superior liability on the part of the Sheriff's Department and Jefferson County for Sheriff Burns' alleged defamatory statements. As plaintiff's defamation claim is solely a state claim, *Count II* alleging liability for defamatory statements cannot confer subject matter jurisdiction.

Count III, although titled "Respondeat Superior," could be liberally construed to allege a negligent supervision or failure to train claim against Jefferson County. Under *Monell v. Department of Social Services,* 436 U.S. 658 (1978), a municipality may be liable for constitutional violations if caused by: (1) a municipal policy; (2) a municipal custom or practice; or (3) the decision of a municipal policymaker. *See Pearce v. Labella,* 971 F.Supp.2d 255, 267 (N.D.N.Y.2013) (citing *Monell,* 436 U.S. at 694).

Plaintiff's conclusory allegations that Jefferson County "is responsible for hiring, supervising, and training agencies such as Defendant Sheriff's Department," "Defendant County has a duty to ensure its agencies act competently and ethically," and "Defendant County breached its duty to competently supervise the direction of Defendant Sheriff's Department and its employees," Compl. p. 5., allege no facts. Further, there is no underlying constitutional violation alleged for which it could be established that a Jefferson County custom or policy caused said violation. *See Monell,* 436 U.S. at 694. Accordingly, *Count III* cannot give rise to subject matter jurisdiction.

**3. *Section 50–a* (Count IV)**
**\*5** Plaintiff alleges his privacy was breached under New York Civil Rights Law section 50–a. Section 50–a provides:

> All personnel records used to evaluate performance toward continued employment or promotion, under the control of any police agency or department of the state or any political subdivision thereof ... shall be considered confidential and not subject to inspection or review without the express written consent of such

police officer ... except as may be mandated by lawful court order.

N.Y. Civ. Rights Law § 50–a. Alone, this alleged violation of a state statute cannot sustain subject matter jurisdiction in federal court. Liberally construed, plaintiff could be alleging a procedural due process violation based on the state statute. To prevail on such a claim, Gerrard "must show he possessed a protected liberty or property interest in the privacy of his personnel file and was deprived of that interest without due process.[7] *Smith,* 2014 WL 2217900, at \*2 (citing *McMenemy v. City of Rochester,* 241 F.3d 279, 285–86 (2d Cir.2001)). He cannot do so however, as "New York courts have repeatedly upheld disclosures of the contents of police personnel files ... in furtherance of the police departments' official functions." *Id.* Just as in *Smith,* defendants here are alleged to have disclosed information from plaintiff's personnel file in furtherance of their official functions (responding to employment inquiries). 2014 WL 2217900, at \*2 (finding no procedural due process violation in substantially similar factual context). Section 50–a affords plaintiff no right to privacy in his personnel file under these circumstances, and therefore he cannot claim that defendants' disclosure of his personnel file deprived him of a property interest in violation of the Constitution.

[7]   It is not entirely clear the connection between the alleged defamatory statements made to prospective employers and the contents of Gerrard's personnel file.

Accordingly, *Count IV* does not allege a violation of federal substantive law that would confer subject matter jurisdiction upon the undersigned.

**E. *Amendment***
In its current form, the complaint fails to assert any basis for subject matter jurisdiction, and even construed liberally, it also fails to state a claim upon which relief could be granted. Under such circumstances, a pro se litigant such as plaintiff would normally be granted an opportunity to amend his complaint. *Thompson v. Carter,* 284 F.3d 411, 416 (2d Cir.2002). However, such measures are not warranted here because, as explained above, any amendment would be futile. *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (dismissal is appropriate where leave to amend would be futile). In light of the above discussion, it is clear that plaintiff's complaint

2015 WL 1534416

cannot proceed as drafted and any amendment would be futile.

## IV. *CONCLUSION*

Gerrard asserts only state law claims over which subject matter jurisdiction is lacking. Even construing his allegations liberally, he cannot make out any federal claims. Because any amendment would be futile, leave to do so is not required. For these reasons, defendants' motion to dismiss plaintiff's complaint will be granted.

**\*6** Therefore, it is

ORDERED that

1. Defendants' motion to dismiss the complaint pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction is GRANTED;

2. Plaintiff's complaint is DISMISSED in its entirety; and

3. The Clerk is directed to serve a copy of this Memorandum–Decision and Order on the parties in accordance with the Local Rules, file a judgment accordingly, and close the file.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1534416

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

803 Fed.Appx. 448
This case was not selected for
publication in West's Federal Reporter.
RULINGS BY SUMMARY ORDER DO NOT HAVE
PRECEDENTIAL EFFECT. CITATION TO A
SUMMARY ORDER FILED ON OR AFTER JANUARY
1, 2007, IS PERMITTED AND IS GOVERNED BY
FEDERAL RULE OF APPELLATE PROCEDURE 32.1
AND THIS COURT'S LOCAL RULE 32.1.1. WHEN
CITING A SUMMARY ORDER IN A DOCUMENT
FILED WITH THIS COURT, A PARTY MUST
CITE EITHER THE FEDERAL APPENDIX OR AN
ELECTRONIC DATABASE (WITH THE NOTATION
"SUMMARY ORDER"). A PARTY CITING A
SUMMARY ORDER MUST SERVE A COPY OF IT ON
ANY PARTY NOT REPRESENTED BY COUNSEL.
United States Court of Appeals, Second Circuit.

Michael KNOPF and Norma
Knopf, Plaintiffs-Appellants,
v.
Frank M. ESPOSITO, Dorsey & Whitney LLP,
Nathaniel H. Akerman, Edward S. Feldman, and
Michael H. Sanford, Defendants-Appellees. *

*    The Clerk of Court is directed to amend the caption
as above.

Nos. 17-4151, 18-668 (L), 18-2193 (Con)
|
February 25, 2020

**Synopsis**
**Background:** Former lenders brought action against former
borrower and his attorneys, alleging conspiracy in violation
of § 1983 to deprive lenders of their constitutional right to due
process in an underlying state court proceeding. The United
States District Court for the Southern District of New York,
Denise L. Cote, Senior District Judge, granted borrower's and
attorneys' motions to dismiss for failure to state a claim, 2017
WL 6210851, and partially granted attorneys' motions for fees
and sanctions in part, 2018 WL 1226023, but later reducing
and vacating in part that award, 2018 WL 3579104.

**Holdings:** The Court of Appeals held that:

[1] the District Court impermissibly drew inferences in favor
of borrower and attorneys;

[2] lenders alleged harm, as required to state claim;

[3] statements allegedly made by attorney's wife were
improper ex parte communications;

[4] lenders' claim was not barred by collateral estoppel;

[5] attorney's wife was a state actor;

[6] lenders had viable equitable interest in condominium; and

[7] lenders were not entitled to supplement record on appeal.

Vacated and remanded.

**Procedural Posture(s):** On Appeal; Motion to Supplement
the Record; Motion to Dismiss for Failure to State a Claim;
Motion for Attorney's Fees.

West Headnotes (7)

**[1]    Civil Rights    Particular Causes of Action**

District court impermissibly drew inferences
in favor of borrower and his attorneys, who
were moving to dismiss for failure to state a
claim lenders' § 1983 conspiracy action for due
process violation, arising out of one attorney
asking wife, a state court's appellate division
employee, to opine that division's orders had
net effect of eliminating restraints on borrower's
ability to sell disputed property; court concluded
that conspiracy allegations were implausible,
disregarding allegations in complaint and
crediting alternative narrative advanced by
borrower and attorneys, and complaint contained
allegations regarding actions that were specific
as to timing and substance. U.S. Const. Amend.
14; 42 U.S.C.A. § 1983.

1 Case that cites this headnote

**[2]    Conspiracy    Due process**

Lenders alleged harm from losing rightful
collateral and priority claim on proceeds from

sale of condominium, as required to state claim for § 1983 conspiracy to violate due process rights against borrower and attorney, despite district court's conclusion that harm resulted from state appellate division's orders declining to enjoin sale of condominium, rather than borrower's alleged scheme to have wife of one attorney opine on net effect of appellate division's orders to allow sale to proceed; lenders alleged that prospective buyer refused to close on sale while any judicial restraints remained, and that opinion given by wife, as appellate division employee, ultimately assuaged buyer's concerns and allowed sale to go forward. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

1 Case that cites this headnote

[3]  **Conspiracy** 👈 Due process

Statements allegedly made by wife of borrower's attorney regarding matter pending in state appellate division, which employed wife, were improper ex parte communications, and thus lenders' claim for § 1983 conspiracy to violate due process rights against borrower and attorneys was not precluded, despite contention that statements concerned only procedural question of underlying dispute rather than merits; state investigation confirmed that telephone call was ex parte conversation on pending matter, and that wife's statements were, at the very least, hybrid of substantive legal advice and procedural information. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

1 Case that cites this headnote

[4]  **Res Judicata** 👈 Sales of real property; vendor and purchaser

No court actually and necessarily decided whether borrower's and attorneys' agreement and phone call with one attorney's wife, a state appellate division employee, denied lenders due process in violation of § 1983, and thus lenders' claim was not barred by collateral estoppel; claim derived from harm done by borrower's alleged scheme to have wife opine on net effect of appellate division's orders to

allow condominium sale to proceed, not from subsequent appellate division order. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

[5]  **Conspiracy** 👈 Particular rights or privileges; particular deprivations

State appellate division employee, who was wife of borrower's attorney, was a state actor, as required for lenders to state § 1983 conspiracy claim for violation of due process rights against borrower and attorneys, arising out of alleged scheme to have wife opine on net effect of appellate division's orders to allow condominium sale to proceed, despite contention that wife lacked decisionmaking authority and that her actions were unauthorized. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

6 Cases that cite this headnote

[6]  **Conspiracy** 👈 Due process

Lenders had viable equitable interest in condominium, as required to state claim for § 1983 conspiracy to violate due process rights against borrower and attorneys, arising out of alleged scheme to have an attorney's wife, a state appellate division employee, opine on net effect of appellate division's orders to allow condominium sale to proceed; by time wife made statements, lenders had won summary judgment on breach of contract claims against borrower in state court, and lenders' constructive trust claims were pending. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

1 Case that cites this headnote

[7]  **Federal Courts** 👈 Amendment, correction, or supplementation

Plaintiffs were not entitled to supplement record on appeal in § 1983 action for due process violation, where materials they wished to submit were not omitted by error or accident, as plaintiffs conceded that materials were newly discovered, and extraordinary circumstances did not warrant consideration of new evidence. U.S.

Const. Amend. 14; 42 U.S.C.A. § 1983; Fed. R. App. P. 10(e)(2)(C).

**\*450** Appeal from a judgment and post-judgment orders of the United States District Court for the Southern District of New York (Cote, *J.*).

UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the judgment and orders of the District Court are **VACATED,** the case is **REMANDED** for further proceedings, and the motions to supplement the record on appeal are **DENIED.**

**Attorneys and Law Firms**

FOR PLAINTIFFS-APPELLANTS: Eric W. Berry, Berry Law PLLC, New York, NY; Gary Greenberg, Esq., New York, NY.

FOR DEFENDANTS-APPELLEES FRANK M. ESPOSITO: Frank Michael Esposito, Esq, Esposito Partners, New York, NY.

DORSEY & WHITNEY LLP, NATHANIEL H. AKERMAN: Anthony P. Badaracco, Nathaniel H. Akerman, Richard Silberberg, Dorsey & Whitney LLP, New York, NY.

EDWARD STEVEN FELDMAN: Edward Steven Feldman, Esq., Feldman & Associates, PLLC, Englewood, NJ.

MICHAEL HAYDEN SANFORD: Michael Hayden Sanford, pro se, Montauk, NY.

PRESENT: RALPH K. WINTER, SUSAN L. CARNEY, JOSEPH F. BIANCO, Circuit Judges.

### SUMMARY ORDER

Appellants Michael Knopf and Norma Knopf (the "Knopfs") appeal from a judgment of the United States District Court **\*451** for the Southern District of New York (Cote, *J.*) dismissing their 42 U.S.C. § 1983 conspiracy claim for failure to state a claim and the court's post-judgment orders granting attorney's fees and sanctions to some of the defendants. The Knopfs also move in this Court, in two separate motions, to supplement the record on appeal.

As alleged in their complaint, in 2006, the Knopfs made loans totaling several million dollars to Michael Hayden Sanford ("Sanford") and his company, Pursuit Holdings, LLC ("Pursuit"), to enable Sanford to purchase several pieces of real property in New York City (the "Properties")—including, as relevant here, a penthouse condominium (the "PHC")—through Pursuit. In connection with the loans, Pursuit and Sanford signed a contract agreeing to execute mortgages in the Knopfs' names on the Properties, and promising not to sell the Properties without the Knopfs' consent.

Sanford and Pursuit never executed those mortgages, however, nor did they repay the loans. Accordingly, in 2009, the Knopfs sued Sanford and Pursuit in the New York State Supreme Court for breach of contract. In 2013, that court denied the Knopfs' motion for summary judgment. In 2014, however, the New York Appellate Division reversed and directed entry of summary judgment for the Knopfs with respect to their breach of contract claim. Because the trial court had not yet assessed the amount of the Knopfs' damages, the Appellate Division did not enter a final judgment.

Meanwhile, in the trial court, the Knopfs made multiple attempts to prevent Sanford from selling the PHC and to secure the proceeds of any sale for payment of Sanford's debt to them. The state trial courts declined to grant the Knopfs the stays they sought, and the Knopfs pursued two separate appeals of those denials. Both of these were pending in the Appellate Division in 2015 when, in conjunction with those appeals, the Appellate Division ordered that any proceeds from the sale of the PHC be placed in escrow (the "October 2015 Order"). It further denied the Knopfs' application for a preliminary injunction barring any sale of the PHC (the "November 2015 Order") and denied Sanford's cross-motion seeking to vacate the October 2015 Order (the "December 2015 Order").

On February 1, 2016, Sanford and Pursuit sold the PHC. The Knopfs allege that they learned of the sale several weeks later, on February 24. On the Knopfs' motion, the Appellate Division ordered on February 25 that the sale proceeds be placed into escrow and prohibited Sanford from selling others of the Properties. But by then, Sanford had disposed of the bulk of the proceeds from the PHC's sale. In June 2016, the Appellate Division denied the Knopfs' motion to hold Sanford in contempt for violating court orders, explaining in an order that the October 2015 escrow requirement had

been vacated by the November 2015 Order (the "June 2016 Order").

In August 2017, the Knopfs filed suit in federal court, alleging that Sanford, working with several attorneys and a law firm in the state court proceeding, conspired in violation of 42 U.S.C. § 1983 to deprive the Knopfs of their constitutional right to due process. In sum, in this suit the Knopfs alleged as follows: At some point in late 2015 or early 2016, Sanford hired Frank Esposito (an attorney) knowing that Esposito was married to Melissa Ringel, an attorney employed by the Appellate Division to provide services to that court. On Sanford's behalf, Esposito discussed with Ringel the series of orders issued by the Appellate Division with regard to the PHC. As a result of these discussions, **\*452** Ringel agreed to opine to the lawyers adverse to the Knopfs in their dispute with Sanford and Pursuit that the net effect of the three Appellate Division orders was to eliminate any restraints on Sanford's sale of the PHC or on the proceeds of any such sale. Esposito relayed Ringel's agreement to Sanford, who then directed two of his other lawyers—Nathaniel Akerman (of the law firm Dorsey & Whitney LLP) and Edward Steven Feldman—to call the Appellate Division and request "clarification" about the orders' effect. App'x 131. Akerman and Feldman did so, and spoke with Ringel by phone in January 2016. Ringel opined as agreed, advising Sanford's attorneys that any restraints that the Appellate Division may have earlier placed on the sale of the PHC or its proceeds were removed. Sanford then used Akerman's and Feldman's summary of that call to convince a potential buyer to proceed with the sale of the PHC. Needless to say, the Knopfs and their attorneys did not know of the call and were not present for it.

An investigation by the New York State Unified Court System Office of Court Administration ("OCA") began in July 2017 and was completed in March 2018. The Appellate Division determined that certain of the factual findings would be relevant to the District Court, and so the Appellate Division provided the District Court with copy of its report (the "OCA Report") in April 2018. *See* OCA Report, *Knopf v. Esposito*, 17-cv-5833 (Apr. 24, 2018), ECF No. 129-2. The OCA Report revealed that Akerman and Feldman called Ringel's direct line at the Appellate Division, despite the fact that her phone number was not available on the court's website. They accepted her opinion as an authoritative clarification, notwithstanding that she was a mediation attorney, not an attorney in the Clerk's Office, and that the Knopfs and their attorneys were not present.

We assume the parties' familiarity with the underlying facts, the procedural history of the case, and the issues on appeal, to which we refer only as necessary to explain our decision to vacate and remand the District Court's judgment dismissing the Knopfs' complaint. We also deny as unnecessary the Knopfs' motions to supplement the record.

## I. Dismissal Order

We review de novo a district court's dismissal of a complaint for failure to state a claim. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), and "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). On a motion to dismiss, the district court is bound to construe the complaint liberally, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Chambers*, 282 F.3d at 152. Further, "[a] court ruling on such a motion may not properly dismiss a complaint that states a plausible version of the events merely because the court finds a different version more plausible." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) (finding antitrust conspiracy claim plausible where complaint specifically alleged, *inter alia*, that several of the defendants met and communicated with each other in a short period of time immediately before conduct causing alleged harm).

To state a claim for § 1983 conspiracy, a plaintiff must allege "(1) an agreement between a state actor and a private party; (2) **\*453** to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 324-25 (2d Cir. 2002). A complaint that contains "only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights," or "diffuse and expansive allegations," is properly dismissed; to be viable, a complaint must allege "specific instances of misconduct." *Id.* at 325 (internal quotation marks omitted). Further, "a plaintiff alleging a § 1983 conspiracy claim must prove an actual violation of constitutional rights." *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995). As relevant here, constitutional guarantees of procedural due process generally require "that a deprivation of life, liberty, or property be preceded by notice and opportunity for [a] hearing appropriate to the nature of

the case." *Chase Grp. All. LLC v. City of N.Y. Dep't of Fin.*, 620 F.3d 146, 150 (2d Cir. 2010) (internal quotation marks omitted).

On this appeal, we review the District Court's December 2017 order granting defendants' motion to dismiss, which the District Court published *before* the OCA Report described above issued. The District Court's order explained that: (1) it found the conspiracy allegations to be conclusory and implausible, and (2) it identified the cause of the Knopfs' alleged harm as the Appellate Division's June 2016 Order (which would not be actionable under § 1983), and not the January 2016 phone interaction with Ringel (which would). This reasoning was erroneous.

 [1] *First*, in concluding that the Knopfs' conspiracy allegations were implausible, the District Court impermissibly drew inferences in favor of defendants: The complaint did not allege that Akerman and Feldman spoke with Ringel as the result of a random or coincidental transfer, as the District Court mistakenly inferred. *Knopf v. Esposito*, No. 17-cv-5833, 2017 WL 6210851, at *7 (S.D.N.Y. Dec. 17, 2017). Rather, it alleged that Akerman and Feldman "requested somebody by 'position' " and were then transferred to Ringel. App'x 131-32. Further, that the call made by Akerman and Feldman, seeking "clarification," was transferred to and handled by Ringel—a mediation attorney whose role did not involve giving procedural (or substantive) advice on pending appeals, and who had no apparent connection to the case except for her marriage to one of Sanford's lawyers—at least made it plausible that Akerman and Feldman had knowingly and specifically sought to speak to her, with the expectation that she would advise as she did, as the complaint alleged. On a motion to dismiss, district courts may not simply disregard allegations in the complaint and credit instead an alternative narrative advanced by defendants. *See Chambers*, 282 F.3d at 152. The Knopfs' allegations were specific enough and, as was later borne out, all too plausible.

Moreover, the complaint here contained allegations regarding defendants' actions that were specific as to timing and substance. These included that: (1) Sanford hired Esposito shortly before the phone call, knowing that he was married to Ringel; (2) Esposito and Ringel spoke about the case prior to the phone call, and Esposito told Sanford what Ringel would say about the court orders; (3) Sanford directed Akerman and Feldman to call the Appellate Division about those orders the next day, and the two lawyers did so; and (4) all of

those parties obtained a financial benefit immediately after the sale closed. *Cf. Ciambriello*, 292 F.3d at 325 (finding that conspiracy allegations were conclusory because there were no "details of time and place" (internal quotation marks omitted)). **\*454** Taken together and viewed as a whole, the complaint's allegations adequately stated a claim for conspiracy under the standards we have articulated. Indeed, in deciding the Knopfs' Rule 60(b) motion for reconsideration, with the benefit of the OCA Report and in light of phone records showing that Akerman and Feldman contacted Ringel on her direct line at the Appellate Division, the District Court acknowledged that "the existence of a conspiratorial agreement among at least some of the defendants" was "more plausible." App'x 2251-52.

 [2] *Second*, the District Court erred when it concluded that the harm the Knopfs complained of—that is, losing their rightful collateral and a priority claim on the sale's proceeds—resulted from the Appellate Division's orders declining to enjoin the sale of the PHC, and not the January 2016 phone call in which Ringel advised the lawyers that the orders were no longer in effect. The Knopfs sufficiently alleged in the District Court that the sale of the PHC (and Sanford's subsequent disposal of the assets from that sale) would not have occurred absent the January 2016 phone call because they also plausibly alleged that the prospective buyer refused to close on the sale while any judicial restraints remained. The opinion that Ringel gave on the January phone call was what ultimately assuaged the buyer's concerns and allowed the sale to go forward, according to the Knopfs. The Knopfs also alleged that Sanford's attorneys initiated the call to Ringel for the express purpose of dissuading the buyer's attorney from filing a motion for clarification. Thus, contrary to the District Court's conclusion, the complaint plausibly alleged that the Knopfs would not have been harmed had the phone call to Ringel not taken place. If the Knopfs had at least participated in the phone call, they would have been aware that Sanford and the buyer intended to act on Ringel's opinion, and they could have sought emergency relief in time to force the escrow of the sale proceeds. In any event, the Knopfs stated a colorable due process claim, even if Ringel's interpretation of the orders were correct, because "[t]he right to be heard does not depend upon an advance showing that one will surely prevail at the hearing." *See Fuentes v. Shevin*, 407 U.S. 67, 87, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972).

 [3] Defendants propose several alternative bases for upholding the District Court's dismissal of the Knopfs' action. None is persuasive. [2] They first argue that the January 2016

phone call did not violate the Knopfs' due process rights —or even constitute an improper ex parte communication —because it concerned only a procedural question, not the merits of the case. As the OCA Report confirms, however, that simply is not the case: The phone call *did* amount to an ex parte conversation on a matter pending in the Appellate Division, and Ringel's statements were, at the very least, a hybrid of substantive legal advice and procedural information. These statements were improper.

[2]    We note that, although certain of defendants are proceeding pro se, pro se attorneys are not entitled to the special solicitude that courts traditionally afford to pro se litigants. *See Tracy v. Freshwater*, 623 F.3d 90, 102 (2d Cir. 2010) ("[A] lawyer representing himself ordinarily receives no such solicitude at all."); *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 82 n.4 (2d Cir. 2001) (pro se attorneys typically cannot claim special consideration courts customarily grant pro se parties). Sanford is not an attorney; however, his brief simply reiterates, and at times copies verbatim without attribution, the arguments found in the other defendants' briefs.

[4]   Next, defendants urge that the Knopfs' claim is barred by collateral estoppel. **\*455** [3] But estoppel, or issue preclusion, applies only if "(1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first proceeding." *Vargas v. City of New York*, 377 F.3d 200, 205-06 (2d Cir. 2004) (internal quotation marks omitted). Thus, to the extent that defendants propose that the Appellate Division's June 2016 Order estops any further litigation of whether the October 2015 escrow requirement was in effect when the attorneys placed the January 2016 phone call, they miss the point. That issue does not affect the viability of the Knopfs' claims, which derive from the harm done by the January 2016 phone call, not the effects of any of the state court orders. Even if the Knopfs are collaterally estopped from litigating questions involving the escrow requirement— a question we do not decide—their § 1983 conspiracy claim is not barred. [4] No court has actually and necessarily decided the issues crucial to the Knopfs pursuing their conspiracy claim—namely, whether the agreement and phone call with a court attorney denied them due process.

[3]    Sanford additionally argues that res judicata bars relitigation of whether the October 2015 Order

was in effect at the time of the sale, because that question was already decided by the state courts. This argument sounds in collateral estoppel, not res judicata. *Compare Kaufman v. Eli Lilly & Co.*, 65 N.Y.2d 449, 455, 492 N.Y.S.2d 584, 482 N.E.2d 63 (1985) ("[C]ollateral estoppel precludes a party from relitigating an *issue* which has previously been decided against him...." (emphasis added) (internal quotation marks omitted)), *with Matter of Josey v. Goord*, 9 N.Y.3d 386, 389, 849 N.Y.S.2d 497, 880 N.E.2d 18 (2007) ("The doctrine of res judicata precludes a party from litigating a *claim* where a judgment on the merits exists from a prior action between the same parties involving the same subject matter...." (emphasis added) (internal quotation marks omitted)). In any event, he is wrong.

[4]    Furthermore, at least one state (trial) court has come to the opposite conclusion, ruling that the escrow order appeared to still be in effect when the phone call took place. *Knopf v. Sanford*, 65 Misc. 3d 463, 478-79, 489, 106 N.Y.S.3d 777 (2019). The Knopfs' arguments that collateral estoppel would not bar the relitigation of the meaning of the Appellate Division orders because they did not have a full and fair opportunity to contest that reasoning is at least arguably colorable and may in the end prevail.

[5]   Defendants next maintain that Ringel was not a state actor because she did not have decisionmaking authority and, in any event, her actions were unauthorized. Defendants' arguments are foreclosed by the Supreme Court's and our Court's case law. *See, e.g., West v. Atkins*, 487 U.S. 42, 49, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) (stating that a public official is a state actor where he is "clothed with the authority of state law" (internal quotation marks omitted)); *United States v. Temple*, 447 F.3d 130, 138 (2d Cir. 2006) ("One who abuses a position given to him or her by the government is said to act under color of law."); *United States v. Giordano*, 442 F.3d 30, 44 (2d Cir. 2006) (holding that a public official's use of official power that causes the deprivation of a constitutional right constitutes state action even if the official had personal reasons for acting as he did).

[6]   Defendants also urge that the Knopfs had no property interest in the PHC or in any proceeds from its sale when the January 2016 phone call was made because the Knopfs had not yet obtained final judgment or a damages award in

their state court breach of contract action. This proposition ignores the fact that the Knopfs had by then won summary judgment on their breach of contract claims against Sanford, and their constructive **\*456** trust claims were pending. The Knopfs therefore had a viable equitable interest in the PHC, as further evidenced by their subsequent success in obtaining restrictions on the sale of the PHC throughout the state court litigation. *See Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 428, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982) ("[A] cause of action is a species of property protected by the Fourteenth Amendment's Due Process Clause."); *cf. Luis v. United States,* —— U.S. ——, 136 S. Ct. 1083, 1093, 194 L.Ed.2d 256 (2016) (describing various contexts where persons with "future ... interest[s]" in a property can obtain restrictions on the property in the present).

Finally, defendants claim that the Knopfs had sufficient notice and an opportunity to be heard before they were deprived of any interest they had in the PHC or its proceeds. This claim falls far short of the mark. No one has disputed that the Knopfs had no notice of or opportunity to be heard during the January 2016 phone call. In fact, they allege that they did not learn of it until weeks after. The post-deprivation process then available to the Knopfs was undeniably insufficient to protect their interests. Indeed, by the time the Knopfs learned of the sale (and obtained another escrow order), most of the sale proceeds had been dissipated.

For these reasons, we vacate the District Court's dismissal of the Knopfs' complaint and remand the cause for further proceedings.

## II. Fees and Sanctions

In its second order following dismissal of the case, the District Court found the Knopfs and Eric W. Berry (the Knopfs' attorney) jointly and severally liable to Dorsey & Whitney LLP for fees under 42 U.S.C. § 1988 and sanctions under 28 U.S.C. § 1927. We review an order imposing attorney's fees under § 1988 for abuse of discretion. *See Chabad Lubavitch of Litchfield Cty., Inc. v. Litchfield Historic Dist. Comm'n,* 934 F.3d 238, 243 (2d Cir. 2019).

"As the decisions of this Court demonstrate, it is very rare that victorious defendants in civil rights cases will recover attorneys' fees." *Sista v. CDC Ixis N. Am., Inc.,* 445 F.3d 161, 178 (2d Cir. 2006). Thus, we have explained:

> A court should award defendants attorney's fees under section 1988 only if the plaintiff's claim was frivolous, unreasonable, or groundless, or the plaintiff continued to litigate after it clearly became so. Though a showing that the plaintiff acted in bad faith will further support an award under section 1988, the determination generally turns on whether the claim itself is clearly meritless.

*Rounseville v. Zahl,* 13 F.3d 625, 632 (2d Cir. 1994) (internal quotation marks, citations, and alterations omitted).

We similarly review an order imposing sanctions under 28 U.S.C. § 1927 for abuse of discretion. *See Gollomp v. Spitzer,* 568 F.3d 355, 368 (2d Cir. 2009). A court may sanction an attorney who "multiplies the proceedings in any case unreasonably and vexatiously." 28 U.S.C. § 1927. A sanctions award under § 1927 requires a showing that an "attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay," and "a finding of conduct constituting or akin to bad faith." *In re 60 E. 80th St. Equities, Inc.,* 218 F.3d 109, 115 (2d Cir. 2000) (internal quotation marks and citations omitted).

For the reasons discussed above, the Knopfs' complaint plausibly alleged a § 1983 claim. Thus, the District Court exceeded the permissible bounds of its discretion **\*457** in awarding fees to defendants under § 1988 because the complaint was not frivolous. *See Rounseville,* 13 F.3d at 632. Likewise, with respect to its award of sanctions under § 1927, it erred because Berry's action (in bringing the complaint) was not "completely without merit." *See In re 60 E. 80th St. Equities,* 218 F.3d at 115.

## III. Motions to Supplement the Record

Generally, on appeal we may consider only material that was part of the record below (*i.e.*, the documents and exhibits filed on the district court docket, any transcripts of proceedings, and a certified copy of the district court docket entries). *See* Fed. R. App. P. 10(a). Providing a small measure of flexibility, Rule 10(e)(2) of the Federal Rules of Appellate

Procedure provides that, "[i]f anything material to either party is omitted from or misstated in the record by error or accident, the omission or misstatement may be corrected and a supplemental record may be certified" by this Court. Fed. R. App. P. 10(e)(2)(C). A motion to supplement the record under Rule 10(e)(2) cannot, however, be used to introduce new evidence. *DiBella v. Hopkins*, 403 F.3d 102, 118 (2d Cir. 2005) (citing Fed. R. App. P. 28(j)).

 [7] We now deny the Knopfs' motions Rule 10(e) to supplement the record on appeal. The Knopfs have not established that the materials they wish to submit were omitted by error or accident (instead, they concede that

the materials are newly discovered) or that extraordinary circumstances warrant consideration of new evidence.

\* \* \*

We have considered all of the parties' remaining arguments and conclude that they are without merit. Accordingly, we **VACATE** the judgment and post-judgment orders of the district court, **REMAND** for further proceedings, and **DENY** the motions to supplement the record.

**All Citations**

803 Fed.Appx. 448

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2004 WL 2404224
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Damien VAZQUEZ, Plaintiff,
v.
Sean COMBS a/k/a P. Diddy, Bad Boy
Entertainment, Inc., The City of New
York and Gloria Frazier, Defendants.

No. 04 Civ.4189(GEL).
|
Oct. 22, 2004.

**Attorneys and Law Firms**

Robert K. Erlanger, New York, New York, for plaintiff
Damien Vazquez.

Jonathan D. Davis, New York, New York, for defendants Sean
Combs and Bad Boy Entertainment, Inc.

OPINION AND ORDER

LYNCH, J.

**\*1** Plaintiff Damien Vazquez claims that he was falsely
arrested and held against his will by New York City police
detective Gloria Frazier, allegedly acting at the direction
of defendants Sean Combs and his company, Bad Boy
Entertainment, Inc. ("Bad Boy"), with whom plaintiff claims
he had a previous employment relationship. Vazquez sued
Frazier and the City for violating his federal civil rights, and
Combs and Bad Boy for conspiracy to do so, also bringing a
number of state law claims against both the government and
private defendants. Combs and Bad Boy now move to the
dismiss the claims against them for failure to state a claim
on which relief can be granted and for lack of subject matter
jurisdiction. For the reasons that follow, the motion will be
granted.

BACKGROUND

The facts set forth in this section are drawn from the
Complaint, and must be accepted as true for purposes of a
motion to dismiss. Bad Boy is an entertainment production

and marketing company, of which Combs, also known as P.
Diddy, is Chairman and Chief Executive Officer. Vazquez
worked for Bad Boy from approximately January 2000 until
May 2002, and then again from January 2003 until shortly
after Christmas 2003. (Compl.¶¶ 12, 14, 18.)

In February 2002, a Bad Boy employee told Vazquez that he
could not longer work in Bad Boy's main offices and gave him
an envelope with several "contact sheets" with information
on other music industry figures to whom Vazquez could send
his resume.[1] (*Id.* ¶ 13.) Vazquez left the unopened envelope
in his car, where it remained until he was in a serious traffic
accident approximately one month later. A relative gathered
and boxed up Vazquez's personal effects from the vehicle after
the accident, and the box sat in Vazquez's parents' garage
for more than a year before being rediscovered by Vazquez
in late 2003. (*Id.* ¶¶ 13, 15.) When Vazquez finally opened
the envelope, he saw that the contact sheets included some
of Combs's personal information, and so Vazquez could send
Combs to return the contact sheets. By return email, Combs
asked for Vazquez's phone number, which Vazquez provided.
(*Id.* ¶ 15.)

[1]    Plaintiff does not explain the discrepancy between
the February conversation and his May departure
date from the company.

Several days after the email exchange, Vashta Dunlop, the
head of Human Resources at Bad Boy, asked Vazquez to
meet with her. (*Id.* ¶ 17.) At the meeting, Vazquez gave
Dunlop the contact sheets, and she questioned him for about
twenty minutes about how he had acquired.. them. (*Id.*) In late
January 2004, about a month after Vazquez's second period
at Bad Boy had ended, Vazquez heard from "sources" at Bad
Boy that Combs was missing one of his Grammy awards and
was spending "a good deal of money" on private investigators
to find it. (*Id.* ¶ 19.) Vazquez sent Combs an email stating
that, several years earlier, another Bad Boy employee had
told Vazquez that he had access to Combs's Grammy awards.
Combs replied that he was "not good at riddles," and asked
for the other employee's name, which Vazquez supplied by
return email. Combs thanked him, and that was apparently the
last time the two men communicated. (*Id.* ¶ 20.)

**\*2** On January 29, 2004, Vazquez received a call from a
person who identified herself only as "Frazier," inviting him
to come to 357 W. 35th Street in Manhattan the next day
for an interview. (*Id.* ¶ 22.) Although Vazquez believed that
Frazier was referring to a job interview, he claims that he

2004 WL 2404224

mentioned during the call that he was ill and a diabetic. (*Id.* ¶ 22.) Around 2:30 p.m. the next day, Vazquez arrived at the address provided by Frazier and was surprised to find himself at the New York Police Department's Midtown South Precinct. Vazquez nonetheless went into the precinct house and asked for Frazier; he was directed upstairs, where he met Frazier, and noticed an 8 ½ by 11″ photograph of Combs hanging near her desk. (*Id.* ¶¶ 23–25.) Frazier told Vazquez that she just wanted to speak with him for a couple of minutes, because she was trying to catch a three o'clock train and she knew he was ill. Vazquez again told Frazier that he was diabetic and "took a needle" (presumably a reference to his need for insulin shots). (*Id.* ¶ 24.)

Over the next several hours, Frazier questioned Vazquez in a number of locations in the precinct house about some alleged crank calls to a co-worker, about the contact sheets, and about Combs's missing Grammy award. (*Id.* ¶¶ 26, 28, 30.) During the questioning, Frazier called Bad Boy a number of times, "asking for guidance and advice" based on the answers Vazquez was giving. (*Id.* ¶ 29.) She asked for Vazquez's driver's license, cellphone and two-way pager, which Frazier later listed as "arrest evidence" on a property voucher, although Vazquez was never told he was under arrest and never advised of his rights or given Miranda warnings. (*Id.* ¶¶ 28, 33.) Vazquez asked Frazier if he needed a lawyer and she told him that he did not—an opinion she repeated to Vazquez's mother when she called later that afternoon. (*Id.* ¶¶ 27, 35.) Both Vazquez and his mother repeatedly told Frazier that Vazquez was ill and needed food to control his diabetes; Frazier ignored or downplayed these requests. (*Id.* ¶¶ 34–35.)

Vazquez was eventually placed in a holding cell at the precinct house and fell unconscious. (*Id.* ¶ 38.) He awoke in an ambulance, handcuffed to a stretcher; he was treated at St. Clare's Hospital with intravenous insulin and returned to the precinct house. (*Id.*) Upon his return, Vazquez was interrogated further about Combs's Grammy award by Frazier and several other detectives, then eventually fingerprinted and photographed, although he maintains he was never advised that he was under arrest. (*Id.* ¶¶ 40, 42.) Around eight in the morning of the following day, Frazier took Vazquez to Bellevue Hospital to receive his next dose of insulin; Vazquez was again handcuffed to the stretcher. (*Id.* ¶ 43.) Vazquez was arraigned approximately eighteen hours after the trip to Bellevue, and charged with aggravated harassment, petit larceny, and criminal possession of stolen property; Frazier also obtained restraining orders against Vazquez as to Combs.

(*Id.* ¶¶ 45–47.) All charges against Vazquez were dismissed on May 5, 2004. (*Id.* ¶ 48.)

## DISCUSSION

### I. *Standard on a Motion to Dismiss*

**\*3** On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must accept as true all well-pleaded factual allegations in the complaint and view them in the light most favorable to the plaintiff, drawing all reasonable inferences in his favor. *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996). The Court will not dismiss a complaint for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46 (1957). To be deemed adequate at the pleading stage, a complaint need not use particular words nor demonstrate that plaintiff will prevail on the merits, but need only provide "a short and plain statement of the claim showing that the pleader is entitled to relief." *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 512–13 (2002) (quoting Fed.R.Civ.P. 8(a)). However, "[w]hile the pleading standard is a liberal one, bald assertions and conclusions of law will not suffice." *Leeds,* 85 F.3d at 53; *see also De Jesus v. Sears, Roebuck & Co.,* 87 F.3d 65, 70 (2d Cir.1996) ("A complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6).") (internal quotation marks omitted.)

### II. *Conspiracy under 42 U.S.C. § 1983*

Plaintiff's sole claim against Combs and Bad Boy under federal law is the Second Claim for Relief: conspiracy to falsely arrest plaintiff, thereby denying him his federal civil rights. In addition to the factual allegations described above, plaintiff avers that "Combs, Bad Boy employees, and Frazier reached an agreement to have plaintiff arrested without probable cause on unrelated charges if he did not falsely confess to taking the Grammy" and that "Combs, Bad Bad [*sic* ] employees, and Frazier engaged in the wrongful, overt acts previously described in furtherance of their conspiracy to deny plaintiff his constitutional rights." (Compl.¶¶ 58–59.)

Notwithstanding the sarcasm and hyperbole in both parties' briefs on this motion, the legal rules are fairly straightforward. Section 1983 creates a federal cause of action for a person who has been deprived of any federal "right[ ], privilege[ ], or immunit[y]" by a person acting "under color of any statute,

2004 WL 2404224

ordinance, regulation, custom, or usage of any State." 42 U.S.C. § 1983; *see also West v. Atkins,* 487 U.S. 42, 48 (1988) ("To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."). Because a section 1983 action requires that the defendant act under color of state law, private persons, such as Combs and Bad Boy, can only be subject to section 1983 liability if they were "jointly engaged with state officials in the challenged action." *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998) (*quoting Dennis v. Sparks,* 449 U.S. 24, 27–28 (1980)). To adequately plead that the private parties were acting under color of state law, a plaintiff must make sufficient factual allegations that tend to show a conspiracy between the private party and the police to deny plaintiff a federal right. *Id.; Ciambriello v. County of Nassau,* 292 F.3d 307, 324 (2d Cir.2002) ("To state a claim against a private entity on a section 1983 conspiracy theory, the complaint must allege facts demonstrating that the private entity acted in concert with the state actor to commit an unconstitutional act.") (internal quotation marks omitted). However, generalized or conclusory allegations of joint actions or conspiracies are insufficient to sustain a section 1983 claim, and complaints that lack further factual specificity or "specific instances of misconduct" are subject to dismissal. *Id.; see also Ostrer v. Aronwald,* 567 F.2d 551, 553 (2d Cir.1977).

 **\*4** Vazquez's section 1983 conspiracy claim against Combs and Bad Boy fails because he does not adequately allege that Combs and Bad Boy conspired with Frazier or acted in concert with her to deprive Vazquez of his civil rights. Although the Complaint alleges that Combs and Bad Boy "reached an agreement" with Frazier to falsely arrest plaintiff, and that Combs and Bad Boy engaged in the "wrongful acts" described elsewhere in the Complaint, the Complaint fails to provide "supporting operative facts tending to show agreement and concerted action between the private party and the state actors." *Studfin v. New York City Police Dep't,* 728 F.Supp. 990, 993 (S.D.N.Y.1990). The Complaint contains no specific factual allegations that suggest any agreement or joint action between Frazier and the private defendants to violate Vazquez's rights.

Rather, the core of plaintiff's allegations against Combs and Bad Boy, read in the light most favorable to him, is that they falsely reported him to the police for harassing Combs and stealing his Grammy, and asked that Vazquez be investigated or questioned about these alleged crimes. But merely filing

a complaint with the police, reporting a crime, requesting criminal investigation of a person, or seeking a restraining order, even if the complaint or report is deliberately false, does not give rise to a claim against the complainant for a civil rights violation. *See Jones v. Maples/Trump,* 98 Civ. 7132(SHS), 2002 WL 287752, at \*5 (S.D.N.Y. Feb. 26, 2002) ("providing false information to an arresting officer is not, by itself, sufficient to state a claim against [a] private party under § 1983."); *see also Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 939 n. 21 (1982) (merely pursuing legal process against another private person does.not.. constitute a conspiracy or joint action with state officials so as to satisfy the 1983 requirement that the action be "under color of state law").

The other actions that plaintiff points to in his brief as suggesting a conspiracy or joint action are likewise insufficient. (P. Mem.3–5.) Actions taken by Bad Boy or Combs alone, without any involvement of the police and no effect on plaintiff's civil rights, such as Dunlop's questioning of Vazquez about the contact sheets or Combs's request that Vazquez supply the name of the co-worker whom he suspected of stealing Combs's Grammy award, do not permit or suggest the inference of any agreement to act in concert. The allegations involving discussions or interactions with Combs and other Bad Boy employees do not even mirror Vazquez's conversations or interactions with Frazier, so as to suggest some sort of coordination. (*Compare* Compl. ¶¶ 17, 20–21 *with* ¶¶ 26, 30–31.)

The only allegation in the Complaint that warrants even a moment's discussion is the claim that Frazier repeatedly called someone at Bad Boy seeking "guidance and advice" during Vazquez's interrogation. (*Id.* ¶ 29.) But even that allegation falls far short of evidencing a conspiracy or joint action. Other than the conclusory reference to "guidance and advice," Vazquez gives no hint, either in the Complaint, in his brief, or in the accompanying affidavit, of the content of these conversations. It is perfectly reasonable that an investigating officer would call a witness or complainant to verify information or ask further questions in the course of interrogating a suspect. Moreover, plaintiff does not even allege that any Bad Boy employee initiated these calls—he clearly states that they were initiated by Frazier. Answering the phone when it rings at a place of business, and then speaking with a police officer about a pending.. investigation of a criminal complaint made by that business, hardly tends to show that the person on the other end of the line was engaged in a conspiracy to violate the suspect's civil rights.

**\*5** Plaintiff's claim that his Complaint is sufficient because it follows "the guidelines of this Court's prior decision" in *Lucas v. Novogratz,* No. 01 Civ. 5445, 2002 WL 31844913 (S.D.N.Y. Dec. 18, 2002), is unavailing. (P. Mem.1, 3.) In *Lucas,* the plaintiff "presented supporting operative facts tending to show agreement and concerted action between the private party and the state actors" and "alleged particular concrete facts" to support an inference of a conspiracy. *Id.* at \*4–5 (internal quotation marks and alterations omitted). Indeed, the plaintiff in *Lucas* alleged six specific statements or acts of the defendants that, "if proved, might support an inference of joint action or agreement between [the private defendants] and [defendant police officer]." *Id.* at \*5.[2] In contrast, plaintiff here points to no relationship between the private defendants and Frazier, no statements made by the private defendants that they had special connections with the police or that they could use the police to pursue their private ends (through means other than simply reporting an alleged crime to the police, which does not constitute inappropriate use of law enforcement by a private party), no statements or acts by Frazier that indicate that she was doing anything other than investigating a complaint of possible criminal activity. Plaintiff's conclusory statements of his own opinion, such as "it became apparent that ... Frazier was now going to be Combs [*sic* ] personal detective to squeeze out of plaintiff the whereabouts of the missing Grammy," cannot correct these deficiencies in the factual allegations of the Complaint.[3]

[2] In particular, the plaintiff in *Lucas* alleged:
(a) Mr. Novogratz stated to Lucas on December 21, 1998, that he "had all his ducks in the water, and had a friend in the detective division at the First Precinct whom he was going to see"; (b) sometime in January 1999 defendant [police officer] Druin caused a clerk at the First Precinct to "abruptly terminate[ ] the taking" of a complaint from Lucas concerning the removal of equipment from the site; (c) Druin on a later occasion informed Lucas that "plaintiff would never have a complaint involving the Novogratzes accepted at his precinct, or at any other"; (d) Druin again intervened on or about January 27, 1999, when Lucas attempted to file a criminal complaint at the First Precinct relating to city permits that allegedly had been fraudulently obtained under plaintiff's name, allegedly telling Lucas "that he would not

allow any criminal complaints to be made that would implicate the Novogratzes"; (e) at the February 18, 1999, [Environmental Control Board] hearing (which apparently took place in the Seventeenth Precinct), Ms. Novogratz telephoned Druin to report that Lucas was in the courtroom, and, as a result of Druin's intervention, the hearing was adjourned; and (f) the following week, Druin sent Detective Matuzak to arrest Lucas while he was hospitalized in the St. Vincent's Hospital Coronary Care Unit, notwithstanding that detectives had earlier agreed to permit Lucas to surrender voluntarily at the precinct after his discharge from the hospital.
*Lucas,* 2002 WL 31844913, at \*4 (internal citations to complaint omitted).

[3] Although *Lucas* is distinguishable in any event, the Court takes due notice of the fact that the *Lucas* decision rested, in part, on the Court's responsibility to read *pro se* complaints liberally and give the benefit of the doubt to litigants who lack the assistance of counsel. No such presumption applies here, where Vazquez has been represented by an attorney at every stage of the litigation.

Finally, in both his Complaint and his brief, plaintiff repeatedly refers to Combs's celebrity status and to plaintiff's belief that the events described in the Complaint occurred because of Combs's celebrity. (*E.g.,* Compl. ¶ 25 (referring to a picture of Combs in the police station), ¶ 51 ("star-struck NYC police officers apply the law differently for celebrities"), P. Mem. 1 (the "notorious defendant Sean Combs" and the "abuse of [his] celebrity power).) That some police officers may be eager to assist celebrities or curry favor with them or their associates does not mean that when those celebrities seek the help of the police they are any more subject to liability for civil rights violations than an ordinary citizen would be. Whatever different treatment Vazquez claims Combs received from the police, neither plaintiff nor the private defendants here will receive any different treatment in this case than that accorded any. other civil litigant in this Court. Vazquez has failed to state a claim for a section 1983 conspiracy as to Combs or Bad Boy, and accordingly that claim will be dismissed. Vazquez's claims that Frazier undertook to violate his civil rights in hopes of pleasing a celebrity are properly directed at Frazier and the City, not at the private defendants.

Vazquez v. Combs, Not Reported in F.Supp.2d (2004)

2004 WL 2404224

### III. *The State Law Claims*

 **\*6**  The Complaint also asserts three causes of action against Combs and Bad Boy for alleged violations of state law: (i) the Fifth Claim: false arrest against both Combs and Bad Boy; (ii) the Eighth Claim: violations of New York Labor Law §§ 191, 198 against Bad Boy for failure to pay wages; and (iii) the Ninth Claim: a quantum meruit claim against Bad Boy for the reasonable value of the work performed by plaintiff. Pursuant to 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction over state law claims if it has dismissed those claims over which it has original jurisdiction. Because the sole federal claim against these defendants will be dismissed, and because, given the very early stage of this litigation, the factors of judicial economy, convenience, fairness, and comity all point toward declining jurisdiction, *see, e.g., Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7 (1988), the three state law claims will likewise be dismissed. *See also Arum v. Miller,* 304 F.Supp.2d 344, 348 (E.D.N.Y.2003) (dismissing state claims against defendants where federal claims against them have been dismissed, even though federal and state claims against other defendants survived).

### CONCLUSION

For all of the foregoing reasons, the claim against Combs and Bad Boy for conspiracy to violate 42 U.S.C. § 1983 (the Second Claim) is dismissed for failure to state a claim upon which relief can be granted. The dismissal is without prejudice to seek leave to replead, should discovery reveal facts that could justify such a claim. The remaining claims against Combs and Bad Boy (the Fifth, Eighth and Ninth Claims) are dismissed for lack of subject matter jurisdiction.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 2404224

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by John v. Lewis,   E.D.N.Y.,   March 31, 2017

2012 WL 1068023

Only the Westlaw citation is currently available.

NOT FOR PUBLICATION

United States District Court,

E.D. New York.

Christopher GORDON, Plaintiff,

v.

The CITY OF NEW YORK, New York City Police Officer Carlos Persalta, Shield # 30640, TD Bank, Elliot Lopez, Curtis Herbert, and Isaac Duncan, Defendants.

No. 10–CV–5148 (CBA)(LB).

|

March 29, 2012.

**Attorneys and Law Firms**

Christopher Gordon, Hasbrouck, NJ, pro se.

Ilan Goldbard, Max Oliver Mccann, NYC Law Department, Mary Theresa O'Flynn, Corporation Counsel of the City of New York, New York, NY, for Defendants.

**MEMORANDUM & ORDER**

AMON, Chief Judge.

**\*1**  Plaintiff Christopher Gordon ("Gordon"), *pro se,* has filed suit pursuant to 42 U.S.C. § 1983 and state law, alleging various violations of his constitutional rights—primarily false arrest and malicious prosecution arising out of his arrest and detention in November 2007 on suspicion that he attempted to cash stolen checks at a TD Bank branch. At the time of this first arrest, Gordon was not prosecuted, but he was later indicted and convicted of larceny and other crimes based on the events at TD Bank. Defendants City of New York and Officer Carlos Peralta now move to dismiss the claims against them pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Also before the Court is the Report and Recommendation (R & R) of the Honorable Lois Bloom, United States Magistrate Judge, recommending that the Court dismiss the claims against the other four defendants because the amended complaint did not properly allege that they acted under color of state law.

For the reasons stated below, the motion to dismiss filed by the City of New York and Officer Peralta is granted in part and denied in part. The Court also adopts the well-reasoned R & R of the Magistrate Judge, and the claims against the remaining four defendants are dismissed in full.

**I. BACKGROUND**

Gordon's factual narrative is at times difficult to follow, but the following facts appear to be alleged in the First Amended Complaint ("Compl."). On November 2, 2007, Gordon claims that he accompanied a co-worker, defendant Curtis Herbert, to a branch of Commerce Bank (since acquired by TD Bank, as it will be referred to in this Order) to withdraw payments for construction work that had been contracted to Herbert and informally sub-contracted to Gordon. (Compl.¶ 8.) It appears that some time earlier, Herbert had attempted to deposit checks allegedly signed by Isaac Duncan and drawn on Duncan's account at Chase Bank, but TD Bank placed the funds on hold due to a suspicion of misconduct. TD Bank then contacted Duncan, who claimed that the checks were stolen and his signature on them forged. (Compl. ¶¶ 33– 34; Pl. Opp., Ex. 4.) Accordingly, when Gordon and Herbert arrived at TD Bank to collect the funds, they were detained by bank staffers, who called 911 to report that the two men were attempting to cash forged checks. Defendant Officer Peralta responded to the call and arrested Gordon and Herbert on the scene. (Compl.¶¶ 8, 30.) Gordon was charged with Grand Larceny in the Second Degree, Identity Theft in the First Degree, and Forgery in the Second Degree. (Compl.¶ 8.) Gordon's complaint asserts that he was detained until November 4, 2007, when he was brought before a judge in the Kings County Criminal Court who promptly dismissed the case against Gordon for lack of evidence and released him. (Compl.¶ 9–10.) The complaint also states that upon his release, he was "without any further knowledge ... of a continuing criminal investigation" against him. (Compl.¶ 10.)

**\*2**  Gordon's Memorandum in Opposition to the Defendants' Motion to Dismiss tells a somewhat different story of the events of November 2–4, 2007. Gordon seems to claim that shortly after his arrest on November 2, the District Attorney's Office notified police that they were declining to prosecute Gordon for the events at TD Bank due to lack of evidence connecting him to the allegedly stolen checks. Gordon claims that the DA's Office instructed the police to release him, but that Officer Peralta nonetheless "unlawfully" and "extrajudicially" detained him for over 48

hours until November 4. [1] (*See* Pl. Opp. at ¶ 3, 9, 11.) Gordon simultaneously seems to maintain that he "was presented before the Kings County Criminal Court on November 4, 2007" and the case was dismissed at that time. (Pl.Opp.¶ 6.) In any event, Gordon's combined account indicates that on November 2–4, 2007, any charges stemming from the TD Bank events were dropped, he was not arraigned, and he was released by November 4 with no knowledge of any pending matters related to that incident. [2]

[1]    It appears that Gordon is making this new allegation in response to the "Declined Prosecution" form from the DA's Office, which the defendants submitted as an exhibit to their motion to dismiss. (*See* O'Flynn Aff., Ex. E.)

[2]    Gordon also alleges that the Assistant District Attorney, without his knowledge, presented the case to a grand jury on December 6, 2007, but the grand jury did not return an indictment, and the case was again dismissed and sealed. (Compl.¶¶ 11–12, 21.)

The prosecution against Herbert, however, continued. (Compl.¶ 58.) Gordon claims that Herbert later entered into an agreement with the DA's Office whereby he agreed to testify against Gordon in exchange for the charges against Herbert being dismissed. (Compl.¶ 58.) Accordingly, charges against Gordon were newly submitted to the grand jury in March 2008, and testimony was presented from Herbert, Officer Peralta, and representatives from TD Bank and Chase Bank. (Compl.¶ 13.) Gordon claims he was then indicted for the previously dismissed charge of Grand Larceny in the Second Degree, along with new charges of Grand Larceny in the Third Degree, Criminal Possession of a Forged Instrument, and Petit Larceny. (Compl.¶ 13.) Gordon was subsequently "re-arrested" on September 23, 2008 pursuant to this indictment. (Compl.¶ 21.)

Gordon's case proceeded to trial and on September 4, 2009, a jury convicted him of Grand Larceny in the Second Degree, Grand Larceny in the Third Degree, Petit Larceny, and two counts of Criminal Possession of a Forged Instrument. (*See* Compl., Ex. H; Pl. Opp., Ex. 1.; O'Flynn Decl., Ex. D.)

## II. DEFENDANTS CITY OF NEW YORK AND OFFICER PERALTA'S MOTION TO DISMISS

### A. Standard of Review

To withstand a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A complaint that contains only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555. Neither will a complaint that contains only "naked assertion[s]" without "further factual enhancement." *Id.* at 557.

Iqbal identifies a "two-pronged" approach to determining the sufficiency of a complaint. 129 S.Ct. at 1950. First, courts can "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* Second, they can then identify whether the complaint, stripped of its conclusory pleadings, "plausibly give[s] rise to an entitlement to relief." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* A court's consideration on a motion to dismiss is "limited to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Allen v. WestPoint–Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991). For example, "courts routinely take judicial notice of documents filed in other courts, ... not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." *Kramer v. Time Warner Inc.,* 937 F.2d 767, 774 (2d Cir.1991); *see Staehr v. Hartford Financial Servs. Group, Inc.,* 547 F.3d 406, 425 (2d Cir.2008).

**\*3** Where the plaintiff appears *pro se,* a court will construe his pleadings liberally and will interpret them "to raise the strongest arguments that they suggest." *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000). However, "[t]he duty to liberally construe a [*pro se* ] plaintiff's complaint is not the equivalent of a duty to rewrite it." *Kirk v. Heppt,* 532 F.Supp.2d 586, 590 (S.D.N.Y.2008) (internal quotation marks and alterations omitted); *see also Chavis v. Chappius,* 618 F.3d 162, 170 (2d Cir.2010) ("[T]hough we are obligated to draw the most favorable inferences that [a *pro se* ] complaint supports, we cannot invent factual allegations that he has not pled.")

## B. Discussion

As an initial matter, Gordon does not appear to dispute the proposition, asserted in the defendants' motion, that he can bring neither a false arrest nor a malicious prosecution claim based on his arrest on September 23, 2008, because that arrest directly resulted in a conviction. [3] *See Savino v. City of New York,* 331 F.3d 63, 72 (2d Cir.2003) (malicious prosecution claim requires that proceedings terminated in the plaintiff's favor); *Cameron v. Fogarty,* 806 F.2d 380, 387–89 (2d Cir.1986) (plaintiff cannot recover for false arrest or malicious prosecution if he was convicted of the crime for which he was arrested). Rather, the amended complaint states, and Gordon's opposition papers repeatedly emphasize, that he brings his false arrest and malicious prosecution claims based only on the November 2, 2007 arrest. (*See* Compl. ¶ 7; Pl Affirmation ¶ 3; Pl. Opp. ¶ 2, 3, 5, 9, 10, 12, 13, 16, 21.) Accordingly, it is only on this former arrest that the Court will focus its analysis, and any false arrest or malicious prosecution claims related to the September 23, 2008 arrest and prosecution are deemed withdrawn. To the extent Gordon's complaint implies that he is bringing other claims related to his trial and conviction, they are dealt with in Section II.B.4.d below.

[3]    While Gordon repeatedly refers to this as an "illegal conviction," (Compl.¶ 15), this assertion appears to be his own personal belief, and he never asserts that this conviction has been overturned or vacated on appeal, or that he has filed a habeas petition. Instead, he refers to it as his "current" conviction, and argues that it should have no bearing on his claims arising out of the November 2, 2007 arrest. (Pl.Opp.¶ 12.) Regardless, as discussed further *infra,* Gordon cannot bring a § 1983 claim that would necessarily imply the invalidity of a standing conviction for which he was serving his sentence when he filed this action. *See Heck v. Humphrey,* 512 U.S. 477, 486–87, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). Thus, any argument that the alleged invalidity of the conviction should lift the bar to challenging the arrest and prosecution that preceded it cannot lie.

### 1. Claims against the City of New York

The Court observes at the outset that Gordon's allegations against the City of New York fail to satisfy the requirements of *Monell v. New York City Dep't of Social Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In order to sustain a claim for relief under 42 U.S.C. § 1983 against a municipal defendant, a plaintiff must show the existence of an officially adopted policy or custom, and a direct causal connection between that policy or custom and the deprivation of a constitutional right. *Bd. of County Comm'rs v. Brown,* 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which can be attributed to a municipal policymaker." *City of Oklahoma v. Turtle,* 471 U.S. 808, 823–24, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). Stated differently, the plaintiff must demonstrate that the municipality was the "moving force" behind the alleged injury. *Brown,* 520 U.S. at 404.

**\*4** Gordon's complaint does not allege the existence of a municipal policy or custom at all. In his opposition memorandum, Gordon occasionally uses the phrase "common policy and practice," (*e.g.* Pl. Opp. ¶¶ 17, 19, 20.), but this allegation is unsupported by anything other than the facts of what occurred in his particular case. *See Ricciuti v. N.Y.C. Transit Authority,* 941 F.2d 119, 123 (2d Cir.1991) ("[A] single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy."); *Santiago v. Campisi,* 91 F.Supp.2d 665, 676 (S.D.N.Y.2000). Moreover, mere conclusory references to a policy or custom, with no supporting facts, will not suffice to state a claim of § 1983 municipal liability. *See Ricciuti,* 941 F.2d at 124 ("[O]ur prior cases suggest that an allegation of municipal policy or custom would be insufficient if wholly conclusory."); 5 Borough Pawn, LLC v. City of New York, 640 F.Supp.2d 268, 299 (S.D.N.Y.2009) (dismissing *Monell* claim because the plaintiffs' "assertion that the City has an unconstitutional policy is based on nothing more than their unsupported supposition"); *Brodeur v. City of New York,* 2002 WL 424688, at *6 (S.D.N.Y.2002).

Accordingly, since Gordon's complaint is devoid of factual support for his references to a municipal policy, the § 1983 claims against the City of New York are dismissed. The remaining § 1983 causes of action will be analyzed only as pertains to Officer Peralta.

### 2. False Arrest

Gordon has brought a claim for false arrest and false imprisonment, claiming that his November 2007 arrest was not supported by probable cause, and that he was unlawfully

detained by the police for two days. The defendants argue that Gordon's false arrest claim arising out of the events of November 2, 2007 is barred by his eventual conviction for those crimes.

A § 1983 claim for false arrest or false imprisonment, based on an individual's right to be free from unreasonable seizures, is substantially the same as a claim for false arrest under New York law. *Boyd v. City of New York,* 336 F.3d 72, 75 (2d Cir.2003). Such a claim requires the plaintiff to show (1) that the defendant intended to confine the plaintiff; (2) that the plaintiff was conscious of the confinement; (3) that the plaintiff did not consent to the confinement; and (4) that the confinement was not otherwise privileged. *Savino v. City of New York,* 331 F.3d 63, 75 (2d Cir.2003). The existence of probable cause to arrest renders an arrest privileged and "is a complete defense to an action for false arrest." *Bernard v. United States,* 25 F.3d 98, 102 (2d Cir.1994); *see Jaegly v. Couch,* 439 F.3d 149, 152 (2d Cir.2006) ("[T]he existence of probable cause is an absolute defense to a false arrest claim.").

As noted above, it has been repeatedly held in this circuit that in an action for false arrest, "the plaintiff can under no circumstances recover if he was convicted of the offense for which he was arrested," because the conviction is treated as conclusive evidence of probable cause to arrest. *Cameron,* 806 F.2d at 387; *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996) (conviction not reversed on appeal is conclusive evidence of probable cause to arrest); *Jones v. King,* 2011 WL 4484360, at *7 (S.D.N.Y.2011) ("Plaintiff's claim of false arrest is barred by the existence of probable cause for the arrest, which is established as a matter of law by his conviction."); *Kneitel v. Danchuk,* 2007 WL 4441224, at *5 (E.D.N.Y.2007) ("A prosecution and conviction, if not overturned, is conclusive evidence that an arrest was supported by the requisite probable cause.") The plaintiff need not be convicted of every crime for which he was arrested for this bar to apply; the existence of a valid conviction for any of the crimes underlying the arrest will foreclose a later false arrest claim. *Jones,* 2011 WL 4484360, at *7; *Ostroski v. Town of Southold,* 443 F.Supp.2d 325, 335 (E.D.N.Y.2006) (citing *Jaegly v. Couch,* 439 F.3d 149, 154 (2d Cir.2006)); *see DeVito v. Barrant,* 2005 WL 2033722, at *4 (E.D.N.Y.2005).

**\*5** The defendants argue that because Gordon's arrest on November 2, 2007 was based on the same charges for which he was eventually convicted, the above rule should still bar him from pursuing a false arrest claim, even though Gordon

was released at that time, and it was not until 2008 that Gordon was indicted and convicted. This argument raises the question of whether the *Cameron* rule only bars a false arrest claim based on the arrest that immediately preceded the conviction, or if it also forecloses a false arrest claim based on an earlier, unfruitful arrest arising out of the same conduct. The language and logic of *Cameron* would seem to apply to any claim for false arrest when the plaintiff is eventually convicted of an offense underlying that arrest, since *Cameron* expressly rejected the proposition that a "premature" arrest is actionable when it nonetheless produces a conviction:

> The fact of conviction means that the plaintiff was not entitled to escape arrest entirely and that the arrest was simply premature. Though the right to be free from arrest without probable cause is substantial, the injury caused solely by prematurity of arrest is, of itself, insubstantial.... [W]e conclude that the proper accommodation between the individual's interest in preventing unwarranted intrusions into his liberty and society's interest in encouraging the apprehension of criminals requires that § 1983 doctrine be deemed ... to incorporate the common-law principle that, where law enforcement officers have made an arrest, the resulting conviction is a defense to a § 1983 action asserting that the arrest was made without probable cause.

*Cameron,* 806 F.2d at 388–89. The Court concludes that, at least in the circumstances presented here, it would be difficult to draw a principled distinction between Gordon's two arrests wherein his conviction would prevent a false arrest claim based on the second arrest, but would allow a claim based on the first, even though the first arrest arose out of the same conduct. The Court thus finds, based on *Cameron* and its lineage, that Gordon's conviction bars his claim that he was arrested without probable cause at TD Bank on November 2, 2007.

This conclusion, however, does not end the inquiry. In Gordon's opposition papers, he now appears to be alleging

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 55 of 370
Gordon v. City of New York, Not Reported in F.Supp.2d (2012)
2012 WL 1068023

that shortly following his arrest, the DA's Office told Officer Peralta that they were not pursuing any charges against Gordon because of a lack of evidence connecting him to the stolen checks, and instructed that Gordon should be released from custody. Gordon claims that Officer Peralta nonetheless detained Gordon unjustifiably and without probable cause for over 48 hours until a judge released him on November 4. Gordon also contends that at that time, "there were no warrants to legally detain him." (Pl.Opp.¶ 3, 17.) Given a court's duty to liberally construe pro se pleadings, the Court believes it should view these new facts as amending the allegations of the complaint. See *Chavis v. Chappius,* 618 F.3d 162, 170 (2d Cir.2010); *Cusamano v. Sobek,* 604 F.Supp.2d 416, 461 (N.D.N.Y.2009).

**\*6** On their face, these allegations would appear to state a freestanding claim for false imprisonment that is separable from the initial arrest at TD Bank—that is, a claim that Officer Peralta kept Gordon in police custody, without probable cause, for some reason beyond the TD Bank charges. Furthermore, Gordon's allegations appear to state a claim for unreasonable detention, based his assertions that he was unreasonably held following a warrantless arrest for over 48 hours before being presented to a judge. See *County of Riverside v. McLaughlin,* 500 U.S. 44, 53, 56, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991) (following warrantless arrest, Fourth Amendment requires "prompt" judicial probable cause determination without "unreasonable delay"; over 48 hours presumptively unreasonable); *Bryant v. City of New York,* 404 F.3d 128, 136–39 (2d Cir.2005) (analyzing § 1983 claim based on "prolonged ... postarrest detention" under Fourth Amendment standards, and upholding dismissal because "the duration of plaintiffs' detentions did not come close to the presumptively unreasonable 48–hour mark"); *Wang v. Vahldieck,* 2012 WL 92423, at \*8 (E.D.N.Y.2012) (upholding § 1983 claim for unreasonable detention based on allegation that defendant "deliberately delayed processing of [plaintiff's] paperwork in order to maximize the length of her detention"); *Richardson v. Providence,* 2011 WL 3701887, at \*8 (E.D.N.Y.2011) (plaintiff's allegations that "defendants detained him capriciously and arbitrarily" following warrantless arrest stated claim for unreasonable detention under § 1983]; *Gonzalez v. Bratton,* 147 F.Supp.2d 180, 199–200 (S.D.N.Y.2001) (finding evidence presented at trial sufficient to support jury's verdict on § 1983 claim for unreasonable detention based on plaintiff's 27–hour detention following arrest).

Moreover, the defendants' Reply concedes that the DA's Office declined prosecution for lack of evidence on November 2, and that Gordon was nonetheless detained for some additional period of time. The defendants argue that Gordon "was not held pursuant to the charges dropped by the prosecution on November 2," but on some other outstanding warrant. (Def. Reply at 3.) In support of this assertion, the defendants have submitted a document from the New York Police Department's booking system dated November 2, 2007 (Gordon's "OLPA History"). Beyond urging the existence of this unspecified "outstanding warrant," the defendants do not offer any other arguments for why Gordon's claims related to this period of detention should be dismissed as a matter of law at this time. (Def. Reply at 3–4.)

The Court does not believe it is appropriate to consider the "OLPA History" document or the warrant it references on a motion to dismiss, since it is not a public filing from another court of which this Court may take judicial notice, but is rather more akin to a police report that is not properly considered at this stage. See *Crews v. County of Nassau,* 2007 WL 4591325, at \*6 (E.D.N.Y.2007) (declining to take judicial notice of "non-judicial documents (such as police reports)" that were not appended to the complaint on a motion to dismiss). In any event, this document is far too abbreviated to provide any clear indication of why Gordon was detained. Thus, given the lack of factual clarity, and in light of the defendants' concession that Gordon was held by police for some period of time for charges unrelated to the TD Bank events, the Court will allow § 1983 claims for false imprisonment and unreasonable detention against Officer Peralta to survive at this time.

**\*7** Accordingly, the Court will grant the motion to dismiss the claim that Gordon was arrested without probable cause for forgery and larceny at TD Bank on November 2, 2007, but will deny the motion to dismiss the claims for false imprisonment and unreasonable detention against Officer Peralta arising out of Gordon's alleged detention from November 2–4, 2007, following the decision by the DA's Office to not pursue charges based on the TD Bank incident.

### 3. Malicious Prosecution

Gordon also brings a malicious prosecution claim based on the fact that after his first arrest, any charges arising out of the TD Bank events were dropped by the DA's Office and/or dismissed by a judge. The defendants argue that Gordon cannot maintain any claim for malicious prosecution based

on those events, because he suffered no post-arraignment deprivation of liberty. The Court agrees with the defendants.

Like a claim of false arrest, the elements of a malicious prosecution claim pursuant to 42 U.S.C. § 1983 are drawn from state law. *Boyd,* 336 F.3d at 75; *Jocks v. Tavernier,* 316 F.3d 128, 134 (2d Cir.2003). To succeed on a claim of malicious prosecution, the plaintiff must prove four elements: (1) the defendant initiated or continued a criminal proceeding; (2) the proceeding terminated favorably to the plaintiff, (3) there was no probable cause for the criminal charge; and (4) the defendant acted maliciously. *Rothstein v. Carriere,* 373 F.3d 275, 282 (2d Cir.2004); *Savino v. City of New York,* 331 F.3d 63, 72 (2d Cir.2003). He must also prove a fifth element, which comes from the federal constitution: "a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Rohman v. NYC Transit Authority,* 215 F.3d 208, 215 (2d Cir.2000); *see also Singer v. Fulton County Sheriff,* 63 F.3d 110, 116 (2d Cir.1995) ("A plaintiff asserting a Fourth Amendment malicious prosecution claim under § 1983 must ... show some deprivation of liberty consistent with the concept of 'seizure.' "). "The essence of malicious prosecution is the perversion of proper legal procedures." *Id.* at 117 (quoting *Broughton v. State of New York,* 37 N.Y.2d 451, 373 N.Y.S.2d 87, 93, 335 N.E.2d 310 (1975)). Thus, where the plaintiff's claim arises out of a warrantless arrest, he cannot bring a malicious prosecution claim based only on pre-arraignment events, since there have been no actions taken pursuant to judicial process. *Id.* (holding that "[plaintiff's] arrest cannot serve as the predicate deprivation of liberty because it occurred prior to his arraignment and without a warrant, and therefore was not pursuant to legal process."); *see Holley v. County of Orange,* 625 F.Supp.2d 131, 142 (S.D.N.Y.2009).

According to Gordon, he was arrested without a warrant on November 2, 2007 based on the 911 call from TD Bank, but the DA's Office declined to prosecute him on those arrest charges. He then claims he was nonetheless detained by the police until November 4, when he was brought before a judge for the first time, and any charges were dismissed. (Compl. ¶¶ 8, 27, 28, 30; Pl. Opp. ¶¶ 2–6, 9.) He makes no allegation that he was arraigned or that any prosecution was commenced at that time; in fact, his account insists upon the opposite—that the police detained him "extrajudicially," in contravention of the DA's instructions, and that upon his initial appearance a judge immediately ordered his release. Gordon himself refers to his detention as "pre-arrangement incarceration." (Pl.Opp.¶ 3.) Further, he emphasizes that he was unaware of any

continued investigation into his involvement at TD Bank until he was "re-arrested" in September 2008 following a grand jury indictment of which he was also unaware. It is thus clear that Gordon has not alleged that any judicial process was commenced against him on November 2–4, 2007, or that there was any arraignment or post-arraignment restraint on his liberty at that time. [4] The proper avenue for redressing Gordon's complaints that the police improperly detained him is grounded in false arrest or false imprisonment, as discussed above.

[4]     The Court notes that although the defendants have made reference to an outstanding (and seemingly unrelated) warrant that may have been the basis for Gordon's detention, Gordon's submissions insist that there was no warrant involved in his detention (*e.g.* Pl. Opp. ¶ 3), and the Court accepts that allegation for purposes of this motion. Thus, Gordon has never offered any facts to suggest that he is bringing a malicious prosecution claim attacking a judicially issued warrant, *cf. Singer,* 63 F.3d at 117, but has always maintained that his claim is premised on the charges related to his warrantless arrest at TD Bank, for which there was never an arraignment.

**\*8** Accordingly, Gordon's malicious prosecution claim against Officer Peralta is dismissed.

### 4. Other § 1983 Claims

Although the defendants have construed Gordon's complaint as only bringing false arrest and malicious prosecution claims under § 1983, Gordon's opposition memorandum makes reference to a few other claims that he believes himself to be asserting that have not been addressed by the defendants. Given that, pursuant to the *in forma pauperis statute* under which Gordon brings this action, the Court must dismiss a claim if it "is frivolous or malicious" or "fails to state a claim on which relief may be granted," the Court will address why these residual federal claims must be dismissed. 28 U.S.C. § 1915(e)(2)(B).

### a) Malicious Abuse of Process

Gordon argues that an "abuse of process claim lies against the defendants as each defendant aided to each other employing regularly issued legal process to compel the performance of the severely prejudicial conduct in violation of plaintiff's fundamental rights." (Pl.Opp.¶ 8.) This appears to be an

2012 WL 1068023

attempt to state a claim for malicious abuse of process under § 1983. Any such claim must be dismissed.

"The torts of malicious prosecution and abuse of process are closely allied." *Cook v. Sheldon,* 41 F.3d 73, 80 (2d Cir.1994). Whereas malicious prosecution concerns the improper issuance of process, malicious abuse of process concerns "the improper use of process after it is regularly issued." *Id.* (internal quotations omitted). Like malicious prosecution, state law provides the elements of a malicious abuse of process claim brought pursuant to § 1983. *Id.* "In New York, a malicious abuse of process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Id.*

As already noted in the Court's discussion of the malicious prosecution claim, Gordon has made no allegations that his November 2007 arrest resulted in any "regularly issued legal process," since the charges were dropped and he was released without any arraignment. Moreover, Gordon has not adequately alleged the "collateral objective" element of the claim. To satisfy this element, a plaintiff must allege "not that the defendant acted with an improper motive, but rather an improper purpose—that is, 'he must claim that [the defendant] aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution.' " *Douglas v. City of New York,* 595 F.Supp.2d 233, 344 (S.D.N.Y.2009) (quoting *Savino v. City of New York,* 331 F.3d 63, 76 (2d Cir.2003)); *see also Conte v. County of Nassau,* 2010 WL 3924677, at *18 (E.D.N.Y.2010). Here, Gordon states that "the defendant's objective was to collaterally obtain the unconstituted conviction." (Pl.Opp.¶ 8.) This amounts only to an allegation that the defendants acted out of a desire to see Gordon convicted, which is not a collateral objective.

**\*9** Accordingly, the malicious abuse of process claim is dismissed.

### b) Section 1985 Conspiracy

Gordon's memorandum also asserts a claim under 42 U.S.C. § 1985(3). Such a claim requires the plaintiff to allege "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property

or deprived of any right or privilege of a citizen of the United States." *Cine SK8, Inc. v. Town of Henrietta,* 507 F.3d 778, 790 (2d Cir.2007). In addition, the plaintiff must show that the alleged conspiracy was "motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." *Thomas v. Roach,* 165 F.3d 137, 146 (2d Cir.1999) (internal quotation marks omitted).

In addition to the fact that Gordon offers only the conclusory allegation that he was conspired against "because he is of minority race" (Pl.Opp.¶ 3), his claim fails because of the intracorporate conspiracy doctrine. Gordon claims that "there was some sort of conspiracy between the N.Y.C. Police Department and its employees to unlawfully detain him." (*Id.*) However, "[u]nder the intracorporate conspiracy doctrine, officers, agents and employees of a single corporate entity are legally incapable of conspiring together." *Hartline v. Gallo,* 546 F.3d 95, 99 n. 3 (2d Cir.2008); *Nassau County Employee "L" v. County of Nassau,* 345 F.Supp.2d 293, 304–05 (E.D.N.Y.2004). Although "[a]n exception to the intracorporate conspiracy doctrine applies to individuals within a single entity when they are pursuing personal interests wholly separate and apart from the entity," Gordon has not alleged that Officer Peralta acted out of any personal interest distinct from those of the police department in general. *Quinn v. Nassau County Police Dep't,* 53 F.Supp.2d 347, 360 (E.D.N.Y.1999).

Accordingly, any claims against Officer Peralta under § 1985(3) are dismissed.

### c) Equal Protection

To the extent Gordon's complaint makes reference to any equal protection violations, they are wholly conclusory and unsupported, and are hereby dismissed. "To prove a violation of the Equal Protection Clause ... a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005). Here, Gordon has offered nothing beyond the occasional bare assertion that the actions alleged were taken because he "is of a minority race." He hasn't alleged any disparity in treatment between himself and another person, and his papers lack any facts related to his race beyond his identification of himself as a minority. Any equal protection claim is dismissed.

#### d) Claims against ADA Hilda Mortensen and Related to Gordon's Conviction

**\*10**  Finally, the Court observes that Gordon's submissions contain repeated allegations directed at the Assistant District Attorney who prosecuted his case, Hilda Mortensen, related to alleged improprieties in Gordon's grand jury indictment, trial, and conviction—including various violations of criminal procedure laws, use of a "defective indictment," and presentation of tainted evidence—all of which Gordon claims resulted in an illegal conviction and sentence. (Compl.¶¶ 38–41, 46, 50.) However, notwithstanding having filed many papers in this case, including an amended complaint that added several defendants, Gordon has never named her as a defendant. Given Gordon's clear understanding of how to add defendants to the cases he files, the Court is hesitant to infer that this complaint brings claims against Mortensen.

In any event, to the extent Gordon attempts to assert claims against Mortensen, they are barred by absolute prosecutorial immunity. *See Buckley v. Fitzsimmons,* 509 U.S. 259, 273, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993); *Parkinson v. Cozzolino,* 238 F.3d 145, 150 (2d Cir.2001). Additionally, any claims against Mortensen (or others) that amount to challenges to the validity of Gordon's conviction are barred by the rule in *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), which holds that a plaintiff may not use § 1983 as a vehicle for bringing a claim that "would necessarily imply the invalidity of his conviction or sentence." *Id.* at 487; *see Wilkinson v. Dotson,* 544 U.S. 74, 81–82, 125 S.Ct. 1242, 161 L.Ed.2d 253 (2005); *Channer v. Mitchell,* 43 F.3d 786 (1994); *Jackson v. County of Nassau,* 2010 WL 335581, at \*7–8 (E.D.N.Y.2010). Although Gordon's custody status at the present moment is unclear from the docket sheet, it is clear that he filed his complaint, amended complaint, and opposition papers while incarcerated for the conviction at issue in this case. He thus had available to him at that time the avenues of both direct appeals and habeas review if he wished to challenge the validity of his conviction. Because he has not asserted that his conviction was ever vacated, he is barred from seeking to imply the invalidity of his conviction through a § 1983 action. *See Browdy v. Karpe,* 2004 WL 2203464, at \*5–8 (D.Conn.2004), *aff'd,* 131 Fed. App'x 751, 753 (2d Cir.2005); *Amaker v. Coombe,* 2002 WL 523388, at \*17–19 (S.D.N.Y.2002).

Accordingly, any claims against ADA Mortensen or any other defendant that are premised on the assertion that Gordon's September 2009 trial and conviction were unconstitutional or otherwise invalid are dismissed.

#### 5. State law claims

The City and Officer Peralta have moved to dismiss any state law claims against them based on Gordon's failure to file a notice of claim. *See* N.Y. Gen. Mun. L. §§ 50–e, 50–k(6); *Khaja–Moinuddin v. City of New York,* 2010 WL 3861003, at \*7 (E.D.N.Y.2010). Gordon does not appear to contest this proposition in this opposition papers. Accordingly, to the extent the complaint asserts any state tort law claims against Officer Peralta or the City, they are dismissed.

### III. JUDGE BLOOM'S REPORT AND RECOMMENDATION

**\*11**  On January 28, 2011, Gordon amended his complaint to add four private defendants: TD Bank, Elliot Lopez, Curtis Herbert, and Isaac Duncan. On July 28, 2011, after receiving a request from Gordon for assistance in serving process on these newly added defendants, Magistrate Judge Lois Bloom issued an R & R recommending that the Court dismiss the amended complaint against these four defendants because Gordon did not properly allege that they acted under color of state law, as required for actions under § 1983. Gordon filed objections pursuant to Fed.R.Civ.P. 72(b) and 28 U.S.C. § 636(b) (1) in a submission dated August 31, 2011.

In reviewing an R & R, the Court "must determine de novo any part of the magistrate judge's disposition that has been properly objected to." Fed.R.Civ.P. 72(b); *see also Edwards v. Fischer,* 414 F.Supp.2d 342, 346–47 (S.D.N.Y.2006); *The European Community v. RJR Nabisco, Inc.,* 134 F.Supp.2d 297, 302 (E.D.N.Y.2001). Upon a review of the record and Gordon's objections, the Court adopts Magistrate Judge Bloom's R & R with the following elaborations, and dismisses all claims against the remaining four defendants.

#### A. Discussion

Gordon's lengthy submission of objections consists mostly of recitations of legal principles, with comparatively little addressed to the particulars of the instant case or to the R & R. Gordon appears to argue that his amended complaint properly pleads that defendants Lopez, Duncan, and Herbert engaged in a conspiracy with state actors, thus rendering their conduct "under color of law" and subject to § 1983. However, apart from Gordon's conclusory iterations of the legal standards for state action, his allegations and arguments remain substantially the same as those already addressed and rejected in the R & R. Although he repeatedly makes

the bare assertion that the private defendants participated in "joint activity" with state actors, the only facts underlying this claim are that Lopez provided false information to the police based on "mere speculations" (Pl. Obj. at 10); that Duncan gave "false and misleading information" to the bank, the police department, and the District Attorney's office (*id.* at 15); and that Herbert offered false testimony to the grand jury in exchange for the charges against him being dropped (*id.* at 21.) As to TD Bank, Gordon argues only that it "creat[ed] or perpetuat[ed] the policy or custom under which the unconstitutional practice of Mr. Lopez occurred," and that it was grossly negligent in supervising its employees. (*Id.* at 11.)

It is true that a court may find that a private individual acted under color of state law for purposes of § 1983 where the complaint sets forth specific facts indicating that "the private actor operate[d] as a willful participant in joint activity with the State or its agents." *Tancredi v. Metro. Life Ins. Co.,* 316 F.3d 308, 313 (2d Cir.2003) (internal quotation marks omitted). However, a complaint premised on this "joint participation theory" of state action cannot rest on conclusory assertions that the private individuals acted in concert with state officials, but must allege facts demonstrating that private actors and agents of the state "carried out a deliberate, previously agreed upon plan," or that their actions "constitute[d] a conspiracy or meeting of the minds." *Dahlberg v. Becker,* 748 F.2d 85, 92 (2d Cir.1984); *see Rosen v. County of Suffolk,* 53 Fed. App'x 578, 580 (2d Cir.2002) ("[I]t is not enough to make a conclusory allegation that the private and state parties acted in concert, the complaint must allege facts demonstrating that the private entity acted in concert with the state actor."); *Valez v. City of New York,* 2008 WL 5329974, at *3 (S.D.N.Y.2008).

**\*12** To that end, as explained by the Magistrate Judge, the mere fact that a private person falsely reported criminal conduct to government officials is insufficient to establish liability as a state actor under § 1983. *See Lugar v. Edmondson Oil Co., Inc.,* 457 U.S. 922, 939 n. 21, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982) (private party's "mere invocation of state legal procedures" does not render that party a state actor under § 1983); *Dahlberg,* 748 F.2d at 93 (allegation that private defendant submitted false affidavit to state court that led to plaintiff's arrest did not make the defendant a state actor under § 1983); *Rosen,* 53 Fed. App'x 578 (allegations that private individual filed false petitions seeking orders of protection and false criminal complaint were insufficient to establish state action under § 1983); *Schneider v. Tretola,* 8

F.3d 809 (1st Cir.1993) (table) ("The defendants, all private persons, cannot be held liable under 42 U.S.C. § 1983 for their alleged acts in employing 'false representations and phony process to induce the policemen to falsely arrest' and imprison plaintiff because the private defendants' actions do not constitute 'state action,' a requisite of a § 1983 cause of action."); *Baez v. JetBlue Airways,* 745 F.Supp.2d 214, 221 (E.D.N.Y.2010) (allegation that private defendants "provided false information to law enforcement officials who then interrogated and arrested" the plaintiff is insufficient to establish state action); *Fisk v. Letterman,* 401 F.Supp.2d 362, 377 (S.D.N.Y.2005); *Vazquez v. Combs,* 2004 WL 2404224, at *4 (S.D.N.Y.2004). Here, Gordon asserts only that the private defendants falsely accused him of criminal activity to state officials, which does not establish that they acted under color of state law.

As to the claim related to Herbert's grand jury testimony, "there are two reasons why § 1983 does not allow recovery of damages against a private party for testimony in a judicial proceeding." *Briscoe v. LaHue,* 460 U.S. 325, 329, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983). First, witnesses in judicial proceedings are protected by absolute immunity against damages claims based on the substance of their testimony. *See id.* at 334 (concluding that "it is clear that § 1983 did not abrogate the absolute immunity existing at common law" for witnesses); *San Filippo v. U.S. Trust Co. of New York, Inc.,* 737 F.2d 246, 254 (2d Cir.1984) (extending *Bricoe* immunity to grand jury testimony). Second, an allegation that a private individual gave false testimony in a judicial proceeding, without more, does not establish state action for purposes of § 1983. *See Briscoe,* 460 U.S. at 329–30 ("It is beyond question that, when a private party gives testimony in open court in a criminal trial, that act is not performed 'under color of law.' "); *Flores v. Levy,* 2008 WL 4394681, at *7 (E.D.N.Y.2008) ("[T]he fact that plaintiff alleges that [a private actor] perjured herself as a witness at his trial does not transform her into a state actor."); *Cipolla v. County of Rensselaer,* 129 F.Supp.2d 436, 447 (N.D.N.Y.2001); *Elmasri v. England,* 111 F.Supp.2d 212, 221 (E.D.N.Y.2000) ("[T]he mere fact that an individual testifies at a court proceeding does not render that person a state actor.").

**\*13** Moreover, the fact that Herbert may have agreed to testify in exchange for the dismissal of the charges against him is not a sufficient allegation that he conspired with state actors to deprive Gordon of his constitutional rights. "To state a claim against a private entity on a section 1983 conspiracy theory, the complaint must allege facts demonstrating that

the private entity acted in concert with the state actor to commit an unconstitutional act." *Ciambriello v. County of Nassau,* 292 F.3d 307, 324 (2d Cir.2002) (quoting *Spear v. Town of West Hartford,* 954 F.2d 63, 68 (2d Cir.1992)). The plaintiff's submissions contain no such facts. Indeed, Gordon's allegations emphasize that Herbert was pursuing a personal vendetta against him, (Compl.¶ 59), and he does not offer any facts demonstrating that the prosecutor was even aware of any perjury on Herbert's part. The only allegation offered to show concerted action with the state is that Herbert offered to testify against Gordon in exchange for his own criminal case being dismissed. (Pl. Obj. at 21.) There is nothing inherently improper in a witness cooperation agreement and, without more, these allegations do not demonstrate a conspiracy with a state actor sufficient to establish that Herbert acted under color of state law.

Finally, as to TD Bank, Gordon has offered no facts demonstrating that it acted under color of law. The vague allegation that the private bank had a "policy or custom" under which its employees' actions occurred, or that it was negligent in supervising its employees, does not make it a state actor for § 1983 purposes, especially since the Court has already determined that its employees did not act under color of state law in reporting information to the police.

In sum, Gordon's submissions do not rise above "merely conclusory allegation [s] that a private entity acted in concert with a state actor," which "do [ ] not suffice to state a § 1983 claim against the private entity." *Ciambriello,* 292 F.3d at 324 (2d Cir.2002). The Court thus agrees with the Magistrate Judge that the § 1983 claims against the private defendants must be dismissed for this reason.

Even if the Court were to find that one or more of these defendants acted under color of law, there is an alternative basis for dismissing Gordon's § 1983 claims: This Court held above that Gordon's conviction barred him from bringing § 1983 challenges to both arrests related the events at TD

Bank, or to the prosecution in 2008 that led to his conviction. The Court also held that Gordon alleged no post-arraignment deprivation of liberty that could serve as the basis of a malicious prosecution claim premised on the November 2007 arrest, and that Gordon failed to state any other claims under § 1983. As Gordon's claims against these four defendants are premised only on their alleged involvement in Gordon's arrests, prosecution, and conviction for the events at TD Bank, the dismissal holdings of this Court's prior order would apply equally to them. There are no allegations that any of these defendants were involved in the separate false imprisonment and unreasonable detention claims that remain against Officer Peralta.

**\*14** Finally, the Court notes that to the extent Gordon's complaint contains fleeting citations to New York Civil Rights Law § 40–c; the state due process clause, N.Y. Const., art. 1, § 6; or the state equal protection clause, N.Y. Const., art. 1, § 11, he has not articulated such claims with any clarity. Additionally, in his objections to the R & R, he did not argue that he had asserted any state law claims against the private defendants that should be retained. Accordingly, any state law claims, if asserted here, are dismissed.

## IV. CONCLUSION

In sum, all claims against the City of New York are dismissed; and all claims against Officer Peralta are dismissed with the exception of claims for false imprisonment and unreasonable detention based on Gordon's allegations that he was unlawfully detained from November 2–4, 2007. The claims against TD Bank, Elliot Lopez, Curtis Herbert, and Isaac Duncan are dismissed in full.

SO ORDERED.

## All Citations

Not Reported in F.Supp.2d, 2012 WL 1068023

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 4394681
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Ramon FLORES, Plaintiff,
v.
Steve LEVY, Thomas J. Spota, III, Wilma
Peterson, Louis J. Ohlig, Edward Vitale, Douglas
M. O'connor, John A.Bray, Linda Kevins,
John Scarglato, Dana Brown, Defendants.

No. 07-CV-3753 (JFB)(WDW).
|
Sept. 23, 2008.

**Attorneys and Law Firms**

Ramon Flores, pro se.

Wilma Peterson, pro se.

Assistant Suffolk County Attorney Brian C. Mitchell,
Hauppauge, NY, for defendants Thomas J. Spota III, Linda
Kevins, John Scarglato, Dana Brown and Steve Levy.

Amy M. Monahan of L'Abbate, Balkan, Colavitta & Contini
LLP, Garden City, NY, for defendants Robert C. Mitchell,
Edward Vitale, and Douglas O'Connor.

MEMORANDUM AND ORDER

JOSEPH F. BIANCO, District Judge.

**\*1** Plaintiff Ramon Flores ("plaintiff" or "Flores"), brings
this action against Suffolk County Executive Steve Levy
("Levy"), Suffolk County District Attorney Thomas J. Spota
III ("Spota"), Assistant District Attorneys Linda Kevins
("Kevins"), Dana Brown ("Brown"), and John Scarglato
("Scarglato") (collectively, "defendant prosecutors"), Suffolk
County Court Judge Louis J. Ohlig ("Judge Ohlig")
(collectively, "County Defendants"), Legal Aid Society
Attorneys Robert C. Mitchell ("Mitchell"), Edward "Ed"
Vitale ("Vitale"), and Douglas M. O'Connor ("O'Connor")
(collectively, "Legal Aid defendants"), John A. Bray, and
Wilma Peterson, alleging malicious prosecution, conspiracy
under 42 U.S.C. § 1983, and deliberate indifference, all
arising from defendant's prosecution.

Defendants moved to dismiss the claims pursuant to
Fed.R.Civ.P. 12(c). For the following reasons, defendants'
motions are granted.

I. BACKGROUND

A. Facts

The following facts are taken from the complaint and are not
findings of fact by the court. The Court assumes these facts to
be true for the purpose of deciding this motion and construes
them in the light most favorable to plaintiff, the non-moving
party.

On February 20, 2003, Flores was arrested in Suffolk County
and charged with one count of criminal assault in the second
degree and one count of criminal contempt in the first degree.
(Compl.¶ 1.) On February 25, 2003, an unidentified man came
to see Flores and told him it was not advisable that he testify
before the grand jury. (Compl.¶ 3.) The unidentified man
stated that he was not an attorney and that he could not answer
any additional questions. (Compl.¶ 3.) Later that afternoon,
plaintiff appeared before the court and was provided with
what he believed to be Legal Aid counsel. (Compl.¶ 4.)

On March 5, 2003, plaintiff was taken to the Suffolk County
Court and arraigned on indictment 493-03, which charged
plaintiff with: 3 counts of assault in the second degree, 2
counts of criminal contempt in the first degree, aggravated
contempt, and menacing. (Compl.¶ 4.) Plaintiff informed
the court that he still had no formal attorney of record.
(Compl.¶ 4A.) The Court appointed a Legal Aid attorney
to represent plaintiff. (Compl.¶ 4B.) After the arraignment,
plaintiff complained to Legal Aid attorney Douglas O'Connor
that plaintiff was not provided with an attorney at an earlier
stage. (Compl.¶ 4C.) O'Connor informed plaintiff that a
motion to dismiss would be filed on the grounds that plaintiff
was not afforded an opportunity to testify before the grand
jury, and that plaintiff was not provided counsel at the time
the grand jury was convened. (Compl.¶ 4C.)

On April 3, 2004, plaintiff returned to court and spoke to his
appointed Legal Aid attorney Edward Vitale. (Compl.¶ 5.)
Plaintiff reviewed the proposed motion to dismiss. (Compl.¶
5.) Plaintiff is unhappy that the motion did not raise the
issue of plaintiff's prior lack of representation. (Compl.¶
5.) Plaintiff ordered Vitale not to file the motion. (Compl.¶
5.) Vitale became angry with plaintiff and told plaintiff

2008 WL 4394681

he was "on his own." (Compl.¶ 5.) Plaintiff notified the Court that he was not satisfied with the motion. (Compl.¶ 5B.) Vitalerequested that he be removed as counsel for plaintiff. (Compl.¶ 5B.) The Court granted Vitale's request and appointed John Bray as counsel. (Compl.¶ 5B.) Further, the court provided plaintiff with additional time to file his motion to dismiss, in order to allow his newly appointed counsel to review the motion. (Compl.5B.)

 **\*2** On April 8, 2003, the court formally appointed Bray as counsel. The case was adjourned for second call so that plaintiff and Bray could confer. (Compl.¶ 6.) Plaintiff asked Bray to amend the motion to dismiss to include an affidavit, noting that plaintiff was not provided with counsel at the time of indictment. (Compl. ¶ 6A .) Bray refused to make the changes and argued with plaintiff. (Compl.¶ 6A.) No second call occurred and the case was adjourned until April 28, 2003. Thereafter, plaintiff notes that Bray refused to assist him and was not responsive to plaintiff's requests. (Compl.¶ 6B.) On April 18, 2003, plaintiff filed a motion to dismiss, asserting that he was not provided representation during a critical stage of the action. (Compl.¶ 6C.) On April 26, 2004, plaintiff received legal mail containing an order from Judge Ohlig, dismissing the indictment based upon a lack of legal counsel provided to plaintiff. (Compl.¶ 6D.)

On May 4, 2003, plaintiff filed three grievances with the Tenth Judicial District against O'Connor, Vitale, and Bray. (Compl. ¶ 7 .) Plaintiff accused the attorneys of failing to safeguard his rights, lying to him, and failing to provide competent assistance. (Compl.¶ 7.) In addition, plaintiff filed a grievance against Judge Ohlig alleging that he violated plaintiff's constitutional rights. (Compl.¶ 7.)

On May 5, 2003, plaintiff appeared in court to testify before a second grand jury. (Compl.¶ 8.) Plaintiff refused to testify before the grand jury because he did not trust Bray. (Compl.¶ 8.) Plaintiff informed the court of his objections to Bray's representation. (Compl.¶ 8A.) As a result of not testifying, plaintiff claims that he was unable to provide the mitigating defense of "Intoxication." (Compl.¶ 8B.)

On May 19, 2003, plaintiff was arraigned on the superseding indictment 111-03, which contained the same 7 counts as the original indictment, plus an additional count of assault in the first degree. (Compl.¶ 9.) Plaintiff alleges that the complainant testified before the grand jury that plaintiff had "knocked out her teeth" thereby implying that there was a loss of actual teeth, when, in fact, it was "broken bridge

work." (Compl.¶ 9Ai.) Plaintiff alleges that the prosecution knew this testimony was false because the medical records in the prosecution's possession indicated that it was broken bridge work and not a loss or break of actual teeth. (Compl.¶ 9Aii.) Plaintiff concludes that the additional first degree assault charge was added as a punitive tactic designed to silence and stop plaintiff from "asserting and continuing to petition for redress" of his constitutional right to counsel. (Compl.¶ 9B.)

In August of 2004, plaintiff was tried on the eight counts contained within the second indictment. (Compl.¶ 11.) Plaintiff alleges that, on August 4, 2004, on direct examination, Wilma Peterson falsely testified that plaintiff had knocked out her teeth. (Compl.¶ 13.) On August 5, 2004, Brown alluded to the fact that Ms. Peterson had the "knocked out teeth" repaired with bridge work. (Compl.¶ 14.) Plaintiff shouted out that the alleged injury was broken bridge work and not actually teeth. (Compl.¶ 14A.) The Court then asked Ms. Peterson whether plaintiff broke her teeth or bridge work. (Compl.¶ 14A.) Ms. Peterson responded that it was bridge work which wasbroken by plaintiff's actions. (Compl.¶ 14A.) The prosecution allegedly failed to elicit a recantation from Ms. Peterson as to her testimony that she lost actual teeth. (Compl.¶ 14B.)

 **\*3** On September 2, 2004, after a trial on the charges in the indictment before the court without a jury, plaintiff was convicted of Assault in the Second Degree under Counts 3 and 4, Menacing in the Second Degree under Count 5, Aggravated Criminal Contempt under Count 6, and Criminal Contempt in the First Degree under Count 7. (Compl. at A-2.) Plaintiff was acquitted on the crime of Assault in the First Degree under Count 1, Assault in the Second Degree under Count 2, and Criminal Contempt in the First Degree under Count 8. (Compl. at A-2 and A-3.) The court noted that the basis for acquittal on the Assault in the First Degree charge was the prosecution's failure to establish "serious physical injury," especially in the absence of testimony by a medical expert regarding the victim's condition. *See* September 2, 2004 Decision (Attached to Compl. at A-3) ("While the photographs introduced into evidence by the People did establish that the victim did suffer considerable bruises and a knife wound, these injuries did not rise to the level of serious under the definition found in the Penal Law.").

B. Procedural History

2008 WL 4394681

On September 5, 2007, plaintiff filed this complaint alleging malicious prosecution, conspiracy, and deliberate indifference. On January 31, 2007, the Legal Aid defendants moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). On February 1, 2008, the County Defendants moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). On May 2, 2008, *pro se* defendant Wilma Peterson filed an answer to the complaint. On May 27, 2008, plaintiff filed an opposition to defendants' motions to dismiss. On June 2, 2008, the Legal Aid defendants filed their reply brief. On June 6, 2008, the County defendants filed their reply brief. On June 22, 2008, Ms. Peterson moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b) (6). On September 2, 2008, plaintiff filed his opposition to Ms. Peterson's motion.

C. Defendant's Motion to Strike

On August 8, 2008, *pro se* plaintiff filed a motion to strike Ms. Peterson's motion to dismiss. In particular, plaintiff objected to the fact that he did not receive copies of certain exhibits that Peterson attempted to file under seal with her motion to dismiss, which the Court declined to accept for filing and returned to the defendant because they were unnecessary for purposes of deciding the motion to dismiss and would not be considered by the Court. For the reasons discussed below, plaintiff's request to strike the motion on such grounds is frivolous.

On July 22, 2008, in connection with her motion to dismiss, *pro se* defendant attempted to file certain exhibits that consisted of medical records, which she requested be placed under seal and not provided to plaintiff. The purpose of these exhibits was to corroborate Ms. Peterson's description in her affidavit of the injuries, which she testified resulted from plaintiff's assault on her, and to explain why she mistakenly described her broken bridge work as her bottom teeth:

   **\*4** The plaintiff did punch me in my mouth, and, as I relived my horrific ordeal during my testimony in front of a second Grand Jury, I mistakenly described my broken bridge work as my bottom teeth. However, I did not conspire with anyone to make any misleading statements. I was only trying to relate the horrible experience of the night the plaintiff assaulted me.

The medical documents the plaintiff made reference to which formed the basis of his complaint against me, also describes the extent of my injuries caused by the brutal acts he committed against me.

For more than three hours, during the plaintiff's assault on me, he repeatedly punched me all over my body, he stabbed me with a meat cleaver and a knife, he bit me on my body, spat in my face and pulled a significant amount of my hair out of my head. He hopped on my broken leg, of which, I was wearing a cast and stabbed my broken leg with a knife and a meat cleaver. Throughout the plaintiff's assault on me, he continuously threatened to cripple me, to blind me, to paralyze me and to kill me.

When the plaintiff punched me in my mouth, he hit me so hard that he indeed broke my bridge work in the bottom of my mouth which also cut a large gash inside my bottom lip and punctured a hole in my bottom lip. As to date, I continue to suffer from nerve damage in my bottom lip. I have a permanent two and a half inch scar inside my bottom lip and a scar outside of my bottom lip from the punctured hole.

I have bruises all over my body. I had to see an optometrist for treatment of trauma to my eye. I have permanent scars on my forehead, hands and left leg. I continue to suffer from nerve damage in my left leg where he stabbed me with a knife. The plaintiff kicked me, very hard, in my lower back, thus, exacerbating a prior injury to my lower back that the plaintiff was aware of before he assaulted me. I now have facet damage in my lower back. And I am in constant pain.

(Peterson Affidavit, at 2-3) (citations omitted).

On July 22, 2008, the Court issued an order declining to accept these medical exhibits because the Court, for purposes of a motion to dismiss under Rule 12(b)(6), must accept the factual allegations set forth in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See* *Cleveland v. Caplaw Enter.,* 448 F.3d 518, 521 (2d Cir.2006); *Nechis v. Oxford Health Plans, Inc.,* 421 F.3d 96, 100 (2d Cir.2005). Thus, "the district court is normally required to look only to the allegations on the face of the complaint." *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007). Given this standard, the Court explained in the July 22 Order:

   In the instant case, under this standard, the Court may not consider these medical records in connection with the motion to dismiss; rather, the

2008 WL 4394681

Court will determine whether the allegations in the complaint state a legal claim against the defendant. In other words, consideration of these medical exhibits is unnecessary for purposes of deciding the motion. Therefore, the Court is declining to accept these exhibits at this time and the Clerk of the Court shall return them to plaintiff. Because Exhibits C-G are not being accepted or considered by the Court, her application to have the records sealed is moot and defendant need not serve such exhibits on defendant.

**\*5** (July 22, 2008 Order, at 1-2.)

Although plaintiff contends in his motion to strike that he cannot reply to defendant's submission without such exhibits, that argument is frivolous. As noted above, the Court has assumed his allegations in the complaint to be true and has not considered these exhibits. In fact, that is the reason the Court declined to accept them. Moreover, none of the factual information contained in Ms. Peterson's affidavit, and recited above, is pertinent to the legal issues in the motion to dismiss. Specifically, the primary issues, as discussed *infra,* based upon the allegations in the complaint, are (1) whether the private actor defendants (namely, Ms. Peterson and plaintiff's court-appointed attorneys) can be sued under Section 1983, and (2) whether the prosecutors have absolute immunity. The nature and extent of Ms. Peterson's injuries, as well as any medical records corroborating such injuries, have no relevance to the consideration of these legal issues. There is no basis to require Ms. Peterson to supply these materials to plaintiff, and unnecessarily reveal private medical information, where the Court rejected them for filing because they have no relevance at the motion to dismiss stage in determining whether plaintiff has a plausible Section 1983 claim. Therefore, plaintiff's motion to strike the defendant's motion was denied on August 21, 2008, and he was directed to file his opposition by September 15, 2008, which plaintiff did do.

D. Standard of Review

In reviewing a motion to dismiss under Rule 12(b)(6), a court must accept the factual allegations set forth in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Cleveland v. Caplaw Enter.,* 448 F.3d 518, 521 (2d Cir.2006); *Nechis v. Oxford Health Plans, Inc.,* 421 F.3d 96, 100 (2d Cir.2005). The plaintiff must satisfy "a flexible 'plausibility' standard, which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible.*" *Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) (emphasis in original). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atlantic,* 127 S.Ct. at 1974. The Court does not, therefore, require "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Id.*

Moreover, as the Second Circuit recently emphasized in *Sealed Plaintiff v. Sealed Defendant,* "[o]n occasions too numerous to count, we have reminded district courts that when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.... This obligation entails, at the very least, a permissive application of the rules governing theform of pleadings.... This is particularly so when the *pro se* plaintiff alleges that her civil rights have been violated. Accordingly, the dismissal of a *pro se* claim as insufficiently pleaded is appropriate only in the most unsustainable of cases." *Sealed Plaintiff v. Sealed Defendant,* No. 06-1590-cv, 2008 U.S.App. LEXIS 17113, at * 15-* 16 (2d Cir. Aug. 12, 2008) (citations and quotation marks omitted); *see also Weixel v. Bd. of Educ. of the City of N.Y.,* 287 F.3d 138, 145-46 (2d Cir.2002) (holding that when plaintiff is appearing *pro se,* the Court shall " 'construe [his complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggests.' ") (quoting *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000)); *accord Sharpe v. Conole,* 386 F.3d 483, 484 (2d Cir.2004).

**\*6** Finally, in connection with a motion to dismiss under Rule 12(b) (6), as noted above, the Court may only consider "facts stated in the complaint or documents attached to the complaint as exhibits or incorporated by reference." *Nechis,* 421 F.3d at 100; *accord Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir.1991). Here, plaintiff appended certain documents to his complaint and the Court has confined its review to the face of the complaint and the documents attached thereto by plaintiff.

2008 WL 4394681

## II. PLAINTIFF'S CLAIMS UNDER 42 U.S.C. § 1983

To prevail on a claim under § 1983, a plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and laws; (2) by a person acting under the color of state law. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993). "Claims for false arrest or malicious prosecution, brought under § 1983 to vindicate the Fourth and Fourteenth Amendment right to be free from unreasonable seizures, are 'substantially the same' as claims for false arrest or malicious prosecution under state law." *Jocks v. Tavernier,* 316 F.3d 128, 134 (2d Cir.2003) (quoting *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996) (false arrest) and citing *Conway v. Vill. of Mount Kisco,* 750 F.2d 205, 214 (2d Cir.1984) (malicious prosecution)).

A. The Legal Aid Attorneys and Ms. Peterson

Plaintiff asserts Section 1983 claims against (1) Ms. Peterson based upon her allegedly false testimony in connection with his criminal case; and (2) his Legal Aid Attorneys for their alleged failure to adequately represent him in connection with his initial indictment. As discussed below, the Section 1983 claims against these defendants fail as a matter of law because (1) none of these defendants are state actors; and (2) plaintiff's conclusory allegations of conspiracy between these defendants and state actors cannot withstand a motion to dismiss. [1]

[1] As a threshold matter, there is a substantial question as to whether plaintiff can proceed at all on a malicious prosecution claim for his acquitted counts because they were so closely intertwined with his counts of conviction and are both felonies. The Court recognizes that, in contrast to false arrest claims, the Second Circuit has noted that a conviction on one claim does not necessarily absolve liability under § 1983 for malicious prosecution as to other criminal charges which were resolved favorably to plaintiff. *See Janetka v. Dabe,* 892 F.2d 187, 190 (2d Cir.1989) (holding that claim of malicious prosecution on charge of resisting arrest, of which plaintiff was acquitted, was not barred by his conviction for disorderly conduct); *see also Posr v. Doherty,* 944 F.2d 91, 100 (2d Cir.1991) (highlighting "the need to separately analyze the charges claimed to have been maliciously prosecuted"). Thus, for the same reasons in this case, a conviction on assault in the second degree does not necessarily bar a malicious prosecution claim on assault in the first degree or attempted assault in the first degree; rather, the Court should analyze a number of factors, including the relative seriousness of the two offenses, "whether the elements of each charge are different, whether one charge is a lesser included offense of the other, and whether the alleged actions were directed at different people." *Pichardo v. N.Y. Police Dep't.,* No. 98-CV-429 (DLC), 1998 WL 812049, at *3 (S.D.N.Y. Nov. 18, 1998) (citing *Janetka,* 892 F.2d at 190); *see also Ostroski v. Town of Southold,* 443 F.Supp.2d 325, 335-40 (E.D.N.Y.2006) (discussing factors). Analyzing the various factors in the instant case-including that both crimes are felonies (and thus are both serious crimes), and arose out of the same incident-the Court concludes that the existence of probable cause as to the counts of conviction should preclude a malicious prosecution claim on the acquitted counts. In fact, as the judge who presided over the bench trial noted, the basis for the acquittal on the assault in the first degree (despite the conviction for assault in the second degree) was the prosecution's failure to demonstrate serious injury. Thus, the acquitted charges are "so closely intertwined with the offense of conviction that there is no reasonable basis to conclude that the [dismissal of] these charges is sufficiently distinct to support a claim of malicious prosecution." *Pichardo,* 1998 WL 812049, at *4 (finding conviction on misdemeanor charge precluded malicious prosecution on felony assault count arising out of same incident). In any event, the Court finds that there are numerous other grounds for dismissal of the case, discussed in detail *infra.*

(1) State Action Requirement

An individual acts under color of state law when he or she exercises power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Polk County v. Dodson,* 454 U.S. 312, 317-38 (1981) (quoting *United States v. Classic,* 313 U.S. 299 (1941)). Thus, a deprivation of a federal statutory or

2008 WL 4394681

Constitutional right is actionable under Section 1983 when such deprivation is caused "by the exercise of some right or privilege created by the State ... or by a person for whom the State is responsible." *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937 (1982). Under this standard, "generally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." *West,* 487 U.S. at 50.

 **\*7**  In the instant case, it is clear from the allegations of the complaint that neither Ms. Peterson who was the alleged victim of the assault that was the subject of plaintiff's criminal trial, nor the Legal Aid Attorneys who represented plaintiff in the pre-trial stage, are state actors. With respect to his Legal Aid Attorneys, it is axiomatic that a "public defender does not act under color of state law when performing a lawyer's traditional functions as counsel to a defendant in a criminal proceeding." *Polk County v. Dodson,* 454 U.S. at 325; *see also Schnabel v. Abramson,* 232 F.3d 83, 87 (2d Cir.2000) ( "[A] legal aid society ordinarily is not a state actor amenable to suit under § 1983.") (citations omitted); *Rodriguez v. Weprin,* 116 F.3d 62, 65-66 (2d Cir.1997) (affirming dismissal of Section 1983 claim against court-appointed appellate attorney for alleged involvement in denial of speedy appeal and noting that "it is well-established that court-appointed attorneys performing a lawyer's traditional functions as counsel to defendant do not act 'under color of state law' and therefore are not subject to suit under 42 U.S.C. § 1983") (collecting cases); *Housand v. Heiman,* 594 F.2d 923, 924-25 (2d Cir.1979) ("[P]ublic defenders or court-appointed defense attorneys do not 'act under color of law.' "); *Sanchez v. Gazzillo,* No. 00-CV-6405 (JS)(MLO), 2001 U.S. Dist. LEXIS 7786, at * 17 (E.D.N.Y. June 5, 2001) (dismissing Section 1983 claim against plaintiff's Legal Aidattorneys). Similarly, with respect to Ms. Peterson, the fact that plaintiff alleges that she perjured herself as a witness at his trial does not transform her into a state actor. *See, e.g., Elmasri v. England,* 111 F.Supp.2d 212, 221 (E.D.N.Y.2000) ("[T]he mere fact that an individual testifies at a court proceeding does not render that person a state actor.") (citing *Briscoe,* 460 U.S. at 329-30; *see also Mitchell v. Mid-Erie Counseling Service,* No. 05-CV6169 CJS(P), 2005 WL 1579810, at \*3 (W.D.N.Y. June 29, 2005) (" 'A witness testifying in a state court proceeding-even if [she] is a state employee who has perjured [herself]-has not acted under color of state law for purposes of § 1983.' ") (quoting *McArthur v. Bell,* 788 F.Supp. 706, 710 (E.D .N.Y.1992)).

Although these individuals are clearly not state actors, the Court recognizes that a private actor can be considered as acting under the color of state law for purposes of Section 1983 if the private actor was " 'a willful participant in joint activity with the State or its agents.' " *See Ciambriello,* 292 F.3d at 324 (quoting *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)) (citation omitted). This potential liability also applies to a court-appointed attorney where the attorney "conspires with a state official to violate the plaintiff's constitutional rights." *Fisk v. Letterman,* 401 F.Supp.2d 362, 378 (S.D.N.Y.2005). Thus, the Court will next examine plaintiff's conspiracy claim to determine whether the allegations are sufficient to survive a motion to dismiss.

### (2) Conspiracy Pursuant to § 1983

 **\*8**  The plaintiff alleges that "all of the defendants ... acted in collusion with the Suffolk County District Attorney's Office and thereby *UNDER COLOR OF STATE LAW* to violate my Federal and State 4th, 5th, 6th and 14th Amendment Constitutional Rights of The Accused." Specifically plaintiff alleges that the Legal Aid defendants conspired with the County Defendants, Bray, and Ms. Peterson to: (1) prevent him from testifying before a grand jury;

(2) deny him effective assistance of counsel; and charge him with additional, higher counts.

The mere use of the term "conspiracy" or "collusion" does not instantly transform a private actor into a state actor for purposes of Section 1983 and is clearly insufficient to satisfy Rule 12(b) (6) in connection with a Section 1983 conspiracy claim. *See Ciambriello,* 292 F.3d at 324 ("A merely conclusory allegation that a private entity acted in concert with a state actor does not suffice to state a § 1983 claim against the private entity."). Instead, "[i]n order to survive a motion to dismiss on a § 1983 conspiracy claim, the plaintiff must allege (1) an agreement between two or more state actors, (2) concerted acts to inflict an unconstitutional injury, and (3) an overt act in furtherance of the goal." *Carmody v. City of New York,* No. 05-CV-8084 (HB), 2006 U.S. Dist. LEXIS 25308, at \*16 (S.D.N.Y. May 11, 2006) (citing *Ciambriello v. County of Nassau,* 292 F.3d 307, 324-35 (2d Cir.2002)). Vague and conclusory allegations that defendants have engaged in a conspiracy must be dismissed. *See Ciambriello,* 292 F.3d at 325 (dismissing conspiracy allegations where they were found "strictly conclusory");

*see also Walker v. Jastremski,* 430 F.3d 560, 564 n. 5 (2d Cir.2005) ("[C]onclusory or general allegations are insufficient to state a claim for conspiracy under § 1983.") (citing *Ciambriello; Sommer v. Dixon,* 709 F.2d 173, 175 (2d Cir.1983) ("A complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss."); *Green v. Bartek,* No. 3:05-CV-1851, 2007 WL 4322780, at *3 (D.Conn. Dec. 7, 2007) ("The Second Circuit has consistently held that a claim of conspiracy to violate civil rights requires more than general allegations.").

The need to guard against the use of conclusory allegations of conspiracy in the context of Section 1983 lawsuits against private actors is particularly compelling. If a plaintiff could overcome a motion to dismiss simply by alleging in a conclusory fashion a "conspiracy" between private actors and state actors, these private actors-including lawyers and witnesses-would be subjected to the substantial cost and disruption incurred by litigants in the discovery phase of these lawsuits, without any indication whatsoever that the plaintiff has a "plausible" conspiracy claim. As the Second Circuit has emphasized, these conspiracy claims are "so easily made and can precipitate such protracted proceedings with such disruption of governmental functions" that "detailed fact pleading is required to withstand a motion to dismiss" them. *Angola v. Civiletti,* 666 F.2d 1, 4 (2d Cir.1981).

**\*9** As discussed below, the complaint does not contain any specific allegations supporting a "plausible" conspiracy claim involving these private actors and the County Defendants. *Pro se* plaintiff's complaint is nothing more than a compendium of conclusory, vague, and general allegations of a conspiracy to deprive him of constitutional rights. "Diffuse expansive allegations are insufficient, unless amplified by specific instances of misconduct." *Ostrer v. Aronwald,* 567 F.2d 55, 533 (2d Cir.1997). Of course, the Court recognizes that "[a plaintiff is not required to list the place and date of defendant[']s meetings and the summary of their conversations when he pleads conspiracy, ... but the pleadings must present facts tending to show agreement and concerted action." *Fisk v. Letterman,* 401 F.Supp.2d 362, 376 (S.D.N.Y.2005) (report and recommendation), accepted by, in part, rejected by, in part, *Fisk v. Letterman,* 401 F.Supp.2d 362 (S.D.N.Y.2005) (citations and quotations omitted). As the Supreme Court recently articulated in *Bell Atlantic Corp. v. Twombly,* although a plaintiff does not need to provide detailed factual allegations, the allegations in the complaint

must be "enough to raise a right to relief above the speculative level." 127 S.Ct. at 1965.

#### i. Wilma Peterson

Plaintiff alleges that Ms. Peterson participated in the malicious prosecution against him by providing false testimony to the second grand jury and at trial that plaintiff had broke her bottom teeth. Moreover, plaintiff alleges that the defendant prosecutors were complicit in that perjury because the defendant prosecutors failed to correct the testimony. Nowhere in the complaint does plaintiff specifically assert that an explicit, or even implicit, agreement existed between Ms. Peterson and the defendant prosecutors to enter into a conspiracy. *See Ciambriello,* 292 F.3d at 324 (dismissing Section 1983 conspiracy claim because "[a]bsent from [plaintiff's] complaint are any factual allegations suggesting that [the private actor defendant] conspired with the County"). Plaintiff simply relies on vague and conclusory allegations to imply that Ms. Peterson conspired with the defendant prosecutors. The mere allegation that Ms. Peterson committed perjury regarding damage to her teeth, and the prosecutor's alleged failure to correct such testimony, is insufficient to support a conspiracy claim. *See, e.g ., Rzayeva v. United States,* 492 F.Supp.2d 60 (D.Conn.2007) ("Plaintiffs' vague and conclusory allegations against private 'conspirators' are entirely unclear, unsupported by facts, and insufficient to substantiate their claims."); *Fiske,* 401 F.Supp.2d at 377 ("Communications between a private and a state actor, without factssupporting a concerted effort or plan between the parties, are insufficient to make the private party a state actor."); *see also Marion v. Groh,* 954 F.Supp. 39, 43 (D.Conn.1997) (dismissing Section 1983 claim against a private citizen who testified against plaintiff at criminal trial where plaintiff made only generalized conspiracy allegations). Accordingly, plaintiff's claims of conspiracy regarding Ms. Peterson must be dismissed.

#### ii. Legal Aid Defendants

**\*10** Plaintiff alleges that the Legal Aid defendants engaged in numerous conspiracies with the other defendants which include: (1) denying plaintiff his right to counsel; (2) preventing plaintiff from testifying before the grand jury; (3) allowing the defendant prosecutors to "lift" the indictment into the county court; and (4) adding the additional charge of assault in the first degree to the indictment.

2008 WL 4394681

Viewing the allegations in the light most favorable to plaintiff, the Court finds that plaintiff has not alleged a conspiracy involving the Legal Aid defendants and any other named party. Plaintiff has failed to articulate any allegations that would suggest that these alleged failures in performance by his attorneys, even if accepted as true, could plausibly support a claim that the Legal Aid defendants were part of a conspiracy with the County defendants. In fact, plaintiff failed to allege that Legal Aid defendants entered into an explicit or implicit agreement with any other named party to this lawsuit. Moreover, as the Second Circuit has noted, generalized allegations of conspiracy "ring especially hollow" where, as here, the parties alleged to be part of the same conspiracy have an "adversarial relationship." *Ciambriello,* 292 F.3d at 324. Given the complete absence of anything other than conclusory allegations of conspiracy, the Section 1983 claims against his Legal Aid attorneys cannot survive a motion to dismiss. *See also Green v. Bartek,* No. 3:05CV1851 (SRU), 2007 WL 4322780, at *3 (D.Conn. Dec. 7, 2007) (dismissing Section 1983 claim against plaintiff's appointed attorney in Family Court where, "[a]lthough [plaintiff] includes several statements regarding an alleged conspiracy, he includes no facts to support this claim"); *Williams v. Jurow,* No. 05 Civ. 6949(DAB), 2007 WL 5463418, at *12 (S.D.N.Y. June 29, 2007) ("Since plaintiff has alleged no facts that would, even if accepted as true, establish that the Legal Aid Defendants' conduct constituted state action, the constitutional claims against them should be dismissed.") (report and recommendation); *Brewster v. Nassau County,* 349 F.Supp.2d 540, 547 (E.D.N.Y.2004) (dismissing Section 1983 claim against Legal Aid Society where plaintiff alleged in a conclusory fashion that Legal Aid waived his rights and failed to adequately represent him in order to "benefit themselves and/or District Attorney," but did "not actually allege[ ] any facts indicating an agreement to act in concert to harm him"); *Hom v. Brennan,* 304 F.Supp.2d 374, 378-79 (E.D.N.Y.2004) (dismissing Section 1983 claim against supervising attorney with the Nassau-Suffolk Law Services because "plaintiff fails to allege with particularity what the alleged conspiracy is, the purpose of the conspiracy, who was involved in the conspiracy, the existence of an act in furtherance of the conspiracy, or that he was injured as a result of the conspiracy"); *Braxton v. Brown,* No. 96 CV 187, 1997 WL 43525, at *3 (E.D.N.Y. Jan. 28, 1997) ("Notwithstanding the latitude afforded a *pro se* complaint, plaintiff fails to allege any facts supporting an inference that the Defense Attorney defendants colluded with the District Attorney defendants. While plaintiff's allegations

might support a state law malpractice action against his former defense attorneys, they do not support a federal court's exercise of jurisdiction under Section 1983.").

**\*11** In sum, having failed to sufficiently allege a conspiracy cause of action between Ms. Peterson, the Legal Aid defendants, and any state actor, the Court dismisses the Section 1983 claim against Ms. Peterson and the Legal Aid defendants. [2]

[2]    Defendant John A. Bray is the court-appointed attorney who replaced the Legal Aid defendants in defending plaintiff in his criminal case. (Compl.¶ 6.) Although defendant Bray has never appeared in this action (and it is unclear whether he was ever served), the Court dismisses the claims against him *sua sponte* because, like the Legal Aid defendants, he is not a state actor. Plaintiff has failed to state a cause of action under Section 1983 against him and plaintiff's claim against Bray, like the other claims in this case, is frivolous. *See, e.g., Liner v. Goord,* 196 F.3d 132, (2d Cir.1999) (holding that district court is authorized to "dismiss the complaint *sua sponte* if, among other things, the complaint is 'frivolous, malicious, or fails to states [sic] a claim upon which relief may be granted' ") (quoting 28 U.S.C. § 1915(a) & (b)(1)).

(3) Other Defects in Claims
against the Legal Aid Defendants

In addition to the legal defects discussed in detail above, there are a number of other grounds set forth by the Legal Aid defendants which independently require dismissal of plaintiff's claims against them as a matter of law.

First, although plaintiff claims that his constitutional rights were violated by the Legal Aid defendants because they failed to ensure his right to appear before the grand jury and testify, it is axiomatic that there is no constitutional right to testify before the grand jury. *See Burwell v. Superintendent of Fishkill Correctional Facility,* No. 06 Civ. 787(JFK), 2008 WL 2704319, at *8 (S.D.N.Y. July 10, 2008) ("[T]here is no federal constitutional right to testify before the grand jury. In fact, there is no federal right to a grand jury in state criminal prosecutions."); *Affser v. Murray,* No. 04 CV 2715, 2008 WL 2909367, at *7 (E.D.N.Y. July 28, 2008) ("[C]ounsel's alleged failure to secure petitioner's presence before the grand jury

does not constitute ineffective assistance") (collecting cases). Thus, any claimed deprivation of such a right is not actionable under Section 1983. *See Frankos v. LaVallee,* 535 F.2d 1346, 1348 n. 3 (2d Cir.1976) ("The complaint alleges that appellees successfully conspired to prevent appellant from testifying at a grand jury investigation of the prison stabbing and that attorney Wylie was incompetent in handling plaintiff's request to testify there. Since one must allege deprivation of a constitutional right under 42 U.S.C. § 1983 and 42 U.S.C. § 1985, and there is no claim that there is a constitutional right to testify at a grand jury proceeding, the judgment of dismissal of these claims for relief is affirmed for lack of subject matter jurisdiction.").

Second, plaintiff suffered no injury from these alleged deprivations because, as set forth in plaintiff's complaint, the court dismissed the initial indictment and a superseding indictment was presented to a second grand jury during which plaintiff had the opportunity to testify, but refused to do so. (Compl.¶¶ 6(D), 8.) To the extent that plaintiff complains about the charges presented to the second grand jury or about his criminal trial, it is clear that he has no plausible claim for any such allegations against the Legal Aid defendants because they were replaced as his attorneys prior to the presentation of the superseding indictment to the second grand jury.

Third, plaintiff was convicted of all of the charges that were the subject of the initial indictment, which he claimed was the result of ineffective and unconstitutional conduct by the Legal Aid defendants. According to the complaint, the additional higher count of assault in the first degree was only contained in the second grand jury, at a time when he was no longer represented by the Legal Aid defendants. (Compl.¶ 9.) Therefore, any malicious prosecution claims, including any malicious prosecution conspiracy, against the Legal Aid defendants related to the charges in the first indictment are barred by Supreme Court's decision in *Heck v. Humphrey,* 512 U.S. 477 (1994). [3]

[3]   The Legal Aid defendants also note that the plaintiff appealed his conviction and raised all of the identical arguments he now asserts in this civil lawsuit regarding alleged defects in the indictment, malicious prosecution, and ineffective assistance of counsel. The Appellate Division, Second Department denied his appeal and found his arguments were without merit. *See People v. Flores,* 40 A.D. 876, 878 (2d Dep't 2007) ("The defendant's remaining contentions, including

those raised in his supplemental pro se brief, that the indictment was defective, that he was maliciously prosecuted, and that he was deprived of the effective assistance of counsel, are without merit."). The Court of Appeals also denied Flores leave to appeal. *See People v. Flores,* 9 N.Y .3d 875 (2007).

**\*12**   Finally, even assuming *arguendo* that some Section 1983 claim could exist based solely on the alleged ineffective conduct by the Legal Aid defendants, it would be time-barred. With respect to Section 1983 and 1985 claims, federal courts generally apply the forum state's statute of limitations for personal injury claims, which is three years in the State of New York. *Pearl v. City of Long Beach,* 296 F.3d 76, 79 (2d Cir.2002) ( Section 1983), *cert. denied,* 538 U.S. 922 (2003); *Paige v. Police Dep't of Schenectady,* 264 F.3d 197, 199 n. 2 (2d Cir.2001) ( Section 1985). Here, as set forth in the complaint, the Legal Aid defendants ceased representing plaintiff in April 2003. (Compl.¶ 6(D).) Because plaintiff commenced this action on September 5, 2007, more than three years after Legal Aid represented him, the claims against the Legal Aid defendants would be untimely even assuming they existed, which they do not for the other reasons outlined by the Court.

In sum, plaintiff does not have a plausible Section 1983 claim against the private actors-defendants Peterson, Mitchell, Vitale, O'Connor, and Bray-and such claims are dismissed as a matter of law under Rule 12(b)(6).

### B. Absolute Immunity

Plaintiff sues the various County Defendants-DA Spota and ADAs Kevins, Scarglato, and Brown-for allegedly improper conduct (1) in connection with his indictment in the grand jury by conspiring to deny him representation by counsel and to prevent him from testifying before the grand jury; and (2) in connection with his trial by eliciting perjured testimony from witnesses, including Ms. Peterson, and not correcting such testimony. Plaintiff asserts claims against these defendants for malicious prosecution, conspiracy to maliciously prosecute, and "deliberate indifference" to the fact that his rights were being violated in the above-referenced manners.

Defendants argue that the Court should dismiss plaintiff's claims against DA Spota and ADAs Kevins, Scarglato, and Brown on the grounds of absolute immunity. As set forth below, the Court agrees. It is abundantly clear from a review of the conduct allegedly attributed to these prosecutors that

2008 WL 4394681

all of the conduct was undertaken in their roles as Assistant District Attorneys (or in Mr. Spota's instance, as District Attorney) during the active prosecution of plaintiff and, thus, they are absolutely immune from a civil suit for damages under Section 1983.

"It is by now well established that a state prosecuting attorney who acted within the scope of his duties in initiating and pursuing a criminal prosecution is immune from a civil suit for damages under § 1983." *Shmueli v. City of New York,* 424 F.3d 231, 236 (2d Cir.2005) (quoting *Imbler v. Pachtman,* 424 U.S. 409, 410, 431 (1976) (citation and quotation marks omitted)). "[D]istrict courts are encouraged to determine the availability of an absolute immunity defense at the earliest appropriate stage, and preferably before discovery.... This is because '[a]n absolute immunity defeats a suit at the outset, so long as the official's actions were within the scope of the immunity.' " *Deronette v. City of New York,* No. 05-CV-5275, 2007 U.S. Dist. LEXIS 21766, at * 12 (E.D.N.Y. Mar. 27, 2007) (citing *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985) and quoting *Imbler,* 424 U.S. at 419 n. 13). However, the Second Circuit has held that in the context of a motion to dismiss under Rule 12(b)(6), "when it may not be gleaned from the complaint whether the conduct objected to was performed by the prosecutor in an advocacy or an investigatory role, the availability of absolute immunity from claims based on such conduct cannot be decided as a matter of law on a motion to dismiss." *Hill v. City of New York,* 45 F.3d 653, 663 (2d Cir.1995).

**\*13** "In determining whether absolute immunity obtains, we apply a 'functional approach,' looking to the function being performed rather than to the office or identity of the defendant." *Hill,* 45 F.3d at 660 (quoting *Buckley v. Fitzsimmons,* 509 U.S. 259, 269 (1993)). In applying this functional approach, the Second Circuit has held that prosecutors are entitled to absolute immunity for conduct " 'intimately associated with the judicial phase of the criminal process.' " *Fielding v. Tollaksen,* No. 06-5393-cv, 2007 U.S.App. LEXIS 28939, at *3-*4 (2d Cir. Dec. 12, 2007) (quoting *Imbler,* 424 U.S. at 430; *Hill,* 45 F.3d at 661 (same). In particular, "[s]uch immunity ... extends to acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State." *Smith v. Bodak,* 147 F.3d 91, 94 (2d Cir.1998) (citation and quotation marks omitted). On the other hand, "[w]hen a district attorney functions outside his or her role as an advocate for the People, the shield of immunity is absent. Immunity does not protect those acts

a prosecutor performs in administration or investigation not undertaken in preparation for judicial proceedings." *Hill,* 45 F.3d at 661; *see also Carbajal v. County of Nassau,* 271 F.Supp.2d 415, 421 (E.D.N.Y.2003) ("[W]hen a prosecutor supervises, conducts, or assists in the investigation of a crime, or gives advice as to the existence of probable cause to make a warrantless arrest-that is, when he performs functions normally associated with a police investigation-he loses his absolute protection from liability.").

Once a court determines that a prosecutor was acting as an advocate, "a defendant's motivation in performing such advocative functions as deciding to prosecute is irrelevant to the applicability of absolute immunity." *Shmueli,* 424 F.3d at 237 (quoting *Bernard,* 356 F.3d at 502); *see also Kleinman v. Multnomah Cty.,* No. 03-1723-KI, 2004 U.S. Dist. LEXIS 21466, at * 18 (D.Or. Oct. 15, 2004) ("The Ninth Circuit has interpreted *Imbler* to support absolute prosecutorial immunity even when a plaintiff alleges that the prosecutor went forward with a prosecution he believed not to be supported by probable cause.").

Plaintiff claims that defendant prosecutors maliciously commenced a criminal prosecution against plaintiff "through fraud and perjury" and "without probable cause to believe [he] committed the crime." *See* Compl. at 15. Specifically, plaintiff claims that the defendant prosecutors filed a second indictment with the additional charge of first degree assault, as punishment for plaintiff's protestations that he was denied his right to counsel. *See id.* Plaintiff further alleges that this additional charge was added as retribution due to plaintiff's grievances filed against the defendant prosecutors and Judge Ohlig. *See id.* In addition, plaintiff alleges that the defendant prosecutors knowingly elicited false testimony from Ms. Peterson in order to establish the necessary elements for first degree assault. (*See* Compl. at 16.)

**\*14** "It is settled law that when a prosecutor presents evidence to a grand jury and at trial he is acting as an advocate and entitled to absolute immunity on claims that the evidence presented was false." *Urrego v. U.S.,* No. 00 CV 1203, 2005 WL 1263291, at *2 (E.D.N.Y. May 27, 2005) (finding that a prosecutor is entitled to absolute immunity where he was alleged to have presented false evidence in order to obtain a superceding indictment) (citing *Buckley,* 509 U.S. 260; *Hill,* 45 F.3d at 662; *Bernard v. County of Suffolk,* 356 F.3d 495, 505 (2d Cir.2003)); *see also Storck v. Suffolk County Dep't of Social Servs.,* 62 F.Supp.2d 927, 943 (E.D.N.Y.1999) ("A prosecutor is also absolutely immune from charges alleging

2008 WL 4394681

the withholding of exculpatory evidence from a grand jury and suppressing *Brady* material. An allegation of conspiracy to perform the foregoing acts does not change the conclusion that the acts are entitled to absolute immunity.") (citations omitted). "[A]bsolute immunity protects a prosecutor from § 1983 liability for virtually all acts, regardless of motivation, associated with his function as an advocate. This would even include ... allegedly conspiring to present false evidence at a criminal trial." *Dory v. Ryan,* 999 F.2d 679 (2d Cir.1993), *as modified at* 25 F.3d 81, 83 (2d Cir.1994). In *Tellier v. Petrillo,* plaintiff alleged that the United States attorneys had "formed a conspiracy to fabricate a new charge, not contained in the original indictment" and had "conspired to present the fabricated evidence to a grand jury in order to obtain a superceding indictment." 133 F.3d 907 (2d Cir.1997.) The Second Circuit affirmed the dismissal of the complaint, noting that the presentation of a superceding indictment was protected by absolute immunity. *Id.* Further, the Second Circuit has specifically held that a prosecutor's determination of which offenses to charge also is protected by absolute immunity. *Ying Jing Gan v. City of New York,* 996 F.2d 522, 530 (2d Cir.1993).

It is clear that defendant prosecutors' decision to seek a second indictment with the additional charge of first degree assault, as well as any alleged attempt to elicit false testimony from a witness, would be protected by absolute immunity. Similarly, defendants are absolutely immune from suit for any of the wrongful acts alleged in the complaint by plaintiff related to his claim that they presented perjured testimony at trial. Finally, any claim that the prosecutors deprived plaintiff of his right to testify before the first grand jury is also within the ambit of absolute immunity. [4] *See, e.g., Phillips v. Eppolito,* No. 02 Civ. 5662(DLC), 2004 WL 540481, at *2 (S.D.N.Y. March 17, 2004) ("The Complaint asserts that [the ADA] failed to permit [plaintiff] to testify in front of the Grand Jury. The act of failing to permit [plaintiff] to testify before a Grand Jury falls within the scope of activities protected by the doctrine of absolute immunity. Therefore, the claim of malicious prosecution against [the ADA] must be dismissed."); *Braxton v. Brown,* No. 96 CV 187, 1997 WL 43525, at *2 (E.D.N.Y. Jan. 28, 1997) ("Plaintiff's complaint against the District Attorney defendants-that they denied him the right to testify before the Grand Jury-is based on their presentation of a case before the Grand Jury. It therefore falls within the scope of the prosecutors' absolute immunity.").

[4]    To the extent that plaintiff is attempting to argue that absolute immunity should not apply

because of some conspiracy between the County Defendants and private actors (such as the Legal Aid defendants and Ms. Peterson), that claim also fails for the reasons discussed in great detail in connection with the Legal Aid defendants and Ms. Peterson. Specifically, plaintiff alleges nothing more than conclusory allegations of conspiracy which are insufficient to survive a motion to dismiss.

 **\*15**  Accordingly, plaintiff's claims against the defendants Spota, Kevins, Scarglato, and Brown are dismissed based on the doctrine of absolute immunity. [5]

[5]    Plaintiff also alleges that Judge Ohlig conspired with the Legal Aid defendants and the defendant prosecutors to maliciously prosecute the plaintiff. Although Judge Ohlig has failed to appear in the case, the Court, *sua sponte,* finds that Judge Ohlig is entitled to absolute immunity. "A judge defending against a section 1983 suit is entitled to absolute immunity from damages for actions performed in his judicial capacity." *Fields v. Soloff,* 920 F.2d 1114, 1119 (2d Cir.1990). Where a judge is acting in a judicial capacity, no liability exists even if the judicial action "was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the clear absence of all jurisdiction." *Stump v. Sparkman,* 435 U.S. 349, 356-57 (1978). "[F]undamentally, since absolute immunity spares the official any scrutiny of his motives, an allegation that an act was done pursuant to a conspiracy has no greater effect than an allegation that it was done in bad faith or with malice, neither of which defeats a claim of absolute immunity." *Dorman v. Higgins,* 821 F.2d 133, 139 (2d Cir.1987). Plaintiff alleges that the judge failed to rule on plaintiff's motion and back-dated his ruling. Any action taken by Judge Ohlig in connection with rendering a decision or acting upon plaintiff's motion is clearly within the judicial capacity of the court. Accordingly, Judge Ohlig is absolutely immune from suit and plaintiff's claims against Judge Ohlig are dismissed.

C. Deliberate Indifference

Defendants also move to dismiss the claim for "deliberate indifference" to the alleged violations of his constitutional rights. As a threshold matter, any attempt to assert such a claim against the District Attorney, or the Assistant District Attorneys or Judge Ohlig, must be dismissed based on the doctrine of absolute immunity as described *supra.* Similarly, any attempt to bring such a claim against the private actor defendants-Ms. Peterson, the Legal Aid defendants, or court-appointed attorney Bray-must be dismissed for the reasons outlined *supra.*

With respect to the only remaining defendant, County Executive Steve Levy, there is simply no plausible cause of action under Section 1983. To the extent plaintiff is attempting to sue Mr. Levy in his individual capacity, it is beyond cavil that the County Executive cannot be held responsible for the actions of the independently-elected District Attorney's decision to indict and prosecute a defendant. Similarly, to the extent that Mr. Levy is being sued in his official capacity in an attempt to allege some type of municipal liability against the County, that claim must also fail as a matter of law. A district attorney in New York State, when prosecuting a criminal matter, acts in a quasi-judicial manner and represents the State, not the County. Thus, a county cannot establish policy in connection with how a district attorney should prosecute New York State penal laws. Therefore, no municipal liability can arise from the District Attorney's decision to prosecute. In short, plaintiff has failed to articulate any plausible claim for municipal liability given his allegations in the complaint. Accordingly, the claim against the County Executive and any municipal liability claim must be dismissed as a matter of law.

### D. Leave to Replead

Although plaintiff has not requested leave to amend or replead his complaint, the Court has considered whether plaintiff should be given an opportunity to replead. The Second Circuit has emphasized that

> A *pro se* complaint is to be read liberally. Certainly the court should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any

indication that a valid claim might be stated.

*Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (quotations and citations omitted). Under Rule 15(a) of the Federal Rules of Civil Procedure, "leave [to amend] shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). However, even under this liberal standard, this Court finds that any attempt to amend the pleading in this case would be futile. [6] As discussed in detail *supra,* it is clear from the complaint (as well as plaintiff's detailed submissions in opposition to the motion) that he does not have any possibility of asserting a plausible Section 1983 claim. This lawsuit is a blatant and frivolous attempt to sue private actors-such as the key prosecution witness (Ms. Peterson) and his court-appointed criminal defense attorneys-because he believes that they separately contributed to his indictment and conviction, even though such actors clearly do not have Section 1983 liability given the allegations in plaintiff's complaint. *See, e.g., Contes v. City of New York,* No. 99 Civ. 1597(SAS), 1999 WL 500140, at *11 (S.D.N.Y. July 14, 1999) ("It would be futile to grant leave to replead in this case. Without state action, which is lacking here, [plaintiff] cannot prevail on a claim pursuant to § 1983."). Similarly, plaintiff sues the District Attorney and ADAs even though their alleged wrongful conduct in the grand jury and at trial, which is described in the complaint, is clearly protected by absolute immunity. In essence, plaintiff is primarily seeking to re-litigate issues, via this civil lawsuit, that he unsuccessfully challenged on direct appeal in seeking to have his conviction overturned against parties who have no Section 1983 liability even if the facts alleged in his complaint are true. After carefully reviewing all of plaintiff's submissions, it is abundantly clear that no amendments can cure these pleading deficiencies and any attempt to replead would be futile. *See Cuoco,* 222 F.3d at 112 ("The problem with [plaintiff's] cause[ ] of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied."); *see also Hayden v. County of Nassau,* 180 F.3d 42, 54 (2d Cir.1999) (holding that if a plaintiff cannot demonstrate he is able to amend his complaint "in a manner which would survive dismissal, opportunity to replead is rightfully denied").

6     In reaching this determination, the Court has reviewed all of the plaintiff's submissions, including the documents that he attached to his

opposition, all of which confirm the futility of any amendment as to the proposed federal claims.

### III. CONCLUSION

**\*16** For the foregoing reasons, defendants' motions to dismiss plaintiff's claims are GRANTED in their entirety. The Clerk of the Court shall enter judgment accordingly and close this case.

The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this order would not be taken in good faith; therefore, *in forma pauperis* status is denied for purpose of an appeal. *See Coppedge v. United States,* 369 U.S. 438, 444-45 (1962).

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 4394681

---

End of Document

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Ryle v. Rehrig Pacific Co., Not Reported in Fed. Supp. (2020)

2020 WL 6196144

2020 WL 6196144
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Joseph RYLE, Jr., Plaintiff,

v.

REHRIG PACIFIC CO.; and Michael Bush, Defendants.

1:19-CV-1478 (GTS/DJS)
|
Signed 10/22/2020

**Attorneys and Law Firms**

OF COUNSEL: KRISTIE HALLORAN HANSON, ESQ.,
HANSON LAW FIRM, Counsel for Plaintiff, 1801 Altamont
Avenue, Schenectady, NY 12303.

OF COUNSEL: CHRISTOPHER JOHN STEVENS, ESQ.,
KRISTI RICH WINTERS, ESQ., JACKSON LEWIS, P.C.,
Counsel for Defendants, 677 Broadway, 4th Floor, Albany,
NY 12110.

**DECISION and ORDER**

GLENN T. SUDDABY, Chief United States District Judge

*1 Currently before the Court, in this action filed by Joseph
Ryle, Jr. ("Plaintiff") against Rehrig Pacific Company and
Michael Bush ("Defendants"), are the following two motions:
(1) Defendants' motion to dismiss Plaintiff's Complaint for
failure to state a claim upon which relief can be granted;
and (2) Plaintiff's cross-motion for leave to file an Amended
Complaint. (Dkt. Nos. 7, 10.) For the reasons set forth below,
Defendants' motion is granted, and Plaintiff's cross-motion is
denied.

**I. RELEVANT BACKGROUND**

**A. Plaintiff's Complaint**
Generally, in his Complaint, Plaintiff asserts eight claims:
(1) a claim of negligence resulting in personal injury
based on (i) harassment, discrimination, and derogatory
statements directed at him by Defendant Bush, and (ii)
Defendant Rehrig's failure to take corrective action based
on those statements despite being made aware of them; (2)
a claim that Defendant Bush's harassment, discrimination,
and derogatory statements created a nuisance that caused

him to sustain personal injuries; (3) a claim that Defendant
Bush's conduct towards him constituted intentional infliction
of emotional distress ("IIED"); (4) a claim of slander based
on defamatory oral statements that Defendant Bush made
about him to other employees; (5) a claim of discrimination
based on discriminatory conduct and defamatory statements
by Defendant Bush that ultimately led to Plaintiff being
constructively discharged; (6) a claim that Defendant Rehrig
wrongfully terminated his employment in retaliation for his
submission of a written complaint to the Employee Resources
Department regarding Defendant Bush's conduct; (7) a claim
that Defendants breached the employment contract with
Plaintiff by creating a retaliatory, hostile work environment
through failing to discipline employees in supervisory or
management positions related to Defendant Bush's conduct;
and (8) a claim that Defendants violated the Family Medical
Leave Act ("FMLA") through Defendant Bush's failure to
exercise due care when addressing the sensitive issues of
Plaintiff's wife and his need to intermittently take leave under
the FMLA. (Dkt. No. 2 [Pl.'s Compl.].)

**B. Parties' Briefing on Defendants' Motion to Dismiss**

**1. Defendants' Memorandum of Law**

Generally, in their motion to dismiss, Defendants argue that
Plaintiff's Complaint fails to state any plausible cause of
action. (Dkt. No. 7, Attach. 1, at 8-13 [Defs.' Mem. of Law].)

As to Plaintiff's negligence claim, Defendants argue that the
Complaint does not identify any duty that Defendants owed
to Plaintiff, or allege facts plausibly suggesting the other
elements of breach, causation, or damages. (Id. at 8.)

As to Plaintiff's nuisance claim, Defendants argue that a
nuisance claim is not relevant to this action (which does not
involve real property), but that, in any event, Plaintiff has not
alleged facts plausibly suggesting any duty Defendants owed
to Plaintiff or any of the other required elements of that claim.
(Id. at 9.)

As to Plaintiff's IIED claim, Defendants argue that Plaintiff
has not alleged facts plausibly suggesting any of the relevant
elements due to a complete lack of detail about the conduct
underlying the claim, and that, in any event, such a claim is
duplicative of the other more specific tort claims alleged. (Id.
at 9-10.)

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 75 of 370

Ryle v. Refrig Pacific Co., Not Reported in Fed. Supp. (2020)

2020 WL 6196144

**\*2** As to Plaintiff's slander claim, Defendants argue that Plaintiff has not even alleged what the slanderous statement was and has additionally failed to allege facts plausibly suggesting any of the other required elements of that claim. (*Id.* at 10.)

As to Plaintiff's discrimination claim, Defendants argue that Plaintiff has not alleged on what basis he was discriminated against or that he belongs to any protected class, has not alleged facts plausibly suggesting that the termination of his employment was due to discrimination, and has not even stated whether this claim was brought under federal or New York law. (*Id.* at 11.)

As to Plaintiff's breach of contract claim, Defendants argue that Plaintiff has not alleged what provision of his employment contract was allegedly breached and has not alleged facts plausibly suggesting any of the required elements of that claim. (*Id.* at 11-12.)

As to Plaintiff's FMLA claim, Defendants argue that Plaintiff has not clearly asserted what right under the FMLA was violated by Defendants' conduct, and that he has not alleged facts plausibly suggesting either an interference claim or a retaliation claim because he has not alleged that he was denied any benefit to which he was entitled under the FMLA or that his termination occurred under circumstances giving rise to an inference of discrimination. (*Id.* at 12-13.)

### 2. Plaintiff's Opposition Memorandum of Law

Generally, in his opposition memorandum of law, Plaintiff argues that his Complaint states plausible causes of action, because (a) he alleged facts plausibly suggesting that Defendants breached their duty to provide a non-hostile work environment by ignoring his complaints about that environment, (b) he has alleged facts to plausibly allege his claim for IIED specifically based on the allegations of Defendants' behavior, and (c) he has alleged facts plausibly suggesting that Defendant Bush slandered him. (Dkt. No. 10, Attach. 2, at 9 [Pl.'s Opp'n Mem. of Law].)

### C. Parties' Briefing on Plaintiff's Cross-Motion to File an Amended Complaint

#### 1. Plaintiff's Memorandum of Law

Generally, Plaintiff argues that he should be permitted to amend his Complaint because leave to do so should be freely given when justice so requires in the absence of any evidence of bad faith, undue delay, or undue prejudice. (Dkt. No 10, Attach. 2, at 8 [Pl's Opp'n Mem. of Law].)

#### 2. Plaintiff's Proposed Amended Complaint

In his proposed Amended Complaint, Plaintiff adds his wife, Linda Ryle, as a co-Plaintiff. (Dkt. No. 12 [Proposed Am. Compl.].) Plaintiff also adds factual allegations to his original eight claims, and asserts eight new claims on behalf of Linda Ryle for the loss of society, services, and companionship related to the injuries alleged as a result of each of Plaintiff's eight claims. (*Id.*)

#### 3. Defendants' Opposition Memorandum of Law

Generally, in their opposition to Plaintiff's motion to file an Amended Complaint, Defendants make two arguments: (1) Plaintiff's motion should be denied as futile because the proposed Amended Complaint, even though adding factual allegations, still does not allege facts plausibly suggesting any valid claim; and (2) Plaintiff's motion to add Linda Ryle as a co-Plaintiff should be denied because she is an improper party due to the fact that she never worked for Defendants or was in any way involved with Defendants, and because her claims for loss of consortium must stand or fall with the substantive claims on which they rely, and, as already argued, Plaintiff has not alleged facts plausibly suggesting that any of those underlying substantive claims are valid. (Dkt. No. 13, at 5-14 [Defs.' Reply Mem. of Law].)

## II. GOVERNING LEGAL STANDARDS

**\*3** It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed. R. Civ. P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed. R. Civ. P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cty.,* 549 F. Supp.2d 204, 211 nn. 15-16 (N.D.N.Y. 2008) (McAvoy, J.) (adopting Report-Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, some elaboration regarding that ground is appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 76 of 370

Ryle v. Refrig Pacific Co., Not Reported in Fed. Supp. (2020)

2020 WL 6196144

that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) [emphasis added]. In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed. R. Civ. P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed. R. Civ. P. 8(a)(2) as "simplified" and "liberal." *Jackson*, 549 F. Supp. 2d at 212 n.20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed. R. Civ. P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson*, 549 F. Supp. 2d at 212 n.17 (citing Supreme Court cases) (emphasis added).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson*, 549 F. Supp. 2d at 212 n.18 (citing Supreme Court cases); *Rusyniak v. Gensini,* 629 F. Supp. 2d 203, 213 & n.32 (N.D.N.Y. 2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed. 2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak,* 629 F. Supp. 2d at 213 n.22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949-52 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly*, the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly*, 127 S. Ct. at 560-61, 577. Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 555-70. The Court explained

that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id.* at 555. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.*

**\*4** As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not show[n]–that the pleader is entitled to relief." *Iqbal*, 129 S. Ct. at 1950 (internal quotation marks and citations omitted). However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.*, it "does not impose a probability requirement." *Twombly*, 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1949. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal*, 129 S. Ct. at 1949 (internal citations and alterations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

## III. ANALYSIS

### A. Whether Plaintiff's Complaint States a Claim Upon Which Relief Can Be Granted

After careful consideration, the Court answers this question in the negative for the reasons stated in Defendants' memorandum of law. (Dkt. No. 7, Attach. 1, at 8-13 [Defs.' Mem. of Law].) To those reasons, the Court adds the following analysis.

As discussed above in Part II of this Decision and Order, threadbare recitals of the elements of a cause of action and assertions without sufficient factual support are insufficient to meet even the liberal pleading standard required on a motion to dismiss. *Iqbal*, 129 S. Ct. at 1949. However, threadbare assertions devoid of factual support are precisely what Plaintiff's Complaint provides here. Of note, the relevant allegations that Plaintiff makes related to his various claims in his original Complaint are as follows: (a) from February 6, 2018, to April 4, 2019, Plaintiff was harassed and discriminated against in such a way that created a burden, nuisance, or intentional infliction of emotional distress; (b) he documented unspecified derogatory statements made about him by Defendant Bush and, on or about April 2, 2018, he submitted a written complaint to the Employee Resources Department regarding his concerns about Defendant Bush's statements; (c) on or about April 16, 2018, he received a letter stating that, as a result of the company's investigation into his complaint, Defendant Rehrig was dismissing all his claims against management and his supervisors; (d) Defendant Bush, as an employee of Defendant Rehrig and Plaintiff's supervisor, breached Plaintiff's employment contract by creating a retaliatory and hostile work environment that ultimately led to the termination of Plaintiff's employment; (e) Defendant Rehrig failed to discipline employees in supervisory or management positions; and (f) Defendant Bush was negligent in his duty as Plaintiff's supervisor to exercise due care towards Plaintiff when addressing the sensitive medical issues of Plaintiff's wife and Plaintiff's need for intermittent use of leave under the FMLA. (Dkt. No. 2 [Pl.'s Compl.].)

Notably, nowhere in his Complaint does Plaintiff allege facts related to how he was harassed or discriminated against (other than unspecified slanderous comments by Defendant Bush), the nature of the words Defendant Bush said that he alleges are slander, the nature of the injuries or emotional distress that he suffered as a result of Defendants' conduct, what portion of his employment contract he asserts was breached by Defendants' actions, or how Defendant Bush's response to Plaintiff's wife's unspecified medical condition and his need to use FMLA leave violated the FMLA. Without such basic factual allegations related to Plaintiff's claims, the Court finds that the Complaint fails to plausibly suggest that Defendants are liable for any misconduct under the law.

**B. Whether Plaintiff's Request to Amend the Complaint Should Be Denied As Futile**

**\*5** After careful consideration, the Court answers the above question in the affirmative for the reasons stated in Defendants' reply memorandum of law. (Dkt. No. 13, at 5-14 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following analysis.

A court should "freely give leave [to amend a complaint] when justice so requires." Fed. R. Civ. P. 15(a)(2). However, the Court is not required to grant leave to amend where such amendment would be futile, or, in other words, when any amendment would not be able to withstand a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *Byerly v. Ithaca Coll.*, 290 F. Supp. 2d 301, 305 (N.D.N.Y. 2003) (Scullin, C.J.). In determining whether amendments to the complaint would be futile, the Court may consider not only proposed amendments submitted by the plaintiff, but also "all possible amendments" that could be made. *Panther Partners Inc. v. Ikanos Commications, Inc.*, 347 F. App'x 617, 622 (2d Cir. 2009).

As to his negligence claim, Plaintiff adds the following relevant factual allegations: (a) Defendants had a duty to not be negligent towards their employees; (b) Defendants breached this duty when they ignored Plaintiff's complaints about Defendant Bush's harassing and derogatory behavior, including his formal written complaint; and (c) as a result of Defendants' conduct, Plaintiff developed severe post-traumatic stress disorder ("PTSD"), anxiety, depression, and panic attacks with agoraphobia that have rendered him unable to work. (Dkt. No. 12 [Proposed Am. Compl.].)

Under New York law, a negligence claim requires proof of the following three elements: (1) a duty owed to the plaintiff by the defendant; (2) a breach of that duty; and (3) an injury substantially caused by that breach. *Pasternack v. Laboratory Corp. of Am. Holdings*, 807 F.3d 14, 19 (2d Cir. 2015).

The Court agrees with Defendants that a duty "not to be negligent" is too broad a factual allegation to plausibly suggest the first element of a negligence claim. Construing the proposed Amended Complaint liberally, the Court finds that Plaintiff has (albeit more implicitly) alleged a slightly more defined duty of a supervisor or employer to not create a hostile work environment and to address complaints of the existence of a hostile work environment. Under New York law, "[t]he injured party must show that a defendant owed not merely a general duty to society but a specific duty to the particular claimant," and "[c]ourts traditionally fix the duty point by balancing factors, including the reasonable

Case 5:24-cv-01237-DNH-MJK   Document 10   Filed 11/12/24   Page 78 of 370

Ryle v. Rehrig Pacific Co., Not Reported in Fed. Supp. (2020)

2020 WL 6196144

expectations of parties and society generally, the proliferation of claims, the likelihood of unlimited or insurer-like liability, disproportionate risk and reparation allocation, and public policies affecting the expansion or limitation of new channels of liability." *In re September 11 Litig.*, 280 F. Supp. 2d 279, 290 (S.D.N.Y. 2003) (internal quotation marks omitted); *see also Alfaro v. Wal-Mart Stores, Inc.*, 210 F.3d 111, 114 (2d Cir. 2000) ("Identifying the scope of an alleged tortfeasor's duty is not something derived or discerned from an algebraic formula. Rather, it coalesces from vectored forces including logic, science, weighty competing socioeconomic policies and sometimes contractual assumptions of responsibility."). However, still, the Court is unable to find that the proposed Amended Complaint has alleged facts plausibly suggesting that Defendants owed a duty to Plaintiff.

**\*6** In any event, even if the proposed Amended Complaint's factual allegations are sufficient to plausibly suggest the existence of a valid legal duty, the Court finds that the only harm that Plaintiff alleges is emotional in nature, and thus his claim is more appropriately a claim for negligent infliction of emotional distress. (*See* Dkt. No. 12 [Pl.'s Proposed Am. Compl., alleging that, as a result of Defendants' conduct, he was diagnosed with severe PTSD, anxiety, depression, and panic attacks with agoraphobia, but alleging no physical harm or fear of physical injury].) Courts have been reluctant to permit recovery on negligence claims based on purely emotional harms unless certain specific conditions have been met. *Vumbaca v. Terminal One Gr. Ass'n L.P.*, 859 F. Supp. 2d 343, 374-76 (E.D.N.Y. 2012). Such claims can be sustained only where there have been allegations plausibly suggesting either a fear of physical injury as a direct result of the alleged conduct itself or that their emotional injury is genuine and substantial as the result of "special circumstances." *See Vumbaca*, 859 F. Supp. 2d at 375; *Ranta v. City of New York*, 14-CV-3794, 2020 WL 5043933, at *2-3 (E.D.N.Y. Aug. 26, 2020) (noting that "the New York Court of Appeals endorsed the view that, in some cases, 'an especial likelihood of genuine and serious mental distress, arising from the special circumstances ... serves as a guarantee that the claim is not spurious' ") (quoting *Johnson v. New York*, 37 N.Y.2d 378, 382 [N.Y. 1975]). "In the absence of fear of injury, the requisite guarantees of genuineness can be provided by the shocking or severe nature of the claim itself"; "a plaintiff's uncorroborated testimony of upsetness" does not suffice to guarantee the genuineness of his allegations of emotional harm. *Id.*; *see also Douyon v. N.Y. Med. Health Care, P.C.*, 894 F. Supp. 2d 245, 268 (E.D.N.Y. 2012) ("In the absence of fear of injury, the guarantee of genuineness can be provided by

the shocking or severe nature of the claim itself or psychiatric testimony.... If a plaintiff is relying on psychiatric testimony, he or she must present more than a plaintiff's uncorroborated testimony of upsetness").

Here, Plaintiff's allegations that Defendant Bush told people he was a lazy minority who was abusing the FMLA system and that Defendant Bush otherwise was harassing and derogatory towards him do not plausibly suggest either fear for his physical safety or the requisite shocking or severe conduct that has been found to constitute special circumstances by other courts. *See, e.g., Baker v. Dorfman*, 239 F.3d 415, 421 (2d Cir. 2000) (finding that negligently misdiagnosing a plaintiff with HIV was likely to constitute a special circumstance to allow for the recovery of purely emotional harm); *Ranta*, 2020 WL 5043933, at *3 (finding that wrongful conviction of a spouse or child would present a special likelihood of genuine and serious mental distress on that person's family members); *Johnson*, 37 N.Y.2d at 380 (finding special circumstances where the plaintiffs were negligently and mistakenly informed that their family member had died).

Additionally, even though Plaintiff has alleged that he was diagnosed with multiple mental impairments at an undisclosed time, has been unable to work or leave his house, and is receiving Social Security disability benefits as a result of his mental impairments (which arguably provide some corroboration for his allegations of emotional distress), the Court finds that his claim against Defendant Bush must fail because all the conduct he alleges Defendant Bush engaged in was intentional (i.e., he alleges that Defendant Bush caused his injury by making various harassing and derogatory statements). *See Trayvilla v. Japan Airlines*, 111 N.Y.S.3d 224, 225 (N.Y. App. Div. 2d Dep't 2019) (noting that allegations of intentional conduct cannot form the basis for a cause of action sounding in negligence); *Offor v. Mercy Medical Ctr.*, 98 N.Y.S.3d 69, 70 (N.Y. App. Div. 1st Dep't 2019) (dismissing claim for negligent infliction of emotional distress where the allegations underlying the claim involved intentional rather than negligent conduct); *Santana v. Leith*, 985 N.Y.S.2d 147, 148 (N.Y. App. Div. 2d Dep't 2014) (noting that "a claim must fail, where, as here, no allegations of negligence appear in the pleadings," in a case where the allegations of conduct consisted of allegations that the defendant attacked him with a hammer while using racial and ethnic slurs, conduct that the court characterized as intentional); *Regeda v. City of New York*, 09-CV-5427, 2012 WL 7157703, at *13 (E.D.N.Y. Sept.

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 79 of 370

Ryle v. Rehrig Pacific Co., Not Reported in Fed. Supp. (2020)

2020 WL 6196144

7, 2012) (finding that the negligent infliction of emotional distress claim should be dismissed because it was based on intentional conduct) report-recommendation adopted by 2013 WL 619567 (E.D.N.Y. Feb. 19, 2013). As a result, the Court finds that Plaintiff has not alleged facts plausibly suggesting a claim for negligence-based infliction of emotional distress as to Defendant Bush.

**\*7** As to Defendant Rehrig, the Court finds that Plaintiff has not alleged facts plausibly suggesting that Defendant Rehrig breached any duty it might have owed to Plaintiff. Plaintiff's proposed Amended Complaint acknowledges that (a) he filed his internal complaint on April 2, 2018, and (b) he received a letter on April 16, 2018, that stated that the company had performed an investigation of his complaint and was subsequently dismissing the claims made in that complaint. (Dkt. No. 12, at ¶¶ 29, 34, 36 [Pl.'s Proposed Am. Compl.].) Plaintiff therefore appears to acknowledge that Defendants did in fact perform some sort of investigation into his internal complaint, even if it did not result in a favorable finding on his claims; and he does not provide any factual allegations plausibly suggesting that this investigation was deficient, pretextual, or unfair.

Furthermore, although the pleadings of represented plaintiffs need not be liberally construed as having been effectively amended by factual allegations contained in their memoranda of law, here, the Court notes that Plaintiff alleges in his memorandum of law that, "[u]pon information and belief, Defendant Bush was suspended on April 5, 2018 and then terminated." (Dkt. No. 10, Attach. 2, at 6 [Pl.'s Opp'n Mem. of Law].) Given the timeline presented by Plaintiff, it therefore appears that Defendant Bush was in fact disciplined after Plaintiff made his internal complaint, although it is unclear whether the complaint was the reason for that discipline.

In short, taken together, the factual allegations of Plaintiff's proposed Amended Complaint do not plausibly suggest that Defendant Rehrig breached any duty it may have had to Plaintiff because, to the contrary, they suggest that Defendant Rehrig took various measures to address Plaintiff's concerns. As a result, Plaintiff has not alleged facts plausibly suggesting that Defendant Rehrig breached any duty it may have owed to Plaintiff to ensure that its employees did not create a hostile work environment.

As to his claim for nuisance, Plaintiff has not added any specific factual allegations, but instead continues to allege that Defendants' harassing and discriminatory conduct

created a nuisance. (Dkt. No. 12, at ¶¶ 15-17 [Proposed Am. Compl.].) Notwithstanding the factual insufficiency of Plaintiff's pleading of this claim, the Court agrees with Defendants that such a claim is not legally cognizable based on the facts alleged. Notably, a claim for private nuisance requires showing a substantial interference with a plaintiff's right to use and enjoy land that is intentional or negligent in origin and unreasonable in character and is caused by the defendant's actions or failure to act, while a claim for public nuisance requires a showing of a substantial interference with a right common to the public that is created, contributed, or maintained by defendant's negligent or intentional conduct or omissions causing a particular harm to the plaintiff that is different from the harm suffered by the community at large. Read v. Corning Inc., 351 F. Supp. 3d 342, 358 (W.D.N.Y. 2018). Because Plaintiff has not alleged facts regarding an interference with his right to use or enjoy land or with a right common the public, he cannot sustain a claim for either private or public nuisance.

As to his claim for IIED, Plaintiff adds the following relevant factual allegations: (a) Defendants' conduct in harassing him, discriminating against him, and making derogatory statements about him was extreme and outrageous in that it was beyond all possible bounds of decency, was atrocious, and was not of the sort of behavior that is tolerated in civilized society; (b) this conduct was intentionally taken with reckless disregard of the fact that it caused Plaintiff severe emotional distress; (c) Plaintiff's resulting emotional distress has rendered him unable to work or even leave his home; and (d) Defendant Bush told "everyone" that Plaintiff is a lazy minority drug user who was taking advantage of the FMLA. (Dkt. No. 12, at ¶¶ 20-23 [Proposed Am. Compl.].)

**\*8** Under New York law, to state a claim for IIED, a plaintiff must allege facts plausibly suggesting the following four elements: (1) extreme and outrageous conduct; (2) intent to cause severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress. Semper v. New York Methodist Hosp., 786 F. Supp. 2d 566, 586 (E.D.N.Y. 2011) (quoting Bender v. City of New York, 78 F.3d 787, 790 [2d Cir. 1996]). As to the first element, "defendant's conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community,' " and "[w]hether conduct is 'outrageous' is a matter of law to be decided by the court." Semper, 786 F. Supp. 2d at 586 (quoting Murphy v. Am. Home Prods. Corp., 448 N.E.2d 86, 90 [N.Y. 1983]).

Ryle v. Refrig Pacific Co., Not Reported in Fed. Supp. (2020)

2020 WL 6196144

Here, Plaintiff's allegations that Defendants harassed him, discriminated against him, and made derogatory comments that he was a lazy minority drug user who was taking advantage of the FMLA do not meet the high standard for stating a claim of IIED. *See Rother v. New York State Dep't. of Corrs. and Community Supervision*, 970 F. Supp. 2d 78, 104 (N.D.N.Y. 2013) (Kahn, J.) (finding that vandalism, shunning, and threats directed at plaintiff along with a single "highly offensive, mysogynist, and demeaning" statement were not sufficiently outrageous); *Biberaj v. Pritchard Indus., Inc.*, 859 F. Supp. 2d 549, 557, 564-65 (S.D.N.Y. 2012) (granting summary judgment against plaintiff on IIED claim where her supervisor and another employee repeatedly told her in front of others that she was "shit," "nothing," an animal, a "bitch," a "slut," and a "whore"); *Semper*, 786 F. Supp. 2d at 587 (noting that allegations that constitute "harassment, disrespectful or disparate treatment, a hostile environment, humiliating criticism, intimidation, insults or other indignities" are generally not sufficiently outrageous to sustain a claim of IIED). Nor has Plaintiff alleged facts plausibly suggesting that these actions were taken with the specific intent to cause Plaintiff severe emotional distress. As a result, Plaintiff's proposed amendments do not state a claim for IIED upon which relief can be granted.

As to his claim for slander, Plaintiff has added the following relevant factual allegations in his proposed Amended Complaint: (a) Defendant Bush intentionally made untrue and defamatory oral statements about him to other employees; (b) Defendant Bush would tell "anyone at the Company who would listen" that Plaintiff was "a minority lazy person" who "inappropriately used the Family Leave Act to take care of his sick wife, who was not sick at all"; and (c) these statements were not true and Defendants knew they were not true. (Dkt. No. 12, at ¶¶ 27-28 [Pl.'s Proposed Am. Compl.].)

Under New York law, to state a cause of action for slander, the plaintiff must allege facts plausibly suggesting (1) a defamatory statement of fact, (2) that is false, (3) published to a third party, (4) of and concerning the plaintiff, (5) made with the applicable level of fault on the part of the speaker, (6) that causes either special harm or constitutes slander per se, and (7) that is not protected by privilege. *Albert v. Loksen*, 239 F.3d 256, 265-66 (2d Cir. 2001).

Here, Plaintiff has not alleged facts plausibly suggesting in particular that he suffered any special harm. Rather, the only harm Plaintiff alleges is generic "personal injuries," which

the Court construes to mean the onset of the PTSD, anxiety, depressive disorder, and panic attacks with agoraphobia that he alleges were the result of Defendants' alleged negligence when harassing him. (Dkt. No. 12, at ¶¶ 12, 30 [Pl.'s Proposed Am. Compl.].) Unlike these emotional harms, special harm is defined as economic or pecuniary loss under New York law. *See Thompson v. Bosswick*, 855 F. Supp. 2d 67, 76 (S.D.N.Y. 2012). Additionally, the fact that Plaintiff alleges he is unable to work as a result of these statements does not constitute a special harm because he has not alleged facts plausibly suggesting that it was the slander itself (i.e., the spreading of those statements to others rather than the effect the words had on him personally) that caused any of his emotional injuries to the extent that he was rendered unable to work. *See Thompson*, 855 F. Supp. 2d at 76 ("Special harm must flow directly from the injury to reputation caused by the defamation, not from the effects of defamation.").

**\*9** Nor are the alleged statements sufficient to constitute defamation per se. *See Medcalf v. Walsh*, 938 F. Supp. 2d 478, 487 (S.D.N.Y. 2013) (noting that the exception from proving special harm for a statement that "tends to injure another in his or her trade, business, or profession" is limited to a statement "made with reference to a matter of significance and importance for that purpose, rather than a more general reflection upon the plaintiff's character or qualities"). Although statements that Plaintiff is "lazy" and abused FMLA leave certainly might have an impact on his reputation in the workplace, they do not go beyond his character or qualities and do not particularly implicate his fitness to perform his work. *See Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 551 (S.D.N.Y. 2011) (finding that statements that plaintiff was a liar, "a loose cannon," and "hates homosexuals" did not reflect on her competence as a fitness instructor and owner, but were merely a more general reflection on her character). Because Plaintiff has not alleged facts plausibly suggesting that he suffered a special harm, he has not stated a claim for slander upon which relief can be granted.

As to his claim for discrimination and retaliation, Plaintiff includes the following relevant factual allegations in his proposed Amended Complaint: (a) Defendant Bush intentionally discriminated against him; (b) Defendant Bush's discrimination and defamatory statements led to Plaintiff's constructive discharge; (c) Plaintiff is half African-American and was the only African-American working for Defendant at the time of his employment; (d) other employees who requested time off under the FMLA were given that time off

Case 5:24-cv-01237-DNH-MJK Document 10 Filed 11/12/24 Page 81 of 370
Ryle v. Rehrig Pacific Co., Not Reported in Fed. Supp. (2020)
2020 WL 6196144

without question; (e) Plaintiff believes that he was singled out because of his race, which is a protected classification; (f) Plaintiff made a complaint about Defendant Bush's conduct; and (g) Plaintiff was retaliated against and forced to leave.[1] (Dkt. No. 12, at ¶¶ 33-37 [Pl.'s Proposed Am. Compl.].) To state either a discrimination claim or a retaliation claim under the NYSHRL, a plaintiff must allege facts plausibly suggesting that he suffered an adverse employment action. See *Jackson v. Battaglia*, 63 F. Supp. 3d 214, 222 (N.D.N.Y. 2014) (noting that a discrimination claim under federal law and the NYSHRL requires a plaintiff to allege that [a] he is a member of a protected class, [b] he is qualified for the job, [c] he suffered an adverse employment action, and [d] the circumstances surrounding the adverse action give rise to an inference of discrimination); *Malena v. Victoria's Secret, LLC*, 886 F. Supp. 2d 349, 261-62 (S.D.N.Y. 2012) (noting that a retaliation claim under federal law and the NYSHRL requires plaintiff to allege that [a] he engaged in protected activity, [b] the employer was aware of this activity, [c] the employer took an adverse action against the plaintiff, and [d] a causal connection exists between the protected activity and the adverse action).

[1]    The Court notes that, to the extent that Plaintiff Complaint or proposed Amended Complaint could be liberally construed as asserting a federal discrimination, hostile work environment, or retaliation claim under Title VII of the Civil Rights Act, Plaintiff has not alleged facts plausibly suggesting that he filed a complaint regarding Defendants' conduct with the Equal Employment Opportunity Commission ("EEOC") or received a right-to-sue letter from the EEOC. See *Bridgeforth v. Cntr. for Disability Servs.*, 09-CV-1435, 2012 WL 3229281, at *4 (N.D.N.Y. Aug. 6, 2012) (Kahn, J.) (finding that the plaintiff could not maintain an action under Title VII because he could not meet the conditions precedent to suit of showing that he made any filings with the EEOC and did not commence the action until after the EEOC filing deadline); *Farrell v. State of New York*, 946 F. Supp. 185, 190 (N.D.N.Y. 1996) (McAvoy, C.J.) ("Timely filing and receipt of a right-to-sue letter is a statutory pre-requisite to bringing a Title VII claim."). As a result, Plaintiff cannot bring a Title VII claim and the Court will construe his Complaint and proposed Amended Complaint as

asserting a claim of discrimination under New York law.

**\*10** Here, Plaintiff has not alleged facts plausibly suggesting that he suffered an adverse action sufficient to state either a discrimination claim or retaliation claim. Notably, the only discernable adverse actions alleged in the proposed Amended Complaint are (a) Defendants' denial of his request for FMLA leave, and (b) Plaintiff's "constructive discharge." As to his requests for FMLA leave, Plaintiff's bare allegations that non-African-American employees were granted FMLA leave while he was denied it are insufficient for reasons that will be discussed in detail below related to Plaintiff's FMLA claim; particularly, Plaintiff has not alleged any facts to plausibly suggest that he made a valid FMLA leave request; and failure to do so prevents this Court from determining whether he has plausibly suggested that the denial of his FMLA request was based on discrimination.

Although a constructive discharge can constitute an adverse action for the purposes of these claims, Plaintiff has failed to allege facts plausibly suggesting that he was constructively discharged. Notably, although Plaintiff alleges that Defendant Bush's harassing conduct and Defendant Rehrig's failure to remedy that conduct essentially forced him out of his job, he includes no allegations as to why this conduct constituted a constructive discharge. "Constructive discharge occurs where an 'employer, rather than discharging [an employee] directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily.' " *Bader v. Special Metals Corp.*, 985 F. Supp. 2d 291, 309 (N.D.N.Y. 2013) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 151-52 [2d Cir. 2003]). Notably, Plaintiff has not alleged any type of demotion, change in his job duties, or loss of benefits, or that he was facing any reasonable threat of termination. *Bader*, 985 F. Supp. 2d at 310. Indeed, Plaintiff does not allege any specific reason for his decision to leave his job other than the alleged harassing and derogatory statements made by Defendant Bush, the denial of his FMLA requests, and Defendant Rehrig's failure to address his complaints. These allegations are simply not sufficient to plausibly suggest that Defendants' conduct meets the high standard required to show a constructive discharge. Because Plaintiff therefore has not alleged facts plausibly suggesting that he suffered any adverse employment action, he has not stated a claim for discrimination or retaliation[2] upon which relief can be granted.

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 82 of 370
Ryle v. Rehrig Pacific Co., Not Reported in Fed. Supp. (2020)
2020 WL 6196144

[2]   Additionally, as to any retaliation claim, Plaintiff has not alleged that any of the harassing conduct or denials of his FMLA requests were denied *after* he made his internal complaint. The only alleged event that Plaintiff alleges occurred after he submitted that complaint is his "constructive discharge," which is based primarily on actions that predated his complaint. Thus, Plaintiff also has not alleged facts plausibly suggesting that his complaint was the cause of his constructive discharge.

As to his claims for breach of contract and/or wrongful termination, Plaintiff includes the following relevant factual allegations: (a) he submitted a written complaint about Defendant Bush's conduct on April 2, 2018, and received a letter on April 16, 2018, indicating that Defendants had investigated his complaint and dismissed all his claims; (b) Defendant Bush "breached the employment contract" by creating a retaliatory, hostile work environment, and Defendant Rehrig failed to supervise and discipline its employees; and (c) New York is an at-will employment state, but Defendants hired Plaintiff to perform certain services for them, and Plaintiff performed those services adequately. (Dkt. No. 12, at ¶¶ 41-44, 47-51 [Pl.'s Proposed Am. Compl.].)

Under New York law, a plaintiff must plead four elements to assert a breach of contract claim: (1) the existence of a contract; (2) that the plaintiff has performed his obligations under the contract; (3) that defendant failed to perform its obligations under the contract; and (4) the plaintiff was damaged as a result of the defendant's nonperformance. *E. Materials Corp. v. Mitsubishi Plastics Composites Am.*, 307 F. Supp. 3d 52, 58 (S.D.N.Y. 2018).

 **\*11** Here, although Plaintiff alleges that there existed a contract between him and Defendant Rehrig (despite also acknowledging his status as an at-will employee), he does not allege any facts about what the nature or terms of that contract were, or what contractual duties Defendant Rehrig owed him under such contract (i.e., whether Defendant Rehrig contracted to provide Plaintiff with a non-hostile work environment free of retaliation or to discipline employees in supervisory or management positions for certain conduct).[3] As a result, Plaintiff has not alleged facts plausibly stating a claim for breach of contract or wrongful termination.

[3]   Plaintiff alleges that Defendants breached "the obligation to protect their employees from their

agents," but fails to allege whether or how any such obligation arose from the alleged contract.

As to his claim pursuant to the FMLA, Plaintiff has added the following relevant factual allegations in his proposed Amended Complaint: (a) he was, at all relevant times, a qualified employee pursuant to the FMLA due to having been employed by Defendant Rehrig for at least 12 months and having worked at least 1,250 hours during the twelve months prior to his request for medical leave; (b) Defendant Rehrig engaged in an industry affecting interstate commerce and employed more than 20 employees and was thus an employer under the FMLA; (c) every time Plaintiff requested time off for his wife's "significant illness," he was denied time off and berated by Defendant Bush; (d) Defendant Bush was negligent by failing to exercise due care towards Plaintiff related to addressing Plaintiff's wife's medical condition and Plaintiff's requests for time off; and (e) Defendant Rehrig was aware of Defendant Bush's actions and did nothing. (Dkt. No. 12, at ¶¶ 54-59 [Proposed Am. Compl.].) The Court therefore liberally construes Plaintiff's proposed Amended Complaint as asserting a claim for interference with rights under the FMLA rather than retaliation for exercising his rights under the FMLA.

To plead a claim of interference with FMLA rights, a plaintiff must allege facts plausibly suggesting the following five elements: (1) he is an eligible employee under the FMLA; (2) the defendant is an employer as defined by the FMLA; (3) he was entitled to take leave under the FMLA; (4) he gave notice to the defendant of his intention to take leave; and (5) he was denied benefits to which he was entitled under the FMLA. *Graziadio v. Culinary Institute of Am.*, 817 F. 3d 415, 425 (2d Cir. 2016).

Here, Plaintiff has, at the very least, not alleged facts to plausibly suggest that he was entitled to take leave under the FMLA. The FMLA entitles an eligible employee to take leave "in order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition." *Smith v. Westchester Cty.*, 769 F. Supp. 2d 448, 466 (S.D.N.Y. 2011) (quoting 29 U.S.C. § 2612[a][1][C]). Plaintiff alleges that his wife had a "significant illness," but he did not provide any factual allegations to plausibly suggest that illness was a "serious health condition" as defined by the FMLA.[4] *See Higgins v. NYP Holdings, Inc.*, 836 F. Supp. 2d 182, 193-94 (S.D.N.Y. 2011) (finding that the plaintiff failed to allege entitlement to leave where he failed to allege that the relevant condition involved inpatient treatment or continuing

2020 WL 6196144

care and thus his allegation that he was entitled to leave was conclusory). Additionally, Plaintiff has not provided any factual allegations plausibly suggesting when he made the relevant requests, whether he submitted the appropriate medical or other documentation, or when these requests were denied or the rationale for the denial. Without such facts to plausibly suggest that Plaintiff made a proper request and that his wife's medical condition was a serious health condition, Plaintiff has not plausibly suggested that Defendants' denial of leave violated his rights under the FMLA.

4  The FMLA defines "serious health condition" as "an illness, injury, impairment, or physical or mental condition that involves (a) inpatient care in a hospital, hospice, or residential medical care facility; or (b) continuing treatment by a health care provider." 29 U.S.C. § 2611(11).

 **\*12** As to the claims for loss of consortium newly asserted by Plaintiff's wife, the Court need not reach the issue of whether these claims can even be properly asserted because it has found that the causes of action underlying Plaintiff's wife's claims all must be dismissed. *See Burns v. City of Utica,* 2 F. Supp. 3d 283, 295 (N.D.N.Y. 2014) (Scullin, J.) ("Since the Court has granted Defendants' motions regarding all of Plaintiff's underlying claims, the Court grants Defendants'

motion to dismiss Plaintiff Christopher Barnes' loss of consortium claims."); *Quinoy v. Pena*, 13-CV-1945, 2014 WL 1998239, at \*13 (S.D.N.Y. May 14, 2014) (noting that "[a] loss of consortium claim is a derivative action that depends on the viability of the primary cause of action or the underlying injury"). As a result, the Court finds that it would be futile to allow Plaintiff to amend the Complaint to add these claims on behalf of Plaintiff's wife.

In sum, because Plaintiff's proposed amendments would be futile, the Court denies Plaintiff's cross-motion to amend his Complaint.

**ACCORDINGLY**, it is

**ORDERED** that Defendants' motion to dismiss (Dkt. No. 7) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's cross-motion to amend the Complaint (Dkt. No. 10) is **DENIED**; and it is further

**ORDERED** that Plaintiff's Complaint is **DISMISSED**.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 6196144

---

**End of Document**  © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 9197680
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

David K. PORATH, Plaintiff,
v.
CITY OF NEW YORK, Bellevue Men's Shelter System,
and N.Y.S. Parole Officer Akaneme, Defendants.

CIVIL ACTION NO. 22 Civ. 1302 (JPC) (SLC)
|
Signed December 21, 2023

**Attorneys and Law Firms**

David K. Porath, E. Elmhurst, NY, Pro Se.

Bryn Ritchie, Philip Sebastian Frank, John Treat, Mark Galen Toews, New York City Law Department, New York, NY, Wynee Ngo, Sichenzia Ross Ference Carmel LLP, New York, NY, for Defendant City of New York.

Bryn Ritchie, John Treat, Mark Galen Toews, New York City Law Department, New York, NY, for Defendant Bellevue Men's Shelter System.

Bryn Ritchie, New York City Law Department, New York, NY, Wesley Eugene Bauman, NYS Office of the Attorney General, New York, NY, David Cheng, Kahana Feld, New York, NY, for Defendant N.Y.S. Parole Officer Akaneme.

**REPORT AND RECOMMENDATION**

SARAH L. CAVE, United States Magistrate Judge.

**\*1 TO THE HONORABLE JOHN P. CRONAN**, United States District Judge:

**I. INTRODUCTION**

Pro se Plaintiff David K. Porath ("Mr. Porath") brings this action against Defendants the City of New York (the "City"), Bellevue Men's Shelter System ("Bellevue," with the City, the "City Defendants"), and New York State Parole Officer Obumneme Akaneme ("Officer Akaneme"), asserting claims under 42 U.S.C. § 1983 ("Section 1983") and New York State law arising from Defendants' alleged failure to correct Mr. Porath's erroneous classification in Bellevue's records as a "sex offender." (ECF Nos. 1 (the "Complaint"); 14

(the "Amended Complaint")). Mr. Porath alleges that the misclassification caused Bellevue to deny him entry and resulted in his incarceration for violating the conditions of his parole. (ECF No. 14 at 3, 5).

Defendants have moved to dismiss the Amended Complaint, with Officer Akaneme moving under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) for lack of subject jurisdiction and failure to state a claim, respectively, and the City Defendants moving under Rule 12(b)(6) only. (ECF Nos. 63; 61 (together, the "Motions")).

For the reasons set forth below, the Court respectfully recommends that the Motions be GRANTED, and that Mr. Porath be granted leave to amend certain claims.

**II. BACKGROUND**

**A. Factual Background**

The following facts are drawn from the Amended Complaint and are presumed true for purposes of deciding the Motions. See Roth v. Jennings, 489 F.3d 499, 509–510 (2d Cir. 2007); Tatum v. City of New York, No. 19 Civ. 2581 (JPC), 2021 WL 4084181, at \*1 (S.D.N.Y. Sept. 8, 2021). [1]

[1]    All internal citations and quotation marks are omitted from case citations unless otherwise noted.

Mr. Porath "did time for burglary" and was released on parole before April 2020. (ECF No. 14 at 2). Following Mr. Porath's release, Officer Akaneme "directed [him] to go to [B]ellevue shelter on numerous occasions." (Id.) At least seven times between April 2020 and November 2021, Bellevue's "intake" refused Mr. Porath entry "because [he] was listed as a 'sex offender' in [Bellevue's] computer system" (the "Misclassification"), and told him that he "would have to go to Swarts Island[.]" (Id. at 3). [2] Mr. Porath repeatedly informed Bellevue that he is "in fact not a sex offender" and, on at least two occasions, "even showed them parole papers stating the opposite of their computer records ..., all to no avail." (Id.) Mr. Porath also complained "numerous times" about the Misclassification to Officer Akaneme, who "did not believe" him and never "look[ed] into" it. (Id.) Bellevue and Officer Akaneme "refused to correct" this "gross negligent error[.]" (Id. at 4).

2023 WL 9197680

2

Mr. Porath appears to be referring to "[t]he Schwartz Assessment Shelter" ("Schwartz"), which "is a shelter for homeless men that is operated by [Volunteers of America] and located on Wards Island in New York City." Jones v. Thomas, No. 20 Civ. 5581 (LLS), 2020 WL 5077026, at *1 (S.D.N.Y. Aug. 27, 2020); see https://www.voa-gny.org/emergency-shelter.

**\*2** Mr. Porath "suffered [four] parole violations" for "refusing to comply with parole to go to Bellevue/Swarts Island as a sex offender[.]" (ECF No. 14 at 5, 7; see id. at 3 (Mr. Porath alleging that he incurred four "violations of incarceration [for] not going somewhere as a sex offender as directed")). He alleges that, at a parole revocation hearing, he "stated [four] times ... that he needs [a] new parole [officer,] that Bellevue has [him] down as a sex offender, and [that Officer Akaneme] is doing nothing to correct this[.]" (Id. at 5).

### B. Procedural Background

On February 15, 2022, Mr. Porath filed the Complaint asserting claims under Section 1983 for defamation, slander, and "false accusations." (ECF No. 2 at 2; see id. at 5 (Mr. Porath alleging that he "has a right to be free from being falsely accused and identified as a 'sex offender' ")). He named Defendants and the Director of the City Department of Homeless Services ("DHS"). (Id. at 1). Mr. Porath requested $750,000.00 in compensatory damages and an order directing that he "be assigned [a] different parole" officer and enjoining Defendants from engaging in "any type of retaliation[.]" (Id. at 5). When he filed the Complaint, Mr. Porath was incarcerated on Rikers Island. (Id. at 2). On February 16, 2022, the Court granted Mr. Porath's request to proceed in forma pauperis. (ECF No. 4).

On March 7, 2022, the Honorable John P. Cronan dismissed Mr. Porath's claims against DHS and directed the U.S. Marshals Service ("USMS") to effect service of the Summons and Complaint on Defendants. (ECF No. 6). On April 4, 2022, Judge Cronan referred the matter to the undersigned for general pretrial supervision and all dispositive motions. (ECF No. 13).

On April 14, 2022, before the Complaint had been served, Mr. Porath filed the Amended Complaint (ECF No. 14), the factual allegations of which largely mirror those in the Complaint. (Compare ECF No. 2 at 4–5 with ECF No. 14 at 1–5). Similar to the Complaint, Mr. Porath alleges that he "brings this [Section] 1983 [action] before the Court

for defamation [of] character, slander, false accusations, and failing to correct a wrong under the 14th Amendment of the United States Constitution[.]" (ECF No. 14 at 1). He also repeats his demand for $750,000.00 in compensatory damages for "defamation for charact[er], pain and suffering, and slander," and for an order directing that he be assigned a new parole officer and prohibiting "any type of retaliation" by Defendants. (Id. at 7). In support of his requested injunctive relief, Mr. Porath alleged that he was to "be released back on parole on or about" June 29, 2022 and assigned to Officer Akaneme. (Id. at 8).

On May 10, 2022, Mr. Porath filed a letter advising that he had been transferred to the Governeur Correctional Facility ("Governeur"). (ECF No. 17). On May 20, 2022, the Court directed the USMS to effect service of the Summons and Amended Complaint on Defendants. (ECF No. 18).

On June 6, 2022, the USMS filed a Process Receipt and Return reflecting that it served the City with the Summons and Complaint—not the Amended Complaint—on May 26, 2022. (ECF No. 20). After the City appeared, the Court granted the City's request to be relieved of the obligation to respond to the Complaint and asked the City to waive service of the Amended Complaint. (ECF No. 22 (the "June 30 Order")). The June 30 Order was mailed to Mr. Porath at Governeur. (Id.; see ECF min. entry July 1, 2022). On July 8, 2022, the City waived service of the Summons and Amended Complaint, making its response due by September 6, 2022. (ECF No. 24).

**\*3** On July 18, 2022, the June 30 Order was returned as undeliverable, with a note indicating Mr. Porath was no longer at Governeur. (ECF min. entry July 18, 2022). On September 14, 2022, the City advised the Court that Mr. Porath "was released from State custody on June 29, 2022[,]" and requested an order directing Mr. Porath to update his address and adjourning the deadline for the City and Bellevue respond to the Amended Complaint. (ECF No. 25). On September 16, 2022, the Court granted the City's request, directed Mr. Porath to update his address by October 17, 2022, and adjourned all Defendants' answer deadline to 30 days after Mr. Porath updated his address. (ECF No. 26). On October 5, 2022, Officer Akaneme appeared, and the Court similarly extended his deadline to respond to the Amended Complaint. (ECF Nos. 29; 31). On November 22, 2022, having received no communication from Mr. Porath, the Court recommended that the Amended Complaint be

2023 WL 9197680

dismissed without prejudice for failure to prosecute. (ECF No. 33 (the "R&R")).

On January 5, 2023, Mr. Porath filed a letter stating, inter alia, that he "has had 'no address' " since July 2022. (ECF No. 36 at 1). Mr. Porath explained that, following his release on June 29, 2022, he "reported to parole as instructed," was assigned to Officer Akaneme and directed to go to Bellevue, and again "was told at [B]ellevue [that he] was still listed as a sex offender." (Id.) Mr. Porath stated that he "instantly felt let down and severely disappointed, and stopped reporting and was living on the streets." (Id.) On November 14, 2022, Mr. Porath "was picked up on a parole warrant ... for absconding for 5 months." (Id. at 3). Mr. Porath also stated that "New York Parole Officer Ms. Felix" ("Officer Felix") had informed him that "Senior Parole Officer O'Neil-Greene" ("Officer O'Neil-Greene") had "corrected the grave error." (Id. at 3). Mr. Porath asked that Officers Felix and O'Neil-Greene be "added to [the] Complaint" for their involvement in correcting the Misclassification. (Id.)

On January 26, 2023, Judge Cronan ruled that, "[i]n light of that change in circumstances, paired with the fact that [Mr. Porath] is proceeding pro se, the Court will allow this case to proceed and not adopt the [R&R]." (ECF No. 39). On February 21, 2023, Mr. Porath filed a letter (i) advising the Court that he was transferred to the Vernon C. Bain Correctional Center, (ii) requesting that Officers Felix and O'Neil-Greene be added as Defendants based on their involvement in correcting the Misclassification, and (iii) requesting permission to serve interrogatories or takes depositions of Defendants. (ECF No. 40). On February 23, 2023, the Court denied without prejudice Mr. Porath's request for discovery and directed Defendants to respond to the Amended Complaint by March 9, 2023. (ECF No. 41).

On February 28, 2023, Officer Akaneme filed a letter advising the Court of the grounds on which he intended to file a motion to dismiss the Amended Complaint. (ECF No. 42). On March 1, 2023, the Court directed the City Defendants to advise by March 9, 2023 whether they also intended to move to dismiss and, if so, to set forth the bases of their intended motion. (ECF No. 43). On March 16, 2023, following an extension at their request (ECF No. 50), the City Defendants filed a letter setting forth the bases on which they intended to move to dismiss the Amended Complaint. (ECF No. 54).

On March 22, 2023, the Court directed Mr. Porath to file a letter stating whether he intended to stand on his Amended

Complaint or sought permission to file a second amended complaint addressing the deficiencies Defendants raised in their letters. (ECF No. 55). In a letter mailed on April 3, 2023 and docketed on April 11, 2023, Mr. Porath advised the Court that he "stands by his [ ] Amended Complaint and states that [there] are no deficiencies." (ECF No. 58 at 1). Accordingly, the Court directed Defendants to file the Motions by June 2, 2023 and directed Mr. Porath file his opposition by July 7, 2023. (ECF No. 60). The Court warned Mr. Porath that his "failure to oppose the Motions will result in the Court ruling on the Motions based on Defendants' submissions alone and may result in dismissal of this action with prejudice." (Id. at 1).

**\*4** On June 2, 2023, Defendants filed the Motions. (ECF Nos. 61; 63). On July 20, 2023, having received no opposition or other communication from Mr. Porath, the Court sua sponte extended Mr. Porath's opposition deadline to August 9, 2023. (ECF No. 67 (the "July 20 Order")). The Court again warned Mr. Porath that his failure to oppose "will result in the Court ruling on the Motions based on Defendants' submissions alone and may result in of the Court granting the Motions and dismissing this action with prejudice." (Id. at 1). On August 21, 2023, having still received no opposition or other communication from Mr. Porath, the Court deemed the Motions fully briefed. (ECF No. 72 (the "Aug. 21 Order")).

On September 5, 2023, the July 20 Order was returned to the Court as "Refused." (ECF min. entry Sept. 5, 2023). On September 18, 2023, the Aug. 21 Order was returned to the Court, with the notation "Return to Sender." (ECF min. entry Sept. 18, 2023).

## III. DISCUSSION

### A. Legal Standard for Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "factual allegations sufficient 'to raise a right to relief above the speculative level.' " ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). The complaint must allege "enough facts to state a claim to relief that is plausible on its face." Starr v. Sony BMG Music Ent., 592 F.3d 314, 321 (2d Cir. 2010) (quoting Twombly, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable

2023 WL 9197680

for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

"In applying this standard, a court accepts as true all well-pled factual allegations but does not credit 'mere conclusory statements' or '[t]hreadbare recitals of the elements of a cause of action.' " Gottesfeld v. Anderson, No. 18 Civ. 10836 (PGG), 2020 WL 1082590, at *4 (S.D.N.Y. Mar. 6, 2020) (quoting Iqbal, 556 U.S. at 678). The Court shall not give "effect to legal conclusions couched as factual allegations." Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir. 2007). "Where a court can infer no more than the mere possibility of misconduct from the factual averments—in other words, where the well-pled allegations of a complaint have not 'nudged [plaintiff's] claims across the line from conceivable to plausible'—dismissal is appropriate." Gottesfeld, 2020 WL 1082590, at *4 (quoting Twombly, 550 U.S. at 570).

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010). "In deciding a motion to dismiss a pro se complaint, ... it is appropriate to consider 'materials outside the complaint to the extent that they are consistent with the allegations in the complaint[.]' " Lopez v. Cipolini, 136 F. Supp. 3d 570, 579 (S.D.N.Y. 2015) (quoting Alsaifullah v. Furco, No. 12 Civ. 2907 (ER), 2013 WL 3972514, at *4 n. 3 (S.D.N.Y.2013)); see Evans v. City of New York, No. 21 Civ. 8660 (JPC), 2022 WL 1172740, at *1 n.1 (S.D.N.Y. Apr. 20, 2022); Velazquez v. Gerbing, No. 18 Civ. 8800 (KMK), 2020 WL 777907, at *6 (S.D.N.Y. Feb. 18, 2020).

## B. Pro Se Considerations

"The Court must construe pro se submissions 'liberally' and interpret them 'to raise the strongest arguments that they suggest.' " Evans v. City of New York, No. 21 Civ. 8660 (JPC), 2022 WL 1172740, at *2 (S.D.N.Y. Apr. 20, 2022) (quoting Meadows v. United Servs., Inc., 963 F.3d 240, 243 (2d Cir. 2020)). Nonetheless, "a pro se plaintiff must still plead enough facts to state a claim to relief that is plausible on its face." Gottesfeld, 2020 WL 1082590, at *5. Despite the Court's obligation "to draw the most favorable inferences" from a complaint, it "cannot invent factual allegations that [the plaintiff] has not pled." Chavis v. Chappius, 618 F.3d 162, 170 (2d Cir. 2010). "The Court need not accept allegations

that are 'contradicted by other matters asserted or relied upon or incorporated by reference by a plaintiff in drafting the complaint.' " Tsinberg v. City of New York, No. 20 Civ. 749 (PAE), 2021 WL 1146942, at *4 (S.D.N.Y. Mar. 25, 2021) (quoting Fisk v. Letterman, 401 F. Supp. 2d 362, 368 (S.D.N.Y. 2005)).

## C. Application

**\*5** In Mr. Porath's words, he brings this action under Section 1983 "for defamation [of] charact[e]r, slander, false accusations, and failing to correct a wrong, under the 14th Amendment of the United States Constitution." (ECF No. 14 at 1). The Court construes the Amended Complaint as asserting Section 1983 claims for alleged violations of the U.S. Constitution including: (i) violations of Mr. Porath's right to procedural due process under the Fourteenth Amendment (the "Procedural Due Process Claims"); (ii) violations of Mr. Porath's right to substantive due process under the Fourteenth Amendment (the "Substantive Due Process Claims," with the Procedural Due Process Claims, the "Due Process Claims"); [3] (iii) false arrest in violation of Fourth Amendment (the "False Arrest Claims"); and (iv) malicious prosecution in violation of the Fourth Amendment (the "Malicious Prosecution Claims," with the Due Process and False Arrest Claims, the "Section 1983 Claims"). The Court also construes the Amended Complaint as asserting claims for (i) violations of the analogous provisions of the New York State Constitution, i.e., procedural due process, substantive due process, false arrest, and malicious prosecution; (ii) defamation; and (iii) negligence (collectively, the "State Law Claims").

[3]     "Because [Mr. Porath] was a parolee at the time of the alleged constitutional violation, his claim[s are] appropriately analyzed under the Fourteenth Amendment's Due Process Clause, not the Eighth Amendment." Stovall v. Wilkins, No. 15 Civ. 2163 (KMK), 2016 WL 5478509, at *3 (S.D.N.Y. Sept. 29, 2016).

Defendants seek dismissal of the Amended Complaint in its entirety. (See ECF Nos. 62; 64). Because the Section 1983 Claims serve as the basis for the Court's subject-matter jurisdiction over this action, the Court analyzes them first. As discussed below, the Court finds that Mr. Porath has failed to allege a plausible Section 1983 Claim. Accordingly, the Court respectfully recommends that the Section 1983 Claims be dismissed without prejudice and with leave to amend, and that the Court decline to exercise supplemental jurisdiction

over the State Law Claims unless and until Mr. Porath can allege a plausible claim under Section 1983.

## 1. Section 1983 Claims

Section 1983 imposes liability on a "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. "Section 1983 is not itself a source of substantive rights," and instead "merely provides a method for vindicating federal rights elsewhere conferred," e.g., the Constitution. Patterson v. Cnty. of Oneida, 375 F.3d 206, 225 (2d Cir. 2004). To state a claim under Section 1983, a plaintiff must plausibly allege "(1) that the defendants deprived him of a right 'secured by the Constitution or laws of the United States'; and (2) that they did so 'under color of state law.' " Giordano v. City of New York, 274 F.3d 740, 750 (2d Cir. 2001) (quoting Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49–50 (1999)). In addition, "[i]t is well settled in th[e] [Second] Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." D'Angelo v. Annucci, No. 16 Civ. 6459 (KMK), 2017 WL 6514692, at *4 (S.D.N.Y. Dec. 19, 2017) (quoting Brown v. City of New York, No. 13 Civ. 6912 (TPG), 2017 WL 1390678, at *6 (S.D.N.Y. Apr. 17, 2017)); see Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994).

The Court now considers each of Mr. Porath's Due Process Claims, False Arrest Claims, and Malicious Prosecution Claims.

## a. Due Process Claims

Pursuant to the Due Process Clause of the Fourteenth Amendment, "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. "The Due Process Clause protects 'the individual against arbitrary action of government.' " Velazquez v. Gerbing, No. 18 Civ. 8800 (KMK), 2020 WL 777907, at *9 (S.D.N.Y. Feb. 18, 2020) (quoting Wolff v. McDonnell, 418 U.S. 539, 558 (1974)).

**\*6** As discussed above, construing his Amended Complaint broadly, Mr. Porath's Due Process Claims include the

Procedural Due Process Claims and the Substantive Due Process Claims.

### i. Procedural Due Process Claim

Mr. Porath alleges that, in failing to correct the Misclassification, Defendants violated his right "to be free from being falsely accused and identified as a 'sex offender.' " (ECF No. 14 at 5). Construing the claim under a "stigma plus" theory, Officer Akaneme argues that Mr. Porath's Procedural Due Process Claims fail because, inter alia, the Misclassification was not publicized and, in any event, "any rights were sufficiently protected by New York State Article 78 proceedings." (ECF No. 64 at 17–18).

#### a) Legal Standard

"A court examining a procedural due process claim under the Fourteenth Amendment 'first asks whether there exists a liberty or property interest which has been interfered with by the State; [and] second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.' " Filteau v. Prudenti, 161 F. Supp. 3d 284, 290 (S.D.N.Y. 2016) (quoting Valmonte v. Bane, 18 F.3d 992, 998 (2d Cir.1994)). "Therefore, to survive a motion to dismiss, a due process claim under § 1983 must allege, inter alia, 'the deprivation of a constitutionally protected interest.' " Id. (quoting Abramson v. Pataki, 278 F.3d 93, 99 (2d Cir.2002)).

With respect to the first element, Mr. Porath alleges that he "has suffered a loss of liberty in the [sense] that [Officer Akaneme] and Bellevue have refused to correct" the Misclassification, which he describes as "defamation of character," and claims that he "has a right to be free from being falsely [accused] and identified as a 'sex offender' " in Bellevue's computer system. (ECF No. 14 at 4–5). While Mr. Porath appears to be alleging that Defendants deprived him of his liberty interest in his good reputation, it is well-settled that "[a] person's interest in his or her good reputation alone, apart from a more tangible interest, is not a liberty or property interest sufficient to invoke the procedural protections of the Due Process Clause or create a cause of action under § 1983." Patterson v. City of Utica, 370 F.3d 322, 329–30 (2d Cir. 2004). "Rather, loss of a person's reputation can rise to the level of a due process violation 'if that loss is coupled with the deprivation of a more tangible interest'; such

a claim 'is commonly referred to as a 'stigma-plus' claim.' " Filteau, 161 F. Supp. 3d at 290 (quoting Patterson, 379 F.3d at 330).

To establish a "stigma plus" claim, then, Mr. Porath must allege: "(1) 'the utterance of a statement sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false,' and (2) 'a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights.' " Vega v. Lantz, 596 F.3d 77, 81 (2d Cir.2010) (quoting Sadallah v. City of Utica, 383 F.3d 34, 38 (2d Cir.2004)). "The statement must [ ] be 'publicized.' " Filteau, 161 F. Supp. 3d at 291 (quoting Abramson, 278 F.3d at 102). "[I]n ascertaining whether a complaint alleges the deprivation of a stigma-plus liberty interest, [the Court] need only determine that both 'stigma' and 'plus' are claimed to be sufficiently proximate." Velez v. Levy, 401 F.3d 75, 89 (2d Cir. 2005). "This requirement will be satisfied where (1) the stigma and plus would, to a reasonable observer, appear connected—for example, due to their order of occurrence or their origin—and (2) the actor imposing the plus adopted (explicitly or implicitly) those statements in doing so." Id. "There is no rigid requirement, therefore, that both the 'stigma' and the 'plus' must issue from the same government actor or at the same time." Id. Finally, "the availability of adequate process defeats a stigma-plus claim." Segal v. City of New York, 459 F.3d 207, 213 (2d Cir. 2006) ("Like any procedural due process claim, a stigma-plus claim enforces a limited but important right: the right to be heard 'at a meaningful time and in a meaningful manner.' " (quoting Goldberg v. Kelly, 397 U.S. 254, 267, (1970)).

### b) Application

**\*7** The Court finds that Mr. Porath has failed to allege a Procedural Due Process Claim based on a stigma plus theory for three reasons. First, although the Second Circuit has held that "wrongly classifying an inmate as a sex offender may have a stigmatizing effect which implicates a constitutional liberty interest[,]" Vega, 596 F.3d at 81–82, Mr. Porath has failed to allege that any Defendant publicized the Misclassification, which, according to Mr. Porath, appeared only within Bellevue's computer system. (See ECF No. 14 at 5 (Mr. Porath alleging that he "has a right to be free from being falsely [accused] and identified as a 'sex offender' (only on Bellevue['s] comput[e]r syst[e]m)[.]")). "Without the element of publication, there is no potential for the stigmatizing information to harm [Mr. Porath's] reputation

in the community." Nuttle v. Ponton, 544 F. Supp. 2d 175, 177 (W.D.N.Y. 2008) (granting motion to dismiss stigma plus claim by student against university officials based on statement by professor to the university's Director Judicial Affairs, where the student "fail[ed] to allege that Defendants publicized the [professor's statements] or disseminated the stigmatizing information outside of [the university]"); see White v. City of New York, No. 13 Civ. 7156 (ER), 2014 WL 4357466, at \*13 (S.D.N.Y. Sept. 3, 2014) (granting motion to dismiss stigma plus claim where plaintiff failed to allege facts indicating that the allegedly stigmatizing remarks were publicized).

Second, even if Mr. Porath alleged that Defendants had publicized the Misclassification, he has failed to plausibly allege a causal connection between any publication and the alleged "plus," i.e., his subsequent incarceration for parole violations. [4] Mr. Porath alleges that he "suffered [four] parole violations" for "refusing to comply with parole to go to Bellevue/Swarts Island as a sex offender[.]" (ECF No. 14 at 5, 7). These allegations, however, are purely conclusory, and fail to specify the nature of Mr. Porath's parole revocation, much less plausibly suggest that the Misclassification and Mr. Porath's subsequent incarceration for parole violations are "sufficiently proximate." Velez, 401 F.3d at 89. He fails to allege, for example, that in revoking his parole, Officer Akaneme "adopted (explicitly or implicitly)" the Misclassification. Id. Indeed, to the contrary, Mr. Porath's allegations suggest that his incarceration was the result of his failure to comply with the parole condition that he find housing, which, he acknowledges, was available to him at Schwartz regardless of the Misclassification, but for his refusal to go there. (See ECF No. 14 at 3 (Mr. Porath alleging that he incurred four "violations of incarceration [for] not going somewhere as a sex offender as directed"); see also ECF No. 36 at 1, 3 (Mr. Porath alleging that, after he "was told at [B]ellevue [that he] was still listed as a sex offender" following his release on June 29, 2022, he "instantly felt let down and severely disappointed, and stopped reporting and was living on the streets" and subsequently "was picked up on a parole warrant ... for absconding for 5 months")). In other words, Mr. Porath does not allege that Officer Akaneme revoked his parole because of the Misclassification, and his allegations suggest that Officer Akaneme would not have initiated revocation proceedings if he had gone to Schwartz. Thus, although despite construing Mr. Porath's allegations liberally, the Court cannot conclude that those allegations would plausibly lead "a reasonable observer" to find that Mr. Porath's incarceration was sufficiently "connected" to the

Misclassification, particularly where Officer Akaneme—i.e., "the actor imposing the plus"—was not the source of the Misclassification. Velez, 401 F.3d at 89 (2d Cir. 2005); cf. Anemone v. Metro. Transp. Auth., 410 F. Supp. 2d 255, 270 (S.D.N.Y. 2006) ("Although inflicted by different actors, the 'stigma' and the 'plus' constitute a liberty interest deprivation because the MTA's act of termination implicitly adopted Sansverie's stigmatizing allegations and would appear, to anyone who had read of the allegations, to be connected to them.").

4    Mr. Porath cannot premise his Procedural Due Process Claim on Bellevue's decision to deny him entry based on the Misclassification, because "he does not have a property right to placement in a particular type of shelter under New York law." Jenkins v. New York City Dep't of Homeless Servs., 643 F. Supp. 2d 507, 512 (S.D.N.Y. 2009) (citing Gomez v. Toledo, 446 U.S. 635, 640 (1980)).

*8  Third and finally, even if Mr. Porath had alleged both that Defendants publicized the Misclassification and a plausible causal connection between the Misclassification and his incarceration, he does not allege a Procedural Due Process Claim because he "has failed to allege any facts demonstrating that under New York law, he was not afforded all of the process he was due." Joseph v. Castillo, No. 20 Civ. 3957 (PKC) (JRC), 2022 WL 4485061, at *4 (E.D.N.Y. Sept. 27, 2022). Mr. Porath "does not allege that he was deprived of due process based on established state procedures, but based on random, unauthorized acts by" Defendants in failing to correct the Misclassification. Id. (finding parolee plaintiff's allegations against defendant parole officer that "consist[ed] of lies, threats, arbitrarily 'reject[ing] every address' proposed by Plaintiff, and intentionally 'leav[ing] [Plaintiff] in prison' to be "random, unauthorized acts). (See ECF No. 14 at 4 (Mr. Porath alleging that both Bellevue and Officer Akaneme "refused to correct" the Misclassification)). "[A] government official's random and unauthorized act does not violate due process if a meaningful postdeprivation remedy is available; when the government cannot predict precisely when the loss will occur, it would be impossible to provide a meaningful hearing before the deprivation of property." Newman v. de Blasio, No. 21 Civ. 6141 (LTS), 2021 WL 4254978, at *4 (S.D.N.Y. Sept. 17, 2021). "If a government official within New York State has failed to act with regard to a litigant's property or liberty interest, courts have held that the process in which to compel that government official to take action is a state-court proceeding for mandamus relief under Article

78 of the New York Civil Practice Law and Rules." Id. (collecting cases).

Here, Mr. Porath fails to allege "that habeas and Article 78 proceedings were inaccessible to [him] to challenge [Defendants'] allegedly random and unauthorized acts[.]" Joseph, 2022 WL 4485061, at *4. He fails to allege, for example, any facts "showing lack of an available judicial proceeding to force a government official to [correct the Misclassification] (such as an Article 78 proceeding) or why such a proceeding is inadequate." Newman, 2021 WL 4254978, at *5. As a result, he "fails to establish 'that no meaningful remedy was available subsequent to [his] liberty deprivation.'" Joseph, 2022 WL 4485061, at *4 (quoting Peterson v. Tomaselli, 469 F. Supp. 2d 146, 165– 66 (S.D.N.Y. 2007) (rejecting a procedural due process claim because "[p]laintiff could have initiated either an Article 78 proceeding or a state habeas proceeding to adjudicate his claim regarding his release date")); see West v. City of New York, No. 23 Civ. 2256 (LTS), 2023 WL 3728374, at *4 (S.D.N.Y. May 30, 2023) ("Plaintiff's allegations seem to suggest that a state employee caused an erroneous notation to be made in the records of her Housing Court proceedings. Post-deprivation remedies in the state courts were available to her to vindicate her rights following such an act, and these allegations thus do not state a claim that her right to procedural due process was violated."); Moore v. Newton, 220 F. Supp. 3d 275, 295 (E.D.N.Y. 2016) (finding that a parole officer's "failure to intervene to secure [P]laintiff's release [was] ... a 'random, unauthorized act' for which the availability of a post-deprivation remedy such as an Article 78 or habeas proceeding under state law would [satisfy due process].''); Schultz v. Egan, 103 F. App'x 437, 441 (2d Cir. 2004) ("[T]he availability of an Article 78 proceeding or a habeas proceeding would almost certainly suffice to satisfy the due process clause.").

Accordingly, the Court finds that Mr. Porath has failed to allege a plausible Procedural Due Process Claim.

### ii. Substantive Due Process Claim

Mr. Porath alleges that, in failing to correct the Misclassification "even after [being] told and shown [that] what they were doing was wrong[,]" Defendants were "deliberate[ly] indifferen[t]" to and "reckless[ly] disregard[ed] ... a loss of liberty and defamation of charact[e]r." (ECF No. 14 at 6). Defendants argue that these

2023 WL 9197680

allegations do not state a plausible Substantive Due Process Claim because, <u>inter alia</u>, Mr. Porath fails to allege that either Defendant (i) violated a duty owed to Mr. Porath, (ii) acted with deliberate indifference, or (iii) engaged in conduct that "shocks the conscience." (ECF Nos. 62 at 17–20; 64 at 19–26).

### a) <u>Legal Standard</u>

"Substantive due process is an outer limit on the legitimacy of governmental action," <u>Natale v. Town of Ridgefield, 170 F.3d 258, 263 (2d Cir. 1999)</u>, and "protects against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is incorrect or ill-advised." <u>Kaluczky v. City of White Plains, 57 F.3d 202, 211 (2d Cir. 1995)</u>. Accordingly, "[f]or a substantive due process claim to survive a <u>Rule 12(b)(6)</u> dismissal motion, it must allege governmental conduct that 'is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.' " <u>Velez, 401 F.3d at 93</u> (quoting <u>Cnty. of Sacramento v. Lewis, 523 U.S. 833, 847 n. 8 (1998)</u>). "The Supreme Court has ... cautioned that the Due Process Clause of the Constitution 'does not transform every tort committed by a state actor into a constitutional violation.' " <u>Correction Officers' Benevolent Ass'n, Inc. v. City of New York, No. 17 Civ. 2899 (LTS), 2018 WL 2435178, at *3 (S.D.N.Y. May 30, 2018)</u> (quoting <u>DeShaney v. Winnebago Cnty. Dep't of Soc. Serv., 489 U.S. 189, 202 (1989)</u>). "A court must 'screen[ ] out all but the most significant constitutional violations, lest the Constitution be demoted to a font of tort law.' " <u>Id.</u> (quoting <u>Matican v. City of New York, 524 F.3d 151, 155 (2d Cir. 2008)</u>).

**\*9** "Generally, ... the Due Process Clause 'confer[s] no affirmative right to government aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual.' " <u>Stovall v. Wilkins, No. 15 Civ. 2163 (KMK), 2016 WL 5478509, at *3 (S.D.N.Y. Sept. 29, 2016)</u> (quoting <u>DeShaney, 489 U.S. at 196</u>). "There are, however, two exceptions to this <u>DeShaney</u> rule[.]" <u>Newman, 2021 WL 4254978, at *3</u>. "First, the [government] or its agents may owe a constitutional obligation to the [plaintiff] ... if the [government] ha[s] a 'special relationship' with the [plaintiff]. Second, the [government] may owe such an obligation if its agents 'in some way had assisted in creating or increasing the danger to the [plaintiff].' " <u>Matican, 524 F.3d at 155</u>. The Second Circuit has explained "that 'special relationship' liability

arises from the relationship between the state and a particular victim, whereas 'state created danger' liability arises from the relationship between the state and the private assailant." <u>Pena v. DePrisco, 432 F.3d 98, 109 (2d Cir. 2005)</u>

With respect to the special-relationship exception, the Second Circuit has held that "[a] parolee, although not in the state's physical custody, is nonetheless in its legal custody, and his or her freedom of movement, while not as restricted as that of an incarcerated prisoner, is nonetheless somewhat curtailed." <u>Jacobs v. Ramirez, 400 F.3d 105, 106 (2d Cir. 2005)</u>. "Accordingly, because the limitations imposed by the state are minimal, so too are the duties it assumes." <u>Id. at 107</u>.

"To succeed on a state-created danger substantive due process violation claim, a plaintiff must establish that the defendant caused the plaintiff to suffer harm through an affirmative action that was of such character as to shock the conscience." <u>Correction Officers' Benevolent Ass'n, 2018 WL 2435178, at *3</u> (citing <u>Lombardi v. Whitman, 485 F.3d 73, 79, 81, 81 n.5 (2d Cir. 2007)</u>). "A determination as to whether a state-sanctioned action shocks the conscience requires a careful evaluation of the particular circumstances of the case, including the nature of the state action, the magnitude and form of the harm inflicted on the plaintiff, and the state of mind of the defendants." <u>Id.</u> "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." <u>Lewis, 523 U.S. at 849</u>. "Negligently inflicted harm, on the other hand, cannot, as a categorical matter, shock the conscience in a constitutional sense." <u>Correction Officers' Benevolent Ass'n, 2018 WL 2435178, at *3</u> (citing <u>Lewis, 523 U.S. at 848–49</u>). "Between intentionally and negligently inflicted harm lies injury caused through a defendant's deliberate indifference, a state of mind that, akin to recklessness, requires that a defendant knew of the risk and deliberately assumed or disregarded it." <u>Id.</u> (citing <u>Pena, 432 F.3d at 114</u>). "Whether a defendant's deliberate indifference is sufficiently egregious to shock the conscience is dependent on the particular circumstances of the violative conduct, such as the nature of the government action and the harm inflicted." <u>Id.</u> (citing <u>Lewis, 523 U.S. at 850</u>).

### b) <u>Application</u>

The Court finds that Mr. Porath has failed to allege a plausible Substantive Due Process Claim for two reasons. First, he "has failed to allege sufficient facts to show, under either of

the two above-referenced exceptions to the DeShaney rule, that a government official [was] required to provide him with aid or protection" by correcting the Misclassification. Newman, 2021 WL 4254978, at *3. Specifically, Mr. Porath fails to plausibly either that either Officer Akaneme or the City had a "special relationship" with him such that either was required to take action to correct the Misclassification. With respect to Officer Akaneme, although Mr. Porath's "status as a parolee required to report to" a homeless shelter "can be said to [create] a [limited] 'special relationship' with the state" and "giv[e] rise to at least some duties on behalf of the state to protect [him]," Mr. Porath has failed to allege that this duty encompassed correcting the Misclassification within Bellevue's computer system, particularly where Mr. Porath acknowledges separate housing was available to him at Schwartz despite the Misclassification. Stovall, 2016 WL 5478509, at *3 (in granting motion to dismiss parolee's substantive due process claim against his parole officer, declining to find that the "minimal limitation—the need to report [to parole meetings]—could give rise to a duty as substantial as one that requires parole officers to ensure safe transit for parolees"); cf., Jacobs, 400 F.3d at 107 (finding that parolee stated Due Process claim where "the state effectively compelled him to live in unsafe conditions").

**\*10** Mr. Porath's allegations with respect to the City are even weaker, as he was not in City custody and has provided no legal authority—nor is the Court aware of any—for the proposition that his limited interaction with Bellevue established a special relationship. See Barker v. Women in Need, Inc., No. 20 Civ. 2006 (LLS), 2020 WL 1922633, at *3 (S.D.N.Y. Apr. 20, 2020) ("There is no constitutional right to a well-run shelter system[,] ... [a]nd the government has no obligation to provide adequate housing.").

Similarly, Mr. Porath has failed to plausibly invoke the state created danger exception. He alleges that, in failing to correct the Misclassification "even after [being] told and shown [that] what they were doing was wrong[,]" Defendants were "deliberate[ly] indifferen[t]" to and "reckless[ly] disregard[ed] ... a loss of liberty and defamation of charact[e]r." (ECF No. 14 at 6). These allegations fail, however, to plausibly suggest that any Defendant "aid[ed]s and abet[ted] a private party in subjecting [Mr. Porath] to unwarranted physical harm." Hemphill v. Schott, 141 F.3d 412, 418 (2d Cir. 1998); see Brown v. City of New York, 786 F. App'x 289, 292 (2d Cir. 2019) (affirming sua sponte dismissal of substantive due process claim where the plaintiff "failed to identify facts showing that merely assigning her

to a new homeless shelter or assigning her to a room with other women encouraged acts of physical violence against her[, ... that Defendants condoned or encouraged any violence against her[, ... or] that the Defendants' inaction constituted an implicit 'prior assurance' that violence against [her] would go unpunished").

Second, even if Mr. Porath had plausibly alleged that Defendants owed him a duty to correct the Misclassification, the Court finds that Mr. Porath's Substantive Due Process Claim is deficient because he has not alleged that Defendants' conduct was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." Velez, 401 F.3d at 93. Again, the crux of Mr. Porath's allegations are that the Defendants failed to correct the Misclassification in Bellevue's computer system. (ECF No. 14 at 5–6). Even accepting these allegations as true, however, Mr. Porath has not alleged that Defendants' conduct rises to the level of a constitutional violation. He does not allege, for example, that the Misclassification, as unfortunate as it may be, deprived him of any housing within the City shelter system. To the contrary, he alleges that Defendants advised him to go to a different shelter, but he refused. (ECF No. 14 at 3, 7). As discussed above, Mr. Porath's own allegations suggest that it was this refusal—not the Misclassification—that led to his parole revocation. (See § III.C.1.a.i.b, supra). Accordingly, "even when read in the light most favorable to [Mr. Porath], nothing alleged in the Amended Complaint shocks the contemporary conscience, suggests egregious conduct, or constitutes a gross abuse of governmental authority." TZ Manor, LLC v. Daines, 815 F. Supp. 2d 726, 751 (S.D.N.Y. 2011) (dismiss substantive due process claim where "[t]here [was] absolutely nothing in the Amended Complaint that even suggest[ed] that the Defendants acted with the intent to injure Plaintiffs"), aff'd, 503 F. App'x 82 (2d Cir. 2012); see Davis v. McCleary, No. 17 Civ. 659 (PKC), 2017 WL 2266856, at *5 (E.D.N.Y. May 23, 2017) ("Requiring a parolee to commute to drug treatments in an inconvenient location comes nowhere near the threshold of conduct that 'shocks the conscience.' "); Stovall, 2016 WL 5478509, at *4 (finding that "[n]othing alleged in the Complaint shock[ed] the contemporary conscience, or [was] brutal or offense to human dignity ... [where t]he Complaint merely allege[d] that Defendants required a parolee with a hard cast on his foot to attend a parole meeting roughly 10 miles away from his home," even though the parolee provided defendants with a doctor's note stating that he was in no condition to travel); cf., Opperisano v. New York Dep't of Parole, No. 16 Civ. 3940 (MKB) (LB), 2017 WL 11504786, at *3–4 (E.D.N.Y. Jan.

25, 2017) (allowing substantive due process claim to proceed where parolee plaintiff alleged that "he was incarcerated for violating his parole after the Parole Officers permitted [him] to reside in locations that violated the order of protection.").

**\*11** Accordingly, the Court finds that Mr. Porath has failed to allege a plausible Substantive Due Process Claim.

### b. False Arrest and Malicious Prosecution Claims

Mr. Porath appears to base the False Arrest and Malicious Prosecution Claims on the theory that the Misclassification led to his arrest and prosecution for parole violations. (ECF No. 14 at 4–5, 7). Defendants argue that these claims fail because, inter alia, Mr. Porath fails to allege that his parole revocation was not supported by probable cause. (ECF Nos. 62 at 21–23, 25; 64 at 27). Officer Akaneme also argues that these claims "are barred under the Heck [5] doctrine." (ECF No. 64 at 26).

5      Heck v. Humphrey, 512 U.S. 477 (1994).

#### i. Legal Standard

"To state a Section 1983 false arrest claim, a plaintiff must allege 'that (1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.' " Grytsyk v. Morales, 527 F. Supp. 3d 639, 647 (S.D.N.Y. 2021) (quoting Ackerson v. City of White Plains, 702 F.3d 15, 19 (2d Cir. 2012)). "Thus, a plaintiff may not bring a false arrest claim if there was probable cause to arrest him for an offense." Id. (citing Betts v. Shearman, 751 F.3d 78, 81 (2d Cir. 2014)).

"In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment, and must establish the elements of a malicious prosecution claim under state law." Manganiello v. City of New York, 612 F.3d 149, 160–61 (2d Cir. 2010). Accordingly, to state a malicious prosecution claim, Mr. Porath "must plead (1) the initiation or continuation of a criminal proceeding against him; (2) termination of the proceeding in his favor; (3) lack of probable cause for commencing the proceeding; (4) actual malice as a motivation for Defendants' actions; and (5) a sufficient post-arraignment liberty restraint to implicate his Fourth

Amendment rights." Grytsyk, 527 F. Supp. 3d at 652–53 (citing McKay v. City of New York, 32 F. Supp. 3d 499, 511 (S.D.N.Y. 2014)). "As lack of probable cause is an element of the tort, 'the existence of probable cause is a complete defense to a claim of malicious prosecution.' " Cintron v. Weshner, No. 18 Civ. 1619 (RA), 2021 WL 1758804, at *3 (S.D.N.Y. May 4, 2021) (quoting Stansbury v. Wertman, 721 F.3d 84, 94–95 (2d Cir. 2013)).

In Heck, the Supreme Court held that "in order to recover damages for an alleged unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence was reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such a determination, or called into question by a court's issuance of a writ of habeas corpus." 512 U.S. at 486–87. Pursuant to the rule announced in Heck, a plaintiff may not use § 1983 to seek damages if a judgment in his favor " 'would necessarily imply the invalidity' of a prior state or federal criminal conviction or sentence." Cox v. Aversa, No. 18 Civ. 3898 (NSR), 2020 WL 815476, at *3 (S.D.N.Y. Feb. 19, 2020) (quoting Heck, 512 U.S. at 487).

#### ii. Application

##### a) No Clear Heck v. Humphrey Bar

**\*12** The Court declines at this stage to determine that Heck bars Mr. Porath's False Arrest and Malicious Prosecution Claims for damages. As Officer Akaneme acknowledges, Mr. Porath's allegations are "unclear" as to whether he challenges the validity of his parole violations, and Officer Akaneme invokes Heck only because Mr. Porath "might be claiming that his parole revocations should be overturned[.]" (ECF No. 64 at 26). While the Court agrees that Mr. Porath's allegations are not clear on this point, it appears from his Amended Complaint that he does not, in fact, challenge the validity of his parole revocation. Indeed, as noted below (see § III.C.1.b.ii.b, infra), Mr. Porath appears to concede that he stopped complying with the conditions of his parole because he refused "to go to Bellevue/Swarts Island[.]" (Id. at 7). Accordingly, given both the ambiguity in Mr. Porath's allegations and the Court's obligations to construe those allegations liberally, the Court declines to infer that Mr. Porath's False Arrest and Malicious Prosecution Claims seek "necessarily [to] invalidate his conviction." Hasan v.

Onondaga Cnty., No. 18 Civ. 806 (GLS) (ATB), 2018 WL 4055296, at *7 (N.D.N.Y. Aug. 2, 2018) (finding Heck did not bar pro se plaintiff's false arrest claim), adopted by, 2018 WL 4054105 (N.D.N.Y. Aug. 24, 2018); see Covington v. City of New York, 171 F.3d 117, 123 (2d Cir. 1999) ("[A] wrongful arrest claim, like many Fourth Amendment claims, does not inevitably undermine a conviction because a plaintiff can wage a successful wrongful arrest claim and still have a perfectly valid conviction."). Moreover, given that it is unclear whether Mr. Porath remains in State custody, Heck "likely ... would not bar any ... claims that [he] seeks to assert here, as '[t]he Heck bar to § 1983 actions ... does not apply to former prisoners who are no longer in custody because only individuals in state or federal custody can petition for writs of habeas corpus to collaterally challenge their convictions.' " Hudson v. Cnty. of Dutchess, 51 F. Supp. 3d 357, 375 (S.D.N.Y. 2014) (quoting Barmapov v. Barry, No. 09 Civ. 3390, 2011 WL 32371, at *3 (E.D.N.Y. Jan. 5, 2011)).

### b) Failure to State a Claim

The Court finds, however, that Mr. Porath's False Arrest and Malicious Prosecution Claims are both deficient for the same reason—Mr. Porath has failed to allege a lack of probable cause for his arrest and prosecution for violating his parole conditions. In the Amended Complaint, Mr. Porath acknowledges that he was arrested and incarcerated for violating the conditions of his parole. (ECF No. 14 at 4, 7). Although Mr. Porath objects to his arrest and confinement, he does not deny that he committed the offenses leading to his parole revocation. In fact, he concedes that he stopped complying with the conditions of his parole because he refused "to go to Bellevue/Swarts Island[.]" (Id. at 7). "As [Mr. Porath] does not allege any fact suggesting that the parole warrant was facially invalid, he fails to state claims for [false arrest] based on his ... arrest pursuant to the parole warrant and subsequent confinement." Lurch v. NYSDOCCS, No. 20 Civ. 3430 (LLS), 2020 WL 3173020, at *5 (S.D.N.Y. June 12, 2020); see Larocco v. Jackson, No. 10 Civ. 1651 (NGG) (LB), 2012 WL 760396, at *3 (E.D.N.Y. Mar. 8, 2012) ("As with [the [plaintiff]'s false arrest claim, his claim for malicious prosecution fails because [he] cannot show a lack of probable cause for commencing the criminal proceedings against him."); see also Hadid v. City of New York, 730 F. App'x 68, 71 (2d Cir. 2018) (affirming dismissal of malicious prosecution claims where "the affirmative defense of probable cause was apparent from

the face of the complaint, which acknowledge[ed] that [the plaintiff] was indicted and convicted").

### 2. Bellevue is Not a Proper Defendant

The City Defendants argue that "all claims against Bellevue should be dismissed" because "Bellevue is a non-suable entity." (ECF No. 62 at 14). The Court agrees. See Medina v. New York State Div. of Parole, No. 20 Civ. 3763 (VSB), 2020 WL 3962011, at *2 (S.D.N.Y. July 12, 2020) ("The Court must dismiss Plaintiff's claims against the Bellevue Men's Shelter ... because agencies of the City of New York ... are not entities that can be sued.").

Accordingly, the Court respectfully recommends that all of Mr. Porath's claims against Bellevue be dismissed

### 3. Monell Claim Against the City

The City argues that Mr. Porath fails to state a municipal liability claim, i.e., "that the City (or any of its agencies) has a municipal policy that caused any deprivations of his constitutional rights." (ECF No. 62 at 16).

### a. Legal Standard

"A plaintiff asserting a claim under 42 U.S.C. § 1983 must show that, 'while acting under color of state law, Defendants deprived him of a federal constitutional or statutory right.' " Vasquez v. Cnty. of Rockland, No. 13 Civ. 5632 (SLC), 2020 WL 883514, at *6 (S.D.N.Y. Feb. 24, 2020) (quoting Blackson v. City of New York, No. 14 Civ. 462 (VEC), 2014 WL 6772256, at *2 (S.D.N.Y. Dec. 2, 2014)).

**\*13** "To state a claim under section 1983 against a municipality such as the City of New York [or against an individual City employee sued in his or her official capacity], [the] Plaintiff must allege plausibly that the municipality itself, not merely one or more employees of the municipality, caused the violation of the plaintiff's rights." Yi Sun v. N.Y.C. Police Dep't, No. 18 Civ. 11002 (LTS) (SN), 2020 WL 4530354, at *4 (S.D.N.Y. Aug. 6, 2020) (citing Connick v. Thompson, 563 U.S. 51, 60 (2011)); see Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 691 (1978) (holding that municipalities cannot "be held liable unless action pursuant to official municipal policy of some

2023 WL 9197680

nature caused a constitutional tort"). "Absent such a custom, policy, or usage, a municipality cannot be held liable on a respondeat superior basis for the tort of its employee." Jones v. Town of East Haven, 691 F.3d 72, 80 (2d Cir. 2012). "[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown, 520 U.S. 397, 404 (1997).

A plaintiff may plead a policy or custom by alleging:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

Kucharczyk v. Westchester Cty., 95 F. Supp. 3d 529, 538 (S.D.N.Y. 2015) (quoting Brandon v. City of New York, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010)). At the pleading stage, the plaintiff "need not prove these elements, but still must plead them sufficiently to make out a plausible claim for relief." Id. at 540.

"[I]solated acts ... by non-policymaking municipal employees are generally not sufficient to demonstrate a municipal custom, policy, or usage that would justify municipal liability." East Haven, 691 F.3d at 81; see City of Oklahoma City v. Tuttle, 471 U.S. 808, 823–24 (1985) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under Monell, unless proof of the incident includes proof that it was caused by an existing, unconstitutional [ ] policy [ ] [that] can be attributed to a municipal

policymaker."). "On the other hand," unconstitutional acts by non-policymaking employees may justify municipal liability if "they were done pursuant to municipal policy, or were sufficiently widespread and persistent to support a finding that they constituted a custom, policy, or usage of which supervisory authorities must have been aware, or if a municipal custom, policy, or usage would be inferred from deliberate indifference of supervisory officials to such abuses." East Haven, 691 F.3d at 81. "A plaintiff alleging that [ ]he has been injured by the actions of a low-level municipal employee can establish municipal liability by showing that a policymaking official ordered or ratified the employee's actions—either expressly or tacitly." Id.

"A municipal policymaking official's 'deliberate indifference' to the unconstitutional actions, or risk of unconstitutional actions, of municipal employees can in certain circumstances satisfy the test for a municipal custom, policy, or usage that is actionable under [§] 1983." East Haven, 691 F.3d at 81 (quoting Amnesty Am. v. Town of West Hartford, 361 F.3d 113, 126, 127 n.8 (2d Cir. 2004)). "To state a claim for municipal liability based on failure to train, [a] Plaintiff therefore must allege facts which support an inference that the municipality failed to train its police officers, that it did so with deliberate indifference, and that the failure to train caused his constitutional injuries." Triano v. Town of Harrison, N.Y., 895 F. Supp. 2d 526, 540 (S.D.N.Y. 2012) (collecting cases). " '[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Brown, 520 U.S. at 410. The Second Circuit has "held that demonstration of deliberate indifference requires a showing that the official made a conscious choice, and was not merely negligent." East Haven, 691 F.3d at 81. A "Plaintiff must allege that the type of ... misconduct at issue ... was known to the [municipality], and not just that the [municipality]'s ... officers engage in misconduct." Triano, 895 F. Supp. 2d at 539.

### b. Application

**\*14** The Court finds that, in addition to failing to allege an underlying Section 1983 Claim (see § III.C.1), Mr. Porath has failed to allege a claim for municipal liability against the City under Monell. Mr. Porath's allegations against the City are limited to the actions of an unidentified Bellevue employee who allegedly refused to correct the Misclassification. (ECF No. 14 at 3–5). Even if this conduct were sufficient to state

2023 WL 9197680

a constitutional violation, Mr. Porath fails to allege any facts to plausibly suggest the existence of a City policy or custom that caused his constitutional injuries. Mr. Porath's reliance on his own, isolated interactions do not plausibly allege that this Bellevue employee acted pursuant to a City custom or policy. See Yi Sun, 2020 WL 4530354, at *5 (granting motion dismiss pro se plaintiff's Monell claim based on "isolated alleged misrepresentations by" non-policymaking municipal employees); Sulaymu-Bey v. City of New York, No. 17 Civ. 3563 (AMD) (SJB), 2019 WL 1434597, at *11 (E.D.N.Y. Mar. 29, 2019) (dismissing Monell claim under Rule 12(c) [6] where the pro se plaintiffs made only conclusory allegations that the City had "customs and policies ... of ignoring exculpatory evidence in its investigations and prosecutions"); Treadwell v. Cnty. of Putnam, No. 14 Civ. 10137 (KMK), 2016 WL 1268279, at *4 (S.D.N.Y. Mar. 30, 2016) (dismissing Monell claim based on "an isolated series of incidents between Plaintiff and [municipal] employees that was the cause of her alleged constitutional injuries").

[6]     "The same standard applicable to Fed. R. Civ. P. 12(b)(6) motions to dismiss applies to Fed. R. Civ. P. 12(c) motions for judgment on the pleadings." Bank of New York v. First Millennium, Inc., 607 F.3d 905, 922 (2d Cir. 2010).

To the extent Mr. Porath asserts the City's Monell liability under a failure-to-train theory, his claim fares no better. Again, his allegations relate only to a single incident of allegedly unconstitutional conduct, and thus are "not sufficient to support a claim for municipal liability." Sulaymu-Bey, 2019 WL 1434597, at *11; see Connick, 563 U.S. at 62 (plaintiffs must establish "[a] pattern of similar constitutional violations by untrained employees ... to demonstrate deliberate indifference for purposes of failure to train."); Turner v. Correct Care Sols., No. 18 Civ. 3370 (VB), 2019 WL 1115857, at *13 (S.D.N.Y. Mar. 11, 2019) (granting motion to dismiss Monell claim and noting that, "to adequately plead a policy or custom under Monell, [a] plaintiff must plausibly allege similar incidents involving others."); Triano, 895 F. Supp. 2d at 532 ("[A] custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the municipality.").

Accordingly, the Court finds that Mr. Porath's Section 1983 Claims against the City fail for the independent reason that he has not alleged a constitutional violation that resulted from a City custom or policy.

#### 4. Absolute and Qualified Immunity

Officer Akaneme also argues that he is entitled to absolute immunity with respect to Mr. Porath's malicious prosecution claim and qualified immunity with respect to all of Mr. Porath's claims. (ECF No. 64 at 28–30). Having determined that Mr. Porath fails to state a Section 1983 Claim, however, the need not address at this time the more difficult questions of absolute and qualified immunity. See Steele-Warrick v. Microgenics Corp., No. 19 Civ. 6558 (FB) (VMS), 2023 WL 3081290, at *11 (E.D.N.Y. Apr. 26, 2023) (declining to address qualified immunity argument with respect to claims that were not plausibly alleged); DeMeo v. Koenigsmann, No. 11 Civ. 7099 (HBP), 2015 WL 1283660, at *18 (S.D.N.Y. Mar. 20, 2015) ("Because plaintiff has failed to state claims on which relief can be granted against Dr. Holder, I need not address the defendants' argument that he is entitled to qualified immunity."); Smith v. Hochul, No. 13 Civ. 1106A (MAT), 2015 WL 1432644, at *5 (W.D.N.Y. Mar. 26, 2015) ("The Court need not decide, at this time, whether [probation officer defendants] are entitled to absolute immunity because the allegations set forth in the amended complaint fail to state a claim upon which relief can be granted and must be dismissed.").

#### 5. State Law Claims

 **\*15** A "district court may decline to exercise supplemental jurisdiction over a claim" once it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). "Further, in the usual case in which all federal law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." Alexander v. JP Morgan Chase Bank, N.A., No. 19-CV-10811 (OTW), 2021 WL 1061833, at *5 (S.D.N.Y. Mar. 18, 2021) (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988)).

Having found that Mr. Porath fails to allege any claim over which the Court has original jurisdiction, I recommend that the Court decline "to exercise supplemental jurisdiction over [his] [S]tate [L]aw [C]laims unless [he] can properly allege a Section [1983] claim" in a second amended complaint. Alexander, 2021 WL 1061833, at *6. Accordingly, the Court

2023 WL 9197680

recommends that the State Law Claims be dismissed without prejudice.

**D. Leave to Amend**

"Leave to amend should be 'freely give[n] ... when justice so requires.' " Trujillo v. City of New York, No. 14 Civ. 8501 (PGG) 2016 WL 10703308, at *21 (S.D.N.Y. Mar. 29, 2016) (quoting Fed. R. Civ. P. 15(a)(2)). The Second Circuit recognizes that "the 'liberal spirit' of the Federal Rule of Civil Procedure 15 embodies a 'strong preference for resolving disputes on the merits.' " Davis v. Goodwill Indus. of Greater N.Y. & N.J., Inc., No. 15 Civ. 7710 (ER), 2017 WL 1194686, at *14 (S.D.N.Y. Mar. 30, 2017) (quoting Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797 F.3d 160, 190–91 (2d Cir. 2015)). "[A] pro se complaint should not be dismissed without the Court's granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." Grullon v. City of New Haven, 720 F.3d 133, 139 (2d Cir. 2013).

"District courts 'ha[ve] broad discretion in determining whether to grant leave to amend[.]' " Trujillo, 2016 WL 10703308, at *21 (quoting Gurary v. Winehouse, 235 F.3d 793, 801 (2d Cir. 2000)). Courts may deny leave to amend for "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." Ruotolo v. City of New York, 514 F.3d 184, 191 (2d Cir. 2008).

Given Mr. Porath's pro se status, the Court respectfully recommends that he be granted leave to amend those claims the Court has found were inadequately pled, i.e., his Section 1983 Claims against the City (including a claim for municipal liability against the City under Monell) and Officer Akaneme. The Court respectfully recommends that leave to amend be denied, however, as to his Section 1983 Claims against Bellevue, because "[t]he defects in these claims are not the result of 'inadequate[ ] or inartful[ ]' pleading, and are not susceptible to cure." Trujillo, 2016 WL 10703308, at *21 (quoting Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000)). Therefore, amendment of these claims would be futile.

**IV. CONCLUSION**

For the reasons set forth above, the Court respectfully recommends that the Motions be GRANTED as follows:

a. Mr. Porath's claims against Bellevue be DISMISSED WITH PREJUDICE.

b. Mr. Porath's Section 1983 Claims against the City and Officer Akaneme be DISMISSED WITHOUT PREJUDICE and with leave to amend.

**\*16** c. The Court decline to exercise supplemental jurisdiction over Mr. Porath's State Law Claims and that these claims be DISMISSED WITHOUT PREJUDICE subject to Mr. Porath's ability to state a plausible Section 1983 Claim in a second amended pleading.

Defendants shall promptly serve a copy of this Report and Recommendation on Mr. Porath, and file proof of service on the docket by **December 22, 2023**.

**NOTICE OF PROCEDURE FOR
FILING OBJECTIONS TO THIS
REPORT AND RECOMMENDATION**

The parties shall have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See also Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D) or (F)). A party may respond to another party's objections within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections, and any response to objections, shall be filed with the Clerk of the Court. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), (d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Cronan.

**FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), (d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985). If Mr. Porath does not have access to cases cited in this Report and Recommendation that are reported on Westlaw, he may request copies from Defendants' counsel. See Local Civ. R. 7.2.

2023 WL 9197680

**All Citations**

Slip Copy, 2023 WL 9197680

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

2024 WL 127025
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

David K. PORATH, Plaintiff,
v.
CITY OF NEW YORK, et al., Defendants.

22 Civ. 1302 (JPC) (SLC)
|
Signed January 11, 2024

**Attorneys and Law Firms**

David K. Porath, E. Elmhurst, NY, Pro Se.

Bryn Ritchie, Philip Sebastian Frank, John Treat, Mark Galen Toews, New York City Law Department, New York, NY, Wynee Ngo, Sichenzia Ross Ference Carmel LLP, New York, NY, for Defendant City of New York.

Bryn Ritchie, John Treat, Mark Galen Toews, New York City Law Department, New York, NY, for Defendant Bellevue Men's Shelter System.

Bryn Ritchie, New York City Law Department, New York, NY, Wesley Eugene Bauman, NYS Office of The Attorney General, New York, NY, David Cheng, Kahana Feld, New York, NY, for Defendant Akaneme.

ORDER ADOPTING REPORT
AND RECOMMENDATION

JOHN P. CRONAN, United States District Judge:

**\*1** Plaintiff David K. Porath brings this action against the City of New York, Bellevue Men's Shelter System ("Bellevue"), and New York State Parole Officer Obumneme Akaneme under 42 U.S.C. § 1983 and New York State law. Dkts. 2 (original complaint), 14 ("Amended Complaint"). Defendants moved to dismiss the Amended Complaint on June 2, 2023. Dkts. 61 (Bellevue and City motion), 63 (Akaneme motion). On December 21, 2023, the Honorable Sarah L. Cave, to whom this case has been referred for general supervision of pretrial proceedings and for dispositive motions, Dkt. 13, issued a Report and Recommendation, recommending that the Court grant these motions and (1) dismiss Plaintiff's claims against Bellevue with prejudice, (2) dismiss the Section 1983 claims against the City of New

York and Akaneme without prejudice, and (3) decline to exercise supplemental jurisdiction over Plaintiff's New York law claims and thereby dismiss them without prejudice. Dkt. 76 ("Report & Recommendation"); *see id.* at 35.

A district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge" in a Report and Recommendation. 28 U.S.C. § 636(b)(1)(C). If a party submits a timely objection to any part of the magistrate judge's disposition, the district court will conduct a *de novo* review of the contested section. Fed. R. Civ. P. 72(b)(3); *see also* United States v. Male Juvenile, 121 F.3d 34, 38 (2d Cir. 1997). If no objections are made, the Court reviews the Report and Recommendation for clear error. *See, e.g.*, Wilds v. United Parcel Serv., 262 F. Supp. 2d 163, 169 (S.D.N.Y. 2003).

The Report and Recommendation, citing both Rule 72 of the Federal Rules of Civil Procedure and 28 U.S.C. § 636(b)(1), advised the parties that they had fourteen days from service of the Report and Recommendation to file any objections, and warned that failure to timely file such objections would result in waiver of any right to object. Report & Recommendation at 36. No objections have been filed and the time for making any objections has passed. The parties have therefore waived the right to object to the Report and Recommendation or to obtain appellate review. *See* Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992); *see also* Caidor v. Onondaga Cnty., 517 F.3d 601 (2d Cir. 2008).

Notwithstanding this waiver, the Court has conducted a *de novo* review of the Report and Recommendation, and finds it to be well reasoned and its conclusions well founded. Accordingly, the Court adopts the Report and Recommendation in its entirety and dismisses the Amended Complaint without prejudice, except for the claims against Bellevue, which are dismissed with prejudice. The Court also adopts Judge Cave's recommendation to grant Plaintiff leave to amend under Federal Rule of Civil Procedure 15 as to the claims dismissed without prejudice. *See* Report & Recommendation at 34-35. Should he choose to do so, Plaintiff shall file a second amended complaint by February 12, 2024. If Plaintiff does not file a second amended complaint by February 12, 2024, or obtain an extension of time to do so by that date, the Court will dismiss this case and direct the Clerk of the Court to close this case without further notice.

**\*2**  The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. *Cf. Coppedge v. United States*, 369 U.S. 438, 444-45 (1962) (holding that an appellant demonstrates good faith when he seeks review of a nonfrivolous issue).

SO ORDERED.

**All Citations**

Slip Copy, 2024 WL 127025

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 101 of 370

Robinson v. Wright, Not Reported in Fed. Supp. (2023)

2023 WL 6122882

2023 WL 6122882
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Christopher E. ROBINSON, Plaintiff,

v.

Michael WRIGHT, New York State Parole
Officer; Matthew Mullen, New York State
Parole Officer; and Tonia Zimmerman,
New York State Parole Officer, Defendants.

5:21-CV-1098
|
Signed September 19, 2023

**Attorneys and Law Firms**

Christopher E. Robinson, Moravia, NY, Pro Se.

Aimee Cowan, New York State Attorney General - Syracuse
Regional Office, Syracuse, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior United States District Judge

**I. INTRODUCTION**

*1 Plaintiff Christopher E. Robinson commenced this civil
rights action *pro se* against defendants Michael Wright,
Matthew Mullen, and Tonia Zimmerman (collectively
"Defendants"). Defendants are all New York State parole
officers. The operative pleading is Plaintiff's Amended
Complaint. ECF No. 11. The Court *sua sponte* dismissed
several causes of action without leave to replead from
the Amended Complaint. ECF No.17. The sole remaining
claims are Fourteenth Amendment due process claims against
Defendants in their individual capacities, brought pursuant to
42 U.S.C. § 1983. *Id.*

In these claims, Plaintiff alleges that Defendants violated
his civil rights by submitting perjured testimony against
him, and by making "omissions of material facts," at
his parole revocation hearing. *See generally* ECF No. 11.
Plaintiff contends that the parole violations against him
were sustained, and he was reincarcerated, "due to the perjured
statements and omissions of material facts" by Defendants.
*Id.* at p. 4. Plaintiff seeks three million dollars ($3,000,000)

in monetary damages against Defendants. *Id.* Plaintiff is
presently in New York State custody. [1]

[1]    *See*    https://nysdoccslookup.doccs.ny.gov/    (last
       accessed 09/13/2023).

Defendants move pursuant to Federal Rule of Civil Procedure
12(b)(6) to dismiss the action on the grounds that Plaintiff's
due process claims are barred by *Heck v. Humphrey*, 512 U.S.
477, 114 S. Ct. 2364, 129 L.Ed.2d 383 (1994). ECF No. 31.
Plaintiff opposes the motion, ECF No. 32, and Defendants file
a reply. ECF No. 33.

After the dismissal motion was fully briefed, Plaintiff filed
a motion for summary judgment. ECF No. 39. Defendants
responded in opposition to that motion, ECF No. 40, and
Plaintiff filed a reply. ECF No. 41.

For the following reasons, Defendants' motion to dismiss
is granted and Plaintiff's motion for summary judgment is
denied as moot.

**II. STANDARD OF REVIEW – Rule 12(b)(6) Motion**

On a Fed. R. Civ. P. 12(b)(6) motion, the Court must accept
"all factual allegations in the complaint as true, and draw[ ]
all reasonable inferences in the plaintiff's favor." *Holmes
v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009) (internal
quotation marks omitted). This tenet does not apply to legal
conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).
Similarly, "[t]hreadbare recitals of the elements of a cause
of action, supported by mere conclusory statements ... are
not entitled to the assumption of truth." *Id.; see also Bell
Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)(stating that
a court is "not bound to accept as true a legal conclusion
couched as a factual allegation"). "To survive a motion to
dismiss, a complaint must contain sufficient factual matter,
accepted as true, to state a claim to relief that is plausible on
its face." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S.
at 570).

"The Court is obligated to construe *pro se* pleadings broadly
and liberally, interpreting them so as to raise the strongest
arguments they suggest." *Daniels v. Kijakazi*, No. 22-
CV-6297 (LJL), 2023 WL 3901987, at *3 (S.D.N.Y. June
8, 2023)(citing *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir.
2007); *Weixel v. Bd. of Educ. of City of New York*, 287 F.3d
138, 146 (2d Cir. 2002); *Cruz v. Gomez*, 202 F.3d 593, 597 (2d
Cir. 2000)). "However, this does not relieve *pro se* plaintiffs
of the requirement that they plead enough facts to 'nudg[e]

2023 WL 6122882

their claims across the line from conceivable to plausible.' " *Id.* (quoting *Twombly*, 550 U.S. at 570). "Nor does it relieve them of the obligation to otherwise comply with the pleading standards set forth by the Federal Rules of Civil Procedure." *Id.* (citing *Saidin v. N.Y.C. Dep't of Educ.*, 498 F. Supp. 2d 683, 687 (S.D.N.Y. 2007)).

## III. DISCUSSION

### a. Application of *Heck v. Humphrey*

**\*2** "An individual convicted of a crime may not bring a section 1983 suit for damages that 'necessarily impl[ies] the invalidity of his conviction or sentence ... unless [he] can demonstrate that the conviction or sentence has already been invalidated.' " *Opperisano v. P.O. Jones*, 286 F. Supp. 3d 450, 454 (E.D.N.Y. 2018)(quoting *Heck*, 512 U.S. at 487) (additional citations omitted). "*Heck's* limitation of section 1983 claims has come to be known as the 'favorable-termination' rule and applies to revocations of parole." *Id.* (citing, *inter alia*, *Lee v. Donnaruma*, 63 Fed. Appx. 39, 41 (2d Cir. 2003) ("Courts have applied *Heck* to prevent a state prisoner from bringing a Section 1983 action challenging a parole revocation unless that revocation decision is reversed or the underlying conviction is set aside.")). "A parolee challenging a parole revocation must therefore demonstrate that his parole revocation has been 'reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus.' " *Id.* at 455 (quoting *Heck*, 512 U.S. at 486–87) (additional citations omitted).

Defendants contend that Plaintiff's Fourteenth Amendment due process claims are barred by *Heck* because, by alleging that Defendants gave perjured testimony and made material omissions during his parole revocation hearing resulting in his conviction and reincarceration, he is implying the invalidity of his parole revocation determination. ECF No. 31-1 at 4 (citing *Harris v. City of New York*, 2003 WL 554745, at \*3 (S.D.N.Y. 2003)(dismissing the plaintiff's section 1983 claim pursuant to *Heck* insofar as he challenged "the basis" for the parole revocation determination). Further, Defendants correctly point out that nowhere in Plaintiff's Amended Complaint does he establish that his parole revocation determination has been invalidated, or that his underlying conviction has been set aside. Rather, as Defendants indicate, Plaintiff's Amended Complaint states that his parole violations "were sustained and I have been reincarcerated due to the perjured statements and omission of material facts by

each and every named defendant." ECF No. 11 at 4. Thus, Defendants contend, Plaintiff's sole remaining § 1983 claims are barred by *Heck* and must be dismissed.

In his opposition, Plaintiff states that he does not "dispute the facts contained in the [Defendants'] PRELIMINARY STATEMENT, STANDARD OF REVIEW or even it's [sic] argument." ECF No. 32, at 6. Plaintiff argues that if he was in fact "using an [sic] § 1983 as the vehicle to argue against his conviction, then dismissal under *Heck* would be the proper remedy." *Id. see also id.* ("The plaintiff does concede to the fact that in his amended complaint it states that his parole violations 'were sustained and I have been reincarcerated due to the perjured statements and omissions of material facts by each and every named defendant.' "). However, Plaintiff argues, he is not using § 1983 as a vehicle to attack his conviction or disturb the final outcome of the hearing, but is only contending that he was injured because Defendants violated his constitutional rights by their conduct at the parole revocation hearing. *Id.* To the extent Plaintiff makes this argument to avoid the application of *Heck*, the argument is rejected.

Plaintiff seeks three million dollars ($3,000,000) in monetary damages as a result of Defendants' alleged constitutional violations. Section 1983 provides the mechanism by which Plaintiff may bring his constitutional claims in federal court. *See Watkins v. Town of Webster*, 592 F. Supp. 3d 96, 127 (W.D.N.Y. 2022). As Defendants argue, Plaintiff's remaining Fourteenth Amendment due process claims must be brought pursuant to § 1983 and he cannot base his constitutional claims directly on the Fourteenth Amendment. *See Rother v. NYS Dep't of Corr. & Cmty. Supervision*, 970 F. Supp. 2d 78, 89, n. 12 (N.D.N.Y. 2013)("While Plaintiff explicitly states that her equal-protection claim is brought pursuant to § 1983, she does not state the specific procedural mechanism upon which her due-process and First Amendment claims rest. These claims, to the extent they seek damages, must be brought pursuant to § 1983 as well.")(citing *Koumantaros v. City Univ. of N.Y.*, 2007 WL 840115, at \*5 (S.D.N.Y. Mar. 19, 2007) ("Plaintiff claims defendant violated the due process and equal protection clauses of the Fourteenth Amendment.... [B]ecause § 1983 provides a remedy for plaintiff's causes of action, plaintiff cannot base her constitutional claims directly on the Fourteenth Amendment"), in turn citing *Pauk v. Bd. of Trustees of City Univ. of N.Y.*, 654 F.2d 856, 865 (2d Cir. 1981)); *see also Pauk*, 654 F.2d at 865 ("[W]hen § 1983 provides a remedy, a ... cause of action grounded on the Constitution is not available."); *Turpin v. Mailet*, 591 F.2d

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 103 of 370

Robinson v. Wright, Not Reported in Fed. Supp. (2023)

2023 WL 6122882

426, 427 (2d Cir. 1979) (rejecting cause of action against municipality grounded directly on Constitution because of the availability of § 1983).

**\*3** Plaintiff's argument that he is not attempting to "attack" his conviction "nor to even disturb the final outcome of the hearing," ECF No. 32, at 6, is belied by the assertions in the Amended Complaint. There, Plaintiff asserts that his parole violations were sustained, and he was reincarcerated, "*due to* the perjured statements and omission of material facts by each and every named defendant." ECF No. 11 at 4 (emphasis added). Further, the Amended Complaint states that "Officer's [sic] Wright, Mullen and Zimmerman has [sic] violated the claiment's [sic] 14th amendment right for [sic] due process for [sic] making perjured statement's [sic]," and that these officers violated Plaintiff's "5 th , 8 th , and 14 th Amendment rights for [sic] malicious prosecution for [sic] making perjured testimony *to ensure* the claiment [sic] be remanded back to prison." *Id.* at 6 (emphasis added).

"*Heck* acknowledged that a plaintiff can bring a § 1983 claim to seek damages for a defendant's use of the 'wrong procedures, not for reaching the wrong result' so long as such a claim does not call into question the lawfulness of plaintiff's continued confinement." *McAdoo v. Jagiello*, No. 9:10-CV-355, 2011 WL 1577236, at \*2 (N.D.N.Y. Apr. 26, 2011) (citing *Heck*, 512 U.S. at 482–83). "In other words, 'the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the [§ 1983] complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.' " *Id.* (quoting *Heck*, 512 U.S. at 487). "The Supreme Court has clarified that 'the proper inquiry is whether 'victory for the prisoners [would] necessarily [mean] immediate release or a shorter period of incarceration.' " *Id.* at \*3 (quoting *McKithen v. Brown*, 481 F.3d 89, 102 (2d Cir. 2007), in turn quoting *Wilkinson v. Dotson*, 544 U.S. 74, 80, 125 S. Ct. 1242, 1247 (2005); *see Chung v. Stanford*, No. 9:22-CV-1236 (GTSDJS, 2023 WL 3073497, at \*3 (N.D.N.Y. Apr. 25, 2023); [2] *Baker v. New York State Dep't of Corr. & Cmty. Supervision*, No. 9:17-CV-1270 (GTS/TWD), 2018 WL 357297, at \*4 (N.D.N.Y. Jan. 10, 2018)(" '*Heck* uses the word 'sentence' interchangeably with ... 'continuing confinement' and 'imprisonment,' thus, any shortening of a term of confinement will be subject to the rule in *Heck*.") (quoting *Wilkinson*, 544 U.S. at 83–84, in turn quoting *Heck*, 512 U.S. at 483, 486) (other citation omitted)).

[2]

In *Chung,* Judge Suddaby wrote:

> Although *Heck* held that the favorable-termination rule is triggered when a prisoner's success would "necessarily imply the invalidity of the *conviction*," 512 U.S. at 487 (emphasis added), the Supreme Court subsequently clarified that *Heck* applies to any challenge to the duration of "confinement" that necessarily implies the invalidity of that confinement, even if that challenge would not implicate the underlying conviction or sentence, *see Wilkinson v. Dotson*, 544 U.S. 74, 81-82 (2005) ("[A] state prisoner's § 1983 action is barred ... *if* success in that action would necessarily demonstrate the invalidity of confinement or its duration." (emphasis in original); *Edwards v. Balisok*, 520 U.S. 641, 648 (1997) (finding that a prisoner's claim for money damages alleging that he was deprived of good-time credits without due process necessarily implies the invalidity of the "punishment imposed," meaning the deprivation of the credits); *Baker v. New York State Dep't of Corr. & Cmty. Supervision*, No. 9:17-CV-1270 (GTS/TWD), 2018 WL 357297, at \*4 (N.D.N.Y. Jan. 10, 2018) ("While the Complaint does not include any specific request for immediate release, in the motion for injunctive relief, Plaintiff seeks to overturn the Panel's decision and moves for immediate release .... To the extent that the Complaint could be construed as seeking release, Plaintiff's claims are dismissed without prejudice pursuant to *Heck*, on the ground that habeas corpus is his sole federal remedy."); *McAllister v. Alexandra*, No. 9:09-CV-0664 (GTS/DRH), 2009 WL 10675934, at \*5 (N.D.N.Y. July 28, 2009) ("Any claim by Plaintiff that he is entitled to damages resulting from the denial of parole release is barred by the doctrine of *Heck v. Humphrey*[.]"); *Grant v. Ahern*, No. 03-CV-0539 (FJS/RFT), 2005 WL 1936175, at \*5 n.3 (N.D.N.Y. Aug. 2, 2005) ("*Heck* has been held to apply to 'suits contesting the rejection of parole release.' ") (quoting *Lampkin v. N.Y. City Dep't of Probation*, No. 00-CV-7165, 2001 WL 210362, at \*2 (S.D.N.Y. Mar. 1, 2001)).

2023 WL 3073497, at \*3.

**\*4** Here, by contending that his parole revocation determination and subsequent sentence were "due to"

Defendants' perjury and material omissions at the parole revocation hearing, Plaintiff's victory on this due process claims would invalidate the results of his parole revocation hearing and would necessarily mean his release or a shorter period of incarceration for his parole violations. Put another way, by alleging that Plaintiff's parole violations were sustained and he was reincarcerated "due to the perjured statements and omissions of material facts" by Defendants, Plaintiff necessarily implies the invalidity of his conviction and sentence based on Defendants' conduct at his parole revocation hearing. For this reason, and because Plaintiff has not alleged that his parole revocation determination or subsequent sentence have been invalidated, Plaintiff's due process claims are barred by *Heck. See, e.g., Sumter v. Marion,* No. 98 Civ. 2744, 1999 WL 767426, at *5 (S.D.N.Y. Sept. 28, 1999) (dismissing § 1983 claim because to find in plaintiff's favor would require finding that defendants falsified evidence at the revocation hearing, thus invalidating the result); *Sealey v. Fishkin,* No. 96 CV 6303, 1998 WL 1021470, at *5 (E.D.N.Y. Dec. 2, 1998) (dismissing § 1983 claim alleging police officer made false statements to parole officials, ultimately leading to parole revocation).

Plaintiff also appears to argue that he is entitled to proceed on his Fourteenth Amendment due process claims despite *Heck* because the Court adopted Judge Lovric's recommendation that a response to these claims was required. This argument is without merit. On an initial review of the Amended Complaint, Judge Lovric recommended, *inter alia,* that Plaintiff's malicious prosecution and false arrest claims be dismissed because Plaintiff had "not obtained a favorable termination of the underlying proceeding to state a malicious prosecution or false imprisonment claim." *See* ECF No. 13 at 8. In making this recommendation, Judge Lovric cited to two cases, one of which quoted from *Heck. See id.* (citing *Aragon v. New York,* 14-CV-9797, 2017 WL 2703562, at *5 (S.D.N.Y. June 22, 2017)("Thus, to recover damages for a false imprisonment claim under Section 1983, a prisoner must demonstrate that his conviction 'has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus.' ")(quoting *Heck,* 512 U.S. at 486-87)). In addressing Plaintiff's Fourteenth Amendment due process claims, Judge Lovric reviewed the rights that an accused parolee is entitled to at a parole revocation hearing, *id.* 8-9, but he did not address whether *Heck* would bar the due process claims. *See id.* Rather, in recommending that these claims be allowed to proceed, Judge Lovric merely stated:

Here, Plaintiff alleges that his constitutional rights were violated during his parole revocation hearing based on false statements made by Defendants. Out of an abundance of caution, mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, *see, e.g., Sealed Plaintiff,* 537 F.3d at 191, and without expressing an opinion as to whether Plaintiff can withstand a properly filed motion to dismiss or for summary judgment, I recommend that a response be required to Plaintiff's Fourteenth Amendment claims against Defendants in their individual capacities.

*Id.* at 9.

Plaintiff filed a letter indicating he had no objection to Judge Lovric's recommendations, *see* ECF No. 14, and no other objections were lodged. The Court adopted Judge Lovric's recommendations because it found that the recommendations were not subject to attack for plain error or manifest injustice. ECF No. 17 at 2. The fact that the Court agreed with Judge Lovric that the due process claims should be allowed to proceed does not mean that Court reached any conclusion on whether the claims were barred by *Heck.* Indeed, Judge Lovric indicated that he was not expressing any opinion as to whether Plaintiff's due process claims could survive a motion to dismiss. Plaintiff cannot avoid the application of *Heck* by arguing that this issue has already been resolved in his favor when, in fact, it has not.

**\*5** For the reasons discussed here, the Court finds that Plaintiff's due process claims are barred by *Heck.* Accordingly, Defendants' motion to dismiss is granted and Plaintiff's due process claims are dismissed.

### b. Leave to Amend

While district courts generally grant *pro se* plaintiffs an opportunity to amend a complaint to cure its defects, leave to amend is not required where it would be futile. *See*

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 105 of 370

**Robinson v. Wright, Not Reported in Fed. Supp. (2023)**

2023 WL 6122882

*Hill v. Curcione*, 657 F.3d 116, 123–24 (2d Cir. 2011); *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988). "[T]he *Heck* rule bars [a] plaintiff's claims until the underlying conviction is invalidated, and thus providing the plaintiff with an opportunity to amend the complaint is futile until such time that the state court conviction is reversed, invalidated by a federal writ of habeas corpus, or otherwise expunged or declared invalid." *Cruz v. Reilly*, No. 08-CV-1245 JFB AKT, 2009 WL 2567990, at *7 (E.D.N.Y. Aug. 18, 2009). Here, "[b]ecause the defects in Plaintiff's complaint [arising from the *Heck* bar] cannot be cured with an amendment, the Court declines to grant Plaintiff leave to amend his [amended] complaint." *Traore v. New York State Div. of Parole*, No. 22-CV-1431 (LTS), 2023 WL 207920, at *3 (S.D.N.Y. Jan. 13, 2023). The Court dismisses Plaintiff's due process claims without prejudice to being brought in a new action if he can establish that his parole revocation determination or subsequent sentence have been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus.

**c. Plaintiff's Motion for Summary Judgment**

Inasmuch as the only remaining claims in this action are Plaintiff's Fourteenth Amendment due process claims against Defendants in their individual capacities, which are now dismissed without leave to amend, Plaintiff's motion for summary judgment is denied as moot.

## IV. CONCLUSION

For the reasons discussed above, Defendants' motion to dismiss Plaintiff's Fourteenth Amendment due process claims against Defendants, ECF No. 31, is **GRANTED**. These claims are **DISMISSED without prejudice** to being brought in a new action if Plaintiff can establish that his parole revocation determination or subsequent sentence have been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus.

Because Plaintiff's Fourteenth Amendment due process claims against Defendants are the only remaining claims in this action, the Amended Complaint, ECF No. 11, is **DISMISSED**.

That being the case, Plaintiff's motion for summary judgment, ECF No. 39, is **DENIED as moot**.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2023 WL 6122882

---

**End of Document**    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**    © 2024 Thomson Reuters. No claim to original U.S. Government Works.    5

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 106 of 370

Harris v. New York Division of Parole, Not Reported in Fed. Supp. (2019)

2019 WL 1958017

2019 WL 1958017
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jimmy HARRIS, Plaintiff,
v.
NEW YORK DIVISION OF PAROLE, et al., Defendant.

9:18-CV-1435 (LEK/TWD)
|
Signed 05/01/2019

**Attorneys and Law Firms**

Jimmy Harris, Comstock, NY, pro se.

**DECISION AND ORDER**

Lawrence E. Kahn, U.S. District Judge

**I. INTRODUCTION**

*1 Plaintiff Jimmy Harris commenced this action by filing a pro se civil rights complaint, an application for leave to proceed in forma pauperis ("IFP") and a motion for appointment of counsel. Dkt. No. 1 ("Complaint"); Dkt. No. 2 ("IFP Application"); Dkt. No. 4 ("Motion for Counsel"). On January 17, 2019, the Court granted Plaintiff's IFP Application, but dismissed the Complaint under 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b) for failure to state a claim upon which relief may be granted. Dkt. No. 5 ("January 2019 Order"). [1] However, since Plaintiff is proceeding pro se, the Court let him submit an amended complaint. Id. He submitted one on February 13, 2019. Dkt. No. 6 ("Amended Complaint"). However, the Amended Complaint does not survive review under §§ 1915(e)(2)(B) and 1915A(b). Therefore, it must be dismissed.

[1]    Based on the Court's decision dismissing the complaint, Plaintiff's Motion for Counsel was denied as moot. Jan. 2019 Order at 6–7.

**II. DISCUSSION**

**A. Legal Standard**

Because Plaintiff is a prisoner proceeding IFP against government officers, the Court must review his Amended Complaint to determine whether it states a claim on which relief can be granted. §§ 1915(e)(2)(B) & 1915A(b). The Amended Complaint must allege "enough facts to state a claim for relief that is plausible on its face," meaning the factual allegations must "raise a reasonable expectation that discovery will reveal evidence" that the defendant is liable for the wrongdoing alleged. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556, 570 (2007); see also Jan. 2019 Order at 2–3. Although the Court must "draw the most favorable inferences" that a pro se plaintiff's "complaint supports, [it] cannot invent factual allegations that he has not pled." Chavis v. Chappius, 618 F.3d 162, 170 (2d Cir. 2010).

Plaintiff asserts claims under 42 U.S.C. § 1983, which establishes a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws of the United States. "Section 1983 itself creates no substantive rights, [but] ... only a procedure for redress for the deprivation of rights established elsewhere." Sykes v. James, 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted). Plaintiff claims violations of the Fourth and Fourteenth Amendments.

Section 1983 does not impose "vicarious" or "respondeat superior" liability, meaning that a supervisor is not liable for damages for his subordinates' constitutional violations merely because he had authority over the wrongdoers. Iqbal, 556 U.S. at 676. Therefore, to survive a motion to dismiss, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Id. In the Second Circuit's terminology, the defendant's "personal involvement ... in [the] alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006).

**B. Summary of the Amended Complaint**

As in his original complaint, Plaintiff challenges his parole revocation following his arrest on March 10, 2018. Am. Compl. at 2. The Amended Complaint adds allegations regarding his allegedly unlawful detention, as well as allegations regarding a "non-contact" condition of his later release from incarceration. He names the following four individuals as defendants: (1) Albany County Sheriff Craig J. Apple; (2) Parole Officer Staszak; (3) Parole Officer Ketterer; and (4) Parole Officer Sorrentini. Id. at 1–2. The following facts are set forth as alleged by Plaintiff in the Amended Complaint.

*2 On March 10, 2018, while Plaintiff was on parole, he was arrested for third-degree assault and "obstruction of breathing" and taken to Albany County Jail. Id. at 2. On

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 107 of 370

Harris v. New York Division of Parole, Not Reported in Fed. Supp. (2019)

2019 WL 1958017

March 23, 2018, the state court, or the state prosecutor, determined that the charges against Plaintiff were based on "false accusations" and dismissed those charges. Id. The next day, Plaintiff's fiancé faxed a court record of the dismissal to Parole Officer Ketterer, who notified Parole Officer Staszak of the dismissal. Id. However, Plaintiff remained in Albany County Jail. Id.

Plaintiff does not state whether he received an initial revocation hearing, but his final revocation hearing was held on April 9, 2018. Id. at 2. Plaintiff asserts that Ketterer and Staszak had "the d[i]scretion ... to restore [P]laintiff back to parole supervision at the Final Hearing" yet "abused th[eir] authority by [ ]holding [P]laintiff unlawfully for 100 days." Id.

Following the final revocation hearing, Plaintiff filed a motion for habeas corpus in the New York State Supreme Court for Albany County challenging his continued detention. Id. at 2. On May 7, 2018, the Honorable Peter Lynch held a hearing to "determin[e] the legality" of Plaintiff's detention. Am. Compl. at 2. No appearance was made on behalf of the New York State Division of Parole. Id. Plaintiff does not state the outcome of the hearing, but on July 2, 2018, he was released from the Albany County Jail on parole and reassigned to Parole Officer Sorrentini. Am. Compl. at 3. Plaintiff alleges that Sorrentini, acting "in concert with Staszak," "forced" Plaintiff to sign a "non-contact" condition of parole that prohibited him from contacting his then-fiancé. Id.

Liberally construed, the amended complaint asserts the following claims: (1) Fourth Amendment false arrest and malicious prosecution claims against Staszak, Ketterer, and Apple; (2) Fourteenth Amendment due process claims against Staszak, Ketterer, and Apple based on Plaintiff's incarceration from March 23 to July 2, 2018; and (3) Fourteenth Amendment freedom-of-association and due process claims against Sorrentini based on her imposition or enforcement of the no-contact condition of parole.

**C. Analysis**

*1. False Arrest, Malicious Prosecution, and Due Process Claims Against Staszak, Ketterer, and Apple*

A false arrest claim under the Fourth Amendment "is substantially the same as a claim for false arrest under New York law." Ackerson v. City of White Plains, 702 F.3d 15,

19 (2d Cir. 2012) (citation omitted). Under New York law, the essential elements of a claim for false arrest are "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." Id. (quoting Broughton v. New York, 335 N.E.2d 310, 314 (N.Y. 1975)). " '[A]n arrest made with probable cause is privileged.' " Jean-Laurent v. Cornelius, No. 15-CV-2217, 2017 WL 933100, at *3 (S.D.N.Y. Mar. 8, 2017) (quoting Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994)). A Fourth Amendment malicious prosecution claim also depends on New York law, under which the plaintiff must show: "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." Manganiello v. City of New York, 612 F.3d 149, 161 (2d Cir. 2010).

Thus, both false arrest and malicious prosecution require a showing that there was no probable cause for the arrest or prosecution. "The burden of establishing the absence of probable cause rests on the plaintiff," Berry v. Marchinkowski, 137 F. Supp. 3d 495, 524 (S.D.N.Y. 2015), unless the arresting officers lacked a warrant, Hoyos v. City of New York, 999 F. Supp. 2d 375, 386 (E.D.N.Y. 2013) (citing Broughton, 335 N.E.2d at 315). "Probable cause is established when the arresting officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." Singer v. Fulton Cty. Sheriff, 63 F.3d 110, 119 (2d Cir. 1995). "When a parolee is involved, the lower 'reasonable cause' standard is in place." Alvarado v. City of New York, 482 F. Supp. 2d 332, 337 (S.D.N.Y. 2007).

**\*3** A warrant for retaking and temporary detention may issue when there is a reasonable cause to believe that the releasee has lapsed into criminal ways or company, or has violated the conditions of his release in an important respect. Reasonable cause exists when evidence or information which appears reliable discloses facts or circumstances that would convince a person of ordinary intelligence, judgment and experience

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 108 of 370

Harris v. New York Division of Parole, Not Reported in Fed. Supp. (2015)

2019 WL 1958017

that it is reasonably likely that a releasee has committed the acts in question or has lapsed into criminal ways or company.

9 N.Y.C.R.R. 8004.2(c).

To establish that prison officials violated the Due Process Clause, Plaintiff must show that they deprived him of a liberty interest without adequate procedural protections. Ortiz v. McBride, 380 F.3d 649, 654 (2d Cir. 2004). Continued release on parole is a protected liberty interest. Morrissey v. Brewer, 408 U.S. 471, 482 (1972). Therefore, "[w]here a state provides a system of parole" as New York does, "it may not revoke a person's parole without providing minimum due process protections." Calhoun v. N.Y. State Div. of Parole Officers, 999 F.2d 647, 652 (2d Cir. 1993). "The state must provide a preliminary probable cause hearing ... as well as a final revocation hearing, at which a parolee may present evidence and confront witnesses." Calhoun, 999 F.2d at 652 (citing Morrissey, 408 U.S. at 487–89). "New York law dictates that final parole revocation hearings generally must be held within 90 days of the probable cause determination or ... the date on which the parolee waived his right to a preliminary hearing." McAdoo v. Jagiello, No. 9:10-CV-355, 2011 WL 1577236, at *5 (N.D.N.Y. Apr. 26, 2011) (citing N.Y. Exec. L. § 259–i(3)(f)(i)). "A person's constitutional rights are [also] violated if 'an (1) investigating official (2) fabricates evidence (3) that is likely to influence a [fact-finder's] decision, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of liberty as a result.' " Jean-Laurent, 2017 WL 933100, at *6 (quoting Jovanovic v. City of New York, 486 F. App'x 149, 152 (2d Cir. 2012)). Probable cause is no defense to a claim that a defendant caused a deprivation of liberty by fabricating evidence. Javanovic, 486 F. App'x at 152.

Plaintiff's claims against Ketterer, Staszak, and Apple must be dismissed for several reasons. First, Plaintiff does not allege facts showing that any of the defendants were personally involved in his arrest or parole revocation. He states that Ketterer and Staszak had "discretion" to release him, but does not support that conclusion with any factual allegations. There are no facts indicating what role, if any, Defendants played in Plaintiff's parole revocation. See Bottom v. Pataki, No. 03-CV-835, 2006 WL 2265408, at *9 (N.D.N.Y. Aug. 7, 2006), aff'd, 610 F. App'x 38 (2d Cir. 2015) (dismissing due process claim for lack of personal involvement because "[o]nly the

New York State Board of Parole ... has the statutory authority to determine which prisoners to release on parole" and the official-defendant had "no involvement" in or "control" over the decision) (citing N.Y. Exec. L. § 259-c); see also Felix v. N.Y. State Dep't of Corr. & Cmty. Supervision, No. 16-CV-7978, 2018 WL 3542859, at *9 (S.D.N.Y. July 23, 2018) (dismissing malicious prosecution claim for similar reasons).

In addition, Plaintiff does not allege that the officers who arrested him for violating his parole conditions lacked a warrant or probable cause, as required to state a false arrest claim; the Amended Complaint does not state facts sufficient to conclude that the arresting officers should have known the charges were false when they arrested him. See Bernard, 25 F.3d at 102 ("A finding of probable cause ... may exist even when it is based on mistaken information, so long as the arresting officer acted reasonably and in good faith in relying on that information."). And Plaintiff does not point to any fabricated evidence or deficiencies in the parole revocation process, as required to support a due process claim. See McAdoo, 2011 WL 1577236, at *5 (dismissing due process claim for failure to allege defects in parole revocation proceedings).

**\*4** Also, a state prisoner may not bring a claim under § 1983 if judgment in his favor "would necessarily demonstrate the invalidity of [his] confinement or its duration." Wilkinson v. Dotson, 544 U.S. 74, 81–82 (2005). Therefore, "in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." Heck v. Humphrey, 512 U.S. 477, 481, 486–87 (1994). Heck bars challenges to the procedures used to determine that the plaintiff should be incarcerated where the "principal procedural defect complained of ... would, if established, necessarily imply the invalidity of the deprivation [of liberty]." Edwards v. Balisok, 520 U.S. 641, 646 (1997). "Courts have applied Heck to prevent a state prisoner from bringing a Section 1983 action challenging a parole revocation" on substantive or procedural grounds "unless that revocation decision [was previously] reversed or the underlying conviction [was] set aside." Lee v. Donnaruma, 63 F. App'x 39, 41 (2d Cir. 2003).

2019 WL 1958017

Since success on Plaintiff's malicious prosecution and due process claims require him to prove the invalidity of his parole revocation, Heck bars those claims unless state authorities reversed the revocation. Lee, 63 F. App'x. at 41. A liberal reading of the Amended Complaint—which asserts that Plaintiff was released only weeks after a state judge heard his unopposed motion for a writ of habeas corpus, Am. Compl. at 2—might suggest that the state court granted the motion, overturning the revocation decision. A state court's grant of a habeas petition vacating the revocation judgment would meet Heck's "favorable termination" requirement. Heck, 512 U.S. at 477. If Plaintiff chooses to submit an Amended Complaint, he should clarify whether the state court granted his motion for habeas corpus or otherwise overturned the revocation decision.

### 2. Fourteenth Amendment Due Process Claims Against Sorrentini

The Constitution protects "two distinct types of association: 'intimate association' and 'expressive association.' " Gray-Davis v. Rigby, No. 5:14-CV-1490, 2016 WL 1298131, at *6 (N.D.N.Y. Mar. 31, 2016) (quoting City of Dallas v. Stanglin, 490 U.S. 19, 23–25 (1989)). "Intimate association" encompasses "those relationships that may be classified as familial in nature, as involving 'deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life.' " Gray-Davis, 2016 WL 1298131, at *6 (quoting Roberts v. United States Jaycees, 468 U.S. 609, 620 (1984)). The right to intimate association "guarantees an individual the choice of entering into an intimate relationship free from undue intrusion by the state." Sanitation & Recycling Indus. v. City of New York, 107 F.3d 985, 996 (2d Cir. 1997) (citing Roberts, 468 U.S. at 617–18).

Conditions of release that restrict the right to intimate association must be "reasonably and necessarily related" to the " 'legitimate interests of the parole regime,' such as 'rehabilitation' and 'protection of the public,' " and must be "tailored in light of the conduct for which [the individual] was convicted." Trisvan v. Annucci, 284 F. Supp. 3d 288, 297 (E.D.N.Y. 2018) (citing Birzon v. King, 469 F.2d 1241, 1243 (2d Cir. 1972)); see also Doe v. Lima, 270 F. Supp. 3d 684, 702–06 (S.D.N.Y. 2017), aff'd sub nom. Doe v. Cappiello, 758 F. App'x 181, 184 (Jan. 30, 2019) (requiring restriction on parolee's contact with children to be "narrowly

tailored to serve a compelling governmental interest" and to a risk defendant posed to his child) (citing United States v. Myers, 426 F.3d 117, 128 (2d Cir. 2005)). In addition, before imposing a parole condition that abridges a protected intimate relationship, the state must afford a parolee notice and an opportunity to be heard. Newman v. Annucci, No. 17-CV-0918, 2018 WL 4554494, at *5 (N.D.N.Y. Sept. 21, 2018).

**\*5** Plaintiff alleges that after he was released on July 2, 2018, Sorrentini "forced" him to sign a document indicating that he was prohibited from contacting his fiancé as a condition of release. Am. Compl. at 3. However, Plaintiff provides no factual basis to conclude that the no-contact condition was unjustified by the circumstances underlying his revocation or his original offense. See Trisvan, 284 F. Supp. 3d at 297 (dismissing due process challenge to parole condition because plaintiff "fail[ed] to present any factual allegations explaining how or why the release conditions are not reasonably or necessarily related to legitimate state interests in light of the crime and conduct underlying his conviction"); Newman, 2018 WL 4554495, at *6 (same). Nor does he allege facts supporting the conclusion that he was "forced" to sign the condition, or that he was not given an opportunity to be heard regarding the condition. Am. Compl. at 3. Accordingly, Plaintiff's Fourteenth Amendment claims against Sorrentini are also dismissed without prejudice.

### III. FINAL OPPORTUNITY TO AMEND

Because Plaintiff alleges claims against many of the defendants for the first time in his Amended Complaint, the Court will give Plaintiff one final opportunity to amend his complaint. See Gomez v. USAA Fed. Savings Bank, 171 F.3d 794, 796 (2d Cir. 1999) ("Certainly the court should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated."). Any amended complaint filed by Plaintiff must bear his original signature, and must be a complete pleading which will supersede and replace the operative pleading in its entirety. Plaintiff must name one or more defendants, and must set forth a short and plain statement of the facts he relies on in support of his claim that the individual named as a defendant engaged in misconduct or wrongdoing that violated Plaintiff's constitutional rights.

If Plaintiff fails to submit a second amended complaint within thirty days of the filing date of this Decision and Order, the Court will, without further order, dismiss this action without

prejudice pursuant to §§ 1915(e)(2)(B) and 1915A(b) for failure to state a claim upon which relief may be granted.

## IV. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the Clerk shall update the docket to add the following parties as defendants: (1) Albany County Sheriff Craig J. Apple; (2) Parole Officer Staszak; (3) Parole Officer Sorrentini; and (4) Parole Officer Ketterer; and it is further

**ORDERED**, that Plaintiff's claims are **DISMISSED without prejudice** pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b); and it is further

**ORDERED**, that if Plaintiff wishes to proceed with this action, he must file a second amended complaint as directed above within thirty days from the filing date of this Decision and Order; and it is further

**ORDERED**, that, if Plaintiff timely files a second amended complaint, this matter be returned to the Court for further review; and it is further

**ORDERED**, that if Plaintiff fails to timely file a second amended complaint as directed above, the Clerk shall enter judgment indicating that this action is **DISMISSED** without further order of this Court pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b) for failure to state a claim upon which relief may be granted. In that event, the Clerk is directed to close this case; an it is further

**ORDERED**, that the Clerk serve a copy of this Decision and Order on Plaintiff.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 1958017

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 111 of 370

Sabino v. Port Authority Police Department, Not Reported in Fed. Supp. (2021)

2021 WL 3914092

2021 WL 3914092
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Saul SABINO, Plaintiff,

v.

PORT AUTHORITY POLICE DEPARTMENT; New
York County District Attorney's Office, Defendants.

21-cv-5731 (JGK)

|

Signed 09/01/2021

**Attorneys and Law Firms**

Saul Sabino, East Elmhurst, NY, Pro Se.

**MEMORANDUM OPINION AND ORDER**

JOHN G. KOELTL, United States District Judge:

 **\*1**  The plaintiff, currently incarcerated in the George R.
Vierno Center on Rikers Island, brings this pro se action
under 42 U.S.C. § 1983, alleging that the Defendants
violated his constitutional rights. [1] By order dated August 10,
2021, the Court granted the plaintiff's request to proceed in
forma pauperis (IFP). [2] For the reasons explained below, the
complaint is dismissed in part.

[1]     The plaintiff initially filed the complaint on
        December 10, 2020, in the United States District
        Court for the Eastern District of New York. On July
        2, 2021, that court transferred the matter here. See
        Sabino v. Port Auth. Police Dep't, No. 20-cv-5247
        (E.D.N.Y. July 2, 2021).

[2]     Prisoners are not exempt from paying the full filing
        fee even when they have been granted permission
        to proceed IFP. See 28 U.S.C. § 1915(b)(1).

**I**

The plaintiff advances claims against the Port Authority
Police Department and the New York County District
Attorney's Office ("DA's Office"). ECF No. 1 ("Compl.").
The complaint contains the following allegations. On August
10, 2020, while the plaintiff was "off" his medication for

schizophrenia and bipolar disorder, and "under the influence
of a ton of street [d]rugs/[n]arcotics," he "went on a
shoplifting rampage" in the Marshalls store across the street
from One World Trade Center. Compl. at 5. The plaintiff "saw
demons on fire that were ready to attack" him, who were
actually "loss prevention workers," and he "pull[ed] out a
hammer to try to scare the [d]emons" away. Id. The plaintiff
ran out of the store, and was chased by "more people,"
including Port Authority police officers. Id. The plaintiff
was arrested, and after he was handcuffed, several of the
officers assaulted and injured him. Id. at 5-6. The plaintiff
was charged with first-degree robbery, criminal possession of
a weapon, and assaulting an officer. His criminal proceedings
are ongoing in the New York County Supreme Court.

According to the plaintiff, those charges should not have
been brought because he was "only shoplifting." Id. at 6. The
plaintiff asserts claims of malicious prosecution, excessive
force, and false arrest. The plaintiff seeks money damages,
the "reversal" of the alleged malicious prosecution, and other
equitable relief.

**II**

The Prison Litigation Reform Act requires that federal courts
screen complaints brought by prisoners who seek relief
against a governmental entity or an officer or employee of a
governmental entity. See 28 U.S.C. § 1915A(a). The Court
must dismiss a prisoner's IFP complaint, or any portion of
the complaint, that is frivolous or malicious, fails to state a
claim upon which relief may be granted, or seeks monetary
relief from a defendant who is immune from such relief. 28
U.S.C. §§ 1915(e)(2)(B), 1915A(b); see Abbas v. Dixon, 480
F.3d 636, 639 (2d Cir. 2007). The Court must also dismiss a
complaint if it lacks subject matter jurisdiction. Fed. R. Civ.
P. 12(h)(3).

**III**

**A.**

The plaintiff advances claims for money damages against
the DA's Office. Compl. at 7. However, state prosecutors
are immune from civil suits for damages for acts committed
within the scope of their official duties where the challenged
activities are "intimately associated with the judicial phase of

Sabino v. Port Authority Police Department, Not Reported in Fed. Supp. (2021)

2021 WL 3914092

the criminal process." Imbler v. Pachtman, 424 U.S. 409, 430, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). The absolute immunity for damages enjoyed by state prosecutors extends to claims for malicious prosecution unless the prosecutor "proceeds in the clear absence of all jurisdiction." Shmueli v. City of New York, 424 F.3d 231, 237-38 (2d Cir. 2005); id. at 237 ("Once the court determines that the challenged prosecution was not clearly beyond the prosecutor's jurisdiction, the prosecutor is shielded from liability for damages for commencing and pursuing the prosecution, regardless of any allegations that his actions were undertaken with an improper state of mind or improper motive.").

*2 Here, the plaintiff's claims against the DA's Office are premised on allegations that the DA's Office brought and is pursing charges in connection with the plaintiff's arrest following the plaintiff's actions on August 10, 2020. Because the DA's Office is indisputably prosecuting statutorily enumerated crimes, the complained of activity is intimately associated with the judicial phase of the criminal process and not beyond the DA Office's jurisdiction. See id. at 238 ("The allegations that the ADAs prosecuted [the plaintiff] and continued with the prosecution describe only functions for which a prosecutor is normally accorded absolute immunity"). Accordingly, all claims for damages against the DA's Office are dismissed with prejudice because they seek monetary relief against a defendant who is immune from suit and are frivolous. 28 U.S.C. § 1915(e)(2)(b)(i), (iii). [3]

[3]    The plaintiff's pursuit of money damages stemming from his claim for malicious prosecution is also barred by Heck v. Humphrey, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), because the state criminal proceedings have not yet been resolved in the plaintiff's favor. Id. at 486-87, 114 S.Ct. 2364; Walden v. City of New York, No. 20-cv-9360, 2020 WL 7496285, at *4 (S.D.N.Y. Dec. 18, 2020) (Heck's "favorable termination rule" precluded malicious prosecution claim seeking money damages because the plaintiff failed to allege that his "conviction ha[d] been overturned or otherwise invalidated"); see infra Section III.B.

**B.**

The complaint, liberally construed, suggests that the plaintiff is seeking equitable relief for his malicious prosecution claim against the DA's Office. Compl. at 6-7. Unlike the plaintiff's claim for money damages, the DA's Office does not enjoy absolute immunity from claims seeking equitable relief. Shmueli, 424 F.3d at 238-39 (noting that a state prosecutor's entitlement to absolute immunity from a malicious prosecution claim for damages "does not bar the granting of injunctive relief").

The tort of malicious prosecution "remedies detention accompanied, not by absence of legal process, but by wrongful institution of legal process." Wallace v. Kato, 549 U.S. 384, 389-90, 127 S.Ct. 1091, 166 L.Ed.2d 973 (2007) (emphasis in original). To prevail on a malicious prosecution claim under New York law and federal law, a plaintiff must show: (1) the commencement or continuation of a criminal proceeding by the defendant against the plaintiff, (2) the termination of the proceeding in favor of the accused, (3) the absence of probable cause for the criminal proceeding and (4) actual malice. Kee v. City of New York, No. 20-2313-cv, 2021 WL 3852241, at *8 (2d Cir. Aug. 30, 2021). For a malicious prosecution claim under Section 1983, a plaintiff also must allege a sufficient post-arraignment liberty restraint. Id.

Because favorable termination is an element of a malicious prosecution claim, a plaintiff cannot state a claim if the relevant criminal proceeding is pending. See, e.g., Bayan v. Sikorski, No. 17-cv-4942, 2021 WL 1163653, at *5 (S.D.N.Y. Mar. 26, 2021); Bussey v. Devane, No. 13-cv-3660, 2013 WL 4459050, at *6 (E.D.N.Y. Aug. 16, 2012).

Here, the plaintiff alleges that his criminal matter is pending. Accordingly, the plaintiff fails to state a claim for malicious prosecution. The plaintiff's claims for malicious prosecution seeking equitable relief are dismissed without prejudice.

**C.**

The plaintiff advances a claim for false arrest against the Port Authority Police Department. A Section 1983 claim "for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures ... is substantially the same as a claim for false arrest under New York law." Kee, 2021 WL 3852241, at *5 (citation omitted). To establish a false arrest claim under New York law, a plaintiff must show that: "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." Liranzo v. United States, 690

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 113 of 370

Sabino v. Port Authority Police Department, Not Reported in Fed. Supp. (2021)

2021 WL 3914092

F.3d 78, 95 (2d Cir. 2012) (alteration in original; emphasis and citation omitted); see also Kee, 2021 WL 3852241, at *5.

**\*3** Probable cause to arrest is a complete defense to a false arrest claim. Jenkins v. City of New York, 478 F.3d 76, 84 (2d Cir. 2007). Officers have probable cause to arrest when they "have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." Gonzalez v. City of Schenectady, 728 F.3d 149, 155 (2d Cir. 2013) (emphasis and citation omitted). "[P]robable cause can exist even where it is based on mistaken information, so long as the arresting officer acted reasonably and in good faith in relying on that information." Bernard v. United States, 25 F.3d 98, 102 (1994); Curley v. Vill. of Suffern, 268 F.3d 65, 70 (2d Cir. 2001).

The plaintiff fails to allege facts suggesting that the Port Authority police officers did not have probable cause to arrest him on August 10, 2020. The plaintiff acknowledges that he shoplifted items from the Marshalls store and brandished a hammer. He then ran away from the store security personnel and the police, who were not in a position to know that the plaintiff had taken drugs and was hallucinating. Therefore, the complaint indicates that "the facts known by the arresting officer[s] at the time of the arrest objectively provided probable cause to arrest." Jaegly v. Couch, 439 F.3d 149, 153 (2d Cir. 2006)(citing Devenpeck v. Alford, 543 U.S. 146, 152, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004)).

Accordingly, the Court dismisses the plaintiff's false arrest claim against the Port Authority Police Department with prejudice. See 28 U.S.C. § 1915(e)(2)(B)(ii).[4]

4    To the extent that the plaintiff also sought to plead a claim for false arrest against the DA's Office, the plaintiff would need to have alleged "facts suggesting that [the prosecutor] was personally involved in the decision to arrest [the plaintiff] or to detain him pre-arraignment." Nunez v. City of New York, No. 14-cv-4182, 2016 WL 1322448, at *6 (S.D.N.Y. Mar. 31, 2016), aff'd, 735 F. App'x 756 (2d Cir. 2018). The complaint is devoid of any such allegations. Accordingly, any claim for false arrest against the DA's Office is dismissed for failure to state a claim.

**D.**

The plaintiff also asserts a claim of excessive force against the Port Authority Police Department. A claim that excessive force was used "in the context of an arrest or investigatory stop of a free citizen [is] most properly characterized as one invoking the protections of the Fourth Amendment." Graham v. Connor, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Police officers' application of force is excessive, in violation of the Fourth Amendment, if it is "objectively unreasonable 'in light of the facts and circumstances confronting them, without regard to [the officers'] underlying intent or motivation." Jones v. Parmley, 465 F.3d 46, 61 (2d Cir. 2006) (alteration in original) (citing Graham, 490 U.S. at 397, 109 S.Ct. 1865). This standard "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396, 109 S.Ct. 1865.

Here, the plaintiff alleges that after he was handcuffed, multiple Port Authority police officers "assaulted" him "resulting in two large lacerations to [his] right arm." Compl. at 6. The plaintiff further alleges that as a result of the alleged assault, he lost feeling in his right hand and suffered lower back pain. Id. The plaintiff claims that he subsequently received medical treatment for his injuries at Riker's Island and received "daily wound care." Id.

**\*4** Allegations that the officers assaulted the plaintiff while he was handcuffed and caused him to suffer injuries for which he needed medical treatment are sufficient to state a claim for excessive force. Accordingly, the plaintiff's claim for excessive force is not dismissed.

**E.**

To the extent that the plaintiff seeks release from custody, the Court liberally construes his submission as a habeas corpus petition filed under 28 U.S.C. § 2241. Under Section 2241(c)(3), habeas corpus relief is available to a person "in custody in violation of the Constitution or laws or treaties of the United States." A convicted prisoner in state custody generally must challenge his confinement in a habeas corpus petition under 28 U.S.C. § 2254, but a state pretrial detainee challenging his

2021 WL 3914092

custody as unlawful under the Constitution or federal law may seek habeas corpus relief in a petition brought under Section 2241. See, e.g., Robinson v. Sposato, No. 11-cv-191, 2012 WL 1965631, at *2 (E.D.N.Y. May 29, 2012); see also Hoffler v. Bezio, 831 F. Supp. 2d 570, 575 (N.D.N.Y. 2011), aff'd, 726 F.3d 144 (2d Cir. 2013).

Before seeking Section 2241 habeas corpus relief, however, a state pretrial detainee must first exhaust any available state court remedies. See United States ex rel. Scranton v. New York, 532 F.2d 292, 294 (2d Cir. 1976) ("While [Section 2241] does not by its own terms require the exhaustion of state remedies as a prerequisite to the grant of federal habeas relief, decisional law has superimposed such a requirement in order to accommodate principles of federalism."). In the pretrial context, such exhaustion includes seeking habeas corpus relief in the state court and, if necessary, appealing up to the New York Court of Appeals. See N.Y.C.P.L.R. §§ 7001 et seq.

In this case, the plaintiff did not allege any facts suggesting that he has exhausted state court remedies by seeking habeas corpus relief in the state courts and appealing to the New York Court of Appeals. Because the plaintiff failed to show that he exhausted his available state court remedies before filing his Section 2241 petition in this Court, the Court denies without prejudice any application for relief under Section 2241.

**F.**

To the extent that the plaintiff seeks intervention by this Court in the ongoing state criminal proceedings, he is not entitled to such relief. In Younger v. Harris, 401 U.S. 37 (1971), the United States Supreme Court held that a federal court may not enjoin a pending state court criminal proceeding in the absence of special circumstances suggesting bad faith, harassment, or irreparable injury that is both serious and immediate. Id. at 41, 52; see also Sprint Commc'ns, Inc. v. Jacobs, 571 U.S. 69, 72-73, 134 S.Ct. 584, 187 L.Ed.2d 505 (2013) ("Younger exemplifies one class of cases in which federal-court abstention is required: When there is a parallel, pending state criminal proceeding, federal courts must refrain from enjoining the state prosecution.")

The plaintiff has alleged no facts showing bad faith, harassment, or irreparable injury with respect to his pending state-court criminal proceedings. Therefore, the Court will not intervene in those proceedings.

**IV**

**A.**

Because the plaintiff has been granted permission to proceed IFP, he is entitled to rely on the Court and the United States Marshals Service to effect service. Walker v. Schult, 717 F.3d. 119, 123 n.6 (2d Cir. 2013); 28 U.S.C. § 1915(d) ("The officers of the court shall issue and serve all process [in IFP cases]."); Fed. R. Civ. P. 4(c)(3) (the court must order the United States Marshals Service to serve if the plaintiff is authorized to proceed IFP). Although Federal Rule of Civil Procedure 4(m) generally requires that the summons and complaint be served within 90 days of the date the complaint is filed, the plaintiff is proceeding IFP and could not have served the summons and complaint until the Court reviewed the complaint and ordered that a summons be issued. The Court therefore extends the time to serve until 90 days after the date the summons is issued. If the complaint is not served within that time, the plaintiff should request an extension of time for service. See Meilleur v. Strong, 682 F.3d 56, 63 (2d Cir. 2012) (providing that it is the plaintiff's responsibility to request an extension of time for service); see also Murray v. Pataki, 378 F. App'x 50, 52 (2d Cir. 2010) ("As long as the [plaintiff proceeding IFP] provides the information necessary to identify the defendant, the Marshals' failure to effect service automatically constitutes 'good cause' for an extension of time within the meaning of Rule 4(m)." (citations omitted)).

**\*5** To allow the plaintiff to effect service on the Port Authority Police Department through the United States Marshals Service, the Clerk of Court is instructed to fill out a United States Marshals Service Process Receipt and Return form (USM-285 form) for this defendant. The Clerk of Court is further instructed to issue a summons and deliver to the Marshals Service all the paperwork necessary for the Marshals Service to effect service upon this defendant.

The plaintiff must notify the Court in writing if the plaintiff's address changes, and the Court may dismiss the action if the plaintiff fails to do so.

**B.**

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 115 of 370
Sabino v. Port Authority Police Department, Not Reported in Fed. Supp. (2021)
2021 WL 3914092

The plaintiff does not name John Doe defendants, but the Court assumes that the plaintiff intended to sue the officers who allegedly used excessive force against him. Under Valentin v. Dinkins, 121 F.3d 72 (2d Cir. 1997), a pro se litigant is entitled to assistance from the district court in identifying a defendant. Id. at 76. In the complaint, the plaintiff appears to supply sufficient information to permit the Port Authority of New York & New Jersey to identify the John Doe police officers who were involved in the plaintiff's arrest. It is therefore ordered that the Port Authority of New York & New Jersey ascertain the identity and badge number of each John Doe officer whom the plaintiff seeks to sue here and the address where each defendant may be served. The Port Authority of New York & New Jersey shall provide this information to the plaintiff and the Court within sixty days of the date of this order.

Within thirty days of receiving this information, the plaintiff must file an amended complaint naming the John Doe defendants. The amended complaint will replace, not supplement, the original complaint. An amended complaint form that the plaintiff should complete is attached to this order. Once the plaintiff has filed an amended complaint, the Court will screen the amended complaint and, if necessary, issue an order directing the Clerk of Court to complete the USM-285 forms with the addresses for the named John Doe Defendants and deliver all documents necessary to effect service to the United States Marshals Service.

## CONCLUSION

The claims for damages against the New York County District Attorney's Office are dismissed on immunity grounds. See 28 U.S.C. § 1915(e)(2)(B)(iii). The false arrest and malicious prosecution claims are dismissed for failure to state a claim on which relief may be granted. See 28 U.S.C. § 1915(e)(2)(B)(ii). The claim for excessive force is not dismissed.

The Clerk of Court is instructed to complete the USM-285 form with the address for the Port Authority Police Department and deliver all documents necessary to effect service to the United States Marshals Service. The Clerk of Court is also directed to add John Doe defendants to the docket.

The Clerk of Court is further directed to mail a copy of this order to the Port Authority of New York & New Jersey at: 4

World Trade Center, 150 Greenwich Street, 23rd Floor, New York, New York 10007.

The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore in forma pauperis status is denied for the purpose of an appeal. Cf. Coppedge v. United States, 369 U.S. 438, 444-45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962) (providing that an appellant demonstrates good faith when he seeks review of a nonfrivolous issue).

**\*6 SO ORDERED.**

### Attachment

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____
Write the full name of each plaintiff.

_____ CV _____
(include case number if one has been assigned)

-against-

AMENDED
COMPLAINT
(Prisoner)

Do you want a jury trial?
☐ Yes    ☐ No

_____
Write the full name of each defendant. If you cannot fit the names of all of the defendants in the space provided, please write "see attached" in the space above and attach and attach an additional sheet of paper with the full list of names. The names listed above must be identical to those contained in Section IV.

NOTICE

The public can access electronic court files. For privacy and security reasons, papers filed with the court should therefore not contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include only: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number. See Federal Rule of Civil Procedure 5.2.

Rev. 5/20/16

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 116 of 370

Sabino v. Port Authority Police Department, Not Reported in Fed. Supp. (2021)

2021 WL 3914092

## I. LEGAL BASIS FOR CLAIM

State below the federal legal basis for your claim, if known. This form is designed primarily for prisoners challenging the constitutionality of their conditions of confinement; those claims are often brought under 42 U.S.C. § 1983 (against state, county, or municipal defendants) or in a "*Bivens*" action (against federal defendants).

☐ Violation of my federal constitutional rights

☐ Other: _____

## II. PLAINTIFF INFORMATION

Each plaintiff must provide the following information. Attach additional pages if necessary.

First Name          Middle Initial          Last Name

State any other names (or different forms of your name) you have ever used, including any name you have used in previously filing a lawsuit.

Prisoner ID # (if you have previously been in another agency's custody, please specify each agency and the ID number (such as your DIN or NYSID) under which you were held)

Current Place of Detention

Institutional Address

County, City          State          Zip Code

## III. PRISONER STATUS

Indicate below whether you are a prisoner or other confined person:

☐ Pretrial detainee
☐ Civilly committed detainee
☐ Immigration detainee
☐ Convicted and sentenced prisoner
☐ Other: _____

Page 2

## IV. DEFENDANT INFORMATION

To the best of your ability, provide the following information for each defendant. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are identical to those listed in the caption. Attach additional pages as necessary.

Defendant 1:
First Name          Last Name          Shield #

Current Job Title (or other identifying information)

Current Work Address

County, City          State          Zip Code

Defendant 2:
First Name          Last Name          Shield #

Current Job Title (or other identifying information)

Current Work Address

County, City          State          Zip Code

Defendant 3:
First Name          Last Name          Shield #

Current Job Title (or other identifying information)

Current Work Address

County, City          State          Zip Code

Defendant 4:
First Name          Last Name          Shield #

Current Job Title (or other identifying information)

Current Work Address

County, City          State          Zip Code

Page 3

## V. STATEMENT OF CLAIM

Place(s) of occurrence: _____

Date(s) of occurrence: _____

### FACTS:

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and how each defendant was personally involved in the alleged wrongful actions. Attach additional pages as necessary.

Page 4

### INJURIES:

If you were injured as a result of these actions, describe your injuries and what medical treatment, if any, you required and received.

## VI. RELIEF

State briefly what money damages or other relief you want the court to order.

Page 5

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 117 of 370

Sabino v. Port Authority Police Department, Not Reported in Fed. Supp. (2021)

2021 WL 3914092

**VII.    PLAINTIFF'S CERTIFICATION AND WARNINGS**

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I understand that if I file three or more cases while I am a prisoner that are dismissed as frivolous, malicious, or for failure to state a claim, I may be denied *in forma pauperis* status in future cases.

I also understand that prisoners must exhaust administrative procedures before filing an action in federal court about prison conditions, 42 U.S.C. § 1997e(a), and that my case may be dismissed if I have not exhausted administrative remedies as required.

I agree to provide the Clerk's Office with any changes to my address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

| Dated | | Plaintiff's Signature | |
|---|---|---|---|
| First Name | Middle Initial | Last Name | |
| Prison Address | | | |
| County, City | | State | Zip Code |

Date on which I am delivering this complaint to prison authorities for mailing: _____

Page 6

**All Citations**

Not Reported in Fed. Supp., 2021 WL 3914092

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 118 of 370

Banyan v. Sikorski, Not Reported in Fed. Supp. (2021)

2021 WL 1163653

2021 WL 1163653
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jonathan BANYAN, Plaintiff,

v.

Police Officer Craig SIKORSKI, Police
Officer Joseph Tennariello, Lieutenant Ian
Rule, Sergeant John Becerra, Esu Officer Paul
Brauer, and the City of New York, Defendants.

17-cv-4942 (LJL)
|
Signed 03/26/2021

**Attorneys and Law Firms**

Joshua Luke Rushing, Perry M. Amsellem, Pryor Cashman LLP, New York, NY, for Plaintiff.

Joseph Rizza, Nicolette Pellegrino, New York City Law Department, New York, NY, for Defendants Police Officer Craig Sikorski, Police Officer Joseph Tennariello, Lieutenant Ian Rule, Sergeant John Becerra, ESU Officer Paul Brauer.

Joseph Rizza, Kavin Suresh Thadani, Nicolette Pellegrino, New York City Law Department, New York, NY, for Defendant The City of New York.

<u>OPINION & ORDER</u>

LEWIS J. LIMAN, United States District Judge:

**\*1** Defendants Craig Sikorski ("Sikorski"), Joseph Tennariello ("Tennariello"), Ian Rule ("Rule"), John Becerra ("Becerra"), and the City of New York (collectively "Defendants") move for summary judgment against Plaintiff Jonathan Banyan ("Plaintiff" or "Banyan"). For the following reasons, Defendants' motion is granted in part and denied in part.

**FACTUAL BACKGROUND**

**A. Undisputed Facts**

This case arises out of Plaintiff's arrest on March 20, 2016. The following facts are undisputed. In the early morning, Police Officer Sikorski, Lieutenant Rule, and Police Officer

Tennariello were in an unmarked SUV between Seventh and Eighth Avenues in New York. Dkt. No. 176 ¶ 1. Around 4:00 a.m., the officers made a traffic stop of a vehicle on 14th Street. *Id.* ¶ 2. While they were conducting the stop, an individual—whose identity remains unknown—approached the officers and told them that his friend had just been "robbed" of his jacket and "beat up" by three black males, one of whom was wearing a red vest. *Id.* ¶ 3. Taking the complainant with them, the officers drove in the direction the complainant informed them that the three individuals had gone. *Id.* ¶ 4. At Eighth Avenue, the complainant identified a group of three black males, one of whom was Plaintiff here, as the individuals who robbed his friend. *Id.* ¶ 5. The complainant also identified the jacket as one being held by Plaintiff. *Id.* ¶ 6.

Much about what happened next is disputed. *See infra.* Undisputed is that a violent altercation ensued between Plaintiff and Tennariello. *Id.* ¶¶ 8-10. At some point, Sikorski joined the altercation. *Id.* ¶ 15. While the struggle was ongoing, other officers arrived on the scene, one of whom, Sergeant Becerra, deployed his taser on Plaintiff three times. *Id.* ¶¶ 23-26. During the struggle, Plaintiff kicked Rule in the knee. *Id.* ¶ 28. Rule rolled his baton against the back of Plaintiff's Achilles tendon in an effort to subdue him. *Id.* ¶ 29. Finally, with the help of seven or eight other officers, who are not named in this action, Sikorski and Tennariello handcuffed Plaintiff. *Id.* ¶ 30.

After subduing Plaintiff, Defendants took him to the Sixth Precinct, where Plaintiff screamed and cursed at police. *Id.* ¶¶ 31-32. Plaintiff was taken to the hospital by ambulance. *Id.* ¶ 34. Because Plaintiff remained highly agitated, the Emergency Services Unit concluded that they would have to use restraints to get Plaintiff onto a stretcher. *Id.* ¶¶ 38-39. Restraints and a mesh restraint blanket were used to control him. *Id.* ¶ 39.

Plaintiff arrived at Bellevue Hospital around 7:10 a.m. *Id.* ¶ 41. Plaintiff was medically cleared and instructed to take ibuprofen for lower back pain. *Id.* ¶ 42.

Rule suffered injuries during the altercation. *Id.* ¶ 43. He had surgery to repair a torn meniscus in his left knee. *Id.* ¶ 44.

**B. Disputed Facts**

Defendants and Plaintiff offer differing accounts of the struggle, each supported by record evidence. According to Defendants, after the complainant identified Plaintiff and his

2021 WL 1163653

companions as the individuals who had robbed his friend, Tennariello exited the vehicle, identified himself as a police officer, and told Plaintiff that he was under arrest and to get against a wall. *Id.* ¶ 8. Plaintiff faced the wall, but then grew paranoid and "started screaming 'Help, help, the police are trying to kill me' " and "tried to squirm away." *Id.* ¶ 10. At this point, Tennariello told Plaintiff he was under arrest, but Plaintiff continued to try to escape. *Id.* ¶ 11. Rule identified himself as a police officer and told the other two members of the group to put their hands against the wall. *Id.* ¶ 12. Rule saw that Tennariello and Plaintiff were struggling and directed Sikorski to assist Tennariello. Sikorski saw that Tennariello was holding onto a handcuff that had been attached to Plaintiff's wrist and that Plaintiff continued to resist. *Id.* ¶ 15. Rule used his radio to call for assistance. *Id.* ¶ 16. An unidentified officer grabbed Plaintiff's legs and brought Plaintiff to the ground. *Id.* ¶ 18. As Plaintiff was falling, he grabbed Tennariello's shirt and vest, pulling him to the ground along with him. *Id.* ¶ 19. Once other officers arrived on the scene, Rule went to assist Tennariello and Sikorski. *Id.* ¶ 20. At this point, Becerra, having responded to Rule's radio call, arrived on the scene, and saw Sikorski, Rule, Tennariello, and perhaps one other officer struggling with Plaintiff. *Id.* ¶ 21. Becerra deployed his taser in stun mode to Plaintiff's lower back. *Id.* ¶ 23. After Becerra deployed his taser, Plaintiff continued to resist. *Id.* ¶ 24. Becerra warned Plaintiff that he would deploy the taser again if he continued to resist. *Id.* ¶ 26. Plaintiff continued to resist, and Becerra deployed his taser again. *Id.* ¶ 27. Finally, Sikorski and Tennariello, with the help of seven or eight other officers were able to get Plaintiff's left arm out from underneath him and to handcuff him. *Id.* ¶ 30.

**\*2**  Plaintiff tells a different story. According to Plaintiff, Tennariello exited the vehicle with his gun drawn and did not identify himself as a police officer. *Id.* ¶ 8. He tackled Plaintiff and pushed him against the wall. *Id.* Plaintiff asked Tennariello why he was stopping him, but he did not answer his question and told him instead to "shut the f*** up." *Id.* ¶ 10. He then began punching Plaintiff in the face, at which point Plaintiff began to try to escape by squirming. *Id.* Plaintiff maintains that he never fought back, and only that he attempted to squirm away from the violence. *Id.* ¶ 13. At some point, Sikorski joined Tennariello in brutally beating Plaintiff. *Id.* ¶ 14. Plaintiff alleges that no attempt was made to handcuff him until after he was on the ground and had already been beaten. *Id.* ¶ 15. He was tackled so violently that his face struck the pavement and his vision was blurred. *Id.* ¶ 18. Plaintiff denies that he brought Tennariello

to the ground along with him. *Id.* ¶ 19. He maintains that the officers continued to beat him after pinning him to the ground. *Id.* ¶ 21. He also recounts that Becerra used his taser on him, but maintains that he used it three times in quick succession without any warning. *Id.* ¶ 26. Plaintiff denies that he kicked Rule in the leg intentionally, and states that any flailing was merely an attempt to squirm away and protect himself. *Id.* ¶ 28. Plaintiff acknowledges that he was eventually handcuffed, but he denies that this occurred prior to the end of the encounter. *Id.* ¶ 30.

## PROCEDURAL HISTORY

### A. Criminal Proceedings

As a result of the incident described above, Banyan was charged in New York state court with two counts of assault against a police officer in violation of N.Y. Penal Law § 120.05(3) and one count of resisting arrest in violation of N.Y. Penal Law § 205.30. *People v. Banyan*, 187 A.D.3d 643 (1st Dep't 2020). Banyan requested that the jury be given a justification charge, which would have permitted the jury to acquit him if it found that he was acting in self-defense. *Id.* The trial court denied the charge. During jury deliberations, the jury sent several notes to the judge expressing discomfort with the charges. One note questioned whether the jurors could acquit Banyan if they believed the law was immoral and requested instruction on jury nullification. Dkt. No. 170, Ex. D. The trial court told the jury that its request was improper. Banyan was convicted on May 17, 2017 and was sentenced to five years' imprisonment.

Banyan appealed the trial court's decision. On October 27, 2020, the Appellate Division found that the trial court had erred in failing to grant Banyan's request for a justification charge. *Id.* According to the court, "[v]iewed in the light most favorable to the defense, the testimony and video evidence show that after defendant resisted police efforts to handcuff him, approximately eight additional officers joined in a struggle, punching and tasing defendant, and the police lieutenant used a baton to roll defendant's Achilles tendon. These facts warranted a justification charge." *Id.* at 644. The Appellate Division ordered a new trial, which is currently pending.

### B. The Instant Proceedings

Banyan filed the complaint in this case on June 29, 2017, after he was convicted but before that conviction was overturned

2021 WL 1163653

for a new trial. Dkt. No. 2. On August 24, 2020, Defendants filed their motion for summary judgment. Dkt. No. 153. On November 10, 2020, Plaintiff wrote to the Court requesting appointment of pro bono counsel to represent him on his summary judgment motion. Dkt. No. 159. The Court granted the request on the same day. Dkt. No. 160.

On November 16, 2020, after the Appellate Division had reversed Plaintiff's criminal conviction and remanded for a new trial, Defendants moved to stay the case pending the resolution of Plaintiff's criminal case. Dkt. No. 162. Plaintiff opposed the motion on November 30, 2020. Dkt. No. 163. On December 2, 2020, the Court denied the motion for a stay. Dkt. No. 167. Plaintiff, now represented by counsel, filed his memorandum of law in opposition to Defendants' motion for summary judgment on February 22, 2021. Dkt. No. 170. Defendants' file their reply on March 22, 2021. Dkt. No. 179.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,' " while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " Konikoff v. Prudential Ins. Co. of Am., 234 F.3d 92, 97 (2d Cir. 2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). In determining whether there are any genuine issues of material fact, the Court must view all facts "in the light most favorable to the non-moving party," Holcomb v. Iona Coll., 521 F.3d 130, 132 (2d Cir. 2008), and the movant bears the burden of demonstrating that "no genuine issue of material fact exists." Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).

**\*3** If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." Jaramillo v. Weyerhaeuser Co., 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Nor may the non-moving party "rely on conclusory allegations or unsubstantiated speculation." F.D.I.C. v. Great

Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010). Rather, to survive a summary judgment motion, the non-moving party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). It "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible," Gottlieb v. Cnty. Of Orange, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation omitted), but rather must demonstrate more than "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

## DISCUSSION

### A. Excessive Force

Plaintiff brings excessive force claims against Rule, Becerra, Sikorski, and Tenneriello. Claims for use of "excessive force in the course of making an arrest, investigatory stop, or other 'seizure' ... are properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." Graham v. Connor, 490 U.S. 386, 388 (1989); see also Brown v. City of New York, 798 F.3d 94, 100 (2d Cir. 2015) ("The Fourth Amendment prohibits the use of excessive force in making an arrest.") (quoting Graham, 490 U.S. at 395). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment, ... [and] [t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Id. at 396-97. The application of the reasonableness inquiry "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by light." Id. "Given the fact-specific nature of the inquiry, granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable." Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 123 (2d Cir. 2004).

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 121 of 370

Banyan v. Sikorski, Not Reported in Fed. Supp. (2021)
2021 WL 1163653

### 1. Claims against Rule and Becerra

In their memorandum in support of the motion to dismiss, Defendants advance several arguments as to why summary judgment should be granted in favor of Rule and Becerra. Defendants argue that Becerra's use of a taser under the circumstances did not constitute excessive force. *See Crowell v. Kirkpatrick*, 400 F. App'x 592, 595 (2d Cir. 2010) (holding that the use of a taser on individuals who were resisting arrest was reasonable as a matter of law). They argue that because Banyan was resisting the officers, Becerra's use of the taser was lawful. Defendants also argue that using the taser three times was objectively reasonable, in light of the facts that Becerra had arrived on the scene in response to a call for help, had observed the other officers struggling with Banyan, and that Banyan continued to resist after he deployed the taser one time. Dkt. No. 156 at 18-19.

**\*4** As for Rule, Defendants argue that his use of his baton on Banyan's Achilles tendon was objectively reasonable in light of the evidence that Rule saw Banyan resisting the other officers and that Banyan injured Rule's meniscus in the struggle. Dkt. No. 156 at 19. Defendants additionally argue that, because Banyan's medical records showed no injuries to his Achilles tendon or to his legs, no reasonable jury could conclude that Rule's use of force towards Banyan was excessive, even if Rule did kick him or stomp on his legs.

Plaintiff did not answer Defendants' arguments in his response. Plaintiff never mentions Becerra in his brief. As for Rule, Plaintiff mentions in his statement of facts only that Rule yelled at him to raise his hands and performed a "pain-inducing so-called 'compliance technique' by rolling his baton up and down Banyan's Achilles Tendon." Dkt. No. 170 at 8. His opposition contains no arguments responsive to Defendants' arguments regarding Rule and Becerra in their initial brief.

Because Plaintiff has not responded to Defendants' arguments with respect to Rule and Becerra, the Court considers those arguments abandoned. "[A] court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed." *Lipton v. Cnty. of Orange, N.Y.*, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004) (citing *Jessamy v. City of New Rochelle, N.Y.*, 292 F. Supp. 2d 498, 515 (S.D.N.Y. 2003)). Plaintiff has not disputed Defendants' arguments that Becerra's use of

the taser was reasonable under the circumstances. Nor has Plaintiff responded to the argument that any use of force by Rule was reasonable. Accordingly, these arguments are deemed abandoned and summary judgment is granted against Plaintiff's excessive force claims against Rule and Becerra.

### 2. Claims against Sikorski and Tennariello

While maintaining that Tennariello and Sikorskis' use of force was reasonable under the circumstances, Defendants concede in their reply that there are material issues of fact concerning the excessive force claims that require a trial. Dkt. No. 179 at 10. Plaintiff has pointed out a number of disputed facts, supported by citations to the record, between Plaintiff's account of events and Defendants' account, including whether Tennariello identified himself as a police officer before tackling Banyan, whether Tennariello told Banyan to get against a wall before tackling him, whether Tennariello began handcuffing Banyan at the beginning of the encounter, and whether the officers used more force than was necessary to apprehend him. Dkt. No. 170 at 2. Because Defendants concede that genuine issues of material facts are disputed with respect to these claims, the Court will not grant summary judgment to these two officers. *See United States v. Int'l Bus. Machines Corp.*, 1975 WL 940, at \*2 (S.D.N.Y. Aug. 6, 1975) ("It is, of course, axiomatic that summary judgment may be granted only when there is no genuine issue as to any material fact.").

### B. Malicious Prosecution

Defendants argue that the Court should grant summary judgment in their favor on Plaintiff's malicious prosecution claim. "[C]laims for malicious prosecution under § 1983 are 'substantially the same' as claims for 'malicious prosecution under state law.' " *Lanning v. City of Glens Falls*, 908 F.3d 19, 25 (2d Cir. 2018) (quoting *Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003)). To prevail on a claim for malicious prosecution under New York law, a plaintiff must establish that "(1) the defendant either commenced or continued a criminal proceeding against him; (2) that the proceeding terminated in his favor; (3) that there was no probable cause for the criminal proceeding; and (4) that the criminal proceeding was instituted in actual malice." *Conway v. Village of Mount Kisco*, 750 F.2d 205, 214 (2d Cir. 1984) (internal quotation marks omitted).

2021 WL 1163653

**\*5** At the time Defendants filed their initial motion for summary judgment in this case, Plaintiff's criminal conviction had not yet been reversed by the Appellate Division. Accordingly, Defendants argued that Plaintiff's conviction barred any claim of malicious prosecution, because a plaintiff cannot bring a Section 1983 malicious prosecution claim when the underlying prosecution resulted in a conviction. *See Heck v. Humphrey*, 512 U.S. 477, 489 (1994). Now, however, the conviction has been overturned and the case has returned to the trial court for a new trial.

Because Plaintiff's criminal trial is still ongoing, Plaintiff's claim of malicious prosecution has not yet accrued. A malicious prosecution claim does not accrue until the prosecution has been terminated in favor of the accused. *See id.*("[A] cause of action for malicious prosecution does not accrue until the criminal proceedings have terminated in the plaintiff's favor."); *Beckett v. Inc. Vill. of Freeport*, 2014 WL 1330557, at \*2 (E.D.N.Y. Mar. 31, 2014) ("It is axiomatic that ... a claim for malicious prosecution does not arise until the underlying charges are dismissed in the plaintiff's favor."); *see also Thompson v. Rovella*, 734 F. App'x 787, 789 (2d Cir. 2018) (" '[T]he prosecution terminates in the plaintiff's favor,' ... when 'the prosecution against the plaintiff has conclusively ended,' such that 'the underlying indictment or criminal information has been vacated and cannot be revived.' ") (quoting *Spak v. Phillips*, 857 F.3d 458, 462 (2d Cir. 2017)); *Sanders v. Simonovic*, 2021 WL 707060, \*5 (S.D.N.Y. Feb. 23, 2021) ("A 'favorable termination' does not occur until the prosecution against the plaintiff has 'conclusively' ended."). Thus, disposition of Plaintiff's malicious prosecution claim must await the resolution of his criminal case.

Plaintiff has opposed a stay of this case pending the outcome of his criminal trial. Dkt. No. 163. Accordingly, Plaintiff's claim is dismissed in this case without prejudice as unripe. Plaintiff may replead his malicious prosecution claim when and if the criminal case is resolved in his favor.

### C. False Arrest

"The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983." *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007) (internal quotation marks omitted). "Probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested

has committed or is committing a crime." *Id.* In determining whether an officer had probable cause, a court may consider only "those facts available to the officer at the time of the arrest and immediately before it." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (emphasis omitted).

In their initial brief, Defendants argue that Plaintiff's federal false arrest claim was barred because Plaintiff had been convicted. Since Defendants filed their motion to dismiss, Plaintiff's state court criminal conviction has been overturned. Accordingly, Defendants no longer rely on the state court conviction to argue that Plaintiff had no Section 1983 cause of action for false arrest. Instead, in their reply, Defendants now argue that probable cause to arrest existed because a complainant identified Plaintiff to the police as the individual who beat up and robbed his friend. Defendants argue that those undisputed facts give rise to probable cause.

**\*6** Plaintiff responds that he "has no knowledge" regarding Defendants' assertions of fact but notes that "newly appointed *pro bono* counsel will move to reopen discovery to adduce inconsistencies in th[e officers'] account[s] or further credibility issues for the officers." Dkt. No. 176 ¶¶ 1-4.

There is no per se rule against the police relying on a tip—even an anonymous one—to make an arrest. *Illinois v. Gates*, 462 U.S. 213, 237-38 (1983). Whether probable cause exists depends on the totality of the circumstances. *Id.* at 230-31; *see also Roberts v. Azize*, 767 F. App'x 196, 200 (2d Cir. 2019) ("Whether an anonymous tip contains sufficient indicia of reliability to support probable cause is a fact-dependent inquiry that largely depends on whether the tipster conveys information that 'demonstrates inside information,' evincing 'a special familiarity with [the subject of the tip's] affairs.' ") (quoting *Alabama v. White*, 496 U.S. 325, 332 (1990)); *United States v. Elmore*, 482 F.3d 172, 179 (2d Cir. 2007) (citation omitted) ("Even a tip from a completely anonymous informant—though it will seldom demonstrate basis of knowledge and the veracity of an anonymous informant is largely unknowable—can form the basis of reasonable suspicion or probable cause if it is sufficiently corroborated."). Moreover, a non-movant may not resist summary judgment by raising issues of credibility alone. *See Rodriguez v. Schneider*, 1999 WL 459813, at \*1 n.3 (S.D.N.Y. June 29, 1999) ("If the non-movant asserts that a fact claimed by the movant to be undisputed is actually in dispute, the non-movant *must* cite evidence on the record to support its contention.").

2021 WL 1163653

At the same time, however, the law disfavors granting summary judgment prior to the close of discovery, *see Hellstrom v. U.S. Dep't of Veterans Affs.*, 201 F.3d 94, 97 (2d Cir. 2000) ("Only in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery."); *GMA Accessories, Inc. v. Croscill, Inc.*, 2007 WL 766294, at *1 (S.D.N.Y. Mar. 13, 2007) (Lynch, J.) ("[S]ummary judgment motions prior to discovery are disfavored."), and Plaintiff— now represented by counsel—has indicated he will move to take discovery that the unrepresented Plaintiff did not take, Dkt. No. 174 ¶¶ 1-6; *see Rivas v. Suffolk Cnty.*, 2008 WL 45406, at *2 (2d Cir. Jan. 3, 2008) ("Appointed counsel should be given the opportunity to file in the district court any and all motions that counsel deems appropriate, including motions ... to reopen discovery."). In these circumstances, where the case will proceed to trial on the excessive force claim in any event, it would be premature for the Court to rule upon Defendants' summary judgment motion before it has had the opportunity to consider whether discovery should be reopened. The Court's decision is without prejudice to Defendants moving the Court for summary judgment again after pro bono counsel moves to reopen discovery and after any additional period for discovery has closed.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART. Summary judgment is granted with respect to Plaintiff's excessive force claims against Rule and Becerra. Summary judgment is denied with respect to Plaintiff's excessive force claims against Tennariello and Sikorski. Summary judgment is also denied as premature on Plaintiff's false arrest claim, though Defendants have the Court's leave to move for summary judgment again after any motion for additional discovery is decided and any additional discovery is taken. Plaintiff's malicious prosecution claim is dismissed as untimely, without prejudice to renewal when and if Plaintiff's criminal case is resolved in his favor.

**\*7** The Clerk of Court is respectfully directed to close the motion at Dkt. No. 153. Parties are directed to appear for a telephonic status conference on April 8, 2021 at 2:00 p.m. Parties are directed to dial (888) 251-2909 and use access code 2123101. In advance of that conference, the parties are directed to meet and confer regarding Plaintiff's motion to reopen discovery (including the number of depositions Plaintiff seeks leave to take) and a proposed schedule for the remainder of the case.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 1163653

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 401651
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Lenny ABREU, Plaintiff,

v.

The CITY OF NEW YORK, Det. Daniel Toro, Shield
No. 3664, Individually and in his Official Capacity,
P.O.s "John Doe", # 1-10 Individually and in their
Official Capacities (the name John Doe being fictitious
as the true names are presently unknown), Defendants.

No. 04-CV-1721 (JBW).
|

Feb. 22, 2006.

**Attorneys and Law Firms**

Jon L. Norinsberg, New York, NY, for Plaintiff.

Corporation Counsel for the City of New York Law
Department, by Hillary A. Frommer, New York, NY, for
Defendants.

MEMORANDUM, ORDER AND JUDGMENT

JACK B. WEINSTEIN, Senior District Judge.

Table of Contents

| | | |
|---|---|---|
| I. Facts | | 3 |
| | A. Robbery and Police Investigation | 3 |
| | B. Written Statement | 5 |
| | C. Oral Statement | 6 |
| | D. District Attorney Investigation and Prosecution | 7 |
| II. Law and Application of Facts to Law | | 7 |
| | A. Summary Judgment | 7 |
| | B. Section 1983 Generally | 8 |
| | C. Municipal Liability | 9 |
| | D. Individual Liability and Qualified Immunity | 10 |
| | 1. Law | 10 |
| | 2. Application of Law to Facts | 11 |
| | E. Malicious Abuse of Process | 12 |
| | F. Violation of Right to Fair Trial | 13 |
| | 1. Plaintiff's Evidence | 13 |

|  |  | i. Grand Jury Testimony | 14 |
|  |  | ii. Statement Notice | 17 |
|  |  | iii. District Attorney's File | 18 |
|  | 2. Sufficiency of the Evidence |  | 20 |
| III. Conclusion |  |  | 21 |

**\*1** While Section 1983 of Title 42 of the United States Code provides an important protection against police abuse, sometimes the statute itself is abused. This is such a case.

Plaintiff sued defendants Detective Daniel Toro, ten unnamed New York City police officers, and the City of New York ("the City") for false arrest and imprisonment; malicious prosecution; malicious abuse of process; and denial of his constitutional right to a fair trial. The City and Toro moved for summary judgment on all claims. The case is dismissed upon withdrawal of claims against the City, granting of the motion for summary judgment by Toro and failure to proceed against any unnamed police officers.

I. Facts

Based on the evidence viewed most favorably to plaintiff, the following are the facts:

A. Robbery and Police Investigation

On November 16, 2001 at 11:30 p.m., two men broke into and robbed the Snitser family home in Woodside, Queens. Rimma Snister and her fourteen year-old son Steven were the only family members present.

Mrs. Snitser filed a complaint the following day. She stated that the men came into her bedroom, tied her up, demanded to know the location of "the money, the gold, and the safe," and searched the second floor of the house. Steven related that the two men came into his room while he was asleep, threw a blanket over his head, tied him up and hit him with an unidentified object. The men stole money, jewelry and electronic equipment.

Steven suffered no visible injuries. There was no sign of a forced entry.

Though not the initial investigator, Toro became the case detective sometime in late November. He had had no prior contact with plaintiff or the victims of the robbery.

On November 29 Toro interviewed Steven at the 108th Precinct. Steven's father Simon-who did not want the family involved in the investigation-and Steven's sister Dina were both present. Steven claimed that he was unable to identify either of the robbers because they were wearing ski masks.

Toro believed that Dina was discouraging Steven from speaking. She did give Toro the names of three of her friends-Oscar Ramirez, Freddy Ceron, and plaintiff-as men who had previously been in the Snitsers' home. One, Oscar, had stayed in the house for a week without the parents' knowledge.

The night of the robbery, Oscar picked Dina up from her home sometime before midnight, dropped her off at a club in the Bronx, and returned to pick her up. She arrived home around 3:30 a.m. Though Oscar had called Dina frequently before the robbery, he rarely did so afterwards. When he did call, he asked about the investigation. About two weeks after the robbery, he called Dina to tell her that he was leaving New York for Pennsylvania, and wanted to retrieve some shoes he had left at the Snitser home during a previous visit. He was thereafter neither interviewed nor found.

In January 2002, Toro interviewed Steven again, this time without any other member of his family present. Steven then asserted that during the robbery he had seen and recognized plaintiff, who was wearing a red bandana and hood. He indicated that he knew plaintiff as "Lenny." Steven said he recognized the voice of the second robber as that of Oscar, Dina's boyfriend. When Toro showed him a photo array, within seconds Steven identified plaintiff as one of his assailants.

**\*2** Toro attributed Steven's delay in coming forward to pressure from his family. According to Neil Gitin, the Queens County Assistant District Attorney assigned to the case,

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 126 of 370
Abreu v. City of New York, Not Reported in F.Supp.2d (2006)
2006 WL 401651

Steven's father explicitly discouraged both Steven and his mother from assisting in the prosecution. By the time of the second interview, Steven had admitted to Toro that he had previously stolen jewelry from his parents' home and had sold it to satisfy a debt he owed for marijuana. Steven had been arrested for the previous crime.

After Steven had identified plaintiff as his assailant, Toro learned that plaintiff had been incarcerated in December 2001 at Willard Drug Treatment Facility for a parole violation. Toro contacted the facility in April 2002 to determine when plaintiff would be released.

Plaintiff was arrested by Toro on June 25, 2002, taken to the 108th Precinct station house and placed in an interview room. It is not clear whether an Assistant District Attorney-a "riding A.D.A." responsible for accompanying police officers on arrests and interviews-was present.

### B. Written Statement

Upon being read *Miranda* warnings, plaintiff waived his rights. He wrote and executed a five-page statement. The conditions of the interrogation and statement were not coercive.

Plaintiff denied any knowledge of, or involvement in, the robbery. He admitted knowing Oscar and Fred, the other two men mentioned by Dina, but claimed ignorance of whether Oscar and Fred had committed the robbery. He admitted that Dina had accused him over the phone of committing the robbery, but insisted that he was innocent.

After plaintiff completed his written statement, a lineup was conducted. Steven positively identified plaintiff as his assailant on the night of the robbery. Charged with burglary and robbery, plaintiff was then incarcerated. He remained in jail to the end of his trial.

### C. Oral Statement

A record of an oral statement attributed to plaintiff appears in the District Attorney's file. It indicates that, at 6:30 p.m. in the 108th Precinct-one hour and fifteen minutes before he signed his handwritten statement-plaintiff said: "Oscar did the robbery. Fred did the robbery. Oscar was the driver." The intake sheet on which this statement appears indicates that the statement was made "to" Toro. Toro did not draft or sign the intake sheet. He does not remember plaintiff making the statement and denies ever having claimed that plaintiff made

it. No witness, including plaintiff, claims to have heard Toro state that plaintiff had made an oral statement.

Gitin, the prosecuting Assistant District Attorney, has no personal knowledge of the source of the oral statement. He testified at a deposition that the oral statement may have been a compilation of three or four different statements which he had gathered together from elsewhere in the prosecution's files or police reports. He was not the initial prosecutor on the case, and has no memory of who was. Gitin stated that the riding Assistant District Attorney may also have heard the statement being made in Toro's presence and so may have written that it was made "to" Detective Toro. No other independent record of the oral statement has been found.

### D. District Attorney Investigation and Prosecution

**\*3** Before trying the case Gitin conducted his own investigation. He interviewed all four members of the Snitser family. Consistent with his second statement to Toro, Steven maintained that he had seen plaintiff the night of the robbery. The others gave substantially the same reports as they had given to Toro. Gitin has no specific memory of meeting with Toro during the investigation. He testified that Toro never encouraged him to prosecute plaintiff.

At the indicting grand jury hearing, plaintiff testified and was confronted with his supposed oral statement. He denied any knowledge of the robberies. He denied making the oral statement. A true bill was returned on nine counts.

At the trial, Gitin did not offer evidence of an oral statement. On cross-examination, Steven testified that he "assumed [the perpetrator] was [plaintiff]." It was Gitin's view that this lack of certainty on Steven's part caused the case to "implode." Plaintiff was acquitted by the jury of all charges.

## II. Law and Application of Facts to Law

### A. Summary Judgment

Summary judgment is granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and identifying which materials "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v.*

*Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

All facts and inferences are viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587-88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Facts and inferences must be drawn from admissible evidence. "Supporting and opposing affidavits ... shall set forth such facts *as would be admissible in evidence.*" Fed.R.Civ.P. 56(e) (emphasis supplied). Evidence that would not be admissible at trial cannot provide a basis for a denial of a motion for summary judgment. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson,* 477 U.S. at 249. *See also Matsushita,* 475 U.S. at 587 ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' "); *Trebor Sportswear Co., Inc. v. Limited Stores, Inc.,* 865 F.2d 506, 510 (2d Cir.1989) (party opposing summary judgment must "identify sufficient *admissible* evidence ... to demonstrate that there existed a genuine issue of material fact" (emphasis supplied)).

### B. Section 1983 Generally

**\*4** Plaintiff brings this suit under Section 1983 of Title 42 of the United States Code, which provides a cause of action for the deprivation of civil rights. The statute provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983.

Section 1983 is an important curb on police misconduct. "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole,* 504 U.S. 158, 161, 112 S.Ct. 1827, 1830, 118 L.Ed.2d 504 (1992). Penalized are law enforcement officers who abuse their positions of power by substituting enmity for investigation-e.g., arresting and charging an individual without cause, *see Cook v. Sheldon,* 41 F.3d 73 (2d Cir.1994), or fabricating evidence against him. *See Taylor v. Sullivan,* 980 F.Supp. 697 (S.D.N.Y.1997), *aff'd* 166 F.3d 1201. It does not provide redress to an accused simply because he has been acquitted of criminal charges. *See, e.g., Martinez v. Simonetti,* 202 F.3d 625, 630 (2d Cir.2000) (summary judgment granted against plaintiff claiming false arrest after he was acquitted on all charges).

### C. Municipal Liability

A municipality will not be held liable under Section 1983 unless the plaintiff can demonstrate that the allegedly unconstitutional action of an individual law enforcement official was taken pursuant to a policy or custom "officially adopted and promulgated by that [municipality's] officers." *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). To prove that non-supervisory personnel's conduct constitutes a "custom or usage," a plaintiff can demonstrate that their practices are so well known that policymaking officials constructively acquiesced in their continuation. *City of St. Louis v. Praprotnik,* 485 U.S. 112, 127, 108 S.Ct. 915, 926, 99 L.Ed.2d 107 (1988). Absent specific allegations that he acted pursuant to an official policy, a single individual's misconduct will not result in respondeat superior liability for his supervisors. *Ricciuti v. N.Y.C. Transit Auth.,* 941 F.2d 119, 123 (2d Cir.1991).

No facts demonstrate that the City's leaders promulgated an official policy or custom of false arrest, malicious prosecution, malicious abuse of process, or violation of the right to a fair trial. There is no evidence suggesting that Toro's alleged actions were so well known that policymaking officials had constructively acquiesced in their continuation. Appropriately, at oral argument plaintiff withdrew his municipal claims, mooting the City's motion for summary judgment.

### D. Individual Liability and Qualified Immunity

2006 WL 401651

*1. Law*

**\*5** Individual liability under Section 1983 arises when, acting under color of law, one individual violates another's constitutional rights. 42 U.S.C. § 1983; *West v. Atkins,* 487 U.S. 42, 49, 108 S.Ct. 2250, 2255, 101 L.Ed.2d 40 (1988) (defining when a defendant acts under color of law). A police officer acting in his official capacity acts under the color of law. *Jocks v. Tavernier,* 316 F.3d 128, 134 (2d Cir.2003).

Qualified immunity protects an officer's discretionary activity in the scope of his employment. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Probable cause provides qualified immunity against claims of: false arrest, *Jocks,* 316 F.3d at 134 (plaintiff must establish "lack of probable cause"); false imprisonment, *Singer v. Fulton County Sheriff,* 63 F.3d 110, 118-19 (2d Cir.1995) (same); and malicious prosecution. *Jocks,* 316 F.3d at 136 (same). It does not provide a defense to a claim for violation of a right to a fair trial, Jocks at 138, or malicious abuse of process. *Savino v. City of New York,* 331 F.3d 63, 77 (2d Cir.2003).

*2. Application of Law to Facts*

Toro had probable cause to arrest plaintiff. Shortly after he became case detective, he investigated the crime and interviewed the entire victim-family. Dina Snitser provided Toro with the names of three men-all friendly with each other-who had been in her house previously, including one, Oscar, who had stayed in the house for a week without her parents' knowledge. At first both Rimma Snitser and her son Steven indicated that they could not identify the perpetrators. Toro, however, had sufficient reason to suspect that Dina's presence and Steven's father's disinclination to pursue the case prevented Steven from speaking truthfully.

Just over a month later, Steven visited the precinct alone and indicated to Toro that he had, in fact, recognized one of his assailants by sight and another by sound. He identified plaintiff as his assailant in a constitutionally fair photo array.

Toro was aware of Steven's previous crime. Nevertheless, he could reasonably have decided that Steven's identification was credible. "A crime victim's unequivocal identification of a suspect ... provides probable cause for an arrest, so long as the officer's belief in the [victim's] allegations was reasonable." *Breitbard v. Mitchell,* 390 F.Supp.2d 237, 245 (E.D.N.Y.2005). Where there is no dispute with regard to the pertinent events and knowledge of the officer, the existence

of probable cause may be determined as a matter of law on a motion for summary judgment in a Section 1983 case. *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996).

His investigation provided Toro with probable cause to arrest and charge plaintiff. At a fair lineup the night of plaintiff's arrest, Steven again positively identified plaintiff-who he had known before the crime-as his assailant. The claims of false arrest, false imprisonment and malicious prosecution cannot stand.

**\*6** It may appear curious that Toro chose not to arrest Oscar, despite Steven's aural identification and Dina's testimony that he had been in the Snitser home previously. Sufficient reasonable basis for this exercise of discretion existed in the more reliable eyewitness identification. In addition, Oscar appears to have left the state, while the plaintiff was at hand. An officer is not required to chase down every lead. He may use his best judgment based on all of the facts as they then appear to him. *Lennon v. Miller,* 66 F.3d 416, 421 (2d Cir.1995) ("[I]n qualified immunity cases, we are not concerned with the correctness of the defendants' conduct, but rather the 'objective reasonableness' of their chosen course of action given the circumstances confronting them at the scene.").

E. Malicious Abuse of Process

To sustain a claim for malicious abuse of process, plaintiff must demonstrate that Toro: 1) employed regularly issued legal process to compel his appearance in court, 2) with the intent to do harm without excuse or justification, 3) in order to obtain an illegitimate collateral objective. *Savino,* 331 F.3d at 76. Absence of probable cause would permit a fact-finder to infer the intent to do harm. *Id.* at 77.

As already noted, *see supra* II.D.2, Toro had probable cause to arrest plaintiff. There is no evidence suggestive of ill-will towards him by Toro. Malice cannot be established. *See id.* (where defendant had probable cause to arrest, plaintiff is not entitled to inference of malice based on absence of probable cause).

Toro's motion for summary judgment on the claim of malicious abuse of process is granted.

F. Violation of Right to a Fair Trial

When an officer supplies false information to a prosecutor about a suspect, the officer has violated that suspect's right to

a fair trial. *Ricciuti*, 124 F.3d at 130. Such unlawful conduct gives rise to an action under Section 1983. *Id.* ("When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C § 1983."). This is true even if the officer had probable cause to arrest the accused in the first place. *Jocks*, 316 F.3d at 138.

Plaintiff denies making the oral statement that appears in the District Attorney's file. Toro denies ever hearing or recounting it. Since plaintiff is entitled to all favorable inferences, the court assumes for the purpose of this decision that plaintiff did not make the oral statement attributed to him. Nevertheless, it cannot find that Toro invented and forwarded the statement since there is no credible evidence to support this inference.

*1. Plaintiff's Evidence*

Plaintiff has adduced three documents that potentially tie Toro to the oral statement: a transcript of plaintiff's grand jury testimony; a statement notice submitted by the State in preparation for plaintiff's criminal trial; and an entry in the Queens County District Attorney's file. Only admissible evidence is to be considered on the motion for summary judgment. *See supra* II.A.

i. Grand Jury Testimony

**\*7** Hearsay is a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid 801(c). Subject to some exceptions, hearsay evidence is inadmissible. Fed.R.Evid. 802.

A transcript of plaintiff's grand jury testimony reveals that, on cross examination, Gitin asked him, "Sir, isn't it a fact that you told Detective Torro [sic] of the [New York Police Department] on June 25, 2002 that Oscar did the robbery, Fred did the robbery, Oscar drives and Oscar has a light-colored Windstar?" Plaintiff denied making the statement and denied any knowledge of the robbery. The grand jury returned an indictment against plaintiff on nine counts, including robbery and assault.

Plaintiff seeks to use Gitin's suggestion-that plaintiff told Toro details about the robbery-against Toro. He offers Gitin's question to prove that Toro told someone in the prosecutor's office that plaintiff admitted knowledge of the robbery.

Only relevant evidence is admissible. Fed.R.Evid. 402. Gitin's statement is relevant only if plaintiff can provide evidence sufficient to show that it came from Toro.

Federal Rule of Evidence 104(b) provides:

> When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition.

Fed.R.Evid. 104(b). The condition of fact to be fulfilled is that Toro made the statement.

Gitin was cross-examining plaintiff before the grand jury in an effort to secure an indictment. He questioned plaintiff sharply, attempting to cause him to inculpate himself. For example:
Q. Isn't it a fact that on November 16 when [Steven] was tied up and a sheet was put over his head you pistol-whipped him?

A. I wasn't there.

Q. What was it that you hit him with?

A. I wasn't there.

Q. What was that that Oscar hit him with?

A. I don't know if he was there.

T. of Grand Jury Proceedings 100:20-101:2. This line is not atypical of a prosecutor's examination of a suspect before a grand jury. Most prospective defendants choose not to testify before grand juries in order to avoid the dangers attendant on such unrestrained questioning.

Any statement plaintiff made during these proceedings could have been introduced at his criminal trial as substantive evidence-i.e., to prove the truth of the matter asserted-if he chose to testify at trial and made a statement inconsistent with his grand jury testimony. *See* Fed.R.Evid. 801(d)(a)(A); *id.* advisory committee's note ("Prior inconsistent statements traditionally have been admissible to impeach but not as

2006 WL 401651

substantive evidence. Under the rule they are substantive evidence.").

Gitin's innuendos before the grand jury could not be offered as substantive evidence at the criminal trial. They were made in a highly adversarial context, lacking probative value of their truth. While at a trial the court will insist that there be a reasonable basis for the implied charge thrown against a witness being cross-examined, even this minimal protection is lacking in a grand jury proceeding where there is no judge present.

**\*8** Before the grand jury, Gitin made numerous assertions that he may not have been able to prove at trial. This, unfortunately, is not unusual. The Federal Rules of Evidence do not apply in grand jury proceedings. *See* Fed.R.Evid. 1101(d)(2); *United States v. Calandra,* 414 U.S. 338, 343, 94 S.Ct. 613, 617, 38 L.Ed.2d 561 (1974) ("The grand jury['s] ... operation generally is unrestrained by the technical procedural and evidentiary rules governing the conduct of criminal trials."). The grand jury's duty is to determine only "whether there is probable cause to believe a crime has been committed...." *Id.* It need not satisfy itself beyond a reasonable doubt that the accused has committed the crime or that particular evidence before it is probative. There is nothing remarkable-or suggestive of law enforcement malfeasance-about a verdict of innocence after an indictment.

There is insufficient basis for concluding from the adversarial questioning of plaintiff during his grand jury testimony that defendant Toro made the statement plaintiff seeks to attribute to him. *See* Fed.R.Evid. 104(b). Gitin's question lacks probative force, and would be inadmissible at trial. *See* Fed.R.Evid. 402. It cannot serve as a basis for denying the summary judgment motion.

### ii. Statement Notice

Before trial, pursuant to section 710.30(1)(a) of the New York Criminal Procedure Law, Gitin served notice of his intent to introduce plaintiff's written and oral statements. The notice reads as follows:

PLEASE TAKE NOTICE, that the People intend to offer at trial an oral statement made by the defendant to DET DANIEL TORO on JUNE 25, 2002, at approximately 6:30 PM, at 108 PCT.

The substance of the defendant's statement(s) is

"Oscar did the robbery. Fred did the robbery. Oscar was the driver. Oscar's car is a light-colored Windstar" or words to that effect.

PLEASE TAKE NOTICE, that the People intend to offer at trial a written statement made by the defendant to DET DANIEL TORO on JUNE 25, 2002, at approximately 7:45 PM, at 108 PCT.

The substance of the defendant's statement(s) is

"SEE ATTACHED."

The attached written statement did not include the remarks about "Oscar" and "Fred."

Plaintiff seeks to introduce this notice as proof that Toro provided the prosecution with the oral statement. The admissibility of the notice depends, as with the grand jury questioning, on its relevancy. Its relevancy depends upon "the introduction of evidence sufficient to support a finding" that Toro did, in fact, attribute to plaintiff the inculpatory remarks. *See supra* II.E.1.i.

Gitin had not yet spoken to Toro as of August 12, 2002, when the notice was created. The prosecutor created this notice in preparation for litigation, not as a result of a factual investigation of its truth. It was based solely on the District Attorney's file.

The notice itself would not have been admissible at plaintiff's criminal prosecution as evidence that he made the statement credited to him. Toro would have had to testify that plaintiff made the statement. Had he testified at the criminal trial, as he did at deposition in this case, that he did not recall hearing the statement, it would not have been admitted. Toro did not testify about the statement at the criminal trial. It was not introduced against plaintiff.

**\*9** There is no basis for tying this document to Toro. Just as, absent adequate foundation, the statement could not be introduced against plaintiff in the criminal trial, it could not be admitted against Toro in this civil action.

### iii. District Attorney's File

The third document plaintiff relies upon in his opposition to the motion for summary judgment is an intake sheet from the

2006 WL 401651

Queens County District Attorney's file on the Snitser robbery. The file reads:


STATEMENTS OF DEFENDANT # 1

[Box checked indicating statement was made after *Miranda* warnings.]
To Whom: *Det. Daniel Toro* Where & When: *108 Pct. 6/25/02* [Boxes checked indicating both oral and written statements made.] [Box left unchecked indicating no videotape was made of the statements.]

Substance of Statement: *Oral-Oscar did the robbery. Fred [word scratched out] did the robbery. Oscar Was the driver. Oscar's car is a light-colored windstar. (6/25/02-6:30p.m./108 Pct.)*

See written statement.


Plaintiff relies upon this page as proof that Toro fabricated the oral statement and relayed it to the prosecution.

Under the "public records" exception, notwithstanding the declarant's availability as a witness, the following is exempt from the ban on hearsay evidence:

> Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth ... (C) in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, *unless the sources of information or other circumstances indicate lack of trustworthiness.*


Fed.R.Evid. 803(8) (emphasis supplied). "Rule 803(8)(C) is to be applied in a commonsense manner, subject to the district court's sound exercise of discretion in determining whether the ... document offered ... has sufficient independent indicia of reliability to justify its admission." *City of New York v. Pullman, Inc.,* 662 F.2d 910, 914 (2d Cir.1981). The record of defendant's alleged statement is a "factual finding resulting from an investigation." It may be assumed for the purpose

of the present discussion that it is admissible as a public record if it "*has sufficient independent indicia of reliability.*" *Id.* (emphasis supplied). It lacks those indicia.

The intake sheet itself contains no evidence directly tying Toro to the statement. Toro did not sign the sheet and denies ever having claimed that plaintiff made the statement. Gitin has no personal knowledge of who made the entry. It may have been drafted by another Assistant District Attorney who was present in the precinct when plaintiff was arrested who thought he heard it being made "to" Toro by plaintiff. Under these circumstances this entry would be excluded were it offered against Toro in this civil suit.


*2. Sufficiency of the Evidence*

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson,* 477 U.S. at 249. Plaintiff's evidence is null. It is insufficient as a matter of law.

**\*10** Plaintiff concedes that he never heard Toro claim that plaintiff made the oral statement. Plaintiff has presented no deposition testimony of any person who claims to have personal knowledge that Toro attributed the remarks to plaintiff.

Plaintiff has offered one potentially admissible document supporting his allegation that Toro manufactured evidence against him. Assuming it were admitted, the jury would not have to credit it. *See* Fed.R.Evid. 104(e) (though the court determines admissibility, "a party [may] introduce before the jury evidence relevant to weight or credibility."). It has almost no inferential probative force. No rational jury could return a verdict in plaintiff's favor based on the evidence plaintiff proffers.

Section 1983 provides important protections against police misconduct in appropriate cases. *See, e.g., Jocks* (off-duty police officer argued with truck driver plaintiff, ordered him to the ground and pressed a gun to the back of plaintiff's head); *Ricciuti* (off-duty officer brawled with fan outside New York Yankees game; fellow officer fabricated detailed confession that was inconsistent with verifiable details of other police reports).

This is not such a case. Both the detective and the prosecutor in this instance-strangers to plaintiff and without apparent animus towards him-conducted thorough, independent investigations of a robbery. There is no allegation

of physical abuse. Plaintiff can produce no motive for the alleged fabrication. The victim identified plaintiff by name as his assailant and later identified him in both a photo array and a lineup. The grand jury properly returned an indictment. After a full and fair trial, plaintiff was acquitted on all charges. On the record before the court, the motion must be granted.

The allegation that an officer has fabricated evidence is serious. That plaintiff spent an extended period in jail for a crime of which he has been acquitted is troubling; it is not unusual. *See* Bureau of Justice Statistics, Compendium of Federal Justice Statistics 54 (2003) (average period of pretrial detention for robbery suspects who could not afford to make bond was 165.5 days). Bail is sometimes properly set high, or denied, for those who pose a serious risk of flight or threat to the community. Even modest bail may prevent many defendants from securing their release pending trial. *See* Vera Institute of Justice, Foreword, Bail Bond Supervision in Three Counties (1995) ( "[P]ersonal wealth determined whether someone detained on a relatively low bail amount would be held in jail until their case ended or would be able to post bail and remain free."). Absent proof of official misconduct, lengthy pre-trial detention not deliberately caused by acts of a police officer does not provide a basis for relief under Section 1983.

### III. Conclusion

The motion for summary judgment by Detective Daniel Toro is granted. Claims against the City are withdrawn. Plaintiff has not pressed his claims against the unnamed officers; the motion for summary judgment on all claims against them is granted.

**\*11**  The case is dismissed. Costs and fees are granted to Daniel Toro.

SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2006 WL 401651

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Marom v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 916424

KeyCite Yellow Flag - Negative Treatment

On Reconsideration in Part   Marom v. City of New York,   S.D.N.Y.,   July 29, 2016

2016 WL 916424
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Yotam MAROM, Miriam Rocek,
and Don Fitzgerald, Plaintiffs,

v.

The CITY OF NEW YORK, New York City Police
Department ("NYPD") Chief of Department Joseph
Esposito, NYPD Deputy Inspector Edward Winski,
NYPD Lieutenant Frank Viviano, NYPD Sergeant Fior
Blanco, Nypd Legal Bureau Officer Oleg Charnyavsky,
NYPD Officer Michael Galgano, Shield No. 2671,
NYPD Officer Cynthia Boyle, Shield No. 6663, NYPD
Officer Steven Valentine, Shield No. 13585, and
NYPD Officers John and Jane Doe #1-15, Defendants.

15-cv-2017 (PKC)
|
Signed 03/07/2016

**Attorneys and Law Firms**

Gideon Orion Oliver, New York, NY, for Plaintiffs.

Andrew Joseph Lucas, Joy Tolulope Anakhu, Lamar Devaughn Winslow, NYC Law Department, Office of the Corporation Counsel, New York, NY, for Defendants.

MEMORANDUM AND ORDER

CASTEL, U.S.D.J.

**\*1** Plaintiffs Yotam Marom, Miriam Rocek, and Don Fitzgerald bring this action against the City of New York, eight named individual defendants employed by the New York City Police Department ("NYPD"), specifically Chief of Department Joseph Esposito, Deputy Inspector Edward Winski, Lieutenant Frank Viviano, Sergeant Fior Blanco, Legal Bureau attorney Oleg Charnyavsky, Officer Michael Galgano (Shield No. 2671), Officer Cynthia Boyle (Shield No. 6663), and Officer Steven Valentine (Shield No. 13585), and 15 unnamed individual NYPD Officers (Officers John and Jane Doe #1-15), asserting nine claims under 42

U.S.C § 1983 and the First, Fourth, Sixth, and Fourteenth Amendments. Plaintiffs claim that, while participating in a protest in Zuccotti Park marking the six-month anniversary of the Occupy Wall Street ("OWS") movement, or in the aftermath of the protest, they were denied certain protected rights. They maintain that they were falsely arrested, subjected to excessive use of force, excessive detention, and malicious abuse of process, prevented from exercising their First Amendment rights, deprived of rights to a fair trial, and denied the equal protection of the laws. The defendants now move to dismiss the complaint pursuant to Rule 12(b)(6), Fed. R. Civ. P. For reasons that will be explained, the motion is granted as to all claims except for: (1) Yotam Marom's and Miriam Rocek's false arrest, First Amendment retaliation, and certain failure to intervene claims; and, (2) Don Fitzgerald's claim of excessive force.

THE FACTS ALLEGED
For the purposes of defendants' motion, all non-conclusory factual allegations set forth in plaintiffs' First Amended Complaint (the "FAC") are accepted as true, see Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), and all reasonable inferences are drawn in favor of the plaintiffs as the non-movants, see In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007).

Plaintiffs bring their claims against three categories of defendants. First, plaintiffs allege that the City of New York, through its agents in the NYPD, adopted policies aimed at depriving OWS protestors of their constitutional rights. (FAC ¶¶ 11, 105). Second, plaintiffs allege that Chief of Department Esposito, Deputy Inspector Winski, Lieutenant Viviano, Sergeant Blanco, and Legal Bureau attorney Charnyavsky, whom the plaintiffs call "supervisory defendants," were personally involved in designing and supervising policies that caused the deprivation of their constitutional rights. (FAC ¶¶ 12, 14-15). Third, plaintiffs allege that Officers Galgano, Boyle, and Valentine, as well as the remaining unnamed defendants, were personally involved in depriving plaintiffs of their rights by implementing the allegedly unconstitutional policies designed by the City and the supervisory defendants. (FAC ¶¶ 13, 16).

    I. Events of March 17, 2012.
On March 17, 2012, plaintiffs Marom, Rocek, and Fitzgerald allege that they were "lawfully present" in Zuccotti Park (also known as Liberty Plaza) in connection with the six month anniversary of the OWS movement. (FAC ¶¶ 157, 175, 196). That same evening, the NYPD "raided Liberty Plaza" and

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 134 of 370

Marom v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 916424

arrested many OWS protestors, including the three plaintiffs. (FAC ¶¶ 151-52).

### A. Yotam Marom.

**\*2** Plaintiffs claim that NYPD Officers "violently arrested" Marom, "forcibly escorted" him to an NYPD-arranged holding area and eventually transported him to NYPD's Midtown South Precinct. (FAC ¶ 159, 161, 163). Marom alleges that he was handcuffed tightly for several hours in connection with his arrest. (FAC ¶ 165). According to the FAC, the police sent Marom to 100 Centre Street where he was arraigned before a New York City Criminal Court Judge "approximately 40 or more hours after his arrest." (FAC ¶¶ 166-67). The FAC also claims that Officer Galgano swore out "an accusatory instrument charging Mr. Marom and another person with various offenses based on false allegations," including that Galgano observed Marom inside Zuccotti Park resisting arrest by sitting down, interlocking arms with other protestors, and refusing to place his arms behind his back after the police gave dispersal orders. (FAC ¶ 171). Marom alleges that Officer Galgano did not actually observe those things himself. (FAC ¶ 172).

### B. Miriam Rocek.

Rocek was allegedly working as a "volunteer street medic" during the March 17, 2012 OWS protest. (FAC ¶ 175). She claims that an unidentified NYPD supervisor specifically targeted her for arrest and said "get her first, she's number one." (FAC ¶ 177). Two male NYPD officers then "grabbed Ms. Rocek by her arms, pulled her by her arms, and threw her onto the ground, so that she ended up face-down on the ground." (FAC ¶ 178). The officers allegedly ripped her jacket during the process. (FAC ¶ 187). Even though Rocek was not resisting arrest, officers were telling her to stop resisting and to just relax. (FAC ¶¶ 179-81). Rocek then said "[f]uck you, don't tell me to relax" to the officers, to which an officer allegedly said "[f]ine, fuck you then," "twisted her arm back as he placed plastic flexcuffs on her," and told her to "[g]et up." (FAC ¶¶ 182-84). The flexcuffs were tight on Rocek's wrist and remained on her for approximately four hours. (FAC ¶ 190). Rocek alleges that the police dragged her by her hair and pulled her up on to her feet because she was unable to get up on her own. (FAC ¶ 185). The police transported Rocek to 100 Centre Street where she was arraigned approximately 24 hours after her arrest. (FAC ¶ 193). The FAC asserts that

Officer Boyle "filled out NYPD paperwork stating that he [sic] had seen Ms. Rocek engage in certain conduct when he [sic] had in fact not done so." (FAC ¶ 140).

### C. Don Fitzgerald.

Don Fitzgerald alleges that NYPD officers grabbed him and threw him face-down on the ground while arresting him during the March 17, 2012 "raid" on Zuccotti Park. (FAC ¶ 198). While on the ground, an unidentified NYPD officer allegedly hit Fitzgerald "at least ten times in the face while saying, '[s]top resisting!'" (FAC ¶ 199). The police handcuffed Fitzgerald tightly and transported him to the Midtown South Precinct. (FAC ¶¶ 201, 203). Approximately 30 hours after the police arrested Fitzgerald, they transported him to 100 Centre Street where he was arraigned in New York City Criminal Court. (FAC ¶¶ 204-05). Fitzgerald claims that his face was swollen and painful for around a week after his arrest. (FAC ¶ 206). He also claims that Officer Valentine "filled out NYPD paperwork stating that he had seen Mr. Fitzgerald engage in certain conduct when he had in fact not done so." (FAC ¶ 141).

### D. Processing of Plaintiffs' Arrests.

Plaintiffs allege that after NYPD officers removed them from Zuccotti Park and brought them to the Midtown South Precinct, defendants Blanco, Charnyavsky, Galgano, Boyle, and Valentine conspired to falsify arrest paperwork. (FAC ¶ 117). While at the NYPD's Midtown South Precinct, Blanco and Charnyavsky allegedly "met with and supervised Galgano, Boyle, and Valentine, along with all other approximately eight assigned arresting officers." (FAC ¶ 114). Blanco and Charnyavsky instructed Galgano, Boyle, Valentine, and the others "regarding what to write in their NYPD arrest processing paperwork related to plaintiffs' and other purportedly related arrests." (FAC ¶ 115). According to plaintiffs, this process resulted in Blanco and Charnyavsky instructing and assisting Galgano, Boyle, and Valentine "in creating false narratives" regarding plaintiffs behavior in Zuccotti Park. (FAC ¶ 117). Plaintiffs claim that Galgano, Boyle, and Valentine—who filled out paperwork allegedly swearing they saw plaintiffs engage in certain conduct— never actually saw Marom, Rocek, or Fitzgerald in Zuccotti Park that day. (FAC ¶¶ 132, 134, 136). Plaintiffs claim they were prosecuted for criminal offenses based on those statements, which they allege were false, (FAC ¶ 147), and that each plaintiff eventually accepted an Adjournment in

2016 WL 916424

Contemplation of Dismissal (an "ACD") to resolve the cases stemming from their arrests. (FAC ¶¶ 173, 194, 207). [1]

[1]    Plaintiffs' memorandum of law in opposition, however, states that Fitzgerald's charges were actually resolved with a guilty plea to a disorderly conduct, which, under New York Law is not a crime but a "violation." (Memorandum of Law in Opposition, 4).

II. NYPD Policies and Practices.

**\*3** Plaintiffs further allege that their unlawful treatment by the NYPD on March 17, 2012 occurred because of two specific policies concerning mass protests that the City of New York, through individual defendant Esposito and others, adopted during a series of meetings leading up to the "raid" on Zuccotti Park. First, the City and supervisory defendants refined and adopted a "policy and practice related to OWS of denying persons arrested at demonstrations individual consideration for release with summonses," which plaintiffs label the "No-Summons Policy." (FAC ¶¶ 59-64). Second, the City and supervisory defendants refined and adopted a "policy and practice related to the centralized processing of arrestees in a single mass arrest processing center including the involvement of NYPD Legal Bureau and Criminal Justice Bureau agents in the creation of boilerplate NYPD documents containing false information," which plaintiffs claim was part of "an unreasonably lengthy and punitive mass arrest processing plan" they call "MAPP." (FAC ¶ 65). According to plaintiffs, the No-Summons Policy and MAPP were specifically directed at OWS protestors. (FAC ¶ 67).

They allege that those two policies differ drastically from the standard policing procedures codified in the NYPD Patrol Guide. (FAC ¶ 69). The standard procedures, according to plaintiffs, call for persons "detained and arrested for non-criminal violations ... as well as most misdemeanor offenses, who are carrying proper identification and have no outstanding arrest warrants, [to be given] individualized determinations of eligibility for release with a Universal Summons or [Desk Appearance Ticket ("DAT") ]." (FAC ¶ 69). The plaintiffs allege that substitution of the No-Summons Policy and MAPP in place of the standard procedures resulted in longer detainment periods for OWS protestors. (FAC ¶¶ 70-73). Plaintiffs claim that these policies derived from "ill-will toward [protestors'] perceived association with OWS," (FAC ¶ 78), and defendants' desire to "deter and/or prevent [protestors] from participating in further OWS-related demonstrations," (FAC ¶ 80).

Plaintiffs also claim that the City utilized similar policies and practices against protestors during the 2004 Republican National Convention (the "RNC"). (FAC ¶¶ 29-31). According to plaintiffs, the City's RNC policies led to unconstitutional results including the widespread failure to make individualized determinations of probable cause, (FAC ¶ 38); the use of excessive force by police officers, (FAC ¶ 39); and, unnecessarily long pre-arraignment detention periods for arrestees, (FAC ¶ 40). The City subsequently "failed to develop and implement adequate training in connection with, and to supervise and/or discipline their subordinates in connection with," mass protest activities, "despite decades of litigation" spurred by the RNC policies, among others. (FAC ¶¶ 45, 26).

On that basis, plaintiffs claim that the City and the "supervisory defendants" knew or should have known that the "NYPD's plans for policing and mass arrest processing" used in connection with the March 17, 2012 OWS protest "would result in unlawful arrests, excessive use of force, excessive detentions, malicious abuse of process, fabrication of evidence, and other unlawful conduct that would lead to constitutional rights violations." (FAC ¶ 105). And, despite that knowledge, the supervisory defendants failed to intervene to prevent or remediate the injuries suffered by the plaintiffs, (FAC ¶ 148), which included "physical, psychological and emotional injuries, mental anguish, suffering, humiliation, embarrassment, and other damages," (FAC ¶¶ 174, 195, 208).

DISCUSSION

I. Legal Standard.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Bell Atlantic v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "The plausibility standard ... asks for more than a sheer possibility that a defendant has acted unlawfully." Id. Legal conclusions and "[t]hreadbare recitals of the elements of a cause of action," are not entitled to any presumption of truth. Id.

II. Plaintiffs' Section 1983 Claims.

Case 5:24-cv-01237-DNH-MJK   Document 10   Filed 11/12/24   Page 136 of 370

Marom v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 916424

**\*4** To state a claim under section 1983, a plaintiff must allege that state officials, acting under color of state law, deprived her of a right guaranteed to her by the Constitution or federal law. 42 U.S.C. § 1983; see Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996). Here, plaintiffs' claims are predicated on allegations that they were: (a) falsely arrested, (b) subjected to excessive force, (c) subjected to excessive detention, (d) victims of malicious abuse of process, (e) deprived of their rights to a fair trial under the Sixth Amendment, (f) deprived of their rights under the First Amendment, and, (g) deprived of the equal protection of the laws under the Fourteenth Amendment. Plaintiffs also allege that the named individual defendants were personally involved in, and failed to intervene to protect plaintiffs from, the deprivation of their rights, see Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994), and that the City of New York is liable for the alleged constitutional violations, see Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 696 (1978). The Court will examine each of these claims in turn.

A. False Arrest Claim.

As an initial matter, plaintiff Don Fitzgerald withdraws his false arrest claim because his arrest was not actually resolved with an ACD, as originally pled, but rather with a guilty plea to disorderly conduct, which is a "violation" and not a crime. (Plaintiffs' Memorandum of Law in Opposition, 4); see N.Y. Penal Law § 240.20. [2] Even if he had not withdrawn his false arrest claim, a "plaintiff can under no circumstances recover if he was convicted of the offense for which he was arrested." Cameron v. Fogarty, 806 F.2d 380, 387 (2d Cir. 1986); see Sealey v. Fishkin, 96 cv 6303 (RR), 1998 WL 1021470, at \*4 (E.D.N.Y. Dec. 2, 1998) (granting summary judgment dismissing false arrest claim on the basis that plaintiff was convicted, on his own guilty plea, to disorderly conduct, a "violation" rather than a crime).

2    The Certificate of Disposition for Fitzgerald states that he pled guilty to N.Y. Penal Law § 240.20, which prohibits various acts as "disorderly conduct." It is a "violation" rather than a crime. (Declaration of Lamar Winslow in Support of Defendant's Motion to Dismiss ("Winslow Decl."), Ex. C). It is appropriate for the Court to consider the Certificates of Disposition at this stage because plaintiffs repeatedly reference that their cases were disposed of on ACDs, (see FAC ¶¶ 173, 194, 207), and thus the Certificates of Disposition setting forth the disposition of their arrests are incorporated by

reference in, and are integral to, the FAC. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153-54 (2d Cir. 2002) (holding that district court could properly consider the text of contracts on motion to dismiss because Amended Complaint was "replete with references to the contracts" and the content of the contracts was integral to the Amended Complaint); see also San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies, Inc., 75 F.3d 801, 809 (2d Cir. 1996).

Marom's and Rocek's false arrest claims remain. Claims for false arrest brought under section 1983 "are 'substantially the same' as claims for false arrest ... under state law." Jocks v. Tavernier, 316 F.3d 128, 134 (2d Cir. 2003). "To state a claim for false arrest under New York law, plaintiffs must show that '(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged.'" Savino v. City of New York, 331 F.3d 63, 75 (2d Cir. 2003) (quoting Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994)). Defendants argue that plaintiffs have not adequately pled facts showing that the arrests of the plaintiffs "was not otherwise privileged," and, alternatively, that defendants had probable cause to arrest Marom and Rocek. In response, plaintiffs contend that there was no probable cause to arrest or that the alleged basis for probable cause is improper because the arresting officers did not personally observe plaintiffs' conduct.

**\*5** In order to state a claim for false arrest, plaintiffs "must show that ... [their] confinement was not otherwise privileged." Savino, 331 at 75. Essentially, this element amounts to determining whether there was legal justification for the challenged arrest—in most cases, whether there was probable cause. See Benjamin v. United States, 554 F. Supp. 82, 85 (E.D.N.Y. 1982). The FAC includes no factual content regarding the arrests aside from the assertion that, prior to being "violently" arrested by police, all three plaintiffs were "lawfully present" in Zuccotti Park "in connection with the six month anniversary of the OWS movement." (FAC ¶¶ 157, 175, 196).

Defendants argue that plaintiffs' assertion that they were "lawfully present" is a legal conclusion and not a statement of fact upon which a claim for relief can be based. They also argue that the FAC does not state a plausible false arrest claim because it fails to describe any of the surrounding circumstances leading to the arrest. Defendants assert that,

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 137 of 370

Marom v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 916424

because showing that an arrest was "not otherwise privileged" is an element of a prima facie claim for false arrest, plaintiffs must actually allege sufficient factual content to permit the Court to reasonably infer that the arrest was unjustified. And, the federal pleading standards would seem to require plaintiffs, at a minimum, to do just that. See Iqbal, 556 U.S. at 678 ("The plausibility standard ... asks for more than a sheer possibility that a defendant has acted unlawfully.") On that basis, defendants argue that plaintiffs' false arrest claim cannot survive a motion to dismiss.

Claims in federal court are governed by federal pleading standards; in the case of section 1983 claims alleging false arrests, state law supplies the elements of the claim. The New York Court of Appeals has held that plaintiffs need not allege "want of probable cause" when stating a false arrest claim based on a warrantless arrest. Broughton v. State, 37 N.Y.2d 451, 458 (1975). This is because, as a matter of substantive law, there is a presumption that "[w]henever there has been an arrest and imprisonment without a warrant" the arrest is unlawful. Id.; Jenkins v. City of New York, 478 F.3d 76, 88 (2d Cir. 2007) ("Where an officer makes an arrest without a warrant, the presumption arises that the plaintiff's arrest was unlawful."). In such cases, it is defendants who bear the burden "of proving that probable cause existed for the plaintiff's arrest" as an affirmative defense. Savino, 331 F.3d at 76 (citing Broughton, 37 N.Y.2d at 458). Thus, the requirement that plaintiffs "show that ... [their] confinement was not otherwise privileged" is satisfied simply by alleging that the arrest was made without a warrant. Because it is reasonable to infer from the FAC that plaintiffs were arrested without a warrant, plaintiffs Marom and Rocek have stated a plausible claim for false arrest despite the paucity of facts alleged in the FAC.

Given the lack of factual content alleged in the FAC, it is impossible for the Court to determine, as a matter of law, that there was probable cause to arrest. This also precludes the Court from being able to determine, at this stage, whether defendants are protected from liability by the doctrine of qualified immunity. See Savino, 331 F.3d at 71 (quoting Mandell v. Cty. of Suffolk, 316 F.3d 368, 385 (2d Cir. 2003)) ("[U]nder the doctrine of qualified immunity, a government official performing discretionary functions is shielded from liability for civil damages if his conduct did not violate plaintiff's clearly established rights or if it would have been objectively reasonable for the official to believe that his conduct did not violate plaintiff's rights.")

B. Excessive Force Claim.

*6 A claim of excessive use of force during an arrest is analyzed under Fourth Amendment principles. Graham v. Connor, 490 U.S. 386, 394 (1989). To prevail, the plaintiff must show that the defendants' use of force was objectively unreasonable "in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397. Marom alleges that he was "violently arrested," (FAC ¶ 159), and that he was handcuffed tightly for several hours in connection with his arrest. (FAC ¶ 165). Rocek alleges that officers "grabbed [her] by her arms, pulled her by her arms, and threw her onto the ground, so that she ended up face-down on the ground," (FAC ¶ 178); that officers ripped her jacket, (FAC ¶ 187); that an officer "twisted her arm back as he placed plastic flexcuffs on her," (FAC ¶ 183); that officers dragged her by her hair and pulled her up onto her feet, (FAC ¶ 185); and, that her flexcuffs were tight and remained fastened for approximately four hours, (FAC ¶ 190). Fitzgerald alleges that officers grabbed him and threw him face-down on the ground, (FAC ¶ 198), that an unidentified NYPD officer hit him "at least ten times in the face" (FAC ¶ 199), and that the police handcuffed him tightly, (FAC ¶ 203). Fitzgerald also claims that his face was swollen and painful for around a week after his arrest. (FAC ¶ 206). The Court will first address plaintiffs' excessive force claims regarding the use of handcuffs and then will address the balance of plaintiffs' excessive force claims.

"Although handcuffs must be reasonably tight to be effective, [ ], overly tight handcuffing can constitute excessive force." Lynch ex rel. Lynch v. City of Mount Vernon, 567 F. Supp. 2d 459, 468 (S.D.N.Y. 2008) (internal citation omitted). "[I]n evaluating the reasonableness of handcuffing, a Court is to consider evidence that: 1) the handcuffs were unreasonably tight; 2) the defendants ignored the [plaintiffs'] pleas that the handcuffs were too tight; and 3) the degree of *injury to the wrists.*" Id. (quoting Esmont v. City of New York, 371 F.Supp.2d 202, 215 (E.D.N.Y 2005) (emphasis in original). "Courts in this Circuit have generally found that handcuffing does not suffice for an excessive force claim unless it causes some injury beyond temporary discomfort or bruising." Omor v. City of New York, 13 cv 2439 (RA), 2015 WL 857587, at *7 (S.D.N.Y. Feb. 27, 2015); see also Lynch, 567 F. Supp. at 468-69 (collecting cases).

While the FAC alleges that all three plaintiffs were handcuffed tightly, there are no allegations that any of the three ever complained to law enforcement about their handcuffs and that defendants ignored those complaints, and there are no

2016 WL 916424

allegations that any plaintiff experienced injuries because of the handcuffs. Marom and Fitzgerald do claim they were handcuffed for "several hours," (FAC ¶¶ 165, 203), and Rocek claims she was handcuffed for "four hours," (FAC ¶ 190), but courts in this district have held other claims alleging similar periods of handcuffing insufficient to state a claim for excessive force. See, e.g., Higginbotham v. City of New York, 105 F. Supp. 3d 369, 377 (S.D.N.Y. 2015) (three hours); Omor, 2015 WL 857587, at *7 (four to five hours); Bender v. City of N.Y., 09 cv 3286 (BSJ), 2011 WL 4344203, at *6 (S.D.N.Y. Sept. 14, 2011) (fourteen hours). Because the FAC only contains allegations that plaintiffs were handcuffed tightly for several hours, it fails to state a plausible excessive force claim based on defendants' use of handcuffs.

With regard to the remaining allegations of excessive force alleged to have been used by defendants, "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham, 490 U.S. at 396. "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' [ ], violates the Fourth Amendment." Id. (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)) (internal citation omitted). Courts in this district have regularly held that a plaintiff must have sustained some injury to maintain a claim of excessive force. See, e.g., Acosta v. City of New York, 11 cv 856 (KBF), 2012 WL 1506954, at *10 (S.D.N.Y. Apr. 26, 2012); Wims v. New York City Police Dep't, 10 cv 6128 (PKC), 2011 WL 2946369, at *4-5 (S.D.N.Y. July 20, 2011). That injury, however, need not be severe. See Robison v. Via, 821 F.2d 913, 924 (2d Cir. 1987) (denying summary dismissal of excessive force claim where plaintiff "testified that she suffered bruises lasting a 'couple weeks'").

*7 In the case of Marom, the FAC fails to state a claim for excessive force. Marom alleges only that he was "violently arrested." The FAC does not explain what specific acts the unidentified officers took against Marom on March 17, 2012 or whether Marom suffered any injuries as a result of the arrest. In the absence of more detailed allegations, Marom has failed to plausibly allege an excessive force claim. See, e.g., Bender, 2011 WL 4344203, at *6 (dismissing excessive force claim where plaintiff claimed only that she was "turn [ed] [ ] upside down, handcuff[ed] [ ] multiple times, [and] physically assault[ed]") (alterations in original).

The FAC also fails to state a plausible excessive force claim with respect to Rocek. The most severe of Rocek's excessive

force allegations are that officers "grabbed Ms. Rocek by her arms, pulled her by her arms, and threw her onto the ground," (FAC ¶ 178), and that officers dragged her by her hair and pulled her up onto her feet, (FAC ¶ 185). The FAC does not, however, allege that Rocek sustained any injuries. Because Rocek does not assert that defendants injured her, allegations that defendants used this minimal amount of force during an arrest are not sufficient to defeat a motion to dismiss. See, e.g., Acosta, 2012 WL 1506954, at *10 (dismissing excessive force claim where plaintiff alleged that an officer "pushed his wrist into his pocket, punched him in the chest, threw him to the ground face first, forcibly handcuffed his left arm, and attempted to manipulate his right arm into handcuffs as well"); Wims, 2011 WL 2946369, at *4 (dismissing excessive force claim where plaintiff asserted that "he was pulled out of his car and 'thrown flat on [his] face unto the filthy ground'")

Conversely, Fitzgerald does allege a plausible claim for excessive use of force. Fitzgerald asserts that an unidentified NYPD officer hit him "at least ten times in the face," (FAC ¶ 199), and that, as a result, his face was swollen and painful for around a week. (FAC ¶ 206). In contrast to Marom's and Rocek's claims, Fitzgerald alleges that he was injured during his arrest. While his injuries were slight, a plaintiff need not suffer severe injuries to make out a plausible claim for excessive use of force. See Robison, 821 F.2d at 924. In the present case, the combination of the amount of force allegedly used—ten hits to the face—with the injuries allegedly sustained—a swollen and painful face for about a week—permit Fitzgerald's excessive force claim to survive a motion to dismiss.

In sum, the only excessive force claim that survives defendants' motion to dismiss is Fitzgerald's claim arising out of an unidentified officers' repeated hits to his face.

### C. Excessive Detention Claim.
The Fourth Amendment also "governs the procedures applied during some period following an arrest." Bryant v. City of New York, 404 F.3d 128, 136 (2d Cir. 2005). Again, the Fourth Amendment's reasonableness test is one of "objective reasonableness," meaning that the subjective motivations of individual officers have no bearing on whether a seizure was reasonable under the Fourth Amendment. Id. "In the context of pretrial detention, the Supreme Court has held that, when there has been a warrantless arrest, the Fourth Amendment requires a prompt judicial determination of probable cause as a prerequisite to an extended pretrial detention." Id.; see

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 139 of 370

Marom v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 916424

Gerstein v. Pugh, 420 U.S. 103, 113-14 (1975). The Supreme Court subsequently clarified what it meant by "prompt" judicial determination of probable cause and held that "a jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement." Cty. of Riverside v. McLaughlin, 500 U.S. 44, 56 (1991). In sum, "[w]hat is constitutionally required is that, except in extraordinary circumstances, the arrestee be given a hearing into probable cause for the arrest within 48 hours." Bryant, 404 F.3d at 138; see also McLaughlin, 500 U.S. at 56 ("Examples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake."). In New York, because probable cause determinations are made at arraignments, the Fourth Amendment requires that an arrestee be arraigned within 48 hours. See Bryant, 404 F.3d at 138. [3]

[3]    Plaintiffs argue that under New York law and the New York State Constitution "a delay in arraignment of anything over 24 hours is presumptively unreasonable." (Plaintiffs' Memorandum of Law in Opposition, 35). Even assuming arguendo that plaintiffs' understanding of the requirements of New York's law and constitution is correct, plaintiffs' present claims are brought pursuant to section 1983, which provides a remedy for the deprivation of federal or US Constitutional rights. See Cox v. Warwick Valley Cent. Sch. Dist., 654 F.3d 267, 272 (2d Cir. 2011).

 *8  Plaintiffs have failed to plead a plausible claim for excessive detention. According to the FAC, Marom was detained for "40 hours or more" prior to being arraigned, (FAC ¶ 167); Rocek was detained for 24 hours, (FAC ¶ 193); and Fitzgerald was detained for "30 or more hours," (FAC ¶ 205). Because plaintiffs' pre-arraignment detention did not exceed 48 hours, their detention period was presumptively reasonable.

Moreover, plaintiffs has failed to make any plausible, non-conclusory allegations showing that the length of their detention resulted from "extraordinary circumstances." McLaughlin, 500 U.S. at 56. The FAC alleges that plaintiffs' were detained "for the purpose of gathering additional evidence to justify the arrest," (FAC ¶ 77), "for delay's sake," (FAC ¶ 79), and "based on malicious, bad faith intent to inhibit or punish" them, (FAC ¶ 75), but those

allegations are entirely conclusory and simply parrot the bases for finding "extraordinary circumstances." The fact that each plaintiff was arraigned on charges of resisting arrest, (N.Y. Penal Law § 205.30), second-degree obstruction of governmental administration, (N.Y. Penal Law § 195.05), disorderly conduct violation, (N.Y. Penal Law § 240.2), and trespass violation, (N.Y. Penal Law 140.05), undermines the plausibility of the assertion that plaintiffs were held longer in order for police to gather evidence of those charges. (Winslow Decl., Ex. C). And, the fact that each plaintiff was detained for a substantially different period of time undermines the plausibility of the assertion that they were detained because of defendants' systemic ill-will towards OWS protestors. For all of the foregoing reasons, plaintiffs' excessive detention claims are dismissed.

    D. Malicious Abuse of Process Claim.

State law provides the elements of a section 1983 claim based on malicious abuse of process. See Savino, 331 F.3d at 76. "In New York, a malicious abuse-of-process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." Cook v. Sheldon, 41 F.3d 73, 80 (2d Cir. 1994). To establish that a defendant employed legal process "in order to obtain a collateral objective that is outside the legitimate ends of the process," a plaintiff must show more than just a malicious motive. Savino, 331 F.3d at 77; see also Curiano v. Suozzi, 63 N.Y.2d 113, 117 (1984) ("A malicious motive alone, however, does not give rise to a cause of action for abuse of process."). "A plaintiff must establish that the defendants had an improper *purpose* in instigating the action." Savino, 331 F.3d at 77 (emphasis in original).

While plaintiffs allege, albeit in a conclusory fashion, that a number of defendants conspired to falsify arresting documents against plaintiffs, (FAC ¶ 117), and that plaintiffs were prosecuted on the basis of those false documents, (FAC ¶ 147), they do not allege any facts permitting a plausible inference that defendants did so "in order to obtain a collateral objective that is outside the legitimate ends of the process." Sheldon, 41 F.3d at 80. Plaintiffs do not identify any possible collateral objective. The allegation that defendants falsified documents permits the Court to infer that defendants intended to do plaintiffs harm, but, an evil motive is not enough to sustain a claim for malicious abuse of process. See Savino, 331 F.3d at 77-78 (holding that plaintiff failed to state a malicious abuse of process claim where he alleged that his

Marom v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 916424

investigation and arrest by the defendants was motivated by the defendants' desire to seek vindication for embarrassment the plaintiff caused the City of New York). Plaintiffs' claims for malicious abuse of process will be dismissed.

E. Right to a Fair Trial Claim.

**\*9** "When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial." Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 130 (2d Cir. 1997); see also Morse v. Fusto, 804 F.3d 538, 548 (2d Cir. 2015). A plaintiff need not have proceeded to a full trial on the merits in order to have an actionable section 1983 claim based on the denial of a fair trial. See Ricciuti, 124 F.3d at 127 (plaintiffs bringing a section 1983 claim for right to a fair trial had their criminal charges dismissed pre-trial); Canario v. City of New York, 5 cv 9343 (LBS), 2006 WL 2015651, at \*1 (S.D.N.Y. July 12, 2006) (plaintiffs original criminal charges were dismissed pre-trial).

As described above, plaintiffs allege that defendants Blanco, Charnyavsky, Galgano, Boyle, and Valentine conspired to create, and created, false arresting documents against plaintiffs. (FAC ¶ 117). Specifically, plaintiffs claim that defendants Blanco and Charnyavsky instructed and assisted Galgano, Boyle, and Valentine "in creating false narratives" regarding plaintiffs behavior in Zuccotti Park. (FAC ¶ 117). They claim that Galgano, Boyle, and Valentine—who filled out arresting paperwork allegedly swearing they saw plaintiffs engage in certain conduct—never actually saw Marom, Rocek, or Fitzgerald in Zuccotti Park that day. (FAC ¶¶ 132, 134, 136). Plaintiffs assert that "[b]ased on those false statements, Plaintiffs were prosecuted for criminal offenses." (FAC ¶ 147).

Those assertions, however, are not sufficient to plausibly allege a fair trial claim. Critically, plaintiffs fail to assert how, in what way, or to what effect, the defendants specifically falsified their arrest processing paperwork. A fair trial claim cannot survive a motion to dismiss based only on broad and conclusory allegations the officers created "false narratives" about what they saw. See Abdul-Rahman v. City of New York, 10 cv 2778 (ILG), 2012 WL 1077762, at \*12 (E.D.N.Y. Mar. 30, 2012) (dismissing a plaintiff's fair trial claim "because he has presented only the most conclusory and generalized allegations, failing to specify in what way the statements, information, or testimony were false or even in what material respect the charges against him were false").

The claim that the false reports were "likely to influence a jury's decision" is also entirely speculative. See Ricciuti, 124 F.3d at 130. The Officers would have had to testify to the purportedly false statements included in the arresting paperwork in court, as the arrest reports, if they included inculpatory evidence against plaintiffs, would have been inadmissible on their own on Confrontation Clause grounds. See Crawford v. Washington, 541 U.S. 36, 59 (2004) (stating Confrontation Clause rule applicable to "[t]estimonial statements of witnesses absent from trial"); See also United States v. Garcia, 282 F. App'x 14, 24 (2d Cir. 2008) (permitting two officers to read from arrest reports and holding that there was no Confrontation Clause violation "because both police officers were witnesses subject to cross-examination by the defendants testifying about their own prior recollection of events"). This kind of speculative chain of events does not suffice to state a plausible fair trial claim. See Brown v. City of New York, 2014 U.S. Dist. LEXIS 181736, \*10 (E.D.N.Y. Dec. 23, 2014) (dismissing right to fair trial claim based on allegedly false statements contained in arrest paperwork); see also Blair v. City of New York, 03 cv 1485(SLT) (CLP), 2009 WL 959547, at \*11 (E.D.N.Y. Mar. 31, 2009) ("Falsified or fabricated evidence alone does not amount to a constitutional violation, however. The constitutional violation occurs when such evidence is admitted at trial and impairs the truth-seeking function of the court proceedings.").

F. First Amendment Claim.

1. Retaliation.

**\*10** As an initial matter, Fitzgerald's First Amendment retaliation claim will be dismissed on the basis that there was probable cause to arrest him. The existence of probable cause will defeat a First Amendment claim "premised on the allegation that defendants prosecuted a plaintiff out of a retaliatory motive." Fabrikant v. French, 691 F.3d 193, 215 (2d Cir. 2012); see also Mozzochi v. Borden, 959 F.2d 1174, 1180 (2d Cir. 1992) ("An individual does not have a right under the First Amendment to be free from a criminal prosecution supported by probable cause, [even if it is] in reality an unsuccessful attempt to deter or silence criticism of the government."). Fitzgerald pled guilty to a disorderly conduct violation arising from his arrest on March 17, 2012. (Plaintiffs' Memorandum of Law in Opposition, 4); see N.Y. Penal Law § 240.20. Because "a conviction of the plaintiff following the arrest is viewed as establishing the existence of

Marom v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 916424

probable cause," Cameron, 806 F.2d at 387, Fitzgerald's First Amendment retaliation claim will be dismissed at this stage.

Marom's and Rocek's retaliation claims, however, remain in issue. "To plead a First Amendment retaliation claim a plaintiff must show: (1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by his exercise of that right; and (3) the defendant's actions caused him some injury." Dorsett v. Cty. of Nassau, 732 F.3d 157, 160 (2d Cir. 2013). To satisfy the first element, plaintiffs must allege that they were engaged in speech protected by the First Amendment. Defendants argue that plaintiffs have failed to establish this element because plaintiffs allege only that they were present in Zuccotti Park.

"It is well established that '[t]he First Amendment affords protection to symbolic or expressive conduct as well as to actual speech.'" Church of Am. Knights of the Ku Klux Klan v. Kerik, 356 F.3d 197, 205 (2d Cir. 2004) (quoting Virginia v. Black, 538 U.S. 343 (2003)). The test for determining whether conduct is sufficiently expressive to implicate the First Amendment is whether "'[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it.'" Id. (quoting Texas v. Johnson, 491 U.S. 397, 404 (1989)) (alterations in original). "The party asserting that its conduct is expressive bears the burden of demonstrating that the First Amendment applies [ ] and that party must advance more than a mere 'plausible contention' that its conduct is expressive." Id. (internal citation omitted).

Plaintiffs allege that they were present in Zuccotti Park "in connection with the six month anniversary of the OWS movement." (FAC ¶¶ 157, 175, 196). While they do not explicitly state that they were "protesting for" or "supporting" or "engaging in political speech with" the OWS movement, they assert that they "participated in a First Amendment Assembly." (FAC ¶ 2). In the context of the FAC, the Court finds it reasonable to infer that plaintiffs used the phrases "in connection with six-month anniversary of the OWS movement" and "participated in a First Amendment Assembly" as shorthand for alleging that they were present in Zuccotti Park with the intention of supporting the OWS movement and its political message. That inference also applies to Rocek, whom plaintiffs allege was volunteering as a street medic in connection with the OWS movement. (FAC ¶ 175). However, because plaintiffs' allege only that they were present in Zuccotti Park "in connection with" the six-month anniversary of OWS, the question remains whether

supportive presence at a political rally, without more, qualifies as expressive conduct.

Courts in this district have held that physical occupation of Zuccotti Park in connection with an OWS rally constitutes expressive conduct. Gersbacher v. City of New York, 14 cv 7600 (GHW), 2015 WL 5692178, at *8 (S.D.N.Y. Sept. 25, 2015); Meyers v. City of New York, 14 cv 9142 (ALC), 2015 WL 6503825, at *14 (S.D.N.Y. Oct. 27, 2015); cf. Pluma v. City of New York, 13 cv 2017 (LAP), 2015 WL 1623828, at *8 (S.D.N.Y. Mar. 31, 2015) (holding that plaintiff who admitted to being "a bystander and citizen journalist witnessing the event," rather than a protester in OWS, was not engaged in expressive conduct). This Court agrees with those holdings. The test for expressive conduct is whether "[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it." Johnson, 491 U.S. at 404. A fair reading of the FAC is that plaintiffs intended to convey a particularized message of political support for OWS with their presence in, and occupation of, Zuccotti Park. The Court also concludes that such a message would have been sufficiently clear to any passerby—even if plaintiffs were not shouting or holding signs. It is plausible to conclude that an individual that chooses to physically associate with the OWS movement in its iconic locale on its six-month anniversary was engaging in expressive conduct protected by the First Amendment.

**\*11** Plaintiffs must also plausibly allege that defendants' actions against them were motivated or substantially caused by the exercise of their First Amendment rights and that defendant's actions caused them some injury. Regarding the third element—injury— plaintiffs can show "*either* that [their] speech has been adversely affected by the government retaliation or that [they have] suffered some other concrete harm." Dorsett, 732 F.3d at 160 (emphasis in the original). Criminal charges qualify as "some other concrete harm." See Smith v. Campbell, 782 F.3d 93, 100 (2d Cir. 2015) (holding that the "issuance of the tickets was an injury in that it subjected [plaintiff] to a state action requiring that she either appear in court, pay a fine, or both"). Defendants' arrest of Marom and Rocek qualifies as an injury to them because it both halted their speech immediately and subjected them to criminal charges.

Regarding the second element—that defendants arrested them *because* they were exercising their First Amendment rights—the FAC includes no factual content regarding

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 142 of 370
Marom v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 916424

the circumstances surrounding plaintiffs' arrests. The only pertinent allegation made in the FAC is that prior to being "violently" arrested by police, all three plaintiffs were "lawfully present" in Zuccotti Park "in connection with the six month anniversary of the OWS movement." (FAC ¶¶ 157, 175, 196). Marom and Rocek fail to describe any part of the interaction between themselves and the police or recount what they or the police were doing at or around the time they were arrested. While the law in no way requires plaintiffs' to set forth a detailed account of the events surrounding their claims in order to survive a motion to dismiss, it does require enough factual content to allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

A court in this district has previously held that a plaintiff involved in an OWS protest in 2011 adequately pled the second element of a retaliation claim by alleging only that officers arrested him while he was engaged in First Amendment speech. Meyers, 2015 WL 6503825, at *12; see also Gersbacher, 2015 WL 5692178, at *8 (denying motion to dismiss retaliation claim where plaintiff alleged he was arrested due to his participation in Occupy Wall Street). The district court based its holding on the Second Circuit's decision in Smith v. Campbell, 782 F.3d 93, 100 (2d Cir. 2015). In that case, the Circuit held that an officer's appearance at the plaintiff's house to deliver traffic tickets "mere hours" after plaintiff engaged in protected speech by complaining about the officer's prior conduct to his superiors "was sufficiently proximate to imply that the issuance of the tickets was motivated by [the plaintiff's] complaint." Campbell, 782 F.3d at 100. It was on that basis—the proximity in time between the plaintiffs' protected speech and the defendants' act—that the court in Meyers concluded that the plaintiff alleged a plausible retaliatory motivation for his arrest. Meyers, 2015 WL 6503825, at *12.

Even though the facts alleged by the plaintiff in her complaint in Smith v. Campbell provided ample factual support, beyond mere proximity in time, for the inference that the officer's conduct was in retaliation for the plaintiff's protected speech, 782 F.3d at 96, the Court concludes that Marom's and Rocek's allegation that they were "lawfully present in Liberty Plaza in connection with the six month anniversary of the OWS movement" and were subsequently arrested, (FAC ¶¶ 157-59, 175-77), is adequate to state a retaliatory motive. But see Anemone v. Metro. Transp. Auth., 629 F.3d 97, 120 (2d Cir. 2011) (affirming summary judgment denying a retaliation claim where the timing of allegedly impermissible action

"reflected instead the steady accumulation of misconduct" by plaintiff and not a retaliatory motive). Thus, Marom and Rocek have stated a plausible First Amendment retaliation claim. The Court acknowledges that the claim, like all claims, may look very different at the summary judgment stage and mere temporal proximity may ultimately prove to be insufficient for a reasonable jury to rule in Marom's and Rocek's favor.

### 2. Time, Place, and Manner Restriction.

**\*12** In addition to their retaliation claim, it appears that plaintiffs also challenge "the restrictions imposed by defendants on plaintiffs' First Amendment rights" as being unconstitutional time, place, and manner restrictions. (FAC ¶ 242).

> "[E]xpressive activity, even in a quintessential public forum, may interfere with other important activities for which the property is used. Accordingly, [the Supreme Court] has held that the government may regulate the time, place, and manner of the expressive activity, so long as such restrictions are content neutral, are narrowly tailored to serve a significant governmental interest, and leave open ample alternatives for communication."

Paulsen v. Gotbaum, 982 F.2d 825, 828 (2d Cir. 1992) (quoting Burson v. Freeman, 504 U.S. 191, 197 (1992)). It is not clear, however, what plaintiffs are asserting were improper time, place, and manner restrictions.

The FAC, read in a light most favorable to plaintiffs, could be alleging that the rules governing the use of Zuccotti Park were unconstitutional time, place, and manner restrictions. To that end, plaintiffs cite several zoning regulations that deal with a variety of issues regarding the park: the requirement that at least 50% of the sidewalk must be free of obstruction, (FAC ¶ 50), the process for making physical modifications to the park, (FAC ¶¶ 51-52), the requirement that all prohibitions on conduct in the park must be clearly posted in writing, (FAC ¶ 53), and the requirement that "public plazas shall be accessible to the public at all times, except where the [New York City Planning Commission] has authorized a nighttime closing," (FAC ¶ 55). However, plaintiffs make no allegations explaining how any of these regulations could plausibly be an improper time, place, and manner restriction on plaintiffs' First Amendment activity. They do allege that police erected barricades around Zuccotti Park beginning on November 15, 2011, (FAC ¶ 93), and "ratified and enforced arbitrary and

Marom v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 916424

shifting criteria determining who could enter the park," (FAC ¶ 94). But, plaintiffs fail to specifically identify any regulation or allege how that regulation was unconstitutional.

Instead, plaintiffs allege that defendants violated the rules regarding Zuccotti Park when arresting OWS protestors on March 17, 2012. And, to the extent the FAC is alleging that the NYPD's conduct itself was somehow an unconstitutional time, place, and manner restriction, plaintiffs only make reference to two actual "policies:" the No-Summons and MAPP policies. According to plaintiffs own complaint, however, those policies dealt with how arrested protestors would be processed by the NYPD. Plaintiffs do not claim that those policies were related to the decision to arrest OWS protestors in the first place. And, to the extent the police arrested plaintiffs in violation of the First Amendment, that constitutional deprivation is covered by plaintiffs' retaliation claim. In sum, even assuming that Zuccotti Park is a traditional public forum in which the First Amendment applies with full force, see Bogart v. City of New York, 13 cv 1017 (NRB), 2015 WL 5036963, at *9 (S.D.N.Y. Aug. 26, 2015) (describing that the recent decisions in this court involving OWS have assumed, but not clearly held that the First Amendment applies to Zuccotti Park), plaintiffs fail to identify any plausible unconstitutional time, place, and manner restriction.

G. Equal Protection Claim.

**\*13**  "There are several ways for a plaintiff to plead intentional discrimination that violates the Equal Protection Clause." Brown v. City of Oneonta, New York, 221 F.3d 329, 337 (2d Cir. 2000). A plaintiff could: (1) "point to a law or policy that expressly classifies persons on [an improper basis];" (2) "identify a facially neutral law or policy that has been applied in an intentionally discriminatory manner;" or, (3) "allege that a facially neutral statute or policy has an adverse effect and that it was motivated by discriminatory animus." Id. It appears from the FAC that plaintiffs are proceeding with an Equal Protection claim based on a selective enforcement theory.

"[A] violation of equal protection for selective enforcement would arise if: (1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person."

LaTrieste Rest. & Cabaret Inc. v. Vill. of Port Chester, 40 F.3d 587, 590 (2d Cir. 1994) (quoting LeClair v. Saunders, 627 F.2d 606, 609-10 (2d Cir. 1980)).

Plaintiffs claim the OWS protestors were subjected to different policing policies than other similarly situated individuals. In essence, plaintiffs allege that the City, through the supervisory defendants and the NYPD, implemented two different policies regarding persons detained and arrested for non-criminal violations. The first policy, the standard one codified in the NYPD's Patrol Guide, calls for individuals detained and arrested for non-criminal violations to be eligible "for release with a Universal Summons or DAT [Desk Appearance Ticket] rather than being held in custody for arraignment." (FAC ¶ 69). This would reduce the amount of time such individuals spent in custody to between two and four hours. (FAC ¶ 70). In contrast, plaintiffs allege that defendants used a second policy, which plaintiffs called the No-Summons Policy and MAPP, to specifically target OWS protestors detained and arrested at demonstrations and to deny them individual consideration for release with a summons. (FAC ¶ 64). Instead, the police centralized the processing of OWS protestors, created false documents regarding those protestors, and subjected them to unreasonably lengthy detention periods. (FAC ¶ 65).

Plaintiffs assert that they were subjected to these policing practices because of their political views. In other words, defendants arrested plaintiffs and refused to give them summonses because they intended to inhibit or punish plaintiffs for the exercise of their First Amendment rights. But, plaintiffs plead only conclusory allegations regarding defendants' intent to discriminate against plaintiffs. They allege no factual content that leads to a reasonable inference that defendants used the "No-Summons" and "MAPP" policies specifically against OWS protestors with an intent to discriminate against them or their political message. There is no non-conclusory allegation that defendants have any antipathy toward any aspect of the viewpoint of the OWS protestors. Conclusory allegations alone are not sufficient to establish a plausible equal protection claim. See Turkmen v. Hasty, 789 F.3d 218, 253-54 (2d Cir. 2015) (finding that claims of discriminatory intent are sufficient to defeat a motion to dismiss where plaintiffs alleged that high level officials condoned discriminatory actions by other officials).

Moreover, plaintiffs fail to adequately allege that they were in fact treated differently than other similarly situated persons. The Second Circuit has interpreted "similarly situated" to

Marom v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 916424

mean "a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical." Graham v. Long Island R.R., 230 F.3d 34, 40 (2d Cir. 2000). Plaintiffs fail to allege any comparative cases at all. Plaintiffs have also failed to adequately allege that defendants policed the March 17, 2012 OWS demonstration differently than other similarly large and disruptive demonstrations. In fact, while the FAC fails to allege that defendants used the standard policing policy during other similarly large demonstrations, it does allege that other large demonstrations not associated with OWS were subjected to policies similar to the "No-Summons" and "MAPP" policies. Specifically, plaintiffs allege that similar policies were used against demonstrations connected with the Republican National Convention in 2004. (FAC ¶¶ 29-45).

**\*14** Thus, even assuming that defendants utilized a non-standard policing policy on March 17, 2012, plaintiffs fail to plausibly allege that it was applied selectively against OWS or with an intent to discriminate against OWS protestors. Plaintiffs' equal protection claims do not survive a motion to dismiss.

### H. Personal Involvement of Named Defendants.

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (quoting Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)). Plaintiffs only surviving claims are Marom's and Rocek's false arrest and First Amendment retaliation claims and Fitzgerald's claim for excessive use of force. If the FAC fails to plausibly allege the personal involvement of the individual defendants' in each of those claims, those respective claims must be dismissed as to those particular defendants.

Prior to the Supreme Court's decision in Iqbal, the law in this Circuit regarding when a defendant was "personally involved" in a constitutional deprivation differentiated sharply between subordinate and supervisory officials. See Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986); Colon, 58 F.3d at 873. Any defendant, subordinate or supervisory, was liable under section 1983 if he or she "directly participated" in a constitutional deprivation. Williams, 781 F.2d at 323; see also Colon, 58 F.3d at 873. Supervisory officials, however, could also be liable for constitutional deprivations arising from conduct related to his or her supervisory responsibilities. Colon, 58 F.3d at

873. Specifically, the Circuit in Colon held that personal involvement of a supervisor may be established by evidence that:

> (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference ... by failing to act on information indicating that unconstitutional acts were occurring.

58 F.3d at 873. The "Colon test" permitted courts to find that supervisory officials were "personally involved" in any constitutional deprivation, regardless of the elements of the underlying constitutional provision at issue, if plaintiffs could prove any one of those five factors. See, e.g., Jenkins v. Garvin, 95 cv 3273 (JSM), 1997 WL 414128, at \*3 (S.D.N.Y. July 23, 1997) (recognizing that in a section 1983 claim premised on the Eighth Amendment a "prisoner may demonstrate the personal involvement of a supervisor by evidence that shows that the supervisor created or allowed the continuance of a policy under which the constitutional deprivation occurred or was grossly negligent in the supervision of a subordinate").

The Iqbal decision rejected Colon's one-size-fits-all "supervisory liability" test in the context of examining a claim of "invidious discrimination in contravention of the First and Fifth Amendments." 556 U.S. at 676. Emphasizing that "vicarious liability is inapplicable to Bivens and § 1983 suits," the Court held that a supervisory official could be found personally liable for a constitutional deprivation only on the basis of "his or her own misconduct." Id. at 676-77. The Court also held that the factors necessary to establish when a supervisor's actions constituted "misconduct" depended only on "the constitutional provision at issue." Id. at 675-76. For example, on a claim of discrimination in violation of the Fifth Amendment's equal protection component, a plaintiff

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 145 of 370

Marom v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 916424

must establish that each defendant acted with a discriminatory purpose.[4] Id. at 676. A plaintiff cannot establish that a supervisor was liable for discrimination simply by proving that the supervisor knew that a subordinate acted with a discriminatory purpose. Id. Where "purpose rather than knowledge is required to impose *Bivens* liability on the subordinate for unconstitutional discrimination; the same holds true for an official charged with violations arising from his or her superintendent responsibilities." Id. at 677.

[4]    The Supreme Court noted that Bivens actions are the "federal analog to suits brought against state officials under" section 1983. Iqbal, 556 U.S. at 675.

**\*15** The Second Circuit has yet to definitively address the impact of Iqbal on the Colon test in areas outside of discrimination. See Reynolds v. Barrett, 685 F.3d 193, 205 n.14 (2d Cir. 2012) (casting doubt on the Colon test); Raspardo v. Carlone, 770 F.3d 97, 117 (2d Cir. 2014) ("We have not yet determined the contours of the supervisory liability test, including the gross negligence prong, after Iqbal."). In the absence of binding precedent, district courts in this Circuit have divided into two camps. Some courts hold that Iqbal categorically eliminated the second, fourth, and fifth Colon factors. See, e.g., Bellamy v. Mount Vernon Hosp., 07 cv 1801 (SAS), 2009 WL 1835939, at \*6 (S.D.N.Y. June 26, 2009) aff'd sub nom. Bellamy v. Mount Vernon Hosp., 387 F. App'x 55 (2d Cir. 2010) ("Only the first and part of the third Colon categories pass Iqbal's muster—a supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred."). While other courts hold that the viability of the second, fourth, and fifth Colon factors depends on the underlying constitutional claim. See, e.g., Sash v. United States, 674 F. Supp. 2d 531, 544 (S.D.N.Y. 2009) ("Where the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth and Eighth Amendments, the personal involvement analysis set forth in Colon v. Coughlin may still apply."); Delgado v. Bezio, 09 cv 6899 (LTS), 2011 WL 1842294, at \*9 (S.D.N.Y. May 9, 2011) (holding that "where the claim does not require a showing of discriminatory intent, the *Colon* analysis should still apply, insofar as it is consistent with the particular constitutional provision alleged to have been violated") (internal quotation marks omitted). Neither sect, however, disputes the viability of the "direct participation" and "policy or custom" factors.

With regard to the disputed second, fourth, and fifth factors of the Colon test, this Court agrees with the latter group. The holding in Iqbal does not stand for the proposition that a supervisor can never be found personally liable for a constitutional deprivation on a showing that he was "grossly negligent" or "deliberately indifferent." It only requires that a supervisor's action—whether direct or through "his or her superintendent responsibilities"—must *itself* violate the terms of the constitutional provision at issue. Iqbal rejected the idea that subordinates and supervisors could be held to different standards of liability for violations of the same Constitutional right, which, to the majority, amounted to applying the forbidden vicarious liability standard under a different label. But, Iqbal does not insulate supervisors from liability for any act or omission that on its own satisfies "each element of the underlying constitutional tort." Turkmen v. Hasty, 789 F.3d 218, 250 (2d Cir. 2015). The Second Circuit's recent decision in Turkmen v. Hasty supports this reading of Iqbal. 789 F.3d at 250 (holding that plaintiffs stated a plausible 1983 claim for an Eighth Amendment deprivation against certain supervisory defendants whose conduct amounted to "deliberate indifference" because the "underlying constitutional violation requires no more than deliberate indifference").

In the present case, the surviving claims are for false arrest, First Amendment retaliation, and excessive force. Plaintiffs allege that the supervisory defendants were personally involved in each those violations. In line with the view stated above, the second, fourth, and fifth Colon factors should not be viable bases for holding the supervisory defendants liable for the First Amendment retaliation claims because those claims have an intent requirement. See Dorsett, 732 F.3d at 160 (holding that on a claim for First Amendment retaliation plaintiffs must show that a "defendant's actions were motivated or substantially caused by his exercise of [plaintiff's First Amendment rights]"). But, those factors may be viable when it comes to false arrest and excessive force claims because those claims have no state-of-mind requirement, only an objectively reasonable standard. It is not necessary, however, for the Court to weigh in definitively on which of the disputed Colon factors are viable for which claims because plaintiffs fail to plausibly allege any facts showing that the supervisory defendants were "grossly negligent" or "deliberately indifferent." Plaintiffs only plausibly allege that defendants "directly participated" in, and "created a policy or custom" allowing for, their constitutional deprivations.

Marom v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 916424

**\*16** Importantly, even if plaintiffs did establish that one of the supervisory defendants created a policy or custom under which a constitutional deprivation occurred, they "must also establish that the supervisor's actions were the proximate cause of the [their] constitutional deprivation." Raspardo, 770 F.3d at 116 (2d Cir. 2014). Section 1983 specifically extends liability to "every person who ... subjects, *or causes to be subjected*, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any [Constitutional rights.]" 42 U.S.C. § 1983 (emphasis added). The Supreme Court has interpreted this language to mean that "Congress did not intend § 1983 liability to attach where such causation was absent." Monell, 436 U.S. at 692. Causation incorporates the tort concept of proximate cause, a concept that has long turned on reasonable foreseeability. See City of Oklahoma City v. Tuttle, 471 U.S. 808, 833 (1985) ("Ordinary principles of causation used throughout the law of torts recognize that 'but for' causation, while probably a necessary condition for liability, is never a sufficient condition of liability."); See also Stanford v. Kuwait Airways Corp., 89 F.3d 117, 125 (2d Cir. 1996) (describing two concepts of foreseeability, with one, "the foreseeability of the specific injury the plaintiff suffered," being related to proximate cause). Where acts of third parties are involved, which will generally be the case in section 1983 claims where a supervisor's liability is premised only on her creation of a "policy or custom," the supervisor may be held liable for "those consequences attributable to *reasonably foreseeable* intervening forces." Warner v. Orange Cty. Dep't of Prob., 115 F.3d 1068, 1071 (2d Cir. 1996) (internal quotation marks omitted) (emphasis added). Thus, if the constitutional deprivation at issue was not a foreseeable consequence of any alleged policy or custom, or the deprivation was caused by some unforeseeable intervening event, plaintiffs have not stated a plausible claim against a supervisory defendant. See Victory v. Pataki, No. 13--3592, 2016 WL 373869, at \*15 (2d Cir. Feb. 1, 2016), as amended (Feb. 24, 2016) (affirming dismissal of claims against Governor Pataki for lack of personal involvement where plaintiff only alleges that Governor Pataki had a blanket policy of opposing parole to violent offenders, but does not allege that that policy led the Governor's staff "to intervene in parole decisions" or to ratify "the rescission procedures employed by the Board of Parole").

### 1. False Arrest.

#### i. Officers Galgano, Boyle, and Valentine.

Plaintiffs do not allege that Galgano or Boyle were personally involved in seizing Marom or Rocek from Zuccotti Park. However, they do allege that Galgano and Boyle were personally involved in creating the NYPD paperwork documenting Marom's and Rocek's arrests. (FAC ¶¶ 139-40). Galgano allegedly filled out the arresting paperwork for Marom, (FAC ¶ 139), and Boyle allegedly filled out the arresting paperwork for Rocek, (FAC ¶ 140). Plaintiffs also allege that the paperwork included "false statements" about what the officers allegedly saw. (FAC ¶¶ 144-45, 147). These allegations are adequate, at this stage, to support claims that Galgano "directly participated" in Marom's false arrest and Boyle "directly participated" in Rocek's false arrest.[5]

> 5
>
> Damages for a false arrest claim "cover the time of detention up until issuance of process or arraignment," Wallace v. Kato, 549 U.S. 384, 390 (2007), not just the initial seizure.

"Direct participation" means "intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal." Provost v. City of Newburgh, 262 F.3d 146, 155 (2d Cir. 2001). First, Galgano and Boyle intentionally participated in the respective arrests by filling out the arresting paperwork for each of those plaintiffs. Second, there is a plausible basis to infer that Galgano and Boyle knew that the arrests were unlawful, if indeed they were, because they were tasked with filing the arrests, which presumably included stating the basis for probable cause. While the FAC also alleges that Officer Valentine filled out the arresting paperwork for Fitzgerald, his false arrest claim does not survive the motion to dismiss. Beyond that, there are no allegations that Officer Valentine directly participated in the arrests of, or filled out the arresting paperwork for, Marom and Rocek.

In sum, Marom adequately alleges that Officer Galgano was personally involved in his false arrest and Rocek adequately alleges that Officer Boyle was personally involved in her false arrest.

#### ii. Supervisory Defendants.

Marom and Rocek also claim that the named "supervisory defendants"—Chief of Department Esposito, Deputy

2016 WL 916424

Inspector Winski, Lieutenant Viviano, Sergeant Blanco, and Legal Bureau attorney Charnyavsky—were personally involved in their false arrests.

The FAC alleges that Blanco and Charnyavsky met with and supervised Officers Galgano and Boyle in connection with processing Marom's and Rocek's arrests. (FAC ¶¶ 127-28). A supervisor can be personally liable if he "participated directly in the alleged constitutional violation." Colon, 58 F.3d at 873. "[O]rdering or helping others to do the unlawful acts, rather than doing them [oneself]," can constitute "direct participation." Provost, 262 F.3d at 155. Blanco and Charnyavsky allegedly gathered together and conferred with the arresting officers and eight other officers, and "conferred with each other about" what they had observed and what the charges were against plaintiffs. (FAC ¶ 114). And, Blanco and Charnyavsky allegedly "instructed" Officers Galgano and Boyle "regarding what to write in their NYPD arrest processing paperwork," including "creating false narratives." (FAC ¶¶ 115-17). Those allegations, coupled with the allegations that Officers Galgano and Boyle lied about conduct they allegedly did not see, (FAC ¶¶139-40), create a plausible claim that Blanco and Charnyavsky "participated directly in the" purported false arrests of Marom and Rocek with knowledge that they were unconstitutional. Colon, 58 F.3d at 873.

**\*17** Regarding Lieutenant Viviano, the FAC fails to plausibly allege that he was personally involved in Marom's and Rocek's false arrests. Plaintiffs allege that Viviano was responsible for ensuring the accuracy of Galgano's, Boyle's, and Valentine's arrest processing paperwork, (FAC ¶ 112), and that he "knew or should have known that the NYPD's March 17, 2012 mass arrest processing plans and/or practices would result in assigned arresting officers filling out NYPD and criminal court paperwork containing false allegations," (FAC ¶ 125). Neither of those allegations give rise to a plausible inference that Viviano directly participated in either false arrest or created any policy or custom.

Regarding Deputy Inspector Winski, the allegations establishing his personal involvement in the false arrests are substantially the same as those against Viviano. Plaintiffs merely allege that he was the second highest ranking NYPD Officer in the vicinity of Marom's and Rocek's arrests, (FAC ¶ 108); that he, or Defendant Esposito, or both, had the responsibility "to ensure that any arrest teams assigned to process arrests had definite knowledge of each arrest," (FAC ¶ 111); and, that he "knew or should have known that the

NYPD's March 17, 2012 mass arrest processing plans and/ or practices would result in assigned arresting officers filling out NYPD and criminal court paperwork containing false allegations," (FAC ¶ 125). Again, these allegations do not create a plausible inference that Winski directly participated in, or created a policy causing, the alleged unconstitutional arrests.

Lastly, regarding Chief of Department Esposito, plaintiffs' allegations fit into two categories. First, similar to the aforementioned allegations against Viviano and Winski, Marom and Rocek allege that Esposito was the highest ranking NYPD Officer "in the vicinity" of their arrests, (FAC ¶ 107), and that he was responsible for all supervisory decisions regarding all fellow officers at Zuccotti Park on March 17, 2012, (FAC ¶¶ 109-11). These allegations fail to state a plausible claim that Esposito "participated directly" in Marom's or Rocek's false arrest. Colon, 58 F.3d at 873.

Second, plaintiffs allege that Esposito "created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom." Colon, 58 F.3d at 873. They allege that between September 17, 2011 and March 17, 2012, Esposito was personally involved in planning for policing the OWS protests and in designing and implementing the NYPD's police responses to OWS. (FAC ¶ 61). They also allege that he met with the then-NYPD Commissioner on a regular basis to discuss the OWS protest and that during those meetings the City adopted the "No-Summons" and "MAPP" policies. (FAC ¶ 63-65). According to plaintiffs, the "MAPP" policy called for NYPD Legal Bureau and Criminal Justice Bureau agents to be involved in "the centralized processing of arrestees in a single mass arrest processing center," which led to the "creation of boilerplate NYPD documents containing false information."[6] (FAC ¶ 65). In an endeavor to connect the "MAPP" policy to Marom's and Rocek's allegedly false arrest, plaintiffs assert that Legal Bureau Attorney Charnavsky instructed Officers Galgano and Boyle to include false information in Marom's and Rocek's arresting documents.

6     The "No-Summons" policy, which was "related to OWS of denying persons arrested at demonstrations individual consideration for release with summonses," (FAC ¶ 64), only bears a causal relationship to the dismissed excessive detention claims.

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 148 of 370

Marom v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 916424

The allegations connecting Esposito to the "MAPP" policy and their attempts to connect the "MAPP" policy to Marom's and Rocek's false arrests are too attenuated to be a plausible basis for showing Esposito's personal involvement. First, the FAC does not "show[ ]" that Esposito was responsible for creating and implementing the "MAPP" policy other than the assertion that he was present during certain meetings with other high ranking NYPD and City decision makers.

 *18  Second, the FAC fails to plausibly allege that the "MAPP" policy proximately caused the falsified reports or false arrests. In a major population center, multiple individuals may violate the law at a single location and at approximately the same time. Those situations may dictate that the police arrest many people in a short span of time. Nothing is inherently unlawful or unconstitutional about creating a plan in advance to deal with such occurrences. There is nothing wrong with developing a uniform procedure for all arrests arising out of a large event. Nor is the use of boilerplate forms or specifically trained agents to facilitate the processing of multiple arrests inherently unlawful or unconstitutional. Of course, the entry of knowingly false information on any record, boilerplate or otherwise, is unlawful. The FAC, however, fails to plausibly allege how Esposito or the "MAPP" policy he allegedly created *caused* false information to be relied upon or recorded during the processing of Marom's and Rocek's arrests. Even assuming *arguendo* that certain defendants entered false information into Marom's and Rocek's arrest reports, plaintiffs fail to show how that intervening event was a reasonably foreseeable consequence of the so called "MAPP" policy.

In sum, plaintiffs' claims that Blanco and Charnyavsky were personally involved in the false arrest of Marom and Rocek survive the motion to dismiss, but their claims against Viviano, Winski, and Esposito do not.

### 2. First Amendment Retaliation.

Marom's and Rocek's claims for First Amendment retaliation also survive defendants' motion to dismiss. Those claims are functionally identical to plaintiffs' false arrest claims regarding the alleged basis for personal involvement of the named defendants, with support for the allegation of a retaliatory motive arising from the proximity in time between plaintiffs' expressive conduct and their arrests. Because both claims arise from the same factual allegations —defendants arrested Marom and Rocek without probable

cause because they were involved in the Occupy Wall Street protest on March 17, 2012—plaintiffs make identical contentions regarding how the named individual defendants were personally involved in those events. On that basis, the Court's analysis regarding the issue of personal involvement is the same on these claims as it was on the false arrest claims.

Thus, for the reasons explained above, plaintiffs adequately allege that Officer Galgano was personally involved in Marom's First Amendment retaliation claim and that Officer Boyle was personally involved in Rocek's First Amendment retaliation claim. Marom's and Rocek's claims that Blanco and Charnyavsky were personally involved in their retaliatory arrests also survives defendants' motion to dismiss. However, the claims that Viviano, Winski, and Esposito were personally involved in the plaintiffs' retaliatory arrests do not.

### 3. Excessive Force.

Fitzgerald's excessive force claim, as noted, also survives defendants' motion to dismiss. A single unidentified officer was allegedly responsible for the actual force used against Fitzgerald. (FAC ¶ 198). Nevertheless, Fitzgerald maintains that Officers Galgano, Boyle, and Valentine and the "supervisory defendants" were personally involved in that use of excessive force.

### i. Officers Galgano, Boyle, and Valentine.

With regard to Officers Galgano and Boyle, plaintiffs do not allege that they saw Fitzgerald in Zuccotti Park, or otherwise participated in or witnessed the use of force against him. And, with regard to Officer Valentine, plaintiffs affirmatively state that he never saw Fitzgerald before Fitzgerald arrived at the Midtown South Precinct. (FAC ¶¶ 136-37). Therefore, the FAC does not plausibly allege that any of the officers were personally involved in the unconstitutional use of force against Fitzgerald. Fitzgerald's excessive force claim is dismissed as to Officers Galgano, Boyle, and Valentine.

### ii. Supervisory Defendants.

There are no allegations that any of the supervisory defendants participated directly in the use of force against Fitzgerald. The most Fitzgerald alleges is that the supervisory defendants were "in the vicinity" of Zuccotti Park during the

Case 5:24-cv-01237-DNH-MJK   Document 10   Filed 11/12/24   Page 149 of 370

Marom v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 916424

protest. For example, the FAC asserts that Esposito was "the highest ranking NYPD officer in the vicinity of Plaintiffs' arrests," (FAC ¶ 107), and that Winksi was "the second-highest-ranking NYPD officer in the vicinity of Plaintiffs' arrests," (FAC ¶ 108). It also alleges that "at least defendants Winski and Viviano were personally involved in OWS-related false arrests in the vicinity of Liberty Plaza." (FAC ¶ 150). These claims of presence in a "vicinity," in the context of a large protest in Zuccotti Park, do not plausibly allege direct participation in the use of excessive force against Fitzgerald.

**\*19** Plaintiffs do not plausibly allege a claim against Esposito. As already discussed, plaintiffs allege that defendant Esposito helped develop policing policies used in Zuccotti Park on March 17, 2012, (FAC ¶¶ 61, 63-65). They also allege, in a conclusory manner, that the use of force by police in making arrests was excessive or "extreme." (FAC ¶ 86). However, plaintiffs fail to draw any causal connection between the "No-Summons" and "MAPP" policies, which deal with methods of arrest processing and post-arrest disposition, and the use of force against OWS protestors. (FAC ¶ 86). Plaintiffs allege that Esposito helped design similar policing policies for the 2004 RNC protests and that those policies resulted in the use of excessive force by police against many arrestees in 2004. (FAC ¶¶ 30-39). But again, the FAC fails to plausibly allege that the policies were the proximate cause of the use of force against Fitzgerald during this OWS protest. Instead, the facts alleged in the FAC give rise to the reasonable inference that the actual use of force was an unforeseeable intervening act. There is nothing alleged about any of the cited policies from which a police supervisor could reasonably foresee that subordinate officers would use excessive force by reason of those policies. Rule 8(a) requires a party to set forth or "show[ ]" facts that make the allegation plausible. Apart from conclusory allegations, the FAC does not permit a reasonable inference that Esposito created or continued policies that caused the excessive use of force against Fitzgerald.

In sum, plaintiffs do not plausibly allege a basis for holding any of the named individual defendants personally liable for the excessive use of force against Fitzgerald and the claim is dismissed as to them all.

### I. Failure to Intervene.
Plaintiffs also claim that the named individual defendants are liable for failing to intervene to prevent plaintiffs' alleged constitutional deprivations. Specifically, Marom alleges that the supervisory defendants and Officers Boyle and Valentine

failed to intervene to protect his rights; Rocek alleges that the supervisory defendants and Officers Galgano and Valentine failed to intervene to protect her rights; and, Fitzgerald alleges that the supervisory defendants and Officers Galgano and Boyle failed to intervene to protect his rights. Because a "failure to intervene [ ] claim is contingent upon the disposition of the primary claims underlying the failure to intervene claim," Matthews v. City of New York, 889 F. Supp. 2d 418, 443-44 (E.D.N.Y. 2012); see also Feinberg v. City of New York, 99 cv 12127 (RC), 2004 WL 1824373, at \*4 (S.D.N.Y. Aug. 13, 2004), plaintiffs' failure to intervene claims are assessed only as they relate to Marom's and Rocek's false arrest and First Amendment retaliation claims and Fitzgerald's excessive force claim.

"All law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." Anderson, 17 F.3d at 557. "An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used, [ ] (2) that a citizen has been unjustifiably arrested [ ] or (3) that any constitutional violation has been committed by a law enforcement official [ ]." Id. However, "[i]n order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring." Id.

### 1. False Arrest Claims.
Rocek alleges that Officers Galgano and Valentine failed to intervene in her unlawful arrest and Marom alleges that Officers Boyle and Valentine failed to intervene in his unlawful arrest. Specifically, the FAC alleges that Galgano, Boyle, and Valentine "gathered together and conferred with each other about what they had observed and what the charges were" regarding Marom and Rocek, prior to filing formal arresting paperwork and further detaining the two plaintiffs. (FAC ¶ 114). On that basis, Rocek plausibly alleges that Galgano and Valentine had a realistic opportunity to intervene in her false arrest and Marom plausibly alleges that Boyle and Valentine had a realistic opportunity to intervene in his false arrest.

Marom and Rocek also allege that the supervisory defendants failed to intervene to stop their false arrests. As an initial matter, Marom and Rocek plausibly allege that Blanco and Charnyavsky were personally involved in their false arrests. Those defendants cannot be liable for both the underlying constitutional deprivation and a failure to intervene to

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 150 of 370

Marom v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 916424

stop themselves from committing that violation. Regarding Viviano's, Winski's, and Esposito's failure to intervene in Marom's and Rocek's false arrest, the two plaintiffs fail to allege any facts showing that those three supervisory defendants were present during any part of the arrest or arrest processing of Marom and Rocek. For that reason, there is no basis to infer that Winski, Viviano, or Esposito had "a realistic opportunity to intervene to prevent" the false arrests from occurring and there is no plausible failure to intervene claim pled against those defendants.

### 2. First Amendment Retaliation Claims.

**\*20** As previously explained, Marom's and Rocek's claims for First Amendment retaliation arise from the same factual allegations as their false arrest claim—defendants arrested Marom and Rocek without probable cause because they were involved in the Occupy Wall Street protest after which Officers Galgano, Boyle, and Valentine, along with Sergeant Blanco and attorney Charnyavsky, gathered together to discuss filing the arresting paperwork for both plaintiffs. As a result, the allegations as to how each of the named defendants are liable for a failure to intervene to prevent Marom's and Rocek's First Amendment retaliation claims are the same as for their false arrest claims. The Court's analysis regarding the plausibility of the failure to intervene claims is the same as well. Marom plausibly alleges that Officers Boyle and Valentine are liable for failing to intervene to prevent his retaliatory arrest and Rocek plausibly alleges that Officers Galgano and Valentine are liable for failing to intervene to prevent her retaliatory arrest. But, neither Marom nor Rocek plausibly allege that Winski, Viviano, or Esposito failed to intervene.

### 3. Excessive Force Claim.

Fitzgerald fails to plausibly allege that any of the named defendants are liable for failing to intervene to prevent the use of excessive force against him. With regard to Officers Galgano and Boyle, Fitzgerald does not allege that they saw him in Zuccotti Park, nor does he allege that they participated in or witnessed the use of force against him. With regard to Officer Valentine, Fitzgerald affirmatively states that he never saw Fitzgerald before Fitzgerald arrived at the Midtown South Precinct. (FAC ¶¶ 136-37). And, regarding the supervisory defendants, Fitzgerald fails to allege that any of the supervisory defendants were present at the actual scene of Fitzgerald's arrest with a "realistic opportunity" to prevent the use of force.

### J. Monell Claims.

Finally, plaintiffs assert that the City of New York is liable for the deprivation of their constitutional rights. "In order to establish municipal liability, 'a plaintiff must show that the violation of his constitutional rights resulted from a municipal custom or policy.'" DeCarlo v. Fry, 141 F.3d 56, 61 (2d Cir. 1998) (quoting Ricciuti v. New York City Transit Auth., 941 F.2d 119, 122 (2d Cir.1991)). A municipality may not be held liable on section 1983 claims solely "by application of the doctrine of *respondeat superior*." Pembaur v. City of Cincinnati, 475 U.S. 469, 478 (1986). Instead, municipal liability can be found where: (1) "a particular municipal action *itself* violates federal law, or directs an employee to do so," Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown, 520 U.S. 397, 404 (1997) (emphasis in original), (2) an "authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right," Id. at 405, (3) unconstitutional "practices [are] so persistent and widespread as to practically have the force of law," Connick v. Thompson, 563 U.S. 51, 61 (2011), and (4) where a municipality's failure to train its employees about their legal duty to avoid violating a citizen's rights amounts to "deliberate indifference," Id. In any case, "a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." Bryan Cty., 520 U.S. at 404.

To succeed in plausibly alleging a claim for municipal liability against the City of New York, the FAC must demonstrate a "direct causal link between" a municipal action and one of the surviving claims: (1) Marom's and Rocek's false arrest claims, (2) Marom's and Rocek's First Amendment retaliation claims, and (3) Fitzgerald's excessive force claim. Plaintiffs list nine potential policies and practices of the City of New York that they believe are bases for municipal liability, (FAC ¶ 269), as well as one claim that the City failed to properly train its police officers. The Court will first address the various alleged municipal practices and then will address the failure to train theory.

### 1. Municipal Policies and Practices.

**\*21** When alleging a Monell claim based on the existence of a municipal policy or practice, plaintiffs must show that the practice causing the deprivation of federal rights is "so persistent and widespread as to practically have the force of law." Connick, 563 U.S. at 61. Generally, "a single incident alleged in a complaint, especially if it involved only actors below the policy making level, does not suffice to show a

Case 5:24-cv-01237-DNH-MJK   Document 10   Filed 11/12/24   Page 151 of 370

Marom v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 916424

municipal policy." DeCarlo, 141 F.3d at 61. "[T]he mere assertion that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference." Zahra v. Town of Southold, 48 F.3d 674, 685 (2d Cir.1995) (alterations omitted) (quoting Dwares v. City of N.Y., 985 F.2d 94, 100 (2d Cir.1993)).

Three of the alleged municipal policies and practices bear no direct causal link to the constitutional deprivations implicated in the surviving claims. First, the alleged practice of using "arrests and full-blown arrest processing in lieu of issuing summonses for summons-eligible offenses," (FAC ¶ 269g), has no connection to Marom and Rocek being arrested without probable cause, or in retaliation for their speech, or with Fitzgerald being subjected to excessive force. That alleged practice is possibly related to plaintiffs' excessive detention claims, but those have been dismissed.

Second, the alleged practice of "assigning 'arrest teams' of officers who had not witnessed the conduct allegedly giving rise to the need for arrests to 'process' the arrests of multiple arrestees, including by filing out NYPD paperwork and swearing out accusatory instruments containing false information," (FAC ¶ 269h), may relate to plaintiffs' malicious abuse of process or right to a fair trial claims because of the implication that materials were regularly falsified, but neither of those underlying claims has survived the motion to dismiss.

Third, the alleged practice of "inserting NYPD Legal Bureau and CJB agents into a special Mass Arrest Processing Plan using a centralized Mass Arrest Processing Center that manufactured false business and court records after the fact," (FAC ¶ 269i), similarly may relate to plaintiffs' dismissed malicious abuse of process and fair trial claims, but has no plausible causal link to the surviving claims.

In contrast, the remaining six alleged municipal policies and practices bear some plausible connection to plaintiffs surviving claims. Plaintiffs allege that the City has practices whereby the NYPD applies the prohibition against "violation-level trespass," (FAC ¶ 269e), and the prohibition on disorderly conduct, (FAC ¶ 269f), against protestors without justification. And, that the City has a practice of treating groups of protestors as a "unit" for "mass arrest" without first giving meaningful notice or opportunities for dispersal. (FAC ¶ 269d). Presumably, plaintiffs are alleging that these three practices regularly lead to false arrests.

Similarly, plaintiffs allege that the City has two practices whereby the NYPD unreasonably restricted protected activities in Zuccotti Park between September 2011 and March 17, 2012, (FAC ¶ 269a), and continually fails to provide adequate opportunities to disperse before arresting protestors engaged in First Amendment activity, (FAC ¶ 269b). Presumably, plaintiffs are alleging that these practices led, and continue to lead, to retaliatory arrests without probable cause. Plaintiffs also allege that there is an NYPD policy and practice of using excessive force against protestors. (FAC ¶ 269c).

For each of these policies, Plaintiffs fail to allege sufficient factual content allowing for the plausible inference that any one of them were "so persistent and widespread as to practically have the force of law." Connick, 563 U.S. at 61. Plaintiffs allege that these policies were "persistent and widespread" on the basis of purported connections to the events of prior demonstrations. For example, the FAC includes allegations that, during the RNC protests in 2004, the City's "crowd and disorder control planning" and "mass arrest and mass arrest processing plans" led to mass arrests, a failure to make individualized probable cause determinations, and excessive force. (FAC ¶¶ 37-39). And, it cites, in blunderbuss fashion, a number of lawsuits brought against the City for actions during that and various other protests in the early 2000s. (FAC ¶ 26). Plaintiffs, however, fail to assert which—if any—of those lawsuits led to findings of liability against the City for false arrests, First Amendment retaliatory arrests, or excessive force. According to the FAC, only one of the referenced cases led to any finding of guilty or liability: a conviction of a police officer for falsifying police records. (FAC ¶ 26, citing People v. Pogan, 06416-2008 (Sup. Ct. N.Y. Co.)). Plaintiffs also fail to specifically connect any of the mentioned lawsuits or the RNC allegations to the specific policies and practices they allege in their Monell claims in this action. On that basis, the FAC lacks sufficient factual content tending to show, even circumstantially, the existence of municipal policies and practices responsible for the plaintiffs constitutional deprivations.

### 2. Failure to Train.

**\*22** Plaintiffs' last theory of Monell liability is based on the City's failure to train its police officers about their legal duty to avoid violating a citizen's rights—namely, using excessive force and making false or retaliatory arrests during mass protests. See Connick, at 61. They allege that the City, through its agents in the NYPD, knew or should have

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 152 of 370
Marom v. City of New York, Not Reported in Fed. Supp. (2016)
2016 WL 916424

known that the mass arrest policies used in 2004 during the RNC protests led officers to use excessive force against protestors and to falsely arrest protestors for engaging in First Amendment activity. (FAC ¶¶ 42-45). And, that the City thereafter failed to properly train officers to ensure that similar constitutional deprivations would not occur under comparable circumstances again—such as the March 17, 2012 "raid" on Zuccotti Park. (FAC ¶ 45).

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." Connick, 563 U.S. at 61. Plaintiffs must show that a municipality's failure to train its employees amounted to "deliberate indifference." Id. "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Id. (quoting Bryan Cty., 520 U.S., at 410). Generally, "[a] pattern of similar constitutional violations by untrained employees is [ ] necessary to demonstrate deliberate indifference for purposes of failure to train." Id. at 62 (internal quotation marks omitted). A plaintiff must also "demonstrate that the policymaker's inaction was the result of conscious choice and not mere negligence." Cash v. Cty. of Erie, 654 F.3d 324, 334 (2d Cir. 2011) (internal quotation marks omitted). "[D]eliberate indifference may be inferred where the need for more or better supervision to protect against constitutional violations was obvious, [ ], but the policymaker fail[ed] to make meaningful efforts to address the risk of harm to plaintiffs." Id. (internal citations and quotation marks omitted).

At the motion to dismiss stage, the Second Circuit utilizes a three-prong test to determine whether plaintiffs have demonstrated a municipality's "deliberate indifference" in the context of a failure to train claim. Walker v. City of New York, 974 F.2d 293, 297-98 (2d Cir. 1992). "First, the plaintiff must show that a policymaker knows to a moral certainty that her employees will confront a given situation." Id. at 297 (internal quotation marks omitted). "Second, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation." Id. And, third, "the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." Id. at 298. Where all three elements are established a plaintiff has stated a plausible Monell claim based on a failure to train. Id.; see also Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 130 n. 10 (2d Cir. 2004).

Plaintiffs have failed to make this threshold showing. It is plausible to infer from the FAC, and is matter of general common sense, that NYPD decision makers are aware that their officers, at some point, will need to arrest protestors taking part in a large demonstration. (FAC ¶¶ 29, 59-64), and that NYPD officers mishandling large protests could cause constitutional deprivations, (FAC ¶¶ 26, 38-40). However, plaintiffs fail to plausibly allege that there is a history of the NYPD mishandling mass protesting situations on a scale that could be reasonably construed as setting out a pattern or practice of constitutional abuse.

As previously explained, plaintiffs only factual support for the assertion that there is a pattern of the NYPD causing similar constitutional deprivations are the allegations about the 2004 RNC protests and the mention of various other section 1983 lawsuits brought against the City. (FAC ¶¶ 26, 37-39, 42). However, the allegations regarding the RNC protest are plaintiffs' own conclusions, unsupported by facts, that the NYPD's actions in 2004 caused a substantial number of constitutional violations. And, the allegations concerning previous section 1983 lawsuits fail to explain which—if any—lawsuits led to findings of liability against the NYPD for constitutional violations, beside the one conviction of an NYPD officer. (FAC ¶ 26). They also do not allege that testimony was taken during any of those lawsuits that shows a pattern and practice of constitutional abuse. Plaintiffs do cite a joint study produced by The Global Justice Clinic at NYU Law School and the Walter Leitner International Human Rights Clinic at Fordham Law School, but that paper references 130 "alleged incidents of physical force [in New York City] ... which warrant investigation by authorities." (Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street (July 25, 2015), p.1, http://hrp.law.harvard.edu/criminal-justice/suppressing-protest-human-rights-violations-in-the-us-response-to-occupy-wall-street/). Neither a newspaper report nor an academic paper reporting on incidents that ought to be investigated is a showing of anything entitled to a presumption of truth.

**\*23** In sum, plaintiffs fail to plausibly allege the City, through the NYPD, engaged in a pattern or practice of similar constitutional deprivations against protestors. See Pluma, 2015 WL 1623828, at \*12 (holding that allegations of a "handful of dissimilar incidents occurring over the course of more than a decade is too sparse to put the City on notice that the NYPD's training program produces officers who are likely

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 153 of 370

Marom v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 916424

to commit constitutional violations through their deployment of pepper spray"); cf. Connick, 563 U.S. at 62 (holding that four overturned Brady convictions "could not have put [the defendant] on notice that the office's *Brady* training was inadequate with respect to the sort of *Brady* violation at issue here"). In addition, plaintiffs allege no facts explain how policing the OWS protest "presents [NYPD officers] with a difficult choice of the sort that training or supervision will make less difficult." While the bar at this early stage of litigation is modest, See Amnesty Am., 361 F.3d at 130 n.10 (interpreting Walker test to have held that, at the motion to dismiss stage, plaintiffs are not required to identify a specific deficiency in a municipality's training program or to establish a causal link between the lack of training and the misconduct to establish a failure to train claim), plaintiffs' simply do not meet the standard of plausibility on this, or any other, theory of Monell liability.

CONCLUSION

Defendants' motion to dismiss is granted in part and denied in part. Specifically, all claims are dismissed except for:

(1) Yotam Marom's false arrest and First Amendment retaliation claims against defendants Galgano, Blanco, and Charnyavsky and the unidentified defendants who physically arrested him, as well as his related failure to intervene claims against defendants Boyle and Valentine; (2) Miriam Rocek's false arrest and First Amendment retaliation claims against defendants Boyle, Blanco, and Charnyavsky, and the unidentified defendants who physically arrested her, as well as her related failure to intervene claims against defendants Galgano and Valentine; and, (3) Don Fitzgerald's claim for excessive use of force against the unidentified defendants who hit him. All claims against the City of New York, Winski, Viviano, and Esposito are dismissed and they are no longer parties to this action.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 916424

---

2012 WL 1077762

🚩 KeyCite Yellow Flag - Negative Treatment
Distinguished by Romero v. Courten, E.D.N.Y., July 30, 2024

2012 WL 1077762
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Luqman ABDUL–RAHMAN, Plaintiff,
v.
The CITY OF NEW YORK, et al., Defendants.

No. 10 Civ. 2778.
|
March 30, 2012.

Memorandum and Order

GLASSER, District Judge.

**\*1** Plaintiff Luqman Abdul–Rahman ("plaintiff" or "Rahman") brought this action against Police Officer Christopher Goodwin, Captain James Fulton, Sergeant Ronald Smith, Detective Gary Gillespie, Police Officer Richard Baez, Detective Jeremy DeMarco, Police Officer Ariel Ortiz, Police Officer Alexander Melandez ("the individual defendants"), and the City of New York (collectively, "defendants"), pursuant to the Civil Rights Act of 1866, 42 U.S.C. §§ 1983 & 1985(3), and New York State law, alleging false arrest, excessive force, illegal search and seizure, retaliation, malicious prosecution, denial of fair trial, conspiracy, negligence, and intentional and negligent infliction of emotional distress. Before the Court is defendants' motion for judgment on the pleadings, pursuant to Federal Rule of Civil Procedure 12(c). For the following reasons, defendants' motion should be GRANTED.

**BACKGROUND**

The following facts are undisputed and drawn from the complaint and documents of which the Court may take judicial notice. On the morning of May 20, 2008, members of the Brooklyn South Narcotics Division, including Police Officer Christopher Goodwin ("Officer Goodwin"), went to a United Parcel Service ("UPS") station in Brooklyn, New York with a canine unit to search for a package alleged to contain narcotics. Am. Compl. ¶ 17. The canine positively identified a cardboard box addressed to Jason Hilton, 1745 President Street, Apartment 6D, Brooklyn, New York ("Apartment 6D"). Officers seized the package and brought it to the 71st Precinct where it was examined and found to contain between ten and fifteen pounds of marihuana. Id. ¶ 18.

At 12:15 p.m. on May 20, 2008, Officer Goodwin appeared before the Supreme Court of the State of New York to obtain a search warrant for Apartment 6D. Am. Compl. ¶ 19; Declaration of John S. Schowengerdt dated August 12, 2011 ("Schowengerdt Decl."), Ex. G. A warrant was subsequently issued, authorizing the search of Apartment 6D and of any persons entering or exiting the premises during the warrant execution. Schowengerdt Decl. Ex. H.

At 12:32 p.m., Captain James Fulton ("Capt.Fulton"), dressed as a UPS worker, delivered the package containing marihuana to Apartment 6D on the sixth floor. An occupant of the apartment, Jeffrey Francois ("Francois"), opened the door, identified himself as the addressee, Jason Hilton, and accepted the package. Am. Compl. ¶ 21; Schowengerdt Decl. Ex. L at 250. Rahman was inside Apartment 6D at the time of the delivery. Id. at 249–50.

Approximately three minutes after Capt. Fulton made the delivery, a man named Castillo exited a nearby apartment and entered Apartment 6D. Schowengerdt Decl. Ex. L at 249. Shortly after Castillo entered the apartment, Rahman left the apartment carrying the box of marihuana, ran up to the seventh floor landing near the roof, dropped the box, and then returned to the sixth floor. Id. at 250, 262. Police did not see Rahman carrying the box up the stairs but a security camera, later obtained and viewed by police, recorded that event. Id. 261–262; Schowengerdt Decl. Ex. I (Criminal Complaint for docket # 2008KN037814).

**\*2** Police did, however, see Rahman return to the apartment and Mr. Castillo then exited the apartment. The two men were intercepted by Detective Gary Gillespie ("Det.Gillespie') coming up the staircase from the fifth floor. Schowengerdt Decl. Ex. L at 250–51, 261. With firearm drawn, Det. Gillespie arrested Rahman and ordered him to lie down on the ground. Am. Compl. ¶ 22; Schowengerdt Decl. Ex. L at 251, 261–63. Tight handcuffs were placed on Rahman, causing "numbness and marks to his wrists." Id. ¶¶ 30, 32. Det. Gillespie and other officers entered the apartment, where they encountered a number of occupants who they placed under arrest. Am. Compl. ¶ 26. They searched the

entire apartment, seizing drug paraphernalia. *Id.* ¶ 28. The package of marihuana was later recovered where Rahman left it. Schowengerdt Decl. Ex I. At approximately 1:30 p.m., Officer Goodwin arrived at the apartment with the search warrant. Am. Compl. ¶ 29.

Rahman was brought to the 71st Precinct, where he was processed, and then taken to Brooklyn Central Booking where he was charged with criminal possession of marihuana in the first, second, third, fourth, and fifth degrees, and unlawful possession of marihuana. *Id.* ¶¶ 35–38; Schowengerdt Decl. Ex I. A grand jury indicted Rahman on July 19, 2008. Am. Compl. ¶ 39; Schowengerdt Decl. Ex. K (Grand Jury Indictment No. 5111/2008). Rahman was tried in the state court and acquitted on June 30, 2009. Am. Compl. ¶ 45; *see People of the State of New York v. Rahman Lugman,* No. 5111–2008 (N.Y. June 29, 2009).

### DISCUSSION

**I. Standard of Review**
Before it can determine the appropriate standard of review to be applied to the defendants' motion, the Court must decide whether to treat it as one for judgment on the pleadings pursuant to Rule 12(c) or a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. If, on a motion for judgment on the pleadings, "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed.R. Civ. P. 12(d). As indicated by the word 'must,' "the conversion of a Rule [12(c)] motion into one for summary judgment under Rule 56 when the court considers matters outside the pleadings is 'strictly enforce[d]' and 'mandatory.' " *Global Network Commc'ns, Inc. v. City of New York,* 458 F.3d 150, 155 (2d Cir.2006) (quoting *Amaker v. Weiner,* 179 F.3d 48, 50 (2d Cir.1999); *Goldman v. Belden,* 754 F.2d 1059, 1066 (2d Cir.1985)).

Plaintiff, taking note of the fact that the documents attached in support of defendants' motion are not attached as exhibits to the Amended Complaint, argues they "have erroneously submitted a motion for summary judgment in the guise of a motion to dismiss on the pleadings." Pl.'s Mem. at 10. Plaintiff urges the Court to deny the motion as premature because he has not yet had an opportunity to complete discovery. Defendants assert that he is wrong.

**\*3** In deciding a motion for judgment on the pleadings, the court considers "the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case." *Roberts v. Babkiewicz,* 582 F.3d 418, 419 (2d Cir.2009). "A complaint is deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." *Sira v. Morton,* 380 F.3d 57, 67 (2d Cir.2004) (citations omitted) (quoting *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002)). The court may also look to public records for limited purposes. *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007) ("If the court takes judicial notice, it does so in order to determine what statements they contained ... not for the truth of the matters asserted.").

In this case, the Court need not convert the defendants' motion to one for summary judgment. All the facts recounted previously or set forth below that are not alleged in the Amended Complaint are undisputed and drawn from materials of which both parties had notice. *See Chambers,* 282 F.3d at 153 ("[G]enerally, the harm to the plaintiff when a court considers material extraneous to a complaint is the lack of notice that the material may be considered."). Defendants have submitted a number of public records from plaintiff's criminal file as exhibits. *See* Schowengerdt Decl. Ex. G, H, I, J, & K. The search warrant, criminal complaint, and indictment are clearly appropriate for consideration in deciding a Rule 12(c) motion because plaintiff had possession of these documents, incorporated them by reference in the Complaint, and their authenticity is not in question. *See* Am. Compl. ¶¶ 19, 29 (Warrant); ¶ 38 (Criminal Complaint); ¶ 39 (Indictment).

Defendants also submitted transcripts from plaintiff's trial, consisting of the sworn testimony of Capt. Fulton and plaintiff, who testified in his own defense. *See* Schowengerdt Decl. Ex. F & L. Among other things, plaintiff's testimony provided an account of his actions between the time that the police delivered marihuana to the apartment and the time police arrested him. For the reasons discussed below, this testimony leads inescapably to the conclusion that police had probable cause to arrest, search, and cause plaintiff to be indicted. This testimony is directly relevant to the Complaint's allegations and plaintiff was plainly aware of his prior testimony when drafting the Amended Complaint. Notably, plaintiff has not disavowed his prior testimony nor has he offered a contradictory set of facts. Plaintiff

argues that this testimony may not be considered without converting the motion into one for summary judgment. He is wrong. His testimony is admissible as party admissions made in public records whose authenticity is not in dispute. *See, e.g., Munno v. Town of Orangetown,* 391 F.Supp.2d 263, 269 (S.D.N.Y.2005) (taking judicial notice, without converting motion to one for summary judgment, of plaintiff's affidavits and pleadings in a related state court action where the documents contradicted the factual allegations contained in the complaint); *Harris v. New York State Dep't of Health,* 202 F.Supp.2d 143, 173 (S.D.N.Y.2002) ("[T]he Court may take judicial notice of admissions in pleadings and other documents in the public record filed by a party in other judicial proceedings that contradict the party's factual assertions in a subsequent action."); *5–Star Mgmt., Inc. v. Rogers,* 940 F.Supp. 512, 518 (E.D.N.Y.1996) (taking judicial notice, without converting motion to one for summary judgment, of plaintiff's admission during testimony in another proceeding). The plain purpose of the exception is to "prevent[ ] plaintiffs from generating complaints invulnerable to Rule 12(b)(6) simply by clever drafting." *Global Network Comm'ns, Inc. v. City of New York,* 458 F.3d 150, 157 (2d Cir.2006); *see also Cortec Indus., Inc. v. Sum Holding, L.P.,* 949 F.2d 42, 44 (2d Cir.1991).

**\*4** In *5–Star Management,* the court observed that judicial notice generally does not extend to the truth of the matter asserted in public records. 940 F.Supp. at 519. However, the court found exceptional circumstances permitted it to consider the plaintiff's prior testimony in state court for its truth because the plaintiff made a critical admission that bore substantially upon the legal sufficiency of the complaint and the plaintiff, despite an opportunity to respond, had not contested the defendants' factual characterization of those admissions. That observation is plainly applicable here and the Court may consider plaintiff's testimony in the prior state court proceedings in deciding this motion. However, the testimony of Capt. Fulton does not fall within that narrow exception and, along with the report prepared by Detective Charles Fico, Schowengerdt Decl. Ex. D, and the memo book prepared by Officer Goodwin, *id.* Ex. E, it is excluded as inappropriate for consideration on a 12(c) motion.

A. Rule 12(c)

Federal Rule of Civil Procedure 12(c) provides, in pertinent part, that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed.R.Civ.P. 12(c). "The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical

to that of a Rule 12(b)(6) motion for failure to state a claim." *Patel v. Contemporary Classics of Beverly Hills,* 259 F.3d 123, 126 (2d Cir.2001). At the outset, it must be noted that a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). "While a complaint ... does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555 (alteration, citations, and internal quotation marks omitted). Instead, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Iqbal,* 129 S.Ct. at 1950 (2009) (second alteration in original) (quoting Fed.R.Civ.P. 8(a)(2)).

The Court accepts as true all factual allegations contained in the Amended Complaint and draws all reasonable inferences in the plaintiff's favor. *Ziemba v. Wezner,* 366 F.3d 161, 163 (2d Cir.2004). Judgment on the pleadings "is appropriate where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings." *Sellers v. M.C. Floor Crafters Inc.,* 842 F.2d 639, 642 (2d Cir.1988).

## II. The Civil Rights Act

**\*5** Section 1983 governs civil rights actions against a person acting under color of state law who "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws of the United States." *See Patterson v. Cnty. of Oneida,* 375 F.3d 206, 225 (2d Cir.2004). "The statute itself is not a source of substantive rights but merely provides 'a method for vindicating federal rights elsewhere conferred.' " *Fowlkes v. Rodriguez,* 584 F.Supp.2d 561, 572 (E.D.N.Y.2008) (quoting *Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)). Here, plaintiff claims a violation of his First, Fourth, Fifth, Sixth, and Fourteenth Amendment rights. New York law provides the elements of the relevant

causes of action. *See, e.g., Singer v. Fulton Cnty. Sheriff,* 63 F.3d 110, 118 (2d Cir.1995) (false arrest); *Cook v. Sheldon,* 41 F.3d 73, 80 (2d Cir.1994)* (malicious prosecution); *Humphrey v. Landers,* 344 F. App'x 686, 688 (2d Cir.2009) (excessive force).

### A. First Claim: False Arrest and Unlawful Search

1. False Arrest

Plaintiff alleges that the individual defendants violated his Fourth Amendment rights because they arrested him without probable cause. Under New York law, the elements of a false arrest claim are "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Singer,* 63 F.3d at 118. Only the fourth element, which embraces probable cause, is in dispute.

The existence of probable cause to arrest " 'is a complete defense to an action for false arrest,' whether that action is brought under state law or under Section 1983." *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996) (citing *Broughton v. State,* 37 N.Y.2d 451, 458, 373 N.Y.S.2d 87, 335 N.E.2d 310 (1975). Probable cause is "a fluid concept ... not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates,* 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). It exists, "when the officers have knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." *Manganiello v. City of New York,* 612 F.3d 149, 161 (2d Cir.2010). What is required is a "probability or substantial chance of criminal activity, not an actual showing of such activity." *United States v. Valentine,* 539 F.3d 88, 94 (2d cir.2008) (citation omitted).

In weighing whether officers had probable cause, the Court considers the totality of the circumstances, *Gates,* 462 U.S. at 233, and makes an objective rather than subjective inquiry as to "the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of arrest." *Devenpeck v. Alford,* 543 U.S. 146, 152–53, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004). Where there is more than one officer cooperating in the investigation, the knowledge of each officer is presumed to be shared by all. *See Celestin v. City of New York,* 581 F.Supp.2d 420,430 (E.D.N.Y.2008). The fact that the officers are later shown to be mistaken, or that the defendant is ultimately acquitted, does not alter the analysis.

*DeFillippo,* 443 U.S. at 35 ("The validity of the arrest does not depend on whether the suspect actually committed a crime; the mere fact that the suspect is later acquitted of the offense for which he is arrested is irrelevant to the validity of the arrest.") Probable cause may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers. *Walczyk v. Rio,* 496 F.3d 139, 157 (2d Cir.2007); *Weyant,* 101 F.3d at 852.

**\*6** Taking all of these factors into account, the Court finds that the officers had probable cause to arrest plaintiff. Plaintiff alleges he was arrested as soon as the defendant police officers entered the apartment. *See* Am. Compl. ¶ 25 ("Once the individual defendants entered the apartment, plaintiff was not free to disregard their questions, or walk way [sic] or leave the scene."). It is undisputed that at the time of the arrest, officers knew that ten to fifteen pounds of marihuana had been shipped from Arizona to the apartment. The quantity of drugs was consistent with distribution, not personal use, and it was reasonable for officers to believe that the occupants of the apartment were engaged in illegal drug trafficking. It was also reasonable to believe that anyone entering or exiting the premises after the drugs were delivered would be engaged in drug activity and that, following delivery, the drugs might be moved out of the apartment. The reasonableness of this conclusion is evidenced by the issuance of a warrant to search the apartment for evidence of drug trafficking and "any other person found in [Apartment 6D] or seen exiting, entering, or attempting to enter or exit the above premises." Schowengerdt Decl. Ex. H.[1] Capt. Fulton delivered the drugs to the apartment where a man identified himself as the addressee, signed for the package, and took it into the apartment. From this, officers could properly conclude that the address was not an error and the occupants of the apartment were engaged in drug trafficking. Almost immediately after the delivery of the drugs, police witnessed plaintiff entering the apartment as Mr. Castillo was exiting. For the above reasons, based on the undisputed facts and drawing all inferences in favor of the plaintiff, the Court finds that plaintiff's arrest was supported by probable cause and his false arrest claim therefore must be dismissed.

[1]    Police applied for a search warrant at 12:15, but the parties dispute whether the search warrant had been issued at the time police officers arrested plaintiff and entered the apartment. *See* Am. Compl. ¶ 27. The Court notes the issuance of the arrest warrant only to show that a neutral magistrate found probable cause existed to search individuals

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 158 of 370
Abdul-Rahman v. City of New York, Not Reported in F.Supp.2d (2012)

2012 WL 1077762

in or entering the apartment, based solely on the evidence of large quantities of marihuana in a package addressed to Apartment 6D.

### 2. Illegal Search & Seizure

Plaintiff alleges that officers also violated his Fourth Amendment rights by engaging in an illegal search. *See* Am. Compl. ¶¶ 64–65. The Amended Complaint does not specify whether plaintiff challenges the search of his person or the search of Apartment 6D but, in either case, plaintiff's claim fails as a matter of law.

Police were permitted to search plaintiff following his arrest. Under the Fourth and Fourteenth Amendments, an arresting officer may, without a warrant, search a person validly arrested. *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *Gustafson v. Florida,* 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973). The constitutionality of a search incident to an arrest does not depend on whether there is any indication that the person arrested possesses weapons or evidence. The fact of a lawful arrest, standing alone, authorizes a search. *Robinson,* 414 U.S. at 235. Because the Court finds officers had probable cause to arrest him, the search of plaintiff was also lawful.

**\*7** Regarding officers' search of the premises, plaintiff lacks standing to challenge this search. The Fourth Amendment protects only those people who have a "legitimate expectation of privacy in the invaded space." *Rakas v. Illinois,* 439 U.S. 128, 142, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). Plaintiff was "a guest invited to stay at the apartment by the tenants" and "not a resident in the apartment." Am. Compl. ¶¶ 23–24. Although guests can have legitimate expectations of privacy under certain circumstances, plaintiff has not pled any facts that would validate such expectations. *See United States v. Cody,* 434 F.Supp.2d 157, 165 (S.D.N.Y.2006) (reviewing the Supreme Court's decisions regarding guests' legitimate expectations of privacy and concluding, "Overnight guests in a person's home share in their hosts' expectation of privacy. Mere invitees do not."). Consequently, plaintiff fails to state a claim for unlawful search and seizure and this claim must be dismissed.

### B. Second Claim: Excessive Force

Plaintiff alleges "[d]uring the arrest of plaintiff, the individual defendants used excessive force against him, by maliciously, gratuitously, and unnecessarily pointing a firearm at him, grabbing plaintiff, and placing excessively tight handcuffs

on plaintiff's wrists." Compl. ¶ 30. Plaintiff alleges he "was physically injured as a result of the excessive use of force, and suffered numbness and marks to his wrists." Compl. ¶ 33. "Where, as here, the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right 'to be secure in their persons ... against unreasonable ... seizures' of the person." *Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The Fourth Amendment standard is purely objective: "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. This standard "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. Because the standard is objective reasonableness, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates the Fourth Amendment," *id.* at 396 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973)), and "[n]ot every infliction of pain reaches the infliction of a constitutional violation," *Esmont v. City of New York,* 371 F.Supp.2d 202, 214 (E.D.N.Y.2005).

It is well established that the right to make an arrest accompanies with it the right to use some degree of physical coercion. *Graham,* 490 U.S. at 396. This frequently involves handcuffing the suspect and "to be effective, handcuffs must be tight enough to prevent the arestee's hands from slipping out." *Esmont,* 371 F.Supp.2d at 214. Therefore, "[t]here is a consensus among courts in this circuit that tight handcuffing does not constitute excessive force unless it causes some injury beyond temporary discomfort." *Lynch ex rel. Lynch v. City of Mount Vernon,* 567 F.Supp.2d 459, 468 (S.D.N.Y.2008) (citing cases); *accord Schy v. Vermont,* 2 F. App'x 101, 101–02 (2d Cir.2001) (painful handcuffing for two-hour period does not violate Constitution); *Arnold v. Westchester Cnty,* No. 09 Civ. 3727(JSR) (GWG), 2012 WL 336129, at \*9 (S.D.N.Y. Feb. 3, 2012) (dismissing prisoner's claim where officer twisted plaintiff's handcuffs and pulled him down a hallway, causing temporary pain and numbness); *Wang v. Vahldieck,* No. 09 Civ. 3783(ARR)(VVP), 2012 WL 92423, at \*7 (E.D.N.Y. Jan. 9, 2012) (dismissing excessive force claim of a plaintiff who was "shrieking in pain" from tight handcuffs but where there was "no

Abdul-Rahman v. City of New York, Not Reported in F.Supp.2d (2012)

2012 WL 1077762

evidence that the tight handcuffing caused any actual physical injury"); *Davis v. Fischer,* No. 09 Civ. 6084(CJS), 2012 WL 177400, at *10 (W.D.N.Y. Jan.20, 2012) (dismissing excessive force claim that tight handcuffing caused numbness to the plaintiff's hands); *Bender v. City of New York,* No. 09 Civ. 3286(BSJ), 2011 WL 4344203, at *6 (S.D.N.Y. Sept.14, 2011) ("extremely tight" handcuffing for almost fourteen hours that left indentations in the plaintiff's forearms for more than six hours after removal is not excessive force); *Barratt v. Joie,* No. 96 Civ. 0324(LTS), 2002 WL 335014, at *7–8 (S.D.N.Y. Mar.4, 2002) (dismissing plaintiff's excessive force claims that included allegations of numbness and bruising to his wrists from tight handcuffs).

**\*8** The injuries suffered by plaintiff are not comparable to those suffered in any of the cases cited by plaintiff in support of his claim. *See Robinson v. Via,* 821 F.2d 913 (2d Cir.1987) (officers allegedly threw plaintiff against a car, causing bruising lasting several weeks); *Maxwell v. City of New York,* 380 F.3d 106 (2d Cir.2004) (officers allegedly threw plaintiff head-first into a car, striking her head against a solid partition and causing concussion symptoms); *Davis v. City of New York,* No. 04 Civ. 3299, 2007 WL 755190, at *2 (E.D.N.Y. Feb. 15, 2007) (officers allegedly kicked plaintiff, a teenage girl, while she was handcuffed and lying on the floor); *Breen v. Garrison,* 169 F.3d 152 (2d Cir.1999) (officer allegedly jumped on plaintiff, yanked his head, pushed his face into a table, intentionally tightened handcuffs and spat in plaintiff's face); *Golio v. City of White Plains,* 459 F.Supp.2d 259 (S.D.N.Y.2006) (officer tightly handcuffed plaintiff for two hours until his hands were visibly swollen and red, allegedly causing permanent nerve damage to surgeon's hand). In comparison, plaintiff's alleged injuries are de *minimus* and, without more, the use of tight-fitting handcuffs, alone, does not constitute excessive force.

It is also reasonable for officers to draw their weapons when entering a residence they reasonably believe to be used for drug trafficking and reasonable for officers "to sometimes aim that weapon at an individual until an assessment can be made as to whether the individual poses a threat." *Anderson v. United States,* 107 F.Supp.2d 191, 199 (E.D.N.Y.2000); *see also United States v. Gaskin,* 364 F.3d 438, 457 (2d Cir.2004) ("[T]his court has frequently observed [that] guns are tools of the narcotics trade, frequently carried by dealers"); *Bolden v. Vill. of Monticello,* 344 F.Supp.2d 407, 419 (S.D.N.Y.2004) ("[In] executing a search warrant for drugs ... it is reasonable for police officers to enter a residence with guns draw to secure the area and prevent harm to themselves or

others." (citing *Speights v. City of New York,* No. 98 Civ. 4635(NG), 2001 WL 797982 (E.D.N.Y. June 18, 2001))); *Lynch,* 567 F.Supp.2d at 468 ("[O]fficers' decision to draw their weapons while searching the Residence for guns, drugs and a drug dealer was objectively reasonable." (citing *Rincon v. City of New York,* No. 03 Civ. 8276(LAP), 2005 WL 646080, at *5 (S.D.N.Y. Mar.21, 2005))).

## C. Third Claim: First Amendment Retaliation

Plaintiff alleges defendants violated his first amendment rights. Plaintiff alleges he "exercised free speech during the incident by, among other things, peacefully telling the individual defendants that he had not committed a crime, and that the officers were mistreating plaintiff." Am. Compl. ¶ 70. This speech "was a motivating factor in defendants' decision to arrest, use force upon, and prosecute him." *Id.* ¶ 71.

In order to survive a motion to dismiss, a claim of retaliation under Section 1983 "must be 'supported by specific and detailed factual allegations,' not stated 'in wholly conclusory terms.' " *Friedl v. City of New York,* 210 F.3d 79, 85–86 (2d Cir.2000) (quoting *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)); *accord Eberling v. Town of Tuxedo,* No. 05 Civ. 2951(CLB), 2006 WL 278246, at *2 (S.D.N.Y. Feb.3, 2006). Plaintiff's claim is entirely specious and there is nothing in the record to indicate plaintiff's speech was a motivating factor in his arrest and prosecution. Plaintiff's allegation is not only speculative but without merit. As has been found, the officers had probable cause to arrest him. Where an officer had probable cause, the Court "will not examine the officer's underlying motive in arresting and charging the plaintiff." *Singer v. Fulton Co. Sheriff,* 63 F.3d 110, 120 (2d Cir.1995) (citing *Mozzochi v. Borden,* 959 F.2d 1174, 1179 (2d Cir.1992)); *accord Curley,* 268 F.3d at 73. For the above reasons, plaintiff's third claim must also be dismissed.

## D. Malicious Prosecution

**\*9** As a preliminary matter, defendants argue plaintiff has abandoned any claim for malicious prosecution. Plaintiff's original Complaint specifically alleged claims for malicious prosecution pursuant to state and federal law. *See* Complaint dated June 17, 2010, ¶¶ 63–67 (*"Fourth Claim:* Malicious Prosecution Under Federal Law"); ¶¶ 68–71 (*"Fifth Claim:* Malicious Prosecution Under State Law"). Defendants argue plaintiff has abandoned these claims because the Amended Complaint "does not contain the same enumerated claims for malicious prosecution found in the original complaint." Defs.' Mem. at 20. Although not numerically labeled

2012 WL 1077762

along with the rest of plaintiff's claims, it is apparent from the factual allegations in the Amended Complaint that plaintiff has not abandoned these claims. *See* Am. Compl. ¶ 1 ("[Defendants] subjected plaintiff to ... malicious prosecution ...."); ¶¶ 41–44 (pleading the four elements of a claim for malicious prosecution). Nevertheless, plaintiff's claim must be dismissed for the reasons stated below.

To prevail on federal or state claims of malicious prosecution, the plaintiff must show: (1) the defendant initiated or continued a criminal proceeding; (2) the proceeding terminated favorably to the plaintiff; (3) there was no probable cause for the criminal charge; and (4) the defendant acted maliciously. *Rothstein v. Carriere,* 373 F.3d 275, 282 (2d Cir.2004); *Savino v. City of New York,* 331 F.3d 63, 72 (2d Cir.2003). Here, plaintiff fails to show there was no probable cause for the criminal charge. In a malicious prosecution case, "the relevant probable cause determination is whether there was probable cause to believe the criminal proceeding could succeed and, hence, should be *commenced." Davis v. City of New York,* 373 F.Supp.2d 322, 333 (S.D.N.Y.2005) (emphasis added) (internal quotation omitted); *Murphy v. Lynn,* 118 F.3d 938 (2d Cir.1997) (noting that relevant probable cause for malicious prosecution claim is probable cause "for commencing the proceedings").

Plaintiff was indicted by a Grand Jury on July 19, 2008. Am. Compl. ¶ 39; Schowengerdt Decl. Ex. K. Prior to his criminal trial, the State Supreme Court conducted an *in camera* review of the Grand Jury minutes and, by a Memorandum and Order dated December 3, 2008, determined the evidence presented to the Grand Jury "legally sufficient to establish the offenses charged." Schowengerdt Decl. Ex. J. The parties do not dispute that the indictment creates a presumption of probable cause. *Manganiello,* 612 F.3d at 161; *Colon,* 60 N.Y.2d at 82, 468 N.Y.S.2d 453, 455 N.E.2d 1248 ("Once a suspect has been indicted ... the law holds that the Grand Jury action creates a presumption of probable cause."); *see also Costello v. United States,* 350 U.S. 359, 363, 76 S.Ct. 406, 100 L.Ed. 397 (U.S.1956) ("An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits. The Fifth Amendment requires nothing more."). That presumption can only have been fortified by the Supreme Court's *in camera* review. Where, as here, a malicious prosecution claim is commenced after a grand jury indictment, plaintiff can only overcome that presumption by showing "the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Manganiello,* 612 F.3d at 162; *see also Colon,* 60 N.Y.2d at 82–83, 468 N.Y.S.2d 453, 455 N.E.2d 1248.

**\*10** Plaintiff alleges the defendant officers "pursuant to a conspiracy, falsely and maliciously told the Kings County District Attorney's Office that plaintiff has committed various crimes." Am. Compl. ¶ 38. Plaintiff also alleges that Officer Goodwin provided false testimony before the Grand Jury. Am. Compl. ¶ 39. Plaintiff does not specify in his Amended Complaint what those false statements were or even that he was not guilty of the crimes for which he was prosecuted. These conclusory and generalized allegations are insufficient to overcome the presumption of probable cause created by the indictment.

In addition, plaintiff's own sworn testimony demonstrates his claim is without merit. Plaintiff testified that after officers delivered the package of marihuana, he exited Apartment 6D carrying the package, carried it up to the seventh floor, and threw it onto the landing by the roof. Plaintiff also testified that a surveillance video installed in the hallway accurately recorded his actions. *See* Schowengerdt Ex. L at 250, 261–263. This is precisely the set of facts that Officer Goodwin provided in the Criminal Complaint that initiated plaintiff's prosecution:

> Deponent [Officer Goodwin] observed, on video surveillance, defendant Rahman exit the location with said package and that defendant Rahman placed said package down on the ground in the staircase immediately next to the above mentioned apartment. The deponent further states that the deponent recovered said package from the stair case [sic] where deponent observed defendant Rahman place said package and that said package contained a quantity of Marihuana that was in excess of ten pounds.

Showengerdt Ex. I. "[I]t has long been recognized that, where there is no dispute as to what facts were relied on to demonstrate probable cause, the existence of probable cause is a question of law for the court." *Walczyk,* 496 F.3d at 157;

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 161 of 370
Abdul-Rahman v. City of New York, Not Reported in F.Supp.2d (2012)
2012 WL 1077762

*see Weyant,* 101 F.3d at 852 (2d Cir.1996) ("The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers ."). Based on the undisputed facts, police and prosecutors had ample reason to believe that plaintiff had committed the crimes with which he was charged and that the criminal proceeding could succeed. Consequently, plaintiff does not allege "enough facts to state a claim to relief that is plausible on its face," *Twombly,* 550 U.S. at 547, and defendants' motion is granted as to plaintiff's malicious prosecution claim.

### E. Fourth Claim: Failure to Supervise

Plaintiff alleges the supervisor defendants are liable to plaintiff because "they supervised subordinate individual defendants concerning above-mentioned unlawful acts against plaintiff, and approved their unlawful acts." Am. Compl. ¶ 73. Because the Court has dismissed plaintiff's prior claims against the individual defendants, finding no unlawful acts were committed, plaintiff's claim for failure to supervise must also be dismissed.

### F. Fifth Claim: Denial of Right to Fair Trial

**\*11** Plaintiff alleges defendants "created false information likely to influence a jury's decision and forwarded that information to prosecutors, violating plaintiff's constitutional right to a fair trial." Am. Compl. ¶ 75. "When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." *Ricciuti v. New York City Transit Auth.,* 124 F.3d 123, 130 (2d Cir.1997) (citations omitted); *see also Jocks v. Tavernier,* 316 F.3d 128, 138 (2d Cir.2003) (holding that fabrication of evidence by police is actionable under § 1983).

Defendants argue the claim must be dismissed because "even if a plaintiff is able to show that the false information ... was likely to influence the jury, where a plaintiff has been acquitted of the criminal charges ... there can be no constitutional violation of a right to a fair trial." Defs.' Mem. at 28–29. The cases cited by defendants in support of this argument have either been acknowledged as erroneously decided, *see Morse v. Spitzer,* No. 7 Civ. 4793(CBA)(RML), 2011 WL 4625996 (E.D.N.Y. Sept. 30, 2011) (noting the magistrate judge erred and plaintiff's acquittal did not defeat his fair trial claim under Second Circuit law), are from other

circuits and not controlling, *see Morgan v. Gertz,* 166 F.3d 1307, 1310 (10th Cir.1999), or did not dismiss the claim on the basis of the acquittal alone, *see Coakley v. 42nd Pct. Case 458,* No. 08 Civ. 6206(JSR), 2009 WL 3095529 (S.D.N.Y. Aug.21, 2009).

The Court's own review of the issue indicates that an acquittal does not extinguish a fair trial claim grounded on allegations police or prosecutors knowingly presented false statements or false evidence. *See Morse,* 2011 WL 4625996, at \*2 (Acquittal does not defeat a fair trial claim where police officers allegedly fabricated evidence); *Johnson v. City of New York,* No. 06 Civ. 630(KAM) (ALC), 2010 WL 2771834, at\*11 (E.D.N.Y. July 13, 2010) (Acquittal does not extinguish a fair trial claim where police officers allegedly gave false testimony); *Zahrey v. City of New York,* No. 98 Civ. 4546(DCP)(JCF), 2009 WL 1024261, at \*8 n. 15 (S.D.N.Y. Apr. 15, 2009) ("In this Circuit, such a Section 1983 action for violation of the right to 'fair trial' [grounded on false evidence] would apparently lie even if a criminal defendant's charges were dismissed prior to trial." (citation omitted)); *Douglas v. City of New York,* 595 F.Supp. 333, 346 n. 6 (S.D.N.Y.2009) ("Nor is a conviction required to bring a § 1983 claim for violation of the right to a fair trial."); *Baez v. JetBlue Airways,* No. 09 Civ. 596(CPS)(SMG), 2009 WL 2447990, at \*8 (E.D.N.Y. Aug. 3, 2009) ("A plaintiff need not show that she was convicted or that a trial took place" in order to bring a § 1983 claim for violation of the right to a fair trial.); *Henry v. City of New York,* No. 02 Civ. 4824(JSM), 2003 WL 22077469, at \*4 (S.D.N.Y. Sept.5, 2003) (rejecting defendants' argument that acquittal extinguished plaintiff's violation of fair trial claim grounded on officers' fabrication of evidence). [2]

> [2]      The Court notes that acquittal may extinguish a fair trial claim grounded on other forms of misconduct. *See Ambrose v. City of New York,* 623 F.Supp.2d 454, 470 (S.D.N.Y.2009) (Acquittal extinguishes fair trial claim based on failure to disclose exculpatory *Brady* material.); *Schiavone Const. Co. v. Merola,* 679 F.Supp. 64, 66 (S.D.N.Y.1988) (Acquittal extinguishes fair trial claim based on prejudicial pretrial publicity because acquittal demonstrates jurors were impartial).

**\*12** Nevertheless, the Court dismisses plaintiff's claim because he has presented only the most conclusory and generalized allegations, failing to specify in what way the statements, information, or testimony were false or even in

what material respect the charges against him were false. *See, e.g.,* Am. Compl. ¶ 38 (Officers "falsely and maliciously told the Kings County District Attorney's Office that plaintiff had committed various crimes."); ¶ 39 (Officer Goodwin "falsely and maliciously told the grand jury that plaintiff had committed various crimes."); ¶ 40 (Officers "provided false statements and information to cause plaintiff to be prosecuted."). His Amended Complaint simply recites the elements of the claim and is the same *ipse dixit. See, e.g., Ricciuti,* 124 F.3d at 130 (the right to a fair trial is violated when an officer "creates false information likely to influence a jury's decision and forwards that information to prosecutors."). As the Supreme Court made clear in *Twombly,* "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555 (alteration, citations, and internal quotation marks omitted). For the above reasons, plaintiff's fifth claim must also be dismissed.

### G. Conspiracy and Municipal Liability

Plaintiff alleges defendants engaged in a conspiracy to violate his constitutional rights, pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1985. *See* Am. Compl. ¶¶ 77, 79. Plaintiff also seeks to hold the City of New York liable for the conduct of its employees, pursuant to *Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). *See* Am. Compl. ¶ 81. These remaining federal claims are predicated on the individual defendants' violation of plaintiff's constitutional rights. *See, e.g., Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999) (An action for conspiracy requires a plaintiff to show, among other things, an overt act taken to inflict an unconstitutional injury); *Nagle v. Marron,* 663 F.3d 100, 116 (2d Cir.2011) (*Monell* violation requires there was a violation

of plaintiff's rights). Because plaintiff has failed to establish any violation of his constitutional rights, these claims also fail and defendants' motion is granted as to plaintiff's sixth, seventh, and eighth claim.

### H. State Law Claims

The Court may decline to exercise supplemental jurisdiction over any and all state law claims of a complaint if the Court has "dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). "It is well settled that where, as here, the federal claims are eliminated in the early stages of litigation, courts should generally decline to exercise pendent jurisdiction over remaining state law claims." *Klein & Co. Futures, Inc. v. Bd. of Trade,* 464 F.3d 255, 262 (2d Cir.2006). Plaintiff's state law claims are therefore dismissed without prejudice in order to allow plaintiff to pursue his state law claims in state court if he so chooses. *See Cave v. East Meadow Union Free Sch. Dist.,* 514 F.3d 240, 250 (2d Cir.2008).

### CONCLUSION

**\*13** For the foregoing reasons, Plaintiff has failed to state a claim as a matter of law and defendants' motion for judgment on the pleadings is granted. Plaintiff's federal claims are dismissed with prejudice and the Court declines to exercise supplemental jurisdiction over the state law claims. The Clerk of Court is respectfully directed to close this case.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 1077762

---

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 4757970
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Theodore HUTCHINS, Plaintiff,

v.

Former Monticello Police Chief Douglas
SOLOMON; Former Monticello Acting Police
Chief Mark Johnstone; Former Monticello Police
Detective Luis Feliciano; and Sullivan County
District Attorney James Farrell, Defendants.

No. 16-CV-10029 (KMK)
|
Signed 09/29/2018

**Attorneys and Law Firms**

Jonathan S. Wachlarz, Esq., Robert E. Borrero, Esq., Law Offices of Michael S. Lamonsoff, PLLC, New York, NY, Counsel for Plaintiff.

David L. Posner, Esq., McCabe & Mack LLP, Poughkeepsie, NY, Counsel for Defendants Douglas Solomon, Mark Johnstone, and Luis Feliciano.

Steven C. Stern, Esq., Alexander J. Eleftherakis, Esq., Sokoloff Stern LLP, Carle Place, NY, Counsel for Defendant James Farrell.

OPINION & ORDER

KENNETH M. KARAS, UNITED STATES DISTRICT JUDGE

**\*1** Plaintiff Theodore Hutchins ("Plaintiff") brings this Action against former Monticello Police Chief Douglas Solomon ("Solomon"), former Monticello Acting Police Chief Mark Johnstone ("Johnstone"), Monticello Police Detective Luis Feliciano ("Feliciano") (collectively "Monticello Defendants"), all of whom were employed by the Village of Monticello as members of the Village of Monticello Police Department ("MPD"), and Sullivan County District Attorney James Farrell ("Farrell"), pursuant to 42 U.S.C. § 1983, alleging malicious prosecution, denial of the right to a fair trial, due process violations, and conspiracy to commit each of the foregoing. (*See* Am. Compl. (Dkt. No. 41).) Before the Court are Monticello Defendants' and Farrell's

Motions To Dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (Monticello Defs.' Not. Of Mot. (Dkt. No. 50); Farrell Not. Of Mot. (Dkt. No. 53).) For the reasons to follow, the Motions are granted in part and denied in part.

I. Background

A. Factual Background
The following facts are taken from Plaintiff's First Amended Complaint and are assumed to be true for purposes of resolving the Motions.

1. Hiring of New Officer and Background Investigation

At all times relevant to the allegations in this case, Plaintiff served as a Trustee on the Board of Trustees for the Village of Monticello. (Am. Compl. ¶ 7.) Solomon was employed as Monticello Police Chief until March 1, 2012. (*Id.* ¶ 13.) He began working for the City of Beacon Police Department on March 5, 2012, and is still employed there. (*Id.*) He was elected as a Trustee of the Village of Monticello in March 2014 and was appointed as Mayor of the Village of Monticello in March 2016. (*Id.*) Johnstone was acting Police Chief of the Village of Monticello from March 1, 2012 to August 19, 2012. (*Id.* ¶ 14.) Johnstone became a lieutenant of the MPD in August 2012. (*Id.*) Feliciano was employed by the MPD as a detective and currently works as an investigator for the Sullivan County District Attorney's Office. (*Id.* ¶ 15.) Farrell was the lead prosecutor assigned to Plaintiff's prosecution, (*id.* ¶ 135), as well as the chief law enforcement official in Sullivan County at all times relevant to the investigation into and prosecution of Plaintiff, (*id.* ¶¶ 136–37).

During 2010–2011, the MPD sought to hire a new officer and sought the cooperation of John LiGreci ("LiGreci"), the Village Manager for Monticello, and Carolyn Hill ("Hill"), the Personnel Director for Sullivan County, to begin the hiring process. (*Id.* ¶ 40.) Pursuant to the New York Civil Service hiring guidelines, applicants for police officer positions must pass the New York State Civil Service test. (*Id.* ¶ 41.) If applicants pass the test they are put on a civil service list for consideration when openings arise. (*Id.*) Kariem McCline ("McCline") applied, qualified for, and was placed on the civil service list for consideration for future openings at the MPD and was included on a list of qualified applicants generated by Hill to fill the request for a new police officer. (*Id.* ¶ 42.)

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 164 of 370

Hutchins v. Solomon, Not Reported in Fed. Supp. (2018)
2018 WL 4757970

**\*2** As Village Manager, LiGreci served as a supervisor to the MPD Police Chief. (*Id.* ¶ 56.) LiGreci ordered Solomon to conduct a background investigation into McCline, as part of the hiring process. (*Id.* ¶ 57.) Plaintiff alleges that Monticello Defendants were aware that LiGreci, as Village Manager, had the sole authority to make hiring decisions for the municipal departments, including the MPD. (*Id.* ¶ 55.) [1] Plaintiff alleges he believed it was within LiGreci's authority to commence and halt background investigations, (*id.* ¶ 54), and he was not aware of Solomon having any independent authority to conduct a background investigation, (*id.* ¶ 58).

[1]    Plaintiff further alleges that "[n]o law tasked any Defendant with the authority to conduct the background investigation" (Am. Compl. ¶ 59), "Monticello Defendants knew that no law tasked Solomon with the responsibility to conduct a [b]ackground [i]nvestigation," (*id.* ¶ 44), and that the "MPD had no independent duty or authority to conduct background investigations into MPD candidates," (*id.* ¶ 61). Inasmuch as Plaintiff is alleging what laws applied to the various Defendants in their official capacities, the Court does not have to accept these conclusions of law as true. *See Andino v. Fischer*, 698 F. Supp. 2d 362, 375 (S.D.N.Y. 2010) (holding that in reviewing a motion to dismiss "a court does not ... have to accept as true conclusions of law or unwarranted deductions of fact") (citing *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 771 (2d Cir. 1994) ).

Solomon created a background investigation procedure to use in investigating McCline. (*Id.* ¶ 43.) Plaintiff alleges that Monticello Defendants knew that Solomon had created the procedure he was using to investigate McCline, (*id.* ¶¶ 45, 62), after receiving the directive from LiGreci to begin the background investigation, (*id.* ¶ 63.) [2] Solomon testified that he made up his mind that McCline was not qualified to be a police officer from the beginning of the background investigation. (*Id.* ¶ 46.) The Amended Complaint does not specify where Solomon testified to this effect.

[2]    Plaintiff alleges that Monticello Defendants knew "there was no publication, regulation, protocol, or law directing Solomon to conduct background investigations or instructing how to conduct such background investigations." (Am. Compl. ¶ 63).

Inasmuch as Plaintiff alleges what the application and meaning of such laws and regulations was or should be, the Court does not accept this allegation as true. *See Andino*, 698 F. Supp. 2d at 375. The Court understands Plaintiff to be alleging that Monticello Defendants did not believe Solomon had any independent authority to conduct the background investigation other than at the instruction of LiGreci and that Solomon created the background investigation procedure of his own accord without oversight or guidance.

Feliciano participated in the background investigation into McCline by interviewing community members. (*Id.* ¶ 47.) He asked some community members whether they knew if McCline associated with "undesirable people" and lived with a partner "out of wedlock." (*Id.*) LiGreci received a complaint from at least one community member that offensive questions were being asked as part of the investigation into McCline. (*Id.* ¶¶ 48, 64.) Thereafter, LiGreci confronted Solomon about the inappropriate questions and the length of time the background investigation was taking. (*Id.* ¶ 65.) LiGreci then halted the background investigation because it was proceeding in an inappropriate manner and was taking too long to complete. (*Id.* ¶ 49.) Plaintiff did not personally compel Solomon in any way to stop the background investigation into McCline. (*Id.* ¶ 71.)

**\*3** Plaintiff alleges that each Monticello Defendant was aware that LiGreci had the authority to halt the background investigation into McCline, (*id.* ¶ 67), and that therefore Monticello Defendants knew that LiGreci's order to stop the investigation could not possibly be "unauthorized" or "stretched into being criminal," (*id.* ¶ 69). Plaintiff alleges that Monticello Defendants "knew no crime was committed" and that "LiGreci acted within his power." (*Id.* ¶ 70.)

2. Monticello Defendants' Contact with Farrell

Plaintiff alleges that despite their knowledge that no crime had been committed, Monticello Defendants falsely informed Farrell "and misled him into believing" that LiGreci had improperly ordered them to stop the McCline background investigation, and that Plaintiff was an accessory to the crime. (*Id.* ¶ 72.)

Until his retirement on March 1, 2012, Solomon compiled the investigative file regarding McCline's background check. (*Id.* ¶ 73b.) Upon his retirement, Solomon turned this file over to

Hutchins v. Solomon, Not Reported in Fed. Supp. (2018)

2018 WL 4757970

Johnstone who took over as acting police chief. (*Id.* ¶¶ 73a, 73g.) Johnstone spoke with Solomon about the background investigation. (*Id.* ¶ 73i.) Until his retirement, "Solomon was in regular communication with Farrell regarding things that were going on in the Village of Monticello." (*Id.* ¶ 73c.) During that time Solomon informed Farrell that he felt "threatened by" Plaintiff with regard to McCline's application. (*Id.* ¶ 73d.) Prior to Johnstone taking over as police chief, Feliciano was responsible for the background investigation. (*Id.* ¶ 73f.) Upon Johnstone taking over, Feliciano prepared a final memorandum and completed the background investigation. (*Id.* ¶ 73h.)

On July 25, 2012, a criminal investigation began into McCline's application process. (*Id.* ¶ 73j.) As part of the criminal investigation, Johnstone provided Farrell information about the McCline hiring process. (*Id.* ¶ 73k.) Johnstone spoke to Farrell on a daily basis between the time he became acting police chief in March 2012, and the time the criminal investigation began in July 2012. (*Id.* ¶ 73m.) Johnstone also met with Defendant Farrell in person. (*Id.*) Plaintiff alleges that during these conversations, Johnstone falsely informed Farrell that Plaintiff was engaged in criminal activity. (*Id.* ¶ 73*l.*) Plaintiff alleges that Farrell initiated and manufactured the criminal investigation "for purposes of bringing about the subsequent criminal charges against Plaintiff and LiGreci." (*Id.* ¶ 87.)

### 3. LiGreci's Directive to Johnstone to Answer Questions

After the initiation of the criminal investigation, LiGreci learned that the Village of Monticello faced potential civil litigation from McCline for the discriminatory fashion in which "his application was processed and his background investigation was conducted." (*Id.* ¶ 83.) LiGreci presented Solomon, and subsequently Johnstone, "with a list of questions to answer regarding the background investigation in preparation for the possible civil litigation." (*Id.* ¶ 84.)

After Johnstone received the directive from LiGreci, he consulted with Farrell, who informed him that there was an ongoing criminal investigation into McCline and LiGreci. (*Id.* ¶ 86.) Johnstone subsequently refused to provide the answers to LiGreci "under the guise of avoiding interference with the allegedly ongoing criminal investigation." (*Id.* ¶ 88.) Johnstone wrote answers to LiGreci's questions but submitted them to the then acting MPD Chief Mir on the day they were due to LiGreci. (*Id.* ¶ 92.) Johnstone's answers

were immediately seized by investigators for the Sullivan County District Attorney's Office at Farrell's directive. (*Id.* ¶ 93.) After Plaintiff was indicted with McCline and LiGreci, Johnstone eventually testified at Plaintiff's trial that he never informed LiGreci of the ongoing criminal investigation as he did not want certain people, including Plaintiff, to learn that there was a criminal investigation. (*Id.* ¶ 89.)

**\*4** Plaintiff alleges that LiGreci was authorized to direct Johnstone to provide answers to questions related to McCline's background investigation, as it was the subject of potential civil litigation against the Village of Monticello. (*Id.* ¶ 103.) Plaintiff further alleges that Defendants knew that LiGreci's order to Johnstone to answer questions regarding the McCline background investigation could not be construed as an illegal interference with the criminal investigation because the Defendants specifically acted to keep the fact of any such criminal investigation from LiGreci and Plaintiff. (*Id.* ¶¶ 95, 99.) Defendants thus could not have believed that LiGreci knew that his order to Johnstone to answer questions regarding the McCline background investigation was unauthorized when he made it because there was an ongoing criminal investigation. (*Id.* ¶ 97.) Plaintiff further alleges that Monticello Defendants had no reason to believe, and it was impossible for any of them to have concluded, that Plaintiff knew, prior to LiGreci's directive, that a criminal investigation had been commenced and that LiGreci no longer had the authority to order Johnstone to answer the questions. (*Id.* ¶ 101.) Nonetheless, Monticello Defendants informed Farrell that Plaintiff had acted as an accessory to LiGreci's order. (*Id.* ¶ 96.)

Defendants accused LiGreci and Plaintiff of interfering with the MPD's independent duty to conduct background investigations into police officer candidates. (*Id.* ¶ 74.) Defendants allegedly provided these false statements to Farrell knowing that there was no basis to support such accusations. (*Id.* ¶ 112.) Specifically, Plaintiff alleges that Monticello Defendants misled Farrell by claiming Plaintiff coerced him and interfered with their investigation. (*Id.* ¶ 119.) Plaintiff alleges he was charged and prosecuted on the basis of these false allegations. (*Id.* ¶ 109.)

### 4. Monticello Defendants' Motives

Defendants allegedly created the criminal investigation into McCline to shield themselves from having to answer LiGreci's lawful inquiries into how they conducted the

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 166 of 370

Hutchins v. Solomon, Not Reported in Fed. Supp. (2018)

2018 WL 4757970

background investigation. (*Id.* ¶ 104.) Plaintiff further alleges that Solomon, Johnstone, and Feliciano fabricated the charges against him in order to advance their own political and professional careers or did so for personal revenge. (*Id.* ¶ 76.) Plaintiff points to the fact that Solomon ran for his trustee seat in 2014 and ran for Mayor of the Village of Monticello in 2016, (*id.* ¶ 77), Johnstone was promoted to the position of Lieutenant with the MPD, (*id.* ¶ 78), and Feliciano started working for the Sullivan County District Attorney's Office, (*id.* ¶ 79).

### 5. Farrell's Participation and Motives

Plaintiff alleges that Farrell participated in the fabrication of the accusations against him during the pre-arrest investigation stage, and that he acted as an investigator rather than a court advocate in doing so. (*Id.* ¶¶ 139, 140.) On July 30, 2012, Farrell sent a letter to Hill, the Commissioner of the Sullivan County Personnel Department, (*id.* ¶ 142), informing her that he had spoken to Johnstone and Solomon about McCline's application and that they wanted him to be disqualified from the MPD job for which he had applied, (*id.* ¶ 143). Farrell allegedly interfered with McCline's hiring process in order to bolster the anticipated allegations against Plaintiff. (*Id.* ¶ 141.) Farrell, Solomon, Johnstone, and Feliciano allegedly worked together to manufacture the investigative file regarding the McCline background investigation so that they could use it to allege that Plaintiff was guilty by association. (*Id.* ¶¶ 145, 149.) Farrell allegedly engaged in these actions in order to manufacture a high profile case to gain media attention and to advance his own career and profile. (*Id.* ¶ 147.)

### 6. Plaintiff's Indictment, Trials, and the Reversal of His Conviction

On September 19, 2012, Johnstone testified at the grand jury against Plaintiff. (*Id.* ¶ 73n.) On November 8, 2012, Plaintiff was indicted by a Sullivan County Supreme Court Grand Jury, (*id.* ¶ 28), for acting in concert with LiGreci to commit two counts of Official Misconduct, ([N.Y. Penal Law § 195.00(1)](#)), and two counts of Coercion in the First Degree, ([N.Y. Penal Law § 135.65(2)](#)). Official Misconduct is a misdemeanor, and Coercion in the First Degree is a felony. (Am. Compl. ¶ 22.) The indictment alleged that Plaintiff acted as an accessory to LiGreci, who allegedly (1) used his executive authority to stop Solomon from conducting a background investigation into McCline and (2) ordered Johnstone to answer certain

questions regarding that same background investigation into McCline. (*Id.* ¶ 23.) In the criminal matter, LiGreci and McCline were Plaintiff's co-Defendants. (*Id.* ¶ 30.)

**\*5** The first trial commenced on May 6, 2013 and continued until a mistrial was declared on May 9, 2013. (*Id.* ¶ 31.) Subsequently, LiGreci pled guilty and McCline's case was severed. (*Id.* ¶ 32.) On June 10, 2013, a retrial against Plaintiff alone began and on July 8, 2013 he was found guilty on all four counts. (*Id.* ¶ 33.)

Plaintiff alleges he suffered *Brady, Rosario,* and due process violations during both trials because Monticello Defendants withheld exculpatory and impeachment materials. (*Id.* ¶¶ 122, 128–29, 130.) Feliciano was a key witness for the prosecution at Plaintiff's criminal trial and he testified that Plaintiff obstructed the background investigation into McCline. (*Id.* ¶ 125.) Plaintiff alleges Monticello Defendants failed to disclose *Brady* and *Rosario* material including recorded conversations between Feliciano and members of the community taken during the McCline background investigation. (*Id.* ¶ 120.) Monticello Defendants also allegedly failed to provide Farrell, at any time prior to the Feliciano's trial testimony, a secretly recorded conversation ("Mack recording") between Feliciano and Mrs. Mack, a witness for the defense in Plaintiff's criminal trial. (*Id.* ¶ 121.) As a result, Plaintiff was not able to cross-examine Feliciano regarding possible contradictions between the recording and Feliciano's testimony at both trials, (*id.* ¶ 124), and was thus denied the opportunity to impeach a key state witness, (*id.* ¶ 127). Plaintiff alleges that Monticello Defendants purposely failed to disclose this recording to Farrell in an attempt to continue the fraudulent criminal prosecution which they had set in motion. (*Id.* ¶ 123.)

On January 30, 2014, Plaintiff was sentenced to six months of incarceration, five years of probation, and 500 hours of community service. (*Id.* ¶ 34.) Plaintiff served five days in jail. (*Id.* ¶ 35.) On January 12, 2016, the Third Department of the New York State Supreme Court Appellate Division reversed Plaintiff's conviction. (*Id.* ¶ 38.)

### B. Procedural History

Plaintiff filed his Complaint against all Defendants on December 29, 2016. (*See* Compl. (Dkt. No. 1).) On January 24, 2017, counsel for Farrell and the County of Sullivan submitted a pre-motion letter to the Court requesting permission to file a Motion To Dismiss. (*See* Letter from Cheryl A. McCausland, Esq. to Court (Dkt. No. 21).) On

2018 WL 4757970

January 27, 2017, counsel for Plaintiff submitted a letter opposing Farrell's request. (*See* Letter from Jessica Massimi, Esq. to Court (Dkt. No. 24).) On January 30, 2017, counsel for Monticello Defendants and the Village of Monticello requested an extension to file an answer or pre-motion letter. (*See* Letter from David L. Posner, Esq. to Court (Dkt. No. 25).) Thereafter, the Court scheduled a pre-motion conference and set a deadline for the filing of their pre-motion letters. (*See* Dkt. Nos. 27–29.) On February 27, 2017, counsel for Monticello Defendants and the Village of Monticello submitted a pre-motion letter requesting permission to file a Motion To Dismiss. (*See* Letter from David L. Posner, Esq. to Court (Dkt. No. 34).) On March 2, 2017, counsel for Plaintiff submitted a letter opposing Monticello Defendants' request. (*See* Letter from Jessica Massimi, Esq. to Court (Dkt. No. 35).) A pre-motion conference was held on March 9, 2017. (*See* Dkt. (entry for March 9, 2017).) Plaintiff filed his Amended Complaint on April 17, 2017. (*See* Am. Compl.) Notably, the Village of Monticello and the County of Sullivan were no longer listed as defendants in the Amended Complaint. (*See id.*)

 **\*6** On May 1, 2017, counsel for Farrell again submitted a pre-motion letter to the Court requesting permission to file a Motion To Dismiss. (*See* Letter from Steven C. Stern, Esq. to Court (Dkt. No. 42).) On May 6, 2017, counsel for Plaintiff submitted a letter opposing Farrell's request. (*See* Letter from Jessica Massimi, Esq. to Court (Dkt. No. 43).) Counsel for Monticello Defendants also filed a pre-motion letter on May 12, 2017. (*See* Letter from David L. Posner, Esq. to Court (Dkt. No. 44).). On May 16, 2017, counsel for Plaintiff submitted a letter opposing Monticello Defendants' request in its entirety. (*See* Letter from Jessica Massimi, Esq. to Court (Dkt. No. 45).) A pre-motion conference was held on June 27, 2017 and the Court entered a briefing schedule. (*See* Dkt. (entry for June 27, 2017); Motion Scheduling Order (Dkt. No. 47).)

On September 1, 2017, Monticello Defendants filed their Motion To Dismiss and accompanying papers. (*See* Monticello Defs.' Not. Of Mot.; Aff. of David L. Posner ("Posner Aff.") (Dkt. No. 51); Monticello Defs.' Mem. of Law in Supp. of Mot. To Dismiss ("Monticello Defs.' Mem.") (Dkt. No. 52).) Farrell filed his Motion To Dismiss and accompanying papers that same day. (*See* Not. Of Mot. (Dkt. No. 53); Aff. of Steven C. Stern ("Stern Aff.") (Dkt. No. 54); Farrell's Mem. of Law in Supp. of Mot. To Dismiss ("Farrell's Mem.") (Dkt. No. 55).)

Plaintiff filed his Opposition to Farrell's Motion to Dismiss on November 24, 2017. (*See* Pl.'s Mem. of Law in Opp'n to Farrell's Mot. To Dismiss ("Pl.'s Mem. re Farrell") (Dkt. No. 60); Decl. Of Jessica Massimi ("Massimi Decl. re Farrell") (Dkt. No. 61).) Plaintiff filed his Opposition to Monticello Defendants' Motion To Dismiss that same day. (*See* Pl.'s Mem. of Law in Opp'n to Monticello Defs.' Mot. To Dismiss ("Pl.'s Mem. re Monticello Defs.") (Dkt. No. 62); Decl. Of Jessica Massimi ("Massimi Decl. re Monticello") (Dkt. Nos. 63–65) ).

Farrell filed his Reply on December 15, 2017. (*See* Farrell's Reply Mem. Of Law in Further Supp. of Mot. ("Farrell's Reply") (Dkt. No. 68).) Monticello Defendants filed their Reply that same day. (*See* Monticello Defs.' Reply Mem. Of Law in Further Supp. of Mot. ("Monticello Defs.' Reply") (Dkt. No. 69).)

C. Materials Considered

1. Standard

As a threshold matter, the Court considers the proper treatment of exhibits submitted by Defendants and Plaintiff in support of their Motions and Opposition. The parties have submitted, and ask the Court to consider, dozens of exhibits that are extraneous to the Amended Complaint. [3]

[3]   Counsel for Monticello Defendants submitted 16 exhibits with their Motion to Dismiss. (*See* Posner Aff.) Counsel for Farrell submitted six exhibits with her Motion to Dismiss. (*See* Stern Aff.) Counsel for Plaintiff submitted eight exhibits with her Opposition to Farrell's Motion, (Massimi Decl. re Farrell), and nine exhibits with his Opposition to Monticello Defendants' Motion, (Massimi Decl. re Monticello Defs.).

Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted). "To go beyond the allegations in the [c]omplaint would convert the ... motion to dismiss into one for summary judgment...." *Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002).

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 168 of 370

Hutchins v. Solomon, Not Reported in Fed. Supp. (2018)

2018 WL 4757970

There are a few notable exceptions to this rule. In addition to the Complaint, a court ruling on a Rule 12(b)(6) motion "may consider ... any written instrument attached to the complaint as an exhibit[,] or any statements or documents incorporated in it by reference," as well as "matters of which judicial notice may be taken, and documents either in [the] plaintiffs' possession or of which [the] plaintiffs had knowledge and relied on in bringing suit." *Kalyanaram v. Am. Ass'n of Univ. Professors at N.Y. Inst. of Tech., Inc.,* 742 F.3d 42, 44 n.1 (2d Cir. 2014) (alterations and internal quotation marks omitted); *Wang v. Palmisano,* 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).

**\*7** "To be incorporated by reference, the [c]omplaint must make a clear, definite and substantial reference to the documents." *Thomas,* 232 F. Supp. 2d at 275. Additionally, even if not attached or incorporated by reference, a document upon which the complaint "solely relies and which is integral to the complaint may be considered by the court in ruling on such a motion." *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir. 2007) (emphasis and internal quotation marks omitted). Documents are "integral" where the plaintiff had to rely on their content "in order to explain what the actual unlawful course of conduct was on which the [d]efendants embarked." *Thomas,* 232 F. Supp. 2d at 276; *see also Munno v. Town of Orangetown,* 391 F. Supp. 2d 263, 269 (S.D.N.Y. 2005) (finding documents were integral to the complaint where the plaintiff "relied heavily upon [them] in framing the [c]omplaint"); *Gantt v. Ferrara,* No. 15-CV-7661, 2017 WL 1192889, at *14 (S.D.N.Y. Mar. 29, 2017) (same).

The Court is also entitled to take notice of matters of public records. *See Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 75 (2d Cir. 1998) (noting that "a district court may rely on matters of public record in deciding a motion to dismiss under Rule 12(b)(6), including case law and statutes"); *Medcalf v. Thompson Hine LLP,* 84 F. Supp. 3d 313, 321 (S.D.N.Y. 2015) ("In considering a motion to dismiss, a court is permitted to take judicial notice of public records...."). The public records courts may consider include dispositions in criminal cases. *See, e.g., Wims v. New York City Police Dep't,* No. 10-CV-6128, 2011 WL 2946369, at *2 (S.D.N.Y. July 20, 2011) (noting that " 'a district court may rely on matters of public record in deciding a motion to dismiss ... including arrest reports, criminal complaints, indictments and criminal disposition data.' "); *U.S. Fid. & Guar. Co. v. Petroleo Brasileiro S.A.-Petrobras,* No. 98-CV-3099, 2001 WL 300735, at *9 n.7 (S.D.N.Y. Mar. 27, 2001) ("With respect to materials from the [s]tate [c]ourt

[a]ction, the [c]ourt may take judicial notice of the relevant pleadings, motion papers, orders, and judgments in the [s]tate [c]ourt [a]ction without converting [the defendant's] motion to one for summary judgment.").

However, in taking judicial notice of such public records, the Court does so only to establish "the fact of such litigation," not for the truth of the matters asserted in that proceeding. *See Global Network Commc'ns, Inc. v. City of New York,* 458 F.3d 150, 157 (2d Cir. 2006) ("A court may take judicial notice of a document filed in another court ... to establish the fact of such litigation and related filings." (internal quotation marks omitted) ); *see also Roth,* 489 F.3d at 509 ("If the court takes judicial notice, it does so in order to determine *what* statements [a document] contained—but *again not for the truth of the matters asserted.*" (internal quotation marks omitted) ).

## 2. Farrell's Exhibits

Most exhibits submitted by Farrell are public records of which the Court may take judicial notice. For example, Farrell's Exhibit C is a copy of the Certificate of Conviction of LiGreci. (Stern Aff. Ex. C ("LiGreci Certificate of Conviction").) Farrell's Exhibit D is a copy of the transcript of LiGreci's plea allocution. (Stern Aff. Ex. D ("LiGreci Plea Allocution").) Farrell's Exhibit E is a copy of the Certificate of Conviction of McCline. (Stern Aff. Ex. E ("McCline Certificate of Conviction").) Farrell's Exhibit F is a copy of the New York Supreme Court's Memorandum and Order vacating Plaintiff's conviction in *People v. Hutchins,* 25 N.Y.S.3d 699 (App. Div. 2016). (Stern Aff. Ex. F ("Hutchins") ). The Court considers these public records in deciding Farrell's Motion, but only to establish the fact of such filings and what they contained, not for the truth of the matter asserted therein. *See Global Network,* 458 F.3d at 157; *Roth,* 489 F.3d at 509.

**\*8** Farrell's Exhibit B is a copy of the July 30, 2012 letter from Farrell to Hill, (Stern Aff. Ex. B ("Farrell Letter") ), that Plaintiff expressly cites as an example of how Farrell investigated him and fabricated allegations against him, (Am. Compl. ¶¶ 142–43). The Court rejects Plaintiff's argument that the letter is not incorporated by reference merely because Plaintiff does not quote from the letter. (Pl.'s Mem. re Farrell at 25.) Plaintiff makes a "clear, definite and substantial reference to the document," when he cites to and paraphrases the letter. *Thomas,* 232 F. Supp. 2d at 275. Plaintiff also relies on the letter to explain "what the actual unlawful course of

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 169 of 370

Hutchins v. Solomon, Not Reported in Fed. Supp. (2018)

2018 WL 4757970

conduct was." *Id.* at 276. Thus, Court considers the Farrell Letter in deciding Farrell's Motion.

### 3. Monticello Defendants' Exhibits

Monticello Defendants' Exhibit B is an excerpt of Feliciano's trial testimony that they include to correct a biographical fact regarding Feliciano's employment. (Posner Aff. Ex. B.) Monticello Defendants' Exhibit P is an email exchange between the parties' counsel showing Defendants attempted to correct this error. (Posner Aff. Ex. P.) Monticello Defendants argue that their counsel contacted Plaintiff's counsel before the filing of the Amended Complaint to correct the biographical error but that the error was repeated in the Amended Complaint. (Monticello Defs.' Mem. 17–18.). Monticello Defendants do not point to any exception that would allow the Court to consider these exhibits. They do not argue that these exhibits are public records, nor that they are incorporated by reference, as indeed Plaintiff's Amended Complaint does not mention or rely on these transcript portions or emails. And, although the Court may consider "documents either in plaintiff's possession or of which plaintiffs had knowledge and relied on in bringing suit," *Brass v. Am. Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir. 1993), "mere notice or possession is not enough," *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). "[A] plaintiff's reliance on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion." *Chambers*, 282 F.3d at 153 (emphasis omitted). Monticello Defendants do not allege that Plaintiff relied on Exhibits B or P in drafting the Amended Complaint, and acknowledge that the failure to correct the biographical fact was likely an oversight. (Monticello Defs.' Mem. 17.) Monticello Defendants may not attempt to edit the Amended Complaint or to impeach Plaintiff by introducing extrinsic evidence at the Motion To Dismiss Stage. Therefore, the Court will not consider Exhibits B or P in deciding their Motion.

Monticello Defendants also submit a number of exhibits that are public records of which the Court may take judicial notice. For example, Monticello Defendants' Exhibit C is a copy of Plaintiff's indictment. (Posner Aff. Ex. C ("Indictment") ). Exhibit D is a copy of the New York County Court decision in Plaintiff's criminal case granting a mistrial. (Posner Aff. Ex. D ("Mistrial Decision").) Exhibit O is the index to the record on appeal in Plaintiff's criminal case. (Posner Aff. Ex.

O ("Index").) The Court considers these public records in deciding this motion, but only to establish the fact of such filings and what they contained, not for the truth of the matter asserted therein. *See Global Network*, 458 F.3d at 157; *Roth*, 489 F.3d at 509. [4]

> [4]    Monticello Defendants' Exhibit M is a copy of
> LiGreci's Plea, (Posner Aff. Ex. M), which the
> Court has explained it will consider as a matter
> of public record as Farrell's Exhibits C and D.
> The Court takes notice of Monticello Defendants'
> Exhibit N, which is a copy of a newspaper article
> describing McCline's conviction. (Posner Aff. Ex.
> N.) *See Condit v. Dunne*, 317 F. Supp. 2d 344,
> 357–58 (S.D.N.Y. 2004) (taking judicial notice of
> newspaper articles submitted by the defendant in
> conjunction with his motion to dismiss, "but only
> for a limited purpose" and not for the truth of the
> articles' content). The Court has already explained
> it will consider Farrell's Exhibit E, which is a copy
> of McCline's Certificate of Conviction, as a matter
> of public record.

**\*9** Monticello Defendants' Exhibits E through L are excerpts of Solomon, Johnstone, and Feliciano's grand jury testimony. (Posner Aff. Ex. E–L). Monticello Defendants argue that these excerpts are "integral" to the Amended Complaint because Plaintiff makes specific and general references to Monticello Defendants' allegedly false testimony that led to his prosecution. (Monticello Defs.' Mem. 16.) Documents are "integral" where the plaintiff had to rely on the content of them "in order to explain what the actual unlawful course of conduct was on which the [d]efendants embarked." *Thomas*, 232 F. Supp. 2d at 276; *see also Munno*, 391 F. Supp. 2d at 269 (finding documents were integral to the complaint where the plaintiff "relied heavily upon [them] in framing the [c]omplaint"); *Gantt*, 2017 WL 1192889, at \*14 (same).

The Court notes that most of Plaintiff's references to Monticello Defendants' testimony are general and do not point to any specific portion of the grand jury or trial transcript. For example, Plaintiff alleges that Johnstone testified in the grand jury against Plaintiff on September 19, 2012, but does not specify the contents of his testimony. (Am. Compl. ¶ 73n.) Plaintiff also generally alleges that each of Monticello Defendants made false statements to the grand jury, (*id.* ¶ 164), and that each of the Defendants falsely alleged that LiGreci and Plaintiff interfered with the MPD's background investigations into McCline, (*id.* ¶ 74). It is not at

Hutchins v. Solomon, Not Reported in Fed. Supp. (2018)

2018 WL 4757970

all clear to the Court that Plaintiff relied on specific excerpts of grand jury testimony to make general allegations that Monticello Defendants fabricated accusations against him.

Plaintiff mentions specific portions of testimony in three instances. First, Plaintiff alleges that Feliciano was a key witness for the prosecution at Plaintiff's criminal trial, (*id.* ¶ 125), and that he testified that Plaintiff obstructed the background investigation into McCline, (*id.* ¶ 126). This is a reference to trial testimony, however, and Monticello Defendants only offer excerpts of grand jury testimony. Second, Plaintiff alleges that Solomon testified that he made up his mind that McCline was not qualified to be a police officer from the beginning of the background investigation, (*id.* ¶ 46), but does not specify whether this was part of Solomon's grand jury or trial testimony. Third, Plaintiff alleges Johnstone testified at trial that he never informed LiGreci of the ongoing criminal investigation as he did not want certain people, including Plaintiff, to learn about the criminal investigation. (*Id.* ¶ 89.) Exhibits E through L are all excerpts of *grand jury testimony* and it does not follow that Plaintiff "relied heavily upon" them to make allegation about Feliciano and Johnstone's *trial testimony* and Solomon's *unspecified testimony.* Even if Plaintiff had quoted directly from or relied upon specific portions of the grand jury testimony, it is not clear that these excerpts were integral or incorporated by reference. *Goldman v. Belden,* 754 F.2d 1059, 1066 (2d Cir. 1985) (holding that "limited quotation does not constitute incorporation by reference" and that it was therefore improper for court to consider extraneous documents submitted by the defendant in support of motion to dismiss without converting motion into a motion for summary judgment and giving the plaintiff opportunity to submit Rule 56 materials); *see also Ying Li v. City of New York,* 246 F. Supp. 3d 578, 596 (E.D.N.Y. 2017) (declining to take judicial notice of grand jury minutes because the plaintiff sought to rely on the substance and truth of the testimony and not just the fact of the testimony).

### 4. Plaintiff's Exhibits

Plaintiff makes clear he does not wish to convert the Motions into summary judgment motions without the opportunity for the Parties to file Rule 56.1 Statements, but nonetheless submits exhibits in his Opposition to the Farrell Motion, (Massimi Decl. re Farrell 1–2), and Monticello Defendants' Motion, (Massimi Decl. re Monticello Defs. 1–2), in order to rebut the evidence offered by Defendants. Several of the

exhibits Plaintiff submits were not even alluded to in the Amended Complaint and will not be considered. [5]

[5]    Plaintiff's Exhibit 1 in Opposition to Monticello Defendants' Motion is Farrell's opening statement in Plaintiff's criminal trial. (Massimi Decl. re Monticello Defs. Ex. 1.) Plaintiff's Exhibit 2 in Opposition to Monticello Defendants' Motion is a partial transcript of Plaintiff's grand jury testimony. (Massimi Decl. re Monticello Defs. Ex. 2.) Plaintiff's Exhibit 4 in Opposition to Monticello Defendants' Motion, (Massimi Decl. re Monticello Defs. Ex. 4), and Plaintiff's Exhibit 3 in Opposition to Farrell, (Massimi Decl. re Farrell Ex. 3.), are partial transcripts of Hill's trial testimony. Farrell's opening statement, Plaintiff's grand jury testimony, and Hill's trial testimony were not mentioned in the Amended Complaint. Plaintiff does not point to any exception that would allow the Court to consider these extraneous materials. The Court will not consider these exhibits.

**\*10** Several of Plaintiff's exhibits tangentially relate to Plaintiff's claim that he suffered *Brady* and *Rosario* violations when Monticello Defendants withheld exculpatory and impeachment materials. (Am. Compl. ¶¶ 119–21, 182(e).) Plaintiff's Exhibit 3 in Opposition to Monticello Defendants' Motion, (Massimi Decl. re Monticello Defs. Ex. 3.), and Plaintiff's Exhibit 6 in Opposition to Farrell's Motion, (Massimi Decl. re Farrell Ex. 6), are copies of a *Rosario* Order Sanctioning Farrell. The Amended Complaint never mentions that Farrell was sanctioned. Plaintiff's Exhibit 5 in Opposition to Monticello Defendants' Motion, (Massimi Decl. re Monticello Defs. Ex. 5), and Plaintiff's Exhibit 5 in Opposition to Farrell's Motion, (Massimi Decl. re Farrell Ex. 5), are copies of the transcript of the trial proceeding regarding the *Rosario* and *Brady* violations. The Amended Complaint never mentions that the *Brady* and *Rosario* violations were discussed at length during trial. The fact that Plaintiff broadly alleges *Brady* and *Rosario* violations does not show that he "relied heavily upon," the *Rosario* order or the trial transcript in framing his Amended Complaint. *See Munno,* 391 F. Supp. 2d at 269, *Gantt,* 2017 WL 1192889, at *14. [6]   The Court will not allow Plaintiff to cherry pick portions of the record that bolster his claims and in effect edit his Amended Complaint through these exhibits.

[6]    Plaintiff's Exhibit 9 in Opposition to Monticello Defendants' Motion, (Massimi Decl. re Monticello

Hutchins v. Solomon, Not Reported in Fed. Supp. (2018)

2018 WL 4757970

Defs. Ex. 3), and Plaintiff's Exhibit 7 in Opposition to Farrell's Motion, (Massimi Decl. re Farrell Ex. 7), are copies of an email exchange between counsel regarding a possible *Brady* order. Plaintiff does not reference a *Brady* order or communications between counsel in the Amended Complaint. Nor does Plaintiff point to any exception that would allow the Court to consider these extraneous emails. Plaintiff's Exhibit 8 in Opposition to Farrell's Motion is a July 5, 2017 letter from Farrell's counsel producing the allegedly withheld Mack recordings. (Massimi Decl. re Farrell Ex. 8.) Nowhere in the Amended Complaint does Plaintiff mention the eventual production of the Mack recordings and he offers no explanation as to why the Court should consider these extraneous communications that took place after this suit was filed. Therefore the Court will not consider these exhibits.

Plaintiff's Exhibit 6 in Opposition to Monticello Defendants' Motion, (Massimi Decl. re Monticello Defs. Ex. 6), and Plaintiff's Exhibit 4 in Opposition to Farrell's Motion, (Massimi Decl. re Farrell Ex. 4), are copies of a partial transcript of Johnstone's trial testimony. Plaintiff's Exhibit 7 in Opposition to Monticello Defendants' Motion, (Massimi Decl. re Monticello Defs. Ex. 7), and Plaintiff's Exhibit 2 in Opposition to Farrell's Motion, (Massimi Decl. re Farrell Ex. 2), are copies of a partial transcript of Solomon's trial testimony. The Amended Complaint makes two specific references to trial testimony. Feliciano testified at trial that Plaintiff obstructed the background investigation into McCline, (*id.* ¶ 126), and Johnstone testified at trial that he never informed LiGreci of the ongoing criminal investigation as he did not want certain people, including Plaintiff, to learn about the criminal investigation, (*id.* ¶ 89). If Plaintiff had offered excerpts of trial transcripts that related strictly to Feliciano and Johnstone's specific statements, and those specific statements only, it would be conceivable that those excerpts were incorporated by reference because the Amended Complaint makes a "clear, definite and substantial reference to" those excerpts and uses those excerpts to explain "what the actual unlawful course of conduct was." *Thomas,* 232 F. Supp. 2d at 275. The portions of transcript that Plaintiff excerpts, however, go well beyond Feliciano and Johnstone's specific statements and include testimony that Plaintiff did not, but presumably could have, mentioned in the Amended Complaint. The Court will not allow Plaintiff to introduce more detail and edit his Amended Complaint through these

extraneous documents. The Court will not consider these exhibits.

## II. Discussion

### A. Standard of Review

Defendants move to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (alteration and internal quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and internal quotation marks omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id.*; *see also Iqbal,* 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2) ) ); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

**\*11** In considering Defendants' Motion To Dismiss, the Court is required to "accept as true all of the factual allegations contained in the [C]omplaint." *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin,*

Hutchins v. Solomon, Not Reported in Fed. Supp. (2018)

2018 WL 4757970

746 F.3d 58, 62 (2d Cir. 2014) (same). And, the Court must "draw[ ] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012) ).

## B. Analysis

### 1. Monticello Defendants

Plaintiff alleges that Monticello Defendants subjected him to malicious prosecution, denied him the right to a fair trial, violated his due process rights, and committed *Brady* violations against him, (Am. Compl. ¶¶ 161–65), and that they conspired with each other and Farrell to do so, (*id.* ¶¶ 180–82). Monticello Defendants argue that they are entitled to absolute immunity for their trial and grand jury testimony and their conversations with prosecutors, as public officials they are entitled to qualified immunity for their entire alleged course of conduct, and an immunity determination notwithstanding, that Plaintiff fails to state a claim against them. (Monticello Defs.' Mem; Monticello Defs.' Reply.)

### a. Absolute Witness Immunity for Grand Jury and Trial Testimony

Monticello Defendants argue that they enjoy absolute immunity against all claims that are based upon their trial testimony. (Monticello Defs.' Mem. 22–23.) Trial witnesses, including government officials, have absolute immunity with respect to any § 1983 claims arising from their testimony, even if it is alleged that such testimony was perjured. *See Briscoe v. LaHue*, 460 U.S. 325, 335–36 (1983) (affirming dismissal of § 1983 claims arising from police officers' perjurious testimony during trial); *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (holding that the plaintiff's due process claim was barred because the defendant, as a witness, was absolutely immune from liability for the evidence he furnished in the proceeding at issue); *Deraffele v. City of New Rochelle*, No. 15-CV-282, 2016 WL 1274590, at *12–13 (S.D.N.Y. March 30, 2016) (noting that an allegation that the defendants gave perjured testimony was not sufficient to render the defendants liable under § 1983); *Anilao v. Spota*, 774 F. Supp. 2d 457, 506 (E.D.N.Y. 2011) (same). This absolute immunity extends to "preparatory activity" including preliminary discussions between a witness and prosecutor discussing the substance of the witness's

testimony. *See O'Neal v. City of New York*, 196 F. Supp. 3d 421, 430–31 (S.D.N.Y. 2016) (holding that absolute immunity for witness testimony extended to preparatory activity); *Bertuglia v. City of New York*, 133 F. Supp. 3d 608, 642–43 (S.D.N.Y. 2015) (same).

The Court finds that Monticello Defendants are entitled to absolute immunity from liability for the testimony they provided at Plaintiff's trial and for information they provided during preparatory meetings discussing that trial testimony. The Court will not consider trial testimony in deciding this motion. However, Plaintiff only cites specifically to trial testimony on a few occasions, and does so in cursory fashion. (Am. Comp. ¶¶ 89, 125–26.) None of Plaintiff's claims is entirely based on trial testimony so that even excluding trial testimony is not dispositive in deciding the viability of any of Plaintiff's claims.

**\*12** Monticello Defendants also argue that they enjoy absolute immunity against all claims based upon their grand jury testimony. Grand jury witnesses generally "enjoy the same immunity as witnesses at trial." *Rehberg v. Paulk*, 566 U.S. 356, 369–70 (2012). The *Rehberg* Court did not distinguish between law enforcement and lay witnesses, *id.* at 367–68, but made clear that absolute immunity does not extend "to all activity that a witness conducts outside of the grand jury room," such as falsifying affidavits and fabricating evidence, *id.* at 370 n.1 (emphasis is omitted). Accordingly, courts in the Second Circuit have declined to grant absolute immunity to law enforcement officers for alleged misconduct, independent of a defendant's grand jury testimony, such as falsifying statements and evidence. *See, e.g., Coggins v. Buonora*, 776 F.3d 108, 113 (2d Cir. 2015) (affirming denial of absolute immunity to a police officer who testified before the grand jury, but who also allegedly falsified police reports, made false statements to the district attorney, and fabricated evidence, finding that the plaintiff's § 1983 claims were based on alleged misconduct that was independently actionable "prior to and independent of [the officer's] perjurious grand jury appearance"); *Garnett v. City of New York*, No. 13-CV-7083, 2014 WL 3950904, at *13 (S.D.N.Y. Aug. 13, 2014) (declining to grant absolute immunity to grand jury witness who allegedly provided fabricated statements to police officer that formed the basis of the criminal complaint); *Maldonado v. City of New York*, No. 11-CV-3514, 2014 WL 787814, at *10 (S.D.N.Y. Feb. 26, 2014) (declining to grant absolute immunity to police officers who testified before grand jury to the same underlying facts where an allegedly

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 173 of 370
Hutchins v. Solomon, Not Reported in Fed. Supp. (2018)
2018 WL 4757970

false narrative of events provided to another officer preceding the plaintiff's arrest).

The Court finds that Monticello Defendants are not entitled to absolute immunity from liability for their grand jury testimony. Plaintiff alleges that Monticello Defendants engaged in exactly the type of conduct, namely the fabrication of false statements and evidence, that courts in the Second Circuit have refused to immunize. *See* *Garnett*, 2014 WL 3950904, at *13; *Maldonado*, 2014 WL 787814, at *10. In the present case, Plaintiff's "claim[s] exist [i]ndependently of the grand jury testimony" and are not "based on" that testimony. *Coggins*, 776 F.3d at 113. Plaintiff only cites specifically to grand jury testimony on two occasions, (Am. Comp. ¶¶ 182f, 73n), and alleges misconduct separate from Monticello Defendants' grand jury testimony, such as the withholding exculpatory evidence and fabricating a background investigation file during the criminal investigation.

#### b. Malicious Prosecution

Monticello Defendants argue that Plaintiff fails to state a claim for malicious prosecution. (Monticello Defs.' Mem. 19–21.) "In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment, and must establish the elements of a malicious prosecution claim under state law." *Manganiello v. City of New York*, 612 F.3d 149, 160–61 (2d Cir. 2010) (citations omitted). To prevail on a malicious prosecution claim under New York law, the plaintiff must show: "(1) the defendant initiated a prosecution against [the] plaintiff, (2) without probable cause to believe the proceeding can succeed, (3) the proceeding was begun with malice, and (4) the matter terminated in [the] plaintiff's favor." *Rentas v. Ruffin*, 816 F.3d 214, 220 (2d Cir. 2016) (alterations and internal quotation marks omitted). "[T]o sustain a § 1983 malicious prosecution claim, there must be a seizure or other perversion of proper legal procedures implicating the claimant's personal liberty and privacy interests under the Fourth Amendment." *Washington v. Cnty. of Rockland*, 373 F.3d 310, 316 (2d Cir. 2004) (internal quotations marks omitted); *Dellutri v. Village of Elmsford*, 895 F. Supp. 2d 555, 569 (S.D.N.Y. 2012) (same).

To satisfy the first element of a malicious prosecution claim, "it must be shown that the defendant played an active role in the prosecution, such as giving advice

and encouragement or importuning the authorities to act." *Mitchell v. Victoria Home*, 434 F. Supp. 2d 219, 227 (S.D.N.Y. 2006) (citations and internal quotation marks omitted). "One who does no more than disclose to a prosecutor all material information within his knowledge is not deemed to be the initiator of the proceeding." *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 217 (2d Cir. 2000). In malicious prosecution cases brought against police officers, plaintiffs have demonstrated that officers initiated criminal proceedings by having the plaintiff arraigned, by filling out complaining and corroborating affidavits, and by signing felony complaints. *See, e.g.*, *Llerando-Phipps v. City of New York*, 390 F. Supp. 2d 372, 383 (S.D.N.Y. 2005); *Costello v. Milano*, 20 F. Supp. 3d 406, 415 (S.D.N.Y. 2014) (same). "Although there is a presumption that a prosecutor exercises independent judgement in deciding whether to initiate and continue a criminal proceeding, an arresting officer may be held liable for malicious prosecution when a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors ... or when she withholds relevant and material information." *Mitchell*, 434 F. Supp. 2d at 226 (citations and internal quotation marks omitted); *see also* *Zahrey v. Coffey*, 221 F.3d 342, 352 (2d Cir. 2000) ("Even if the intervening decision-maker (such as a prosecutor, grand jury, or judge) is not misled or coerced, it is not readily apparent why the chain of causation should be considered broken where the initial wrongdoer can reasonably foresee that his misconduct will contribute to an 'independent' decision that results in a deprivation of liberty.").

*13 "[P]robable cause is a complete defense to a constitutional claim of malicious prosecution." *Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014). "[A] grand jury indictment gives rise to a presumption that probable cause exists and a claim for malicious prosecution in relation to the crimes described in the indictment thereby is defeated." *McClellan v. Smith*, 439 F.3d 137, 145 (2d Cir. 2006). "[A] presumption of probable cause ... may *only* be rebutted by evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003) (internal quotation marks omitted). Moreover, "a conviction establishes the existence of probable cause which, even when the conviction is reversed on appeal, becomes a rebuttable presumption which can be rebutted only by a showing that conviction itself was a result of fraud, perjury, or other unethical acts on the part of the defendant." *Elek v. Inc. Vill. of Monroe*, 815 F. Supp. 2d 801, 808

Case 5:24-cv-01237-DNH-MJK Document 10 Filed 11/12/24 Page 174 of 370

Hutchins v. Solomon, Not Reported in Fed. Supp. (2018)

2018 WL 4757970

(S.D.N.Y. 2011) (omitting internal citation). Plaintiff "bears the burden of proof in rebutting the presumption, and he must do so with more than mere conjecture and surmise that his indictment was procured as a result of conduct undertaken by the defendants in bad faith." *Battisti v. Rice*, No. 10-CV-4139, 2017 WL 78891, at *9 (E.D.N.Y. Jan. 9, 2017) (internal quotation marks omitted); *see also Savino*, 331 F.3d at 73 (same).

"[M]alice does not have to be actual spite or hatred, 'but only a showing' that the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served." *Bertuglia*, 133 F. Supp. 3d at 634 (internal quotation marks omitted); *Fobbs v. City of New York*, No. 15-CV-6736, 2017 WL 2656207, at *6 (S.D.N.Y. June 19, 2017) (same). A "lack of probable cause generally creates an inference of malice," *Boyd v. City of New York*, 336 F.3d 72, 78 (2d Cir. 2003), as does a prosecution pursued with "reckless disregard of the rights of the plaintiff," *Manganiello*, 612 F.3d at 163 (internal quotation marks omitted), *see also Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 536 (S.D.N.Y. 2015) (noting that "a jury may infer malice from the absence of probable cause").

Favorable termination requires a plaintiff to "demonstrate a final termination of the criminal proceeding in [his] favor, or at least not inconsistent with [his] innocence." *Scalpi v. Town of East Fishkill*, No. 14-CV-2126, 2016 WL 858955, at *11 (S.D.N.Y. Feb. 29, 2016) (quoting *Lozada v. Weilminster*, 92 F. Supp. 3d 76, 96 (E.D.N.Y. 2015) ). Here, because Plaintiff's conviction was vacated, *Hutchins*, 25 N.Y.S.3d at 704, the matter terminated in Plaintiff's favor.

Being free from unreasonable physical detention is a liberty interest under the Fourth Amendment. *See Murphy v. Lynn*, 118 F.3d 938, 945 (2d Cir. 1997) (holding that defendant who was released post-arraignment, but ordered not to leave the state and required to make approximately eight court appearances while his criminal proceeding was pending, had shown "a seizure within the meaning of the Fourth Amendment"). Some courts have found "liberty interests" to be implicated even in cases where there was no arrest or incarceration. *See, e.g.*, *Sassower v. City of White Plains*, 992 F. Supp. 652, 656 (S.D.N.Y. 1998) (finding that where a plaintiff was required to appear in court on three occasions and "cut short" her travel, she had raised "a genuine issue of fact as to the deprivation of liberty element" of her malicious prosecution claim); *Willner v. Town of N.*

*Hempstead*, 977 F. Supp. 182, 189 (E.D.N.Y. 1997) (finding a seizure "[a]lthough there are no allegations of an arrest or an otherwise physical detention" because plaintiff "was required to make court appearances"). The Court concludes that because Plaintiff alleges he spent five days in jail, (Am. Compl. ¶ 35), his personal liberty interest was implicated. Whether Plaintiff can make out a malicious prosecution claim against Monticello Defendants thus depends on whether Defendants can overcome the presumption of probable cause, and whether Plaintiff properly alleges that they initiated a prosecution against him, and did so with malice.

### i. Solomon

**\*14** Plaintiff makes numerous conclusory allegations about Monticello Defendants' knowledge and intentions. For example, Plaintiff alleges that despite the fact that each Monticello Defendant was aware that LiGreci had the authority to halt the background investigation into McCline, and that therefore LiGreci's order to stop the investigation was not criminal, (Am. Compl. ¶¶ 67, 69, 70), each nonetheless misled Farrell into believing LiGreci improperly coerced each of them into stopping the background investigation and that Plaintiff was an accessory, (*id.* ¶¶ 72, 96, 112, 119). Plaintiff also alleges that Monticello Defendants knew that an order by LiGreci to Johnstone to answer questions about the McCline background investigation was not criminal, (*id.* ¶¶ 95, 99), and that LiGreci and Plaintiff were unaware of the ongoing criminal investigation and thus could not have tried to interfere with it, (*id.* ¶¶ 97, 101), but that they nonetheless informed Farrell that Plaintiff had acted as an accessory to LiGreci's order, (*id.* ¶ 96). Plaintiff further alleges that Monticello Defendants purposely failed to disclose the Mack recording to Farrell in an attempt to continue the fraudulent criminal prosecution which they had set in motion. (*Id.* ¶ 123.) Monticello Defendants and Farrell allegedly manufactured the McCline file so that they could use it to allege that Plaintiff was guilty by association. (*Id.* ¶¶ 145, 149.)

The only allegations with respect to Solomon, however, are that until his retirement Solomon compiled the investigative file regarding McCline's background check, (*id.* ¶ 73b); that upon his retirement, Solomon turned this file over to Johnstone, (*id.* ¶¶ 73a, 73g), and spoke with him about it, (*id.* ¶ 73i); that until his retirement, Solomon was in regular communication with Farrell regarding events in the Village of Monticello, (*id.* ¶ 73c.); and finally that Solomon informed Farrell that he felt threatened by Plaintiff with regard to

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 175 of 370

Hutchins v. Solomon, Not Reported in Fed. Supp. (2018)
2018 WL 4757970

McCline's application, (*id.* ¶ 73d.). Plaintiff does not allege that Solomon lied about feeling threatened by Plaintiff. He does not point to which fabricated statements or evidence were included in the McCline file by Solomon. Indeed, Plaintiff's allegations describe a police chief conducting an investigation and discussing that investigation with other law enforcement officials. Plaintiff has not identified any particular lie allegedly told by Solomon that led to his conviction. *See Savino*, 331 F.3d at 73 (noting that "mere conjecture and surmise" are insufficient to rebut the presumption of probable cause created by an indictment by a grand jury (internal quotation marks omitted) ); *Battisti*, 2017 WL 78891, at *11 (holding that "unsupported allegations that" the defendants told multiple versions of a story, had materially changed their story, or failed to disclose exculpatory evidence are "not sufficient to overcome the presumption of probable cause resulting from a grand jury indictment"); *S.B. v. City of New York*, No. 14-CV-1021, 2016 WL 4530455, at *15 (E.D.N.Y. Aug. 29, 2016) (holding that allegations that fail to "suggest the nature of the purported misconduct" are "far too conclusory to rebut the presumption of probable cause that arose following the indictment"); *Stukes v. City of New York*, No. 13-CV-6166, 2015 WL 1246542, at *6 (E.D.N.Y. Mar. 17, 2015) (finding "alleg[ations] that the [defendant] presented false-facts to the grand jury, and that [the d]efendants failed to turn over exculpatory evidence for presentation to the grand jury" to be "conclusory statements [that] fail to overcome the presumption of probable cause." (alterations, citations, and internal quotation marks omitted) ). Plaintiff also alleges that Monticello Defendants failed to turn over the Mack recording to Farrell, (*id.* ¶¶ 120–21), but he fails to allege that Solomon ever knew about that recording, had it in his possession, or had an opportunity to turn it over to Farrell and failed to do so.

Plaintiff fails to rebut the presumption of probable cause with respect to Solomon. He does not allege sufficient facts to indicate the conviction was "procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Savino*, 331 F.3d at 72; *see also* Elek, 815 F. Supp. 2d at 809. Therefore, the Court dismisses the malicious prosecution claim against Solomon.

"As probable cause is a complete defense to a claim of malicious prosecution, the Court does not reach the other elements of the malicious prosecution claim." *Deanda v. Hicks*, 137 F. Supp. 3d 543, 575 (S.D.N.Y. 2015) (citing *Sullivan v. LaPlante*, No. 03-CV-359, 2005 WL 1972555, at *8 & n. 17 (N.D.N.Y. Aug. 16, 2005) ).

### ii. Feliciano

**\*15** Plaintiff makes the same general allegations against Feliciano as he does against Solomon, but adds that Feliciano was the officer who allegedly conducted the Mack interview and created that recording, (*id.* ¶¶ 120–21), and who also testified at Plaintiff's trial, (*id.* ¶ 125). Inasmuch as Plaintiff alleges that the Mack recording was suppressed, he successfully points to Feliciano as the officer who created the recording and who would have been in a position to bring it to Farrell's attention. [7] Thus, Plaintiff successfully rebuts the presumption of probable cause, with respect to Feliciano because he alleges facts that his conviction may have been "procured by ... the suppression of evidence or other police conduct undertaken in bad faith." *Savino*, 331 F.3d at 72.

[7]    Plaintiff also alleges that Feliciano was responsible for the McCline background investigation, (*id.* ¶ 73f), and eventually prepared the final memorandum regarding the investigation, (*id.* ¶ 73h). Much like Plaintiff's description of Solomon's alleged misconduct, these allegations amount to no more than a description of a police officer conducting an investigation and writing a police report.

However, Plaintiff's malicious prosecution claim against Feliciano fails because he cannot satisfy the first element of a malicious prosecution claim, as he fails to allege how Feliciano "played an active role in the prosecution." *Mitchell*, 434 F. Supp. 2d at 227. Plaintiff alleges that both Solomon and Johnstone spoke and met with Farrell, (Am. Compl. ¶¶ 73c, 73d, 73*l*, 73m, 86), but he does not point to an instance when Feliciano reported to or spoke with Farrell, much less that Feliciano ever gave Farrell advice or encouraged him to bring the case against Plaintiff. Because Plaintiff does not properly allege that Feliciano "initiated a prosecution against" him, *Rentas*, 816 F.3d at 220, the Court dismisses the malicious prosecution claim as to Feliciano.

### iii. Johnstone

Plaintiff makes the same general allegations against Johnstone as he does against Solomon and Feliciano, but in addition he alleges that in order to commit malicious prosecution, Johnstone provided Farrell information about

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 176 of 370

Hutchins v. Solomon, Not Reported in Fed. Supp. (2018)

2018 WL 4757970

the McCline hiring process during the criminal investigation, (Am. Compl. ¶ 73k), spoke to Farrell on a daily basis between the time he became acting police chief in March 2012, (*id.* ¶ 73m), and the time the criminal investigation began in July 2012, and also met with Farrell in person, (*id.*). Plaintiff further alleges that during these conversations, Johnstone misinformed Farrell that Plaintiff was engaged in criminal activity. (*Id.* ¶ 73*l.*) Johnstone was also the officer who alerted Farrell that LiGreci had instructed him to answer the list of questions related to the McCline investigation. (*Id.* ¶¶ 86, 92.) By alleging that Johnstone misinformed Farrell during the regular phone calls and the in-person meeting they had, Plaintiff plausibly points to "police conduct undertaken in bad faith" and thus rebuts the presumption of probable cause with respect to Johnstone. *Savino*, 331 F.3d at 72; *see also Elek*, 815 F. Supp. 2d at 808.

Plaintiff also plausibly alleges that Johnstone "initiated a prosecution against" him. *Rentas*, 816 F.3d at 220. In addition to making the conclusory allegation against all Monticello Defendants that they knowingly misinformed Farrell that a crime had been committed and that Plaintiff was an accessory to that crime, (Am. Compl. ¶¶ 67, 69, 70, 72, 95–96, 97, 101, 112, 119), Plaintiff also points to specific instances of Johnstone speaking with Farrell, allegedly passing him information about the investigation, and allegedly lying to him during those conversations in order to implicate Plaintiff, (*id.* ¶¶ 73k, 73*l*, 73m, 86, 92).

**\*16**  Plaintiff also properly alleges that Johnstone initiated the prosecution with malice. Plaintiff again makes several conclusory allegations, including that Monticello Defendants created the criminal investigation into McCline to shield themselves from inquiries into how they conducted his background investigation, (*id.* ¶ 104), and that they fabricated the charges against him in order to advance their own careers, (*id.* ¶ 76). But Plaintiff also alleges that Johnstone was promoted to the position of Lieutenant with the MPD and offers this fact to plausibly plead an improper motive. (*Id.* ¶ 78.) *See Bertuglia*, 133 F. Supp. 3d at 634 (noting that the malice element is satisfied by a "showing that the defendant ... commenced the criminal proceeding due to a wrong or improper motive"). Moreover, "[a] lack of probable cause generally creates an inference of malice." *Boyd*, 336 F.3d at 78. Although Plaintiff may face an uphill battle at the summary judgment or trial stage in substantiating this allegation and proving a connection between Johnstone's career trajectory and his involvement in Plaintiff's prosecution, at this stage Plaintiff has alleged

"enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Therefore, Monticello Defendants' motion to dismiss the malicious prosecution claim with respect to Johnstone is denied.

### c. Interaction of Malicious Prosecution, Fair Trial, and *Brady* Claims

Because Plaintiff brings claims for malicious prosecution, the denial of the right to a fair trial, and a *Brady* violation, the Court briefly considers the interaction and overlap between the legal standards for these claims and how Plaintiff attempts to use the same factual allegations about the fabrication of incriminating evidence and the withholding of exculpatory evidence in support of each.

### i. Fair Trial Claim Standard

"When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997). To state a fair trial right claim, a plaintiff must plausibly plead the following elements: "(1) investigating official (2) fabricates information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016) (citing *Ricciuti*, 124 F.3d at 130).

Probable cause is not a defense to a denial of fair trial claim. *See Heard v. City of New York*, 319 F. Supp. 3d 687, 697 (S.D.N.Y. 2018); *Overby v. Fabian*, No. 17-CV-3377, 2018 WL 3364392, at \*11 (S.D.N.Y. July 10, 2018) (same). "Because probable cause is no defense to a denial of the right to a fair trial claim, fair trial claims cover kinds of police misconduct not addressed by false arrest or malicious prosecution claims." *Garnett*, 838 F.3d at 278; *see also Brandon v. City of New York*, 705 F. Supp. 2d 261, 276 (S.D.N.Y. 2010) (noting that the Second Circuit has permitted "claims for both malicious prosecution and a denial of his right to trial based on the same alleged fabrication of evidence").

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 177 of 370

Hutchins v. Solomon, Not Reported in Fed. Supp. (2018)

2018 WL 4757970

Conclusory statements that officers fabricated evidence do not suffice to state a claim for the denial of a fair trial. See *Longo v. Ortiz*, No. 15-CV-7716, 2016 WL 5376212, at \*6 (S.D.N.Y. Sept. 26, 2016) (holding that the plaintiff failed to state denial of fair trial claim where he alleged "he was denied the right to a fair trial ... when the defendants fabricated evidence, gave false testimony, and made false extrajudicial statements ... to be used against [the plaintiff] at trial as well as to a Supreme Court judge in an effort to secure a search warrant, indictment and conviction") (internal quotation marks omitted); *Harasz v. Katz*, 239 F. Supp. 3d 461, 493 (D. Conn. 2017) (holding that the plaintiff failed to state a denial of fair trial claim where he merely alleged that officers "did in fact participate in fabrication of evidence, ignored the truth when presented and chose what to bring as the truth ... [and] did not want the truth to interfere with their witch hunt."). Instead plaintiffs must identify the actual fabrication. See, e.g., *Cunningham v. City of New York*, No. 17-CV-5124, 2018 WL 4168964, at \*5 (S.D.N.Y. Aug. 30, 2018) (dismissing fair trial claim where the complaint failed to assert that arresting report contained a fabrication); *Harasz*, 239 F. Supp. 3d at 493–94 (finding the plaintiff failed to plausibly allege fabrication of evidence against officer who did not create any evidentiary materials that were forwarded to prosecutors even if officer failed to conduct a thorough investigation).

**\*17** Finally, in the context of a fabrication of evidence claim, the Second Circuit equates "the fraudulent omission of factual information ... with the affirmative perpetration of a falsehood," and expressly disclaims any "plausible legal distinction between misstatements and omissions." *Morse v. Fusto*, 804 F.3d 538, 550 (2d Cir. 2015).[8]

[8]     The Court notes, however, that in the Second Circuit cases that Plaintiff and Defendants cite, the officers who were found to have "fabricated evidence" for purposes of a fair trial claim, did take some affirmative action toward preparing or creating the evidence later relied upon by prosecutors. See, e.g., *Ricciuti*, 124 F.3d at 130 (holding that officers manufactured evidence by preparing a false report recounting a false confession from the plaintiff); *Garnett*, 838 F.3d at 275 (holding officer manufactured evidence where he falsified a written record of his own observations of the plaintiff's activity and created statements made by the plaintiff during a drug bust operation

which false accounts were recorded in official police reports forwarded to the prosecutor).

ii. *Brady* Claim Standard

"The basic rule of *Brady* is that the Government has a constitutional duty to disclose favorable evidence to the accused where such evidence is 'material' either to guilt or to punishment." *United States v. Coppa*, 267 F.3d 132, 139 (2d Cir. 2001). "There are three components of a true *Brady* violation: [1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." *Deanda*, 137 F. Supp. 3d at 577 (quoting *Poventud v. City of New York*, 750 F.3d 121, 133 (2d Cir. 2014) (en banc) (internal quotation marks omitted) ); *see also Ambrose v. City of New York*, 623 F. Supp. 2d 454, 467 (S.D.N.Y. 2009) (same).

"Police officers can be held liable for *Brady* due process violations under § 1983 if they withhold exculpatory evidence from prosecutors." *Bermudez v. City of New York*, 790 F.3d 368, 376 n.4 (2d Cir. 2015). "[P]olice officers satisfy their obligations under *Brady* when they turn exculpatory evidence over to the prosecutors," *Walker v. City of New York*, 974 F.2d 293, 299 (2d Cir. 1992), "unless there is some indication that the police have suppressed evidence," *McCaffrey v. City of New York*, No. 11-CV-1636, 2013 WL 494025, at \*12 (S.D.N.Y. Feb. 7, 2013).

Under the third prong, prejudice will only be shown where the undisclosed evidence is "material." See *Boyette v. Lefevre*, 246 F.3d 76, 91–92 (2d Cir. 2001) (citing *United States v. Bagley*, 473 U.S. 667, 682 (1985) ). "Undisclosed 'evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *United States v. Payne*, 63 F.3d 1200, 1209 (2d Cir. 1995) (quoting *Bagley*, 473 U.S. at 682). "A 'reasonable probability' is 'a probability sufficient to undermine confidence in the outcome' of the case, hence, the undisclosed evidence will be deemed material only if it 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' " *Id.* (quoting *Bagley*, 473 U.S. at 682 and *Kyles v. Whitley*, 514 U.S. 419, 435 (1995) ). "[W]here the allegedly undisclosed material is not exculpatory, but rather impeachment evidence, that evidence is not material for *Brady* purposes...." *Hayes v. Lee*, No. 11-CV-1365, 2015 WL

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 178 of 370

Hutchins v. Solomon, Not Reported in Fed. Supp. (2018)
2018 WL 4757970

5943677, at *31 n. 34 (S.D.N.Y. Oct. 13, 2015) (quoting *Mack v. Conway,* 476 F. App'x 873, 876 (2d Cir. 2012) (internal citation marks omitted) ); *see also United States v. Rosner,* 516 F.2d 269, 273–74 (2d Cir. 1975) (holding additional impeachment evidence was not material where other evidence supported conviction).

### iii. Interaction

**\*18** Courts in the Second Circuit have long treated malicious prosecution and fair trial claims as separate causes of action. *See, e.g., Garnett,* 838 F.3d at 278 (noting that "fair trial claims cover kinds of police misconduct not addressed by false arrest or malicious prosecution claims") (citing *Ricciuti,* 124 F.3d at 130); *Brandon,* 705 F. Supp. 2d at 276 (noting that the Second Circuit has permitted "claims for both malicious prosecution and a denial of the right to trial based on the same alleged fabrication of evidence") (internal citation omitted); *McCaffrey,* 2013 WL 494025, at *12 (treating plaintiff's malicious prosecution and fair trial claims as separate constitutional torts). Several courts in the Second Circuit have, however, found that *Brady* claims are duplicative of both fair trial and malicious prosecution claims where the alleged underlying conduct is the same, and have therefore considered plaintiffs' claims through the lens of *Brady. See, e.g., Deanda,* 137 F. Supp. 3d at 578; *McCaffrey,* 2013 WL 494025, at *12.

In *Deanda,* the court granted summary judgment to the defendants on plaintiff's malicious prosecution claim because it found there was probable cause to initiate the criminal proceeding and that that served as a complete defense. 137 F. Supp. 3d at 575. The court then separately assessed plaintiff's *Brady* violation claim and found it was "duplicative of [Plaintiff's] malicious prosecution claim," because the plaintiff offered the exclusion of exculpatory evidence from a police report as the basis of her malicious prosecution claim. *Id.* at 578. The court explained that in a case where a "plaintiff can demonstrate that police have turned over fabricated evidence to the prosecutor," the court can redress such conduct "not as a *Brady* violation, but because it violates the right not to be deprived of liberty on the basis of false and fabricated evidence (as a malicious prosecution claim]"). *Id.* at 578 (citing *Myers v. County of Nassau,* 825 F. Supp. 2d 359, 367 (E.D.N.Y. 2011) ). The court then analyzed plaintiff's claim through the *Brady* lens and concluded that the plaintiff failed to allege "the second element of a *Brady* claim—that the evidence was suppressed." *Id.*

Unlike the plaintiff in *Deanda,* Plaintiff here specifically does not rely on only the allegedly withheld *Brady* materials as the basis for his malicious prosecution claims. His malicious prosecution claim against Johnstone survives this Motion To Dismiss based on the alleged conduct of misinforming Farrell, not based on the withholding of *Brady* materials. The Court will thus consider whether Plaintiff can also state a separate *Brady* claim against Johnstone. Plaintiff's malicious prosecution claims against Feliciano and Solomon, which are dismissed herein, are also based on their whole course of conduct, not just the withholding of *Brady* materials. Therefore, the Court will consider whether Plaintiff successfully states a separate *Brady* claim against Feliciano and Solomon.

In *McCaffrey,* the court treated the plaintiff's malicious prosecution and fair trial claims as "causes of action for separate constitutional torts." 2013 WL 494025, at *10. The court treated the plaintiff's fair trial claim and *Brady* violation claim as one, however, "[b]ecause the parties have discussed Plaintiff's asserted *Brady* violations as the basis for [the] [p]laintiff's § 1983 denial of fair trial claim" and the court therefore "address[ed] [the] [p]laintiff's fair trial claims through the lens of *Brady.*" *Id.* at *12 (internal quotation marks omitted). Applying the *Brady* violation test, the court denied summary judgment on the fair trial claim because there was a question of fact as to whether the plaintiff suffered prejudice at trial because exculpatory statements were suppressed or fabricated evidence turned over to prosecutors. *See* 2013 WL 494025, at *13.

**\*19** Unlike the plaintiff in *McCaffrey,* Plaintiff here specifically does not rely on only the withholding of *Brady* materials as the basis for his fair trial claim. In their Memoranda of Law, Monticello Defendants assume that Plaintiff is basing his fair trial claim on the withholding of *Brady* and *Rosario* materials, specifically pointing to the Mack recording. (Monticello Defs.' Mem. 23–25; Monticello Defs.' Reply 4–5). [9] In his opposition, however, Plaintiff supports his fair trial claim with allegations that Monticello Defendants failed to inform Farrell about their false statements, created a false narrative, and conducted the investigation into Plaintiff in a deficient manner. (Pl.'s Mem. re Monticello Defs. 17–19). Plaintiff does not mention the withholding of *Brady* materials in his brief's section on his fair trial claim. (*See id.*) Plaintiff does, however, mention the withholding of exculpatory evidence, specifically the Mack recording, in the section of his brief arguing

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 179 of 370
Hutchins v. Solomon, Not Reported in Fed. Supp. (2018)
2018 WL 4757970

he suffered a *Brady* violation. (Pl.'s Mem. re Monticello Defs. 20–21). The Court thus considers the basis of Plaintiff's fair trial claim to be the fabricated evidence (in the form of misrepresentations to Farrell), *and* the basis of Plaintiff's *Brady* claim to be the withheld exculpatory evidence. The Court therefore considers Plaintiff's claim that Monticello Defendants withheld exculpatory evidence through the "*Brady* lens."

9 Monticello Defendants respond to both Plaintiff's fair trial and *Brady* claims with the same argument that Plaintiff cannot state a claim based upon the Mack recording because police officers do not have an obligation to turn the materials over until trial and that once officers turn such materials over, it becomes the prosecutor's responsibility to produce such evidence to the defense. (Monticello Defs.' Mem. 23–25; Monticello Defs.' Reply 4–5). Monticello Defendants cite to extraneous materials the Court has explained it will not consider, (*see* supra Section I(C)(3) ), to elaborate on who was in possession of the *Brady* materials, whether those materials were turned over, and whether Farrell was sanctioned for failing to produce those materials.

The Court thus applies the fair trial claim legal standard to each Monticello defendant with respect to any allegedly "fabricated evidence," *see* *Ricciuti,* 124 F.3d at 130, and the *Brady* standard to each Monticello defendant with respect to any withheld exculpatory evidence, *see* *Ying Li,* 246 F. Supp. 3d at 626–28 (analyzing fabrication of false evidence allegations as a fair trial claim and separately analyzing concealment of exculpatory evidence allegations as a *Brady* violation).

### iv. Fair Trial Standard Applied

Plaintiff alleges that Johnstone falsely informed Farrell during one of their calls or meetings that Plaintiff had engaged in criminal activity. (Am. Compl. ¶ 73*l*.) Plaintiff also alleges that each Monticello Defendant participated in manufacturing the McCline file so that they could use it to assert that Plaintiff was guilty by association. (*Id.* ¶¶ 145, 149.) Plaintiff further alleges that each Monticello Defendant knowingly misled Farrell into believing LiGreci and Plaintiff committed a crime, and that this ultimately led to Plaintiff's conviction. (*Id.* ¶¶ 67, 69, 70, 72, 95–96, 99, 101, 112, 119.) Although Plaintiff fails to offer details about the timing and substance

of Johnstone's misrepresentation to Farrell, and about what the falsehoods in the McCline file were and how they implicated Plaintiff, at this stage he has plausibly pleaded fabrications by Monticello Defendants that resulted in his conviction. Therefore, Monticello Defendants' motion to dismiss Plaintiff's fair trial claim is denied.

### v. *Brady* Violation Standard Applied

Plaintiff fails to allege that Solomon and Johnstone withheld the Mack recording from Farrell because Plaintiff fails to allege any fact showing that Solomon and Johnstone even knew of the existence of the Mack recording, that it was ever in their possession, or that they ever had an opportunity to turn the recording over to Farrell and failed to do so. *See* *Bermudez,* 790 F.3d at 376 n.4 ("Police officers can be held liable for *Brady* due process violations under § 1983 if they withhold exculpatory evidence from prosecutors."). Plaintiff does, however, allege that Feliciano was the officer who conducted the Mack interview and created that recording, (*id.* ¶¶ 120–21), and that he was a key witness at Plaintiff's trial, (*id.* ¶ 125). Even assuming that alleging that Feliciano created the Mack recording and later testified somehow showed that he withheld evidence, Plaintiff fails to allege prejudice.

**\*20** Plaintiff alleges that Monticello Defendants failed to provide Farrell the Mack recording, (*Id.* ¶ 121), and that this resulted in prejudice to Plaintiff because he was not able to cross-examine and thus impeach Feliciano, a key government witness (*id.* ¶¶ 124, 127). Plaintiff alleges that the recording could have been used to impeach Feliciano, but does not specify how the evidence would have been exculpatory. *See* *Hayes,* 2015 WL 5943677, at \*31 n. 34 ("[W]here the allegedly undisclosed material is not exculpatory, but rather impeachment evidence, that evidence is not material for *Brady* purposes....") (alterations and internal quotation marks omitted). Plaintiff does not allege what the contents of recording were or how they would have changed the outcome of the proceeding, and thus does not satisfy the prejudice element of a *Brady* claim. *See* *Bagley,* 473 U.S. at 682 (holding that "undisclosed evidence is only material if there is a reasonable probability that, had the evidence been disclosed to the defense the result of the proceeding would have been different"); *Kyles,* 514 U.S. at 435 (same); *Payne,* 63 F.3d at 1209 (same). Therefore the Court dismisses Plaintiff's *Brady* claim as to each Monticello Defendant.

#### d. Due Process Claim

Plaintiff does not separately allege a procedural or due process violation but only mentions due process in the context of his causes of action pursuant to § 1983. The Court interprets Plaintiff's due process claims to be based on the alleged *Brady* violation, (Pl.'s Mem. re Monticello Defs. 20–21), and the alleged violation of the right to a fair trial, (*id.* 17–19). "A fair trial claim is a civil claim for violations of a criminal defendant's Fourteenth Amendment due process rights." *Fappiano v. City of New York*, 640 Fed. App'x. 115, 118 (2d Cir. 2016) (citing *Ramchair v. Conway*, 601 F.3d 66, 73 (2d Cir. 2010) ). A defendant's right to a fair trial is violated when exculpatory evidence is withheld, i.e., when a *Brady* violation occurs, and also when an officer forwards fabricated evidence to prosecutors. See *Ricciuti*, 124 F.3d at 130. Because the Court has addressed Plaintiff's *Brady* violation and fair trial claims in detail, it will not conduct a separate procedural or substantive due process analysis. *See, e.g., Ying Li*, 246 F. Supp. 3d at 626–28 (construing plaintiff's due process claim to be based on alleged concealment of exculpatory evidence (*Brady* claim) and fabrication of false evidence (fair trial claim) and respectively applying the fair trial legal standard and the *Brady* violation legal standard).

The Court also does not read Plaintiff's Amended Complaint or briefing to suggest that he is basing a due process claim on his malicious prosecution allegations. And indeed, Plaintiff could not successfully do so because malicious prosecution and due process claims coalesce. See *Albright v. Oliver*, 510 U.S. 266, 274 (1994) (holding that malicious prosecution and due process claims coalesce); *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 115 (2d Cir. 1995) (same); *Cooper v. City of New Rochelle*, 925 F. Supp. 2d 588, 612–13 (S.D.N.Y. 2013) (same). The Court has separately considered and ruled on Plaintiff's malicious prosecution, fair trial, and *Brady* claims against Monticello Defendants and has thus addressed all procedural and substantive due process claims Plaintiff raises against them in his Amended Complaint.

#### e. Qualified Immunity

Monticello Defendants argue that even if Plaintiff states a claim they are nonetheless shielded by qualified immunity. (Monticello Defs.' Mem. 25–26; Monticello Defs.' Reply 8–9.)

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted); *see also Village of Freeport v. Barrella*, 814 F.3d 594, 609 (2d Cir. 2016) (same). "Qualified immunity protects public officials from civil liability only if (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Coggins*, 776 F.3d at 114 (internal quotation marks omitted). [10]

[10] The Supreme Court has instructed that "[t]o be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right. In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (citations, alterations, and internal quotation marks omitted). Furthermore, "the right allegedly violated must be established, not as a broad general proposition, but in a particularized sense so that the contours of the right are clear to a reasonable official." *Id.* at 665 (citations and internal quotation marks omitted). Otherwise stated, to determine whether a right is clearly established, courts must determine "whether (1) it was defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has confirmed the existence of the right, and (3) a reasonable defendant would have understood that his conduct was unlawful." *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011).

**\*21** "In the case of allegations to which probable cause is a complete defense, such as false arrest or imprisonment, the Second Circuit has defined the standard of qualified immunity as one of 'arguable probable cause.' " *Betts v. Shearman*, No. 12-CV-3195, 2013 WL 311124, at \*4 (S.D.N.Y. Jan. 24, 2013), *aff'd*, 751 F.3d 78 (2d Cir. 2014) (internal quotation marks omitted); *see also Hudson v. Cty. of Dutchess*, No. 12-CV-5548, 2015 WL 7288657, at \*12 (S.D.N.Y. Nov. 16, 2015) (dismissing malicious prosecution claim on qualified immunity grounds based on arguable probable cause). "Arguable probable cause exists when a reasonable police officer in the same circumstances and

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 181 of 370

Hutchins v. Solomon, Not Reported in Fed. Supp. (2018)

2018 WL 4757970

possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in the light of well-established law." *Cerrone*, 246 F.3d at 202–03 (internal quotation marks omitted). In other words, an officer is entitled to qualified immunity if (1) "it was objectively reasonable for the officer to believe that probable cause existed," or (2) "officers of reasonable competence could disagree on whether the probable cause test was met." *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991); *see also* *Betts*, 2013 WL 311124, at *4 (same).

Because qualified immunity "reflects an immunity from suit rather than a mere defense to liability ... [,] it is appropriate to decide the issue of qualified immunity, when raised, at an early stage of the litigation, such as when deciding a pre-answer motion to dismiss." *Betts*, 2013 WL 311124, at *4 (emphasis and internal quotation marks omitted). "[U]sually, the defense of qualified immunity cannot support the grant of a Rule 12(b)(6) motion," but a district court may grant a Rule 12(b)(6) motion on the ground of qualified immunity if "the facts supporting the defense appear on the face of the complaint." *McKenna v. Wright*, 386 F.3d 432, 435–36 (2d Cir. 2004) (internal quotation marks omitted). "[W]hen determining a motion to dismiss on qualified immunity grounds in advance of full merits discovery, the plaintiff's version of the facts is presumed to be true...." *5 Borough Pawn, LLC v. City of New York*, 640 F. Supp. 2d 268, 285 (S.D.N.Y. 2009). In such cases, "the question to be answered is whether the defendant ..., confronted with the facts as alleged by [the] plaintiff, could reasonably have believed that his actions did not violate some settled constitutional right." *Id.* Moreover, "the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." *McKenna*, 386 F.3d at 36.

Monticello Defendants argue that they are entitled to qualified immunity because the interpretation of state law was not clear at the time that Plaintiff was investigated, tried, and convicted. (Monticello Defs.' Mem. 25–26; Monticello Defs.' Reply 8–9). Plaintiff's conviction was overturned by the Appellate Division on the grounds that because LiGreci, as Village Manager, had the authority to direct and to stop a background check and had the authority to direct a Village employee to answer questions, he could not be guilty of official misconduct under N.Y. Penal Law § 195.00(1) because the provision requires performance of an unauthorized act. *Hutchins*, 25 N.Y.S.3d at 702–04.[11] Monticello Defendants point to another New York Appellate Division decision,

*People v. Flanagan*, 28 N.Y.3d 644 (2017), where the court, contrary to *Hutchins*, held that § 195.00(1) can be violated even if the underlying conduct of the official was authorized because "all the surrounding circumstances" including the official's motives can be considered. *Id.* at 657. Based on this conflicting state court interpretation of § 195.00(1), Monticello Defendants argue that it could not have been clearly established to them, or to "every reasonable official" in their place, that the conduct they allegedly reported could not, as a matter of law, meet the elements of Penal Law § 195.00(1), and that therefore they were justified in presenting evidence of a potential crime to Farrell. (Monticello Defs.' Mem. 26.)

[11]    The appellate court also found no proof that Plaintiff knew or believed LiGreci's conduct was unauthorized, so that he could not have the subjective intent to commit the crimes with which he was charged. 25 N.Y.S.3d at 704.

**\*22** Plaintiff counters that Monticello Defendants' qualified immunity defense does not appear on the face of the Amended Complaint and therefore Monticello Defendants are not entitled to qualified immunity. (Pl.'s Mem. re Monticello Defs. 23–25). The Amended Complaint states that § 195.00(1) was the statute pursuant to which Plaintiff was convicted, (Am. Compl. ¶¶ 2, 22), and that Plaintiff's conviction was reversed on appeal. (*Id.* ¶¶ 2, 38, 158, 173.) The Amended Complaint, however, does not elaborate on the Appellate Division's reasoning for the reversal nor does it mention *Flanagan* or that the officers were aware of the conflicting state law. Moreover, Monticello Defendants do not argue that they knew of or relied on *Flanagan*, or any other similar case, nor can they, because *Flanagan* was issued in 2017 and postdates all of the 2011–2012 conduct by Monticello Defendants that is at issue in this case. The Court agrees with Plaintiff that Monticello Defendants' qualified immunity defense does not appear on the face of the Amended Complaint.

The Court thus finds that Monticello Defendants are not entitled to qualified immunity at the motion to dismiss stage and Plaintiff's surviving claim for malicious prosecution against Johnstone and his fair trial claim against all Monticello Defendants can proceed.

## 2. Farrell

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 182 of 370

Hutchins v. Solomon, Not Reported in Fed. Supp. (2018)
2018 WL 4757970

Plaintiff alleges that Farrell maliciously prosecuted him, denied him the right to a fair trial, and violated his due process rights, (Am. Compl. ¶¶ 176–79), and that he conspired with Monticello Defendants to do so, (*id.* ¶¶ 180–82). Farrell argues that (1) as a prosecutor he is absolutely immune from liability, (2) if absolute immunity is not a bar to the claims against him he is entitled to qualified immunity, and (3) immunity determination notwithstanding, that Plaintiff fails to state a claim against him. (Farrell Mem. 1.)

a. Absolute Immunity

i. Absolute Immunity Standard

It is well established that prosecutors are entitled to absolute immunity from civil suits for damages under § 1983 when "function[ing] as advocates for the state in circumstances intimately associated with the judicial phase of the criminal process." *Bernard v. Cty. of Suffolk*, 356 F.3d 495, 502 (2d Cir. 2004) (internal quotation marks omitted); *see also Hill v. City of New York*, 45 F.3d 653, 661 (2d Cir. 1995) ("Prosecutorial immunity from § 1983 liability is broadly defined, covering virtually all acts, regardless of motivation, associated with [the prosecutor's] function as an advocate." (alterations and internal quotation marks omitted) ). However, not every action performed by a prosecutor is "absolutely immune merely because [it was] performed by a prosecutor." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993). Rather, a prosecutor's entitlement to absolute immunity turns on "the capacity in which the prosecutor acts at the time of the alleged misconduct." *Zahrey*, 221 F.3d at 346. Thus, to determine whether a prosecutor's conduct is entitled to absolute immunity, courts must apply "a functional approach, which looks to the nature of the function performed [by the prosecutor]." *Buckley*, 509 U.S. at 269 (internal quotation marks omitted); *see also Van de Kamp v. Goldstein*, 555 U.S. 335, 342 (2009) ("To decide whether absolute immunity attaches to a particular kind of prosecutorial activity, one must take account of [ ] 'functional' considerations....").

Generally, whether a prosecutor "may be sheltered by absolute immunity from liability for [his conduct] turns on whether or not [his conduct] occurred in the course of his role as an advocate." *Hill*, 45 F.3d at 662. This protection covers such acts as "initiating a prosecution and presenting the case at trial" or at other court proceedings, *id.* at 661; *see also Smith v. Garretto*, 147 F.3d 91, 94 (2d Cir. 1998) ("A prosecutor enjoys absolute immunity for acts taken in

initiating a prosecution and in presenting the state's case, whether at a trial, a preliminary hearing, or a bail hearing.") (citations and internal quotation marks omitted), as well as "the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made," *Buckley*, 509 U.S. at 273; *see also Hill*, 45 F.3d at 661 (noting that prosecutors are "immune for conduct in preparing for [prosecutorial] functions," including "evaluating and organizing evidence for presentation at trial or to a grand jury, or determining which offenses are to be charged") (internal citations omitted). Absolute immunity also protects "the knowing presentation of perjured testimony to a grand jury, without any prosecutorial involvement in its earlier inducement." *Bernard*, 356 F.3d at 506. Furthermore, it is well established that a prosecutor's motives for actions that are deemed to be within his or her role as an advocate are irrelevant to the granting of absolute immunity. *See Shmueli v. City of New York*, 424 F.3d 231, 237–38 (2d Cir. 2005) (holding that absolute immunity is "not affected by allegations that improperly motivated prosecutions were commenced or continued pursuant to a conspiracy"); *Bernard*, 356 F.3d at 503 (holding that "once a court determines that challenged conduct involves a function covered by absolute immunity, the actor is shielded from liability for damages regardless of the wrongfulness of his motive or the degree of injury caused"); *Pinaud v. Cty. of Suffolk*, 52 F.3d 1139, 1148 (2d Cir. 1995) ("[W]hen the underlying activity at issue is covered by absolute immunity, the plaintiff derives no benefit from alleging a conspiracy." (internal quotation marks omitted) ).

**\*23** In contrast, "[w]hen a [prosecutor] functions outside his [or her] ... role as an advocate for the People, the shield of [absolute] immunity is absent." *Hill*, 45 F.3d at 661. Specifically, "[w]hen a prosecutor performs the investigative functions normally performed by a detective or police officer, it is neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other." *Buckley*, 509 U.S. at 273 (internal quotation marks omitted); *see also Smith*, 147 F.3d at 94 ("[W]hen a prosecutor ... performs the investigative functions normally performed by a detective or police officer, he is eligible only for qualified immunity." (internal quotation marks omitted) ).

Although the line between a prosecutor's acts as an advocate and as an investigator is often "difficult to draw," *Zahrey*, 221 F.3d at 347, "[t]he key ... is the degree to which the specific conduct at issue is 'intimately associated with the judicial

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 183 of 370

Hutchins v. Solomon, Not Reported in Fed. Supp. (2018)

2018 WL 4757970

phase of the criminal process,' " *DiBlasio v. Novello*, 344 F.3d 292, 300 (2d Cir. 2003) (quoting *Imbler*, 424 U.S. at 430). In assessing how closely connected a prosecutor's conduct is to the judicial phase of the criminal process, the timing of the conduct is relevant, but not dispositive. *See id.* at 300–01; *see also Genzler v. Longanbach*, 410 F.3d 630, 639 (9th Cir. 2005) ("The timing of evidence gathering is a relevant fact in determining how closely connected that conduct is to the official's core advocacy function in the judicial process...."). For example, the Supreme Court has observed that absolute immunity is unavailable for investigative conduct that takes place before probable cause has been established: "A prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested." *Buckley*, 509 U.S. at 274; *see also Zahrey*, 221 F.3d at 347 n.2 (explaining that *Buckley* "suggests that a prosecutor's conduct prior to the establishment of probable cause should be considered investigative"). The converse is not necessarily true, however. "[A] determination of probable cause does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards." *Buckley*, 509 U.S. at 274 n.5. The Second Circuit has distinguished between "preparing for the presentation of an existing case," on the one hand, and attempting to "furnish evidence on which a prosecution could be based," on the other hand —making clear that only the former entitles a prosecutor to absolute immunity. *Smith*, 147 F.3d at 94. Notably, the mere fact that a prosecutor might later convene a grand jury and obtain an indictment does not serve to cloak his or her prior investigatory actions with the protection of absolute immunity. *See Buckley*, 509 U.S. at 275–76 ("That the prosecutors later called a grand jury to consider the evidence this work produced does not retroactively transform that work from the administrative into the prosecutorial.").

"[D]istrict courts are encouraged to determine the availability of an absolute immunity defense at the earliest appropriate stage, and preferably before discovery ... because an absolute immunity defeats a suit at the outset, so long as the official's actions were within the scope of the immunity." *Deronette v. City of New York*, No. 05-CV-5275, 2007 WL 951925, at *4 (E.D.N.Y. Mar. 27, 2007) (alterations and internal quotation marks omitted). "However, the Second Circuit has held that, 'when it may not be gleaned from the complaint whether the conduct objected to was performed by the prosecutor in an advocacy or an investigatory role, the availability of absolute immunity from claims based on such conduct cannot be decided as a matter of law on a motion to dismiss.' "

*Varricchio v. County of Nassau*, 702 F. Supp. 2d 40, 65 (E.D.N.Y. 2010) (quoting *Hill*, 45 F.3d at 663).

### ii. Application

**\*24** Plaintiff makes the conclusory allegation that Farrell participated in the fabrication of accusations against him. (Am. Compl. ¶¶ 139, 140.) According to Plaintiff Farrell allegedly worked with Monticello Defendants to manufacture the investigative file regarding the McCline background investigation so that they could use it to allege that Plaintiff was guilty by association. (*Id.* ¶¶ 145, 149.) Plaintiff points to the July 30, 2012 letter Farrell sent to Hill, instructing her that the MPD wanted McCline disqualified from the hiring process, (*id.* ¶¶ 145, 149), as proof of Farrell's interference with the hiring process and his attempt to manufacture allegation against Plaintiff, (*id.* ¶ 141). Plaintiff labels this as investigatory work that took place at the pre-arrest stage. (*Id.* ¶¶ 139, 140.) Plaintiff fails, however, to explain how these investigatory actions related to him. The letter and the allegedly false investigatory file were about McCline and not Plaintiff. The only connection between these investigatory acts and Plaintiff is his conclusory allegation that Farrell engaged in these actions in order to eventually maliciously prosecute Plaintiff. (*Id.* ¶¶ 139, 140.) Plaintiff fails to point to any specific investigatory actions Farrell took that related to him. Thus, the only concrete action Plaintiff points to that Farrell took in relation to him is the actual decision to *institute a prosecution* against him based on false evidence. (*See id.* ¶ 135.)

Farrell is protected by absolute immunity for his evaluation of the evidence and subsequent decision to indict Plaintiff. *See Kalina v. Fletcher*, 522 U.S. 118, 130 (1997) (finding that the defendant prosecutor's "determination that the evidence was sufficiently strong to justify a probable-cause finding[ ] [and] her decision to file charges" "involved the exercise of professional judgment" and were protected by absolute immunity); *Williams v. City of New York*, No. 06-CV-6601, 2009 WL 3254465, at *10 (E.D.N.Y. Oct. 9, 2009) ("[E]valuating evidence and deciding whether to initiate a prosecution are exactly the sort of actions for which absolute immunity shields prosecutors from liability."); *Bhatia v. Gaetano*, No. 06-CV-1771, 2008 WL 901491, at *3 (D. Conn. Mar. 31, 2008) (finding that the decision to institute a prosecution "after considering the weight of evidence in the case," despite evidence that witnesses were lying, was protected by absolute immunity). Moreover, to the extent

Plaintiff alleges that Farrell presented false evidence to or excluded exculpatory evidence from the Grand Jury, he is protected by absolute immunity for such acts of advocacy. See *Peay v. Ajello*, 470 F.3d 65, 67–68 (2d Cir. 2006) (conferring absolute immunity on prosecutor who allegedly conspired to present false evidence at trial); *Shmueli*, 424 F.3d at 237 ("A prosecutor is ... entitled to absolute immunity despite allegations of his 'knowing use of perjured testimony' and the 'deliberate withholding of exculpatory information.' " (quoting *Imbler*, 424 U.S. at 431 n.34) ); *Deskovic v. City of Peekskill*, No. 07-CV-8150, 2009 WL 2475001, at *15 (S.D.N.Y. Aug. 13, 2009) (finding the prosecutor "absolutely immune for allegedly procuring false scientific evidence ... and then presenting it at trial"). [12]

[12]    The fact that Plaintiff alleges that Farrell manufactured charges against him in order to create a high-profile case to gain media attention and to advance his career and profile does not impact the absolute immunity analysis. As noted, a prosecutor's motive to engage in conduct for which the prosecutor is immune is irrelevant. See *Shmueli*, 424 F.3d at 237–38; *Pinaud*, 52 F.3d at 1148.

Because the Court finds that Farrell is absolutely immune from liability for the conduct alleged by Plaintiff, the Court dismisses all claims against him. *See, e.g., Shmueli*, 424 F.3d at 236–37 (dismissing malicious prosecution claim based on absolute immunity); *Warney v. Monroe County*, 587 F.3d 113, 125 (2d Cir. 2009) (reversing district court denial of motion to dismiss, noting that prosecutors are absolutely immune for non-disclosure of exculpatory information); *Peay*, 470 F.3d at 68 (affirming dismissal of claim against prosecutor for § 1983 conspiracy based on absolute immunity); *O'Neal*, 196 F. Supp. 3d at 431–32 (dismissing fair trial claim based on absolute immunity); *Zanfardino v. City of New York*, 230 F. Supp. 3d 325, 335 (S.D.N.Y. 2017) (dismissing § 1983 "due process violations" claim where prosecutor allegedly ignored evidence in custody of NYPD detectives, malicious prosecution claim, and *Brady* violation claim against prosecutor based on absolute immunity).

### 3. Conspiracy

**\*25**  A § 1983 conspiracy claim requires: "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." [13] *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999); *D'Angelo-Fenton v. Town of Carmel*, 470 F. Supp. 2d 387, 397 (S.D.N.Y. 2007) (citing *Bussey v. Phillips*, 419 F. Supp. 2d 569, 586 (S.D.N.Y. 2006) ). "[C]omplaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his [or her] constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 325 (2d Cir. 2002) (internal quotation marks omitted).

[13]    Plaintiff must allege an agreement and specify how defendants carried it out in concert. See *Rose v. Garritt*, No. 16-CV-3624, 2018 WL 443752, at *8 (S.D.N.Y. Jan. 16, 2018) (dismissing § 1983 claim that the nurse " 'purposely omitted' [the] [p]laintiff's descriptions of his injuries and the assault 'to limit [the] [p]laintiff's capacity to file and win an Eighth Amendment suit' " because the plaintiff failed to allege an agreement between the nurse and the assaulting defendants (alterations and citations omitted) ); *Thomas v. Demeo*, No. 15-CV-9559, 2017 WL 3726759, at *12 (S.D.N.Y. Aug. 28, 2017) (dismissing § 1983 conspiracy claim because the complaint did not "provide even circumstantial allegations that the alleged conspiracy existed, much less any details as to the extent of the alleged agreement or how [the] [d]efendants collectively carried it out"); *Baines v. City of New York*, No. 10-CV-9545, 2015 WL 3555758, at *12 (S.D.N.Y. June 8, 2015) ("Although [the] [p]laintiff repeatedly asserts that [the] [d]efendants entered an agreement to violate his civil rights ..., the [complaint] is devoid of facts that would render that allegation plausible as opposed to merely conceivable." (citation omitted) ); *Tavares v. New York City Health & Hosps. Corp.*, No. 13-CV-3148, 2015 WL 158863, at *7–8 (S.D.N.Y. Jan. 13, 2015) (dismissing a conspiracy claim where plaintiff failed to "put forward any facts supporting the inference that the ... [d]efendants acted in concert"); *Bermudez v. City of New York*, No. 11-CV-750, 2013 WL 593791, at *8 (S.D.N.Y. Feb. 14, 2013) (dismissing a conspiracy claim where the plaintiff alleged that the defendants "conferred and agreed not to pursue" certain evidence, "agreed not to disclose"

2018 WL 4757970

certain information, and "actively conspired to suppress the actual events").

"Allegations of conspiracy must allege with at least some degree of particularity overt acts which defendants engaged in which were reasonably related to the promotion of the alleged conspiracy." *Phillips v. County of Orange*, 894 F. Supp. 2d 345, 383–84 (S.D.N.Y. 2012) (omitting internal quotation); *see also* *Morales v. City of New York*, 752 F.3d 234, 237 (2d Cir. 2014) (finding claims that defendants worked together insufficient to suggest an improper motive); *Beechwood Restorative Care Center v. Leeds*, 436 F.3d 147, 154 (2d Cir. 2006) (finding that the fact that government employees from various federal and state agencies cooperated does not, without more, prove they conspired to violate plaintiff's rights); *Scotto v. Almenas*, 143 F.3d 105, 114–15 (2d Cir. 1998) (concluding that "several telephone calls and other communications" were not sufficient to show conspiracy); *Zahrey v. City of New York*, No. 98-CV-4546, 2009 WL 1024261, at *11 (S.D.N.Y. Apr. 15, 2009) (dismissing conspiracy claim on summary judgment where the plaintiff "provide[d] no evidence, absent the fact that the [i]ndividual [d]efendants worked together, that ... an agreement existed").

**\*26** Plaintiff neither properly alleges the required existence of an agreement, nor the required meeting of the minds, between Monticello Defendants and Farrell. Plaintiff describes Solomon, Johnstone, and Feliciano's positions in the MPD, how they interacted with each other, and how they interacted and communicated with Farrell. Plaintiff alleges that they shared information about the McCline investigation and spoke with each other. (Am. Compl. ¶¶ 72, 73(a–n).) The facts Plaintiff points to fail to do more than describe a group of police officers working on the same case and passing information on to a prosecutor. *Zahrey*, 2009 WL 1024261, at *11 (dismissing conspiracy claim where plaintiff provided no evidence, absent the fact that defendants worked together, that an agreement existed). Plaintiff does not allege when or how any of the Defendants agreed to violate Plaintiff's rights, what the scope of the agreement was, or any other detail regarding the alleged agreement. Plaintiff thus fails to allege a factual basis supporting the existence of an agreement.

As for Farrell, Plaintiff repeatedly alleges that Monticello Defendants lied to him and mislead him. (Am. Compl. ¶¶ 72, 73(a–n), 96, 119.) Plaintiff does not explain how Monticello Defendants simultaneously lied to Farrell and had an agreement with him to violate Plaintiff's constitutional rights. Plaintiff thus fails to allege a factual basis supporting a meeting of the minds between Monticello Defendants and Farrell.

Accordingly, the conspiracy claim against Monticello Defendants and Farrell is dismissed.

### III. Conclusion

In light of the foregoing analysis, the Court grants Monticello Defendants' Motion To Dismiss with respect to the *Brady* and conspiracy claims as to each Monticello Defendant, grants the Motion with respect to the malicious prosecution claim against Solomon and Feliciano, but denies the Motion with respect to the malicious prosecution claim against Johnstone, and denies the Motion with respect to the fair trial claim as to each Monticello Defendant. The Court grants Farrell's Motion To Dismiss in its entirety on absolute immunity grounds. The claims that are dismissed are dismissed without prejudice. Although Plaintiff has filed an Amended Complaints in this Action, this is the first adjudication on Defendants' Motion to Dismiss. *See* *Rennalls v. Alfredo*, No. 12-CV-5300, 2015 WL 5730332, at *5 n. 6 (S.D.N.Y. Sept. 30, 2015) ("[The] Court will afford Plaintiff an opportunity to amend if, after reviewing this Order and Opinion and the law therein, he still believes that he can plausibly state claims against Defendants."). Plaintiff may file a Second Amended Complaint within thirty days of this Opinion and Order. The Clerk of Court is respectfully requested to terminate the pending Motions. (Dkt. Nos. 50, 53.)

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 4757970

---

Longo v. Ortiz, Not Reported in Fed. Supp. (2016)

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 186 of 370

2016 WL 5376212

KeyCite Yellow Flag - Negative Treatment
Distinguished by *Jackson v. Nassau County,*  E.D.N.Y.,  July 28, 2021

2016 WL 5376212
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Vincent LONGO, Plaintiff,
v.
Sergeant Frederic ORTIZ, Detective Anthony
Manuzza, and Unidentified Police Officers
in their capacity as individuals, Defendants.

15-CV-7716 (VEC)
|
Signed 09/26/2016

**Attorneys and Law Firms**

Gloria Keum, Dawn M. Florio Law Firm PLLC, Fred
Lichtmacher, The Law Offices of Fred Lichtmacher, P.C.,
New York, NY, for Plaintiff.

Evan Craig Brustein, Tavish Coryell Deatley, New York City
Law Department, New York, NY, for Defendants.

OPINION & ORDER

VALERIE CAPRONI, United States District Judge

 **\*1**  Plaintiff Vincent Longo brings this action pursuant
to 42 U.S.C. § 1983 against Sergeant Frederic Ortiz,
Detective Anthony Manuzza, and Unidentified Police
Officers (collectively, "Defendants"), all in their individual
capacities as employees of the New York City Police
Department ("NYPD"). Plaintiff asserts claims for malicious
prosecution and denial of a fair trial. Defendants have moved
to dismiss Plaintiff's Complaint pursuant to Rule 12(b)(6) of
the Federal Rules of Civil Procedure for failure to state a
claim (the "Motion") (Dkt. 14). For the following reasons,
Defendants' Motion is GRANTED.

BACKGROUND [1]

[1]    The facts are taken from the Plaintiff's complaint.
The Court assumes that all facts alleged in the

complaint are true, *see Galper v. JP Morgan
Chase Bank,* 802 F.3d 437, 443-44 (2d Cir. 2015),
although some seem farfetched.

On October 12, 2010, plain-clothes police officers, including
Defendant Ortiz, stopped Plaintiff while he was walking
with some acquaintances and his dog outside his home in
Manhattan. Compl. ¶¶ 10-13. Plaintiff was allegedly unaware
that Defendant Ortiz was a plain-clothed police officer and
was startled by the stop. He quickly entered his building and
closed the door. *Id.* ¶ 14. According to Plaintiff, the building
door was glass and, through the door, he saw that Defendant
Ortiz was pointing a gun at him. *Id.* ¶¶ 15.

As Plaintiff ran to his apartment on the third floor, Defendant
Ortiz broke through the glass door of the building and, still
pointing his gun, followed Plaintiff. *Id.* ¶¶ 16-20. Plaintiff
entered his apartment and attempted to close the door, but
Ortiz used his weapon to block the door from closing. *Id.* ¶¶
21-22. As Plaintiff tried to push the weapon out of the way
and wrestle the door shut, additional police officers arrived.
*Id.* ¶¶ 22-25. At some point, a black NYPD radio was used to
prevent the door from closing. *Id.* ¶ 25. Plaintiff grabbed the
radio and was able to close the door. *Id.* ¶¶ 26-27.

After the door was shut, Plaintiff realized, allegedly for the
first time, that he held a police radio and that the individuals
outside his door were police officers. *Id.* ¶ 27. At that
point, Plaintiff climbed down his fire escape to the street
and surrendered to officers who had gathered outside of his
apartment building. *Id.* ¶¶ 28-32.

Police took Plaintiff to the police station and charged him
with: (1) Attempted Criminal Possession of a Weapon in
the Second Degree, (2) Assault in the Second Degree, (3)
Criminal Mischief in the Second Degree, (4) Robbery in the
Third Degree, (5) Attempted Robbery in the Third Degree, (6)
Reckless Endangerment in the Second Degree, (7) Criminal
Possession of a Controlled Substance in the Seventh Degree,
and (8) Unlawful Possession of Marijuana. *Id.* ¶ 34. Plaintiff
was incarcerated for approximately two weeks before being
released on bail. *Id.* ¶ 38.

Plaintiff alleges that, in relation to the incident, Defendants
fabricated facts "in order to justify the bad stop, seizure,
illegal search, reckless[ ] destr[uction of] property by crashing
through a glass door and having drawn a gun without any legal
justification." *Id.* ¶ 35. According to Plaintiff, Defendants
"swore to and signed a search warrant affidavit based on
information they fabricated" and, after a Supreme Court judge

Longo v. Ortiz, Not Reported in Fed. Supp. (2016)

Case 5:24-cv-01237-DNH-MJK   Document 10   Filed 11/12/24   Page 187 of 370

2016 WL 5376212

approved the warrant, "tore through" Plaintiff's apartment. *Id.* ¶¶ 36-37. Moreover, Plaintiff asserts that "[D]efendants provided false information to the District Attorney," which led to criminal charges being brought against him, *id.* ¶ 39, and "false testimony ... during the Manhattan District Attorney's grand jury presentation," which led to a grand jury indicting him for Robbery in the Third Degree, Attempted Robbery in the Third Degree, and three counts of Attempted Assault in the Second Degree, *id.* ¶¶ 40-41. Plaintiff also contends that Defendants "gave false testimony" during pretrial hearings and jury trial, *id.* ¶ 44, and harassed one of Plaintiff's primary witnesses by "temporarily seizing and searching the witness on the street" the day that the witness was scheduled to testify, commenting that it was a "big day." *Id.* ¶¶ 42-43. On July 22, 2015, Plaintiff was acquitted of all charges. *Id.* ¶ 46.

## DISCUSSION

**\*2**  Defendants move to dismiss the Complaint arguing that Plaintiff has (1) failed to state a claim for malicious prosecution because he has not sufficiently pled facts to overcome the presumption of probable cause created by the indictment or to support his allegation that the Defendants acted with the requisite malice, and (2) failed to state a claim for denial of his right to a fair trial because his allegations are conclusory and the fabricated evidence he alleges cannot properly form the basis for such a claim.

### I. Legal Standard

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a complaint must allege sufficient facts, taken as true, to state a plausible claim for relief." *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)). Federal Rule of Civil Procedure 8(a)(2) requires " 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Plaintiff's obligation to provide the grounds of his entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. "Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we 'are not bound to accept as true a legal conclusion couched as a

factual allegation.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). "[T]o survive a motion under Rule 12(b)(6), a complaint does not need to contain detailed or elaborate factual allegations, but only allegations sufficient to raise an entitlement to relief above the speculative level." *Keiler v. Harlequin Enters., Ltd.*, 751 F.3d 64, 70 (2d Cir. 2014) (citation omitted). Plaintiff's allegations must nudge his claims " 'across the line from conceivable to plausible.' " *Iqbal*, 556 U.S. at 683 (quoting *Twombly*, 550 U.S. at 570).

## II. Malicious Prosecution

To prevail on a malicious prosecution claim under Section 1983, a plaintiff must establish the elements of a state law malicious prosecution claim and also show a violation of his rights under the Fourth Amendment. *See Roberts v. Babkiewicz*, 582 F.3d 418, 420 (2d Cir. 2009). To establish a malicious prosecution claim under New York law, a plaintiff must prove "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Manganiello v. New York City*, 612 F.3d 149, 161 (2d Cir. 2010) (citations and internal quotations omitted); *see also Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997), *cert. denied*, 522 U.S. 1115 (1998). Defendants argue that Plaintiff fails sufficiently to plead factual allegations to meet the third and fourth elements.

### A. Probable Cause

The existence of probable cause is a complete defense to a claim for malicious prosecution. *Manganiello*, 612 F.3d at 161-62. An " 'indictment by a grand jury creates a presumption of probable cause' " that a plaintiff may rebut only by " 'evidence that the indictment was procured by "fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." ' " *Id.* (quoting *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003) (quoting *Colon v. City of New York*, 60 N.Y.2d 78, 83 (1983))); *see also Rothstein v. Carriere*, 373 F.3d 275, 283 (2d Cir. 2004) (" 'The presumption may be overcome only by evidence establishing that the police witnesses have not made a complete and full statement of facts either to the Grand Jury or to the District Attorney, that they misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith.' " (quoting *Colon*, 60 N.Y.2d at 82-83)).

Longo v. Ortiz, Not Reported in Fed. Supp. (2016)

2016 WL 5376212

**\*3** Defendants argue that Plaintiff fails to plead factual allegations sufficient to overcome the presumption of probable cause created by the indictment. *See* Defs. Mem. at 5-8; Defs. Reply at 2-6. Plaintiff responds that he has alleged sufficient facts as to "other police conduct undertaken in bad faith." Pl. Opp. at 15. The crux of Plaintiff's argument appears to be that the charges on which Plaintiff was ultimately indicted—Robbery in the Third Degree, Attempted Robbery in the Third Degree and three counts of Attempted Assault in the Second Degree—all arose in response to an unjustified hot pursuit of Plaintiff into his apartment building.[2] Plaintiff contends that the officers, to cover up what was otherwise an unjustified hot pursuit that resulted in damage to his apartment and to the apartment building, "manufactur[ed] facts and evidence and pass[ed] those along to the prosecutors" and the grand jury; in particular, Ortiz fraudulently created and executed affidavits in support of the search warrant for Plaintiff's apartment[3] and in the criminal complaint. *Id.* at 13.[4]

---

[2]    It is important to note what this is case is *not* about. Plaintiff does *not* claim false arrest or that he was subject to an unlawful search. In his opposition, he reiterates he is "not suing over the unjustified chase and entry into his home." Pl. Opp. at 13. Although his opposition to Defendants' motion includes a lengthy analysis of the legality of Defendants' hot pursuit, Plaintiff states clearly that it is relevant only for context. Pl. Opp. at 13 ("[I]t was the defendants' inappropriate acts, after they had taken drastic actions when chasing someone who was not a fleeing felon, which created the need for them to manufacture facts and evidence and pass those along to the prosecutors which caused plaintiff's ordeal.").

[3]    Although Plaintiff focuses on alleged false statements in the search warrant affidavit, the Court does not fully understand the relevance of those arguments to Plaintiff's claims of malicious prosecution and denial of a fair trial, inasmuch as Plaintiff is not asserting claims relating to the search.

[4]    Although Plaintiff also alleges in his Complaint that "false testimony ... during the Manhattan District Attorney's grand jury presentation," *id.* ¶ 40, and false testimony during pre-trial hearings and jury trial, *id.* ¶ 44, constituted bad faith

conduct, the parties agree that, pursuant to the Supreme Court's holding in *Rehberg v. Paulk*, 132 S. Ct. 1497 (2012), Plaintiff cannot premise his malicious prosecution allegations on defendants' allegedly false testimony to the grand jury or the Court. *See* Pl. Opp. at 9; *see also Rehberg*, 132 S. Ct. at 1506 ("[W]e conclude that grand jury witnesses should enjoy the same immunity as witnesses at trial. This means that a grand jury witness has absolute immunity from any § 1983 claim based on the witness' testimony.") As the Second Circuit has made clear, however, the absolute immunity articulated in *Rehberg* does not " 'extend[ ] to *all* activity that a witness conducts outside of the grand jury room.' " *Coggins v. Buonora*, 776 F.3d 108, 112-13 (2d Cir. 2015) (denying a police officer absolute immunity from plaintiff's allegations that the officer withheld and falsified evidence) (quoting *Rehberg*, 132 S. Ct. at 1507 n.1).

The grand jury's indictment presumptively established that probable cause existed for the charges of Robbery in the Third Degree, Attempted Robbery in the Third Degree and three counts of Attempted Assault in the Second Degree. Accordingly, Plaintiff is required to rebut that presumption and must establish that the alleged circumstances "warrant a finding of misconduct sufficient to erode the 'premise that the Grand Jury acts judicially.' " *Rothstein*, 373 F.3d at 283-84 (quoting *Colon*, 60 N.Y.2d at 82).

Plaintiff's allegations in his Complaint are insufficient to overcome the presumption of probable cause created by the indictment. He alleges that his indictment "was secured by the suppression of exculpatory evidence and by dishonest statements made by the defendants to the prosecutor as well as to the grand jury." *Id.* ¶ 52. He further alleges that Defendants "swore to and signed a search warrant affidavit based on information they fabricated," *id.* ¶ 36; Defendants "provided false information to the District Attorney," *id.* ¶ 39; and Defendants harassed one of Plaintiff's primary witnesses by "temporarily seizing and searching the witness on the street" the day that the witness was scheduled to testify, commenting that it was a "big day," *id.* ¶¶ 42-43.

**\*4** But Plaintiff's allegations as to false or fabricated information are entirely conclusory and generalized and do not contain the specificity required to state a claim for malicious prosecution. *See Abdul-Rahman v. City of New York*, No. 10 CV 2778 (ILG), 2012 U.S. Dist. LEXIS 45653,

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 189 of 370

Longo v. Ortiz, Not Reported in Fed. Supp. (2016)

2016 WL 5376212

at *29, 2012 WL 1077762 (E.D.N.Y. Mar. 30, 2012) (finding that allegations that officers "falsely and maliciously told" the District Attorney's Office that plaintiff had committed various crimes or "provided false testimony" were "conclusory and generalized allegations ... insufficient to overcome the presumption of probable cause created by the indictment."); *Lewis v. City of New York*, No. 12-CV-2836 (RRM) (RML), 2013 WL 6816615, at *9 (E.D.N.Y. Dec. 24, 2013) (finding Plaintiff had failed to rebut the presumption of probable cause when Plaintiff did "not allege any facts concerning the form or substance of the evidence or information he claims [was] fabricated"), *aff'd*, 591 Fed.Appx. 21 (2d Cir. 2015). Plaintiff's allegation of "harassment" of one of his primary witnesses is particularly irrelevant because, among other reasons, the alleged harassment occurred *after* the Plaintiff was indicted; even if true, such conduct entirely fails to call into question the validity of the indictment.

Moreover, the Court will not consider factual allegations that Plaintiff raised for the first time in his opposition brief to Defendants' Motion to Dismiss. There, Plaintiff asserted that the false information he is alleging in the search warrant affidavit and criminal complaint are Ortiz's representations that: (1) Ortiz personally observed motions indicative of a drug hand off, Pl. Opp. at 4, 10, 15-16, 19-21; (2) Ortiz found glassine envelopes allegedly containing heroin residue that he connected to Plaintiff, *id.* at 4, 17; (3) Plaintiff caused damage to Plaintiff's apartment, apartment building, and water pipes, *id.* at 4, 6-8; and (4) Plaintiff injured Ortiz's right leg and foot, *id.* at 20-21. Nowhere in the Complaint, however, does Plaintiff allege facts regarding the alleged drug-hand off, the discovery of the glassine envelopes, the extent of damage to the Plaintiff's apartment, or any injuries to Ortiz. " '[T]he Court does not rely on factual assertions made for the first time in Plaintiff's opposition brief ... as it is 'axiomatic that the Complaint cannot be amended by briefs in opposition to a motion to dismiss.' " *Troy v. City of New York*, No. 13-CV-5082 (AJN), 2014 WL 4804479, at *1 (S.D.N.Y. Sept. 25, 2014), *aff'd*, 614 Fed.Appx. 32 (2d Cir. 2015). [5]

[5]    Plaintiff also introduces with his opposition brief a number of exhibits that were not attached to his Complaint, including the criminal complaint and excerpts of the trial and hearing transcripts from Plaintiff's criminal trial, Keum Decl. (Dkt. 19), Exs. 2, 3, 5; the supporting affidavit and search warrant for Plaintiff's apartment, *id.* Ex. 4; Ortiz's medical records associated with injuries incurred in connection with Plaintiff's arrest, *id.*

Ex. 6; photographs of the damaged doors to Plaintiff's apartment building and his apartment, of his sink and damaged pipes, and of a sign from the Department of Building on the front door of the apartment below Plaintiff's deeming the apartment to be uninhabitable, *id.* Exs. 7-9; and a datasheet specific to Plaintiff's criminal case generated by the Manhattan District Attorney's Office, *id.* Ex. 10.

Under certain circumstances, a district court may consider documents other than the complaint when deciding a Rule 12(b)(6) motion, such as documents attached to the complaint or incorporated by reference, matters of which judicial notice may be taken under Rule 201 of the Federal Rules of Evidence, and documents integral to the complaint where the complaint "relies heavily upon its terms and effect." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002); *see also Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007). The Court declines, however, to consider such materials when the factual allegations they are offered to support are not themselves pled in Plaintiff's complaint.

Even if the Court were to consider these allegations and documents, the Court is skeptical that, without more, they would be sufficient to counter the presumption of probable cause. *See Lewis v. City of New York*, 591 Fed.Appx. 21 (2d Cir. 2015) (summary order) (allegations "that the defendant officers *must have* fabricated evidence in light of [plaintiff's] version of the events and his ultimate acquittal" are insufficient to counter the presumption of probable cause); *see also Jefferson v. Javits*, No. 06-CV-6616 (NGG) (LB), 2010 WL 3926203, at *3 (E.D.N.Y. Sept. 30, 2010) ("Speculation or conjecture that a plaintiff's indictment resulted from a defendant's misconduct will not suffice."); *Coakley v. 42nd Pct. Case 458*, No. 08 CIV. 6206 (JSR), 2009 WL 3095529, at *7 (S.D.N.Y. Sept. 28, 2009) ("[W]ithout factual support, [plaintiff's] speculations of a set-up are insufficient to overcome the presumption of probable cause created by the indictment.").

**\*5** Plaintiff also urges the Court separately to analyze probable cause for the charges on which the grand jury did *not* indict him: Attempted Criminal Possession of a Weapon, Criminal Mischief, Reckless Endangerment, Criminal Possession of a Controlled Substance, and Unlawful Possession of Marijuana. *See* Pl. Opp. at 17-18. Relying on

2016 WL 5376212

*Posr v. Doherty*, 944 F.2d 91 (2d Cir. 1991), and *Janetka v. Dabe*, 892 F.2d 187 (2d Cir. 1989), Plaintiff argues that "[a]s the indicted and not indicted charges are entirely distinguishable, at a bare minimum plaintiff's malicious prosecution claim for the felonies he was not tried on must be allowed to move forward." Pl. Opp. at 18.

In *Posr*, the Second Circuit held that a finding of probable cause on one charge does not foreclose a malicious prosecution claim based on charges requiring different, and more culpable, behavior. 944 F.2d at 100 (citing *Janetka*, 892 F.2d at 189). In *Janetka*, the Second Circuit held that an unfavorable termination on one charge should not preclude a finding of liability for a malicious prosecution claim on a separate charge. *Janetka*, 892 F.2d at 190. In *Janetka*, the Second Circuit emphasized that the elements of each charge were different, neither charge was a lesser included offense of the other, and the charges arose out of distinct facts. *Id.* ("[Plaintiff] was charged with two distinct offenses involving distinct allegations"—the disorderly conduct charge involved plaintiff's actions toward an unidentified individual, while the other involved plaintiff's actions toward the officers attempting to arrest him); *see also Posr*, 944 F.2d at 100 (noting with approval the finding in *Janetka* that the charges "arose out of distinct facts and should be analyzed separately" and, from that, the jury could have concluded there was probable cause to charge plaintiff with disorderly conduct but not with resisting arrest or assault.). Both cases highlight the need for courts to analyze separately the charges claimed to have been maliciously prosecuted. *Posr*, 944 F.2d at 100 ("While [*Janetka* is] not precisely on point here, where the issue is whether the officers had probable cause to commence proceedings against [plaintiff], not with whether the charges were terminated in plaintiff's favor, *Janetka* is useful in highlighting the need to separately analyze the charges claimed to have been maliciously prosecuted.").

Defendants argue that *Janetka* and *Posr* do not apply to this case because "[a]ll charges, both indicted and unindicted, arise from the same factual circumstances involving the same individuals and here, plaintiff was indicted on felony charges of similar degree." Defs. Reply at 7. The Court is skeptical of Defendants' position, but need not resolve the issue at this juncture.[6] Plaintiff's Complaint is devoid of allegations sufficient to state a malicious prosecution claim on the basis of the unindicted offenses. In his Complaint, Plaintiff stated in conclusory fashion that Ortiz stopped him "[w]ithout probable cause, reasonable suspicion, nor an announcement of who he was," Compl. ¶ 13; *see also*

*id.* ¶ 48 ("[D]efendants ... caused and continued his arrest, without probable cause, nor a reasonable suspicion he had committed the crimes alleged"), mentioned in passing that he was charged with "Criminal Possession of a Controlled Substance" and "Unlawful Possession of Marijuana," *id.* ¶ 34, and described the incident as a "bad stop," *id.* ¶ 35. But other than those vague and conclusory allegations, Plaintiff's Complaint lacks any factual assertions about the events giving rise to the unindicted charges or to support his position that, as to those charges, there was no probable cause.[7]

6    The unindicted charges of criminal possession of a controlled substance and unlawful possession of marijuana involve distinct and different elements than the indicted charges of robbery and assault. Additionally, none of the unindicted charges is a lesser included offense of the indicted charges.

7    Because Plaintiff's Complaint otherwise fails to plead facts sufficient to support his claims, the Court need not address Defendants' concern that Plaintiff will be unable to show that, for the unindicted charges, he suffered a cognizable deprivation of liberty separate and apart from the indicted charges. Defs. Reply at 7. Defendants are correct that, in addition to the elements of malicious prosecution under state law, Plaintiff must also allege that there was "a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights" in order to state a claim for malicious prosecution under section 1983. *See Rohman v. New York City Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000). Plaintiff's complaint asserts that he "was incarcerated for approximately two weeks before being released on bail." Compl. ¶ 38. From the face of the Complaint, however, the Court cannot tell whether the bail conditions imposed on Plaintiff were more onerous because of the charges on which he was ultimately not indicted. Without some indication that the unindicted charges caused a deprivation of liberty over and above what was caused by the indicted charges, Plaintiff will be unable to state a claim.

**B. Actual Malice**

*6  Defendants also urge the Court to dismiss Plaintiff's malicious prosecution claim because Plaintiff has not alleged adequately actual malice. Defs. Mem. at 8-9. "Under New York law, malice does not have to be actual spite or hatred,

Longo v. Ortiz, Not Reported in Fed. Supp. (2016)

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 191 of 370

2016 WL 5376212

but means only 'that the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served.' " *Pinter v. City of New York*, 976 F. Supp. 2d 539, 559 (S.D.N.Y. 2013) (quoting *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 573 (2d Cir. 1996)); *see also Manganiello*, 612 F.3d at 163-64 (" '[M]alice may be shown by proving that the prosecution complained of was undertaken from improper or wrongful motives, or in reckless disregard of the rights of the plaintiff.' " (quoting *Pinsky v. Duncan*, 79 F.3d 306, 313 (2d Cir. 1996))).

Plaintiff asserts in his opposition brief that to cover up what was otherwise an unjustified hot pursuit that resulted in damage to his apartment and apartment building, the officers "manufacture[d] facts and evidence and pass[ed] those along to the prosecutors" and the grand jury. Pl. Opp. at 13. As currently drafted, however, Plaintiff's Complaint is conclusory and merely alludes to an improper or wrongful motive. Plaintiff asserts that "[t]he acts alleged by the defendants were fabricated in order to justify the bad stop, seizure, illegal search, recklessly destroying property by crashing through a glass door and having drawn a gun without any legal justification." Compl. ¶ 35. He later alleges, again in a conclusory fashion, that "[t]he individual defendants acted intentionally, willfully, maliciously, negligently and with reckless disregard for and deliberate indifference to Mr. Longo's rights." *Id.* ¶ 56. Plaintiff must do more than offer speculation and conclusion that Defendants' motives were improper. *Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level ....")

### III. Denial of Right to Fair Trial

Plaintiff also claims he was denied a fair trial. A person is denied the right to a fair trial when an investigating official provides to the prosecutor fabricated evidence that is likely to influence a jury's decision, and the plaintiff suffers a deprivation of liberty as a result. *Perez v. Duran*, 962 F. Supp. 2d 533, 543 (S.D.N.Y. 2013) (quoting *Jovanovic v. City of New York*, 486 Fed.Appx. 149, 152 (2d Cir. 2012) (summary order)). "A plaintiff need not have proceeded to a full trial on the merits in order to have an actionable section 1983 claim based on the denial of a fair trial." *Marom v. City of New York*, No. 15-CV-2017 (PKC), 2016 WL 916424, at *9 (S.D.N.Y. Mar. 7, 2016) (citing *Ricciuti v. New York City Transit Auth.*, 124 F.3d 123, 127 (2d Cir. 1997); *Canario v. City of New York*, 05 CIV 9343 (LBS), 2006 WL 2015651, at *1 (S.D.N.Y. July 12, 2006)). "[T]he claim accrues when

the officer forwards the false information to the prosecutors." *Garnett v. Undercover Officer C0039*, No. 1:13-CV-7083 (GHW), 2015 WL 1539044, at *4 (S.D.N.Y. Apr. 6, 2015).

Defendants urge this Court to dismiss Plaintiff's claim arguing, first, that Plaintiff's allegations lacked specificity regarding in what way Defendants' statements, information, or testimony were false or in what material respect the charges against him were false. Defs. Mem. at 10-11.[8] As with the malicious prosecution claims, the Court agrees. Plaintiff alleges that he was "denied the right to a fair trial ... when the defendants fabricated evidence, gave false testimony, and made false extrajudicial statements to the Manhattan District Attorney's Office to be used against Mr. Longo at trial as well as to a Supreme Court judge in an effort to secure a search warrant, indictment and conviction against Mr. Longo." Compl. ¶ 59. But those allegations fail to state with the requisite specificity the evidence that was purportedly fabricated. *See Lewis*, 591 Fed.Appx. at 22 ("[A]gree[ing] with the district court that because Lewis has provided no detail regarding the evidence purportedly fabricated by the defendant officers, he has not stated a plausible claim for denial of the right to a fair trial."); *Waddlington v. City of New York*, 971 F. Supp. 2d 286, 297 (E.D.N.Y. 2013) ("Plaintiff at no point alleges with specificity what false information [police officers] created or forwarded to the D.A.'s Office"); *Wright v. Orleans Cty.*, No. 14-CV-00622 (AF), 2015 WL 5316410, at *13 (W.D.N.Y. Sept. 10, 2015) ("[A]lthough Plaintiffs allege unidentified Defendants presented falsified information to the Grand Jury as well as at trial, the failure to specify what constituted the allegedly falsified information is fatal to Plaintiffs' fair trial claim."). As with his malicious prosecution claim, the Court declines to consider the somewhat more specific factual allegations that Plaintiff introduced for the first time in his opposition brief. *See* Pl. Opp. at 19-22.[9]

[8]    As with the malicious prosecution claim, Plaintiff acknowledges that he cannot premise his claim for denial of a right to fair trial on claims of false testimony alone. Pl. Opp. at 20, 22; Defs. Reply at 8.

[9]    And as with the malicious prosecution claims, the Court is skeptical that the allegations Plaintiff included in his opposition brief would suffice, without more, to state a claim for denial of his right to a fair trial. *Waddlington*, 971 F. Supp. 2d at 297 ("Plaintiff's mere recitation of inconsistencies in

Longo v. Ortiz, Not Reported in Fed. Supp. (2016)

2016 WL 5376212

certain officers' testimonies, without more, does not establish liability under section 1983 for providing false information to prosecutors.").

**\*7** Defendants also argue, however, that Plaintiff fails to allege that the fabricated evidence was material – that is, would have been likely to influence a jury. According to Defendants, the search warrant affidavit and the criminal complaint cannot form the basis of a denial of fair trial claim because those documents constitute inadmissible hearsay and could never be admitted into evidence at trial. Defs. Reply at 8-9. The Court need not decide the issue at this stage but notes that the fact that the allegedly fabricated information was incorporated into documents that were not themselves admissible (a criminal complaint and a search warrant affidavit) is of no moment. *Soomro v. City of New York*, No. 13CV0187 (LTS), 2016 WL 1266069, at \*6 (S.D.N.Y. Mar. 30, 2016) ("[T]he fact that allegedly fabricated evidence would be inadmissible at trial by itself is not a bar to the claim."); *see Marom v. City of New York*, No. 15-CV-2017, slip op. at 4 (S.D.N.Y. July 29, 2016) (reinstating plaintiff's fair trial claims on a Motion for Reconsideration and holding that materiality does not require admissible evidence); *Buie v. City of New York*, No. 12 CV 4390 (RJD) (CLP), 2015 WL 6620230, at \*11 (E.D.N.Y. Oct. 30, 2015) (holding false information in a criminal complaint could form the basis of a § 1983 denial of a right to fair trial claim, even though the complaint was inadmissible and the allegedly fabricated evidence could only otherwise reach the jury through defendants' immunity-cloaked testimony). That said, the Defendants are correct that to form the basis of a denial of a fair trial right the allegedly false information must be material, a standard Plaintiff may well have difficulty meeting.

### IV. Leave to Amend

Pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure, the Court has discretion to grant leave to Plaintiff to amend his complaint when justice so requires. Fed. R. Civ. P. 15(a)(2). If Plaintiff wishes to amend his complaint, he must move for leave to do so on or before October 14, 2016, and the motion must attach a proposed amended complaint. Defendants shall have until October 28, 2016 to oppose Plaintiff's motion, and Plaintiff's reply shall be due November 4, 2016.

### CONCLUSION

For the foregoing reasons, the Defendants' Motion to Dismiss (Dkt. 14) is GRANTED. If Plaintiff wishes to seek leave to file an Amended Complaint, he must make a motion for leave to amend his Complaint on or before **October 14, 2016**. Defendants must file a response to the motion on or before **October 28, 2016,** and Plaintiff's reply must be filed on or before **November 4, 2016**. The Clerk of Court is respectfully requested to close Docket Entry 14.

### SO ORDERED.

Date: September 26, 2016.

### All Citations

Not Reported in Fed. Supp., 2016 WL 5376212

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

1997 WL 576038

1997 WL 576038
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Danilo KINCH, Plaintiff,

v.

Superintendent C. ARTUZ; Deputy Superintendent
D. Bliden; Rabbi M. Chill, Defendants.

No. 97 CIV. 2419 (LAP).
|
Sept. 15, 1997.

*MEMORANDUM AND ORDER*

PRESKA, District J.

**\*1** Plaintiff, a prisoner currently an inmate in the custody of the Green Haven Correctional Facility ("Green Haven"), brings this *pro se* action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that Rabbi M. Chill ("Rabbi Chill") denied plaintiff access to Jewish Sabbath Services provided at Green Haven as well as the right to participate in the kosher food program at Green Haven. Defendant Superintendent C. Artuz ("Artuz") and defendant Deputy Superintendent D. Bliden ("Bliden") have moved to dismiss plaintiff's complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil procedure. For the reasons that follow, defendants' motion to dismiss is granted.

*BACKGROUND*

Kinch is currently an inmate at Green Haven. (Complaint ("Compl.") at 2). Artuz and Bliden are employed by the New York State Department of Correctional Services ("DOCS") as Superintendent and Deputy Superintendent for Programs at Green Haven, respectively. (Compl. at 3).

Plaintiff alleges that Rabbi Chill discriminated against plaintiff in violation of DOCS' Directive 4202. (*Id.*). Directive 4202 provides as follows:

> Resident Chaplains are responsible for pastoral care for the entire inmate population and for staff. They also provide spiritual guidance, religious activities and volunteers, ongoing pastoral counseling, and religious education for particular faith groups. Chaplains report directly to the Deputy Superintendent for Program Services, but as situations warrant, may consult directly with the superintendent.

Plaintiff claims that he attempted to attend Sabbath Services but was denied the right to attend because he is a Black Hebrew Israelite. (*Id.*). Plaintiff further alleges that on September 6, 1996, Rabbi Chill informed plaintiff that Hebrew Israelites could not participate in the kosher food program at Green Haven. (*Id.* at 3-a). Two days later plaintiff made a written request for an interview with Rabbi Chill. (*Id.*). Rabbi Chill responded to plaintiff's request with a request for documentation verifying plaintiff's affiliation with the Jewish faith. Plaintiff subsequently provided Rabbi Chill with a letter from a rabbi outside of DOCS by the name of Simeon Ben Israel verifying that plaintiff was in fact a Jew/Hebrew. (*Id.*). Plaintiff claims that although Rabbi Chill acknowledged receipt of this verification, Rabbi Chill continued to deny plaintiff access to the kosher food program. (*Id.*). Nowhere in the body of the complaint does plaintiff allege that either Artuz or Bliden played any role whatsoever in the denial of religious services.

*DISCUSSION*

I. Standard Applicable to A Motion to Dismiss
When deciding a motion to dismiss under Rule 12(b)(6), a court must accept as true all well-pleaded factual allegations of the complaint and must draw all inferences in favor of the pleader. *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir. 1993); *see City of Los Angeles v. Preferred Communications, Inc.,* 476 U.S. 488, 493 (1986); *Miree v. DeKalb County,* 433 U.S. 25, 27 n.2 (1977) (both referring to "well-pleaded allegations"). "'[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference."' *International Audiotext Network, Inc. v. American Tel. and Tel. Co.,* 62 F.3d 69, 72 (2d Cir. 1995) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir. 1991), *cert. denied sub nom. Cortec Indus., Inc. v. Westinghouse Credit Corp.,* 503 U.S. 960 (1992)). Dismissal is proper only when "it appears beyond doubt that the plaintiff can prove no set

1997 WL 576038

of facts in support of his claims which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957), *quoted by Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974); *accord Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir. 1994). "The latter principle is to be applied with particular strictness when the plaintiff complains of a civil rights violation." *Branum v. Clark,* 927 F.2d 698, 705 (2d Cir. 1991).

**\*2** Furthermore, because Mr. Kinch filed this action *pro se,* I must judge his pleadings by a more lenient standard than that accorded to "formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U.S. 519, 520, *reh'g denied,* 405 U.S. 948 (1972); *accord Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir. 1994) ("[W]e read [the *pro se* party's] supporting papers liberally, and will interpret them to raise the strongest arguments that they suggest."); *Hanlin v. Mitchelson,* 794 F.2d 834, 838-39 (2d Cir. 1986) (citing *Haines* to support the principle that *pro se* pleadings are given a liberal construction); *see Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir. 1988) (referring to the "special solicitude" afforded *pro se* litigants when confronted with motions for summary judgment).

Nevertheless, proceeding *pro se* does not altogether relieve Mr. Kinch from the usual pleading requirements. *See Lee v. Coughlin,* 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (holding that a "*pro se* party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment") (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir. 1991)), *reh'g granted on other grounds,* 914 F. Supp. 1004 (S.D.N.Y. 1996); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080 (PKL), 1994 WL 681763, at \*5 (S.D.N.Y. Dec. 5, 1994) ("The work product of *pro se* litigants should be generously and liberally construed, but [the *pro se*'s] failure to allege either specific facts or particular laws that have been violated renders his attempt to oppose defendants' motion ineffectual."); *Stinson v. Sheriff's Dep't,* 499 F. Supp. 259, 262 (S.D.N.Y. 1980) (holding that the liberal standard accorded *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended"). Applying these standards to plaintiff's complaint, I find that plaintiff has not stated a claim upon which relief may be granted.

II. Section 1983 Claim Requirement of Personal Involvement
Kinch has sued under 42 U.S.C. § 1983. According to this provision,

[e]very person who, under any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. Under section 1983, "[p]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (citing *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied,* 434 U.S. 1087 (1978) (citations omitted)). Furthermore, the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement. Therefore, a prison official may not be found liable for a constitutional violation merely because of the acts of those under his control. *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir. 1995); *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319 (2d Cir. 1986); *Williams v. Vincent,* 508 F.2d 541, 546 (2d Cir. 1974). Although both Artuz's and Bliden's names appear in the caption of the complaint, the complaint contains no allegations with respect to Artuz or Bliden. Nowhere in the complaint does plaintiff suggest that either of these two defendants was personally involved in the alleged deprivation of plaintiff's rights. Nor does the complaint suggest that defendants were grossly negligent in managing their subordinates who caused the alleged constitutional violation or that they created a policy or custom permitting the alleged violation to occur.

**\*3** Plaintiff does assert in his memorandum that he wrote Bliden on October 14, 1996 and again on November 18, 1996 "to have him correct the on going discriminatory practices of Rabbi Chill." (Plaintiff's Memorandum in Support of Opposition to Motion to Dismiss at 1, 4). Plaintiff also asserts in his memorandum that he "made no direct claim as to Artuz and Bliden's involvement because their function, responsibilities, authorities, and duties are covered under

Kinch v. Artuz, Not Reported in F.Supp. (1997)

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 195 of 370

1997 WL 576038

the Department of Correctional Services directives. Even if these allegations had been contained in plaintiff's complaint and thus could properly be considered as part of plaintiff's pleadings, such allegations would be insufficient to withstand a motion to dismiss.

With respect to plaintiff's first argument, even if a letter complaining of discrimination were sufficient to plead a claim under § 1983, plaintiff has not even alleged that any such letter was sent to Artuz. Thus, regardless of the significance of plaintiff's letter, plaintiff has not alleged any involvement whatsoever on behalf of Artuz. Furthermore, even if the letter had been sent or forwarded to Artuz, sending a letter to a supervisory official does not amount to the level of personal involvement necessary to state a claim under § 1983, because

> ... it is well established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegation made therein is insufficient to hold that official liable for the alleged violations.

*Greenwaldt v. Coughlin,* 1995 WL 232736, *4 (S.D.N.Y. 1995); *see also Zamakshari v. Dvoskin,* 899 F. Supp. 1097, 1110 (S.D.N.Y. 1997) (citing *Candelaria v. Coughlin,* 787 F. Supp. 368, 373 (S.D.N.Y. 1992), *aff'd,* 979 F.2d 845 (2d Cir. 1992); *Garrido v. Coughlin,* 716 F. Supp. 98, 100 (S.D.N.Y. 1989)).

Plaintiff's second argument is directly contrary to the holdings of *Monell* and its progeny. *Monell v. N.Y.C. Dep't of Soc. Servs.,* 436 U.S. 658, 98 S. Ct. 2018 (1978); *accord City of St. Louis v. Praprotnik,* 485 U.S. 112, 108 S. Ct. 915 (1988); *see also Hendricks v. Coughlin,* 114 F.3d 390, 394 (2d Cir. 1997); *Champion v. Artuz,* 76 F.3d 483, 486-87 (2d Cir. 1996); *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir. 1995); *Green v. Bauvi,* 46 F.3d 189, 194 (2d Cir. 1995). Plaintiff argues that Artuz and Bliden are liable by virtue of their supervisory position with respect to Rabbi Chill. In *Monell,* however, the Supreme Court stated unequivocally that a plaintiff may not rely on the doctrine of *respondeat superior* to impose liability on a supervisory official in a § 1983 action. *Monell,* 436 U.S. at 691, 98 S. Ct. at 2036. Accordingly, plaintiff's motion with respect to defendants Artuz and Bliden must be dismissed.

*CONCLUSION*

For the reasons set forth above, the motion of defendants Artuz and Bliden to dismiss plaintiff's claims against them is granted.

SO ORDERED:

Dated: New York, New York
 **\*4**  September 10, 1997

**All Citations**

Not Reported in F.Supp., 1997 WL 576038

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

83 Fed.Appx. 359
This case was not selected for
publication in West's Federal Reporter.
United States Court of Appeals,
Second Circuit.

James J. D'AMATO, Plaintiff–Appellant,

v.

Anthony RATTOBALLI, Defendant–Appellee.

No. 03–7539.
|
Dec. 8, 2003.

**Synopsis**

**Background:** Federal habeas petitioner brought action against his former attorney and district court judge involved in the habeas case, asserting claims under § 1983 and under statutes setting forth offenses of conspiracy to commit offense against or to defraud the United States and subornation of perjury. The United States District Court for the Eastern District of New York, Joanna Seybert, J., dismissed the complaint sua sponte, and habeas petitioner appealed.

**Holdings:** The Court of Appeals held that:

[1] privately retained attorney was not acting under the color of state law so as to support petitioner's § 1983 claim against his former attorney for ineffective assistance of counsel;

[2] statutes setting forth offenses of conspiracy to commit offense against or to defraud the United States, and subornation of perjury, standing alone, did not provide for civil remedies;

[3] judge was entitled to absolute immunity from liability for damages under § 1983 for actions performed in her judicial capacity; and

[4] application for a writ of mandamus, rather than a § 1983 action, was the proper vehicle with which to address petitioner's claims that the district court unduly delayed the resolution of his habeas petition.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss.

West Headnotes (5)

[1]    **Civil Rights**    Attorneys and witnesses

Privately retained attorney was not acting under the color of state law so as to support § 1983 claim of federal habeas petitioner against his former attorney for ineffective assistance of counsel. U.S.C.A. Const.Amend. 6; 42 U.S.C.A. § 1983.

4 Cases that cite this headnote

[2]    **Action**    Criminal acts

**Conspiracy**    Nature, form, and right of action

Statute setting forth offense of conspiracy to commit offense against or to defraud the United States, standing alone, did not provide for civil remedy. 18 U.S.C.A. § 371.

4 Cases that cite this headnote

[3]    **Action**    Criminal acts

Statute setting forth offense of subornation of perjury, standing alone, did not provide for civil remedy. 18 U.S.C.A. § 1622.

9 Cases that cite this headnote

[4]    **Civil Rights**    Judges, courts, and judicial officers

A judge is entitled to absolute immunity from liability for damages under § 1983 for actions performed in her judicial capacity, even if the action she took was in error, was done maliciously, or was in excess of her authority. 42 U.S.C.A. § 1983.

1 Case that cites this headnote

[5]    **Civil Rights**    Availability, Adequacy, Exclusivity, and Exhaustion of Other Remedies

An application for a writ of mandamus, rather than a § 1983 action, was the proper vehicle

with which to address federal habeas petitioner's claims that the district court unduly delayed the resolution of his habeas petition. 42 U.S.C.A. § 1983.

**\*360** Appeal from the United States District Court for the Eastern District of New York (Joanna Seybert, Judge).

**Attorneys and Law Firms**

James J. D'Amato, Inverness, FL, for Appellant, pro se.

Matthew K. Flanagan, L'Abbate, Balkan, Colavita & Contini, LLP, Garden City, NY, for Appellee.

Present: VAN GRAAFEILAND, SACK, and John R. GIBSON, * Circuit Judges.

\*   Of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

### SUMMARY ORDER

**\*\*1** UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the judgment of May 16, 2003 be and it hereby is AFFIRMED.

Plaintiff-appellant James D'Amato appeals from a judgment of the United States District Court for the Eastern District of New York (Joanna Seybert, *Judge*) dismissing *sua sponte* his complaint against Anthony Rattoballi, his former lawyer, for alleged violations of his constitutional rights under 42 U.S.C. § 1983, violations of 18 U.S.C. §§ 371 and 1622, ineffective assistance of counsel, and breach of an attorney-client contract.

**[1]   [2]   [3]**   The district court properly concluded that D'Amato's section 1983 claims against Rattoballi should be dismissed on the ground that Rattoballi, a privately retained attorney, was not acting under the color of state law. *See Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998). The district court also concluded correctly that D'Amato cannot recover damages against Rattoballi under 18 U.S.C. §§ 371 or 1622, because these criminal statutes, standing alone, do not provide for civil remedies. To the extent that D'Amato has also alleged state-law claims, the district court properly declined to exercise supplemental jurisdiction to address those claims. *See Valencia ex rel. Franco v. Lee,* 316 F.3d 299, 305–08 (2d Cir.2003).

**[4]   [5]**   On appeal, D'Amato also raises various claims against the district court judge. He cannot prevail on these claims either. It is well-established that a judge is entitled to absolute immunity from liability for damages under section 1983 for actions performed in her judicial capacity, and that the judge "will not be deprived of immunity [even] if the action [she] took was in error, was done maliciously, or was in excess of [her] authority." *Fields v. Soloff,* 920 F.2d 1114, 1119 (2d Cir.1990) (internal quotation marks omitted). As for D'Amato's claims that the district court has, among other things, unduly delayed the resolution of his habeas petition, even were that true, an application for a writ of mandamus, rather than a section 1983 action, would be the proper vehicle with which to address the claims. *See* **\*361** *Mallard v. U.S. Dist. Court for the S. Dist. of Iowa,* 490 U.S. 296, 308, 109 S.Ct. 1814, 104 L.Ed.2d 318 (1989).

For the foregoing reasons, the judgment of the district court is hereby AFFIRMED.

**All Citations**

83 Fed.Appx. 359, 2003 WL 22955858

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

4 Fed.Appx. 7
This case was not selected for
publication in the Federal Reporter.
United States Court of Appeals,
Second Circuit.

Michael MCCLOUD, Plaintiff–Appellant,

v.

Leighton M. JACKSON et al., Defendants–Appellees.

No. 00–31.
|
Feb. 2, 2001.

**Synopsis**

Inmate brought § 1983 action against court-appointed attorney, alleging attorney sexually harassed him, threatened him, and forced him to perform sexual favors in exchange for money and legal assistance. The United States District Court for the Northern District of New York, Lawrence E. Kahn, J., sua sponte dismissed complaint for failing to state a claim on which relief could be granted. Inmate filed an amended complaint naming counties, State of New York, and State Division of Parole as defendant. Amendment complaint was also dismissed for failure to state a claim. Inmate appealed. The Court of Appeals held that: (1) attorney did not act 'under color of state law' and therefore was not subject to suit under § 1983; (2) counties could not liable under doctrine of respondeat superior; and (3) Eleventh Amendment barred claims against State and Division of Parole.

Affirmed.

**Procedural Posture(s):** On Appeal.

West Headnotes (8)

**[1]    Civil Rights** 🔑 Attorneys and witnesses

Court-appointed attorney who represented inmate at a parole revocation hearing and two subsequent parole proceedings did not act 'under color of state law' and therefore was not subject to suit under § 1983. 42 U.S.C.A. § 1983.

9 Cases that cite this headnote

**[2]    Civil Rights** 🔑 Nature and elements of civil actions

To state a claim under § 1983, a plaintiff must allege: (1) the deprivation of a right secured by the Constitution or laws of the United States (2) which has taken place under color of state law. 42 U.S.C.A. § 1983.

8 Cases that cite this headnote

**[3]    Civil Rights** 🔑 Attorneys and witnesses

To the extent that inmate's attorney served as privately-retained counsel, rather than as a court-appointed attorney, he was not liable under § 1983, absent showing that attorney worked with state officials to deprive inmate of federal rights. 42 U.S.C.A. § 1983.

12 Cases that cite this headnote

**[4]    Federal Courts** 🔑 Waiver of Error in Appellate Court

Inmate waived his attorney malpractice claim by failing to address claim on appeal.

**[5]    Civil Rights** 🔑 Criminal law enforcement; prisons

Counties were not liable in § 1983 action for appointing and paying attorney, who allegedly sexually harassed inmate, under doctrine of respondeat superior, where counties were not engaged in a supervisory relationship with attorney and inmate's pleadings neither mentioned nor suggested the existence of a municipal custom or policy. 42 U.S.C.A. § 1983.

**[6]    Civil Rights** 🔑 Governmental Ordinance, Policy, Practice, or Custom

A § 1983 plaintiff seeking to impose liability on a municipality must prove that a municipal policy or custom caused the deprivation of federal rights. 42 U.S.C.A. § 1983.

**[7]**   **Civil Rights** 🔑 Prisons

Inmate could not assert claims under § 1983 against counties for holding him in jail, as any claim for money damages which necessarily imputed the invalidity of a conviction was barred under *Heck v. Humphrey* until such time as the conviction was vacated or otherwise invalidated. 42 U.S.C.A. § 1983.

1 Case that cites this headnote

**[8]**   **Federal Courts** 🔑 Suits Against States; Eleventh Amendment and Sovereign Immunity

**Federal Courts** 🔑 Parole boards and board members

Eleventh Amendment barred inmate's § 1983 claims against the People of the State of New York and the New York State Division of Parole. U.S.C.A. Const.Amend. 11; 42 U.S.C.A. § 1983.

21 Cases that cite this headnote

**\*8**  Appeal from the United States District Court for the Northern District of New York, Lawrence E. Kahn, Judge.

**Attorneys and Law Firms**

Michael McCloud, Hudson Correctional Facility, Hudson, NY, pro se.

Salvatore Canonico, Esq., Canonico & Ostrowsky, Brooklyn, NY, for appellees.

Present OAKES, STRAUB and POOLER, Circuit Judges.

SUMMARY ORDER

**\*\*1**  AFTER SUBMISSION AND UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED AND DECREED **\*9** that the judgment of the District Court is hereby AFFIRMED.

Appellant Michael McCloud, *pro se,* filed a § 1983 complaint against Leighton Jackson, a court-appointed attorney assigned to represent Mr. McCloud at a parole revocation hearing, who also represented Mr. McCloud at

two subsequent parole proceedings, [1] alleging that Jackson sexually harassed him, threatened him, and forced him to perform sexual favors in exchange for money and legal assistance. Mr. McCloud also stated that Jackson's actions constituted attorney malpractice and that Jackson breached the attorney/client privilege.

[1]    With respect to the subsequent parole proceedings, it is not clear whether Jackson acted as a court-appointed attorney or as privately-retained counsel.

The United States District Court for the Northern District of New York (Lawrence E. Kahn, *Judge*) *sua sponte* dismissed Mr. McCloud's complaint for failing to state a claim on which relief could be granted, stating that Jackson could not be held liable under § 1983 because he did not act under color of state law. The District Court stated that McCloud could file an amended complaint, but noted that if the amended complaint were brought pursuant to § 1983, it had to allege wrongful conduct on the part of defendants who acted on behalf of the state.

Mr. McCloud filed an amended § 1983 complaint, seeking to withdraw Jackson as a defendant and add the following defendants: New York County; Jefferson County; Suffolk County (collectively "the county defendants"); the People of the State of New York; and the New York State Division of Parole. Mr. McCloud stated that all of the defendants were responsible for Jackson's actions because they appointed and paid Jackson and knew or should have known about Jackson's unethical tendencies. McCloud further alleged that the Division of Parole was liable for Jackson's conduct because it allowed Jackson to lie while representing McCloud at a state habeas corpus proceeding. He stated that the county defendants were liable because he was detained in each county in connection with his various parole proceedings.

The District Court *sua sponte* dismissed Mr. McCloud's amended complaint for failure to state a claim on which relief could be granted, finding that none of the defendants could be held liable under § 1983.

Mr. McCloud filed a timely notice of appeal and subsequently submitted an appellate brief, restating the arguments raised in his original complaint and his amended complaint. Jackson responds that Mr. McCloud makes only vague allegations and has failed to allege that Jackson acted under state law.

**[1]** **[2]** **[3]** The District Court properly dismissed Mr. McCloud's § 1983 claim against Jackson. "To state a claim under § 1983, a plaintiff must allege (1) the deprivation of a right secured by the Constitution or laws of the United States (2) which has taken place under color of state law." *Rodriguez v. Weprin,* 116 F.3d 62, 65 (2d Cir.1997). "[I]t is well-established that court-appointed attorneys performing a lawyer's traditional functions as counsel to defendant do not act 'under color of state law' and therefore are not subject to suit under 42 U.S.C. § 1983." *Id.* at 65–66. Although a court-appointed attorney is subject to § 1983 liability where he conspires with state officials to deprive his client of federal rights, *see Tower v. Glover,* 467 U.S. 914, 923, 104 S.Ct. 2820, 81 L.Ed.2d 758 (1984), Mr. McCloud makes no allegations of such a conspiracy. To the extent that Jackson may have served **\*10** as privately-retained counsel, rather than as a court-appointed attorney, he still could not be held liable under § 1983 because there was no showing that he worked with state officials to deprive Mr. McCloud of federal rights. *See Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998) (private parties may be held liable under § 1983 if they " 'jointly engaged with state officials in the challenged action.' ") (internal citations omitted).

**\*\*2** **[4]** The District Court's order did not address Mr. McCloud's attorney malpractice claim. Because Mr. McCloud does not address this claim on appeal, the claim is deemed waived. *See LoSacco v. City of Middletown,* 71 F.3d 88, 92–93 (2d Cir.1995). In any event, the District Court appropriately dismissed Mr. McCloud's complaint in its entirety, including the malpractice component, because when all claims over which the district court has original jurisdiction are dismissed, the general rule is that state law supplementary claims should also be dismissed. *See* 28 U.S.C. § 1367(c)(3); *see also Lanza v. Merrill Lynch & Co.,* 154 F.3d 56, 61 (2d Cir.1998). Moreover, Mr. McCloud has never alleged, nor does the record provide any support for, jurisdiction over Mr. McCloud's malpractice claim based on diversity of citizenship. *See* 28 U.S.C. § 1332. Although Mr. McCloud sought more than $75,000 in damages, he has never alleged,

nor does the record show, that the parties are citizens of different states.

**[5]** **[6]** **[7]** The District Court properly dismissed Mr. McCloud's claims against the county defendants for appointing and paying Jackson, because "the doctrine of respondeat superior cannot be used to establish liability under Section 1983." *Blyden v. Mancusi,* 186 F.3d 252, 264 (2d Cir.1999). Although, in limited circumstances, supervisors may be found liable under § 1983 for the actions of their subordinates, *id.,* the defendants were not engaged in a supervisory relationship with Jackson. In addition, a plaintiff seeking to impose liability on a municipality "must prove that a municipal 'policy' or 'custom' caused the deprivation." *Wimmer v. Suffolk County Police Dep't,* 176 F.3d 125, 137 (2d Cir.), *cert. denied,* 528 U.S. 964, 120 S.Ct. 398, 145 L.Ed.2d 310 (1999). Here, Mr. McCloud's pleadings neither mentioned nor suggested the existence of a municipal custom or policy. Furthermore, Mr. McCloud could not assert claims under § 1983 against the county defendants for holding him in jail because any claim for money damages which, as here, necessarily imputes the invalidity of a conviction, is barred under *Heck v. Humphrey,* 512 U.S. 477, 484, 486–87, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), until such time as the conviction is vacated or otherwise invalidated.

**[8]** Finally, the District Court properly dismissed Mr. McCloud's claims against the People of the State of New York and the New York State Division of Parole because the Eleventh Amendment bars suits against states and state agencies. *See Jones v. N.Y.S. Div. of Military & Naval Affairs,* 166 F.3d 45, 49 (2d Cir.1999).

For the reasons set forth above, we AFFIRM the judgment of the District Court.

**All Citations**

4 Fed.Appx. 7, 2001 WL 99820

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by Powell v. Alexander, D.Conn., September 17, 2018

95 F.Supp.3d 293
United States District Court, E.D. New York.

Malek HARRISON, Plaintiff,

v.

State of NEW YORK; County of Nassau; Nassau County
Police Department; Ronald Rispoli; Anthony Dicaprio;
Jeffrey S. Marshall; Nassau County Office of the District
Attorney; Jhounelle Cunningham; The TJK Companies,
Inc.; Nils Renner; Christine Grimaudo; United States
Secret Service; Joseph Gerbino; Geoffrey Prime;
and The Law Office of Elliot Schlissel, Defendants.

No. 14–CV–1296 (JFB)(AKT)
|
Signed March 20, 2015.

**Synopsis**

**Background:** Arrestee, litigating pro se, brought action
against state, store owner and its employees, Secret Service
and its agent, arrestee's former retained counsel and former
assigned counsel, and other defendants, relating to plaintiff's
arrest and prosecution in state court for criminal possession
of forged instrument, i.e., counterfeit currency that arrestee
allegedly had given to store's cashier. Defendants filed
motions to dismiss.

**Holdings:** The District Court, Joseph F. Bianco, J., adopting
the report and recommendation of A. Kathleen Tomlinson,
United States Magistrate Judge, held that:

[1] New York State had not waived its Eleventh Amendment
sovereign immunity from § 1983 suits;

[2] Secret Service had sovereign immunity from *Bivens*
claims;

[3] arrestee would be granted extension of time to serve
complaint on Secret Service Agent in his individual capacity;

[4] arrestee failed to sufficiently allege that store owner acted
under color of state law;

[5] arrestee sufficiently alleged that store's investigator
conspired with county detective, so that investigator was state
actor for § 1983 purposes;

[6] arrestee's allegations were insufficient to invoke
continuing violation doctrine, as basis for delaying
commencement of limitations period for § 1983 claim against
store's investigator; and

[7] arrestee failed to sufficiently allege that appointed counsel
was a state actor.

Motions granted in part and denied in part.

**Procedural Posture(s):** Motion to Dismiss; Motion to
Dismiss for Failure to State a Claim; Motion to Dismiss for
Lack of Subject Matter Jurisdiction.

West Headnotes (75)

**[1]    United States Magistrate
Judges 👉 Determination and Disposition**

A district judge may accept, reject, or
modify, in whole or in part, the findings
and recommendations of the United States
Magistrate Judge. 28 U.S.C.A. § 636; Fed.Rules
Civ.Proc.Rule 72(b), 28 U.S.C.A.

1 Case that cites this headnote

**[2]    United States Magistrate
Judges 👉 Objections to Report and
Recommendation**

**United States Magistrate Judges 👉 Plain
error, clear error, and manifest injustice review**

For those portions of a report and
recommendation of a United States Magistrate
Judge to which no specific written objections are
made, the district court may accept the findings
contained therein without de novo review, as
long as the factual and legal bases supporting the
findings are not clearly erroneous. 28 U.S.C.A.
§ 636(b)(1)(C); Fed.Rules Civ.Proc.Rule 72(b),
28 U.S.C.A.

1 Case that cites this headnote

**[3]**    **Federal Civil Procedure** ⚷ Time of determination; reserving decision

**Federal Courts** ⚷ Necessity of Objection; Power and Duty of Court

Where a defendant moves for dismissal based on insufficient service of process and failure to state a claim, logic compels initial consideration of the issue of personal jurisdiction over the defendant, because a court without such jurisdiction lacks power to dismiss a complaint for failure to state a claim. Fed.Rules Civ.Proc.Rule 12(b)(5, 6), 28 U.S.C.A.

1 Case that cites this headnote

**[4]**    **Federal Courts** ⚷ Dismissal or other disposition

When a plaintiff fails to meet his burden of showing that the court has personal jurisdiction over the moving defendants, the district court lacks power to dismiss the complaint for failure to state a claim. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

1 Case that cites this headnote

**[5]**    **Federal Civil Procedure** ⚷ Pro Se or Lay Pleadings

**Federal Civil Procedure** ⚷ Pleading over

A pro se complaint is to be read liberally, and a court should not dismiss, for failure to state a claim, without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated. Fed.Rules Civ.Proc.Rules 12(b)(6), 15(a), 28 U.S.C.A.

10 Cases that cite this headnote

**[6]**    **Federal Civil Procedure** ⚷ Pleading over

Leave to re-plead can be denied where it is clear that no amendments can cure the pleading deficiencies and any attempt to re-plead would be futile. Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

3 Cases that cite this headnote

**[7]**    **Federal Civil Procedure** ⚷ Pleading over

On dismissal for failure to state a claim, pro se arrestee would not be granted leave to amend his § 1983 claim against state and his *Bivens* claims against the Secret Service and Secret Service Agent in his official capacity, arising from allegedly false arrest for criminal possession of forged instrument, i.e., counterfeit currency, where amendment would be futile, in light of defendants' federal sovereign immunity or Eleventh Amendment state immunity. U.S.C.A. Const.Amends. 4, 11; 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rules 12(b)(1), 15(a), 28 U.S.C.A.

3 Cases that cite this headnote

**[8]**    **Federal Civil Procedure** ⚷ Pleading over

On dismissal for failure to state a claim, pro se arrestee would not be granted leave to amend his § 1983 complaint against store's investigator, alleging investigator's joint action or conspiracy with county detective to justify the allegedly false arrest for passing counterfeit currency, where amendment would be futile, in light of the claim being time-barred. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rules 12(b)(6), 15(a), 28 U.S.C.A.

4 Cases that cite this headnote

**[9]**    **Civil Rights** ⚷ Liability of Federal Government and Its Agencies and Officers

A § 1983 action cannot lie against federal officers. 42 U.S.C.A. § 1983.

1 Case that cites this headnote

**[10]**    **United States** ⚷ Pleading

Arrestee's pro se complaint, invoking § 1983 as basis for action against Secret Service agent, relating to allegedly false arrest for criminal possession of forged instrument, i.e., counterfeit currency, would be construed as a *Bivens* claim, on agent's motion to dismiss; § 1983 action could

not lie against a federal officer, and while the complaint did not reference *Bivens*, it was the non-statutory federal counterpart to § 1983, for suits aimed at federal rather than state officials. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rule 12(b), 28 U.S.C.A.

**[11]    Federal Courts**  ⟜  Limited jurisdiction; jurisdiction as dependent on constitution or statutes

Federal courts are courts of limited jurisdiction and may not preside over cases absent subject matter jurisdiction.

5 Cases that cite this headnote

**[12]    Federal Courts**  ⟜  Dismissal or other disposition

A case must be dismissed for lack of subject matter jurisdiction when the district court lacks the statutory or constitutional power to adjudicate it. Fed.Rules Civ.Proc.Rule 12(b)(1), 28 U.S.C.A.

2 Cases that cite this headnote

**[13]    Federal Courts**  ⟜  Presumptions and burden of proof

When resolving a motion to dismiss for lack of subject matter jurisdiction, the district court must take all uncontroverted facts in the complaint as true, and draw all reasonable inferences in favor of the party asserting jurisdiction. Fed.Rules Civ.Proc.Rule 12(b)(1), 28 U.S.C.A.

5 Cases that cite this headnote

**[14]    Federal Courts**  ⟜  Pleadings and motions
**Federal Courts**  ⟜  Evidence;  Affidavits

On a motion to dismiss for lack of subject matter jurisdiction, the court is not confined to the four corners of the complaint and may resolve disputed jurisdictional fact issues by reference to evidence outside the pleadings, such as affidavits. Fed.Rules Civ.Proc.Rule 12(b)(1), 28 U.S.C.A.

2 Cases that cite this headnote

**[15]    Federal Courts**  ⟜  Weight and sufficiency

The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence.

7 Cases that cite this headnote

**[16]    Federal Courts**  ⟜  Pleadings and motions

Although courts hold pro se complaints to less stringent standards than formal pleadings drafted by lawyers, pro se litigants still must establish subject matter jurisdiction to proceed in federal court.

10 Cases that cite this headnote

**[17]    Process**  ⟜  Nature and necessity in general

Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied.

**[18]    Federal Civil Procedure**  ⟜  Matters considered in general

Similar to a motion to dismiss for lack of subject matter jurisdiction, a court considering a motion to dismiss for insufficient service of process may look to matters outside the complaint to determine whether it has personal jurisdiction. Fed.Rules  Civ.Proc.Rule  12(b)(1, 5), 28 U.S.C.A.

5 Cases that cite this headnote

**[19]    Federal Civil Procedure**  ⟜  Motion and proceedings thereon

When a defendant moves to dismiss for insufficient service of process, the plaintiff bears the burden of proving adequate service. Fed.Rules Civ.Proc.Rule 12(b)(5), 28 U.S.C.A.

5 Cases that cite this headnote

**[20]**  **Federal Civil Procedure** 🔑 Process, defects in

If the court determines that service of process was insufficient, the court may, but is not required to, dismiss the action. Fed.Rules Civ.Proc.Rule 12(b)(5), 28 U.S.C.A.

2 Cases that cite this headnote

**[21]**  **Federal Civil Procedure** 🔑 Pro Se or Lay Pleadings

On a defendant's motion to dismiss for failure to state a claim, where a plaintiff is proceeding pro se, the complaint must be considered under a more lenient standard than that accorded formal pleadings drafted by lawyers, and therefore, a court must construe a pro se plaintiff's complaint broadly and interpret it to raise the strongest arguments that it suggests; however, mere conclusions of law or unwarranted deductions need not be accepted. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

4 Cases that cite this headnote

**[22]**  **Federal Courts** 🔑 Suits Against States; Eleventh Amendment and Sovereign Immunity

Eleventh Amendment sovereign immunity bars suits in federal court against a state by one of its own citizens. U.S.C.A. Const.Amend. 11.

7 Cases that cite this headnote

**[23]**  **Federal Courts** 🔑 Suits Against States; Eleventh Amendment and Sovereign Immunity

As a general matter, states enjoy sovereign immunity from suit in federal court, even if the claim arises under federal law. U.S.C.A. Const.Amend. 11.

12 Cases that cite this headnote

**[24]**  **Federal Courts** 🔑 Waiver by State; Consent

A State may waive its Eleventh Amendment sovereign immunity by consenting to suit in federal court. U.S.C.A. Const.Amend. 11.

9 Cases that cite this headnote

**[25]**  **Federal Courts** 🔑 Abrogation by Congress

Congress may abrogate the Eleventh Amendment sovereign immunity of the States, from suits in federal court, by acting pursuant to a grant of constitutional authority. U.S.C.A. Const.Amend. 11.

6 Cases that cite this headnote

**[26]**  **Federal Courts** 🔑 Suits for injunctive or other prospective or equitable relief; Ex parte Young doctrine

**Federal Courts** 🔑 Agencies, officers, and public employees

Under the *Ex parte Young* doctrine, the Eleventh Amendment sovereign immunity of the States, from suits in federal court, does not bar a suit against a state official when that suit seeks prospective injunctive relief. U.S.C.A. Const.Amend. 11.

**[27]**  **Federal Courts** 🔑 Waiver by State; Consent

New York State has not waived its Eleventh Amendment sovereign immunity from suit in federal courts, as to § 1983 claims. U.S.C.A. Const.Amend. 11; 42 U.S.C.A. § 1983.

19 Cases that cite this headnote

**[28]**  **Federal Courts** 🔑 Civil rights and discrimination in general

Congress, in enacting § 1983, did not abrogate the States' Eleventh Amendment sovereign immunity from suits in federal court. U.S.C.A. Const.Amend. 11; 42 U.S.C.A. § 1983.

5 Cases that cite this headnote

**[29]**  **United States** 🔑 Necessity of waiver or consent

Under federal sovereign immunity, the United States may not be sued without its consent, and

the existence of consent is a prerequisite for jurisdiction.

1 Case that cites this headnote

**[30]    United States** 🔑 **Mode and sufficiency of waiver or consent**

Consent to suit by the United States, as exception to federal sovereign immunity, must be unequivocally expressed in statutory text, and cannot simply be implied.

1 Case that cites this headnote

**[31]    United States** 🔑 **What Are Suits Against United States or Its Officers or Agents Barred by Immunity**

**United States** 🔑 **Officer sued in official capacity**

Because an action against a federal agency or federal officers in their official capacities is essentially a suit against the United States, such suits are barred under the doctrine of federal sovereign immunity, unless such immunity is waived.

8 Cases that cite this headnote

**[32]    United States** 🔑 **Constitutional Violations; Bivens Claims**

A *Bivens* claim against a federal agency is precluded under sovereign immunity, because an action against a federal agency is essentially a suit against the United States, and *Bivens* actions against the United States are barred under the doctrine of sovereign immunity.

4 Cases that cite this headnote

**[33]    United States** 🔑 **Constitutional Violations; Bivens Claims**

**United States** 🔑 **In general; individual or official capacity**

Federal sovereign immunity barred plaintiff's *Bivens* claims against the Secret Service and a Secret Service agent in his official capacity, relating to plaintiff's arrest for criminal

possession of forged instrument, i.e., counterfeit currency that allegedly had been given to store's cashier. U.S.C.A. Const.Amend. 4.

**[34]    Federal Civil Procedure** 🔑 **Process, defects in**

A plaintiff's failure to timely serve the complaint on a United States employee sued in an individual capacity may result in dismissal of the action. Fed.Rules Civ.Proc.Rules 4(i)(3), (m), 12(b)(5), 28 U.S.C.A.

**[35]    Process** 🔑 **Presumptions and burden of proof**

When a defendant has raised a challenge to the sufficiency of service of process, the plaintiff bears the burden of proving adequate service. Fed.Rules Civ.Proc.Rule 4(m), 28 U.S.C.A.

2 Cases that cite this headnote

**[36]    Federal Civil Procedure** 🔑 **Fact issues**

**Federal Civil Procedure** 🔑 **Affidavits**

A defendant's omission of a supporting affidavit that attests to the alleged deficiencies in plaintiff's service of process may be grounds to deny a motion to dismiss for insufficient service of process, if the defendant's conclusory allegations do not specify the service provision the plaintiff failed to satisfy, or the plaintiff provides evidence to rebut the defendant's allegations. Fed.Rules Civ.Proc.Rule 12(b)(5), 28 U.S.C.A.

2 Cases that cite this headnote

**[37]    Process** 🔑 **Time for service**

Even in the absence of good cause for the plaintiff's failure to timely serve the complaint on the defendant, the district court may, in its discretion, grant an extension of time for service. Fed.Rules Civ.Proc.Rule 4(m), 28 U.S.C.A.

5 Cases that cite this headnote

**[38]    Process** 🔑 **Time for service**

Four factors are typically weighed in determining whether to grant an extension of time for service of the complaint, absent good cause for the failure to timely serve: (1) whether the applicable statute of limitations would bar the refiled action; (2) whether the defendant had actual notice of the claims asserted in the complaint; (3) whether the defendant had attempted to conceal the defect in service; and (4) whether the defendant would be prejudiced by the granting of plaintiff's request for relief. Fed.Rules Civ.Proc.Rule 4(m), 28 U.S.C.A.

5 Cases that cite this headnote

[39]  Process  Time for service

The fact that the statute of limitations has run on a plaintiff's claim is a factor favoring the plaintiff, when determining whether to grant the plaintiff an extension of time for service of the complaint, absent good cause for the failure to timely serve. Fed.Rules Civ.Proc.Rule 4(m), 28 U.S.C.A.

4 Cases that cite this headnote

[40]  United States  Process

Alleged expiration of statute of limitations for pro se arrestee's Fourth Amendment false arrest claim against Secret Service Agent in his individual capacity, in Bivens action, was factor weighing in favor of granting arrestee an extension of time to serve the complaint on Agent, in absence of good cause for arrestee's failure to timely serve the complaint. U.S.C.A. Const.Amend. 4; Fed.Rules Civ.Proc.Rules 4(i)(3), (m), 12(b)(5), 28 U.S.C.A.

[41]  United States  Pleading

Secret Service Agent's actual notice of Fourth Amendment false arrest claim against him in his individual capacity, in Bivens action, was factor weighing in favor of granting pro se arrestee an extension of time to serve the complaint on Agent, in absence of good cause for arrestee's failure to timely serve the complaint; Agent ultimately received arrestee's pleadings and in fact filed motion to dismiss based

on those pleadings. U.S.C.A. Const.Amend. 4; Fed.Rules Civ.Proc.Rules 4(i)(3), (m), 12(b)(5), 28 U.S.C.A.

1 Case that cites this headnote

[42]  United States  Pleading

In absence of good cause for pro se arrestee's failure to timely serve the complaint on Secret Service Agent, arrestee would be granted an extension of time to serve the complaint, in Bivens action asserting Fourth Amendment false arrest claim against Agent in his individual capacity; statute of limitations allegedly had expired, Agent had actual notice of claim, and Agent would not be prejudiced by extension of time, though United States Attorney's Office (USAO) had not attempted to conceal the absence of service of process. U.S.C.A. Const.Amend. 4; Fed.Rules Civ.Proc.Rules 4(i)(3), (m), 12(b)(5), 28 U.S.C.A.

[43]  Civil Rights  Complaint in general

To state a claim under § 1983, a plaintiff must allege: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws, and (2) that the deprivation was committed by a person acting under the color of state law. 42 U.S.C.A. § 1983.

40 Cases that cite this headnote

[44]  Constitutional Law  Applicability to governmental or private action; state action

Because the United States Constitution regulates only the government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes state action.

5 Cases that cite this headnote

[45]  Civil Rights  State or territorial action, or individual or private action, in general

State action, for § 1983 purposes, requires both an alleged constitutional deprivation caused by the exercise of some right or privilege created

by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible, and that the party charged with the deprivation is a person who may fairly be said to be a state actor. 42 U.S.C.A. § 1983.

11 Cases that cite this headnote

[46]    **Civil Rights** 🔑 Private Persons or Corporations, in General

The conduct of private persons or entities, no matter how discriminatory or wrongful, generally does not constitute state action and therefore cannot form the basis of a § 1983 claim. 42 U.S.C.A. § 1983.

10 Cases that cite this headnote

[47]    **Civil Rights** 🔑 Private Persons or Corporations, in General

**Civil Rights** 🔑 Cooperation with state actor

State action arising from private behavior may be found, for § 1983 purposes, when there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself, such as where the private actor was a willful participant in joint activity with the State or its agents or where the private actor conspired with a state official to violate the plaintiff's constitutional rights. 42 U.S.C.A. § 1983.

22 Cases that cite this headnote

[48]    **Civil Rights** 🔑 Cooperation with state actor

**Civil Rights** 🔑 Color of law; state action

The concepts of private actors acting jointly or in conspiracy with state actors, for purposes of state action requirement for § 1983 liability, are intertwined, and even if considered as conceptually separate theories, both require the pleading of facts sufficient to show something more than conclusory allegations. 42 U.S.C.A. § 1983.

6 Cases that cite this headnote

[49]    **Civil Rights** 🔑 Cooperation with state actor

To establish a private citizen's joint action with a state official, for purposes of state action requirement for § 1983 liability, a plaintiff must show that the private citizen and the state official shared a common unlawful goal; the true state actor and the jointly acting private party must agree to deprive the plaintiff of rights guaranteed by federal law, or, in other words, the private party must act in willful collaboration with a state actor to deprive the plaintiff of a federal right. 42 U.S.C.A. § 1983.

18 Cases that cite this headnote

[50]    **Civil Rights** 🔑 Cooperation with state actor

A private citizen's conduct in summoning police officers or providing information to police officers, even if that information is false or results in the officers' taking affirmative action, is not sufficient to constitute joint action with state actors for purposes of state action requirement for § 1983 liability. 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

[51]    **Civil Rights** 🔑 Private Persons or Corporations, in General

A private party's motivation is irrelevant to the determination of whether that private party acted under color of state law, for purposes of state action requirement for § 1983 liability. 42 U.S.C.A. § 1983.

20 Cases that cite this headnote

[52]    **Civil Rights** 🔑 Cooperation with state actor

To demonstrate that a private party was a state actor engaged in a conspiracy with other state actors under § 1983, a plaintiff must allege: (1) an agreement between the private party and state actors; (2) concerted acts to inflict an unconstitutional injury; and (3) an overt act in furtherance of the goal. 42 U.S.C.A. § 1983.

27 Cases that cite this headnote

**[53]    Civil Rights** 🔑 **Color of law; state action**

Claims alleging that private parties conspired with state officials to violate civil rights, for purposes of state action requirement for § 1983 liability, are held to a heightened pleading standard, because if a plaintiff could overcome a motion to dismiss simply by alleging in a conclusory fashion a conspiracy between private actors and state actors, these private actors would be subjected to the substantial cost and disruption incurred by litigants in the discovery phase of these lawsuits, without any indication whatsoever that the plaintiff has a plausible conspiracy claim. 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

5 Cases that cite this headnote

**[54]    Civil Rights** 🔑 **Color of law; state action**

Under heightened requirements for pleading that a private actor conspired with a state actor to violate civil rights, for purposes of state action requirement for § 1983 liability, places and dates of meetings need not be pled with particularity, but the complaint, to survive a motion to dismiss, must set forth a plausible theory of agreement and concerted action. 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

1 Case that cites this headnote

**[55]    Civil Rights** 🔑 **Pursuit of private or judicial remedies**

Arrestee failed to sufficiently allege that store owner acted under color of state law, for purposes of state action requirement for § 1983 liability, relating to plaintiff's false arrest for possession of forged instrument, i.e., counterfeit currency that allegedly had been given to store's cashier, where arrestee alleged only that store owner should be held liable for conduct of its cashier, its investigator, and an anonymous employee, which allegedly involved racial profiling of black male customers. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[56]    Civil Rights** 🔑 **Attorneys and witnesses**

Conduct of store employees, in allegedly deliberately supplying county detective with false information that arrestee had given counterfeit currency to store's cashier, was insufficient to constitute state action by store employees, as would be required for employees' § 1983 liability for false arrest arising from alleged racial profiling of black male customers. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[57]    Federal Civil Procedure** 🔑 **Amendments by briefs or motion papers**

In general, a plaintiff is not permitted to use its reply to a dispositive motion as a vehicle for amending its complaint.

**[58]    Federal Civil Procedure** 🔑 **Pro Se or Lay Pleadings**

Although courts afford pro se plaintiffs a fair measure of procedural latitude, this latitude typically does not extend so far as permitting a plaintiff to supplement the claims in his complaint with additional allegations in his motion papers.

**[59]    Federal Civil Procedure** 🔑 **Matters considered in general**

Supplementary allegations and evidence, in pro se arrestee's reply to store employees' motion to dismiss the § 1983 claims against them, related to complaint's allegations that store's investigator and county detective together "manufactured" investigator's written statement purportedly justifying the arrest, and thus, the supplementary allegations and evidence would be considered when determining whether state action requirement for store investigator's § 1983 liability was sufficiently alleged, in action alleging false arrest arising from racial profiling of store's black male customers. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[60]** **Civil Rights** 🔑 Attorneys and witnesses

Arrestee sufficiently alleged that store's investigator acted jointly or conspired with county detective, for purposes of state action requirement for § 1983 liability, in action alleging false arrest arising from racial profiling of black male customers; arrestee alleged that store's investigator and detective together manufactured the scenario of a call coming from an anonymous store employee and then drafted investigator's written statement in a poor attempt to substantiate a basis for arresting plaintiff for giving counterfeit currency to store's cashier. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[61]** **Federal Courts** 🔑 Civil rights and discrimination cases

The statute of limitations for claims brought pursuant to § 1983 is determined by state law. 42 U.S.C.A. § 1983.

1 Case that cites this headnote

**[62]** **Civil Rights** 🔑 Time to Sue

In New York State, the statute of limitations for actions brought pursuant to § 1983 is the three-year general or residual statute of limitations for personal injury actions. 42 U.S.C.A. § 1983.

1 Case that cites this headnote

**[63]** **Federal Courts** 🔑 Computation and tolling

**Limitation of Actions** 🔑 Civil rights

While state law supplies the statute of limitations for claims under § 1983, federal law determines when a federal claim accrues, which occurs when the plaintiff knows or has reason to know of the harm. 42 U.S.C.A. § 1983.

5 Cases that cite this headnote

**[64]** **Limitation of Actions** 🔑 Suspension or stay in general; equitable tolling

Under New York law, equitable tolling of a statute of limitations may be permitted

when the plaintiff was induced by fraud, misrepresentations, or deception to refrain from filing a timely action.

**[65]** **Limitation of Actions** 🔑 Civil rights

A § 1983 claim for false arrest generally accrues, for limitations purposes, on the date of the arrest. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

9 Cases that cite this headnote

**[66]** **Limitation of Actions** 🔑 Civil rights

For § 1983 claims involving conspiracies to violate an individual's civil rights, the cause of action accrues and the statute of limitations begins to run from the time of commission of the overt act alleged to have caused damages. 42 U.S.C.A. § 1983.

4 Cases that cite this headnote

**[67]** **Limitation of Actions** 🔑 Civil rights

**Limitation of Actions** 🔑 Civil rights

The continuing violation doctrine is an exception to the normal knew-or-should-have-known accrual date for § 1983 claims, for limitations purposes. 42 U.S.C.A. § 1983.

3 Cases that cite this headnote

**[68]** **Limitation of Actions** 🔑 Civil rights

**Limitation of Actions** 🔑 Civil rights

To rely on the continuing violation doctrine as an exception to the normal knew-or-should-have-known accrual date for § 1983 claims, for limitations purposes, a plaintiff must allege both the existence of an ongoing policy of discrimination and some non-time-barred acts taken in furtherance of that policy. 42 U.S.C.A. § 1983.

4 Cases that cite this headnote

**[69]** **Limitation of Actions** 🔑 Civil rights

Arrestee's allegations were not sufficient to invoke the continuing violation doctrine, as basis

for delaying the commencement of limitations period for arrestee's § 1983 claim alleging that his false arrest for giving counterfeit currency to store's cashier arose from joint action or conspiracy between store's investigator and county detective; arrestee's conclusory allegation that store owner fostered an environment that encouraged its employees to racially profile black males in its stores did not legitimately challenge a custom or policy, and arrestee did not allege a continuous series of events that gave rise to a cumulative injury and instead complained only of the single, discrete act of his false arrest. 42 U.S.C.A. § 1983.

1 Case that cites this headnote

[70]    **Limitation of Actions**  ⬦  Civil rights

Arrestee's § 1983 claim for false arrest, arising from alleged joint action or conspiracy of store's investigator and county detective, accrued, for limitations purposes, when plaintiff was arrested for passing counterfeit currency; arrestee alleged that the overt act of store's investigator and detective, to manufacture grounds for the arrest, occurred before the arrest, and arrestee did not assert any impediment to bringing the claim within the three-year limitations period borrowed from New York law. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

1 Case that cites this headnote

[71]    **Civil Rights**  ⬦  Attorneys and witnesses

Private attorneys and law firms do not act under color of state law and are not state actors for purposes of § 1983 simply by virtue of their state-issued licenses to practice law. 42 U.S.C.A. § 1983.

47 Cases that cite this headnote

[72]    **Civil Rights**  ⬦  Attorneys and witnesses

Public defenders, including Legal Aid attorneys, court-appointed counsel, and private attorneys do not act under the color of state law, as would be required for § 1983 liability, merely by virtue of their position. 42 U.S.C.A. § 1983.

11 Cases that cite this headnote

[73]    **Civil Rights**  ⬦  Attorneys and witnesses

Law firm that represented criminal defendant as retained counsel, in prosecution for criminal possession of forged instrument, did not act under color of state law, as would be required for § 1983 liability to criminal defendant, even if law firm was negligent in representing him and even if it perpetrated falsities before the court. 42 U.S.C.A. § 1983.

[74]    **Civil Rights**  ⬦  Attorneys and witnesses

Criminal defendant's bare, implicit allegations that his appointed counsel was "beholden" to county district attorney's office and acted as a "proxy" for the office when counsel allegedly refused to call or subpoena a witness who would likely have exposed office's hidden agenda to cover up police misconduct that led to defendant's arrest for passing counterfeit currency, without any plausible allegation of a specific agreement between appointed counsel and the office, was insufficient to allege that appointed counsel conspired with the office to violate criminal defendant's civil rights, as would satisfy state action requirement for stating a claim under § 1983. 42 U.S.C.A. § 1983.

[75]    **Federal Courts**  ⬦  Effect of dismissal or other elimination of federal claims

In the usual case in which all federal-law claims are eliminated by the district court before trial, the balance of factors of judicial economy, convenience, fairness, and comity will point toward declining to exercise supplemental jurisdiction over the remaining state-law claims. 28 U.S.C.A. § 1367(c)(3).

1 Case that cites this headnote

**Attorneys and Law Firms**

**\*302** Malek Harrison, Rosedale, NY, pro se.

Lori L. Pack, Office of the New York State Attorney General, Hauppauge, NY, Ralph J. Reissman, Mineola, NY, Craig M. Dolinger, McAndrew Conboy & Prisco LLP, Woodbury, NY, Diane C. Leonardo–Beckmann, United States Attorneys Office, Central Islip, NY, Daniel M. Maunz, Scott E. Kossove, Amy M. Monahan, L'Abbate, Balkan, Colavita & Contini, LLP, Garden City, NY, Jordan S. Palatiello, Matthew K. Flanagan, Catalano Gallardo & Petropoulos, LLP, Jericho, NY, for Defendants.

ORDER

JOSEPH F. BIANCO, District Judge:

**\*\*1** Before the Court is a Report and Recommendation ("R & R") from Magistrate Judge Tomlinson, recommending that the Court grant the defendants' separate motions to dismiss *pro se* plaintiffs claims, except with respect to the claims against U.S. Secret Service Agent Joseph Gerbino ("Agent Gerbino") in his individual capacity. For the reasons set forth below, having considered the parties' submissions, as well as having reviewed the entire R & R *de novo* (with Agent Gerbino's objections), the Court adopts Magistrate Judge Tomlinson's thorough and well-reasoned R & R in its entirety, and grants *pro se* plaintiff an additional 30 days to serve Agent Gerbino with the summons and complaint.

## I. PROCEDURAL HISTORY

On February 26, 2014, *pro se* plaintiff Malek Harrison filed this complaint under 42 U.S.C. § 1983 alleging violations of his Fourth, Fifth, Sixth, and Fourteenth Amendment rights based on his arrest and prosecution in state court for criminal possession of a forged instrument. The following defendants have moved to dismiss the claims: the State of New York ("the State") on May 19, 2014 (Docket No. 23); the U.S. Secret Service and Agent Gerbino (collectively, "the Federal Defendants") on August 25, 2014 (Docket No. 47); the TJX Companies, Inc., Christine Grimaudo, and Nils Renner (collectively, "the TJX Defendants") on June 9, 2014 (Docket No. 29); Attorney Geoffrey Prime on April 17, 2014 (Docket No. 13); and the Law Office of Elliot Schlissel on May 2, 2014 (Docket No. 14). By Order dated August 29, 2015, the

Court referred the motions to dismiss to Magistrate Judge Tomlinson for an R & R.

On February 13, 2015, Magistrate Judge Tomlinson issued an R & R recommending that the Court: (1) grant the State's motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1); (2) grant the Federal Defendants' motion to dismiss plaintiffs claims against the Secret Service and Agent Gerbino in his official capacity under Rule 12(b)(1) for lack of subject matter jurisdiction, but deny their motion to dismiss plaintiff's claims against Agent Gerbino in his individual capacity and grant plaintiff 30 days to effectuate service of the summons and complaint upon Agent **\*303** Gerbino; (3) grant the TJX Defendants' motion to dismiss under Rule 12(b)(6); (4) grant the Law Office of Elliot Schlissel's motion to dismiss; (5) grant Attorney Prime's motion to dismiss; (6) decline to exercise supplemental jurisdiction over the state law claims against the TJX Defendants, Attorney Prime, and the Law Office of Elliot Schlissel; and (7) deny plaintiff leave to re-plead the dismissed claims.

The R & R further instructed that any objections be submitted within fourteen (14) days of service of the R & R. (*See* R & R dated February 13, 2015 at 45.) As indicated by the docket sheet, copies of the R & R were mailed to plaintiff by the Federal Defendants, the Law Office of Elliot Schlissel, Attorney Prime, and the TJK Defendants on February 17, 2015 and February 18, 2015. (*See* ECF Nos. 54–57.) Agent Gerbino submitted his objections to the R & R on February 27, 2015. *Pro se* plaintiff has filed no objections to date, although the date for filing any objections has expired.

## II. STANDARD OF REVIEW

**\*\*2** **[1]** **[2]** A district judge may accept, reject, or modify, in whole or in part, the findings and recommendations of the Magistrate Judge. *See DeLuca v. Lord,* 858 F.Supp. 1330, 1345 (S.D.N.Y.1994); *Walker v. Hood,* 679 F.Supp. 372, 374 (S.D.N.Y.1988). As to those portions of a report to which no "specific written objections" are made, the Court may accept the findings contained therein without *de novo* review, as long as the factual and legal bases supporting the findings are not clearly erroneous. *See* Fed.R.Civ.P. 72(b); *Thomas v. Arn,* 474 U.S. 140, 149, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Greene v. WCI Holdings Corp.,* 956 F.Supp. 509, 513 (S.D.N.Y.1997). When "a party submits a timely objection to a report and recommendation, the district judge will review the parts of the report and recommendation to which the

party objected under a *de novo* standard of review." *Jeffries v. Verizon,* 10–CV–268 (JFB)(AKT), 2012 WL 4344188, at *1 (E.D.N.Y. Sept. 21, 2012); *see also* 28 U.S.C. § 636(b)(1)(C) ("A judge of the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made."); Fed.R.Civ.P. 72(b)(3) ("The district judge must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions.").

## III. ANALYSIS

### A. The Claims Against Agent Gerbino

Here, Agent Gerbino filed a timely objection to Judge Tomlinson's R & R on February 27, 2015. As a result, the Court will conduct a *de novo* review of the portions of the R & R to which Agent Gerbino objects, namely the portion that grants plaintiff a 30–day extension to properly effectuate service and that declines to consider other Rule 12(b)(6) grounds for dismissal of the claims against Agent Gerbino in his individual capacity. (Agent Gerbino's Objections at 4.)

#### i. *The Relevant Portions of the R & R*

To summarize, the Federal Defendants moved for dismissal of the claims against Agent Gerbino under three theories: first, that the claims against the Secret Service and Agent Gerbino in his official capacity are barred by sovereign immunity; second, that the claim against Agent Gerbino in his individual capacity should be dismissed under Rule 12(b)(5) because *pro se* plaintiff failed to serve Agent Gerbino with the complaint; and, third, that the claims **\*304** against Agent Gerbino should be dismissed under Rule 12(b)(6) because plaintiff's false arrest claims are time-barred, plaintiff has failed to adequately state a claim of unconstitutional misconduct by Agent Gerbino, and Agent Gerbino is entitled to qualified immunity. (Federal Defs' Mem. Of Law in Support of Motion to Dismiss the [C]omplaint, 5–12.)

In the R & R, Judge Tomlinson recommends that the Court dismiss the claims against the Secret Service and Agent Gerbino in his official capacity under Rule 12(b)(1) for lack of subject matter jurisdiction. However, after reviewing

the Federal Defendants' second argument—namely, that the action should be dismissed under Rule 12(b)(5) for lack of service—Judge Tomlinson concludes that "although Plaintiff failed to serve Agent Gerbino or show good cause for lack of service, he should be granted a discretionary extension to effectuate service upon Agent Gerbino in his individual capacity." (R & R at 17.) Accordingly, Judge Tomlinson recommends that the Court deny the motion to dismiss the claims against Agent Gerbino in his individual capacity and grant plaintiff an additional 30 days within which to serve the summons and complaint upon Agent Gerbino. (*Id.*) As the question of proper service is a jurisdictional matter, Judge Tomlinson notes that the Court "should first address the preliminary questions of service and personal jurisdiction before turning, if necessary, to the defendants' Rule 12(b)(6) arguments." (R & R at 20 (quotation marks and citation omitted).) As a result, the R & R does not address the Federal Defendants' additional arguments for dismissal of the claims against Agent Gerbino under Rule 12(b)(6).

#### ii. *Agent Gerbino's Objections*

**\*\*3** Agent Gerbino first objects to Judge Tomlinson's recommendation that the Court provide *pro se* plaintiff with additional time to effectuate service. Agent Gerbino argues that granting a 30–day extension "contravenes this Court's order on March 5, 2014, directing [p]laintiff to serve the [c]omplaint on the [d]efendants on or before June 26, 2014" (Agent Gerbino's Objections at 4), and that the four factors outlined in *Purzak v. Long Island Housing Servs., Inc.* do not weigh in favor of granting the plaintiff an extension absent a showing of good cause. No. 12–CV–1747, 2013 WL 5202711, at *5 (E.D.N.Y. Sept. 13, 2013). After reviewing Judge Tomlinson's recommendations, the Court agrees with her finding that "the [*Purzak* ] factors militate against dismissal of the Complaint and weigh in favor of granting Plaintiff—a *pro se* litigant—a final opportunity to effectuate proper service on Agent Gerbino." (R & R at 24–25.) As Magistrate Judge Tomlinson notes, in analyzing the factors, there is no prejudice to Agent Gerbino to allowing re-service. If plaintiff re-serves, Agent Gerbino can simply re-file his same Rule 12(b)(6) motion and the Court will address it expeditiously once plaintiff is given an opportunity to respond, including providing any possible basis for equitable tolling.

**[3]** **[4]** Agent Gerbino also objects to the fact that Judge Tomlinson did not consider the Federal Defendants

additional arguments for dismissal under Ruler 12(b)(6). After *de novo* review and thorough consideration of Agent Gerbino's objections, the Court once again agrees with Judge Tomlinson's analysis. It is well established that "where a defendant moves for dismissal under Rules ... 12(b)(5) and 12(b)(6) 'logic compel[s] initial consideration of the issue of jurisdiction over the defendant—a court without such jurisdiction lacks power to dismiss a complaint for failure to state a claim.' " **\*305** *Hertzner v. U.S. Postal Service,* No. 05–cv–2371 (DRH)(ARL), 2007 WL 869585, at \*3 (E.D.N.Y. March 20, 2007) (quoting *Arrowsmith v. United Press International,* 320 F.2d 219, 221 (2d Cir.1963)). Furthermore, when a plaintiff "fail[s] to meet [his] burden that the Court has jurisdiction over the Moving Defendants ... the Court 'lacks power to dismiss [the C]omplaint for failure to state a claim.' " *Hertzner,* 2007 WL 869585, at \*8 (quoting *Arrowsmith,* 320 F.2d at 221). As a result, it is entirely proper for the Court to decline to address the Rule 12(b)(6) motions until the issue of service of process is resolved.

As a result, reviewing the R & R *de novo* and fully considering Agent Gerbino's objections, the Court agrees with Magistrate Judge Tomlinson's recommendation that the Federal Defendants' motion to dismiss the claims against Agent Gerbino in his individual capacity be denied and that the *pro se* plaintiff be extended an additional thirty days to serve Agent Gerbino with a copy of the summons and complaint. If *pro se* plaintiff properly effectuates service within this time frame, then Agent Gerbino may renew his motion for dismissal under Rule 12(b)(6).

### B. Remaining Claims

**\*\*4** Although *pro se* plaintiff has not objected to the R & R, and thus *de novo* review is not required, the Court has conducted a *de novo* review of the R & R in an abundance of caution. After reviewing the full record and the applicable law *de novo,* the Court also adopts Judge Tomlinson's report and recommendations relating to the motions to dismiss brought by the State, the Federal Defendants, the TJX defendants, Attorney Prime, and the Law Office of Elliot Schlissel.

### C. Leave to Re–Plead

**[5]  [6]**  In this case, *pro se* plaintiff has not requested leave to amend his complaint. However, Judge Tomlinson did address this issue in the R & R, and has recommended

that leave to re-plead be denied. The Second Circuit has emphasized that "[a] *pro se* complaint is to be read liberally" and that a "court should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (quotations and citations omitted). Under Rule 15(a) of the Federal Rules of Civil Procedure, the "court should freely give leave [to amend] when justice so requires." Fed.R.Civ.P. 15(a). However, leave to re-plead can be denied where it is clear that no amendments can cure the pleading deficiencies and any attempt to replead would be futile. See *Cuoco,* 222 F.3d at 112 ("The problem with [plaintiff's] cause[ ] of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied."); *see also Hayden v. Cnty. of Nassau,* 180 F.3d 42, 53 (2d Cir.1999) (holding that if a plaintiff cannot demonstrate he is able to amend his complaint "in a manner which would survive dismissal, opportunity to replead is rightfully denied").

**[7]  [8]**  As Judge Tomlinson points out, leave to amend is often futile when a claim is dismissed based on certain substantive grounds, including sovereign immunity (*see Dasrath v. Stony Brook Univ. Med. Ctr.,* 965 F.Supp.2d 261, 275 (E.D.N.Y.2013); *Temple v. N.Y.S. Dep't of Taxation & Fin.,* No. 11–CV–0759, 2012 WL 503618 at \*6 (E.D.N.Y. Feb. 15, 2012)), the expiration of the statute of limitations (*see Apostolidis v. JP Morgan Chase & Co.,* No. 11–CV–5664, 2012 WL 5378305, at \* 9 (E.D.N.Y. Nov. 2, 2012)), or the lack of state action requisite for a Section 1983 claim (*see Peterec–Tolino v. New York,* 364 Fed.Appx. 708, 711 (2d Cir.2010) (affirming district court's *sua sponte* dismissal of § 1983 claims without leave to amend because, **\*306** *inter alia,* certain defendants were not state actors and "[a]ny amendment would be futile")); *Shorter v. Rice,* No. 12–CV–0111 (JFB)(ETB), 2012 WL 1340088, at \*5 (E.D.N.Y. Apr. 10, 2012) (denying leave to amend because "plaintiff does not have any possibility of asserting a plausible Section 1983 claim ... because of the lack of state action as to the defendant"); *Wilson v. Wilson–Polson,* No. 09 Civ. 9810(PGG), 2010 WL 3733935, at \*10 (S.D.N.Y.Sept. 23, 2010) (leave to amend unwarranted because, *inter alia,* plaintiff could not allege state action under Section 1983); *Contes v. City of New York,* No. 99 Civ. 1597(SAS), 1999 WL 500140, at \*11 (S.D.N.Y. July 14, 1999) ("It would be futile to grant leave to replead in this case. Without state action, which is lacking here, [plaintiff] cannot prevail on a claim pursuant to § 1983."). In this case, the claims against the State,

the Secret Service, and Agent Gerbino in his official capacity were dismissed on sovereign immunity grounds; the claims against the TJX Defendants were dismissed as time-barred; and the claims against Attorney Prime and the Law Office of Elliot Schlissel were dismissed for failure to show state action. As a result, Judge Tomlinson recommends dismissal of all of the federal claims, with the exception of the claims against Agent Gerbino in his individual capacity, without leave to re-plead. The Court agrees with Judge Tomlinson and finds that any attempt to amend the complaint in this case would be futile, and as a result, dismissal without leave to re-plead is appropriate.

### IV. CONCLUSION

**\*\*5** Having conducted a *de novo* review of Judge Tomlinson's findings, and having considered Agent Gerbino's objections, the Court adopts the analysis and recommendations in the thorough and well-reasoned R & R in their entirety. Accordingly, IT IS HEREBY ORDERED that: (1) the motion to dismiss brought by the State is GRANTED and plaintiff's claims against the State are dismissed with prejudice; (2) the motion to dismiss by the Federal Defendants is (a) GRANTED with respect to plaintiff's claims against the Secret Service and Agent Gerbino in his official capacity and those claims are dismissed with prejudice, and (b) DENIED with respect to plaintiff's claims against Agent Gerbino in his individual capacity, and that plaintiff is granted 30 days to serve the summons and complaint upon Agent Gerbino; (3) the motion to dismiss by the TJX Defendants is GRANTED and the plaintiff's federal claims against the TJX Defendants are dismissed with prejudice; (4) the motion to dismiss by Attorney Prime is GRANTED and plaintiff's federal claims against him are dismissed with prejudice; (5) the motion to dismiss by the Law Office of Elliot Schlissel is GRANTED and plaintiff's federal claims against that firm are dismissed with prejudice; and (6) plaintiff's state law claims against the TJX Defendants, Attorney Prime, and the Law Office of Elliot Schlissel are dismissed without prejudice.

SO ORDERED.

### *REPORT AND RECOMMENDATION*

A. KATHLEEN TOMLINSON, United States Magistrate Judge:

### I. *PRELIMINARY STATEMENT*

*Pro se* Plaintiff Malek Harrison ("Plaintiff") brings this 42 U.S.C. § 1983 civil rights action alleging violations of his Fourth, Fifth, Sixth and Fourteenth Amendment rights based on his arrest and prosecution in state court for criminal possession of a forged instrument. The following defendants have moved to dismiss the claims asserted against them in the Complaint: (1) State of New York ("the State"); (2) United States Secret Service ("the Secret Service") and United States **\*307** Secret Service Agent Joseph Gerbino ("Agent Gerbino") (collectively, "the Federal Defendants"); (3) The TJX Companies, Inc., TJX Marmaxx (collectively, "TJX"), Nils Renner ("Renner"), and Christine Grimaudo ("Grimaudo") (collectively, "the TJX Defendants"); and Plaintiff's two former attorneys, (4) The Law Office of Elliot Schlissel ("the Schlissel Firm") and (5) Geoffrey Prime ("Attorney Prime" or "Prime"). *See* DE 13, 14, 23, 29, and 47.[1] Judge Bianco referred the motions to this Court for a Report and Recommendation. DE 51. Based upon a thorough review of the Complaint, the arguments advanced by the parties in their written submissions, and the applicable case law, the Court respectfully recommends to Judge Bianco that: (1) the motion to dismiss by the State of New York be GRANTED; (2) the motion to dismiss by the Federal Defendants be GRANTED, in part, as to Plaintiff's claims against the Secret Service and Agent Gerbino in his official capacity, and DENIED, in part, as to Plaintiff's claims against Agent Gerbino in his individual capacity, and that Plaintiff be granted 30 days to serve the Summons and Complaint upon Agent Gerbino; (3) the motion to dismiss by the TJX Defendants be GRANTED; (4) the motion to dismiss by the Schlissel Firm be GRANTED; and (5) the motion to dismiss by Attorney Prime be GRANTED.

[1]    The Nassau County Defendants have not moved to dismiss the Complaint and have filed an Answer. *See* DE 30.

### II. *RELEVANT FACTUAL BACKGROUND*

**\*\*6** The following information has been derived from the Complaint and generally pertains only to the defendants who have moved to dismiss the Complaint. All facts alleged by the Plaintiff are assumed to be true for purposes of deciding a motion to dismiss and are construed in a light most

favorable to the Plaintiff as the non-moving party. *See, e.g.,* *LaFaro v. N.Y. Cardiothoracic Grp.,* 570 F.3d 471, 475 (2d Cir.2009); *Matthews v. City of N.Y.,* 889 F.Supp.2d 418, 425 (E.D.N.Y.2012).

### A. Allegations Against the TJX Defendants

On January 12, 2011, Grimaudo was working as a cashier at Marshalls department store in Elmont, New York when she was handed nine counterfeit $100 bills for three separate purchases. Compl. ¶ 24; *see id.* ¶ 14. Renner, who was then working as the National Task Force Investigator for the TJX Marmaxx Group, conducted an investigation of the incident and eventually contacted defendant Detective Ronald Rispoli ("Detective Rispoli") of the Nassau County Police Department's Crimes Against Property ("CAP") Squad. *Id.* ¶ 23. Renner gave a statement to Detective Rispoli ("the Statement of Nils Renner") in which he mentioned an "anonymous Marshalls employee" who allegedly led Renner to identify Plaintiff as the person who used the counterfeit currency. *Id.* ¶¶ 23–25.

The Complaint asserts that both Renner and Grimaudo conspired with Detective Rispoli to deny Plaintiff's constitutional rights by intentionally and falsely implicating him in the alleged crime at Marshalls. *See id.* ¶¶ 13, 14, 23, 24. Specifically, Plaintiff contends that Renner "conspired with an 'anonymous Marshalls employee' and Detective Ronald Rispoli to introduce a falsified complaint identifying Plaintiff as the perpetrator." *Id.* at ¶ 23; *see id.* ¶ 13. Plaintiff similarly alleges that Grimaudo "conspired with Detective Ronald Rispoli to racially profile and intentionally and falsely identify the Plaintiff as the perpetrator[ **\*308** ] who handed her nine (9) counterfeit 100 dollar bills ... on January 11, 2011." *Id.* ¶ 24; *see id.* ¶ 14. According to the Complaint, Grimaudo "failed to identify the counterfeit currency at the time of the transaction" and "later identified Plaintiff as a way of removing suspicion from herself and her co-workers." *Id.* ¶ 24. The Complaint notes that "the Court would have to believe" that, although Grimaudo "did not identify the bills as counterfeit," she was able to identify Plaintiff "on February 16, 2011, well over a month after the alleged commission of the crime." *Id.* Plaintiff therefore asserts that "Grimaudo deliberately participated in a conspiracy to deny his constitutional rights by racially profiling him and ... making a knowingly false identification, which led directly to his arrest." *Id.*

The Complaint further alleges that TJX, as the employer of Renner, Grimaudo, and the "anonymous Marshalls employee" mentioned in the Statement of Nils Renner, "foster[ed] an environment whereby its employees ... were encouraged and/or permitted to racially profile Black males in its stores." *Id.* ¶ 25. The Complaint asserts that TJX's "actions or inactions led to a denial of Plaintiff's constitutional rights not to be racially profiled and falsely charged in the commission of [a] crime by the complicit actions of its employees." *Id.* Plaintiff therefore maintains that TJX must "bear the brunt of the responsibility for the actions of its employees and the harm caused to him as a result of his false arrest and malicious criminal prosecution." *Id.*

### B. Allegations Against Agent Gerbino

**\*\*7** On February 17, 2011, "over one (1) month after the alleged crime was committed," Plaintiff was arrested by Detective Rispoli and two other NCPD detectives also named in the instant Complaint. *Id.* ¶ 19. Plaintiff alleges that his arrest was "unlawful" and that, "[a]ccording to police reports," Agent Gerbino assisted both with the investigation that led to his arrest as well as the arrest itself. *Id.* Plaintiff asserts that "[t]hese officials conspired to falsify a complaint, namely 'the Statement of Nils Renner,' to identify and arrest [him]" for allegedly using counterfeit currency. *Id.*

### C. Allegations Against The Schlissel Firm

Plaintiff was charged with seven felony counts of criminal possession of a forged instrument pursuant to New York Penal Law § 170.30. *See id.* ¶ 19. After his arrest, Plaintiff retained the Schlissel Firm to represent him in his criminal proceedings. *See id.* ¶ 26. However, on October 12, 2012, the Schlissel Firm moved to be relieved as counsel. *See id.* Ultimately, that motion was successful and the Schlissel Firm was relieved as Plaintiff's counsel. *See id.*

The Complaint alleges that the Schlissel Firm violated Plaintiff's constitutional rights through "a deliberate denial of effective assistance of counsel and [by] filing motion(s) and replies with the court, which contained false and misleading information, including blatant falsehoods regarding money owed and services rendered." *Id.* ¶ 18 (internal quotation marks omitted). Specifically, the Complaint asserts that the firm "collected $4,240 from Plaintiff and simply made hollow appearances, while continuously demanding an additional $10,000 to take the matter to trial." *Id.* ¶ 26. According to the Complaint, the firm "offer[ed] no relevant strategy and refus[ed] to effectively provide pretrial motions aimed at assisting [its] client." *Id.* The Complaint further alleges that the firm, in moving to be relieved as counsel, **\*309** made

"falsified claims" about monies owed by Plaintiff to the firm. *See id.* These actions allegedly "prejudiced the Plaintiff not only by prolonging the case through unethical withdrawal, but [by] destroy[ing] Plaintiff's confidence in the integrity of the legal profession." *Id.*

### D. Allegations Against Attorney Prime

The Complaint alleges that after the Schlisser Firm was relieved as counsel, "Plaintiff was then represented by Legal Aid." *Id.* ¶ 21. However, on the morning of February 4, 2013, the day Plaintiff's criminal case was set for trial, "a Legal Aid staffer" told Plaintiff that "her office could no longer represent him due to a conflict-of-interest involving someone from Marshalls' Loss–Prevention Department and the decision had already been made for the assignment of counsel from the Assigned Counsel Defender Plan." *Id.* This "impromptu counsel switch," which Plaintiff believes "was out of the ordinary course of normal assignment protocol of the Assigned Counsel Defender Plan," resulted in the appointment of Attorney Prime as Plaintiff's counsel. *Id.*

**\*\*8** According to the Complaint, Attorney Prime, who was formerly employed by Defendant Nassau County's Office of the District Attorney ("the DA's Office"), was "unlawfully handpick[ed]" by that office to be Plaintiff's assigned counsel as part of a "conspiracy ... to sabotage Plaintiff's [d]efense." *Id.* ¶¶ 19–21. Particularly, the Complaint alleges that Attorney Prime conspired with the DA's Office and Assistant District Attorney Jhounelle Cunningham ("ADA Cunningham") by refusing to subpoena Renner in connection with defending the criminal charges against Plaintiff. *Id.* at ¶ 20. According to the Complaint, Attorney Prime "vehemently refused" Plaintiff's multiple requests to call or subpoena Renner, telling Plaintiff that "he would NOT consider calling Nils Renner to testify in his case under any circumstances whatsoever." *Id.* [2] Plaintiff maintains that Prime's refusal to call Renner was "exceedingly negligent" and that "Attorney Prime refused to comply with [Plaintiff's] ... wishes because he was beholden to the Nassau County Office of the District Attorney and [ADA] Cunningham, whom bade him not to pursue this line of strategy, which would likely expose their hidden agenda to cover up the obvious police misconduct." *Id.* The Complaint further alleges that Prime, as the "hand-picked representative" of the DA's Office, "was willing to try to sabotage [Plaintiff's] case to assist in insulating his former employer Nassau County Office of the District Attorney, from being held accountable for malicious prosecution and covering up police misconduct." *Id.* ¶ 21; *see id.* ("Geoffrey

Prime chose to employ a strategy that would not result in adverse consequences for his former employer and refused to pursue his client's superior strategy, which aimed to expose both the police and prosecutorial misconduct at trial."). [3]

[2] The Complaint further alleges that "Prime blatantly lied about submitting an application to the presiding judge to obtain approval for compensation to obtain a private investigator to seek out Nils Renner and on several occasions told the Plaintiff that the private investigator could not find Mr. Renner." Compl. ¶ 22. "Plaintiff asserts that Mr. Prime never sought approval nor did he ever hire any private detective to find Mr. Renner, as he continuously stated that he had no intention of ever calling Nils Renner, who Plaintiff was convinced was the key to obtaining a dismissal in the case." *Id.*

[3] The Complaint further suggests that the alleged conspiracy between Attorney Prime and the DA's Office was motivated by race. *See* Compl. ¶¶ 21–22. Particularly, the Complaint states that "[t]he assumption was to assign a prominent Black attorney and former Nassau County Assistant District Attorney, who would be most likely to gain the confidence of an unwitting Black client who wouldn't question his attorney's strategy, or the lack thereof, and accept a plea agreement," which Plaintiff ultimately refused to do. *Id.* ¶ 21; *see id.* ¶ 22 (alleging that "abuse and misconduct [by the DA's Office] continues to run rampant by targeting African American defendants without probable cause and even going as far as employing an unwitting defendant's legal counsel to assist them in obtaining any form of plea agreement that would insulate that office and the State of New York from any future civil action.").

**\*310** The Complaint states that Attorney Prime filed one "omnibus" motion on Plaintiff's behalf on or around June 17, 2013. *Id.* However, because this motion "sought to remove the defense's only piece of evidence that would demonstrate police misconduct and eliminate Plaintiff's trial strategy of exposing that misconduct," Plaintiff moved on June 28, 2013 to have new counsel appointed to represent him. *Id.* Even though the judge in the underlying criminal proceeding apparently "tried to convince Plaintiff to allow Mr. Prime to continue as counsel ... [because] Mr. Prime was doing a 'good job' and doing all that he could to defend his client's

best interest," Plaintiff's application was granted on or about August 12, 2013. *Id.* The criminal case against Plaintiff was later dismissed on October 21, 2013. *See id.* [4]

[4]    The Complaint asserts that the DA's Office and ADA Cunningham brought a new criminal proceeding against Plaintiff on October 18, 2013, approximately two months after Attorney Prime's representation of Plaintiff ended. Compl. ¶ 22. Because the allegations related to this second criminal proceeding generally concern the conduct of the Nassau County Defendants, and do not attribute wrongdoing to Attorney Prime or any of the other moving defendants, the Court will not address them at this juncture.

### III. *CAUSES OF ACTION SET FORTH IN THE COMPLAINT*

 [9]    [10]    Plaintiff brings this action pursuant to Section 1983 and seeks damages based on the Defendants' "individual and collective participation in (1) racial profiling (2) false arrest, (3) malicious prosecution, (4) corruption, (5) abuse of power, (6) conflict of interest, (7) insufficient and unethical representation by counsel, (8) legal malpractice and ( [9] ) the conspiracy to deny his constitutional right to a fair process and a fair trial." *Id.,* Compl. & Jury Demand. Taking the Complaint as a whole, the Court construes the pleading as raising the following federal claims against the various moving defendants: (1) false arrest, fabrication of evidence, and conspiracy against the Federal Defendants pursuant to *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) [5] ; (2) Section 1983 false arrest and conspiracy against the TJX Defendants; and (3) ineffective assistance of counsel against the Schlissel Firm and Attorney Prime which Plaintiff characterizes as Section 1983 claims. The Complaint also appears to assert New York State law claims for negligent supervision against TJX, and legal malpractice **\*311** against the Schlissel Firm and Attorney Prime.

[5]    A Section 1983 action "cannot lie against federal officers." *Kingsley v. Bureau of Prisons,* 937 F.2d 26, 30 (2d Cir.1991). Although Plaintiff brings this action pursuant to Section 1983 and does not reference *Bivens* in his Complaint, *see generally* Compl., the Court interprets Plaintiff's claims against the Federal Defendants as having been brought under *Bivens,* which is "the non-statutory

federal counterpart of a suit brought pursuant to 42 U.S.C. § 1983 and is aimed at federal rather than state officials." *Isasi v. Heinemann,* No. 08–CV–5284, 2009 WL 159601, at \*1 (E.D.N.Y. Jan. 22, 2009); *see Megna v. Food & Drug Admin.,* No. 08–CV–1435, 2009 WL 749900, at \*4–\*5 (E.D.N.Y. Mar. 17, 2009) *aff'd sub nom. Megna ex rel. Megna v. Food & Drug Admin.,* 377 Fed.Appx. 113 (2d Cir.2010).

### IV. *STANDARDS OF REVIEW*

 **\*9**   In this case, the Court is presented with three grounds which may warrant dismissal of the Complaint: lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1); insufficient service of process pursuant to Fed.R.Civ.P. 12(b)(5); and failure to state a claim upon which relief may be granted pursuant to Fed.R.Civ.P. 12(b)(6). The Court addresses the standard of review for each section of Rule 12(b) in turn.

### A. Rule 12(b)(1) Legal Standard

 [11]    [12]    [13]    [14]    [15]    [16]    "Federal courts are courts of limited jurisdiction and may not preside over cases absent subject matter jurisdiction." *Allen v. Mattingly,* No. 10 CV 0667, 2011 WL 1261103, at \*5 (E.D.N.Y. Mar. 29, 2011), *aff'd,* 478 Fed.Appx. 712 (2d Cir.2012) (citations omitted); *see Gunn v. Minton,* —— U.S. ——, ——, 133 S.Ct. 1059, 1064, 185 L.Ed.2d 72 (2013); *Frontera Resources Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic,* 582 F.3d 393, 397 (2d Cir.2009). Accordingly, a case must be dismissed for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) "when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000); *see Alston v. Sebelius,* No. 13–CV–4537, 2014 WL 4374644, at \*5 (E.D.N.Y. Sept. 2, 2014). When resolving a motion to dismiss under Rule 12(b)(1), "the district court must take all uncontroverted facts in the complaint ... as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.,* 752 F.3d 239, 243 (2d Cir.2014) (citing *Amidax Trading Grp. v. S W.I.F.T. SCRL,* 671 F.3d 140, 145 (2d Cir.2011) (per curiam)). The Court is not confined to the four corners of the complaint and may resolve disputed jurisdictional fact issues by reference to evidence outside the pleadings, such as affidavits. *Id.* (quoting *APWU v. Potter,* 343 F.3d 619, 627 (2d Cir.2003)); *see Baur v. Comm'r of Social Sec.,* No. 10–CV–3781, 2011 WL 1877726, at \*2 (E.D.N.Y. May 16, 2011). Moreover, "[t]he plaintiff

2015 WL 1413359

bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." *Aurecchione v. Schoolman Transp. Sys., Inc.,* 426 F.3d 635, 638 (2d Cir.2005); *see Alston,* 2014 WL 4374644, at *5. "Although courts hold *pro se* complaints to less stringent standards than formal pleadings drafted by lawyers, *pro se* litigants still must establish subject matter jurisdiction to proceed in federal court." *Buch v. Farmingdale State Coll.,* No. 12–CV–1762, 2013 WL 789354, at *10 (E.D.N.Y. Mar. 4, 2013) (internal citation and quotation marks omitted) (citing *Torres v. Dep't of Homeland Sec.,* 441 Fed.Appx. 812, 812 (2d Cir.2011)); *see also United States v. Cotton,* 535 U.S. 625, 630, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002) ("[S]ubject matter jurisdiction, because it involves the court's power to hear a case, can never be forfeited or waived.").

**B. Rule 12(b)(5) Legal Standard**

[17]   [18]   [19]   [20]   "Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied." *Dynegy Midstream Servs. v. Trammochem,* 451 F.3d 89, 94 (2d Cir.2006) (internal quotation marks and citation omitted). "Rule 12(b)(5) authorizes dismissal of a complaint for insufficient service of process upon motion by a defendant made prior to the defendant's filing an answer." *Butler v. N.Y. City Dep't of Educ.,* No. 10–CV–5748, 2014 WL 5023507, at *2 (E.D.N.Y. Oct. 7, 2014). Similar to a motion **\*312** to dismiss pursuant to Rule 12(b)(1), a court considering a motion to dismiss pursuant to Rule 12(b)(5) for insufficient service of process may "look to matters outside the complaint to determine whether it has jurisdiction." *Garnett–Bishop v. N.Y. Cmty. Bancorp, Inc.,* No. 12–CV–2285, 2014 WL 5822628, at *10 (E.D.N.Y. Nov. 6, 2014); *see, e.g., Butler,* 2014 WL 5023507, at *2; *Jordan v. Forfeiture Support Assoc.,* 928 F.Supp.2d 588, 594 (E.D.N.Y.2013). "[W]hen a defendant moves to dismiss under [R]ule 12(b)(5), the plaintiff bears the burden of proving adequate service." *Burda Media, Inc. v. Viertel,* 417 F.3d 292, 298–99 (2d Cir.2005); *see Butler,* 2014 WL 5023507; *Hertzner v. U.S. Postal Serv.,* No. 05–CV–2371, 2007 WL 869585, at *3 (E.D.N.Y. Mar. 20, 2007). " ' If the court determines that service was insufficient, the court may, but is not required to, dismiss the action.' " *Nolan v. Cuomo,* No. 11 CV 5827, 2013 WL 168674, at *7 (E.D.N.Y. Jan. 16, 2013) (quoting *Sajimi v. City of N.Y.,* 2011 WL 135004, at *3 (E.D.N.Y. Jan. 13, 2011)) (internal alteration omitted); *accord Rankel v. Town of Somers,* 999 F.Supp.2d 527, 536 (S.D.N.Y.2014) (quoting *Darden v. DaimlerChrysler N. Am. Holding Corp.,* 191 F.Supp.2d 382, 387 (S.D.N.Y.2002)).

**C. Rule 12(b)(6) Legal Standard**

**\*\*10**   In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the Plaintiff. *See Cleveland v. Caplaw Enters.,* 448 F.3d 518, 521 (2d Cir.2006); *Nechis v. Oxford Health Plans, Inc.,* 421 F.3d 96, 100 (2d Cir.2005); *Buch,* 2013 WL 789354, at *10. The plaintiff must satisfy "a flexible 'plausibility standard.' " *Iqbal v. Hasty,* 490 F.3d 143, 157 (2d Cir.2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 546, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The Court, therefore, does not require "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570, 127 S.Ct. 1955; *see Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC,* 595 F.3d 86, 91 (2d Cir.2010) (holding that a complaint must set forth "a plausible set of facts sufficient 'to raise a right to relief above the speculative level.' ") (quoting *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955).

The Supreme Court recently clarified the appropriate pleading standard in *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), in which the court set forth a two-pronged approach to be utilized in analyzing a motion to dismiss. District courts are to first "identify [ ] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679, 129 S.Ct. 1937. Though "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* Second, if a complaint contains "well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a [d]efendant has acted unlawfully." *Id.* at 678, 129 S.Ct. 1937 (citing *Twombly,* 550 U.S. at 556–57, 127 S.Ct. 1955) (internal citations omitted).

**\*313**   [21]   In addition, where, as here, a plaintiff is proceeding *pro se,* the complaint must be considered under a more lenient standard than that accorded "formal pleadings

drafted by lawyers." *Bellamy v. Mt. Vernon Hosp.,* No. 07 Civ. 1801, 2009 WL 1835939, at *3 (S.D.N.Y. June 26, 2009) (quoting *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)). Therefore, a court must construe a *pro se* plaintiff's pleading broadly and interpret it to raise the strongest arguments it suggests. *See Hughes v. Rowe,* 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980); *Weixel v. Bd. of Educ. of the City of N.Y.,* 287 F.3d 138, 145–46 (2d Cir.2002); *see also Sealed Plaintiff v. Sealed Defendant,* 537 F.3d 185, 191 (2d Cir.2008) (holding that, that when a plaintiff proceeds *pro se,* the district court "is obliged to construe his pleadings liberally" and noting that "the dismissal of a *pro se claim* as insufficiently pleaded is appropriate only in the most unsustainable of cases."). "However, mere conclusions of law or unwarranted deductions need not be accepted." *Alston,* 2014 WL 4374644, at *5 (internal quotation marks omitted).

## V. DISCUSSION

### A. Motion to Dismiss by The State of New York

 **11** The State of New York moves to dismiss the Complaint pursuant to Rule 12(b)(1) and 12(b)(6). *See* New York State Defendant's Memorandum of Law in Support of Its Motion to Dismiss the Complaint ("State Mem.") at 1. The State asserts that this Court lacks subject matter jurisdiction over Plaintiff's Section 1983 claims against the State based on the doctrine of sovereign immunity and, in any event, Plaintiff has not adequately pleaded a claim against the State for which relief could be granted. *See id.* Plaintiff has not filed opposition to the State's motion to dismiss. For the reasons explained below, the Court concludes that Plaintiff's claims against the State are barred by the Eleventh Amendment and must be dismissed for lack of subject matter jurisdiction.[6]

[6]     The State of New York asserts its sovereign immunity arguments in a motion to dismiss under Rule 12(b)(1), rather than Rule 12(b) (6). *See* State Mem. at 3. It is an open question in the Second Circuit whether claims of Eleventh Amendment sovereign immunity "should be viewed as raising a question of subject matter jurisdiction, and thus be evaluated under Rule 12(b)(1), or as an affirmative defense analyzed under Rule 12(b)(6)." *Garcia v. Paylock,* 13–CV–2868, 2014 WL 298593, at *2 n. 3 (E.D.N.Y. Jan. 28, 2014); *see Carver v. Nassau Cnty. Interim Fin. Auth.,* 730 F.3d 150, 156 (2d Cir.2013) ("[W]hether the claim of sovereign immunity constitutes a true

issue of subject matter jurisdiction or is more appropriately viewed as an affirmative defense is an open question in the Supreme Court and the Second Circuit.") (citing *Wisc. Dep't of Corr. v. Schacht,* 524 U.S. 381, 391, 118 S.Ct. 2047, 141 L.Ed.2d 364 (1998) (stating that the question of whether "Eleventh Amendment immunity is a matter of subject matter jurisdiction" is one that "we have not decided")). This distinction can be "significant" because "while [a district court] must accept all factual allegations in a complaint as true when adjudicating a motion to dismiss under [Rule] 12(b)(6), ... in adjudicating a motion to dismiss for lack of subject-matter jurisdiction [under Rule 12(b)(1) ], a district court may resolve disputed factual issues by reference to evidence outside the pleadings, including affidavits." *State Emps. Bargaining Agent Coal. v. Rowland,* 494 F.3d 71, 77 (2d Cir.2007) (citations omitted).

Here, however, this distinction has no practical effect because the Court, in considering the State's sovereign immunity arguments, "has considered only the pleadings and the relevant state and federal law and has drawn all inferences in Plaintiff's favor." *Tiraco v. N.Y. State Bd. of Elections,* 963 F.Supp.2d 184, 191 n. 6 (E.D.N.Y.2013). Thus, the Court will consider the State's motion as having been properly made under Rule 12(b)(1). *Id.; cf. Garcia,* 2014 WL 298593, at *2 n. 3 (considering the State's sovereign immunity defense under Rule 12(b)(1) because "[t]he Supreme Court has ... referred in dicta to Eleventh Amendment sovereign immunity as implicating subject matter jurisdiction") (citing *e.g. Va. Office for Prot. & Advocacy v. Stewart,* 563 U.S. 247, ——, 131 S.Ct. 1632, 1638, 179 L.Ed.2d 675 (2011) ("[A]bsent waiver or valid abrogation, federal courts may not entertain a private person's suit against a State.")); *but see JTE Enters., Inc. v. Cuomo,* 2 F.Supp.3d 333 (E.D.N.Y.2014) (applying the Rule 12(b)(6) standard in analyzing the State's sovereign immunity arguments); *Nolan,* 2013 WL 168674, at *6 (same).

### *314  1. Eleventh Amendment Sovereign Immunity

 [22]     [23]     The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted

against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The Supreme Court has long held that the Eleventh Amendment bars suits against a state by one of its own citizens. *See, e.g.,* Bd. of Trs. of Univ. of Alabama v. Garrett, 531 U.S. 356, 363, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001); Hans v. Louisiana, 134 U.S. 1, 10–11, 10 S.Ct. 504, 33 L.Ed. 842 (1890). Moreover, "[a]s a general matter, states enjoy sovereign immunity from suit in federal court, even if the claim arises under federal law." *KM Enters., Inc. v. McDonald,* 518 Fed.Appx. 12, 13 (2d Cir.2013) (citing U.S. Const. amend. XI; *Alden v. Maine,* 527 U.S. 706, 727–28, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999)).

**[24] [25] [26]** While sovereign immunity "is not absolute," the Supreme Court "ha[s] recognized only two circumstances in which an individual may sue a State." *Coll. Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 670, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999). First, "a State may waive its sovereign immunity by consenting to suit." *Id.* (citing *Clark v. Barnard,* 108 U.S. 436, 447–48, 2 S.Ct. 878, 27 L.Ed. 780 (1883)). Second, Congress may abrogate the sovereign immunity of the States by acting pursuant to a grant of constitutional authority. *Id.* (citing *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976)); *see Kimel v. Florida Bd. of Regents,* 528 U.S. 62, 80, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000). [7]

> [7]
> A third exception also exists under the *Ex parte Young* doctrine, which holds that the Eleventh Amendment does not bar a "suit against a state official when that suit seeks ... prospective injunctive relief." *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 73, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). Here, Plaintiff has neither sued a state official nor sought injunctive relief. Thus, the *Ex Parte Young* doctrine does not apply to Plaintiff's case.

**[27] [28]** Neither of these exceptions applies in this case. Plaintiff brings this action against the State pursuant to Section 1983. *See* Compl. ¶ 1. It is well established that "New York State has not waived its sovereign immunity from Section 1983 claims." *Nolan,* 2013 WL 168674, at *7 (citing *Trotman v. Palisades Interstate Park Comm'n,* 557 F.2d 35, 39–40 (2d Cir.1977)); *see e.g., Mamot v. Bd. of Regents,* 367 Fed.Appx. 191, 192 (2d Cir.2010) (summary order); *Dube v. State Univ. of New York,* 900 F.2d 587, 594–95 (2d Cir.1990) (holding that the Eleventh Amendment precludes an action

under Section 1983 against SUNY, an integral part of the State of New York). Moreover, Congress did not abrogate that immunity when it enacted Section 1983. *See Will v. Mich. Dep't of State Police,* 491 U.S. 58, 66, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) ("Congress, in passing § 1983, had no intention to disturb the States' Eleventh Amendment immunity [.]") (citing **\*315** *Quern v. Jordan,* 440 U.S. 332, 350, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979)).

**\*\*12** For the foregoing reasons, the Court concludes that none of the exceptions to the State's sovereign immunity apply and Plaintiff's claims against New York State are therefore barred by the Eleventh Amendment. The State has also moved to dismiss pursuant to Rule 12(b)(6). *See* State Mem. at 1. However, because the Court finds that it lacks subject matter jurisdiction over Plaintiff's claims against the State in the first instance, it need not consider whether the Complaint fails to state a claim against the State for which relief may be granted. *Brown v. Wells Fargo Bank, N.A.,* No. 13–CV–3258, 2014 WL 1875083, at *1 (E.D.N.Y. May 8, 2014); *see, e.g., Pivotal Payments, Inc. v. FVA Ventures, Inc.,* No. CV 11–5713, 2012 WL 3887360, at *3 (E.D.N.Y. July 30, 2012), *report and recommendation adopted,* No. 11–CV–5713, 2012 WL 3909739 (E.D.N.Y. Sept. 6, 2012); *Fridman v. Postmaster Gen., U.S. Postal Serv.,* No. CV–95–4049, 1996 WL 90543, at *2 (E.D.N.Y. Feb. 26, 1996). Accordingly, the Court respectfully recommends to Judge Bianco that the State's motion to dismiss pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction be GRANTED.

### B. Motion to Dismiss By the Federal Defendants

The Federal Defendants bring their motion to dismiss the Complaint pursuant to Rule 12(b)(1), [8] 12(b)(5) and 12(b)(6). *See* Federal Defendants' Memorandum of Law In Support of Motion to Dismiss the [C]omplaint ("Fed. Mem.") at 1. The Federal Defendants argue that, as a threshold matter, Plaintiff's *Bivens* claims brought against the Secret Service and Agent Gerbino in his official capacity are barred by sovereign immunity and therefore must be dismissed. *See id.* at 7–8. The Federal Defendants further assert that the action must be dismissed as to Agent Gerbino in his individual capacity [9] pursuant to Rule 12(b)(5) because he was never served with the Complaint. *See id.* at 12. Finally, the Federal Defendants assert multiple grounds for dismissal based on Rule 12(b)(6), namely, that (1) Plaintiff's false arrest claims are time-barred by the three-year statute of limitations; (2) Plaintiff has failed to adequately allege unconstitutional misconduct on the part of Agent Gerbino; and (3) Agent

Gerbino is entitled to qualified immunity. *See id.* at 5–12. Plaintiff has not opposed the Federal Defendants' motion. For the reasons explained below, **\*316** the Court concludes that (1) Plaintiff's claims against the Secret Service and Agent Gerbino in his official capacity are barred by sovereign immunity and must be dismissed for lack of subject matter jurisdiction; and (2) although Plaintiff failed to serve Agent Gerbino or show good cause for lack of service, he should be granted a discretionary extension to effectuate service upon Agent Gerbino in his individual capacity.

8    Although the Federal Defendants do not reference Rule 12(b)(1) as a grounds for their motion to dismiss, they argue that, to the extent Plaintiff has asserted claims against the Secret Service and Agent Gerbino in his official capacity, those claims are barred by the doctrine of sovereign immunity. *See* Fed. Mem. at 7–8. "[A] finding of sovereign immunity would deprive this [C]ourt of subject matter jurisdiction." *Dotson v. Griesa,* 398 F.3d 156, 177 (2d Cir.2005) (citing *e.g. Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 94–96, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998)). Accordingly, the Court will construe the Federal Defendants' sovereign immunity arguments as being made pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction.

9    The Complaint does not state whether Agent Gerbino is being sued in his official or individual capacity. *See generally* Compl. Under these circumstances, the Court may assume that the suit is brought against Agent Gerbino in his individual capacity. *See Brown v. Lindsay,* No. 08–CV–2182, 2010 WL 1049571, at \*16 (E.D.N.Y. Mar. 19, 2010) (citing *Davis v. Cnty. of Nassau,* 355 F.Supp.2d 668, 675–76 (E.D.N.Y.2005)). However, because the Federal Defendants have also moved to dismiss Plaintiff's claims to the extent they have been brought against Agent Gerbino in his official capacity, the Court will address those arguments.

### *1. Federal Sovereign Immunity*

[29]  [30]  [31]   It is well established that "the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell,* 463 U.S. 206, 212, 103 S.Ct. 2961, 77 L.Ed.2d

580 (1983). Such consent to suit "must be 'unequivocally expressed' in statutory text, and cannot simply be implied." *Adeleke v. United States,* 355 F.3d 144, 150 (2d Cir.2004) (citing *United States v. Nordic Village, Inc.,* 503 U.S. 30, 33, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992)). Moreover, "[b]ecause an action against a federal agency or federal officers in their official capacities is essentially a suit against the United States, such suits are ... barred under the doctrine of sovereign immunity, unless such immunity is waived." *Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 510 (2d Cir.1994) (citing *FDIC v. Meyer,* 510 U.S. 471, 484–87, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994); *Kentucky v. Graham,* 473 U.S. 159, 166–67, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985)). "*Bivens* authorizes suits against the responsible federal official, not against the government itself, and *Bivens*-type actions against the United States are ... routinely dismissed for lack of subject matter jurisdiction." *Keene Corp. v. United States,* 700 F.2d 836, 845 (2d Cir.1983).

**\*\*13  [32]  [33]**  Plaintiff seeks monetary damages against the Secret Service, a federal agency, and Agent Gerbino for allegedly violating his constitutional rights pursuant to Section 1983, which the Court construes as a *Bivens* claim. *See generally* Compl. "[A] *Bivens* claim against a federal agency is precluded, as an action against a federal agency is essentially a suit against the United States, and *Bivens* actions against the United States are barred under the doctrine of sovereign immunity." *Katsoulakis v. Astrue,* No. 10–CV–0081, 2011 WL 3877080, at \*5 (E.D.N.Y. Aug. 31, 2011); *see, e.g., Robinson,* 21 F.3d at 510; *Urena v. Wolfson,* No. 09–CV–1107, 2010 WL 5057208, at \*5 (E.D.N.Y. Dec. 6, 2010). Sovereign immunity also bars Plaintiff's *Bivens* claims to the extent they have been brought against Agent Gerbino in his official capacity. *See Robinson,* 21 F.3d at 510 (holding that *Bivens* action was "properly dismissed" against federal agency and individual federal defendants in their official capacities "for want of subject matter jurisdiction" based on sovereign immunity).

For these reasons, the Court concludes that it lacks subject matter jurisdiction over Plaintiff's *Bivens* claims asserted against the Secret Service and Agent Gerbino in his official capacity. Consequently, the Court respectfully recommends to Judge Bianco that those claims be dismissed. 10

10    The Court notes that, were the Court to consider Plaintiff's claims against the Federal Defendants as arising under Section 1983 rather than *Bivens,* dismissal would still be warranted because the

United States has not waived its sovereign immunity from suit under Section 1983. *See Davis v. United States,* No. 03 CIV. 1800, 2004 WL 324880, at *10 (S.D.N.Y. Feb. 19, 2004); *Petrenko v. United States,* 859 F.Supp. 647, 649 (E.D.N.Y.1994) (citing *Ricca v. United States,* 488 F.Supp. 1317, 1325 (E.D.N.Y.1980)).

### *317  2. Insufficient Service of Process on Agent Gerbino

The Federal Defendants maintain that the claims asserted against Agent Gerbino in his individual capacity must be dismissed pursuant to Rule 12(b)(5) because he has never been served with the Complaint. *See* Fed. Mem. at 12. The Federal Defendants have not provided an affidavit from Agent Gerbino or other evidence to support their allegations of insufficient service. Plaintiff, meanwhile, has not opposed the Federal Defendants' motion to dismiss, nor has he otherwise established that he either adequately served Agent Gerbino or that he had good cause for failing to serve him.

[34]  [35]  Under Fed.R.Civ.P. 4(m), a plaintiff must serve a defendant within 120 days of the filing of the complaint. In order to serve a United States employee sued in an individual capacity, "a party must serve the United States and also serve the officer or employee." Fed.R.Civ.P. 4(i)(3). Failure to do so may result in dismissal of the action. *See Zapata v. City of N.Y.,* 502 F.3d 192, 196 (2d Cir.2007). "When a defendant has raised a challenge to the sufficiency of process under Rule 4(m), the plaintiff bears the burden of proving adequate service." *Matos v. City of N.Y.,* No. 10–CV–4558, 2012 WL 7160430, at *3 (E.D.N.Y. Dec. 3, 2012) (citing *Dickerson v. Napolitano,* 604 F.3d 732, 752 (2d Cir.2010)).

Plaintiff commenced this action on February 26, 2014 and summonses were issued to the Federal Defendants that same day. *See* DE 1–DE 3. On March 5, 2014, Judge Bianco issued an Order directing that the Court would dismiss Plaintiff's action without prejudice if service was not made upon Defendants by June 26, 2014, as required by Rule 4(m), and Plaintiff "fail[ed] to show good cause why such service has not been effected." DE 4. On July 22, 2014, the United States Attorney's Office ("USAO") appeared on behalf of the Federal Defendants and filed a letter request for leave to move to dismiss the Complaint. DE 43. In the letter, copied to Plaintiff, the USAO informed the Court that "[t]o date, Federal Defendants have not been served and Plaintiff has not made any attempts to properly serve the Federal Defendants." *Id.* The Federal Defendants assert in their memorandum of

law, filed August 23, 2014, that Agent Gerbino still has not been served pursuant to Rule 4(i)(3) and that Plaintiff has neither shown good cause for failing to comply with Rule 4(m)' s 120–day rule nor requested additional time from the Court to effectuate proper service. *See* Fed. Mem. at 12– 14. Accordingly, the Federal Defendants argue that Plaintiff's claims against Agent Gerbino must be dismissed pursuant to Rule 12(b)(5). *See id.* at 14. As discussed above, the Federal Defendants have not included an affidavit or other evidence to support their request for dismissal based on insufficient service.

**14  The Court notes at the outset that it will address the insufficient service of process issue because the Federal Defendants have raised it and " 'the Court must first address the preliminary questions of service and personal jurisdiction' " before turning, if necessary, to the defendants' Rule 12(b)(6) arguments. *Hertzner,* 2007 WL 869585, at *3 (quoting *Mende v. Milestone Tech., Inc.,* 269 F.Supp.2d 246, 251 (S.D.N.Y.2003)); *see Arrowsmith v. United Press Int'l,* 320 F.2d 219, 221 (2d Cir.1963) ( "[L]ogic compel[s] initial consideration of the issue of jurisdiction over the defendant —a court without such jurisdiction lacks power to dismiss a complaint for failure to state a claim."). However, the Court maintains that Judge Bianco's March 5, 2014 Order was clear in directing that this action be dismissed without prejudice *318  if Plaintiff did not comply with Rule 4(m).

[36]  Turning to the merits of the motion, the Court finds that, as a preliminary matter, the Federal Defendants' failure to provide a sworn statement is not fatal to their Rule 12(b)(5) motion to dismiss. The omission of "a[ ] supporting affidavit that attests to the alleged deficiencies in plaintiff['s] service of process" may be grounds to deny a Rule 12(b)(5) motion if the movant's conclusory allegations do not specify the service provision the plaintiff failed to satisfy, *Koulkina v. City of N.Y.,* 559 F.Supp.2d 300, 312 (S.D.N.Y.2008), or the plaintiff provides evidence to rebut the movant's allegations. *See United States v. Jost,* 9 F.Supp.3d 303, 307 (W.D.N.Y.2014) (holding that "defendant's unsupported and uncorroborated statement [that she was never served] is insufficient to overcome the sworn affidavit relied upon by plaintiff"); *Griffin–Nolan v. Providence Wash. Ins. Co.,* 504 CV 1453, 2005 WL 1460424 at *3 (N.D.N.Y. June 20, 2005) (denying the defendants' motion to dismiss where "[t]he docket sheet contain[ed] four affidavits of service that indicate that each Defendant was served with the summons and the complaint," the "[p]laintiff's counsel ... filed an affidavit stating that Plaintiff personally served summonses and complaints for all

Defendants upon Defendants' counsel," and the defendants "d[id] not address insufficiency of service of process in their reply memorandum of law"). These are not the circumstances presented here. The Federal Defendants stated both in their letter to Judge Bianco and their memorandum of law that Rule 4(i)(3) governed service upon Agent Gerbino and that Plaintiff failed to serve Agent Gerbino by June 26, 2014 as required by Rule 4(m) and the Court's March 5, 2014 Order. *See* DE 43; Fed. Mem. at 13–14. Although it appears Plaintiff was mailed a copy of these submissions, *see* DE 43, DE 47, as well as a copy of the Court's March 5, 2014 Order, *see* Elec. Order, Mar. 5, 2014, he has not provided proof of service upon Agent Gerbino.

Based on these circumstances, the Court finds that the Federal Defendants' challenge to the sufficiency of process pursuant to Rule 4(m) effectively shifted the burden of proof to Plaintiff to show that service was adequate. *See Matos,* 2012 WL 7160430, at *3. Plaintiff has neither alleged that he served Agent Gerbino with the Complaint nor offered evidence to show that service was effected within the 120–day time period specified by Rule 4(m). Accordingly, Plaintiff has not met his burden of proving that he properly served Agent Gerbino. *See generally id.*

**\*\*15** Because Plaintiff has not shown that he complied with Rule 4(m)'s 120–day time period, "the question becomes whether the [C]omplaint must be dismissed against [Agent Gerbino] or whether [P]laintiff should be provided with an extension of time to effect proper service." *Nolan,* 2013 WL 168674, at *12 (quoting *Fileccia v. City of N.Y.,* 2011 WL 4975313, at *3 (E.D.N.Y. Sept. 23, 2011)) (internal quotation marks and alterations omitted). "Rule 4(m) permits the Court to dismiss an action if service is not made in a timely manner, but also provides that 'if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.' " *Id.* (quoting Fed.R.Civ.P. 4(m)); *see Matos,* 2012 WL 7160430, at *3. Here, Plaintiff has not made any attempt to show the existence of "good cause" for his failure to serve Agent Gerbino. In fact, he has not even responded to the Federal Defendant's motion to dismiss.

[37]  [38]  "Even in the absence of good cause, however, the court may, in its discretion,  **\*319** grant an extension." *Matos,* 2012 WL 7160430, at *3.

Courts have typically weighed four factors in determining whether to grant an extension of time absent good cause: '(1) whether the applicable statute of limitations would bar

the refiled action; (2) whether the defendant had actual notice of the claims asserted in the complaint; (3) whether the defendant had attempted to conceal the defect in service; and (4) whether the defendant would be prejudiced by the granting of plaintiff's request for relief from the provision.'

*Purzak v. Long Island Hous. Servs., Inc.,* No. 12–CV–1747, 2013 WL 5202711, at *5 (E.D.N.Y. Sept. 13, 2013) (quoting *Carroll v. Certified Moving & Storage, Co.,* 04 CV 4446, 2005 WL 1711184, at *2 (E.D.N.Y. July 19, 2005)); *see, e.g. Walters v. Suffolk Cnty.,* No. 09–CV–556, 2014 WL 940734, at *4 (E.D.N.Y. Mar. 11, 2014); *Matos,* 2012 WL 7160430, at *3; *Hertzner,* 2007 WL 869585, at *4–8. The Court finds that the balance of these factors weigh in favor of granting Plaintiff a discretionary extension.

[39]  [40]  As to the first factor, "courts have consistently considered the fact that the statute of limitations has run on a plaintiff's claim as a factor favoring the plaintiff in a Rule 4(m) analysis." *Purzak,* 2013 WL 5202711, at *6 (quoting *Carroll,* 2005 WL 1711184, at *2) (internal quotation marks and alteration omitted). The Court notes that this rule generally applies where the original complaint was timely filed (if not properly served) and the court's dismissal without prejudice would bar the plaintiff from later refiling the complaint based on statute of limitations grounds. *See, e.g., Walters,* 2014 WL 940734, at *4; *Jordan,* 928 F.Supp.2d at 599; *Carroll,* 2005 WL 1711184, at *2. Here, the Federal Defendants argue that the three-year statute of limitations on Plaintiff's false arrest claim against Agent Gerbino had *already* run by the time Plaintiff filed his Complaint on February 26, 2014. *See* Fed. Mem. at 4. However, the Federal Defendants assert this statute of limitations argument as an independent grounds for Rule 12(b)(6) dismissal of the Complaint, not as a factor weighing against a discretionary extension of Plaintiff's time to serve the Complaint. Moreover, some case law suggests that a discretionary extension may still be appropriate even where, as here, the defendant alleges that the plaintiff's claims are time-barred prior to the filing of the complaint. *See Morris v. Ford Motor Co.,* No. 07–CV–424S, 2009 WL 2448473, at *5 (W.D.N.Y. Aug. 7, 2009) (granting discretionary extension even though the defendant also moved to dismiss the complaint for failure to commence the action within the applicable statute of limitations); *cf. Purzak,* 2013 WL 5202711, at *8 n. 4 (granting a discretionary extension for the plaintiff to serve her first federal complaint and declining to address the defendants' claim that, because the plaintiff failed to properly serve the first federal complaint within the statute of limitations, her second federal complaint was untimely at the time of filing). Accordingly, the Court finds the first

factor, while not dispositive, does weigh in Plaintiff's favor. *See Purzak,* 2013 WL 5202711, at *6.

**\*\*16** **[41]**   As to the second factor, the Court finds that the Federal Defendants had actual notice of the claim asserted in the Complaint. It is undisputed that the Federal Defendants ultimately received Plaintiff's pleadings "and in fact filed the instant motions to dismiss based on those pleadings." *Jordan,* 928 F.Supp.2d at 599 (E.D.N.Y.2013). Thus, this factor favors granting Plaintiff an extension.

As to the third factor, there is no evidence that the Federal Defendants have **\*320** attempted to conceal the absence of service of process. Significantly, the USAO brought the service issue to the Court's attention in its July 22, 2014 letter, copied to Plaintiff, seeking a pre-motion conference. *See* DE 43. This factor therefore does not favor granting Plaintiff a discretionary extension. However, this factor alone is not sufficient to offset other factors weighing in Plaintiff's favor. *See Purzak,* 2013 WL 5202711, at *7 (citing *Jordan,* 928 F.Supp.2d at 599 (granting extension even when defendant did not attempt to conceal the defect in service because "this factor alone does not offset the numerous reasons that support granting plaintiff additional time to correct service of process"); *Feingold v. Hankin,* 269 F.Supp.2d 268, 277 (S.D.N.Y.2003) (granting extension even when statute of limitations did not bar refiling of action and defendant had not tried to conceal ineffective service)).

Finally, as to the fourth factor, the Court finds that this factor favors Plaintiff because the Federal Defendants would not be prejudiced by extending the time within which Plaintiff may serve his pleadings on Agent Gerbino in conformity with the Federal Rules. *Jordan,* 928 F.Supp.2d at 599 ("Although defendant 'will be burdened with the obligation to defend this lawsuit if the extension is granted, that does not rise to the level of prejudice necessary to tip the balance of this factor in defendant's favor.' ") (quoting *Lumbermens Mut. Cas. Co. v. Dinow,* No. 06–CV–3881, 2009 WL 2424198, at *4 (E.D.N.Y. Aug. 6, 2009)) (alterations omitted); *see also Walters,* 2014 WL 940734, at *4 (finding that the fourth factor favored the plaintiff where the defendants "ha [d] not shown prejudice" and merely argued that the plaintiff "is not likely to succeed on the merits."); *Purzak,* 2013 WL 5202711, at *7 (finding no prejudice even though the defendants "would be forced to defend this action even though the statute of limitations has expired").

**[42]**   On balance, the Court concludes that the foregoing factors militate against dismissal of the Complaint and weigh in favor of granting Plaintiff—a *pro se* litigant—a final opportunity to effectuate proper service on Agent Gerbino. Accordingly, the Court respectfully recommends to Judge Bianco that Plaintiff be granted one final opportunity of 30 days to serve the Summons and Complaint upon Agent Gerbino, if Plaintiff chooses to do so. In light of this determination, the Court need not address the alternative grounds for dismissal advanced by the Federal Defendants pursuant to Rule 12(b)(6). *See generally Conway v. Am. Red Cross,* No. CV 10–1859, 2010 WL 4722279, at *6 (E.D.N.Y. Nov. 15, 2010).

**\*\*17**   For the foregoing reasons, the Court respectfully recommends to Judge Bianco that the motion to dismiss by the Federal Defendants be GRANTED, in part, pursuant to Rule 12(b)(1), by dismissing Plaintiff's claims against the Secret Service and Agent Gerbino in his official capacity, and be DENIED, in part, as to Plaintiff's claims against Agent Gerbino in his individual capacity. The Court further recommends that Plaintiff be granted a final period of 30 days within which to serve the Summons and Complaint upon Agent Gerbino.

### C. Motion to Dismiss by the TJX Defendants

The TJX Defendants move to dismiss the Complaint pursuant to Rule 12(b)(6). *See generally* Memorandum of Law in Support of TJX Defendants' Motion to Dismiss ("TJX Mem.") at 1. Primarily, these defendants assert that, as private actors, they are not subject to suit under Section 1983, and Plaintiff has not sufficiently **\*321** alleged that they acted under color of state law for purposes of that statute. *See id.* at 5–7. The TJX Defendants further argue that, in any event, Plaintiff's false arrest claims asserted against them are time-barred by Section 1983's three-year statute of limitations. *See id.* at 8. [11]   In his opposition, Plaintiff does not dispute that the TJX Defendants are private actors. Rather, Plaintiff argues that he has adequately alleged the existence of a joint activity and conspiracy between the TJX Defendants and Detective Rispoli to establish state action under Section 1983. *See* Plaintiff's Opposition to Defendant's Motion to Dismiss the Complaint Against Them ("Pl.'s Opp. to TJX Mot.") ¶ 4 [DE 38]. Plaintiff also maintains that his false arrest claims are not time-barred because the statute of limitations only began to run once his criminal case was dismissed in October 2013. *See id.* ¶ 6. For the reasons set forth below, the Court concludes that (1) Plaintiff's allegations of conspiracy and

joint action between Detective Rispoli and Grimaudo and TJX are insufficient to survive a motion to dismiss; and (2) Plaintiff has adequately alleged, through his submissions on this motion, that Renner engaged in a joint activity and conspiracy with Rispoli; but (3) in any event, Plaintiff's Section 1983 claims against all the TJX Defendants are time-barred.

11    The TJX Defendants do not address the state law claim for negligent supervision which Plaintiff appears to have alleged against TJX. However, as discussed later in this Report and Recommendation, the Court recommends that Judge Bianco decline to exercise supplemental jurisdiction over any state law causes of action alleged in the Complaint.

### *1. Section 1983 State Action Requirement*

[43]    Section 1983 provides that:

> [e]very person who, under color of any statute, ordinance, regulation, custom or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured.

42 U.S.C. § 1983. "Section 1983 provides a cause of action against any person who deprives an individual of federally guaranteed rights 'under color' of state law." *Filarsky v. Delia,* ––– U.S. ––––, 132 S.Ct. 1657, 1661, 182 L.Ed.2d 662 (2012). Thus, to state a claim under Section 1983, a plaintiff must allege (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws, and (2) that the deprivation was "committed by a person acting under the color of state law." *Cornejo v. Bell,* 592 F.3d 121, 127 (2d Cir.2010); *see Ahlers v. Rabinowitz,* 684 F.3d 53, 60 (2d Cir.2012); *Ciambriello v. Cnty. of Nassau,* 292 F.3d 307, 323 (2d Cir.2002); *see also Rehberg v. Paulk,* ––– U.S. ––––, 132 S.Ct. 1497, 1501–02, 182 L.Ed.2d 593 (2012).

**\*\*18** [44]    [45]    " 'Because the United States Constitution regulates only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes state action.' " *Fabrikant v. French,* 691 F.3d 193, 206 (2d Cir.2012) (quoting *Flagg v. Yonkers Sav. & Loan Ass'n,* 396 F.3d 178, 186 (2d Cir.2005)). "[S]tate action requires both an alleged constitutional deprivation 'caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible,' and that 'the party charged with the deprivation must be a person who may fairly be said to be a state actor.' " **\*322** *Am. Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999) (quoting *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982)) (emphasis omitted).

[46]    [47]    [48]    The conduct of private persons or entities, "no matter how discriminatory or wrongful," generally does not constitute state action and therefore cannot form the basis of a Section 1983 claim. *Id.; see Hooda v. Brookhaven Nat'l Lab.,* 659 F.Supp.2d 382, 393 (E.D.N.Y.2009) ( Section 1983 "constrains only state conduct, not the 'acts of private persons or entities.' ") (quoting *Rendell–Baker v. Kohn,* 457 U.S. 830, 837, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982)). However, "state action may be found when 'there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself.' " *Abdullahi v. Pfizer, Inc.,* 562 F.3d 163, 188 (2d Cir.2009) (*quoting Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n,* 531 U.S. 288, 295, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001) (internal quotation marks omitted)). Such a nexus may exist where "the private actor was a willful participant in joint activity with the State or its agents" or where the private actor "conspire[d] with a state official to violate the plaintiff's constitutional rights." *Young v. Suffolk Cnty.,* 922 F.Supp.2d 368, 385 (E.D.N.Y.2013) (internal quotation marks omitted); *see, e.g., Caldwell v. Myer,* No. 14–CV–5383, 2015 WL 428063, at \*3 (E.D.N.Y. Jan. 30, 2015) (citing *Ciambriello,* 292 F.3d at 323–24); *Shabtai v. Levande,* No. 13 CV 4580, 2013 WL 6116850, at \*3 (E.D.N.Y. Nov. 20, 2013) (citing *e.g. Filarsky,* 132 S.Ct. at 1661–62; *Briscoe v. LaHue,* 460 U.S. 325, 330 n. 7, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983)); *Anilao v. Spota,* 774 F.Supp.2d 457, 498 (E.D.N.Y.2011) (quoting *Dennis v. Sparks,* 449 U.S. 24, 27, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980)). "The concepts of acting 'jointly' or in 'conspiracy with' state actors are intertwined ... [and e]ven if considered as conceptually separate theories, both require the pleading of facts sufficient to show something more than conclusory allegations." *Stewart v. Victoria's Secret Stores, LLC,* 851 F.Supp.2d 442, 445 (E.D.N.Y.2012)

[49]   " 'To establish joint action, a plaintiff must show that the private citizen and the state official shared a common unlawful goal; the true state actor and the jointly acting private party must agree to deprive the plaintiff of rights guaranteed by federal law.' " *Anilao,* 774 F.Supp.2d at 498 (quoting *Bang v. Utopia Rest.,* 923 F.Supp. 46, 49 (S.D.N.Y.1996)); *see Lynch v. Southampton Animal Shelter Found. Inc.,* 971 F.Supp.2d 340, 351 (E.D.N.Y.2013). In other words, "[j]oint action with a state official can be found only if it is shown that the private individual acted in 'wilful collaboration' with a state actor to deprive the plaintiff of a federal right." *Stewart,* 851 F.Supp.2d at 445 (citing *Bacquie v. City of N.Y.,* No. 99–CV–10951, 2000 WL 1051904, at *1 (S.D.N.Y. July 31, 2000)). "[C]onclusory allegations" or "naked assertions" of a joint activity are not sufficient to survive a motion to dismiss. *Id.* (internal quotation marks omitted); *see Ratner v. Robinson,* No. 13–CV–6278, 2014 WL 4659308, at *2 (E.D.N.Y. Sept. 16, 2014) ("A 'conclusory allegation that a private entity acted in concert with a state actor does not suffice to state a § 1983 claim against the private entity.' ") (quoting *Lee v. Law Office of Kim & Bae, P.C.,* 530 Fed.Appx. 9, 9 (2d Cir.2013) (internal quotation marks omitted)). Rather, the "pleadings asserting joint activity must allege 'specific facts tending to show agreement and concerted action.' "
**\*323** *Stewart,* 851 F.Supp.2d at 445 (quoting *Bacquie,* 2000 WL 1051904, at *1).

**\*\*19** [50]   [51]   It is well established that "the summoning of police officers or the provision of information to police officers, even if that information is false or results in the officers taking affirmative action, is not sufficient to constitute joint action with state actors for purposes of Section 1983." *Young,* 922 F.Supp.2d at 385 (citing *e.g. Ginsberg v. Healey Car & Truck Leasing, Inc.,* 189 F.3d 268, 272 (2d Cir.1999)); *see Stewart,* 851 F.Supp.2d at 446 ("Merely providing information to law enforcement, even if that information is false or mistaken, does not render the supplier of information a state actor.") (citing *Luciano v. City of N.Y.,* No. 09–CV–359, 2009 WL 1953431, at *2 (S.D.N.Y. July 2, 2009); *Johns v. Home Depot U.S.A., Inc.,* 221 F.R.D. 400, 405 (S.D.N.Y.2004)); *Anilao,* 774 F.Supp.2d at 498. "Moreover, a private party's motivation is irrelevant to the determination of whether that private party acted under color of state law." *Young,* 922 F.Supp.2d at 385 (citing *Kash v. Honey,* 38 Fed.Appx. 73, 75–76 (2d Cir.2002) (finding no state action by private lawyer who plaintiff

alleged "maliciously, for purpose or purposes personal to him, including the purpose of penalizing [plaintiff] for exercising his First Amendment rights ... falsely charged [plaintiff] in an accusatory instrument"); *Shapiro v. City of Glen Cove,* No. CV 03–0280, 2005 WL 1076292, at *7 (E.D.N.Y. May 5, 2005) ("In any event, whatever motivation [a private party] may have had in calling in the complaint and alerting the media is irrelevant to the question of whether she was a state actor.")); *see Estes–El v. Dumoulin,* No. 6–CV–2528, 2012 WL 1340805, at *4 (E.D.N.Y. Apr. 18, 2012). "[I]t is only when a private actor takes a more active role and jointly engages in action with state actors [ ] that he will be found to have acted under color of state law for purposes of Section 1983." *Young,* 922 F.Supp.2d at 385 (citing *Lugar,* 457 U.S. at 942, 102 S.Ct. 2744; *Adickes,* 398 U.S. at 152, 90 S.Ct. 1598); *see Stewart,* 851 F.Supp.2d at 446 ("Where, on the other hand, a private citizen has done more than simply call police and provide sworn information, a claim of state action may be sustained."). "In such cases, facts showing concerted action must be alleged, even at the pleading stage, to avoid dismissal." *Stewart,* 851 F.Supp.2d at 446.

[52]   [53]   [54]   "Alternatively, to demonstrate that a private party defendant was a state actor engaged in a conspiracy with other state actors under § 1983, a plaintiff must allege (1) an agreement between the private party and state actors, (2) concerted acts to inflict an unconstitutional injury, and (3) an overt act in furtherance of the goal." *Anilao,* 774 F.Supp.2d at 499; *see Caldwell,* 2015 WL 428063, at *3; *Young,* 922 F.Supp.2d at 385; *Estes–El,* 2012 WL 1340805, at *5. "Claims alleging conspiracies to violate civil rights are held to a heightened pleading standard." *Brewster v. Nassau Cnty.,* 349 F.Supp.2d 540, 547 (E.D.N.Y.2004) (citing *Julian v. N.Y. City Transit Auth.,* 857 F.Supp. 242, 252 (E.D.N.Y.1994)). This heightened pleading standard is necessary because

**\*\*20** [t]he need to guard against the use of conclusory allegations of conspiracy in the context of Section 1983 lawsuits against private actors is particularly compelling. If a plaintiff could overcome a motion to dismiss simply by alleging in a conclusory fashion a 'conspiracy' between private actors and state actors, these private actors would be subjected to the substantial cost and disruption incurred by litigants in the discovery phase of these lawsuits, without any indication whatsoever that the plaintiff has a 'plausible' conspiracy **\*324** claim. As the Second Circuit has emphasized, these conspiracy claims are 'so easily made and can precipitate such protracted proceedings with

such disruption of governmental functions' that 'detailed fact pleading is required to withstand a motion to dismiss' them. *Angola v. Civiletti,* 666 F.2d 1, 4 (2d Cir.1981).

*Nealy v. Berger,* No. 08–CV–1322, 2009 WL 704804, at *6 (E.D.N.Y. Mar. 16, 2009); *see, e.g., Stewart,* 851 F.Supp.2d at 445–46; *Brewster,* 349 F.Supp.2d at 547. Thus, "[v]ague and conclusory allegations that defendants have engaged in a conspiracy must be dismissed." *Anilao,* 774 F.Supp.2d at 499; *see, e.g., Ciambriello,* 292 F.3d at 324 ("A merely conclusory allegation that a private entity acted in concert with a state actor does not suffice to state a § 1983 claim against the private entity."); *Brewster,* 349 F.Supp.2d at 547 (" 'A complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss.' ") (quoting *Sommer v. Dixon,* 709 F.2d 173, 175 (2d Cir.1983)). Although "places and dates of meetings need not be pled with particularity," the complaint "must set forth a plausible theory of agreement and concerted action." *Stewart,* 851 F.Supp.2d at 445 (citing *McIntyre v. Longwood Cent. Sch. Dist.,* 2008 WL 850263 *11 (E.D.N.Y.2008)); *see Anilao,* 774 F.Supp.2d at 499.

In his Complaint, Plaintiff alleges that Renner and Grimaudo "conspired" with Detective Rispoli to falsely identify Plaintiff as the perpetrator of the alleged crime involving the use of counterfeit currency at Marshalls. *See* Compl. ¶¶ 13–14; 23–24. Plaintiff further asserts that negligence on the part of TJX "led to a denial of Plaintiff's constitutional rights not to be racially profiled and falsely charged in the commission of [a] crime by the complicit actions of its employees." *Id.* ¶ 25.

 **[55]**   As a preliminary matter, the Court notes that Plaintiff does not allege in the Complaint or his opposition to the motion to dismiss that TJX engaged in a joint activity or conspired with a state actor to deny Plaintiff's constitutional rights. *See id.* Plaintiff merely asserts that TJX must be held liable for the conduct of its employees—namely, Renner, Grimaudo, and the "anonymous Marshalls employee"—which allegedly led to his false arrest. *See id.* Accordingly, Plaintiff has not established that TJX acted under the color of state law for the purposes of Section 1983 claims.

 **\*\*21**  **[56]**   With regard to Renner and Grimaudo, Plaintiff has not alleged adequate facts in the Complaint to support his allegations that these private actors engaged in a conspiracy with Detective Rispoli. Plaintiff asserts that Renner conspired with Detective Rispoli "to introduce a falsified complaint identifying Plaintiff as the perpetrator" of the alleged crime, and that Grimaudo similarly conspired with Rispoli to

"falsely identify the Plaintiff as the perpetrator." *Id.* ¶¶ 24–25. However, the fact that a private actor provided false or mistaken information to law enforcement "does not render the supplier of information a state actor." *Stewart,* 851 F.Supp.2d at 446; *see, e.g., Anilao,* 774 F.Supp.2d at 498. Thus, even if Renner and Grimaudo did provide false information to Detective Rispoli implicating Plaintiff in the crime, as Plaintiff alleges in his Complaint, this conduct alone is not sufficient to constitute state action. Similarly, because a private actor's motivation is irrelevant to the determination whether the individual acted under color of state law, *Young,* 922 F.Supp.2d at 385, Plaintiff's allegations that Renner and Grimaudo "deliberately" misidentified him, and that Grimaudo did so "as a way of removing suspicion **\*325** from herself and her co-workers," Compl. ¶ 23–24, do not suffice to establish that these private actors engaged in a joint activity with Detective Rispoli.

Critically absent from the Complaint are any specific facts identifying a "willful collaboration" between Renner, Grimaudo, and Rispoli to deny Plaintiff's constitutional rights, *Stewart,* 851 F.Supp.2d at 445, or an "overt act" or the "agreement" between the private actors and state actor forming the conspiracy. *See, e.g., Young,* 922 F.Supp.2d at 385. As discussed above, such facts must be alleged in the Complaint in order to survive a motion to dismiss. *Stewart,* 851 F.Supp.2d at 446; *see Nealy,* 2009 WL 704804, at *6 (noting that "detailed fact pleading is required to withstand a motion to dismiss" allegations of conspiracy in the context of Section 1983 lawsuits against private actors) (internal quotation marks omitted). Rather, Plaintiff's Complaint merely contains vague and conclusory allegations that Renner and Grimaudo participated in a conspiracy with Detective Rispoli to intentionally deny his constitutional rights. *See, e.g., Ciambriello,* 292 F.3d at 324; *Brewster,* 349 F.Supp.2d at 547. These allegations fall short of the facts necessary to support a claim of joint collaboration or conspiracy with a state actor so as to impose individual liability.

 **[57]**   **[58]**   **[59]**   **[60]**   That said, if the Court considers allegations in the Complaint in conjunction with the allegations and evidence Plaintiff presents in opposition to the TJX Defendants' motion, Plaintiff appears to have adequately made out a claim of conspiracy with regard to Renner. In his opposition, Plaintiff asserts for the first time [12] that Detective Rispoli and Renner "together ... manufactured the scenario of a call coming from 'an anonymous Marshalls employee' " and "then draft[ed] this 'Statement of Nils Renner' in a poor

2015 WL 1413359

attempt to substantiate a basis for Plaintiff's arrest." Pl.'s Opp. to TJX Mot. ¶ 4. Plaintiff further alleges that, because the account of the alleged crime contained in Detective Rispoli's police report is nearly identical to the Statement of Nils Renner, Rispoli must have "manufactured the information" in the Statement, conveyed that information to Renner, "and then presented [it] as if ... Renner had offered it from his own internal investigation." *Id.* ¶ 3. To substantiate these claims, Plaintiff has attached to his opposition papers the "Statement of Nils Renner" and Detective Rispoli's police report. *See id.,* Ex. A & Ex. B.

12    In general, a party is not permitted to use its reply to a dispositive motion as a vehicle for amending its complaint. *See Wright v. Ernst & Young LLP,* 152 F.3d 169, 178 (2d Cir.1998). "[A]lthough courts afford *pro se* plaintiffs a fair measure of procedural latitude, this latitude typically does not extend so far as permitting a plaintiff to supplement the claims in his complaint with additional allegations in his motion papers." *Salemo v. Murphy,* No. 11 CIV. 2525, 2012 WL 4714765, at *2 (S.D.N.Y. Sept. 27, 2012) (citing *Shah v. Helen Hayes Hosp.,* 252 Fed.Appx. 364, 366 (2d Cir.2007)); *see Ratner,* 2014 WL 4659308, at *3 n. 2 (declining to consider additional evidence and allegations related to the Section 1983 private actor-conspiracy theory raised for the first time in the plaintiff's opposition brief). However, because Plaintiff's supplementary allegations and evidence relate to claims he made in the Complaint—*i.e.,* that the Statement of Nils Renner was "manufactured" by Detective Rispoli—the Court will consider them in determining whether Plaintiff has adequately alleged state action by Renner. *See Miller v. Cnty. of Nassau,* No. 10–CV–3358, 2013 WL 1172833, at *6 (E.D.N.Y. Mar. 19, 2013) (considering "failure to train claim" raised for the first time in opposition to summary judgment because, construing the complaint liberally in favor of the plaintiff, the claim was related to one allegation in the complaint).

**\*\*22** Considering these additional allegations in conjunction with the Complaint, the **\*326** Court concludes that Plaintiff has, by a narrow margin, provided a sufficient factual basis for his allegations of conspiracy and joint action between Renner and Detective Rispoli. With his supplementary claims, Plaintiff has alleged that Renner did not merely elicit an exercise of state authority, but that he

joined and participated in the exercise of that authority by agreeing with Detective Rispoli to fabricate evidence for the purpose of effectuating Plaintiff's false arrest. *See Anilao,* 774 F.Supp.2d at 501. Accordingly, the Court concludes that Plaintiff has sufficiently pled that Renner acted under the color of state law for the purposes of Section 1983, and Plaintiff's Complaint against Renner need not be dismissed on that basis.

In sum, the Court concludes that Plaintiff's allegations against TJX and Grimaudo are not sufficient to plead state action by these defendants. For these reasons, the Court respectfully recommends to Judge Bianco that Plaintiff's Section 1983 claims against TJX and Grimaudo be dismissed. Plaintiff has met the state action threshold with regard to Renner. As the Court explains below, however, Plaintiff's Section 1983 claims against all the TJX Defendants, including Renner, are time-barred.

### *2. Statute of Limitations*

[61] [62] [63] [64] The statute of limitations for claims brought pursuant to Section 1983 is determined by state law, and in New York State, the statute of limitations for actions brought pursuant to Section 1983 is three years. *Owens v. Okure,* 488 U.S. 235, 249–51, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989) (holding that the most appropriate statute of limitations in a § 1983 action is found in the "general or residual [state] statute [of limitations] for personal injury actions"); *Shomo v. City of N.Y.,* 579 F.3d 176, 181 (2d Cir.2009) ("The statute of limitations for claims brought under Section 1983 is governed by state law, and in this case is the three-year period for personal injury actions under New York State law."). "While state law supplies the statute of limitations for claims under § 1983, federal law determines when a federal claim accrues. The claim accrues when the plaintiff knows or has reason to know of the harm." *Connolly v. McCall,* 254 F.3d 36, 41 (2d Cir.2001) (quoting *Eagleston v. Guido,* 41 F.3d 865, 871 (2d Cir.1994)); *see also Shomo,* 579 F.3d at 181 ("A Section 1983 claim ordinarily accrues when the plaintiff knows or has reason to know of the harm.") (internal quotation marks omitted); *Rene v. Jablonski,* No. 08 Civ. 3968, 2009 WL 2524865, at *5 (E.D.N.Y. Aug. 17, 2009) ("Federal law governs the question of when a Section 1983 claim accrues. Under federal law, 'the time of accrual is that point in time when the plaintiff knows or has reason to know of the injury which is the basis of his action.' ") (quoting *Covington v. City of N.Y.,* 171 F.3d 117, 121 (2d

Cir.1999) (alterations and citations omitted)). The statute of limitations period may be extended if the claimant "is under a disability because of infancy or insanity at the time the cause of action accrues." N.Y. C.P.L.R. 208. Equitable tolling may also be permitted when the plaintiff "was induced by fraud, misrepresentations or deception to refrain from filing a timely action." *Abbas v. Dixon,* 480 F.3d 636, 641–42 (2d Cir.2007) (internal quotation marks omitted); *see also Koch v. Christi's Intern., PLC,* 699 F.3d 141, 157 (2d Cir.2012) (citing *Abbas,* 480 F.3d at 642).

 **\*\*23** **[65]** **[66]** A claim for false arrest generally accrues on the date of the arrest. *See Wallace v. Kato,* 549 U.S. 384, 397, 127 S.Ct. 1091, 166 L.Ed.2d 973 (2007) ("[T]he statute of limitations upon a § 1983 claim seeking damages for a false arrest in violation **\*327** of the Fourth Amendment, where the arrest is followed by criminal proceedings, begins to run at the time the claimant becomes detained pursuant to legal process."); *Crichlow v. Butcher,* No. 09 Civ. 4398, 2009 WL 4266711, at \*3–4 (E.D.N.Y. Nov. 20, 2009) ("The statute of limitations for a § 1983 civil rights action in New York is three years, and accrues for a false arrest claim at the time of arrest." (citations omitted)); *see also Singleton v. City of N.Y.,* 632 F.2d 185, 191 (2d Cir.1980) (finding that the plaintiff's Section 1983 false arrest claim accrued on the date of his arrest, as that "was the time at which plaintiff knew of his injury arising from the alleged[ly] ... false arrest"). Moreover, "for claims alleging civil conspiracies, including conspiracies to violate an individual's civil rights, 'the cause of action accrues and the statute of limitations begins to run from the time of commission of the overt act alleged to have caused damages.' " *Poux v. Cnty. of Suffolk,* No. 09 CV 3081, 2010 WL 1849279, at \*8 (E.D.N.Y. May 4, 2010) (quoting *Chodos v. Federal Bureau of Investigation,* 559 F.Supp. 69, 74 (S.D.N.Y.1982), *aff'd,* 697 F.2d 289 (2d Cir.1982)) (citing *Singleton,* 632 F.2d at 192; *Afshar v. Procon Inc.,* 442 F.Supp. 887, 891 (S.D.N.Y.1977), *aff'd,* 580 F.2d 1044 (2d Cir.1978)); *see Allen,* 2011 WL 1261103, at \*11.

 **[67]** **[68]** **[69]** **[70]** Applying these principles, the Court concludes that Plaintiff's Section 1983 claims against the TJX Defendants are time-barred. Plaintiff's false arrest claims accrued on February 17, 2011, the date he was arrested.[13] Plaintiff alleges that Grimaudo and Renner conspired with Detective Rispoli to fabricate evidence which led to Plaintiff's false arrest. This assertion indicates that the overt acts which formed the basis of this conspiracy occurred—and the conspiracy claims accrued—sometime prior to Plaintiff's arrest on February 17, 2011. Plaintiff did not file his

Complaint until February 26, 2014, which is beyond the three-year statute of limitations for his Section 1983 claims against the TJX Defendants. Plaintiff has not asserted any impediment to bringing his Section 1983 claims within the limitations period, and, therefore, his claims are time-barred.

13    Plaintiff argues in his opposition that his false arrest claim did not accrue until his criminal proceedings were dismissed on October 21, 2013 "because defendants' actions constitute a continuing violation." Pl.'s Opp. to TJX Mot. ¶ 6. "The continuing violation doctrine is an 'exception to the normal knew-or-should-have-known accrual date.' " *Shomo,* 579 F.3d at 181 (quoting *Harris v. City of N.Y.,* 186 F.3d 243, 248 (2d Cir.1999)). Pursuant to that doctrine, "[w]hen a plaintiff brings a § 1983 claim challenging that his constitutional rights were violated as a result of an alleged custom or policy, the statute of limitations period does not begin to run until the last act in furtherance of the policy." *Harper v. City of N.Y.,* No. 09–CV–05571, 2010 WL 4788016, at \*5 (E.D.N.Y. Nov. 17, 2010) *aff'd,* 424 Fed.Appx. 36 (2d Cir.2011) (citing *Cornwell v. Robinson,* 23 F.3d 694, 703 (2d Cir.1994)).
      Plaintiff's attempt here to invoke the continuing violation doctrine is unavailing. To rely on the doctrine, a plaintiff "must allege both the existence of an ongoing policy of ***discrimination*** and some non-time-barred acts taken in furtherance of that policy." *Harris,* 186 F.3d at 250 (emphasis added). Although Plaintiff contends that TJX "foster[ed] an environment" that encouraged its employees "to racially profile Black males in its stores," Compl. ¶ 25, this conclusory allegation does not amount to a legitimate challenge to a custom or policy for the purposes of invoking the continuing violation doctrine. Moreover, Plaintiff does not seek to challenge a "continuous series of events that gave rise to a cumulative injury." *Harper,* 2010 WL 4788016, at \*5. Rather, his claim relates only to the single, discrete act of his false arrest on February 26, 2011. The continuing violation doctrine therefore does not apply in these circumstances.

 **\*328** For the foregoing reasons, the Court respectfully recommends to Judge Bianco that the motion to dismiss by the TJX Defendants be GRANTED.

### D. Motions to Dismiss by The Schlissel Firm and Attorney Prime

The Schlissel Firm and Attorney Prime (collectively, "the Attorney Defendants") move to dismiss Plaintiff's ineffective assistance of counsel claims (mischaracterized by Plaintiff as Section 1983 claims) and state legal malpractice claims pursuant to Rule 12(b)(6). *See* Memorandum of Law in Support of Pre–Answer Motion to Dismiss ("Schlissel Mot.") at 5; Memorandum of Law in Support of Prime's Motion to Dismiss ("Prime Mot.") at 1. The Attorney Defendants contend that dismissal is warranted because (1) they do not qualify as state actors under Section 1983; and (2) Plaintiff has not alleged a cognizable claim for legal malpractice pursuant to state law. Schlissel Mot. at 1–2; Prime Mot. at 5–10. Plaintiff's oppositions to these motions largely mirror the allegations raised in his Complaint. Particularly, in his opposition to the Schlissel Firm's motion, Plaintiff argues that the firm acted negligently and failed to exercise "due diligence" in its representation of Plaintiff by, among other things, "fail[ing] to uncover that the state never possessed the valid instrument necessary to proceed to trial." Pl.'s Affidavit/Affirmation in Opposition to Defendant's Motion at ¶ 2(b) [DE 25]. In opposition to Prime's motion, Plaintiff alleges, as he did in the Complaint, that Prime "acted as a proxy for the Nassau County District Attorney's Office" and that Prime's refusal to subpoena Renner (or otherwise follow Plaintiff's preferred trial strategy) demonstrates that Prime "was given and accepted this impromptu assignment [as Plaintiff's assigned counsel] only to repay and/or curry favors from his former employer." Pl.'s Affidavit/Affirmation in Opposition to Defendant's Motion ("Pl.'s Opp. to Prime Mot.") ¶ 3(a) [DE 22]. For the reasons set forth below, the Court concludes that (1) Plaintiff's Section 1983 claims against the Attorney Defendants must be dismissed and (2) the Court should decline to exercise supplemental jurisdiction over Plaintiff's legal malpractice claims asserted under state law.

### 1. *Section 1983 Claims*

**\*\*24** **[71]** **[72]** "It is well-settled that private attorneys and law firms ... do not act under color of state law and are not state actors for purposes of Section 1983 simply by virtue of their state-issued licenses to practice law." *Manko v. Steinhardt,* No. 11–CV–5430, 2012 WL 213715, at \*4 (E.D.N.Y. Jan. 24, 2012) (citing *e.g. Fine v. City of N.Y.,* 529 F.2d 70, 74 (2d Cir.1975) (private attorney not a state

actor)); *see McCloud v. Jackson,* 4 Fed.Appx. 7, 9–10 (2d Cir.2001) ("To the extent that [the defense attorney] may have served as privately-retained counsel, rather than as a court-appointed attorney, he still could not be held liable under § 1983 because there was no showing that he worked with state officials to deprive [the plaintiff] of federal rights."); *Grant v. Hubert,* No. 09–CV–1051, 2009 WL 764559, at \*1 (E.D.N.Y. Mar. 20, 2009) (citing *e.g., Polk County v. Dodson,* 454 U.S. 312, 319, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981)). Similarly, "public defenders, including Legal Aid attorneys, court-appointed counsel and private attorneys do not act under the color of state law merely by virtue of their position." *Delarosa v. Serita,* 2014 WL 1672557, at \*3 (E.D.N.Y. Apr. 28, 2014); *see Rodriguez v. Weprin,* 116 F.3d 62, 65–66 (2d Cir.1997) (private attorney not a state actor by virtue of his appointment by the court to represent a defendant in a state criminal proceeding); *Brown v. Legal Aid Soc.,* 367 Fed.Appx. 215, 216 (2d Cir.2010) ("A 'public **\*329** defender does not act under color of state law when performing a lawyer's traditional functions as counsel to a defendant in a criminal proceeding.'") (quoting *Polk Cnty.,* 454 U.S. at 325, 102 S.Ct. 445); *Licari v. Voog,* 374 Fed.Appx. 230, 231 (2d Cir.2010) ("It is well established that private attorneys—even if the attorney was court appointed—are not state actors for the purposes of § 1983 claims") (citing *Rodriguez,* 116 F.3d at 65–66); *Shorter v. Rice,* No 12–CV–0111, 2012 WL 1340088, at \*4 (E.D.N.Y. Apr. 10, 2012) ("[N]either public defenders, such as Legal Aid attorneys, nor court-appointed counsel, nor private attorneys, act under the color of state law merely by virtue of their position[.]").

However, "an otherwise private person or entity," including private or "appointed defense counsel, can act 'under color of state law' if he or it engages in a conspiracy with state officials to deprive a person of his federal rights." *Brewster,* 349 F.Supp.2d at 546 (citing *Tower v. Glover,* 467 U.S. 914, 920, 104 S.Ct. 2820, 81 L.Ed.2d 758 (1984)); *see McClinton v. Suffolk Cnty. Police 3rd Precinct,* No. 12–CV–3777, 2014 WL 1028993, at \*4 (E.D.N.Y. Mar. 14, 2014); *Nealy,* 2009 WL 704804, at \*5. As discussed above, claims alleging conspiracies to violate civil rights must be pleaded with specificity and "[a]n otherwise invalid [Section] 1983 claim cannot survive a motion to dismiss merely by mentioning the word " 'conspiracy.' " " *Brewster,* 349 F.Supp.2d at 546. Rather, a plaintiff must allege: "(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello,* 292 F.3d at 324–25.

### a. Application to the Schlissel Firm

**\*\*25** **[73]** The Court finds that Plaintiff's pleadings are insufficient to support a conspiracy claim against the Schlissel Firm. Plaintiff does not allege that the Schlissel Firm acted jointly with a state actor or conspired with a state actor to deprive Plaintiff of some constitutional right, nor does he posit any factual allegations that would support such a claim. Rather, Plaintiff's submissions focus solely on the firm's allegedly negligent representation of him and the purported falsities it perpetrated before the court in his criminal proceedings. Accordingly, the Court respectfully recommends to Judge Bianco that Plaintiff's Section 1983 claims against the Schlissel Firm be dismissed.

### b. Application to Attorney Prime

**[74]** The Court similarly concludes that Plaintiff has not adequately pled a conspiracy claim against Attorney Prime. Plaintiff alleges, in essence, that Prime conspired with the DA's Office to derail Plaintiff's defense in order to protect the DA Office's from liability for alleged misconduct. According to Plaintiff, the DA's Office "hand-picked" Prime because he was formerly employed by the office and "was willing to try to sabotage [Plaintiff's] case to assist in insulating his former employer ... from being held accountable for malicious prosecution and covering up police misconduct." Compl. ¶ 21. Plaintiff alleges that, because Prime was "beholden" to the DA's Office, he refused to call or subpoena Renner as a witness in Plaintiff's criminal case, as doing so "would likely expose [the DA Office's] hidden agenda to cover up the obvious police misconduct." *Id.* However, Plaintiff's Complaint does not allege any specific facts indicating that an agreement existed between the DA's Office and Prime to act in concert to sabotage his criminal defense. In other words, Plaintiff has not alleged facts that "plausibly suggest a 'meeting of the minds,' " **\*330** *Bertuglia v. City of New York,* 839 F.Supp.2d 703, 728 (S.D.N.Y.2012), and his bare, implicit allegations that Prime was "beholden" to and acted as a "proxy" for the DA's Office are insufficient to support a conspiracy claim. *See Nealy,* 2009 WL 704804, at \*5. Therefore, the Court respectfully recommends to Judge Bianco that Plaintiff's Section 1983 claims against Attorney Prime be dismissed.

### 2. Legal Malpractice Claims

**[75]** In addition to his Section 1983 claims, Plaintiff raises state law claims for legal malpractice against the Attorney Defendants. Under 28 U.S.C. § 1367, which governs a federal court's exercise of supplemental jurisdiction, "[t]he district court may decline to exercise supplemental jurisdiction over a claim ... [if] the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3); *see Spiegel v. Schulmann,* 604 F.3d 72, 78 (2d Cir.2010). Indeed, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors [of judicial economy, convenience, fairness, and comity] will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988); *see Tops Markets, Inc. v. Quality Markets, Inc.,* 142 F.3d 90, 103 (2d Cir.1998) ("[W]hen all federal claims are eliminated in the early stages of litigation, the balance of factors generally favors declining to exercise pendent jurisdiction over remaining state law claims and dismissing them *without* prejudice.") (emphasis in original). Here, the Court has concluded that the ineffective assistance of counsel causes of action against the Attorney Defendants, which Plaintiff has mischaracterized as Section 1983 claims, must be dismissed for failure to state a claim under Rule 12(b)(6). Although the Attorney Defendants argue that Plaintiff's legal malpractice claims may be dismissed on the merits, "no exceptional circumstances exist in this case for the Court to decide these state law claims, and interests of judicial economy, convenience, comity and fairness to litigants are not violated by refusing to entertain these matters of state law in this case." *Nealy,* 2009 WL 704804, at \*10; *see, e.g., Nelson v. Brown,* No. 13–CV–3446, 2014 WL 4470798, at \*5 (E.D.N.Y. Sept. 10, 2014) (declining to exercise supplemental jurisdiction over state law legal malpractice claim where federal claims were dismissed under Rule 12(b)(6)). Accordingly, the Court recommends to Judge Bianco that the Court, in its discretion, decline to exercise supplemental jurisdiction over Plaintiff's state law claims and that those claims be dismissed without prejudice. [14]

14    The Court makes the same recommendation with respect to Plaintiff's state law claim for negligent supervision against TJX.

**\*\*26** For the foregoing reasons, the Court respectfully recommends to Judge Bianco that the motions to dismiss by the Schlissel Firm and Attorney Prime be GRANTED.

## VI. *LEAVE TO RE–PLEAD*

Although Plaintiff has not requested leave to amend his Complaint, the Court has considered whether Plaintiff should be given an opportunity to re-plead his various claims against the moving defendants. "When addressing a *pro se* complaint, a district court should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." **\*331** *Aquino v. Prudential Life & Cas. Ins. Co.,* 419 F.Supp.2d 259, 278 (E.D.N.Y.2005); *see also Thompson v. Carter,* 284 F.3d 411, 419 (2d Cir.2002) ("The liberal pleading standards applicable to *pro se* civil rights complaints in this circuit require that the district court give [plaintiff] an opportunity to flesh out his somewhat skeletal complaints before dismissing them"). A court should only deny a *pro se* plaintiff leave to amend when "it is 'beyond doubt that the plaintiff can provide no set of facts in support' of his amended claims." *Pangburn v. Culbertson,* 200 F.3d 65, 71 (2d Cir.1999) (quoting *Ricciuti v. N.Y. City Transit Auth.,* 941 F.2d 119, 123 (2d Cir.1991)).

Even under this liberal standard, however, the court may decline to provide the plaintiff with an opportunity to re-plead if the court finds that the plaintiff "cannot correct the defects in his federal claims" and therefore "any attempt to amend the pleading ... would be futile." *Shorter,* 2012 WL 1340088, at \*5; *see Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) ( "The problem with [plaintiff's] cause[ ] of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied."). To that end, denial of leave to amend on the basis of futility may be appropriate where a claim is dismissed (1) on sovereign immunity grounds, *see Dasrath v. Stony Brook Univ. Med. Ctr.,* 965 F.Supp.2d 261, 275 (E.D.N.Y.2013) ("Leave to amend would be futile with respect to the claims dismissed due to ... the [defendant's] Eleventh Amendment immunity."); *Temple v. N.Y.S Dep't of Taxation & Fin.,* No. 11–CV–0759, 2012 WL 503618, at \*9 (E.D.N.Y. Feb. 15, 2012); (2) because it is time-barred by the applicable statute of limitations, *see Apostolidis v. JP Morgan Chase & Co.,* No. 11–CV–5664, 2012 WL 5378305, at \*9 (E.D.N.Y. Nov. 2, 2012) ("[P]laintiff does not have any possibility of asserting plausible federal claims because dismissal is not based upon pleading deficiencies, but rather the applicable statute of limitations which cannot be remedied by any amendments."); *Mercedes v. AVA Pork Products, Inc.,*

No. 13–CV–3212, 2014 WL 1369611, at \*6 (E.D.N.Y. Apr. 8, 2014); *Nasso v. Bio Reference Labs., Inc.,* 892 F.Supp.2d 439, 455 (E.D.N.Y.2012); and/or (3) due to lack of state action under Section 1983, *see Shorter,* 2012 WL 1340088, at \*5; *Leogrande v. Erie Ins. Co. of N.Y.,* No. 11–CV–1319, 2011 WL 1528103, at \*4 (E.D.N.Y. Apr. 20, 2011) ("[W]here any amendment to the complaints would clearly be futile because of a lack of state action under Section 1983, dismissal without leave to re-plead is appropriate."); *Contes v. City of N.Y.,* No. 99 Civ. 1597, 1999 WL 500140, at \*11 (S.D.N.Y. July 14, 1999) ("It would be futile to grant leave to replead in this case. Without state action, which is lacking here, [plaintiff] cannot prevail on a claim pursuant to § 1983.").

**\*\*27** Based on the foregoing case law and the Court's analysis of Plaintiff s claims set forth *supra* in this Report and Recommendation, the Court recommends to Judge Bianco that Plaintiff's federal claims against all of the moving defendants be dismissed, without leave to replead, with the exception of Plaintiff's *Bivens* claims against Agent Gerbino in his individual capacity. Moreover, as previously discussed, the Court recommends that Plaintiff's state law claims be dismissed without prejudice.

## VII. *CONCLUSION*

Based on the foregoing information, the Court respectfully recommends to Judge Bianco that (1) the motion to dismiss brought by the State of New York be GRANTED and Plaintiff's claims be dismissed WITH PREJUDICE as against the State; (2) the motion to dismiss by the Federal Defendants be (a) GRANTED, in **\*332** part, and Plaintiff's claims against the Secret Service and Agent Gerbino in his official capacity be dismissed WITH PREJUDICE, and (b) DENIED, in part, as to Plaintiff's claims against Agent Gerbino in his individual capacity, and that Plaintiff be granted 30 days to serve the Summons and Complaint upon Agent Gerbino; (3) the motion to dismiss by the TJX Defendants be GRANTED and Plaintiff's federal claims against those defendants be dismissed WITH PREJUDICE; (4) the motion to dismiss by the Schlissel Firm be GRANTED and Plaintiff's federal claims against the law firm be dismissed WITH PREJUDICE; (5) the motion to dismiss by Attorney Prime be GRANTED and Plaintiff's federal claims against Prime be dismissed WITH PREJUDICE; and (6) Plaintiff's state law claims against TJX, the Schlissel Firm, and Attorney Prime be dismissed, WITHOUT PREJUDICE.

## VIII. *OBJECTIONS*

**Harrison v. New York, 95 F.Supp.3d 293 (2015)**

2015 WL 1413359

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections. *See also* FED. R. CIV. P. 6(a) and (e). Such objections shall be filed with the Clerk of the Court via ECF. Any objections being filed by a *pro se* litigant are to be sent by first-class mail to the Clerk of the Court. A courtesy copy of any objections filed is to be sent to the Chambers of the Honorable Joseph F. Bianco, and to the Chambers of the undersigned. Any requests for an extension of time for filing objections must be directed to Judge Bianco prior to the expiration of the fourteen (14) day period for filing objections. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Beverly v. Walker,* 118 F.3d 900, 901 (2d Cir.1997), cert. denied, 522 U.S. 883, 118 S.Ct. 211, 139 L.Ed.2d 147 (1997); *Savoie v. Merchants Bank,* 84 F.3d 52, 60 (2d Cir.1996).

**Defendants' Counsel is directed to serve a copy of this Report and Recommendation upon the *Pro Se* Plaintiff forthwith by overnight mail and first-class mail and to file proof of such service on ECF.**

**\*\*28  SO ORDERED.**

Dated: February 13, 2015.

**All Citations**

95 F.Supp.3d 293, 2015 WL 1413359

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 1340088

2012 WL 1340088
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Johnny F. SHORTER, Plaintiff,
v.
District Attorney Kathleen RICE, A.D.A. Irene
Angelakis, Michael D. Elbert, Esq., Defendants.

No. 12–CV–0111 (JFB)(ETB).
|
April 10, 2012.

MEMORANDUM AND ORDER

JOSEPH F. BIANCO, District Judge.

**\*1**  On January 5, 2011, incarcerated *pro se* plaintiff Jo
tony F. Shorter ("plaintiff") filed a complaint pursuant to
42 U.S.C. § 1983 ("Section 1983") against the defendants,
the Nassau County District Attorney Kathleen Rice ("DA
Rice"), Nassau County Assistant District Attorney Irene
Angelakis ("ADA Angelakis"), and Michael D. Elbert, Esq.
("Elbert"), along with an application to proceed *in forma
pauperis*. Upon review of plaintiff's application to proceed *in
forma pauperis,* the Court finds that plaintiff's financial status
qualifies him to commence this action without prepayment
of the filing fee. Accordingly, the application to proceed *in
forma pauperis* is granted pursuant to 28 U.S.C. § 1915.
However, for the reasons that follow, the complaint is *sua
sponte* dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B).
Specifically, plaintiff's federal claims against defendants DA
Rice and ADA Angelakis, as well as any federal claim against
defendant Elbert, are *sua sponte* dismissed in their entirety
with prejudice pursuant to 28 U.S.C. § 1915A. Further, the
Court declines to exercise supplemental jurisdiction over
plaintiff's purely state law claims in the absence of any
federal claims. Thus, any state claims are dismissed without
prejudice. Therefore, the complaint is dismissed in its entirety.

I. *THE COMPLAINT*

According to the brief complaint, submitted on the Court's
Section 1983 complaint form, plaintiff alleges that he was
arrested on October 22, 2010 and charged with criminal
possession of a weapon. Plaintiff claims that he pled guilty
to a felony charge for which he is currently serving a

three year prison term. (Compl. at ¶ IV). Relying on the
Nassau County Police Department Property Bureau Invoice
("Invoice"), which plaintiff has attached as Exhibit "A" to
the complaint, plaintiff claims that the charge should have
been brought as a non-felony. (Compl. at ¶ IV; Exhibit "A").
Plaintiff alleges that DA Rice and ADA Angelakis wrongfully
prosecuted the charge as a felony and that his criminal defense
attorney, defendant Elbert, encouraged plaintiff to enter a plea
of guilty to the felony charge. (Compl. at ¶ IV). Plaintiff
claims that Elbert withheld the Invoice from the plaintiff and,
had plaintiff had the Invoice, plaintiff would not have pleaded
guilty to the felony charge. (Compl. at ¶ IV). According to
the complaint, possession of the handgun in question is a non-
felony offense because there was no firing pin. (Compl. at ¶
IV). To support this allegation, plaintiff cites to an antiquated
section of the former New York Penal Law, N.Y. Penal Law
§§ 1897, 1897–b, [1] and a 1961 case that applied the former
statute, *People v. Grillo,* 15 A.D.2d 502, 222 N.Y.S.2d 630
(App.Div.1961). (Compl. at ¶ IV).

[1]     Penal Law § 1897, enacted in 1909 and amended
        in 1911, was repealed in 1963 and replaced with
        the current Penal Law sections governing weapons
        possessions offenses, N.Y. Penal Law §§ 265 *et
        seq. See* Note following Penal Law § 265.00
        (McKinney 2010).

In the section of the complaint that calls for injuries claimed
as a result of the events complained about, plaintiff states
that he suffers from mental anguish "due to the fact that I
was threatened to cop out to 3 years or get 15 years if I did
not cop to the 3 years." (Compl. at ¶ IV.A). Additionally,
plaintiff claims to have received no medical treatment for his
mental anguish. (Compl. at ¶ IV.A). As a result, plaintiff seeks
a damages award of five million ($5,000,000.00) dollars.
(Compl. at ¶ V).

II. *DISCUSSION*

A. *In Forma Pauperis Application*
**\*2**  Upon review of plaintiff's application, the Court finds
that plaintiff's financial status qualifies him to commence
this action without prepayment of the $350.00 filing fee. *See*
28 U.S.C. §§ 1914(a), 1915(a)(1). Accordingly, plaintiff's
application to proceed *in forma pauperis* is granted.

B. *Standard of Review for Sua Sponte Dismissal*

Under 28 U.S.C. § 1915A, a district court "shall review, before docketing, if feasible or, in any event, as soon as practicable after docketing, a complaint in a civil action in which a prisoner seeks redress from a governmental entity or employee of a governmental entity." 28 U.S.C. § 1915A. Upon review, a district court shall dismiss a prisoner complaint *sua sponte* if the complaint is "frivolous, malicious, or fails to state a claim upon which relief may be granted; or seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b); 28 U.S.C. § 1915(e)(2) (B); *see Abbas v. Dixon,* 480 F.3d 636, 639 (2d Cir.2007).

It is axiomatic that district courts are required to read *Pro se* complaints liberally, *see Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)); *Chavis v. Chappius,* 618 F.3d 162, 170 (2d Cir.2010), and to construe them " 'to raise the strongest arguments that [they] suggest[ ].' " *Chavis,* 618 F.3d at 170 (quoting *Harris v. City of New York,* 607 F.3d 18, 24 (2d Cir.2010)). Moreover, at the pleadings stage of the proceeding, the Court must assume the truth of "all well-pleaded, nonconclusory factual allegations" in the complaint. *Kiobel v. Royal Dutch Petroleum Co.,* 621 F.3d 111, 124 (2d Cir.2010); *see also Jackson v. Birmingham Bd. of Educ.,* 544 U.S. 167, 171, 125 S.Ct. 1497, 161 L.Ed.2d 361 (2005).

"[A]ny party or the court *sua sponte,* at any stage of the proceedings, may raise the question of whether the court has subject matter jurisdiction." *United Food & Commercial Workers Union, Local 919, AFL–CIO v. CenterMark Prop. Meriden Square, Inc.,* 30 F.3d 298, 301 (2d Cir.1994) (quoting *Manway Constr. Co. v. Hous. Auth. of Hartford,* 711 F.2d 501, 503 (2d Cir.1983) (internal quotation omitted)). Courts may also dismiss *sua sponte* claims that are barred by sovereign immunity or judicial immunity. *In re Camardo Law Firm, P.C. v. Dep't of the Army,* No. 5:09–CV–654 (FJS/GHL), 2010 WL 1935868, at *2 (N.D.N.Y. May 11, 2010) ("Although the parties do not address this point, the Court, at any time, can *sua sponte* raise the issue of subject matter jurisdiction or sovereign immunity." (citing *Grupo Dataflux v. Atlas Global Group, L.P.,* 541 U.S. 567, 593, 124 S.Ct. 1920, 158 L.Ed.2d 866 (2004) and *Warren v. United States,* No. 06–CV–0226S, 2009 WL 1663991, at *2 (W.D.N.Y. June 15, 2009)). Finally, it is not inappropriate for a court to dismiss a claim under Section 1983 where there is no conceivable basis to find that the defendant was a state actor. *See Sommer v. Rankin,* 449 F.Supp. 66, 67 (E.D.N.Y.1978) ("In this case, the claim of state action, which is essential to the invocation of [§ ] 1983,

is clearly frivolous. This court cannot believe that the Court of Appeals intended that *sua sponte* dismissal should be avoided even in cases such as this, where there is no conceivable basis for liability under § 1983. Accordingly, the court is of the opinion that in this particular case, such dismissal would not be inappropriate."); *see also Walton v. Breeyear,* No. 9:05–CV–0194 (LEK/DEP), 2007 WL 446010, at *5 n. 12 (N.D.N.Y. Feb.8, 2007); *Mendlow v. Seven Locks Facility,* 86 F.Supp.2d 55, 59 n. 1 (D.Conn.2000).

C. *Prosecutorial Immunity*

 **\*3** DA Rice and ADA Angelakis are entitled to absolute prosecutorial immunity from plaintiff's federal claims, which are for monetary damages. The Second Circuit has long held that:

> Absolute immunity affords "complete protection from suit," *Harlow v. Fitzgerald,* 457 U.S. 800, 807, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), because it gives "public officials entrusted with sensitive tasks a protected area of discretion within which to carry out their responsibilities," *Barr v. Abrams,* 810 F.2d 358, 361 (2d Cir.1987), so that they will not feel "constrained in making every decision by the consequences in terms of [their] own potential liability in a suit for damages," *Imbler v. Pachtman,* 424 U.S. 409, 424–25, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). The doctrine's nature "is such that it 'accords protection from ... any judicial scrutiny of the motive for and reasonableness of official action,' " *Shmueli v. City of New York,* 424 F.3d 231, 237 (2d Cir.2005) (quoting *Robinson v. Via,* 821 F.2d 913, 918 (2d Cir.1987)), even where the challenged conduct was motivated by a wrongful motive or even malice, *Bernard v. County of Suffolk,* 356 F.3d 495, 503 (2d Cir.2004) (citing *Cleavinger v. Saxner,* 474 U.S. 193, 199–200, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985)).

*In re NYSE Specialists Securities Litigation,* 503 F.3d 89, 95–96 (2d Cir.2007). Under federal law, prosecutors enjoy absolute immunity from liability in suits seeking monetary damages for acts carried out in their prosecutorial capacities, *i.e.,* those acts "intimately associated with the judicial phase of the criminal process," *Imbler,* 424 U.S. at 430, 96 S.Ct. 984, 47 L.Ed.2d 128; *see also Parkinson v. Cozzolino,* 238 F.3d 145, 150 (2d Cir.2001), but not for "those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than that of advocate." *Imbler,* 424 U.S. at 430–31, 96 S.Ct. 984, 47 L.Ed.2d 128. Absolute prosecutorial immunity applies, *inter alia,* when a prosecutor prepares to initiate and pursues a

prosecution, *see, e.g., Kent v. Cardone,* 404 F. App'x 540, 542–43 (2d Cir. Jan.5, 2011); *Peay v. Ajello,* 470 F.3d 65, 68 (2d Cir.2006), or engages in administrative duties that are directly connected with the conduct of atrial, *Van de Kamp v. Goldstein,* 555 U.S. 335, 342–43, 129 S.Ct. 855, 861–62, 172 L.Ed.2d 706 (2009).

Here, the challenged actions of DA Rice and ADA Angelakis fall squarely within the scope of their prosecutorial capacities. Accordingly, Plaintiff's claims against DA Rice and ADA Angelakis are barred by absolute prosecutorial immunity and are dismissed with prejudice as frivolous pursuant to 28 U.S.C. § 1915A. *See Collazo v. Pagano,* 656 F.3d 131 (2d Cir.2011).

### D. *Defendant Michael Elbert*

Plaintiff's remaining federal claim against defendant Elbert, who is alleged to have been his defense attorney in the underlying criminal, also cannot survive as a matter of law. As discussed below, any attempt to bring a Section 1983 claim against Elbert fails for lack of state action. Moreover, to the extent plaintiff seeks to bring a state law malpractice claim against defendant Elbert, the Court declines to exercise supplemental jurisdiction over that claim given the dismissal of the federal claims. [2]

[2]    There is no diversity jurisdiction over that claim because defendant Elbert, like plaintiff, is alleged to be a New York resident.

**\*4** Although it is unclear, to the extent that plaintiff is attempting to assert a Section 1983 claim against his defense attorney in the criminal case, such claim cannot survive as a matter of law because of a lack of state action. An individual acts under color of state law when he or she exercises power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Polk Cnty. v. Dodson,* 454 U.S. 312, 317–18, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981) (quoting *United States v. Classic,* 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941)). In the instant action, it is clear from the allegations of the complaint that defendant Elbert does not qualify as a state actor within the meaning of § 1983. To that end, it is axiomatic that neither public defenders, such as Legal Aid attorneys, nor court-appointed counsel, nor private attorneys, act under the color of state law merely by virtue of their position. *Polk Cnty.,* 454 U.S. at 325 (stating that a "public defender does not act under color of state law when performing a lawyer's traditional functions as counsel to a defendant in a criminal

proceeding"); *Grant v. Hubert,* No. 09–CV–1051, 2009 WL 764559, at \*1 (E.D.N.Y. Mar. 20, 2009) ("It is well settled that private attorneys do not act under color of state law and are not state actors simply by virtue of their state-issued licenses to practice law."); *see also Rodriguez v. Weprin,* 116 F.3d 62, 65–66 (2d Cir.1997) (affirming dismissal of § 1983 claim against court-appointed appellate attorney for alleged involvement in denial of speedy appeal and noting that "it is well-established that court-appointed attorneys performing a lawyer's traditional functions as counsel to defendant do not act 'under color of state law' and therefore are not subject to suit under 42 U.S.C. § 1983" (collecting cases)). Thus, plaintiff's federal claim against Elbert is both frivolous—because the legal theory on which it is based is "indisputably meritless"—and fails to state a claim for which relief can be granted because plaintiff cannot assert a plausible § 1983 claim against his attorney. [3] *See Kash v. Honey,* 38 F. App'x 73, 75–76 (2d Cir.2002) (concluding that there was no state action by a private lawyer who plaintiff alleged "maliciously, for purpose or purposes personal to him, including the purpose of penalizing [plaintiff] for exercising his First Amendment rights ... falsely charged [plaintiff] in an accusatory instrument"); *Licari v. Voog,* No. 08–4920–pr, 2010 WL 1647456, at \*1 (2d Cir. Apr.26, 2010) (affirming district court's *sua sponte* dismissal of § 1983 claim against defense attorney because claim was frivolous under § 1915(e) (2)(B)(i)).

[3]    The Court recognizes that state action can be demonstrated if the private party is part of a conspiracy with state actors. However, plaintiff has failed to articulate any allegations that would suggest that these alleged failures in performance by his attorney, even if accepted as true, could plausibly support a claim that his attorney was part of a conspiracy with the County defendants. In fact, plaintiff failed to allege that his attorney entered into an explicit or implicit agreement with any other named party to this lawsuit. Instead, he simply asserts his lawyer was ineffective. Moreover, as the Second Circuit has noted, generalized allegations of conspiracy "ring especially hollow" where, as here, the parties alleged to be part of the same conspiracy have an "adversarial relationship." *Ciambriello v. Cnty. of Nassau,* 292 F.3d 307, 324 (2d Cir.2002). Given the complete absence of anything allegations of conspiracy, the Section 1983 claims against his attorney cannot survive a motion to dismiss. *See also Green v. Bartek,*

No. 3:05CV1851 (SRU), 2007 WL 4322780, at *3 (D.Conn. Dec.7, 2007) (dismissing Section 1983 claim against plaintiff's appointed attorney in Family Court where, "[a]lthough [plaintiff] includes several statements regarding an alleged conspiracy, he includes no facts to support this claim"); *Brewster v. Nassau Cnty.,* 349 F.Supp.2d 540, 547 (E.D.N.Y.2004) (dismissing Section 1983 claim against Legal Aid Society where plaintiff alleged in a conclusory fashion that Legal Aid waived his rights and failed to adequately represent him in order to "benefit themselves and/or District Attorney," but did "not actually allege[ ] any facts indicating an agreement to act in concert to harm him"); *Hom v. Brennan,* 304 F.Supp.2d 374, 378–79 (E.D.N.Y.2004) (dismissing Section 1983 claim against supervising attorney with the Nassau–Suffolk Law Services because "plaintiff fails to allege with particularity what the alleged conspiracy is, the purpose of the conspiracy, who was involved in the conspiracy, the existence of an act in furtherance of the conspiracy, or that he was injured as a result of the conspiracy"); *Braxton v. Brown,* No. 96 CV 187, 1997 WL 43525, at *3 (E.D.N.Y. Jan.28, 1997) ("Notwithstanding the latitude afforded a *pro se* complaint, plaintiff fails to allege any facts supporting an inference that the Defense Attorney defendants colluded with the District Attorney defendants. While plaintiff's allegations might support a state law malpractice action against his former defense attorneys, they do not support a federal court's exercise of jurisdiction under Section 1983."). Moreover, based upon the allegations in the complaint, it is clear that plaintiff is alleging malpractice or ineffective assistance of counsel, rather than conspiracy. Thus, leave to re-plead would be futile.

### E. *No Leave to Re–Plead*

In dismissing plaintiff's federal claims, the Court has considered whether to dismiss the federal claims with prejudice, or grant leave to re-plead. Having reviewed the complaint, the Court declines to provide plaintiff with an opportunity to re-plead, because he cannot correct the defects in the federal claims.

**\*5** The Second Circuit has emphasized that "[a] *pro se* complaint is to be read liberally. Certainly the court should not dismiss without granting leave to amend at least once

when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation marks omitted). Under Rule 15(a) of the Federal Rules of Civil Procedure, "[t]he court should freely give leave [to amend] when justice so requires." Fed.R.Civ.P. 15(a)(2). However, even under this liberal standard, this Court finds that any attempt to amend the pleading in this case would be futile. *See Cuoco,* 222 F.3d at 112 ("The problem with [plaintiff's] cause[ ] of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied.") As discussed in detail *supra,* it is clear from the complaints that plaintiff does not have any possibility of asserting a plausible Section 1983 claim because of the application of the doctrine of absolute immunity to his federal claims against the prosecutors, and because of the lack of state action as to defendant Elbert. Thus, where any amendment to the complaints would clearly be futile, dismissal without leave to re-plead is appropriate. *See, e.g., Peterec–Tolino v. New York,* 364 F. App'x 708, 711 (2d Cir.2010) (affirming district court's *sua sponte* dismissal of § 1983 claims without leave to amend because, *inter alia,* certain defendants were not state actors and "[a]ny amendment would be futile"); *Wilson v. Wilson–Poison,* No. 09 Civ. 9810(PGG), 2010 WL 3733935, at *10 (S.D.N.Y. Sept.23, 2010) (leave to amend unwarranted because, *inter alia,* plaintiff could not allege state action under Section 1983); *Contes v. City of New York,* No. 99 Civ. 1597(SAS), 1999 WL 500140, at *11 (S.D.N.Y. July 14, 1999) ("It would be futile to grant leave to replead in this case. Without state action, which is lacking here, [plaintiff] cannot prevail on a claim pursuant to § 1983.").

### F. *Declining to Exercise Supplemental Jurisdiction over State Law Claims*

Having determined that plaintiff's federal claims are *sua sponte* dismissed, the Court concludes that retaining jurisdiction over any state law claims is unwarranted. 28 U.S.C. § 1367(c)(3); *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *see also McCluskey v. N.Y. State Unified Court Sys.,* No. 10–cv–2144, 2010 WL 2558624, at *7 (E.D.N.Y. June 17, 2010). "In the interest of comity, the Second Circuit instructs that 'absent exceptional circumstances,' where federal claims can be disposed of ... courts should 'abstain from exercising pendent jurisdiction.' " *Birch v. Pioneer Credit Recovery, Inc.,* No. 06–CV–6497T, 2007 WL 1703914, at *5 (W.D.N.Y. June 8, 2007) (quoting *Walker v. Time Life Films, Inc.,* 784 F.2d 44, 53 (2d Cir.1986)).

Therefore, in the instant case, the Court, in its discretion, " 'decline[s] to exercise supplemental jurisdiction' " over plaintiff's state law claims because "it 'has dismissed all claims over which it has original jurisdiction.' " *Kolari v. N. Y.-Presbyterian Hosp.,* 455 F.3d 118, 122 (2d Cir.2006) (quoting 28 U.S.C. § 1367(c)(3)); *see also Cave v. E. Meadow Union Free Sch. Dist.,* 514 F.3d 240, 250 (2d Cir.2008) ("We have already found that the district court lacks subject matter jurisdiction over appellants' federal claims. It would thus be clearly inappropriate for the district court to retain jurisdiction over the state law claims when there is no basis for supplemental jurisdiction."); *Karmel v. Claiborne, Inc.,* No. 99 Civ. 3608(WK), 2002 WL 1561126, at *4 (S.D.N.Y. July 15, 2002) ("Where a court is reluctant to exercise supplemental jurisdiction because of one of the reasons put forth by § 1367(c), or when the interests of judicial economy, convenience, comity and fairness to litigants are not violated by refusing to entertain matters of state law, it should decline supplemental jurisdiction and allow the plaintiff to decide whether or not to pursue the matter in state court.").

 **\*6** Accordingly, pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to retain jurisdiction over any remaining state law claims given the absence of any federal claims that survive.

III. *CONCLUSION*

For the reasons set forth above, plaintiff's federal claims against defendants DA Rice and ADA Angelakis, as well as any federal claim against defendant Elbert, are *sua sponte* dismissed in their entirely with prejudice pursuant to 28 U.S.C. § 1915A. Further, the Court declines to exercise supplemental jurisdiction over plaintiff's purely state law claims in the absence of any federal claims. Thus, any state claims are dismissed without prejudice. Therefore, the complaint is dismissed in its entirety. The Clerk of the Court shall enter judgment accordingly and close the case.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith and, thus, *in forma pauperis* status is denied for purposes of an appeal. *Coppedge v. United States,* 369 U.S. 438, 444–45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). The Clerk shall enter judgment accordingly and close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 1340088

---

2015 WL 710544
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

George O'DELL, Plaintiff,

v.

Charmaine BILL, Treatment Team Leader; Alvin Tucker,
S.C.T.A. # 1; Darian Frazier, S.C. T.A. # 11; Kristin
Woodlock, Acting Commissioner; Jeffrey Nowicki,
Chief of Mental Health Treatment Services; Dr. Terri
Maxymillian, Chief of Mental Health Treatment Services;
and Maureen Bosco, Acting Director, Defendants.

No. 9:13–CV–1275 (FJS/TWD).
|
Signed Feb. 18, 2015.

**Attorneys and Law Firms**

George O'Dell, Ogdensburg, NY, pro se.

Office of the New York, State Attorney General, Timothy P.
Mulvey, AAG, of Counsel, Syracuse, NY, for Defendants.

Hon. Eric T. Schneiderman, Attorney General for the State of
New York, Timothy P. Mulvey, Esq., of Counsel, Syracuse,
NY, for Defendants.

**ORDER**

SCULLIN, Senior District Judge.

**\*1** Currently before the Court are Magistrate Judge Dancks'
November 25, 2014 Report–Recommendation and Order, *see*
Dkt. No. 24, and Plaintiff's objections thereto, *see* Dkt. No.
27. In her Report–Recommendation and Order, Magistrate
Judge Dancks recommended that this Court grant Defendants'
motion to dismiss Plaintiff's complaint for failure to state a
claim as to the claims against Defendants Bill, Woodlock,
Nowicki, Maxymillian, and Bosco with leave to amend; deny
Defendants' motion to dismiss Plaintiff's complaint for failure
to state a claim as to the claims against Defendants Tucker and
Frazier; direct Defendants Tucker and Frazier to answer the
complaint; *sua sponte* dismiss Plaintiff's claim regarding New
York Mental Hygiene Law § 10.06(k) with leave to amend;
and grant Plaintiff thirty-days in which to file an amended
complaint. *See* Dkt. No. 24 at 16–17.

Plaintiff filed a document in response to Magistrate Judge
Dancks' Report–Recommendation and Order, which the
Court construes as his objections to the same. *See* Dkt. No.
27. Plaintiff makes no specific objection to any of Magistrate
Judge Dancks' recommendations; rather, it appears that his
intent is to present the Court with more evidence to support
his claim that his injuries are real and that Defendants Tucker
and Frazier failed to protect him from sustaining such injuries.

In light of the conclusory and general nature of Plaintiff's
objections, the Court has reviewed the record for clear error
and manifest injustice and, finding none, the Court hereby

**ORDERS** that Magistrate Judge Dancks' November 25, 2014
Report–Recommendation and Order is **ACCEPTED in its
entirety** for the reasons stated therein; and the Court further

**ORDERS** that Defendants' motion to dismiss Plaintiff's
complaint for failure to state a claim, *see* Dkt. No. 19,
is **GRANTED** as to the claims against Defendant Bill,
Woodlock, Nowicki, Maxymillian and Bosco **with leave to
amend;** and the Court further

**ORDERS** that Defendants' motion to dismiss Plaintiff's
complaint for failure to state a claim, *see* Dkt. No. 19, is
**DENIED** as to the claims against Defendants Tucker and
Frazier; and the Court further

**ORDERS** that Defendants Tucker and Frazier shall answer
Plaintiff's complaint within **twenty (20) days** of the date of
the filing of this Order; and the Court further

**ORDERS** that Plaintiff's claim under New York Hygiene
Law § 10 .06(k) is **DISMISSED** *sua sponte* **with leave to
amend;** and the Court further

**ORDERS** that, if Plaintiff wants to pursue one or more
of the claims that the Court has dismissed with leave to
amend, he must file an amended complaint. Any amended
complaint that Plaintiff files shall supersede and replace
the original complaint in its entirety; therefore, in any such
amended complaint, Plaintiff must include the claims against
Defendants Tucker and Frazier, which the Court did not
dismiss, if he wishes to proceed with those claims. In any
amended complaint that he files, Plaintiff must allege claims
of misconduct or wrongdoing against each named defendant
that Plaintiff has a legal right to pursue and over which this
Court may properly exercise jurisdiction. Furthermore, any

amended complaint that Plaintiff files must comply with the pleading requirements of Rules 8 and 10 of the Federal Rules of Civil Procedure. The Court advises Plaintiff that, if he does not file an amended complaint within **thirty (30) days** of the date of the filing of this Order, this case will proceed based solely on the claims that Plaintiff asserted against Defendants Tucker and Frazier in his original complaint; and the Court further

 **\*2  ORDERS** that the Clerk of the Court shall send Plaintiff a copy of his original complaint and the form complaint available for use by litigants in Section 1983 actions to assist Plaintiff in preparing an amended complaint; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

### REPORT–RECOMMENDATION AND ORDER

THÉRÈSE WILEY DANCKS, United States Magistrate Judge.

This pro se civil rights action,[1] commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Frederick J. Scullin, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff George O'Dell alleges that Defendants violated his constitutional rights by failing to protect him from another patient at the Central New York Psychiatric Center ("CNYPC"). (Dkt. No. 1 .) Currently pending before the Court is Defendants' motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 19.) For the reasons that follow, I recommend that Defendants' motion to dismiss be granted in part and denied in part and that the Court sua sponte dismiss Plaintiffs claim regarding New York Mental Hygiene Law section 10.06(k) with leave to amend.

[1]     Plaintiff in this action is not a prisoner, but an involuntarily committed patient under the New York Mental Hygiene Law. N.Y. Mental Hygiene Law art. 10 (McKinney 2014).

**I. BACKGROUND**

The following facts are derived from the face of the operative complaint and are accepted as true for the purposes of deciding the pending motion to dismiss. Erickson v. Pardus, 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007). Plaintiff was housed in ward 405 at CNYPC "from on or about 2012" through June 9, 2014. (Dkt. No. 1 at 5; Dkt. No. 23.) During the month of September 2013, Humberto Gonzalez, another resident at CNYPC, was brought to ward 405. (Dkt. No. 1 at 5.) Gonzalez had previously resided in ward 405 before he punched another resident "for no real known reason," broke the resident's jaw, and was sent to Oneida County Correctional Facility to serve a criminal sentence. Id.

The morning after his return to ward 405,[2] Gonzalez entered the day room, "started to call the residents of ward 405 all kinds of abusive, insultive names," and "began to tell the residents of ward 405, that he ... would punch and [break] anyone['s] ... jaw, like the last one he punched." (Dkt. No. 1 at 5.) Gonzalez further told the residents of ward 405 "how he [would] fight anyone o n[the] ward, from the biggest to the smallest, anyone that thinks he can fight," and that "he was going to watch sports, and if anyone don't like it, to come see him ... about that matter, and he will settle that matter." Id. Defendant Secure Care Treatment Aide Alvin Tucker then entered the day room and "began to tell everyone [ ] that Gonzalez wasn't threatening no one [and] how he (Tucker), didn't want anyone to write letters." Id. at 6.

[2]     Plaintiff's complaint (Dkt. No 1) describes these incidents as occurring over at least three days, while his response (Dkt. No. 21) describes the same incidents as occurring over two days.

Two days later, Gonzalez entered the mess hall and made threats similar to those he had made on his first morning back. (Dkt. No. 1 at 6.) Fifteen minutes later, Defendant Tucker entered the dining area and "began to state, how Gonzalez wasn't threatening no one, and Gonzalez wasn't going to fight, or beat up anyone." Id. Gonzalez then got up to leave and stated, "[e]veryone heard what I said, if [there] is anyone, come to me." Id.

 **\*3** Gonzalez continued to make similar threats against individual residents of ward 405. (Dkt. No. 1 at 6.) Defendant Tucker and Defendant Secure Treatment Aide Darian Frazier[3] continued to state that Gonzalez was not threatening anyone and that "they liked Gonzalez, as Gonzalez [would] stand up, and make sure they watch[ed]

sports." *Id.* Gonzalez was room restricted "several times" for threatening and approaching residents of ward 405. *Id.* However, neither Defendant Tucker nor Defendant Frazier made notes concerning Gonzalez's threats. [4] *Id.*

[3]     Plaintiff does not mention Defendant Frazier until this point in his complaint.

[4]     Plaintiff contradicts himself and alleges that Defendants Tucker and Frazier, "as well as many residents did [write] notes, and letters concerning being fearful for Gonzalez threatening everyone." (Dkt. No. 1 ¶ 9.)

Plaintiff notes that while Gonzalez was housed in ward 405, the entire ward went to recreation with ward 605. (Dkt. No. 1 at 7.) Ward 605 housed the resident that Gonzalez had previously punched in broken his jaw. *Id.* During these times, Gonzalez and the patient he previously punched would ride an elevator to the recreation yard and then be in the recreation yard together. *Id.* Plaintiff claims this was "[t]otally insane." *Id.*

One day, [5] Gonzalez was arguing with residents in ward 405 while Plaintiff sat in the back of the sun room reading magazines. (Dkt. No. 1 at 7.) At this time, the "staff [was] in the day room, and in the hallway that looks directly into the day room, and the sun room." (Dkt. No. 21 at 7. [6]) Plaintiff then "felt a heavy sha[rp] pain in [his] head." (Dkt. No. 1 at 7.) Plaintiff woke up with his head in bandages and was informed that Gonzalez had hit him on the head with a chair. *Id.* Plaintiff suffered "multiple pains in [his] head, ... pains in [his] neck, ... dizzy spells," and was light headed. *Id.* Plaintiff had a large laceration on the top of his head running from one side to the other. (Dkt. No. 1–3.) Plaintiff alleges that Gonzalez "split [ ] ... plaintiff's head open in several different areas." (Dkt. No. 21 at 2.)

[5]     Plaintiff does not specify the date on which Gonzalez hit him with the chair.

[6]     A pro se plaintiff's papers in response to a defendant's motion to dismiss for failure to state a claim may be considered as effectively amending the allegations of his complaint-to the extent those papers are consistent with the allegations in the complaint. *See Drake v. Delta Air Lines, Inc.,* 147 F.3d 169, 170 n. 1 (2d Cir.1998) (per curiam); *Gill v. Mooney,* 824 F.2d 192, 195 (2d

Cir.1987); *Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (Hurd, J.), *amended on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004) (Hurd, J.).

Plaintiff cites a report by the Commission on the Quality of Care (CQC) of the Office for People with Developmental Disabilities that describes "how multiple reports ... in [CNYPC have] never been filled out as required by staff, and [the] administration does not do anything about totally improper procedures." [7] (Dkt. No. 21 at 3.) Further, Plaintiff alleges that staff, including Defendants Tucker and Frazier, allowed residents to fight one another for periods of fourteen to eighteen minutes. *Id.* Defendants Tucker and Frazier took no "precautionary actions" toward preventing Gonzalez from punching residents, breaking the jaw of residents, or hitting Plaintiff with a chair. *Id.*

[7]     Plaintiff also states that as "the CQC Report by the Quality Care and Advocacy Agency clearly shows, the ... Central New York Psychiatric Center made [ ]and did minimum reports, but did not do any Documentations on Reported Staff assaults on Residents, and did not do any Investigations, or Investigation Reports, or file any documentation follow up reports on staff assaults on Residents." (Dkt. No. 21 at 4–5.)

Plaintiff filed this action on October 15, 2013, against Defendants Tucker, Frazier, Charmaine Bill (Treatment Team Leader), Kristin Woodlock (Acting Commissioner), Jeffrey Nowicki (Chief of Mental Health Treatment Services), Dr. Terri Maxmillian (Chief of Mental Health Treatment Services), and Maureen Bosco (Acting Director) for negligence, deliberate negligence, and deliberate indifference as violating his First, Fifth, Sixth, Eleventh, and Fourteenth Amendments rights. (Dkt. No. 1 at 1–4, 8.)

**\*4** Defendants now move to dismiss the complaint. (Dkt. No. 19.) Plaintiff has opposed the motion. (Dkt. No. 21.) Defendants have filed a reply. (Dkt. No. 22.)

## II. MOTION TO DISMISS

### A. Legal Standard Governing Motions to Dismiss for Failure to State a Claim

A defendant may move to dismiss a complaint on the ground that the complaint fails to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). In order to state a

claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not shown-that the pleader is entitled to relief." *Id.* at 679 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a pro se complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 555).

### B. Personal Involvement

Plaintiff names Charmaine Bill (Treatment Team Leader), Alvin Tucker (S.C.T.A. # 1), Darian Frazier (S.C.T.A.# 1), Kristin Woodlock (Acting Commissioner), Jeffrey Nowicki (Chief of Mental Health Treatment Services), Dr. Terri Maxymillian (Chief of Mental Health Treatment Services), and Maureen Bosco (Acting Director) as defendants. (Dkt. No. 1 at 1–3.) Defendants move to dismiss, arguing that Plaintiff has failed to allege facts plausibly suggesting their personal involvement. (Dkt. No. 19–1 at 3–5.) Defendants are correct as to Defendants Bill, Woodlock, Nowicki, Maxymillian, and Bosco.

Under Second Circuit precedent, " 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)).

In order to prevail on a § 1983 cause of action against an individual, a plaintiff must show some "tangible connection" between the unlawful conduct and the defendant. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). If the defendant is a supervisory official, a mere linkage to the unlawful conduct through the chain of command (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct. *Polk Cnty. v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (per curiam); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985) (per curiam). In other words, supervisory officials may not be held liable merely because they held positions of authority. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996) (citations omitted). Rather, supervisory personnel may be considered personally involved if they: (1) directly participated in the violation; (2) failed to remedy that violation after learning of it through a report or appeal; (3) created, or allowed to continue, a policy or custom under which the violation occurred; (4) had been grossly negligent in managing subordinates who caused the violation; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citations omitted).

**\*5** Here, Plaintiff alleges that Defendants Bill, Woodlock, Nowicki, Maxymillian, and Bosco violated his constitutional rights in their supervisory capacities. (Dkt. No. 1 at 8.) Nowhere in Plaintiff's complaint does he allege that Defendants Bill, Woodlock, Nowicki, Maxymillian, and Bosco were personally involved in failing to protect him from Gonzalez. (Dkt. No. 1.) Plaintiff does not mention these supervisory Defendants as having any tangible connection to Gonzalez, Gonzalez's behavior, the conduct of the aides present during the threats and during the injuring incident, or Plaintiff's injury. *Id.* Therefore, accepted as true and viewed in a light most favorable to Plaintiff, these facts do not plausibly suggest that Defendants Bill, Woodlock, Nowicki, Maxymillian, and Bosco were personally involved in a violation of Plaintiff's rights. Therefore, Plaintiff's complaint fails to state a cause of action against Defendants Bill, Woodlock, Nowicki, Maxymillian, and Bosco.

Where a pro se complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal

O'dell v. Bill, Not Reported in F.Supp.3d (2015)
Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 243 of 370
2015 WL 710544

quotation and citation omitted). However, an opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Id.* Here, Plaintiff fails to mention Defendants Bill, Woodlock, Nowicki, Maxymillian, and Bosco in his claims. This may be cured with more sufficient pleading of the facts. Therefore, Plaintiff's claims against Defendants Bill, Woodlock, Nowicki, Maxymillian, and Bosco should be dismissed with leave to amend.

Defendants argue that the complaint fails to sufficiently allege personal involvement by Defendants Tucker and Frazier. (Dkt. No. 19–1 at 4–5.) This argument is without merit. As discussed in more detail below, the complaint alleges facts plausibly suggesting that Defendants Tucker and Frazier personally violated Plaintiff's constitutional rights. Therefore, I recommend that the Court deny Defendants' motion to dismiss as to Defendants Tucker and Frazier.

**C. Failure to Protect**

Plaintiff claims that Defendants Tucker and Frazier violated his constitutional rights by failing to protect him from Gonzalez. (Dkt. No. 1 at 4.) Defendants Tucker and Frazier argue that this claim should be dismissed. (Dkt. No. 19–1 at 5–7.) For reasons discussed below, I recommend that Defendants' motion be denied.

A prisoner has a right under the Eighth Amendment to be protected from harm. To state an Eighth Amendment failure to protect claim, a prisoner must allege facts plausibly suggesting that (1) he was incarcerated under conditions posing a substantial risk of serious harm; and (2) prison officials exhibited deliberate indifference to that risk. *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Deliberate indifference is a conscious disregard of a substantial risk of serious harm. *Id.* at 835.

**\*6** Here, Plaintiff is not an incarcerated prisoner, but an involuntarily committed patient at a psychiatric center under the New York Mental Hygiene Law. (Dkt. No. 1 at 5.) The Second Circuit has yet to articulate the standard for a failure to protect claim alleged by an involuntarily committed patient. *Yeldon v. Sawyer,* No. 9:10–CV–266 (TJM/RFT), 2012 U.S. Dist. LEXIS 77043, at \*19–20, 2012 WL 1995839, at \*6 (N.D.N.Y. Apr.26, 2012) (citing *Lane v. Carpinello,* No. 9:07–CV–751 (GLS/DEP), 2009 U.S. Dist. LEXIS 88345, at \*18, 2009 WL 3074344, at \*61 (N.D.N.Y. Sept.24, 2009)).[8] The Supreme Court has held that involuntarily committed

patients have substantive due process rights. *Youngberg v. Romeo,* 457 U.S. 307, 315, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). In *Youngberg,* the Court noted that the right to personal security is a "historic liberty interest," and that "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed-who may not be punished at all-in unsafe conditions." *Youngberg,* 457 U.S. at 316 (citing *Ingraham v. Wright,* 430 U.S. 651, 673, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977)). *See also DeShaney v. Winnebago Cnty. Dep't Soc. Servs.,* 489 U.S. 189, 199–200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a duty to assume some responsibility for his safety and general well-being.").

8    The Court will provide Plaintiff with copies of all unpublished decisions cited herein in accordance with *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009) (per curiam). [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

The circuit courts have split as to the legal standard that should be applied to substantive due process claims alleged by involuntarily committed patients. Some circuits follow *Youngberg* and hold that the standard for determining whether an involuntarily committed patient's substantive due process rights have been violated is whether a "decision by [a] professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." 457 U.S. at 323. *See also Amnions v. Washington Dep't of Soc. & Health Servs.,* 648 F.3d 1020, 1027 (9th Cir.2011) (applying the professional judgment standard to Fourteenth Amendment claims alleged by involuntarily committed patients); *Lanman v. Hinson,* 529 F.3d 673, 684 (6th Cir.2008) (applying the professional judgment standard to Fourteenth Amendment claims alleged by involuntarily committed patients, but recognizing the application of the deliberate indifference standard for claims alleged against non-professionals); *Patten v. Nichols,* 274 F.3d 829, 838 (4th Cir.2001) (applying the professional judgment standard to Fourteenth Amendment claims alleged by involuntarily committed patients and rejecting the deliberate indifference standard for involuntarily committed patients); *Feagley v. Waddill,* 868 F.2d 1437, 1439–40 (5th Cir.1989) (applying the professional judgment standard to Fourteenth Amendment claims alleged by involuntarily committed patients). *Cf. Lavender v. Kearney,* 206 F. App'x 860 (11th Cir.2006) (interpreting *Youngberg*

as articulating a standard of deliberate indifference for Fourteenth Amendment claims alleged by involuntarily committed patients).

**\*7** Other circuits follow the Supreme Court's ruling in *County of Sacramento v. Lewis* which applied a "shocks the conscience" standard to all substantive due process claims involving an "abusive executive action." 523 U.S. 833, 846, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). *See Benn v. Universal Health Sys., Inc.,* 371 F.3d 165, 174 (3d Cir.2004) (applying the shocks the conscience standard to Fourteenth Amendment claims alleged by involuntarily committed patients); *Moore ex rel. Moore v. Briggs,* 381 F.3d 771, 773 (8th Cir.2004) (applying the shocks the conscience standard to Fourteenth Amendment claims alleged by involuntarily committed patients, but noting that "conduct *may* shock the conscience of federal judges only if [defendants] acted with 'deliberate indifference.' " (emphasis in original).); *Davis v. Rennie,* 264 F.3d 86, 99 (1st Cir.2001) (finding lower court did not err by declining to give a shocks the conscience instruction for a claim alleged by an involuntarily committed patient). Under this standard, "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Lewis,* 523 U.S. at 849. The Court noted that in a substantive due process claim under the Fourteenth Amendment by a pretrial detainee, deliberately indifferent conduct could shock the conscience. *Id.* at 849–50.

The Second Circuit has applied the professional judgment standard to substantive due process violations under the Fourteenth Amendment alleged by involuntarily committed patients against professionals. *Olivier v. Robert L. Yeager Mental Health Ctr.,* 398 F.3d 183, 188–89 (2d Cir.2005) (citing *Rodriguez v. City of New York,* 72 F.3d 1051, 1061–62 (2d Cir.1995)). The Supreme Court has defined a professional for purposes of the professional judgment standard as:

> a person competent, whether by education, training or experience, to make the particular decision at issue. Long-term treatment decisions normally should be made by persons with degrees in medicine or nursing, or with appropriate training in areas such as psychology, physical therapy, or the care and training of the retarded.

*Youngberg,* 457 U.S. at 323 n. 30.

However, the Second Circuit has not articulated whether to apply this standard to substantive due process violations under the Fourteenth Amendment alleged by involuntarily committed patients *against non-professionals.* District courts within the Second Circuit have distinguished cases applying the professional judgment standard found in *Youngberg* from cases where the defendants-such as psychiatric center aides-are "low-level staff members." *Vallen v. Carrol,* No. 02 Civ. 5666(PKC), 2005 U.S. Dist. LEXIS 20840, at \*25–26, 2005 WL 2296620, at \*8 (S.D.N.Y. Sept.20, 2005) (determining the defendant security hospital treatment assistants at Mid–Hudson Forensic Psychiatric Center were low-level staff members) .[9] *See also McChesney v. Hogan,* No. 9:08–CV–0563 (NAM/DEP), 2010 U.S. Dist. LEXIS 91681, at \*14–16, 2010 WL 3613806, at \*5 (N.D.N.Y. Aug.11, 2010) (citing *Vallen* to find that security hospital treatment assistants at Central New York Psychiatric Center were not professionals); *Dove v. City of New York,* No. 03–CV–5052 (JFB)(LB), 2007 U.S. Dist. LEXIS 18341, at \*23–25, 2007 WL 805786, at \*8 (E.D.N.Y. Mar.15, 2007) (acknowledging that both circuit and district courts have chosen to apply a standard of deliberate indifference to non-professionals as suggested in *Youngberg* ).

9     "Unlike the defendants in *Youngberg,* the defendants here are low-level staff members. The nature of such an employee immediately addressing patient-on-patient assault or theft differs significantly from higher-level decisions like patient placement and the adequacy of supervision. For the latter decisions, it is readily possible to apply a test based on professional judgment, practice or standards. In this case, professionals made none of the challenged decisions, and thus the ['professional judgment standard'] has no applicability." *Vallen,* 2005 WL 2296620 at \*8.

**\*8** Further, these district courts have acknowledged the potential standards for a substantive due process violation under the Fourteenth Amendment alleged by an involuntarily committed patient, but have largely declined to apply a specific standard, holding that the facts of their cases did not rise to the level of any possible standard. However, these district courts, acknowledging both the deliberate indifference standard and the professional judgment standard, have more often than not favored the deliberate indifference standard. *See Groves v. Davis,* No. 9:11–CV–1317 (GTS/RFT), 2012 U.S. Dist. LEXIS 25367, at \*12, 2012 WL

651919, at *3 (N.D.N.Y. Feb.28, 2012); *McChesney,* 2010 WL 3613806 at *6; *Lane,* 2009 WL 3074344 at *19; *Vallen,* 2005 WL 2296620 at *9 (also considering shocks the conscience standard); *Daniel H. ex rel. Hardaway H. v. City of New York,* 115 F.Supp.2d 423, 430 (S.D.N.Y.2000) (only considering deliberate indifference standard); *cf. Yeldon,* 2012 WL 1995839 at *7 (acknowledging both standards but declining to favor one); *Dove,* 2007 WL 805786 at *8 (acknowledging both standards but declining to favor one).

I am inclined to follow this trend of cases and apply the deliberate indifference standard to a substantive due process violation under the Fourteenth Amendment alleged by an involuntarily committed patient against a non-professional.

First, since aides have a duty to protect patients who are not currently incarcerated for punitive measures, the rights of these involuntarily committed patients rise to at least the same level as those inmates who are incarcerated for punitive measures-their Eighth Amendment rights. *See DeShaney,* 489 U.S. at 199–200; *see also Groves,* 2012 WL 651919 at *3 (applying the Eighth Amendment deliberate indifference standard to a claim by an involuntarily committed patient as if he were an inmate). Second, the burden of a shocks the conscience standard is an "unduly heavy burden" on a pro se plaintiff and "would be inconsistent with the state's central role in supervising and caring for the involuntarily committed." *McChesney,* 2010 WL 3613806 at *5 (citing *Vallen,* 2005 WL 2296620 at *9). Third, it is possible to analogize the rights of a pretrial detainee with those of an involuntarily committed patient, as both are not in state custody as a means of punishment for a conviction. The standard for analyzing a pretrial detainee's Fourteenth Amendment claim is deliberate indifference. *Bourdon v. Roney,* No. 9:99–CV–0769 (LEK/GLS), 2003 U.S. Dist. LEXIS 3234, at *28–29, 2003 WL 21058177, at *10 (N.D.N.Y. Mar.6, 2003).

A non-professional official acts with deliberate indifference if he "knows of and disregards an excessive risk to [patient] health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer,* 511 U.S. at 837; *see also McChesney,* 2010 WL 3613806 at *6 (using the Eighth Amendment deliberate indifference standard for a failure to protect claim made by an involuntarily committed patient under the Fourteenth Amendment).

*9 Here, Plaintiff alleges that Defendants Tucker and Frazier failed to protect him against patient Gonzalez who made threatening and insulting comments to other patients, including Plaintiff, in the presence of Defendants. (Dkt. No. 1 at 6–8; Dkt. No. 21 at 2–6.) Accepting the allegations of the complaint as true, Defendants Tucker and Frazier knew that patient Gonzalez posed a risk to Plaintiff and the other patients in CNYPC. Gonzalez had previously punched and broken the jaw of a patient, resulting in a criminal sentence at a correctional facility. (Dkt. No. 1 at 5.) Defendants Tucker and Frazier also knew that Gonzalez made repeated threats to the patients in ward 405, as they even told the patients to disregard these "threats." *Id.* at 6. Not only were Defendants Tucker and Frazier aware of Gonzalez's behavior, but they also made excuses for Gonzalez's behavior and even promoted it. *Id.* Plaintiff alleges that Defendants Tucker and Frazier allowed residents to fight for periods of time. (Dkt. No. 21 at 3.) Even when Gonzalez was room restricted for his threats, Defendants Tucker and Frazier failed to make notes of his behavior, suggesting they disregarded any risk to the other patients. (Dkt. No. 1 at 6–7 .)

Accepting the facts alleged by Plaintiff as true and construing them liberally for this pro se Plaintiff, the complaint alleges facts plausibly suggesting that Defendants Tucker and Frazier knew of the excessive risk of substantial harm posed by Gonzalez and disregarded it, ultimately failing to protect Plaintiff. Plaintiff has alleged facts plausibly suggesting that Defendants Tucker and Frazier failed to protect him. Therefore, I recommend Defendants' motion to dismiss for failure to state a claim for failure to protect be denied.

### III. NEW YORK MENTAL HYGIENE LAW CLAIM

Plaintiff attaches a set of arguments at the end of his complaint, entitled "continued of facts," that addresses the New York Mental Hygiene Law Section 10.06(k). (Dkt. No. 1–1.) Plaintiff explains the term of his criminal punishment, the expiration of the punishment, and his transfer to CNYPC. *Id.* at 1. Plaintiff further appears to name the Office of the Attorney General broadly, Attorney General Eric T. Schneiderman, and Assistant Attorney General James Williams as responsible for his unconstitutional imprisonment in CNYPC under New York Mental Hygiene Law Section 10.06(k). *Id.* at 4.

Plaintiff raises the claim that the New York Mental Hygiene Law Section 10.06(k) violates his due process rights under the Fourteenth Amendment. (Dkt. No. 1–1 at 1.) Defendants did not address this claim in their motion to dismiss. (Dkt. No.

19.) For the reasons discussed below, I recommend that the Court dismiss this claim sua sponte with leave to amend.

### A. Legal Standard

The Court may address a claim sua sponte. 28 U.S.C. § 1915(e) (2006) directs that when a person proceeds in forma pauperis, "the court shall dismiss the case at anytime if the court determines that ... the action ... (I) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2) When screening a complaint, the court has the duty to show liberality towards pro se litigants. *Nance v. Kelly,* 912 F.2d 605, 606 (2d Cir.1990) (per curiam). "[E]xtreme caution should be exercised in ordering sua sponte dismissal of a pro se complaint before the adverse party has been served and [the] parties have had an opportunity to respond." *Anderson v. Coughlin,* 700 F.2d 37, 41 (2d Cir.1983).

### B. Analysis

**\*10** Here, Plaintiff failed to list any of the named Defendants as involved in his claim involving New York Mental Hygiene Law Section 10.06(k). (Dkt. No. 1–1.) As described above, a defendant must have personal involvement in the violation of the plaintiff's rights. Here, Defendants named in the complaint had no personal involvement in the alleged violations under New York Mental Hygiene Law Section 10.06(k). Plaintiff may be able to amend this complaint to either show the named Defendants' direct involvement in these violations or to name new Defendants. Therefore, I recommend that the Court dismiss this claim sua sponte with leave to amend.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion to dismiss for failure to state a claim (Dkt. No. 19) be **GRANTED** with leave to amend as to Defendants Bill, Woodlock, Nowicki, Maxymillian, and Bosco, and **DENIED** as to Defendants Tucker and Frazier; and it is further

**RECOMMENDED** that Defendants Tucker and Frazier be directed to answer the complaint; and it is further

**RECOMMENDED** that Plaintiff be granted thirty days to file an amended complaint; and it is further

**ORDERED** that the Clerk provide Plaintiff with copies of *Yeldon v. Sawyer,* No. 9:10–CV–266 (TJM/RFT), 2012 U.S.

Dist. LEXIS 77043, 2012 WL 1995839 (N.D.N.Y. Apr.26, 2012), *Lane v. Carpinello,* No. 9:07–CV–751 (GLS/DEP), 2009 U.S. Dist. LEXIS 88345, 2009 WL 3074344 (N.D.N.Y. Sept.24, 2009), *Vallen v. Carrol,* No. 02 Civ. 5666(PKC), 2005 U.S. Dist. LEXIS 20840, 2005 WL 2296620 (S.D.N.Y. Sept.20, 2005), *McChesney v. Hogan,* No. 9:08–CV–0563 (NAM/DEP), 2010 U.S. Dist. LEXIS 91681, 2010 WL 3613806 (N.D.N.Y. Aug.11, 2010), *Dove v. City of New York,* No. 03–CV–5052 (JFB)(LB), 2007 U.S. Dist. LEXIS 18341, 2007 WL 805786 (E.D.N.Y. Mar.15, 2007), *Groves v. Davis,* No. 9:11–CV–1317 (GTS/RFT), 2012 U.S. Dist. LEXIS 25367, 2012 WL 651919 (N.D.N.Y. Feb.28, 2012), and *Bourdon v. Roney,* No. 9:99–CV–0769 (LEK/GLS), 2003 U.S. Dist. LEXIS 3234, 2003 WL 21058177 (N.D.N.Y.2003).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs. .,* 892 F.2d 15, 16 (2d Cir.1989) (per curiam)); 28 U.S.C. § 636(b)(1) (Supp.2013); Fed.R.Civ.P. 72, 6(a).

Dated Nov. 25, 2014.

2003 WL 21058177 Only the Westlaw citation is currently available. United States District Court, N.D. New York.

Ronald D. BOURDON, Plaintiff,

v.

Frank RONEY, New York State Trooper; Alfonso Ortega, New York State Trooper; William McEvoy, New York State Trooper; Dean Edwards, New York State Trooper; Anthony Larock, New York State Trooper; and Jeffrey Dorward, New York State Trooper; Defendants.

No. 9:99–CV–0769(LEK)GLS. | March 6, 2003.

### Attorneys and Law Firms

**\*11** Ronald Bourdon, Auburn Correctional Facility, Auburn, NY, Plaintiff, pro se.

Hon. Eliot Spitzer, Attorney General of the State of New York, Department of Law, The Capitol, Albany, New York, for the Defendants.

Roger W. Kinsey, Asst. Attorney General, of counsel.

### *REPORT–RECOMMENDATION and ORDER*

SHARPE, United States Magistrate Judge.

**\*1** This matter was referred to the undersigned for Report–Recommendation by the Honorable Lawrence E. Kahn, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rules N.D.N.Y. 72.3(c).

Plaintiff, *pro se* Ronald Bourdon ("Bourdon") alleges in his amended complaint that the defendants conspired to fabricate false evidence against him for the purpose of obtaining an "unlawful search warrant," destroying exculpatory evidence, and conducting an illegal search of his property. Bourdon also claims that the defendants used excessive force against him in the course of his arrest and subsequent interrogation, all in violation of his constitutional rights (*Dkt. No. 9; Am. Compl.*). Bourdon seeks substantial monetary damages.

Presently before the court is the defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56 (*Dkt. No. 48*). Bourdon filed a response (*Dkt. No. 72*). For the following reasons, this court recommends that summary judgment be granted in part and denied in part.

### I. *Summary Judgment Standard*

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. Fed.R.Civ.P. 56; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *see also, Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2502, 2510, 91 L.Ed.2d 202 (1986). At that point, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. *Id.*

### II. *Background*

Bourdon filed the present action on May 14, 1999. By Order filed August 11, 1999 ("August order"), District Judge Lawrence E. Kahn dismissed this action unless Bourdon filed an amended complaint within thirty days of the August order (*Dkt. No. 4*). Bourdon did not file an amended complaint. Bourdon appealed the August order to the Second Circuit Court of Appeals (*Dkt. No. 6*).

On May 17, 2000, the Second Circuit affirmed the dismissal of Bourdon's complaint as to "the judge, the prosecutors, the appointed attorneys, Broome County, and the government informer" (*Dkt. No. 8 at 3*). The Circuit held, however, that Bourdon was entitled to assert excessive force claims against the New York State Trooper defendants named in his original complaint as well as claims arising out of the search of his home and the seizure of property from his residence. *Id.*

**\*12** In accordance with the decision of the Second Circuit, on August 11, 2000, Bourdon filed an amended complaint (*Dkt. No. 9*).

### A. *Bourdon's Allegations*

\*2 On June 14, 1996, defendants Frank Roney ("Roney") and Alfonso Ortega ("Ortega") drafted an application to search Bourdon's home (*Am.Compl.,* ¶ 1). The application was based on information obtained from an informant whom Roney and Ortega "knew to be false and unreliable." The informant "harbored ill will against the plaintiff." *Id.* at ¶ 2. Roney and Ortega presented the application to Broome County Judge Patrick Mathews in bad faith and "intentionally misled the court with false information." *Id.* at ¶ 3. The search warrant application submitted by Roney and Ortega lacked "probable cause." *Id.* at ¶ 4. Thereafter, Judge Mathews issued a search warrant, without probable cause, permitting the search of Bourdon's home. The search of Bourdon's home was "motivated by malice and an intent to arrest and seize evidence." *Id.* at ¶ 9.

On June 14, 1996, Bourdon's home was searched pursuant to the warrant and Bourdon and another resident of the dwelling, John Verge, were arrested. *Id.* at ¶ 10. When Bourdon was arrested, "his wrists were cuffed with his palms facing outward to insure added pain and discomfort, the cuffs were [then] squeezed painfully tight." *Id.* at ¶ 13.Bourdon was placed in the back of a squad car which was parked in the sun. The car windows were closed and the inside of the car felt "like a greenhouse." *Id.* at ¶ 13.He remained in the hot car, in

2015 WL 710544

handcuffs, for three hours without water or the use of a toilet. *Id.* at ¶ 14.

At one point, Roney opened the car door and said that if Bourdon told him where the guns were he could have some water, use the toilet, have his handcuffs loosened, and sit outside on a bench near the house. *Id.* at ¶ 15.Bourdon denied having guns. Roney got angry and told Bourdon that he "could suffer until he was ready to talk." *Id.* at ¶ 15.At that point, Bourdon's wrists were blue, his right leg was numb, he had wet his pants, and he had severe pain in his lower back.

Defendants seized items not included in the warrant such as Bourdon's books, his daughter's photographs and family albums, and his father's hunting license. *Id.* at ¶¶ 17–18.Defendants searched Bourdon's red van, his jeep, and the wooded area surrounding Bourdon's home, all places not listed in the warrant. *Id.* at ¶ 20.Bourdon claims that the only vehicle mentioned in the search warrant was his white van. Bourdon claims that the defendants removed a briefcase from his red van, moved it to the white van, and "staged a fraudulent photograph that depicted [the briefcase] as being originally found in the white van." Defendants also removed some items from the briefcase and placed them in Bourdon's home and then pretended that the items were originally found in the home. *Id.* at ¶ 20.Defendants later used the documents found in the briefcase to obtain an indictment against Bourdon. *Id.* The search ended at 9:35 p.m. Bourdon's home was left "in shambles." *Id.* at ¶ 21.

**\*13  \*3** During the search, defendants seized and improperly disposed of exculpatory evidence, specifically Bourdon's father's valid hunting license which was found in the same closet with the seized guns. The valid hunting license was never included in the inventory list of the items seized. *Id.* at ¶ 23.

After the search, Bourdon was taken to the state trooper barracks for interrogation. Bourdon's shoes were taken away and he was forced to stand barefoot on the cold cement floor "with one wrist painfully chained to a wall for another three hours." *Id.* at ¶ 22.Roney and Jeffrey Dorward ("Dorward") interrogated Bourdon, "inflicting pain and threats to obtain information." *Id.*

The defendants also "coerced" John Verge into providing information during an "unconstitutional interrogation." Based upon this information, the defendants returned to Bourdon's home three hours later and seized his father's guns from the rafters of the home. *Id.* at ¶ 24.

Bourdon claims that the defendants deliberately withheld evidence, conducted another illegal search of his home on the following day and seized more evidence, then "unlawfully combined all of the evidence as being seized on June 14, 1996." *Id.* at ¶ 25.Bourdon claims that the defendants violated his right to due process, to be free from unreasonable search and seizure and false arrest, and to be free from the use of excessive force in the course of an arrest.

**B. *Defendants' Affidavits***

**1. *Defendant Roney***

Roney states that on June 12, 1996, his barracks received a citizen's complaint against Bourdon that he had physically harassed two women and "brandished a handgun" (*Dkt. No. 49; Roney Aff. at ¶¶ 3–4* ). The complainants and Paul Mollis ("Mollis"), a friend of Bourdon's, each gave written statements to the state police. *Id.* at ¶ 5–6; *see also, Ex. A (copy of the Investigation Report), pp. 6–11 & 29–37*. Mollis told the state police that he had been to Bourdon's home several times over the last year and had seen weapons there. Mollis stated that on June 13, 1996, he saw Bourdon near his white van with a pistol in his hand (*Roney Aff., Ex. A, pp. 13–16* ). On June 13, 1996, Roney went to Bourdon's home and Bourdon identified himself as "John Verge" (*Roney Aff., ¶ 11* ).

Based upon Roney's investigation and the statements given, Roney and Ortega prepared a search warrant application (*Roney Aff., ¶ 8; see also, Id., Ex. A, pp. 39–45* ). Judge Mathews determined that probable cause existed and issued a search warrant on June 14, 1996 (*Roney Aff., ¶ 9; Id., Ex. A, pp. 65–67* ).

On June 14, 1996, the defendants executed the search warrant at Bourdon's home. Bourdon again identified himself as "John Verge" and was thereafter arrested for second degree criminal impersonation. Defendant LaRock handcuffed Bourdon and placed him in a patrol car.

Roney states that at one point he asked Bourdon to tell him where the guns were located (*Roney Aff., ¶ 19* ). At some point, McEvoy took Bourdon to the woods, removed the handcuffs and allowed him to urinate. McEvoy then reapplied the cuffs and placed Bourdon in another patrol car. *Id.* at ¶¶ 19–21. The search stopped when it became too dark to work, and LaRock was assigned to guard the site for the night. *Id.* at ¶¶ 24–25.

**O'dell v. Bill, Not Reported in F.Supp.3d (2015)**
Case 5:24-cv-01237-DNH-MJK   Document 10   Filed 11/12/24   Page 249 of 370
2015 WL 710544

**\*14  \*4** Bourdon was brought to the police barracks and secured to a "bull ring" which Roney describes as a ring secured in the wall. One of Bourdon's handcuffs was attached to the bull ring. Bourdon was brought from the holding area to Roney's office several times. Each time, his shoes were removed because Bourdon was considered an escape risk. *Id.* at ¶¶ 27–28.

During Verge's interrogation on June 14, 1996, he told Dorward about a "secret compartment" in Bourdon's home. *Id.* at ¶ 29; *see also, Ex. A, pp. 22, 49–50.* McEvoy returned to the secured search area, located the secret compartment and found a shotgun, a rifle, and a handgun (*Roney Aff., ¶ 37; Id., Ex. A, pp. 23–26* ). Bourdon was then arraigned on felony charges of criminal possession of a weapon and criminal possession of forged instruments (*Roney Aff., ¶ 38* ).

**2. *Defendants Edwards and LaRock***

Edwards and LaRock stated that on the day the search warrant was executed, Bourdon falsely identified himself as John Verge. He was arrested for second degree criminal impersonation (*Dkt No. 51; Edwards Aff., ¶¶ 3–7; Dkt. No. 52; LaRock Aff., ¶¶ 1–7* ). LaRock stated that after Bourdon's arrest, he handcuffed Bourdon and put him in a patrol car. LaRock was assigned to guard the search area overnight when it became too dark to continue. Later in the evening, McEvoy returned to the search site and located a secret compartment in Bourdon's home wherein he found a rifle, a shotgun, and a **pistol** (*LaRock Aff., at ¶¶ 15–17* ).

**3. *Defendant McEvoy***

McEvoy stated that about two hours after the search began, he escorted Bourdon to the woods and allowed him to urinate (*Dkt. No. 53; McEvoy Aff., ¶¶ 3–5; see also, Id., Ex. B, Bourdon's Dep. at 79:13* ). McEvoy stated that after the search was stopped for the night, he returned to the site, located a secret compartment and found a shotgun, a rifle, and a pistol (*McEvoy Aff., ¶¶ 7–9* ).

**4. *Defendant Dorward***

Dorward stated that after the search stopped for the night, he interrogated John Verge who told him that there was a "secret compartment" in Bourdon's home (*Dorward Aff., at ¶ 15; Dkt. No. 54* ). Verge signed, in Dorward's presence, a four page statement which included information about the secret compartment. *Id.* at ¶16; *see also, Id., Ex. A, pp. 22, 49–52.*

**5. *Defendant Ortega***

Ortega stated that on June 14, 1996, he helped Roney prepare a search warrant application for Bourdon's home, vehicles and premises (*Dkt. No. 55; Ortega Aff, ¶ 3* ). Ortega stated that on that same day, he was present when Roney "affirmed" the application in the presence of Judge Mathews.

**III. *Collateral Estoppel***

Under the full faith and credit statute, federal courts must give preclusive effect to state court judgments whenever the courts of the State in which the judgment was entered would do so. *Hickerson v. City of New York,* 146 F.3d 99, 103 (2d Cir.l998) (citing *inter alia Allen v. McCurry,* 449 U.S. 90, 96, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980)). New York law provides that an issue may not be relitigated if the identical issue was "lnecessarily decided in a previous proceeding, provided that the party against whom collateral estoppel is being asserted had a full and fair opportunity to litigate the issue in the prior action." *Id.* at 104 (citations omitted). The party opposing the application of collateral estoppel has the burden of proving that he was denied the full and fair opportunity to litigate the issue or issues in question. *Id.* at 109 (citing *In re Sokol,* 113 F.3d 303, 306 (2d Cir.1997); *Kaufmann v. Eli Lilly & Co.,* 65 N.Y.2d 449, 456, 482 N.E.2d 63–67, 492 N.Y.S.2d 584, 588 (1985)).

**\*15  \*5** A determination of whether the party opposing collateral estoppel had a full and fair opportunity to litigate involves considering the "realities of the prior litigation," including circumstances which may have had the practical effect of discouraging a party from fully litigating an issue. *Id.* (citing *Ryan v. New York Telephone Co.,* 62 N.Y.2d 494, 501, 467 N.E.2d 487, 491, 478 N.Y.S.2d 823, 827 (1984). The factors to be considered include the nature of the forum and the importance of the claim in the prior litigation, the incentive and initiative to litigate, the actual extent of the litigation, and the competence and expertise of counsel. *Id.*

**A. *The Search Warrant***

The Fourth Amendment forbids "unreasonable searches and seizures" of a person's "papers [ ] and effects" and requires that any search warrant be supported by "probable cause." U.S. Const. Amend. IV. The existence of probable cause is a complete defense to a claim that plaintiff's Fourth Amendment rights have been violated because the search warrant was obtained unlawfully. *DeFelice v. Ingrassia,* 210 F.Supp.2d 88, 92 (D.Conn.2002).

Bourdon claims that the search warrant was not based upon probable cause and therefore the warrant was unreasonable and constitutionally infirm. Specifically, Bourdon claims that the search warrant application prepared by Roney and Ortega was (a) based upon information obtained from an unreliable informant that they knew to "harbor[ ] ill will against the plaintiff (*Am. Compl .*, ¶ 2); and, (b) presented to the Broome County Court "in bad faith" because it contained intentionally misleading and false information. *Id.* at ¶ 3.

As stated above, the party seeking the benefit of collateral estoppel has the burden of showing the identity of the issues, and the party opposing the application of collateral estoppel has the burden of showing that he did not have a full and fair opportunity to litigate the claims in the prior action. *D'Andrea v. Hulton,* 81 F.Supp.2d 440, 443 (W.D.N.Y.), *adopted by* 1999 U.S. Dist. LEXIS 20701 (W.D.N.Y. Dec. 17, 1999) (citing *inter alia Khandhar v. Elfenbein,* 943 F.2d 244, 247 (2d Cir.1991)). In order to find identity of issues, the court must find that the issue to be decided in the second action was material to the first action and essential to the decision in the first action. *Id.* The court must also find that a different judgment in the second action would destroy or impair rights or interests established by the first action. *Id.* (citing *Schuylkill Fuel Corp. v. B. & C. Nieberg Realty Corp. Inc.,* 250 N.Y. 304, 307, 165 N.E. 456 (1929)).

Defendants argue that the validity of the search warrant and, in particular, the presence of probable cause to issue the warrant, have already been litigated twice by Bourdon in state court. First, at a suppression hearing and again, upon appeal of Bourdon's conviction; therefore, he may not litigate the issues again.

**\*16   \*6** Bourdon previously argued in state court that "the warrant was not supported by probable cause in that it relied upon an application from which there were material omissions, and which contained false statements by Roney, and information supplied by an informant who was not reliable." See *People v. Bourdon,* 258 A.D.2d 810, 811, 686 N.Y.S.2d 162 (3d Dep't 1999). The state court determined that probable cause did exist to issue the warrant and thus, the warrant was properly issued. *Id.* at 812, 686 N.Y.S.2d 162.Bourdon's attempt to relitigate the very same issues in this court must fail.

Because the state court has already decided that there was probable cause to issue the search warrant and Bourdon had a full and fair opportunity to argue this issue in state court, this court recommends that the defendants' motion for summary

judgment be granted as to Bourdon's claim that the warrant was illegally issued.

**B.** *Search and Seizure*

The Fourth Amendment requires that search warrants "particularly describe[e] the place to be searched, and the persons or things to be seized."

Bourdon claims that the search conducted in accordance with the warrant was unreasonable because it exceeded the scope of the warrant. Bourdon argues that the search was unreasonable because the defendants searched places not specifically identified in the search warrant. The warrant permitted the defendants to search Bourdon's person, his residence and any unattached structures, a white 1983 GMC van registered to him, any vehicle that he is found to be present in, and any person in Bourdon's residence or in any vehicle with Bourdon (*Dkt. No. 49 at 65–67* ). Bourdon claims that the defendants searched his "second van, his jeep, and property surrounding his home, and a trailer" and seized items not specifically listed in the search warrant.

Defendants argue in conclusory fashion that the issues concerning the actual search and seizure have been fully litigated in state court. They offer no evidence to support this argument.

This court is unable to determine the reasonableness of the search and seizure or whether this claim is barred by collateral estoppel. Accordingly, without addressing the merits of this claim, the court recommends that the defendants' motion for summary judgment be denied, without prejudice, as to Bourdon's claim that the search and seizure was unconstitutionally executed. Defendants are granted permission to file a renewed motion for summary judgment on this issue which must be filed within forty-five days following a final decision by the District Judge on this motion for summary judgment. Any renewed summary judgment motion filed by the defendants must include a full presentation of the record of Bourdon's underlying state court proceedings including, but not limited to, any state court decision made at Bourdon's suppression hearing, a complete transcript of Bourdon's suppression hearing, and any briefs or other relevant papers filed by him on appeal.

**C.** *Fifth Amendment Claim*

**\*17   \*7** The Fifth Amendment, made applicable to the states through the Fourteenth Amendment, provides in part that "[n]o person ... shall be compelled in any criminal case to

be a witness against himself." U.S. CONST. Amend. V. It guarantees "the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty ... for such silence." *Malloy v. Hogan,* 378 U.S. 1, 8, 84 S.Ct. 1489, 1493–94, 12 L.Ed.2d 653 (1964).

Bourdon claims that while subject to custodial interrogation, he was cuffed to the wall in a standing position for hours and forced to stand on a cold cement floor without shoes. Bourdon claims that he did not want to talk but the defendants continued to question him. At his deposition, he claimed that the defendants threatened him with "a long term incarceration" if he didn't reveal where his guns were. He also claimed that Dorward threatened that he "better cooperate with Roney, because Roney gets very upset" (*Dkt. No. 50, Dep. at 104* ). Bourdon asserts a claim for violation of the constitutional privilege against self-incrimination.

"Even if it can be shown that a statement was obtained by coercion, there can be no Fifth Amendment violation until that statement is introduced against the defendant in a criminal proceeding ... [t]o constitute a Fifth Amendment violation 'use of the [coerced] statement at trial is not required,' but that there must be some 'use or derivative use of a compelled statement at any criminal proceeding against the declarant.' " *Deshawn v. Safir,* 156 F.3d 340, 346–47 (2d Cir.1998) (internal citations omitted).

Since Bourdon admitted at his deposition that he made no statement to police during interrogation (*Dkt. No. 50, Dep. at 123* ), he cannot prove a necessary element of the Fifth Amendment violation, namely "use or derivative use of a compelled statement" against himself. Since Bourdon alleges no injury, this Court recommends the dismissal of Bourdon's Fifth Amendment claim.

## IV. *False Arrest*

"The right to be free from arrest or prosecution in the absence of probable cause is a long established constitutional right." *Ricciuti v. N.Y.C. Transit Authority,* 124 F.3d 123, 128 (2d Cir.1997). In order to state a claim for false arrest under the federal constitution, plaintiff must show that he was arrested without probable cause. *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 569 (2d Cir.1996) (citing *Broughton v. New York,* 37 N.Y.2d 451, 456, 335 N.E.2d 310, 313, 373 N.Y.S.2d 87, 93 (1975)). Probable cause exists when the arresting officer has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant v. Okst,*

101 F.3d 845, 852 (2d Cir.1996). In assessing the existence of probable cause, the court must consider the facts available to the officer at the time of the arrest and immediately before it. *Lowth,* 82 F.3d at 569. The existence of probable cause is a complete defense to an action for false arrest, even if the plaintiff is subsequently acquitted of the charges, because probable cause constitutes justification for the arrest. *Weyant,* 101 F.3d at 852 (citing *Bernard v. United States,* 25 F.3d 98, 102 (2d Cir.1994)). In deciding whether probable cause to arrest exists, a police officer is entitled to rely on the victim's allegations that a crime has been committed. *Martinez v. Simonetti,* 202 F.3d 625, 634 (2d Cir.2000) (citing *Singer v. Fulton County Sheriff,* 63 F.3d 110, 119 (2d Cir.1995)). A police officer is also entitled to rely on the allegations of fellow police officers. *Martinez,* 202 F.3d at 634 (citing *Bernard v. U.S.,* 25 F.3d 98, 102–03 (2d Cir.1994)). The evidence needed to establish probable cause is less than that necessary to support a conviction. *Krause v. Bennett,* 887 F.2d 362, 370 (2d Cir.1989). Probable cause may be determined on the law on a motion for summary judgment if there is no dispute as to the pertinent events and the knowledge of the police officer. *Weyant,* 101 F.3d at 852.

**\*18**  **\*8** Bourdon contends that his arrest on the night of June 14, 1996, was without probable cause. Because this court finds that the defendants had probable cause to arrest Bourdon and that Bourdon was eventually convicted, the false arrest claim fails.

Roney states that on June 13, 1996, he went to Bourdon's home and spoke to a man who identified himself as John Verge (*Roney Aff., ¶ 11* ). Unbeknownst to Roney, the man was actually Bourdon. On June 14, 1996, the date of Bourdon's arrest and search of his home, Roney spoke to Bourdon who again identified himself as John Verge. Roney held out two photographs of Ronald Bourdon for Bourdon's inspection. Bourdon affirmed that the photos were of Ronald Bourdon but persisted in holding himself out to be John Verge. *Id.* at ¶¶ 12–14.Roney, knowing the man he was conversing with was actually Bourdon, arrested Bourdon for second degree criminal impersonation. *Id.* at ¶ 16; *see also, Edwards Aff., ¶¶ 4–7; LaRock Aff., ¶¶ 1–7; and Dorward Aff., ¶¶ 1–7.* In his own affidavit, Bourdon admits that when Roney spoke to him on June 13, 1996, Bourdon "lied and said that he [Bourdon] was not Mr. Bourdon, and that he [Mr. Bourdon] was not home" (*Dkt No. 72; Bourdon Aff., ¶ 9* ). Bourdon admitted that when he was asked for identification, he produced "a New York State drivers license with his photo on the license, in the name of John Verge." *Id.* at ¶ 10.Bourdon further testified that "[d]efendants Roney and Dorward were unaware

that they were being duped by him, and that he was really Mr. Bourdon and not John Verge." *Id.* at ¶ 11.Additionally, Bourdon testified at his deposition that (a) he possessed a driver's license in the name of John Verge which had his picture on it; and, (b) that on June 13, 1996, he falsely identified himself to Roney as John Verge and offered the false driver's license in support of his claim. *Dep. at 35–36 & 55–56.* Bourdon was arrested for second degree criminal impersonation following his second conversation with Roney.

New York Penal Law § 190. 25(1) provides: "A person is guilty of criminal impersonation in the second degree when he [i]mpersonates another and does an act in such assumed character with intent to obtain a benefit or to injure or defraud another." Conviction of this crime requires proof that the defendant impersonated a real person and not simply used some fictitious or assumed name. *People v. Sadiq,* 236 A.D.2d 638, 654 N.Y.S.2d 35 (N.Y.App.Div.), appeal denied sub nom., *People v. Sikandar,* 89 N.Y.2d 1100, 682 N.E.2d 995, 660 N.Y.S.2d 394 (1997). The "benefit" contemplated by the statute prohibiting criminal impersonation need not be monetary but may consist of the desire to avoid apprehension or prosecution. *People v. Sherman,* 116 Misc.2d 109, 455 N.Y.S.2d 528 (Rochester City Court, Monroe County 1982).

In light of Bourdon's own admission that on June 13, 1996, he willingly and knowingly identified himself as "John Verge", a real person, and produced a driver's license containing fraudulent information in support of this claim for the ostensible purpose of misleading the state police, it is absurd that he now argues that there was no probable cause to arrest him. Moreover, an officer is not required to make a full investigation of the surrounding circumstances prior to taking action. "Once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Ricciuti,* 124 F.3d at 128. Roney's version of the events is believable and his credibility is bolstered by the fact that Bourdon admitted to the very behavior for which he was arrested. Bourdon has not provided information or evidence to contest the defendants' allegations concerning probable cause. Under the circumstances, because probable cause is determined based upon the information available to the officer at the time of the arrest, the officers had a reasonable basis for believing there was probable cause to arrest Bourdon on June 14, 1996.

**\*19 \*9** In any event, Bourdon was ultimately convicted of second degree criminal impersonation. *See People v. Bourdon,* 258 A.D.2d 810, 686 N.Y.S.2d 162 (3d Dep't 1999).

The Second Circuit has held that a plaintiff's conviction prevents his recovery on a § 1983 claim for false arrest. *Cameron v. Fogarty,* 806 F.2d 380, 387 (2d Cir.l986). "Where the civil rights plaintiff has been convicted of the offense for which he was arrested, we have in effect accepted the fact of that conviction as conclusive evidence of good faith and reasonableness of the officer's belief in the lawfulness of the arrest." *Id.* at 388.Evidence of a conviction is a complete defense to a § 1983 action for false arrest. *Id.* at 388–89.

Since probable cause and Bourdon's conviction are each a defense to a false arrest claim, this court recommends the dismissal of Bourdon's false arrest claim.

**V. *Excessive Force Claim***

The Supreme Court has made it clear that excessive force used by officers during an arrest violates the Fourth Amendment which guarantees citizens the right to be free from unreasonable seizures of the person. *Graham v. Connor,* 490 U.S. 386, 394, 1098 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989). "To establish a Fourth Amendment excessive force claim, a plaintiff must show that the force used by the officer was, in light of the facts and circumstances confronting him, 'objectively unreasonable' under Fourth Amendment standards." *Horton v. Town of Brookfield,* 98CV01834, 2001 WL 263299 (D.Conn.2001) (citing *Finnegan v. Fountain,* 915 F.2d 817, 823 (2d Cir.1990) (other citation omitted).

Bourdon complains that he was handcuffed for three hours while the search was conducted. He was also handcuffed, sometimes to a wall, at the police barracks for an additional two to three hours (*Dkt. No. 50; Dep. at 105–110* ). During his time in the patrol car, the defendants were actively involved in executing the search warrant and Bourdon was left alone in the car. The defendants admit that Bourdon was later cuffed to the wall at the police barracks. However, Roney explains that this is "the only holding area available in the Troop Barracks" (*Roney Aff. at 3* ). He also explains that this system, referred to as a bull ring, is commonly used at troopers' barracks throughout the state. *Id.* at 3.

Handcuffing has been found to give rise to a claim of excessive force where an individual suffers an injury as a result of being handcuffed. *Gonzales v. City of New York,* 98–CV–3084, 2000 WL 516682, at \*4 (E.D.N.Y. March 7, 2000); *Simpson v. Saroff,* 741 F.Supp. 1073, 1078 (S.D.N.Y.1990). "Where the plaintiff does not allege that a prior injury existed or that an injury resulted from being handcuffed, however, courts have found that no constitutional violation exists and have dismissed the claims." *Horton,* 2001 WL 263299, at

*7 (citing *Scott v. County of Nassau,* 94CV4291, 1998 WL 874840, at *5 (E.D.N.Y. Dec.11, 1998) (granting summary judgment where there were no additional allegations of excessive force or allegations of prior injury); *Murphy v. Neuberger,* 94 Civ. 7421, 1996 WL 442797, at *8 (S.D.N.Y. Aug.6, 1996) (granting motion to dismiss where plaintiff did not allege that he suffered any injury as a result of being handcuffed); *Foster v. Metropolitan Airports Comm'n,* 914 F.2d 1076, 1082 (8th Cir.1990) (affirming grant of summary judgment where plaintiff did not provide evidence of permanent injury).

**\*20  \*10** Bourdon has not alleged or provided any evidence of permanent injury as a result of being handcuffed. He does not claim to have had a pre-existing injury of which the officers were aware, or to have requested medical treatment while being handcuffed or immediately thereafter. The mere fact that Bourdon was uncomfortable for several hours is not enough to establish a constitutional violation. *See Miller v. Glanz,* 948 F.2d 1562, 1569–70 (10th Cir.1991) (plaintiff experienced only "momentary discomfort" when he was handcuffed in an "awkward position" for two hours). Thus, this court cannot find that handcuffing Bourdon, without more, constitutes a violation of his constitutional rights.

Bourdon also claims that he was subjected to physical and emotional abuse during his confinement at the police barracks. However, at his deposition, he admits that the defendants did not hit or strike him with anything (*Dep. at 105* ). He merely states that they threatened him with a lengthy incarceration. Bourdon further states that he was in pain and he was stiff after sitting in the car for three hours. Bourdon has alleged no injury and admits that there was no physical contact between himself and the defendants beyond the handcuffing. Bourdon has failed to allege any excessive force used at the police barracks. Accordingly, this court recommends that Bourdon's excessive force claim be denied.

## VI. *Conditions of Confinement*

Pretrial detainees may not be subjected to conditions and restrictions that amount to "punishment" without due process of law. *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60

L.Ed.2d 447 (1979); *Weyant,* 101 F.3d at 856.[1] A detainee's Fourteenth Amendment due process rights concerning the conditions of his confinement are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *City of Revere v. Massachusetts General Hospital,* 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605

(1983) (citations omitted). The standard for analyzing a pretrial detainee's Fourteenth Amendment claim is the same as the Eighth Amendment standard. *See Weyant,* 101 F.3d at 856. Thus, a pretrial detainee's pleadings regarding the conditions of his confinement are sufficient if they meet both an objective and a subjective standard. To meet the objective standard, the claims must be "sufficiently serious"- the deprivation must deny minimal civilized measure of life's necessities. As to the subjective standard, plaintiff must allege that the defendants "had a sufficiently culpable state of mind amounting to at least deliberate indifference." *Dawes v. Walker,* 239 F.3d 489, 493–94 (2d Cir.2001) (citations omitted); *see also,* Weyant, 101 F.3d at 856.

[1]  Because plaintiff was a pre-trial detainee, his conditions of confinement is analyzed under the due process clause of the Fourteenth

Bourdon alleges that the manner in which he was detained after his arrest violated his constitutional rights. Bourdon claims that immediately after his arrest, he was placed in a hot, unventilated car for three hours without water or bathroom privileges. Later at the barracks, he was required to stand, off and on, for three hours while handcuffed to a wall without shoes or socks.

**\*21  \*11** At his deposition, Bourdon admitted that he was allowed to urinate in the woods at about 9:30 p.m. Since the search began at approximately 6:30 p.m., Bourdon went, at most, three hours without bathroom privileges and water (*Roney Aff. at 2* ).

This court finds that Bourdon has failed to allege or substantiate both the objective and subjective components necessary to establish that the defendants acted with deliberate indifference in their methods of confinement. He has failed to adequately allege that he was denied minimal necessities of civilized life for a substantial period of time. *See Whitted v. Lazerson,* 96 Civ. 2746, 1998 WL 259929, at *3 (S.D.N.Y. May 21, 1998) ("temporary deprivation of the right to use the toilet, in the absence of serious physical harm or a serious risk of contamination, simply does not rise to the level of an Eighth Amendment violation"); *Warren v. Irvin,* 985 F.Supp. 350, 356 (W.D.N.Y.1997) (Depriving inmate of water for three days because he was using it to flood his cell did not amount to Eighth Amendment violation). In any event, because the defendants have stated a legitimate purpose in Bourdon's confinement-to secure Bourdon during the search and interrogation by the only means available-Bourdon has failed to establish that the

defendants secured him in this manner merely as a form of punishment. Accordingly, this court recommends that the defendants' motion for summary judgment be granted as to Bourdon's conditions of confinement claim.

## VII. *Heck v. Humphrey*

In *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), the Supreme Court held that a § 1983 action seeking damages is not cognizable if a decision in favor of the plaintiff would necessarily invalidate a criminal conviction unless the conviction or sentence had been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal, or called into question by a federal habeas court. *Heck,* 512 U.S. at 486–87.

Bourdon's claims concerning the validity of the search warrant, the false arrest claim, and the Fifth Amendment violation have been recommended to be dismissed on the merits. Thus, this court need not analyze these claims under *Heck.*

Still remaining is Bourdon's claim that the defendants exceeded the scope of the search warrant. Because this court has determined that it cannot assess the validity of these claims without further development of the record by the defendants, this court also cannot consider at the present time whether *Heck* would invalidate these claims.

## VIII. *Qualified Immunity*

As an alternative basis to grant dismissal, the defendants argue that they are entitled to qualified immunity. Qualified immunity protects government officials who perform discretionary functions in the course of their employment. It shields them from liability for money damages where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). It also protects officials from "the burdens of costly, but insubstantial, lawsuits." *Warren v. Keane,* 196 F.3d 330, 332 (2d Cir.1999) (quotation marks and internal citations omitted).

**\*22 \*12** The question of whether qualified immunity will protect a public official depends upon " 'the objective legal reasonableness' of the action assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) (citations omitted). Furthermore, the contours of the right violated must be

sufficiently clear that a reasonable official might understand that his actions violate that right. *Id.* at 640, 107 S.Ct. at 3039; *Keane,* 196 F.3d at 332. The test for "evaluating whether a right was clearly established at the time a § 1983 defendant acted is: '(1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and, (3) whether under pre-existing law a reasonable defendant official would have understood that his or her acts were unlawful." ' *African Trade & Information Center, Inc., v. Abromaitis,* 294 F.3d 355, 360 (2d Cir.2002); *see also, Charles W. v. Maul,* 214 F.3d 350, 360 (2d Cir.2000).

Additionally, the Second Circuit has held that a court may dismiss a claim based upon qualified immunity without first deciding the substantive claims therein. *See Home v. Coughlin,* 191 F.3d 244 (2d Cir.1999). Also within this decision, the Second Circuit suggested that the qualified immunity issue should be addressed before the substance of a claim. The court shall now consider the defendants' claim that they are entitled to qualified immunity.

In this case, it has been clearly established that persons have a right to be free from unreasonable search and seizure, false arrest, excessive force, inhumane conditions of confinement, and self-incrimination. However, this court finds that it was objectively reasonable for the defendants to believe that their conduct did not violate Bourdon's constitutional rights. The record reflects that the defendants could not have known that the statements provided in support of the search warrant were unreliable or that they lacked probable cause to arrest Bourdon. In fact, Bourdon admits to behavior which would amount to probable cause to arrest.

The record also reflects that Bourdon was handcuffed in a car for approximately three hours without water or the use of bathroom facilities. Bourdon makes no allegations that he told the defendants during this time that he was in pain or discomfort. Finally, the record reflects that while at the police barracks, Bourdon was handcuffed to a wall for approximately one and one-half hours on two separate occasions. Again, Bourdon does not allege that he complained of pain or discomfort to the defendants at this time. Bourdon also admits that he was never physically attacked by the defendants. Under these circumstances, it was reasonably objective to believe that Bourdon was not in pain or distress. Furthermore, this court finds that the defendants did not use excessive force upon Bourdon or confine him under inhumane conditions. Finally, since Bourdon made

no statement during his interrogation, it was reasonably objective for the defendants to believe that they did not violate Bourdon's right to be free from self-incrimination.

**\*23  \*13** Accordingly, as an additional basis to grant summary judgment, this court recommends that the claims concerning the search warrant, false arrest, excessive force, unconstitutional conditions of confinement, and the Fifth Amendment be dismissed because the defendants are entitled to qualified immunity on these claims.

### IX. *Stay of Discovery*

By Order of this court filed February 27, 2002, discovery in this action was stayed until a final decision was rendered on this motion for summary judgment. Because it is recommended that the defendants may file a renewed motion for summary judgment, the stay of discovery is continued until either (1) a decision by the District Judge on any renewed motion for summary judgment; or (2) absent any extensions of time granted by this court, the expiration of the time to file a renewed motion for summary judgment if no such motion has been filed.

WHEREFORE, based on the above, it is hereby

RECOMMENDED, that the defendants' motion be GRANTED (*Dkt. No. 48* ) to the extent that the following claims are dismissed on the merits as well as on the basis of qualified immunity:

a. Invalid search warrant;

b. False arrest;

c. Excessive force;

d. Illegal conditions of confinement; and

e. Fifth Amendment claim, and it is further

RECOMMENDED, that the defendants' motion be DENIED in all other respects, without prejudice, the defendants may file a renewed motion for summary judgment addressing Bourdon's claim involving the search and seizure issue. Any renewed motion must be filed within forty-five days following a decision by the District Judge on this summary judgment motion; and it is further

ORDERED, that the stay of discovery is continued until either: (1) a decision by the District Judge on any renewed motion for summary judgment; or (2) absent any extensions of time granted by this court, the expiration of the time to file

a renewed motion for summary judgment if no such motion has been filed.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.Roldan v. Racette,* 984 F.2d 85 (2d Cir.l993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

---

2007 WL 805786 Only the Westlaw citation is currently available. United States District Court, E.D. New York.

Horace DOVE, Plaintiff,

v.

CITY OF NEW YORK, Venessa Williams, Staff on Ward 53 at Kings County Hospital, The Patients on Ward 53, Jewish Board Family & Children Services, Owners of Maple Street Residence, Jeffrey Clarke, Arlene Bishop, Esther, The Staff at Maple Street, Lionel Young, and Abbot Laboratory of Illinois, Defendants.

No. 03–CV–5052 JFB LB. | March 15, 2007.

**Attorneys and** Law Firms

 **\*24** Plaintiff appears pro se.

John P. Hewson and Lisa Fleming Grumet, Esqs., Corporation Counsel of the City of New York, Marc A. Konowitz, Esq., New York State Attorney General's Office, New York, NY, for Defendants.

### MEMORANDUM AND ORDER

JOSEPH F. BIANCO, District Judge.

**\*1** *Pro se* plaintiff Horace Dove ("Dove") brings this action against the City of New York (the "City"), Vanessa Williams ("Williams"), the staff on Ward 53 at Kings County Hospital, and the patients on Ward 53 (collectively, "defendants"), alleging violations of plaintiffs constitutional rights pursuant to 42 U.S.C. § 1983 and various state law

WESTLAW  © 2024 Thomson Reuters. No claim to original U.S. Government Works.

claims. [1] Specifically, plaintiff alleges that, during his time as a patient at Kings County Hospital (the "Hospital"), (1) the Hospital's policy or custom of permitting patients to smoke in the Hospital violated plaintiff's rights, (2) the Hospital's staff and several patients conspired to assault plaintiff and (3) the Hospital's staff failed to protect plaintiff from assaults by other patients on four separate occasions between June 9, 2002 and July 10, 2002.

[1]    Defendants Jewish Board of Family & Children Services, the owners of the Maple Street Residence, Jeffrey Clark, Arlene Bishop, Esther, the Staff at Maple Street, Lionel Young, and Abbot Laboratory of Illinois are no longer parties to this action.

Defendants now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. [2] For the reasons that follow, defendants' motion is granted.

[2]    Plaintiff failed to serve the unidentified staff and patients named in the complaint. Thus, those defendants have not appeared in the instant action.

## I. BACKGROUND

### A. Facts

Upon consideration of a motion for summary judgment, the Court construes the facts in the light most favorable to plaintiff, the non-moving party. [3] *See Capobianco v. City of New York,* 422 F.3d 47, 50 (2d Cir.2005).

[3]    Defendants submitted a statement, pursuant to Local Civil Rule 56. 1, which asserts material facts that they claim are undisputed in this case. Defendants also complied with Local Civil Rule 56. 2 by providing notice to plaintiff that he is not entitled simply to rely on allegations in his complaint, but is required to submit evidence, including sworn affidavits, witness statements and documents to respond to the motion for summary judgment, pursuant to Fed.R.Civ.P. 56(e). (*See* Dkt. Entry # 84.) This action provided actual notice to plaintiff of the consequences of noncompliance with the requirements of Fed.R.Civ.P. 56. See, e. g., *Irby v. N.Y. Transit Auth.,* 262 F.3d 412, 414 (2d Cir.2001) ("[W]e remind the district courts of this circuit, as well as summary judgment movants, of the necessity that *pro se* litigants have

actual notice, provided in an accessible manner, of the consequences of the *pro se* litigant's failure to comply with the requirements of Rule 56.... [E]ither the district court or the moving party is to supply the *pro se* litigant with notice of the requirements of Rule 56.... In the absence of such notice or a clear understanding by the *pro se* litigant of the consequences of failing to comply with Rule 56, vacatur of the summary judgment is virtually automatic.") Although plaintiff did not respond to defendants' Rule 56. 1 Statement in the precise form specified by the local rule, the Court overlooks this technical defect and reads plaintiff's responses liberally as he is *pro se,* and considers factual assertions made by plaintiff in his submissions to the Court as contesting defendants' statement of material undisputed facts, where his statements or evidence conflict. *See Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 63, 73 (2d Cir.2001) ("A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules.") (citations omitted); *see, e.g., Gilani v. GNOC Corp.,* No. 04 Civ. 2935(ILG), 2006 WL 1120602, at *2 (E.D.N.Y. April 26, 2006) (exercising court's discretion to overlook the parties' failure to submit statements pursuant to Local Civil Rule 56. 1). Therefore, where the Court cites to defendants' Rule 56. 1 Statement, plaintiff has not contested that fact in any of his papers. *See, e.g., Pierre–Antoine v. City of New York,* No. 04 Civ. 6987(GEL), 2006 WL 1292076, at *3 (S.D.N.Y. May 9, 2006) (deeming facts in defendants' Rule 56. 1 statement as admitted by *pro se* plaintiff, where plaintiff was provided notice of his failure to properly respond to the summary judgment motion under Local Civil Rule 56. 2 and the court's review of the record did not reveal that there was a genuine issue of material fact); *Gilliam v. Trustees of Sheet Metal Workers' Natl Pension Fund,* No. 03 Civ. 7421(KMK), 2005 WL 1026330, at *1 n. 2 (S.D.N.Y. May 3, 2005) (deeming defendants' factual assertions admitted where *pro se* plaintiff was provided with notice under Local Civil Rule 56. 2 and where plaintiff did not submit evidence controverting those factual assertions).

The Hospital is operated by defendant City and offers treatment to patients involuntarily committed for treatment

of mental health issues. (Dfts.' 56. 1 ¶¶ 7–14.) Defendant Williams is a Coordinating Manager in the Behavioral Health Division of the Hospital. According to the New York City Health and Hospitals Corporation's "PositionDescription" for a Coordinating Manager, Williams' duties include aiding in the maintenance of a safe and hygienic environment at the Hospital, procuring supplies to facilitate the comfort, safety and therapeutic aspects of the Hospital wards, and supervising the staff that maintains the Hospital's wards. (Dfts.' 56. 1 ¶ 27; Hewson Decl., Ex. K.) Moreover, according to the City, Williams' duties do not include the supervision over, or responsibility for, any aspect of patient care. (Id.)

On June 9, 2002, New York City police officers brought plaintiff to the Hospital. (Dfts.' 56. 1 ¶ 5.) After plaintiff's arrival, a treating physician and a social worker diagnosed plaintiff with schizophrenia of the chronic paranoid type. (Id. ¶ 7.) They also found that plaintiff was abusive and threatening to others, was a threat to himself and others, and that he suffered from persecutory delusions. (Id. ¶¶ 7, 9, 12.)On June 10, 2002, plaintiff was admitted to the Hospital pursuant to New York Mental Hygiene Law Section 9.39, and sent to Ward 53. (Id. ¶ 12; Compl. ¶ 29.) Plaintiffs claims arise out a string of incidents that allegedly occurred while plaintiff was a patient at the Hospital.

### 1. Smoking in the Hospital

**\*25** According to plaintiff during his first night at the Hospital, plaintiff's roommates and other patients smoked marijuana and cigarettes in plaintiffs room. (Compl.¶ 30.) The patients continued to smoke, plaintiff alleges, even though plaintiff told the patients that he had asthma, that he was allergic to marijuana and cigarette smoke, and that the smoke was harmful to him. (Id.) Plaintiff also alleges that he complained to the staff about other patients' smoking, but that the staff did nothing to stop the patients from smoking. (Id. ¶ 31.) According to plaintiff, the other patients told him that the Hospital staff allowed patients to smoke in their rooms. (Id. ¶ 33.)

### 2. The June 15, 2002 Incident

**\*2** On or about June 15, 2002, plaintiff and four other patients at the Hospital were involved in a physical altercation. (Hewson Decl., Ex. E.; Compl. ¶ 35.) According to plaintiff, six patients, including one of his roommates, surrounded plaintiff and "viciously assaulted" him. (Compl.¶ 35.) Plaintiff alleges that "some of the staff in Ward 53" were

warned of the attack in advance and "gave their approval." (Id. ¶ 38.)According to plaintiffs deposition testimony, the attackers hit him in the face with an iron rod, kicked him in the face, poured chemicals on his left hand, caused him to bleed from his nose and mouth and rendered him unconscious for two to three hours. (Hewson Decl., Ex. G.)

However, according to the Hospital's records, a physician examined plaintiff following the June 15, 2002 altercation and noted that plaintiff had "no visible injury," and did not indicate that plaintiff had any facial injuries, chemical burns on his hands, blood on his skin or clothes, or had suffered a loss of consciousness. (Hewson Decl., Ex. E.) However, the physician noted that plaintiff's eyeglasses were broken during the altercation. (Id.) The Hospital's records also indicate that members of the nursing staff had observed plaintiff at fifteen-minute intervals throughout the day on June 15, 2002, and there was no evidence that plaintiff had suffered any injuries during that time. (Id., Ex. H.) According to the Hospital's records, the patients involved in the altercation were separated and counseled as to their behavior. (Hewson Decl., Ex. E.)

### 3. The Chair–Throwing Incident

According to plaintiff, on June 22, 2002, another patient threw "iron chairs at [plaintiffs] head." (Compl.¶ 43.) Plaintiff alleges that, during the incident, the other patient said that plaintiff had complained too much to the staff. (Id. ¶ 44.)According to plaintiff, the assault rendered him unconscious for hours. (Hewson Decl., Ex. G.) Moreover, plaintiff alleges that, following the incident, he ran to the staff office and asked the staff to stop the other patient from assaulting him, but the staff did not tell the other patient to stop. (Id. ¶ 43.)

The Hospital's records show that plaintiff was involved in a "chair throwing" incident with another patient on July 2, 2002 rather than, as plaintiff alleges, on June 22, 2002. (Hewson Decl., Ex. F.) According to the Hospital's records, plaintiff was hit in the chest by one of his peers during the incident. (Id.) Plaintiff was examined by a physician following the incident on July 2, 2002; the physician found no injuries to plaintiff. (Id., Ex. F.) Moreover, according to the Hospital's records, members of the nursing staff had observed plaintiff at fifteen-minute intervals throughout the day on July 2, 2002, and there was no evidence that plaintiff had been lying on the floor unconscious or that plaintiff had suffered any injuries during that time.[4] (Hewson Decl., Ex. H.) Also, according

to the Hospital's records, a psychiatrist evaluated plaintiff on July 2, 2002 and found that he continued to be delusional. (*Id.*)[4] The Hospital's records also indicate that, on June 22, 2002–the alleged date of the chair-throwing incident according to plaintiff-members of the nursing staff had observed plaintiff at fifteen-minute intervals throughout the day and there was no evidence that such an altercation had occurred or that plaintiff had suffered any injuries during that time. (Hewson Decl., Ex. H.)

### 4. The June 27, 2002 Incident

**\*26  \*3** According to plaintiff, on June 27, 2002, he told Williams that he suffered from asthma and that the smoking by other patients was very harmful to him. (Compl.¶ 46.) In response, according to plaintiff, Williams told him that patients are permitted to smoke in all of the Hospital's wards and that plaintiff should not complain to the Hospital's staff about other patients smoking in the Hospital. (*Id.* ¶¶ 47, 54.)Moreover, plaintiff alleges that three other patients joined the conversation and that Williams told those three patients that they could "smoke all they want in Ward 53." (*Id.* ¶ 54.)

Plaintiff alleges that, following plaintiff's conversation with Williams, plaintiff saw Williams speak separately with the same three patients. (Compl.¶ 51.) Plaintiff concedes in the complaint that he could not hear what Williams and the three patients were saying during this separate conversation. (Compl.¶¶ 51–52.) Moreover, during his deposition, plaintiff confirmed that he had no direct knowledge of the content of the conversation between Williams and the three patients. (Hewson Decl., Ex. G)

According to plaintiff, on the night of June 27, 2002, five patients, including the three patients with whom Williams had allegedly spoken to, "viciously assaulted" plaintiff in his room. (Compl.¶ 54.) Plaintiff alleges that Williams had conspired with the alleged attackers to harm plaintiff, and that, during the assault, the attackers allegedly told plaintiff that Williams "did not like" plaintiff. (Compl.¶¶ 56, 58.)

According to the Hospital's records, members of the nursing staff had observed plaintiff at fifteen-minute intervals throughout the day on June 27, 2002, and there was no evidence that an incident occurred or that plaintiff had suffered any injuries during that time. (Hewson Deck, Exs. F, H.)

### 5. The July 9, 2002 Incident

Plaintiff alleges that five patients "viciously assaulted [plaintiff] again" on July 9, 2002. (Compl.¶ 78.) According to plaintiff, the other patients once again assaulted plaintiff with an iron rod and rendered him unconscious. (Hewson Decl., Ex. G.) Plaintiff alleges that, during the alleged assault, he called out to the staff for help but no one came to help him. (Compl.¶ 79.)

The Hospital's records do not reflect that an incident occurred on July 9, 2002. According to the Hospital's records, members of the nursing staff had observed plaintiff at fifteen-minute intervals throughout the day on July 9, 2002, and there was no evidence that an incident had occurred or that plaintiff was injured on that day. (Hewson Decl., Exs. F, H.) In particular, according to the Hospital's records, plaintiff was examined by hospital personnel sometime after 1:00 p.m. and was found to be "cooperative and friendly," although still suffering from "persecutory delusions." (*Id.,* Ex. F.) Plaintiff was again observed at 10:00 p.m. and "no complaints [were] voiced" by him to the Hospital's staff. (*Id.*)

**\*27  \*4** On July 10, 2002, plaintiff was transferred from the Hospital to Kingsboro Psychiatric Center, a New York State facility. (Compl.U 84.) Upon arriving at Kingsboro, plaintiff was given a full physical exam by a doctor. (Hewson Deck, Ex. I.) Records of that examination indicate that plaintiff did not have any physical problems except for a rash on his left hand, and that he was in good physical health, had no injury or abnormalities to his head, and denied having any physical ailments. (*Id.*)

### B. Procedural History

Plaintiff commenced the instant action against the City on October 6, 2003. On October 8, 2003, plaintiff filed an amended complaint naming several additional defendants. By Memorandum and Order dated September 28, 2005, the Honorable Nina Gershon dismissed plaintiff's claims against several defendants. On February 10, 2006, the case was reassigned to this Court. On July 17, 2006, defendants moved for summary judgment pursuant to Rule 56.

### II. DISCUSSION

### A. Standard of Review

Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); Globecon Group, LLC v. Hartford Fire Ins. Co., 434 F.3d 165, 170 (2d Cir.2006). Moreover, where the plaintiff is proceeding *pro se,* the Court must "construe the complaint broadly, and interpret it to raise the strongest arguments that it suggests." Weixel v. Bd. of Educ. of the City of N.Y., 287 F.3d 138, 145–46 (2d Cir.2002) (quoting Cruz v. Gomez, 202 F.3d 593, 597 (2d Cir.2000)).

The moving party bears the initial burden of showing that he or she is entitled to summary judgment. *See* Huminski v. Corsones, 396 F.3d 53, 69 (2d Cir.2005). However, once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial."* Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir.2002) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 77 (2d Cir.1984) (internal quotations omitted); Tufariello v. Long Island R.R., 364 F.Supp.2d 252, 256 (E.D.N.Y.2005).

As such, a *pro se* party's "bald assertion," completely unsupported by evidence, is not sufficient to defeat a motion for summary judgment. Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir.1991). Instead, to overcome a motion for summary judgment, the non-moving party must provide this Court "with some basis to believe that his 'version of relevant events is not fanciful.' " Lee v. Coughlin, 902 F.Supp. 424, 429 (S.D.N.Y.1995) (quoting Christian Dior–New York, Inc. v. Koret, Inc., 792 F.2d 34, 37–39 (2d Cir.1986)); *accord* Perez v. N.Y. Presbyterian Hosp., No. 05 Civ. 5740(LBS), 2006 WL 585691, at *3 n. 1 (S.D.N.Y. March 20, 2006).

## B. Plaintiff's Allegations

**\*28 \*5** The standard rule is that, at the summary judgment stage, the court "is ... to eschew credibility assessments." Amnesty Am. v. Town of West Hartford, 361 F.3d 113, 122 (2d Cir.2004); Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, in Jeffreys v. City of New York, 426 F.3d 549 (2d Cir.2005), the Second Circuit recognized that there is a narrow exception to this well-established rule in the "rare circumstances" where the sole basis for the disputed issues of fact is the plaintiff's "own testimony" which is so lacking in credibility that no reasonable juror could find for the plaintiff. In affirming the dismissal of the plaintiff's suit at the summary judgment stage, the Second Circuit explained:

> [W]e hold that the District Court did not err in granting defendants' motion for summary judgment on the basis that Jeffreys's testimony-which was largely unsubstantiated by any other direct evidence-was "so replete with inconsistencies and improbabilities" that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in his complaint.

*Id.* at 505 (citing Jeffreys v. Rossi, 275 F.Supp.2d 463, 475 (S.D.N.Y.2003) (dismissing excessive force claims brought under 42 U.S.C. § 1983)); *see also* Trans–Orient Marine Corp. v. Star Trading & Marine, Inc., 925 F.2d 566, 572 (2d Cir.1991) (holding that the post-trial sworn statements of the president of plaintiff corporation did not create a factual issue because "a party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony"); Radobenko v. Automated Equip. Corp., 520 F.2d 540, 544 (9th Cir.1975) (holding that plaintiff had failed to create an issue of fact where plaintiff's affidavits conflicted with plaintiffs earlier deposition); Schmidt v. Tremmel, No. 93 Civ. 8588(JSM), 1995 U.S. Dist. LEXIS 97, at *10–* 11, 1995 WL 6250 (S.D.N.Y. Jan. 6, 1995) (finding no genuine issues of material fact where "[n]o reasonable person would undertake the suspension of disbelief necessary to give credit to the allegations made in [plaintiffs] complaint or in her subsequent missives to the court"); Ward v. Coughlin, No. 93 Civ. 1250(FJS)(RWS), 1995 U.S. Dist. LEXIS 21297, at *11 (S.D.N.Y.1995) (finding plaintiffs self-serving affidavit incredible as a matter of law); Price v. Worldvision Enters., Inc., 455 F.Supp. 252, 266 n. 25 (S.D.N.Y.1978) (addressing affidavit of party).

Here, the Court believes that there is a clear basis to find that the instant action presents one such "rare circumstance[ ]" where the plaintiff's testimony is "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in his complaint." Jeffreys, 275

F.Supp.2d at 475 (internal quotations and citation omitted). Plaintiff's allegations in his complaint and his deposition testimony provide the sole basis for the alleged disputed issues of fact in this case. However, the credibility of plaintiff's submissions is critically undermined by both the evidence presented by defendants, as well as the gross inconsistencies found in plaintiff's own submissions. *See Law Offices of Curtis V. Trinko, LLP v. Verizon Comm'ns. Inc.,* No. 00 Civ.1910(SHS), 2006 WL 2792690, at *9 (S.D.N.Y. Sep.27, 2006).

**\*29  \*6** First, as set forth in the facts section, the Hospital's records contradict plaintiff's testimony as to the occurrence of several of the alleged assaults and as to the occurrence or the severity of all of plaintiff's alleged injuries. [5] Second, as discussed more fully below, plaintiff has undermined his own allegations regarding Williams' involvement in the alleged June 27, 2002 assault by conceding that he has no personal knowledge, or any other evidence, that Williams conspired to assault him.

[5]     There is no credible evidence demonstrating that any of the incidents alleged by plaintiff even occurred, save for the June 15, 2002 incident and the chair-throwing incident As discussed *supra,* the Hospital's records confirm that plaintiff was involved in a physical altercation with four other patients on June 15, 2002, as well as some type of "chair-throwing" incident with another patient on July 2, 2002. However, as to the June 15, 2002 incident, the Hospital's documentation indicates that plaintiff did not suffer any injury as a result of the altercation, much less the severe injuries alleged by plaintiff, which include facial cuts, bleeding, chemical burns, and brain damage. Moreover, plaintiff's own submissions drastically diverge as to the severity of the injuries he allegedly suffered during the June 15, 2002 altercation. Similarly, as to the chair-throwing incident, the Hospital's documentation indicates that plaintiff did not suffer any injury as a result of the incident, much less the severe injuries alleged by plaintiff. Moreover, plaintiff's own allegations regarding the chair-throwing incident are grossly inconsistent

Finally, plaintiffs own submissions are replete with contradictory descriptions of the injuries he allegedly suffered as a result of the alleged assaults. As to the alleged June 15, 2002 assault, plaintiff variously asserts that he suffered just "headaches" (Compl.¶ 39), or "severe brain damage" (Dep.

Tr., at 88), as a result of the assault. As to the chair-throwing incident, plaintiff contends both that he was assaulted by five patients (Dep. Tr. at 91), and that he was assaulted by just one patient (Compl.¶ 43). Also as to the chair-throwing incident, plaintiff fails to allege in the complaint that he suffered any injuries during the incident. However, plaintiff asserts in his deposition testimony that he was rendered unconscious as a result of the incident and remained so for "hours." (Pl.'s Dep. at 91–92.) As to the alleged July 9, 2002 assault, plaintiff asserts in his complaint that he "became unconscious" as a result of the assault, and fails to allege what, if any, weapons were used during the assault. However, in his deposition testimony, plaintiff contends that the assailants used an "iron rod" and left a "scar" on his forehead. (Pl.'s Dep. at 108.)

Therefore, the Court finds that, given the complete lack of evidence to support plaintiff's claims regarding these assaults and the alleged severe injuries resulting therefrom, the Hospital documentation fully contradicting such claims, and the drastic inconsistencies in plaintiff's own statements regarding these incidents, dismissal is warranted under *Jeffreys* because no reasonable juror could credit plaintiffs unsubstantiated testimony under these circumstances. However, even if the Court fully credited plaintiff's allegations regarding these incidents, summary judgment is still appropriate because he has produced no competent evidence demonstrating that these defendants are liable for the alleged actions of the other patients. As set forth more fully below, even assuming *arguendo* that the smoking by other patients and all of the assaults referred to in plaintiff's testimony actually occurred, plaintiff has failed to establish a genuine issue as to defendants' liability for the alleged deprivations of plaintiff's rights.

### C. Claims Against the Unnamed Defendants

At this stage of the case, discovery has been completed and plaintiff has failed to identify or to serve with process any of the unnamed defendants allegedly responsible for the deprivation of plaintiff's rights. Moreover, plaintiff does not assert that additional discovery will help to ascertain the identities of such individuals. Accordingly, because a "tort victim who cannot identify the tortfeasor cannot bring suit," the Court grants summary judgment as to plaintiff's claims against the unnamed defendants. *Valentin v. Dinkins,* 121 F.3d 72, 75 (2d Cir.1996); *see, e.g., Peterson v. Tomaselli,* —— F.Supp.2d ——, 2007 WL 102073, at *18 (S.D.N.Y.2007); *Alicea v. City of New York,* No. 04 Civ. 1243(RMB), 2005 WL 3071274, at *1 n. 1 (S.D.N.Y. Nov.15, 2005).

### D. Due Process Claims

**\*30  \*7** Plaintiff asserts, *inter alia,* a violation of his rights under the Eighth and Fourteenth Amendments. However, because plaintiff was not a convicted prisoner at the time of the alleged deprivation of his federal rights, any claim arising from his confinement must be asserted under the Due Process Clause of the Fourteenth Amendment, rather than the provisions of the Eighth Amendment. *See, e.g., Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996); *Vallen v. Carrol,* No. 02 Civ. 5666(PKC), 2005 WL 2296620, at \*9 (S.D.N.Y. Sept.20, 2005); *see also Fair v. Weiburg,* No. 02 Civ. 9218(KMK), 2006 WL 2801999, at \*4 (S.D.N.Y. Sept.28, 2006).

"An involuntary civil commitment is a massive curtailment of liberty, ... and it therefore cannot permissibly be accomplished without due process of law." *Rodriguez v. City of New York,* 72 F.3d 1051, 1061 (2d Cir.1995) (citation and quotation omitted); *see Graves v. MidHudson,* No. 04 Civ. 3957(FB), 2006 WL 3103293, at \*3 (E.D.N.Y. Nov.2, 2006). However, in this case, the complaint, even as liberally construed, fails to allege that plaintiff's rights were violated during the civil commitment process. [6]

[6]   The Court notes that plaintiff's brief in response to the instant motion consists principally of quotations from Supreme Court opinions regarding the process due to individuals prior to their involuntary commitment to a mental hospital. However, the entirety of plaintiff's submissions to the Court-that is, other than his response brief-fail to allege or to address a claim that plaintiff's pre-commitment procedural rights were violated by defendants; nor has plaintiff requested leave to amend his complaint to allege such a claim. Moreover, at his deposition, plaintiff was asked to clarify whether he was, in fact, alleging a violation of his pre-commitment procedural rights. Plaintiff declined to do so. (Hewson Deck, Ex. G.) Accordingly, the Court declines to address any such claim at this time.

However, " '[t]he mere fact that an individual has been committed under proper procedures ... does not deprive him of all substantive liberty interests under the Fourteenth Amendment.' " *MidHudson,* 2006 WL 3103292, at \*3 (citing *Youngberg v. Romeo,* 457 U.S. 307, 315, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982)). Such individuals retain a right to " 'conditions of reasonable care and safety' " during their confinement. *Kulak v. City of New York,* 88 F.3d 63, 77 (2d Cir.1996) (quoting *Youngberg,* 457 U.S. at 324); *Lombardo v. Stone,* No. 99 Civ. 4603(SAS), 2001 WL 940559, at \*8 (S.D.N.Y. Aug.20, 2001) (citing *Youngberg,* 457 U.S. at 315–16 ("If it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed-who may not be punished at all-in unsafe conditions.")); *see also DeShaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 199, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) ( "[T]he substantive component of the Fourteenth Amendment's Due Process Clause requires the State to provide involuntarily committed mental patients with such services as are necessary to ensure their 'reasonable safety' from themselves and others."); *Beck v. Wilson,* 377 F.3d 884, 889–90 (8th Cir.2004) ( "Because [plaintiff] was an involuntarily committed patient ... the Fourteenth Amendment imposed upon the defendants, as state actors, an affirmative duty to undertake some responsibility for providing [her] with a reasonably safe environment.").

In *Youngberg,* the Supreme Court set forth the standard for adjudicating Section 1983 claims brought by involuntarily committed mental patients against "professional" officials charged with the patients' care. *Youngberg,* 457 U.S. at 322–24; *see Vallen,* 2005 WL 2296620, at \*9; *Warheit v. City of New York,* No. 02 Civ. 7345(PAC), 2006 WL 2381871, at \*11 (S.D.N.Y. Aug.15, 2006); *Lombardo,* 2001 WL 940559; *Marczeski v. Handy,* No. 01 Civ. 01437(AHN)(HBF), 2004 WL 2476440, at \*8 (D.Conn. Sept. 9, 2004) (Fitzsimmons, Magistrate J.). In reviewing such claims, the critical question is whether the charged official's decision alleged to have caused a deprivation was "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg,* 457 U.S. at 323; *see Kulak v. City of New York,* 88 F.3d 63, 75 (2d Cir.1996) ("This standard requires more than simple negligence on the part of the doctor but less than deliberate indifference.").

**\*31  \*8** Notably, however, the Court in *Youngberg* specifically limited the substantial departure standard to claims against "professionals," or "person[s] competent, whether by education, training or experience, to make the particular decision at issue," and contrasted such persons with non-professionals, or "employees without formal training but who are subject to the supervision of qualified persons." *Youngberg,* 457 U.S. at 323 n. 30; *see Kulak,* 88 F.3d at 75. As such, some courts have declined to apply the *Youngberg* standard to officials deemed to be "low-

O'dell v. Bini, Not Reported in F.Supp.3d (2015)
Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 262 of 370
2015 WL 710544

level staff members," and, instead, apply a "deliberate indifference" standard to Section 1983 claims against such officials, asking whether "the [challenged] officials displayed a mental state of deliberate indifference with respect to [plaintiff's] rights." *Marczeski,* 2004 WL 2476440, at *8; *see Shaw by Strain v. Strackhouse,* 920 F.2d 1135, 1147 (3rd Cir.1990) ("Nonprofessional employees who provide care for involuntarily institutionalized mentally retarded individuals are subject even after *Youngberg,* only to a deliberate indifference standard."); *Moore v. Briggs,* 381 F.3d 771, 773 (8th Cir.2004) (applying deliberate indifference standard to Section 1983 claims against staff at a group home for the mentally retarded); *see also Vallen,* 2005 WL 2296620, at *9 ("I am inclined to agree ... that the standard of 'deliberate indifference' is the correct one for Section 1983 claims brought by involuntarily committed mental patients and based on alleged failures to protect them that violated their substantive due process rights.").

However, in this case, the Court need not reach the issue of whether defendants' actions should be evaluated under the "substantial departure" or "deliberate indifference" standard because, under either standard, the result is the same: no reasonable factfinder could conclude based upon the evidence, drawing all inferences in plaintiff's favor, that defendants' conduct substantially departed from accepted professional judgment, practices, or standards, or was deliberately indifferent to plaintiff's constitutional rights. *See Vallen,* 2005 WL 2296620, at *9.

As the Second Circuit has observed:

> Rule 56(e) of the Federal Rules of Civil Procedure states unequivocally that in order to defeat a motion for summary judgment, the opposing party must "set forth specific facts showing that there is a genuine issue for trial." Such an issue is not created by a mere allegation in the pleadings, nor by surmise or conjecture on the part of the litigants.

*U.S. v. Potamkin Cadillac Corp.,* 689 F.2d 379, 381 (2d Cir.1982) (quotations and citations omitted); *see Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980) (requiring that the party opposing summary judgment "bring to the district court's attention some affirmative indication that his version of relevant events is not fanciful"). Here, the Court finds that plaintiff has failed to set forth any evidence, beyond mere "surmise or conjecture," in support of his allegations that defendants were personally involved in the alleged deprivations of plaintiff's

constitutional rights or that a municipal policy or custom caused the alleged deprivations.

### (i) Due Process Claims Against Williams

**\*32** **\*9** In order to be held liable under § 1983, each defendant must have been personally involved in the alleged constitutional violation. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) ("It is well settled in [the Second Circuit] that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.") (internal citation omitted); *see also Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987)."[A] defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority." *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). As such, the Second Circuit has held that the personal involvement of supervisory officials may be established by evidence that: (1) the defendant participated directly in the alleged constitutional violation; (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) the defendant exhibited gross negligence or deliberate indifference to the rights of the plaintiff by failing to act on information indicating that unconstitutional acts were occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

In this case, plaintiff alleges that Williams was involved in the deprivation of his right to reasonable care and safety in two ways. First, plaintiff alleges that, on June 27, 2002, Williams told other patients that they could smoke in the Hospital. (Compl.¶ 54.) Second, plaintiff alleges that Williams had foreknowledge of the alleged assault against Williams that occurred on June 27, 2002, and "conspired" with the alleged attackers to harm plaintiff. (Compl. ¶¶ 53, 56.) For the reasons set forth below, the Court finds that plaintiff fails to present facts from which a reasonable factfinder could conclude that Williams was personally involved in the deprivation of any rights guaranteed to plaintiff by the Fourteenth Amendment.

First, plaintiff alleges that Williams violated plaintiff's rights by telling other patients that they could smoke in the hospital, thus causing harm to plaintiff. In particular, plaintiff asserts that he informed Williams about the serious health risks posed to plaintiff by other patients' smoking habits and that he

witnessed Williams tell other patients that they could smoke in the Hospital.

However, assuming *arguendo* that the alleged conduct, if true, would constitute a violation of plaintiff's right to reasonable care and safety, plaintiff has failed to produce any affirmative evidence in support of his allegations that Williams was personally involved in causing other patients to smoke. Specifically, in support of his allegations, plaintiff points to a single conversation with Williams on June 27, 2002, wherein Williams allegedly told plaintiff and three other patients that patients were permitted to smoke in the Hospital. (Compl.¶¶ 46–49, 51–53.) However, plaintiff has failed to present any facts demonstrating that this conversation actually caused any patients to smoke in the Hospital or even that, following the alleged conversation, other patients actually did smoke in the Hospital. Plaintiff points to specific instances of patients smoking in his room at times *preceding* the alleged conversation with Williams, but he fails to allege or to offer any evidence from which this Court could reasonably infer that Williams *caused* patients to smoke in the Hospital.

**\*33  \*10** Thus, the Court finds that plaintiff has failed to present any evidence, beyond conjecture, from which the Court could reasonably infer that Williams' conduct caused plaintiff to suffer "actual or imminent harm." *See Benjamin, 343 F.3d at 51 n. 17* ("To establish the deprivation of a basic human need such as reasonable safety, an inmate must show 'actual or imminent harm.' ") (quoting *Lewis v. Casey,* 518U.S. 343, 350 (1996)). Accordingly, plaintiff's claims against Williams arising from alleged smoking in the Hospital are dismissed.

Second, plaintiff has failed to set forth concrete evidence showing that Williams was personally involved in the alleged June 27, 2002 assault of plaintiff by other patients. Plaintiff offers nothing more than bald assertions that Williams condoned the assault and conspired with the alleged attackers to harm plaintiff. In support of these allegations, plaintiff points to a second conversation involving Williams and three other patients that allegedly also took place on June 27, 2002, wherein Williams and the patients allegedly "conspired or agreed" that the patients would assault plaintiff that night. (*See* Compl. ¶ 62.)

However, even assuming *arguendo* that plaintiff observed a conversation between Williams and three other patients on June 27, 2002 and that plaintiff was actually assaulted that night, plaintiff has failed to raise a triable issue as to whether Williams conspired or agreed to assault plaintiff.

In the complaint, plaintiff concedes that he has no direct knowledge of the contents of the alleged conversation; he claims that Williams pulled the three patients "aside so that she could talk to them without me hearing what they were talking about." (Compl.¶ 52.) Moreover, at his deposition, plaintiff confirmed that he had no direct knowledge of the conversation or of Williams' approval of the alleged assault. (Hewson Decl., Ex. G.) Although plaintiff also asserted at his deposition that he knew of other patients that had overheard staff members approve the alleged assault, plaintiff has failed to identify those witnesses. (*Id.*)

Accordingly, because plaintiff has failed to produce *any* affirmative evidence, beyond conjecture, demonstrating that Williams participated in, directed, or had knowledge of the alleged June 27, 2002 assault, the Court grants defendants' motion as to plaintiff's claims against Williams arising from that assault.

### (ii) Due Process Claims against the City

It is well-settled that municipalities may not be liable under § 1983 for constitutional torts committed by its employees under a *respondeat superior* theory; rather, to prevail against a municipality, a plaintiff must demonstrate that his injury "was caused by a policy or custom of the municipality or by a municipal official 'responsible for establishing final policy.' " *Skehan v. Village of Mamaroneck,* 465 F.3d 96, 108–9 (2d Cir.2006) (quoting *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)); *accord Coon v. Town of Springfield, Vt.,* 404 F.3d 683, 686 (2d Cir.2005). "In essence, 'municipalities such as the City of New York may only be held liable when the city itself deprives an individual of a constitutional right.' " *Warheit,* 2006 WL 2381871, at \*12 (quoting *Davis v. City of New York,* 228 F.Supp.2d 327, 336 (S.D.N.Y.2002)).

**\*34  \*11** Moreover, courts must apply "rigorous standards of culpability and causation" to *Monell* claims in order to ensure that "the municipality is not held liable solely for the actions of its employee." *Bd. of Cty. Com'rs of Bryan Cty., Okl. v. Brown,* 520 U.S. 397, 405, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). "Thus, a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the *state." Davis,* 228 F.Supp.2d at 336 (citing *Oklahoma City v. Tuttle,* 471 U.S. 808, 831, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (Brennan, J., concurring in part and concurring in the judgment)). Instead, to constitute a "policy," the municipality must have either enacted an official policy measure or an employee with "policy making

authority" must have undertaken an unconstitutional act. *See Pembaur,* 475 U.S. at 480–81. A "custom," although it need not receive formal approval by the municipality, must be "so persistent or widespread as to constitute a custom or usage with the force of law" and "must be so manifest as to imply the constructive acquiescence of senior policymaking officials." *Green v. City of New York,* 465 F.3d 65, 80 (2d Cir.2006) (quotation marks and citations omitted). "To succeed on this theory, plaintiff must prove the existence of a practice that is permanent." *Davis,* 228 F.Supp.2d at 337. For the reasons that follow, the Court finds that no reasonable factfinder could conclude that the alleged deprivation of plaintiff's rights was caused by a municipal policy or custom.

### 1. Smoking in the Hospital

Plaintiff alleges that it was the "policy or custom" of the City to permit patients to smoke in the Hospital, thus depriving plaintiff of his right to reasonable care and safety during his confinement. However, defendants have demonstrated that the City's official policy is to prohibit smoking in health care facilities, except in designated areas. *See* N.Y.C. Admin. Code § 17–503 ("Smoking is prohibited in ... [h]ealth care facilities including ... hospitals ... [and] psychiatric facilities ..., provided however, that this paragraph shall not prohibit smoking by patients in separate enclosed rooms of residential health care facilities or facilities where day treatment programs are provided, which are designated as smoking rooms for patients."). Plaintiff has failed to present any facts that create a triable issue as to whether City policymakers altered this policy at the Hospital or that it was the custom or practice of the City to deviate from this policy.[7] In addition, plaintiff has failed to identify any members of the Hospital's staff that allegedly permitted other patients to smoke or the other patients that allegedly told plaintiff they had received permission to smoke from members of the Hospital's staff.

[7]     Even assuming *arguendo* that Williams told patients and staff members on June 27, 2002 that patients were permitted to smoke in the hospital, a "single instance" of improper conduct by Williams, who lacks final policymaking authority to suspend the smoking prohibition set forth in New York City Administrative Code § 17–503, would not create a triable issue of fact as to the existence of an unconstitutional policy or a custom or practice so widespread as to have the force of law. *See Sewell v. N.Y.C. Transit Auth.,* 809 F.Supp.

208, 217 (E.D.N.Y.1992) ( "[W]hen an official's discretionary decisions are constrained by policies not of that official's making, those [municipal] policies, rather than the subordinate's departures from them, are the act of the municipality.") (quoting *St. Louis v. Praprotnik,* 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988)).

Accordingly, because plaintiff "points to no evidence, other than his own speculation, that such a custom or policy exists," *Warheit,* 2006 WL 2381871, at *13, the Court finds that plaintiff has failed to raise a genuine issue as to whether the City is liable under Section 1983 for permitting patients to smoke in the Hospital. *See Opals on Ice Lingerie v. Body Lines Inc.,* 320 F.3d 362, 370 n. 3 (2d Cir.2003) ("An 'opposing party's facts must be material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative, nor merely suspicions.' ") (quoting *Contemporary Mission v. U.S. Postal Serv.,* 648 F.2d 97, 107 n. 14 (2d Cir.1981)).

### 2. Assaults on Plaintiff

**\*35   \*12** Plaintiff alleges that Hospital staff had foreknowledge of each of the alleged assaults against plaintiff by other patients and that it was the "policy and custom" of the City to allow such assaults to occur. (Compl.¶ 67.) As to the alleged "policy" that harmed plaintiff, plaintiff fails to identify any municipal official with policy making authority who was involved in an assault against plaintiff or to provide any documents, affidavits, or other evidence from which a reasonable jury could find that such a policy actually exists. *See Warheit,* 2006 WL 2381871, at *12 n. 4 (finding no unconstitutional policy where plaintiff "provides no evidence, other than his own bare allegations, that such a policy exists").

As to the alleged "custom" of Hospital staff to permit other patients to assault plaintiff, the Court finds that no reasonable factfinder could conclude that the alleged assaults were caused by an unofficial practice of the Hospital "so persistent or widespread as to constitute a custom or usage with the force of law." *Green,* 465 F.3d at 80.

Plaintiff has failed to specifically identify any defendants, other than Williams, who failed to protect plaintiff from attacks by other patients. Moreover, even as to the unnamed staff members who allegedly permitted assaults on plaintiff, plaintiff has failed to present evidence showing that a trial is needed on the issue of whether a practice existed among Hospital staff to allow assaults against plaintiff.

Specifically, plaintiff has failed to present any facts, beyond mere conjecture, demonstrating that the Hospital staff had foreknowledge of the alleged assaults or that they failed to act or to intervene to protect plaintiff from such assaults. *See Vallen,* 2005 WL 2296620, at *11 (granting summary judgment were there was "nothing in the record that shows whether [hospital staff] observed the attack and failed to act or intervene").

First, as to the June 15, 2002 incident, plaintiff fails to offer any facts demonstrating that members of the Hospital's staff knew of or condoned the alleged assault, other than his unsupported speculation that "some of the staff" knew of the assault and gave their approval. (*See* Compl. ¶¶ 35, 38.)

Second, as to the alleged chair-throwing incident, plaintiff fails to present any facts from which a reasonable factfinder could infer that Hospital staff knew of or failed to stop the alleged assault. Plaintiff merely alleges that, *following* the assault, he "told the staff to tell [the other patient] to stop but they did not tell him to stop it." (Compl.¶ 43.)

Third, as to the June 27, 2002 incident, the Court found *supra* that plaintiff has failed to present any facts that create a triable issue as to the alleged deprivation of plaintiff's rights based on the conduct of Williams. Plaintiff does not allege that any other defendants were involved in that alleged assault.

Finally, as to the alleged assault that occurred on July 9, 2002, plaintiff asserts that he called out to Hospital staff for help but no staff members came to help him. However, there is nothing in the record from which a reasonable juror could find that members of the Hospital's staff observed the alleged assault, or heard plaintiff's call for help and failed to act or to intervene in the assault.

**\*36  \*13** Accordingly, because plaintiff has failed to identify a municipal policy or custom that caused injury to plaintiff, the Court finds that no reasonable factfinder could conclude that the City was liable for the alleged deprivation of plaintiff's rights.

### E. Other Federal Claims

Plaintiff also alleges various other claims arising from the alleged deprivation of his federal rights. For the reasons that follow, the Court grants summary judgment as to all of defendants' remaining federal claims.

First, because the Court found *supra* that plaintiff has failed to offer any evidence of an agreement between Williams and plaintiff's alleged attackers and because plaintiff has failed to specifically identify any other government officials that entered into such an agreement, plaintiff's Section 1983 and Section 1985 conspiracy claims are dismissed. *See, e.g., Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999); *Thomas v. Roach,* 165 F.3d 137, 147 (2d Cir.1999). Moreover, because no actionable conspiracy exists, plaintiffs' Section 1986 claims must also fail. *See Dwares v. New York,* 985 F.2d 94, 101 (2d Cir.1993) ("Liability under § 1986 ... is dependent on the validity of a claim under § 1985.") (citing *Dacey v. Dorsey,* 568 F.2d 275, 277 (2d Cir.1978)).

Second, plaintiff's Section 1981 claim is dismissed because plaintiff has failed to allege, or provide any proof, that any individuals intended to discriminate against plaintiff on the basis of race. *See Gyadu v. Hartford Ins. Co.,* 197 F.3d 590, 591 (2d Cir.1999).

Finally, plaintiff's Section 1988 claim for attorney's fees is dismissed because plaintiff is not the "prevailing party" in this case. 42 U.S.C. § 1988; *see Ass'n for Retarded Citizens of Conn., Inc. v. Thome,* 68 F.3d 547, 551 (2d Cir.1995).

### F. State Law Claims

Plaintiff also asserts claims under the New York State Constitution. (Compl.¶ 1.) Defendants argue that plaintiff's pendent state law claims must be dismissed for failure to file a Notice of Claim pursuant to New York General Municipal Law Sections 50–e and 50–i. *See Hardy v. N.Y.C. Health & Hosps. Corp.,* 164 F.3d 789, 793 (2d Cir.1999) (holding that in federal court, state notice-of-claim statutes apply to state law claims). Plaintiff does not dispute defendants' assertion that a Notice of Claim was not filed for any of his state law claims. Sections 50–e and 50–i require a party asserting a state law tort claim against a municipal entity or its employees acting in the scope of their employment to file a notice of claim within ninety days of the incident giving rise to the claim and requires the plaintiff to commence the action within a year and ninety days from the date on which the cause of action accrues. *See* N.Y. Gen. Mun. Law §§ 50–e, 50–I. "Under New York law, notice of claim is a statutory precondition to filing suit against the City or its employees." *Harris v. Bowden,* No. 03 Civ. 1617(LAP), 2006 U.S. Dist. LEXIS 12450, at *22, 2006 WL 738110 (S.D.N.Y. March 23, 2006). "A plaintiff's failure to file a notice of claim requires dismissal of pendent state tort claims against the City or its employees in a federal civil rights action." *Robinson v. Matos,* No. 97 Civ. 7144(TPG), 1999 U.S. Dist. LEXIS 5447, at *3, 1999 WL

225938 (S .D.N.Y. April 19, 1999) (citing *Felder v. Casey,* 487 U.S. 131, 151, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988)).

**\*37 \*14** Furthermore, the Court does not have jurisdiction to allow plaintiff to file a late notice of claim. *Corcoran v. N.Y. Power Auth.,* No. 95 Civ. 5357(DLC), 1997 U.S. Dist. LEXIS 14819, at \*19 (S.D.N.Y. Sept. 26, 1997); *see also* N.Y. Gen. Mun. Law § 50(e) (7) ("All applications under this section shall be made to the supreme court or to the county court."). Accordingly, defendants' motion to dismiss plaintiff's state law claims is granted. [8] *See Gonzalez v. City of New York,* No. 94 Civ. 7377(SHS), 1996 U .S. Dist. LEXIS 5942, at \*5–\*6, 1996 WL 227824 (S.D.N.Y. May 3, 1996) ("Despite the statute's seemingly plain language, it applies not only to suits against municipal corporations but also to suits against 'officer[s], agent[s] or employee[s] "whose conduct has caused injury.").

[8]   Plaintiff also seeks relief under "[a]pplicable ... State Statutes," but fails to identify, and the Court is unable to discern, which, if any, state statutes apply to this case. (*See* Compl. ¶ 1.) Nevertheless, even assuming *arguendo* that plaintiff had properly alleged state statutory claims, such claims must also be dismissed due to plaintiff's failure to file a Notice of Claim. See, *e.g.,* *Flynn v. New York City Bd. of Educ.,* No. 00 Civ. 3775(LAP), 2002 WL 31175229, at \*9–\*10 (S.D.N.Y. Sept.30, 2002) (dismissing New York state statutory claims due to plaintiffs failure to file a notice of claim).

Moreover, even assuming *arguendo* that plaintiff had filed a notice of claim, the Court would, in its discretion, "decline to exercise supplemental jurisdiction over [plaintiff's] state law claims [because] it has dismissed all claims over which it has original jurisdiction." *Kolari v. New York Presbyterian Hospital,* 455 F.3d 118, 121–22 (2d Cir.2006) (quoting 28 U.S.C § 1367(c)(3)) (internal quotation marks omitted) ("If the federal law claims are dismissed before trial ... the state claims should be dismissed as well."); *Karmel v. Liz Claiborne, Inc.,* No. 99 Civ. 3608(WK), 2002 U.S. Dist. LEXIS 12842, \*11, 2002 WL 1561126 (S.D.N.Y. July 15, 2002) ("Where a court is reluctant to exercise supplemental jurisdiction because of one of the reasons put forth by § 1367(c), or when the interests of judicial economy, convenience, comity and fairness to litigants are not violated by refusing to entertain matters of state law, it should decline supplemental jurisdiction and allow the plaintiff to decide whether or not to pursue the matter in state court.").

### III. CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment is GRANTED and plaintiff's claims are dismissed in their entirety. The Clerk of the Court shall enter judgment in favor of defendants and close this case.

SO ORDERED.

2012 WL 651919 Only the Westlaw citation is currently available. United States District Court, N.D. New York.

Kenneth Carl GROVES, Sr., Plaintiff,

v.

Brett DAVIS, Secure Care Treatment Aid; David W. Sill, Secure Care Treatment Aid; Thomas Nicolette, RN, Ward Nurse; Charmaine Bill, Treatment Team Leader; Jill E. Carver, Social Worker, Primary Therapist; Edwin Debroize, Psychologist Assist; Jeff Nowicki, Chief of Mental Health Treatment Serv.; Terri Maxymillian, Ph.D., Dir. of Mental Health Serv.; Sgt. Sweet, Security Services, CNYPC; Michael Hogan, Comm'r, Dep't of Mental Health, Defendants.

No. 9:11–CV–1317 (GTS/RFT). | Feb. 28, 2012.

**Attorneys and Law Firms**

Kenneth Carl Groves, Sr., Marcy, NY, pro se.

### *MEMORANDUM DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* civil rights action filed by Kenneth Carl Groves, Sr. ("Plaintiff"), against numerous employees of New York State or the Central New York Psychiatric Center ("Defendants"), are Plaintiff's motion to proceed *in forma pauperis,* his motion for a temporary restraining order and preliminary injunction, and his motion for appointment of counsel. (Dkt.Nos.2, 3, 4.) [1] For the reasons set forth below, Plaintiff's motion to proceed *in forma pauperis* is granted; his motion for a preliminary injunction is denied; his motion for appointment of counsel

**O'dell v. Bill, Not Reported in F.Supp.3d (2015)**
Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 267 of 370
2015 WL 710544

is denied; Plaintiff's claims of deliberate indifference to his mental health needs against Defendants Bill, Carver and DeBroize are *sua sponte* dismissed with prejudice; Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from their alleged personal involvement in the August 8, 2011 assault are *sua sponte* dismissed without prejudice and with leave to amend in this action in accordance with Fed.R.Civ.P. 15; Sgt. Sweet is *sua sponte* dismissed without prejudice as a Defendant in this action; the Clerk is directed to issue summonses, and the U.S. Marshal is directed to effect service of process on Defendants Davis, Sill, and Nicolette.

1    This is the fourth civil rights action filed by Plaintiff in this District. Generally, two of these actions arose out of Plaintiff's refusal to consent to a strip search and the subsequent actions taken against Plaintiff as a result of his refusal. *See Groves v. New York,* 09–CV–0406, Decision and Order (N.D.N.Y. filed May 11, 2009) (Hurd, J.) (*sua sponte* dismissing complaint pursuant to 28 U.S.C. § 1915[e][2][B] ); *Groves v. The State of New York,* 9:09–CV–0412, Decision and Order (N.D.N.Y. filed Mar. 26, 2010) (Sharpe, J.) (granting defendants' motion to dismiss the complaint pursuant' to Fed.R.Civ.P. 12[b][6] ). The third action alleged numerous violations of Plaintiff's constitutional rights during the period July 23, 2009, and August 26, 2009, and was dismissed without prejudice upon Plaintiff's request in October, 2010. *See Groves v. Maxymillian,* 9:09–CV–1002, Decision and Order (N.D.N.Y. filed Oct. 8, 2010) (Suddaby, J.). As a result, it does not appear that the current action is barred because of res judicata, collateral estoppel, and/or the rule against duplicative litigation.

## I. RELEVANT BACKGROUND

**\*38**  On November 7, 2011, Plaintiff commenced this action *pro se* by filing a civil rights Complaint, together with a motion to proceed *in forma pauperis.* (Dkt.Nos.1, 2.) 2  Liberally construed, Plaintiffs Complaint alleges that the following constitutional violations against him occurred during his confinement at Central New York Psychiatric Center ("CNYPC"): (1) Defendants Davis and Sill used excessive force against him under the Eighth and/or Fourteenth Amendments; (2) Defendant Nicolette knew of and failed to take action to protect Plaintiff from the assault under the Eighth and/or Fourteenth Amendments;

(3) Defendants Bill, Carver, and DeBroize were deliberately indifferent to his mental health needs under the Eighth and/or Fourteenth Amendments; and (4) Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, Bosco, and Hogan failed to "adequately train the staff under their supervision" and to take appropriate action in response to the incident. (*See generally* Dkt. No. 1.) For a more detailed description of Plaintiff's claims, and the factual allegations giving rise to those claims, the reader is referred to Part III.B of this Decision and Order.

2    At that time, Plaintiff also filed motions for injunctive relief and for appointment of counsel. (Dkt.Nos.3, 4.)

## II. MOTION TO PROCEED *IN FORMA PAUPERIS*

Because Plaintiff sets forth sufficient economic need, the Court finds that Plaintiff may properly commence this action *in forma pauperis.* (Dkt. No. 2.)

## III. *SUA SPONTE* REVIEW OF PLAINTIFF'S COMPLAINT

In light of the foregoing, the Court must now review the sufficiency of the allegations that Plaintiff has set forth in his Complaint in light of 28 U.S.C. § 1915(e)(2)(B). This is because Section 1915(e)(2)(B) directs that, when a plaintiff seeks to proceed *in forma pauperis,* "(2) ... the court shall dismiss the case at any time if the court determines that... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief."

28 U.S.C. § 1915(e)(2)(B). 3

3    The Court notes that, similarly, Section 1915A(b) directs that a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b).

### A. Governing Legal Standard

**\*2**  It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6), can be based on one or both of two

grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty.,* 549 F.Supp.2d204, 211, nn. 15–16 (N.D.N.Y.2008) (McAvoy, J., adopting Report–Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, a few words regarding that ground are appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed.R.Civ.P. 8(a)(2).

 **\*39** On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal." *Jackson,* 549 F.Supp.2d at 212, n. 20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson,* 549 F.Supp.2d at 212, n. 17 (citing Supreme Court cases) (emphasis added).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson,* 549 F.Supp.2d at 212, n. 18 (citing Supreme Court cases); *Rusyniak v. Gensini,* 629 F.Supp.2d 203, 213 & n. 32 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12–61 (3d ed.2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak,* 629 F.Supp.2d at 213, n. 22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949–52, 173 L.Ed.2d 868 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly,* the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1.

*Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly,* 127 S.Ct. at 1968–69. Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965–74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id.* at 1965. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.*

**\*3** As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949."[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not show[n]-that the pleader is entitled to relief." *Id.* at 1950 [internal quotation marks and citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.,* it "does not impose a probability requirement." *Twombly,* 550 U.S. at 556.

 **\*40** Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal,* 129 S.Ct. at 1949 (internal citations and alterations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

**O'dell v. Bill, Not Reported in F.Supp.3d (2015)**
Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 269 of 370

2015 WL 710544

This pleading standard applies even to *pro se* litigants. While the special leniency afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed), it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12. [4] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8,10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow. [5] Stated more simply, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." *Jackson,* 549 F.Supp.2d at 214, n. 28 [citations omitted]. [6]

[4]    See *Vega v. Artus,* 610 F.Supp.2d 185, 196 & nn. 8–9 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

[5]    See *Vega,* 610 F.Supp.2d at 196, n. 10 (citing Supreme Court and Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

[6]    It should be emphasized that Fed.R.Civ.P. 8's plausibility standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which (when reviewing a *pro se* pleading) the Court stated, *"Specific* facts are not necessary" to successfully state a claim under Fed.R.Civ.P. 8(a)(2). *Erickson v. Pardus,* 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) [emphasis added]. That statement was merely an abbreviation of the often-repeated point of law-first offered in *Conley* and repeated in *Twombly*-that a pleading need not "set out *in detail* the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965, n. 3 (citing *Conley,* 355 U.S. at 47) [emphasis added]. That statement did not mean that all pleadings may achieve the requirement of "fair notice" without ever alleging any facts whatsoever. Clearly, there must still be enough fact set out (however set out, whether in detail or in a generalized fashion) to raise a right to relief above the speculative level to a plausible level. *See Rusyniak,* 629 F.Supp.2d at 214 & n. 35 (explaining holding in *Erickson* ).

## B. Analysis of Plaintiff's Complaint

The Court prefaces its analysis of Plaintiff's Complaint by noting that, although Plaintiff is a civilly committed sex offender and no longer a prisoner, the Court will look to cases addressing prisoner's rights in analyzing Plaintiffs claims, because "confinement of civilly committed patients is similar to that of prisoners." *Holly v. Anderson,* 04–CV–1489, 2008 WL 1773093, at *7 (D.Minn.Apr.15, 2008); *see also Morgan v. Rabun,* 128 F.3d 694, 697 (8th Cir.1997) ("The governmental interests in running a state mental hospital are similar in material aspects to that of running a prison."). Thus, whereas claims of excessive force by convicted criminals are analyzed under the Eighth Amendment to the United States Constitution, because Plaintiff is a civilly committed sex offender and no longer a prisoner, his substantive rights to be free from unsafe conditions of confinement arise under the Due Process Clause of the Fourteenth Amendment. In *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Court stated "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional [under the Due Process Clause] to confine the involuntarily committed-who may not be punished at all-in unsafe conditions." *Youngberg,* 457 U.S. at 315–16. As have numerous other courts which have considered the issue, this Court has found that "the standard for analyzing a civil detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard." *Groves v. Patterson,* 09–CV–1002, Memorandum–Decision and Order at *15–16 (N.D.N.Y. filed Nov. 18, 2009). [7]

[7]    See *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) ("[W]hile the Supreme Court has not precisely limned the duties of a custodial official under the Due Process Clause to provide needed medical treatment to a pretrial detainee, it is plain that an unconvicted detainee's rights are at least as great as those of a convicted prisoner."); *Walton v. Breeyear,* 05–CV–0194, 2007 WL 446010, at *8, n. 16 (N.D.N.Y.Feb.8, 2007) (Peebles, M.J.) (noting that pretrial detainees enjoy protections under the due process clause of the Fourteenth Amendment parallel to those afforded to sentenced prisoners by the Eighth Amendment); *Vallen v. Carrol,* 02–CV–5666, 2005 WL 2296620, at 8–9 (S.D.N.Y.Sep.20, 2005) (finding that the Eighth Amendment standard of "deliberate indifference" is the correct one for Section 1983

claims brought by involuntarily committed mental patients based on alleged failures to protect them that violated their substantive due process rights); *Bourdon v. Roney,* 99–CV–0769, 2003 WL 21058177, at *10 (N.D.N.Y.Mar.6, 2003) (Sharpe, M.J.) ("The standard for analyzing a pretrial detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard.").

### 1. Excessive Force Claims Against Defendants Davis, Still and Nicolette

**\*41  \*4** Plaintiff alleges that on August 8, 2011, Defendant Davis entered Plaintiff's dorm room at CNYPC and "viciously attacked and brutally assaulted and battered" him. (Dkt. No. 1 at 4.) During the course of this assault, Defendant Sill is alleged to have entered Plaintiffs room and "jump[ed] on the plaintiff's legs holding and pinning them as Defendant Davis [continued to beat Plaintiff]." (*Id.*) As alleged in the Complaint, although Defendant Nicolette knew in advance that this assault was planned, he "remained in the Nurses Station" and "did nothing to interceed [sic] or stop the brutal attack on the plaintiff" (*Id.* at 5.)

To validly assert a violation of the Eighth Amendment through the use of excessive force, an inmate must allege the following: (1) subjectively, that the defendants acted wantonly and in bad faith; and (2) objectively, that the defendants' actions violated "contemporary standards of decency." *Blyden v. Mancusi,* 186 F.3d 252, 262–63 (2d Cir.1999) (internal quotation marks omitted) (citing *Hudson v. McMillian,* 503 U.S. 1, 8 [1992] ).

Here, construing the factual allegations of Plaintiffs Complaint with special leniency, the Court finds that Plaintiff appears to have alleged facts plausibly suggesting that he was subjected to excessive force by Defendants Davis and Sill. In addition, by alleging that Defendants Davis, Sill and Nicolette discussed the assault in advance of it occurring, and that Nicolette was in the vicinity of Plaintiff's room and had an opportunity to intervene to prevent it, the Complaint sufficiently alleges that Defendant Nicolette was personally involved and/or failed to protect Plaintiff from the assault. *See Bhuiyan v. Wright,* 06–CV–0409, 2009 WL 3123484, at *7 (N.D.N.Y.Sept.29, 2009) (Scullin, J.) ("The fact that defendant Davis was not in the room, but was acting as a 'lookout' so that no one came into the room while plaintiff was being beaten, would not absolve him from liability for the assault. An officer's failure to intervene during another

officer's use of excessive force can itself constitute an Eighth Amendment violation unless the assault is "sudden and brief," and the defendant had no real opportunity to prevent it."); *Jeffreys v. Rossi,* 275 F.Supp.2d 463, 474 (S.D.N.Y.2003) (holding that an officer may be personally involved in the use of excessive force if he either directly participates in the assault or if he was present during the assault, yet failed to intervene on behalf of the victim, even though the officer had a reasonable opportunity to do so).

As a result, a response to these claims is required from Defendants David, Sill, and Nicolette. In so ruling, the Court expresses no opinion as to whether Plaintiff's claims can withstand a properly filed motion to dismiss or for summary judgment.

### 2. Deliberate Indifference Claims Against Defendants Bill, Carver and DeBroize

Plaintiff alleges that on August 9, 2011, the day after the alleged assault, he attempted to "discuss the incident and what transpired" with Defendants Bill and Carver. (Dkt. No. 1 at 5.) Plaintiff alleges that Defendant Bill told him, "I don't want to discuss this Mr. Groves, we're too busy for your foolishness and the matter is being investigated." (*Id.*) Plaintiff's effort to explain that he was frightened by the incident was rebuffed by Defendant Bill, who told Plaintiff to "grow up." (*Id.* at 5–6.) The following day, Plaintiff attempted to discuss the incident with Defendant Carver, his primary therapist, again without success. A further attempt at discussion later that day was met with Defendant Carver "stating to the plaintiff in a snotty tone 'grow the hell up!' " (*Id.* at 6.) On August 10, 2011, Plaintiff attempted to discuss the incident "and his current fears and feelings," during his Monday afternoon "Process Group," which is facilitated by Defendant DeBroize. As alleged, Defendant DeBroize told Plaintiff and the other group members that the matter was under investigation "so no one could discuss the incident with anyone." (*Id.* at 6.)

**\*42  \*5** To state a claim of deliberate indifference to a serious medical and/or mental health need under the Eighth Amendment, a plaintiff must first allege facts plausibly suggesting that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting *Estelle v. Gamble,* 429

U.S. at 102, 105–06). The "deliberate indifference standard embodies both an objective and a subjective prong," both of which the plaintiff must establish. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,*513 U.S. 1154, 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). "First, the alleged deprivation must be, in objective terms, 'sufficiently serious.' " *Id.* (citations omitted). Second, the defendant "must act with a sufficiently culpable state of mind." *Id.*

With regard to the first element, generally, to be sufficiently serious for purposes of the Constitution, a medical condition must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) [citations omitted], *accord, Hathaway,* 37 F.3d at 66; *Chance v. Armstrong,*

143 F.3d 698, 702 (2d Cir.1998).). [8] Under the subjective component, a plaintiff must also allege facts plausibly suggesting that the defendant acted with "a sufficiently culpable state of mind." *Hathaway,* 37 F.3d at 66. The requisite culpable mental state is similar to that of criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301–03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). Aphysician's negligence in treating or failing to treat a prisoner's medical condition does not implicate the Eighth Amendment and is not properly the subject of a *Section 1983* action. *Estelle,* 429 U.S. at 105–06; *Chance,* 143 F.3d at 703. [9]

[8]  Relevant factors informing this determination include whether the plaintiff suffers from an injury that a "reasonable doctor or patient would find important and worthy of comment or treatment," a condition that "significantly affects" a prisoner's daily activities, or "the existence of chronic and substantial pain." *Chance,* 143 F.3d at 702.

[9]  Thus, a physician who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference. *Harrison,* 219 F.3d at 139. Likewise, an inmate who disagrees with the physician over the appropriate course of treatment has no claim under *Section 1983* if the treatment provided is "adequate." *Chance,* 143 F.3d at 703. The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the

Eighth Amendment when the care provided is 'reasonable.' " *Jones v. Westchester Cnty. Dept. of Corr.,* 557 F.Supp.2d 408, 413 (S.D.N.Y.2008). In addition, "disagreements over medications, diagnostic techniques (e .g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention are not adequate grounds for a *section 1983* claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001). However, if prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," such conduct constitutes deliberate indifference. *Harrison,* 219 F.3d at 138.

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting that Defendants Bill, Carver, and DeBroize acted with deliberate indifference to Plaintiff's serious mental health condition when they declined to discuss the incident of August 8, 2011. There is nothing in the Complaint that even remotely suggests that the requested conversations were integral to Plaintiff's treatment as a convicted sex offender involuntarily committed to CNYPC, or that Defendants' refusal to discuss the incident with Plaintiff when he requested to do so caused Plaintiff to suffer any harm or worsening of his condition. In addition, Plaintiff does not allege that any of these Defendants acted with the requisite culpable state of mind.

**\*43**  Moreover, the statements made by Defendants Bill and Carver that he should "grow up," even if construed as verbal harassment, do not give rise to a cognizable claim that may be pursued under *Section 1983*. Allegations of verbal harassment are insufficient to support a *Section 1983* claim. *Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001); *see also Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) ("[A]llegations of verbal harassment are insufficient to base a *§ 1983* claim if no specific injury is alleged .").

**\*6** For these reasons, Plaintiffs deliberate indifference claims against Defendants Bill, Carver, and DeBroize are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b) (6). Moreover, because the Court cannot imagine how Plaintiff might correct this claim through better pleading, he is not granted leave to attempt to do so in an amended pleading. [10]  Rather, this claim is hereby dismissed with prejudice.

10     The Court notes that, generally, leave to amend pleadings shall be freely granted when justice so requires. Fed.R.Civ.P. 15(a). However, an opportunity to amend is not required where amendment would be futile. *John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.,* 22 F.3d 458, 462 (2d Cir.1994). *John Hancock Mut. Life Ins. Co.,* 22 F.3d at 462. The Second Circuit has explained that "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993); *see Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) ("The problem with [Plaintiff's] cause of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied."). This rule is applicable even to *pro se* plaintiffs. *See, e.g., Cuoco,* 222 F.3d at 103.

**3. Failure to Supervise Claims Against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan**

To prevail on a claim under 42 U.S.C. § 1983, a defendant must be personally involved in the plaintiff's constitutional deprivation. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). Generally, for purposes of 42 U.S.C. § 1983, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. [11]

11     *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,* 781 F.2d 319, 323–324 (2d Cir.1986) (setting forth four prongs).

Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement. *McKinnon,* 568 F.2d at 934. Rather, a plaintiff must demonstrate " 'a tangible connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas,* 04–CV–7263, 2008 WL 857528, at *2 (S.D.N.Y.Mar.31, 2008) (quoting *Bass v. Jackson,* 790 F.2d 260, 263 [2d

Cir.1986] ) (other citation omitted). An official's failure to respond to grievance letters from inmates, however, "does not establish supervisory liability." *Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997). [12] Moreover, "the law is clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials." *Pine v. Seally,* 9–CV–1198, 2011 WL 856426, at *9 (N.D.N.Y. Feb.4, 2011). [13]

12     *See also Gillard v. Rosati,* 08–CV–1104, 2011 WL 4402131, at *7 (N.D.N.Y.Aug.22, 2011) (Peebles, J.) ("It is well-established that without more, 'mere receipt of letters from an inmate by a supervisory official regarding a medical claim is insufficient to constitute personal liability." [internal quotation marks and brackets omitted] ); *Greenwaldt v. Coughlin,* 93–CV–6551, 1995 WL 232736, at *4 (S.D.N.Y.Apr.19, 1995) ("it is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations."); *Clark v. Coughlin,* 92–CV 0920, 1993 WL 205111, at *5 n. 2 (S.D.N.Y.Jun.10, 1993) ("Courts in this jurisdiction have consistently held that an inmate's single letter does not constitute the requisite personal involvement in an alleged constitutional deprivation to trigger the Commissioner's liability.")

13     *See also Bernstein v. N.Y.,* 591 F.Supp.2d 448, 460 (S.D.N.Y.2008) ("Courts within the Second Circuit have determined that there is no constitutional right to an investigation by government officials." [internal quotation marks, brackets and ellipsis omitted] ).

In his Complaint, Plaintiff alleges in wholly conclusory terms that Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan failed to "adequately train the staff under their supervision and fail[ed] to act within the scope and training of the position and job title they hold." (Dkt. No. 1 at 8.) Plaintiff alleges that he submitted a letter of complaint to Defendant Hogan and wrote to Defendant Nowicki on several occasions expressing concern his complaint had not been responded to, only to be advised that in September, 2011 that an investigation was ongoing. (*Id.* at 6–7.) Plaintiff does not allege that any of these Defendants personally participated in the alleged assault on August 8, 2011.

**\*44** Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting any personal involvement by these Defendants in the alleged use of excessive force on August 8, 2011. As a result, Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from this incident are *sua sponte* dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6). This dismissal is without prejudice to Plaintiff's right to file an Amended Complaint that corrects the above-described pleading defects, and states a viable claim against these Defendants. The Court notes that, at this early stage of the case, Plaintiff has the right —without leave of the Court-to file an Amended Complaint within the time limits established by Fed.R.Civ.P. 15(a)(1) (B). However, if he seeks to file an Amended Complaint after those time limits, he must file a motion for leave to file an Amended Complaint in accordance with Fed.R.Civ.P. 15(a) (2). In either event, Plaintiff is advised that *any Amended Complaint must be a complete pleading that will replace and supersede the original Complaint in its entirety, and that may not incorporate by reference any portion of the original Complaint. See* N.D.N.Y. L.R. 7.1(a)(4).

**\*7** Finally, although Plaintiff names Sgt. Sweet as a Defendant in the caption of the complaint and in the listing of the parties, he has not set forth in the Complaint any allegations of fact regarding the conduct of this Defendant complained of. (*See generally* Dkt. No. 1.) As a result, the Complaint fails to state a claim upon which relief may be granted and Sgt. Sweet is dismissed from this action without prejudice to Plaintiff's right to file an Amended Complaint as set forth above.

## IV. MOTION FOR INJUNCTIVE RELIEF

A preliminary injunction is an "extraordinary remedy that should not be granted as a routine matter." *Patton v. Dole,* 806 F.2d 24, 28 (2d Cir.1986). In most cases, to warrant the issuance of a preliminary injunction, a movant must show (a) irreparable harm and (b) either (1) a likelihood of success on the merits of the claim or (2) sufficiently serious questions going to the merits, and a balance of hardships tipping decidedly in favor of the moving party. *D.D. ex rel. V.D. v. New York City Bd. of Educ.,* 465 F.3d 503, 510 (2d Cir.2006) (quotation omitted). "The purpose of issuing a preliminary injunction is to 'preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the ... merits.' " *Candelaria v. Baker,* 00–CV–912, 2006 WL 618576, at \*3 (W.D.N.Y.Mar.10, 2006) (quoting *Devose v. Herrington,* 42 F.3d 470, 471 [8th Cir.1994]

). Preliminary injunctive relief " 'should not be granted unless the movant, by a clear showing, carries the burden of persuasion.' " *Moore v. Consolidated Edison Co. of New York, Inc.,* 409 F.3d 506, 510 (2d Cir.2005) (quoting *Mazurek v. Armstrong,* 520 U.S. 968, 972 [1997] ). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Moore,* 409 F.3d at 510 (citing *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 381, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992). The same standards govern consideration of an application for a temporary restraining order. *Perri v. Bloomberg,* 06–CV–0403, 2008 WL 2944642, at \*2 (E.D.N.Y.Jul.31, 2008) [citation omitted]. The district court has broad discretion in determining whether to grant a preliminary injunction. *Moore,* 409 F.3d at 511.

**\*45** "The Second Circuit has defined 'irreparable harm' as 'certain and imminent harm for which a monetary award does not adequately compensate,' noting that 'only harm shown to be non-compensable in terms of money damages provides the basis for awarding injunctive relief.' " *Perri,* 2008 WL 2944642, at \*2 (citing *Wisdom Import Sales Co., L.L.C v. Labatt Brewing Co., Ltd.,* 339 F.3d 101, 113–14 [2d Cir.2003] ); *see also Kamerling v. Massanari,* 295 F.3d 206, 214 (2d Cir.2002) ("To establish irreparable harm, a party seeking preliminary injunctive relief must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.") (internal quotation omitted). Speculative, remote or future injury is not the province of injunctive relief. *Los Angeles v. Lyons,* 461 U.S. 95, 111–12, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *see also Hooks v. Howard,* 07–CV–0724, 2008 WL 2705371, at \*2 (N.D.N.Y.Jul.3, 2008) (citation omitted) ("Irreparable harm must be shown to be imminent, not remote or speculative, and the injury must be such that it cannot be fully remedied by monetary damages.").

**\*8** Plaintiff has submitted a document entitled "Order to Show Cause for Preliminary Injunction and Tempor[ary] Restraining Order." (Dkt. No. 3.) Construed liberally, Plaintiff's submission seeks a temporary restraining order and injunctive relief enjoining Defendants from "submitting and filing false and untrue statements and reports" regarding the August 11, 2011 incident, and to "stop all retaliatory actions against the plaintiff...." (*Id.* at 1.) Plaintiff also seeks an "Order of Seperation [sic]" directing that Defendants Davis, Sill, Nicolette, Bill, Carver and DeBroize be "restrained from being within 100 feet from the plaintiff in any form or matter." (*Id.* at 2.)

The Court has reviewed Plaintiff's motion papers thoroughly and considered the claims asserted therein in the light most favorable to Plaintiff, as a *pro se* litigant. Based upon that review, the Court finds that the harm Plaintiff alleges is purely speculative and, therefore, not "irreparable." Plaintiff's motion is supported only by a recitation of the alleged assault in August, 2011. (*Id.* at 1–4.) Plaintiff has not supported the claims of ongoing misconduct set forth in his motion papers with any factual allegations, such as the dates on which the misconduct occurred, the nature of the injuries he claims to have suffered, the identities of the persons responsible for the conduct he seeks to enjoin, or the relationship between those actions and the claims asserted in his Complaint. Simply stated, Plaintiff's alleged fear of future wrongdoing by the Defendants is not sufficient to warrant the extraordinary remedy of preliminary injunctive relief.

The Court further notes that the requested injunctive relief cannot be granted unless there is also proof that Plaintiff has a likelihood of succeeding on the merits of his claim, or evidence that establishes sufficiently serious questions going to the merits of his claim and a balance of hardships tipping decidedly toward him. *See Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992). Plaintiff has failed to submit *proof or evidence* that meets this standard. Plaintiff's allegations, standing alone, are not sufficient to entitle him to preliminary injunctive relief. *See Ivy Mar Co. v. C.R. Seasons Ltd.,* 907 F.Supp. 547, 561 (E.D.N.Y.1995) ("[B]are allegations, without more, are insufficient for the issuance of a preliminary injunction."); *Hancock v. Essential Resources, Inc.,* 792 F.Supp. 924, 928 (S.D.N.Y.1992) ("Preliminary injunctive relief cannot rest on mere hypotheticals."). Without evidence to support his claims that he is in danger from the actions of anyone at CNYPC, the Court will not credit Plaintiff's conclusory allegations that he will be retaliated against or harmed in the future.

**\*46** Plaintiff has failed to establish either of the two requisite elements discussed above. As a result, Plaintiff's request for a temporary restraining order and/or injunctive relief is denied.

## V. MOTION FOR APPOINTMENT OF COUNSEL

**\*9** Courts cannot utilize a bright-line test in determining whether counsel should be appointed on behalf of an indigent party. *Hendricks v. Coughlin,* 114 F.3d 390, 392–93 (2d Cir.1997). Instead, a number of factors must be carefully considered by the court in ruling upon such a motion:

> [T]he district judge should first determine whether the indigent's position seems likely to be of substance. If the claim meets this threshold requirement, the court should then consider the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

*Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994) (quoting *Hodge v. Police Officers,* 802 F.2d 58, 61 [2d Cir.1986] ). This is not to say that all, or indeed any, of these factors are controlling in a particular case. [14] Rather, each case must be decided on its own facts. *Velasquez v. O'Keefe,* 899 F.Supp. 972, 974 (N.D.N.Y.1995) (McAvoy, C.J.) (citing *Hodge,* 802 F.2d at 61).

14     For example, a plaintiff's motion for counsel must always be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector, and such a motion may be denied solely on the failure of the plaintiff to provide such documentation. *See Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994); *Cooper v. Sargenti Co., Inc.,* 877 F.2d 170, 172, 174 (2d Cir.1989) [citation omitted].

Upon due consideration, the Court finds that the relevant factors weigh decidedly against granting Plaintiff's motion at this time. For example, the Court finds as follows: (1) the case does not present novel or complex issues; (2) it appears to the Court as though, to date, Plaintiff has been able to effectively litigate this action; (3) while it is possible that there will be conflicting evidence implicating the need for cross-examination at the time of the trial, as is the case in many actions brought under 42 U.S.C. § 1983 by *pro se* litigants, "this factor alone is not determinative of a motion for appointment of counsel," *Velasquez,* 899 F.Supp. at 974;

(4) if this case survives any dispositive motions filed by Defendants, *it is highly probable that this Court will appoint trial counsel at the final pretrial conference;* (5) this Court is unaware of any special reasons why appointment of counsel at this time would be more likely to lead to a just determination of this litigation; and (6) Plaintiff's motion for counsel is not accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

For these reasons, Plaintiff's motion for the appointment of counsel is denied without prejudice. After the Defendants have responded to the allegations in the Complaint which survive *sua sponte* review, and the parties have undertaken discovery, Plaintiff may file a second motion for the appointment of counsel, at which time the Court may be better able to determine whether such appointment is warranted in this case. Plaintiff is advised that any second motion for appointment of counsel must be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

**\*47  \*10 ACCORDINGLY,** it is

**ORDERED** that Plaintiff's motion to proceed *in forma pauperis* (Dkt. No. 2) is **GRANTED;** [15] and it is further

[15]   Plaintiff should note that he will still be required to pay fees that he may incur in this action, including but not limited to copying and/or witness fees.

**ORDERED** that Plaintiff's motion for injunctive relief (Dkt. No. 3) is **DENIED;** and it is further

**ORDERED** that Plaintiff's motion for appointment of counsel (Dkt. No. 4) is **DENIED** without prejudice; and it is further

**ORDERED** that Plaintiff's claims of deliberate indifference against Defendants Bill, Carver and DeBroize are *sua sponte* **DISMISSED** with prejudice pursuant to 28 U.S.C. § 1915(e) (2) (B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from their alleged personal involvement in the August 8, 2011 incident are *sua sponte* **DISMISSED** without prejudice **and with leave to amend** in this action in accordance with Fed.R.Civ.P. 15 (as described above in Part III.B.3. of this Decision and Order), pursuant to 28 U.S.C. § 1915(e)(2)(B) (ii) and Fed.R.Civ.P. 12(b) (6); and it is further

**ORDERED** that Defendant Sweet is *sua sponte* **DISMISSED** without prejudice and with leave to be **reinstated** as a Defendant in this action in accordance with Fed.R.Civ.P. 15, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is otherwise accepted for filing (i.e., as to the claims against Defendants Davis, Sill, and Nicolette arising from the August 8, 2011 incident); and it is further

**ORDERED** that Plaintiff provide a summons, USM–285 form and a copy of the complaint for Defendant Davis, Sill and Nicollette for service, and upon receipt from Plaintiff of the documents required for service of process, the Clerk shall (1) issue summonses and forward them, along with copies of the Complaint to the United States Marshal for service upon the remaining Defendants, and (2) forward a copy of the summons and Complaint by mail to the Office of the New York State Attorney General, together with a copy of this Decision and Order; and it is further

**ORDERED** that, after service of process on Defendants, a response to the Complaint shall be filed by the Defendants or their counsel as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261–7367. Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of it was mailed to all opposing parties or their counsel. **Any document received by the Clerk or the Court which does not include a certificate of service showing that a copy was served upon all opposing parties or their attorneys will be stricken from the docket .** Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify, in writing, the Clerk's Office and all parties or their counsel of any change in Plaintiff's address; his failure to so may result in the dismissal of this action.** All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court.

2009 WL 3074344 Only the Westlaw citation is currently available. United States District Court, N.D. New York.

Warren LANE, Plaintiff,

v.

Sharon E. CARPINELLO, Commissioner, New York State Office of Mental Health; Donald Sawyer, Director; Sharon Barboza, M.D.; Jeffrey Nowicki, Social Worker; Anthony Lucenti, Social Worker; J. Crociata, Nurse; Michael Babula, Treatment Assistant; Frank Menz, Treatment Assistant; Stephen Coppola, Treatment Assistant Central New York Psychiatric Center; and Barbara Bebe, Facility Review Specialist, New York State Commission for Quality of Care, Defendants.

Civil Action No. 9:07–cv–751

(GLS/DEP). | Sept. 24,2009.

**\*48** West KeySummary

**1 Civil Rights**
+ Physical Access and Mobility; Carriers

A visually impaired sex offender failed to state a discrimination claim under the Americans with Disabilities Act against employees who worked in his sex offender treatment program. The sex offender alleged that the employees failed to provide him with a reasonable accommodation after taking his cane. The cane was confiscated because sex offenders were not permitted to have such items in the treatment facility and the confiscation of the cane did not exclude the sex offender from participating in the program or of the benefits of the services, programs, or activities of the sex offender treatment program. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

Cases that cite this headnote

**Attorneys and Law Firms**

Warren Lane, Bronx, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, Dean J. Higgins, Assistant Attorney General, of Counsel, Albany, NY, for the Defendants.

*ORDER*

GARY L. SHARPE, District Judge.

**\*1** The above-captioned matter comes to this court following a Report–Recommendation by Magistrate Judge David E. Peebles, duly filed August 31, 2009. Following ten days from the service thereof, the Clerk has sent the file, including any and all objections filed by the parties herein.

No objections having been filed, and the court having reviewed the Magistrate Judge's Report–Recommendation for clear error, it is hereby

ORDERED, that the Report–Recommendation of Magistrate Judge David E. Peebles filed August 31, 2009 is ACCEPTED in its entirety for the reasons state therein, and it is further

ORDERED, that the plaintiff's motion for partial summary judgment (Dkt. No. 57) is DENIED, defendants' cross-motion for summary judgment (Dkt. No. 79) is GRANTED, and the plaintiff's complaint is DISMISSED in its entirety, and it is further

ORDERED, that the Clerk of the court serve a copy of this order upon the parties in accordance with this court's local rules.

IT IS SO ORDERED.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff Warren Lane, a former New York State prison inmate who alleges that he is "legally blind", has commenced this civil rights action pursuant to 42 U.S.C. §§ 1983, 1984, 1985 and 12,101 against ten defendants, eight of whom are employed at the Central New York Psychiatric Center ("CNYPC"), alleging various constitutional and statutory violations committed by the defendants during the period of his confinement in CNYPC. In his complaint, plaintiff asserts claims relating to his involuntary confinement at CNYPC in 2006, commencing upon his conditional release date from prison. Plaintiff maintains that he was transferred into CNYPC in violation of his constitutional right to due

process, and that while there he was subjected to further violations, including discrimination based upon his disability, excessive force, failure to intervene to protect him from harm, indifference to his medical needs, and retaliation. Plaintiff requests redress in the form of compensatory and punitive damages as well as declaratory relief.

**\*49** Currently pending before the court in connection with this action are two motions. Plaintiff initiated the motion process by seeking partial summaiy judgment with respect to his claim that he was denied due process with regard to his commitment to CNYPC and for violations of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12,101 *et seq.,* while he was held there. Defendants responded in opposition and cross-moved for summaiy judgment requesting dismissal of plaintiffs complaint in its entirety. Having carefully reviewed the extensive record now before the court, I recommend that plaintiff's motion for partial summaiy judgment be denied, defendants' motion for summaiy judgment be granted, and plaintiff's complaint be dismissed in its entirety.

## I. *BACKGROUND* [1]

[1] In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff. *See Burtnieks v. City of New York,* 716 F.3d 982, 985–86 (2d Cir.1983) (citations omitted). It should be noted, however, that many of plaintiff's allegations regarding his case and treatment while at CNYPC are vigorously contested by defendants.

Plaintiff, who is visually impaired, was incarcerated by the New York State Department of Correctional Services ("DOCS") for approximately twenty-five years following his conviction for multiple sex offenses.[2] Plaintiff's Motion for Partial Summaiy Judgment (Dkt. No. 57–4) p. 1. Prior to his DOCS conditional custody release date, plaintiff was evaluated by two physicians from the New York State Office of Mental Health ("OMH"); based upon their evaluations, on September 12, 2006, on application of the superintendent of the Sullivan Correctional Facility made pursuant to section 9. 27 of the New York Mental Hygiene Law ("MHL"), plaintiff was admitted involuntarily into CNYPC under close observation for participation in the sex offender treatment program ("SOTP").[3] Lane Aff. (Dkt. No. 57–2) ¶¶ 1–5. Although his stay at the CNYPC lasted for less

than two months, plaintiff's many complaints regarding his commitment and treatment at that facility give rise to this suit.

[2] Plaintiff was given a vision impairment assessment on July 22, 2005 while incarcerated at Sullivan Correctional Facility, and was diagnosed as having a prosthesis of the left eye and glaucoma and increasing myopia in the right eye. Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 57–4), Exh. B. Defendants acknowledge the existence of one artificial eye, but state their belief that plaintiff is able to use his other eye to read, write, and operate a calculator. *See* Affidavit of Jeffrey Nowicki, LCSW–R ("Nowicki Aff.") (Dkt. No. 79–5) ¶¶ 10–11; Defendants' Response to Plaintiff's Request for Admissions (Dkt. No. 62–3) ¶ 3.

[3] The CNYPC is a secure adult psychiatric center established within the New York State Office of Mental Health. Defendants' Statement Pursuant to Local Rule 7.1(a)(3) (Dkt. No. 79–2) ¶ 3.

**\*2** Admission records reflect that upon being admitted to CNYPC, plaintiff was "very agitated due to his admission to the SOTP and was making statements that he would due [sic] whatever it took to violate and get sent back to prison." Higgins Decl. (Dkt. No. 79–4) Exh. D, p. 92.[4] When admitted to CNYPC, plaintiff's mobility cane, which he claims to require when he is outdoors or in an unfamiliar environment, was confiscated by defendant Steven Coppola, a treatment assistant at the facility. Complaint (Dkt. No. 1) p. 6. According to defendants, plaintiffs cane was taken pursuant to a CNYPC safety and security policy that precludes any resident of the center from possessing such an item. Nowicki Aff. (Dkt. No. 79–5) ¶ 7. Plaintiff alleges that thereafter he was denied reasonable accommodations for his blindness despite his numerous requests. Complaint (Dkt. No. 1) p. 6. Defendant Jeffrey Nowicki, who was at all times relevant to plaintiff's complaint the Team Leader of the SOTP at CNYPC and is currently the Chief of Mental Health Treatment Services of the SOTP, explains that while plaintiff's cane was confiscated, he was offered a wheelchair or walker, both of which plaintiff refused. Nowicki Aff. (Dkt. No. 79–5) ¶¶ 1, 7–8. Nowicki states further that staff at CNYPC were aware of plaintiff's left eye prosthesis and that plaintiff was given medical support for this condition. *Id.* ¶ 10. Plaintiff's in-patient nursing assessment conducted on September 12, 2006, upon his admission to CNYPC, reflects plaintiff's mobility status as fully independent without any notations that a cane

O'dell v. Bill, Not Reported in F.Supp.3d (2015)
Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 278 of 370
2015 WL 710544

or walker was needed. Higgins Decl. (Dkt. No. 79–4) Exh. D, p. 38.

[4]  To protect plaintiff's privacy, and with the permission of the court, defendants filed plaintiff's records from CNYPC as well as those records from the Commission on Quality of Care and Advocacy traditionally and under seal as Exhibits D and E, respectively, to the Declaration of Dean J. Higgins, Esq. ("Higgins Decl."), Dkt. No. 79–4.

**\*50**  On October 13, 2006, one month after his transfer into CNYPC, plaintiff wrote a letter to defendant Donald Sawyer, director of the facility, demanding compliance with the ADA and that he be provided with reasonable accommodations for his disability, including a laptop computer with zoom text, a scanner and inkjet color printer, a 7x magnifier, books on tape, a high intensity lamp and 20/20 pens. Complaint (Dkt. No. 1) p. 9; Plaintiff's Motion for Partial Summaiy Judgment (Dkt. No. 57–4) Exh. C; *see also* Defendants' Response to Plaintiffs Statement Pursuant to Local Rule 7.1(a)(3) (Dkt. No. 78) ¶ 5. Plaintiff claims that, in response, defendant Nowicki told him that accommodations were unnecessary because plaintiff "would not remain at CNYPC for much longer." Complaint (Dkt. No. 1) p. 9. Feeling threatened by Nowicki's statement, Lane sent a letter to defendant Sharon Carpinello, Commissioner of the OMH, requesting that she place him into protective custody and transfer him from CNYPC. *Id.* Plaintiff did not receive a response to that letter. *Id.*

Plaintiff claims to have been subjected to three separate attacks during his stay at CNYPC. On September 18, 2006, while in the recreation yard, plaintiff was struck by a football and subsequently attacked by a fellow patient, suffering injury to his face, nose and jaw.[5] Complaint (Dkt. No. 1) p. 7; Plaintiffs Deposition Transcript ("Tr.") pp. 27–33.[6] Plaintiff claims that upon requesting medical attention he was told by defendant J. Crociata, a nurse at CNYPC, "[t]here's nothing wrong with you," and denied treatment. Complaint (Dkt. No. 1) p. 7. Plaintiff's CNYPC records contradict his version of the events, instead reflecting that defendant Crociata witnessed plaintiff arguing with another patient near the recreation yard door entrance and tried to intervene. Higgins Decl. (Dkt. No. 79–4) Exh. D, p. 114. When Crociata approached Lane and inquired if he was injured, Lane stated that he was not touched and became angry when Crociata asked what had happened, accusing Crociata of being a racist. *Id.* Plaintiff was visited by a doctor later that evening during rounds; although the doctor offered to see him, plaintiff again said he was "okay" and declined any treatment. *Id.*

[5]  The record is unclear as to whether the incident occurred on September 17 or 18, 2009. The parties agree, however, that plaintiff was involved in an altercation in the recreation yard during that period, as a result of which he later sought to pursue criminal charges.

[6]  Plaintiff's deposition transcript, which was filed as Exhibit F to Defendants' Motion for Summary Judgment (Dkt. No. 79–7), will be referenced herein as "Tr."

**\*3**  Following the September 18, 2009 incident, plaintiff demanded that he be permitted to file criminal charges against the patient who assaulted him, but was allegedly denied the opportunity to contact law enforcement authorities by Nowicki and defendants Michael Babula and Frank Menz, both of whom are treatment assistants at CNYPC. Complaint (Dkt. No. 1) p. 7. Nowicki informed plaintiff that mediation was available to handle such disputes, making it unnecessary to contact the State Police.[7] *Id.* Plaintiff claims defendant Nowicki then threatened that if he insisted on filing criminal charges, Nowicki would have his parole violated. *Id.* As a result of the September 18 attack plaintiff no longer felt safe, particularly in light of his blindness, and was fearful of losing his remaining ability to see in another altercation. *Id* . Plaintiff requested that Nowicki either transfer him to another facility or place him in protective custody.[8] *Id.* After both requests were denied, plaintiff subsequently sent a written request to defendants Sawyer and Sharon Barboza, Director of the SOTP at CNYPC, again asking for protective custody and transfer. *Id.* Plaintiff received no response from either Sawyer or Barboza. *Id.*

[7]  Plaintiff ultimately agreed to settle the matter through that channel. *See* Higgins Decl. (Dkt. No. 79–4) Exh. D, pp. 134–35.

[8]  Defendant Nowicki asserts that the CNYPC staff was not aware that plaintiff needed protection and that it was actually the other residents who needed protection from the plaintiff. Nowicki Aff. (Dkt. No. 79–5) ¶ 17.

**\*51**  Plaintiff's CNYPC records show that a call was placed to the New York State Police when plaintiff indicated that he wanted to pursue criminal charges, and that plaintiff became belligerent and threatening after the incident, touting his lengthy disciplinary record in prison and warning not only

that he would "kick the shit" out of the other patient with whom he had the problem, but also that he would soon be running the ward. [9] Higgins Decl. (Dkt. No. 79–4) Exh. D, pp. 116–19. Plaintiff did contact his parole officer regarding the incident and also filed a complaint with Nowicki. *Id.*

[9]    The DOCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in a Special Housing Unit ("SHU"). Tier III hearings concern the most serious violations, and could result in unlimited keeplock or SHU confinement, with significant restrictions on access to exercise, showers, and other programs and privileges available in general prison population, and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246, 142 L.Ed.2d 202 (1998). Inmates in SHU are not completely restricted. *Husbands v. McClellan,* 990 F.Supp. 214, 217 (W.D.N.Y.1998); *see also* 7 N.Y.C.R.R. pt. 304. Although Lane appears to dispute their accuracy, parole records indicate that while in prison he was accused of sixty-one Tier III infractions and forty-one Tier II violations, including harassing, threatening, lewd, unhygienic and violent conduct, resulting in a total of approximately five years in keeplock, eight years of disciplinary SHU confinement and seven months of involuntary protective custody. Higgins Decl. (Dkt. No. 79–4) Exh. E, pp. 153–80.

The next relevant incident occurred on September 22, 2006 when, plaintiff claims, defendant Nowicki called him to a hallway and ordered defendants Menz and Coppola to "take him down" after Lane refused to speak with Nowicki. Complaint (Dkt. No. 1) p. 8. As a result, plaintiff was thrown to the floor and kicked and punched, put in restraints, and placed on a gurney, even though he claims he did not resist. [10] *Id.* Plaintiff alleges that he was denied medical treatment for the shoulder, lower back, and face injuries that he sustained and was instead held captive in a room for two to three days, forced to sleep on the floor, and provided only one meal during that time period. Complaint (Dkt. No. 1) p. 8; Tr. p. 55.

[10]    Plaintiff stated during his deposition that approximately twenty staff members were present

during the assault; as a result, he is unsure which defendants actually kicked and punched him. Tr. pp. 49–50.

Once again, defendants' version of what occurred on that occasion is markedly different. Defendant Nowicki states that on September 22, 2006 plaintiff became hostile toward both staff and the residents, and threatened to instigate a riot. Nowicki Aff. (Dkt. No. 79–5) ¶¶ 21–30; *see also* Higgins Decl. (Dkt. No. 79–4) Exh. D, pp. 139–50. Nowicki attempted to counsel Lane in the "side room"; plaintiff rebuffed those efforts and instead attempted to re-enter the day room. Nowacki Aff. (Dkt. No. 79–5) ¶¶ 23–24. As a result, plaintiff was placed in four point restraints, pursuant to a doctor's orders, for a period of seven minutes and physically removed to the side room. *Id.* ¶ 25. When plaintiff's threats continued, he was left in the side room under supervision, consistent with hospital policy, from September 22, 2006 at 1:00 p.m. until September 25 at 9:30 a.m., during which time he was provided food, a mattress and a chair. *Id.* ¶¶ 26–30. When plaintiff was visited by a psychiatrist, he stated that he was upset because he felt that he was being treated differently than other patients with respect to unit policies, and denied any intention to hurt anyone, despite his threats. Higgins Decl. (Dkt. No. 79–4) Exh. D, p. 150. Detailed CNYPC progress notes recording plaintiff's status at fifteen minute intervals show that Lane was provided and ate all of his meals during the time he was confined to the side room. *Id.* pp. 153–81. Plaintiffs parole officer was called to CNYPC, but found that there was insufficient evidence to bring parole violation charges against plaintiff. *Id.* p. 186; *see also* Nowicki Aff. (Dkt. No. 79–5) ¶ 27 (reflecting that the parole officer was summoned at plaintiff's request).

**\*52  \*4** Following the events of September 18 and 22, 2006, plaintiff and his wife made several written complaints and placed telephone calls to various New York and federal agencies and officials. Complaint (Dkt. No. 1) p. 8. Plaintiff complains that neither he nor his wife were ever contacted by New York State Mental Hygiene Legal Services, that Prisoners Legal Services declined to represent him because he was no longer incarcerated, and that defendant Beebe, the person with the New York State Commission for Quality Care of Persons with Disabilities, assigned to investigate plaintiff's complaint, never visited CNYPC while Lane was there, and failed to interview plaintiff or his wife. *Id.* Defendants, by contrast, contend that defendant Beebe had either personal telephone conversations or exchanged voice mail messages with plaintiff's wife, Denise Lane, on October 1, October

O'dell v. Bill, Not Reported in F.Supp.3d (2015)

2015 WL 710544

23, November 1, November 3, and November 7, 2006. Defendants' Response to Plaintiffs Request for Admissions (Dkt. No. 62–3) ¶ 8. Defendant Beebe also visited CNYPC on November 21, 2006 to investigate plaintiff's complaints. Higgins Aff. (Dkt. No. 79–1) Exh. E, pp. 32–33.

Plaintiff asserts that in early October of 2006, he was again "attacked" by another patient whom, he maintains, has a history of assaultive behavior. Complaint (Dkt. No. 1) p. 9; Tr. p. 39. While plaintiff admits that there was no physical contact between the two, he states that out of fear he immediately requested placement in protective custody, a request that was once again denied. *Id.* After the incident, plaintiff was brought to the side room and is reported to have said that the fellow patient kept threatening him, and that he would take matters into his own hands if required. Higgins Decl. (Dkt. No. 79–4) Exh. D, p. 214. It was noted that CNYPC staff members were becoming increasingly concerned regarding plaintiff's menacing behavior and his apparent attempts to control and rally other patients, and that Lane stated that he felt like killing the other patient. *Id.,* pp. 214, 220.

The final incident of which plaintiff complains occurred on October 31, 2006, when Lane, upset after seeing another patient attacked, requested and was given permission to return to his room instead of remaining queued with the other patients proceeding to the dining room. Complaint (Dkt. No. 1) p. 9. After returning to his room plaintiff was approached by defendant Lucenti regarding the incident; responding to Lucenti, Lane said, "[w]hat are you people waiting for someone to get stabbed?" Complaint (Dkt. No. 1) p. 9. When plaintiff left his room later that day he was confronted by defendants Nowicki, Lucenti, Menz, Coppola and Babula, at which time Nowicki allegedly stated, "[w]e got you now." Complaint (Dkt. No. 1) p. 10. Plaintiff appears to have interpreted this statement to mean that defendants falsified documents to make it seem that plaintiff had threatened defendant Lucenti. *Id.;* Tr. pp. 43–44. As a result of the incident plaintiff's parole status was revoked, and he was removed that day from CNYPC and transferred into the Oneida County Jail. Nowicki Aff (Dkt. No. 78–2) ¶¶ 6, 19; Tr. p. 18.

**\*53  \*5** According to defendants the events of October 31, 2006 were precipitated by plaintiff's refusal to stay in line and his subsequent threat, when approached regarding the incident, to put a knife to the neck of one of the CNYPC staff members. Higgins Decl. (Dkt. No. 79–4) Exh. D, pp. 296– 301. According to defendant Lucenti, when he went to speak with the plaintiff about getting out of line,

> Mr. Lane then got in my face, he said he was going to put a knife in a TA's [treatment assistant's] neck, a knife or something in a TA's neck. He said I am serious, I will put a knife in one of their necks, I will lay them out cold. You better call parole. I'm tired of all this, I am going to the side room.

Parole Hearing Tr. (Dkt. No. 84–5) p. 32; Higgins Decl. (Dkt. No. 79–4) Exh. D, p. 296. Lucenti considered this to be a serious threat. Parole Hearing Tr. (Dkt. No. 84–5) p. 32. Plaintiff demanded that he be moved to the side room and returned to prison, and was informed that arrangements were being made to return him to the custody of the DOCS as soon as possible; plaintiff went to the side room, his parole officer was called, a violation was issued, and Lane was returned to prison. *Id.*

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on July 19, 2007, and was thereafter granted leave to proceed *in forma pauperis* on August 1, 2007. Dkt. Nos. 1,4. In his complaint plaintiff names ten defendants, including Sharon E. Carpinello, the Commissioner of the OMH; Barbara Beebe, [11] a facility review specialist from the State of New York Commission on Quality of Care for Persons with Disabilities; Donald Sawyer, the Director of the CNYPC; Sharon E. Barboza, M.D., the Director of the SOTP at CNYPC; Jeffrey Nowicki, a team leader of the SOTP at CNYPC; and Anthony Lucenti, Michael Babula, Frank Menz, Steven Coppola, and J. Crociata, all staff members at the facility. Alleging violations of the ADA as well as the First, Fourth, Fifth, Eighth and Fourteenth Amendments of the United States Constitution, plaintiff's complaint asserts ten enumerated causes of action, including denial of due process, failure to provide reasonable accommodations for his disability, excessive use of force, deliberate indifference to his medical needs, failure to intervene and/or protect, retaliation, conspiracy and failure to investigate his complaints. *Id.*

[11]    Defendant Beebe's name is incorrectly spelled as "Bebe" in the caption and throughout plaintiff's complaint. The court will respectfully direct the

clerk to amend the caption to reflect the correct spelling of that defendant's name.

On October 2, 2008, following joinder of issue and the close of discovery, plaintiff moved for partial summary judgment on his due process claim as it relates to his commitment to CNYPC as well as his claims under the ADA. Dkt. No. 57. In support of his motion, relying on the doctrines of *res judicata* and collateral estoppel, plaintiff asserts that the procedures under which he was involuntarily committed to CNYPC were determined to be unconstitutional by the New York State Court of Appeals in *Harkavy v. Consilvio,* 7 N.Y.3d 610, 825 N.Y.S.2d 702 (2006), that he was unlawfully denied a mobility guide for his blindness, and that his parole violation was "fruit of a poisonous tree" and would not have occurred had he not been unlawfully detained at CNYPC in violation of the Fourth Amendment. Dkt. No. 57.

**\*54  \*6** Defendants opposed plaintiff's motion and cross-moved for summary judgment, advancing several grounds for rejection of all of plaintiff s claims, including that 1) plaintiff's section 1983 claims against defendants, acting in their official capacities, are barred by the Eleventh Amendment; 2) plaintiff has failed to establish a valid cause of action under the ADA, and defendants cannot be held individually liable for damages under that Act; 3) plaintiff has not established claims of failure to protect, deliberate indifference to his medical needs, denial of access to courts, retaliation, excessive use of force, or conspiracy; 4) plaintiff has failed to demonstrate the requisite personal involvement by defendants Carpinello and Sawyer to support a finding of liability against them; 5) plaintiff has no cognizable constitutional interest in filing a criminal complaint, or in the pursuit of an investigation regarding his complaints made while housed at CNYPC; 6) defendants are not bound by the Court of Appeals decision in *Harkavy,* which was decided after plaintiff was released from CNYPC, and that decision does not create a constitutional right that is redressable in this court; and 7) in any event, defendants are shielded from suit by the doctrine of qualified immunity. Dkt. No. 79–3. Plaintiff has since responded in opposition to defendants' motion. Dkt. No. 84.

Both of the pending summary judgment motions, which are now ripe for determination, have been referred to me for a report and recommendation pursuant to 28 U.S.C § 636(b)(1) (B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson,* 477 U.S. at 247, 106 S.Ct. at 2509–10). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

A moving party seeking summary judgment bears the initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson, All* U.S. at 250 n 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex, All* U.S. at 324, 106 S.Ct. at 2553; *Anderson, All* U.S. at 250, 106 S.Ct. at 2511. Where a party is proceeding pro se, the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, to successfully resist summary judgment they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620–21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

**\*55  \*7** When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences

from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict"). In a case such as this, where parties have interposed cross-motions for summary judgment, each motion must be independently assessed, using this standard as a backdrop. *See Light Sources, Inc. v. Cosmedico Light, Inc.,* 360 F.Supp.2d 432, 434 (D.Conn.2005).

**B. *Fourteenth Amendment Procedural Due Process Claim***

Plaintiff challenges his involuntary commitment to CNYPC as violative of his right to due process and moves for summary judgment on this claim, arguing that the New York State Court of Appeals decision in *Harkavy,* should be given res judicata or collateral estoppel effect in this action. In *Harkavy,* the Court of Appeals held that the DOCS' resort to Article 9 of the MHL to institute commitment procedures for sex offenders in its custody was improper, observing that

> in the absence of a clear legislative directive in regard to inmates nearing their release from incarceration, we believe that [New York] Correction Law § 402 is the appropriate method for evaluating an inmate for postrelease involuntary commitment to a mental facility.

*Harkavy,* 7 N.Y.3d at 614, 825 N.Y.S.2d 702, 859 N.E.2d 508. [12] Having been committed to CNYPC under MHL § 9. 27, plaintiff now argues that *Harkavy* renders his commitment unconstitutional, and that defendants are bound by that decision. Defendants counter that since plaintiff was already removed from CNYPC and returned to prison by the time *Harkavy* was decided, the case has no bearing on his circumstances.

[12]    The Correction Law requires that the prison superintendent first apply to the court for appointment of two examining physicians and then

petition the court again for a commitment order, providing a copy of the petition to the inmate, the inmate's friend or relative, and to the Mental Hygiene Legal Service. *Harkavy,* 7 N.Y.3d at 612, 825 N.Y.S.2d 702, 859 N.E.2d 508. The Correction Law also provides the inmate with an opportunity to request a hearing before a judge after receiving a copy of the petition but before being committed to the psychiatric hospital. *Harkavy, 1* N.Y.3d at 612, 7 N.Y.3d 607, 825 N.Y.S.2d 702, 859 N.E.2d 508. In contrast, the requirements of MHL Article 9 do not necessitate that the examining physicians be appointed by the court, nor do they require either notice to the inmate or the opportunity for a hearing. *Harkavy,* 7 N.Y.3d at 612, 825 N.Y.S.2d 702, 859 N.E.2d 508. In the wake of *Harkavy,* on March 14, 2007, then-New York Governor Eliot Spitzer signed the Sex Offender Management and Treatment Act, which became effective on April 13, 2007, in part as Article 10 of the MHL, creating a new legal regime for committing sex offenders to mental health facilities for treatment in the SOTP.

**1. *Res Judicata***

Under the doctrine of *res judicata,* known also as "claim preclusion," a final judgment on the merits of an action precludes the parties, or those in privity with the parties, from relitigating issues that were or could have been raised in that action. *Allen v. McCurry* 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980); *Jacobson v. Fireman's Fund Insurance Co.,* 111 F.3d 261, 265 (2d Cir.1997); *Burgos v. Hopkins,* 14 F.3d 787, 789 (2d Cir.1994). "It is a cardinal principle of *res judicata* that 'the first suit and the subsequent case must involve the same cause of action[,]' otherwise, *res judicata* will not bar the second action." *Thompson v. County Franklin,* No. 92–CV–1258, 1996 WL 341988, at *3 (June 18, 1996) (McCurn, S.J.) (quoting *Bloomquist v. Brady,* 894 F.Supp. 108, 114 (W.D.N.Y.1995)). In the Second Circuit, there are three separate but related factors which together inform the analysis of the preclusive effect to be given a prior judgment, including "[w]hether the same transaction or connected series of transactions is at issue, whether the same evidence is needed to support both claims, and whether the facts essential to the second were present in the first." [13] *Woods v. Dunlop Tire Corp.,* 972 F.2d 36, 38 (2d Cir.1992) (quoting *NLRB v. United Technologies,* 706 F.2d 1254, 1260 (2d Cir.1983) (internal quotations omitted)).

13    Both the Full Faith and Credit Clause of the United States Constitution, see U.S. Const. art. IV, § 1, and the corresponding Full Faith and Credit statute, 28 U.S.C. § 1738, require that a federal court accord a state court judgment the same preclusive effect that it would merit under the law of the state from which it originated. *See Migra v. Warren City Sch. Dist. Bd. of Educ.,* 465 U.S. 75, 81, 104 S.Ct. 892, 896, 79 L.Ed.2d 56 (1984); *Kremer v. Chem. Constr. Corp.,* 456 U.S. 461, 466, 102 S.Ct. 1883, 1889–90, 72 L.Ed.2d 262 (1982); *Burgos v. Hopkins,* 14 F.3d at 790. This principle applies fully to claims brought pursuant to 42 U .S.C. § 1983. *Migra,* 465 U.S. at 84–85, 104 S.Ct. at 897–98; *Allen v. McCurry,* 449 U.S. at 103–04, 101 S.Ct. at 419–20. *Giakoumelos v. Coughlin,* 88 F.3d 56, 59 (2d Cir.1996). Since the state court determination upon which Lane rests his res judicata and collateral estoppel argument originated in New York, the law of that state controls in determining the extent of the preclusive effect of which *Harkavy* is deserving. *Giakoumelos,* 88 F.3d at 59; *see also Marvel Characters, Inc. v. Simon,* 310 F.3d 280, 286 (2d Cir.2002); *LaFleur v. Whitman,* 300 F.3d 256, 271–72 (2d Cir.2002). It should be noted, however, that while the law of New York, rather than federal principles, applies to determine the preclusive effect to be given to the decision in *Harkavy,* this is a distinction without a difference since, as the Second Circuit has noted, "there is no discernable difference between federal and New York law concerning *res judicata* and collateral estoppel." *Marvel Characters, Inc.,* 310 F.3d at 286 (citing *Pike v. Freeman,* 266 F.3d 78, 90 n. 14 (2d Cir.2001)).

**\*56 \*8** Neither Lane nor the defendants were parties to *Harkavy.* That lawsuit was a habeas corpus proceeding filed against the DOCS by the New York Mental Hygiene Legal Services seeking the immediate release of certain individuals whose prison terms had expired and were being held at the Manhattan Psychiatric Center. While it is arguable that defendants in this action are in privity with the DOCS, *see Browdy v. Lantz,* 3:03CV1981, 2006 WL 2711753, at \*5 p.Conn. Sept. 21, 2006), plaintiff, who had been released from CNYPC at the time *Harkavy* had been decided, was not a party to that action, does not allege any privity with the petitioners in *Harkavy,* and was never held in the Manhattan Psychiatric Center. Accordingly, the two actions do not arise from the same core of operative facts, nor would they involve the same evidence. In addition, although both *Harkavy* and this action involve MHL § 9. 27, *Harkavy* did not determine the constitutionality of the DOCS' use of MHL § 9.27 to commit sex offenders leaving their custody. Rather, the issue presented and addressed by the New York Court of Appeals in that case was whether the DOCS' use of the MHL procedure, as distinct from that set forth in Correction Law § 402, was proper, and the court held only that it was not. *Harkavy,* 7 N.Y.3d at 610, 825 N.Y.S.2d 702, 859 N.E.2d 508. For these reasons, the *Harkavy* decision does implicate the doctrine of *res judicata* in this action.

### 2. *Collateral Estoppel*

The doctrine of collateral estoppel, or claim preclusion, is equally inapplicable in this case. Once a court has decided an issue of fact or law necessary to its judgment, a party to the first action, or one in privity with the party, cannot relitigate that specific issue in a subsequent lawsuit. *Allen,* 449 U.S. at 94; *Burgos,* 14 F.3d at 792; *Ryan v. N.Y. Telephone Co.,* 62 N.Y.2d 494, 500, 478 N.Y.S.2d 823, 467 N.E.2d 487, 490 (1984). Under New York law, collateral estoppel applies only if 1) the issue in question was necessarily decided in the prior proceeding and is decisive of the present proceeding; and 2) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first proceeding. *Burgos,* 14 F.3d at 792; *Khandhar v. Elfenbein,* 943 F.2d 244, 247 (2d Cir.1991). The party asserting collateral estoppel has the burden of showing that the identical issue was previously decided, while the party opposing estoppel must show the absence of a full and fair opportunity to litigate in the prior proceeding. *Burgos,* 14 F.3d at 792. Because the issue decided in *Harkavy* was not identical to the issue raised in this lawsuit, collateral estoppel does not preclude litigation of the constitutionality of defendants' actions in this case.

### 3. *Due Process*

Turning to the merits of plaintiff's due process claim, I begin by noting that to successfully state a claim under 42 U.S.C. § 1983 for denial of procedural due process, a plaintiff must show that he or she 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000) (citations omitted); *Hynes,* 143 F.3d at 658; *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir.1996). It is undeniable that [i]nvoluntary confinement, including civil commitment, constitutes a significant deprivation of liberty, requiring due process."

*Abdul v. Matiyn v. Pataki,* 9:06–CV–1503, 2008 WL 974409, at *10 (N.D.N.Y. April. 8, 2008) (Hurd, J. and Homer, M.J.) (quoting *Fisk v. Letterman,* 401 F.Supp.2d 362, 374 (S.D.N.Y.2005) (citations omitted). "When a person's liberty interests are implicated, due process requires at a minimum notice and an opportunity to be heard." *Mental Hygiene Legal Service v. Spitzer,* 2007 WL 4115936, at * 5 (citing *Hamdi v. Rumsfeld,* 542 U.S. 507, 533, 124 S.Ct. 2633, 2648, 159 L.Ed.2d 578 (2004) (plurality opinion)). The Supreme Court has approved the use of involuntary confinement where there has been a determination that the person in question currently suffers from a "mental abnormality" and is likely to pose a future danger to the public. *Abdul,* 2008 WL 974409, at *10 (citing *Kansas v. Hendricks,* 521 U.S. 346, 371, 117S, —— S.Ct. ——, ——, ——S, — L.Ed.2d ——, ——, ——S, S.Ct. ——, ——, —— S, ——L.Ed.2d ——, ——, ——S.Ct. 2072, 2086 (1997)).

**\*57  \*9** Plaintiff was committed to CNYPC by way of the procedures set out in MHL § 9. 27, rather than Correction Law § 402. Lane was not afforded notice and an opportunity to be heard before, or even after, his transfer to that facility. In light of these facts, and for the reasons underpinning the Court of Appeals' decision in *Harkavy,* it appears that plaintiff's due process rights were violated in connection with his commitment. *Abdul,* 2008 WL 974409, at *10; *see also Wheeler v. Pataki,* No. 9:07–CV–0892, 2009 WL 674152, at *6–7 (N.D.N.Y. March 11, 2009) (McAvoy, S.J. and Lowe, M.J.). I therefore recommend denial of defendants' motion for summary judgment dismissing plaintiff's due process claim to the extent that defendants' basis for dismissal is addressed to the merits of that cause of action.[14]

[14] It is worth noting that the only named defendant who was even remotely involved in plaintiff's civil commitment was defendant Sawyer, to the extent that he signed the certification of service of a "Notice of Application for Court Authorization to Retain a Patient" on October 26, 2006, forty-four days after plaintiff was committed to CNYPC. *See* Higgins Decl. (Dkt 79–4) Exh. D, p. 391. Plaintiff has not named as defendants in this action any prison official who was involved in his commitment under the MHL. Because I ultimately recommend that such a claim against prison officials would be subject to dismissal based upon qualified immunity, I find that any attempt by plaintiff to amend his complaint to name such defendants would not cure this fatal substantive

defect, and would therefore be futile. *Cuoco v. Mohtsugu,* 222 F.3d 99, 112 (2d Cir.2000).

### 4. *"Fruit of the Poisonous Tree"*

In an apparent effort to make a claim for violation of his Fourth Amendment rights, plaintiff next argues that if he had not been committed to CNYPC under the MHL, he would not have been "illegally" confined and therefore would not have threatened defendant Lucenti and violated his parole. In a creative attempt to draw upon principles that do not translate well into this setting, Lane argues that the conduct giving rise to his parole revocation is "tainted" under the "fruit of the poisonous tree" principles.

"The fruit of the poisonous tree doctrine excludes evidence obtained from or as a consequence of lawless official acts." *Townes v. City of New York,* 176 F.3d 138, 145 (2d Cir.1999) (quoting *Costello v. United States,* 365 U.S. 265, 280, 81 S.Ct. 534, 542, 5 L.Ed.2d 551 (1961)). It does not apply in this context where plaintiff apparently objects to use of evidence of his threats as a basis for a parole violation. *See Rabb v. McMaher,* No. 94–CV–614, 1998 WL 214425, at *7 (N.D.N.Y.Apr.24, 1998) (Pooler, J.) ("This doctrine applies to evidence that is obtained during a criminal investigation as a result of an unconstitutional search; it does not apply to to prison disciplinary hearings."). Simply stated, the fruit of the poisonous tree doctrine cannot link the conduct allegedly violating plaintiff's Fourth Amendment rights to his return to prison and establish an actionable claim, since this evidentiary doctrine is inapplicable in a civil section 1983 setting. *Townes,* 176 F.3d at 145.

### C. *Qualified Immunity*

As one of the bases for their summary judgment motion, defendants assert their entitlement to qualified immunity from suit. Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (citations omitted). Accordingly, governmental officials sued for damages "are entitled to qualified immunity if 1) their actions did not violate clearly established law, or 2) it was objectively reasonable for them to believe that their actions did not violate such law." *Warren v. Keane,* 196 F.3d 330, 332 (2d Cir.1999) (citing *Salim v. Proulx,* 93 F.3d 86, 89 (2d Cir.1996)); *see also Zellner v. Summerlin,* 494 F.3d 344,

367 (2d Cir.2007); *Iqbal v. Hasty,* 490 F.3d 143,152 (2d Cir.2007), *rev'd on other grounds, sub. nom. Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 173 L.Ed.2d 868 (May 18, 2009). The law of qualified immunity seeks to strike abalance between overexposure by government officials to suits for violations based upon abstract rights and an unduly narrow view which would insulate them from liability in connection with virtually all discretionary decisions. *Locurto v. Safir,* 264 F.3d 154, 162–63 (2d Cir.2001); *Warren,* 196 F.3d at 332. As the Second Circuit has observed,

**\*58 \*10** [q]ualified immunity serves important interests in our political system, chief among them to ensure that damages suits do not unduly inhibit officials in the discharge of their duties by saddling individual officers with personal monetary liability and harassing litigation.

*Provostv. City of Newburgh,* 262 F.3d 146, 160 (2d Cir.2001) (internal quotations omitted) (citing, *inter alia, Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics,* 456 F.2d 1339, 1348 (2d Cir.1972)).

Until recently, it was generally agreed that a proper qualified immunity analysis entailed a three step inquiry. *Harhay v. Town of Ellington Bd. of Educ.,* 323 F.3d 206, 211–12 (2d Cir.2003). As a threshold matter a court considering the issue was charged with first determining whether, based upon the facts alleged, the plaintiff had facially established a constitutional violation. *Id .; Gilles v. Repicky,* 511 F.3d 239, 243–44 (2d Cir.2007). If the answer to this inquiry was in the affirmative, then the focus turned to whether the right in issue was clearly established at the time of the alleged violation. *Id.* (citing *Saucier v. Katz,* 533 U.S. 194, 201–02, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001)); *see also Poe v. Leonard,* 282 F.3d 123, 132–33 (2d Cir.2002). Finally, upon determining that the plaintiff had a clearly established, constitutionally protected right which was violated, the court next considered whether it was nonetheless objectively reasonable for the defendant to believe that his or her action did not abridge that established right. *Harhay,* 323 F.3d at 211; *Poe,* 282 F.3d at 133 (quoting *Tierney v. Davidson,* 133 F.3d 189, 196 (2d Cir.1998) (quoting, in turn, *Salim,* 93 F.3d at 89)).

The United States Supreme Court recently had the opportunity to reconsider the analysis prescribed by *Saucier,* holding that while the sequence of the inquiry set forth in that case is often appropriate, it should no longer be regarded as compulsory. *Pearson v. Callahan,* 555 —— U.S. ——, 129 S.Ct. 808, 820, 172 L.Ed.2d 565 (Jan. 21, 2009). In *Pearson,* the Court reasoned that while the *Saucier* protocol

promotes the development of constitutional precedent and is "especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable," the rigidity of the rule comes with a price. *Id.* at 818. The inquiry often wastes both scarce judicial and party resources on challenging questions that have no bearing on the outcome of the case. *Id.* Given that the purpose of the qualified immunity doctrine is to ensure that insubstantial claims are resolved prior to discovery, the Court opined that the algorithm prescribed by Saucier may serve to defeat this goal by requiring the parties "to endure additional burdens of suit-such as the cost of litigating constitutional questions and delays attributable to resolving them-when the suit otherwise could be disposed of more readily." *Id.* (quotations and citations omitted).

**\*59 \*11** As a result of its reflection on the matter, the *Pearson* Court concluded that because "the judges of the district courts and courts of appeals are in the best position to determine the order of decision making [that] will best facilitate the fair and efficient disposition of each case", those decision makers "should be permitted to exercise their sound discretion in deciding which of the ... prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." *Id.* at 818, 821. In other words, as recently emphasized by the Second Circuit, the courts "are no longer *required* to make a 'threshold inquiry' as to the violation of a constitutional right in a qualified immunity context, but we are free to do so." *Kelsey v. County of Schoharie,* 567 F.3d 54, 61 (2d Cir.2009) (citing *Pearson,* 129 S.Ct. at 821) (emphasis in original). "The *[Saucier* two-step] inquiry is said to be appropriate in those cases where 'discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all.' " *Id.* (quoting *Pearson,* 129 S.Ct. at 818).

The question is whether "upon viewing the allegations of the complaint in the light most favorable to the plaintiff and drawing all inferences favorable to the plaintiff, [a] reasonable jury *could* conclude that it was objectively unreasonable for the defendants to believe that they were acting in a fashion that did *not* violate an established federally protected right," in which case the motion to dismiss must be denied. *Quartararo v. Catterson,* 917 F.Supp. 919, 959 (E.D.N.Y.1996) (quoting *Ying Jing Can v. City of New York,* 996 F.2d 522, 532 (2d. Cir.1993); *see also Schwartz v. Dennison,* 518 F.Supp.2d 560, 571 (S.D.N.Y.2007), *aff'd* 2009 WL 2172510 (2d Cir. July 22, 2009).

Although I have determined that plaintiff's right to due process was violated when he was involuntarily committed to CNYPC, I also find that the inability of state officials, including defendants and any DOCS official that may have been involved, to rely on MHL § 9. 27 was not clearly established at that time. At the time of plaintiff's commitment the Court of Appeals had not yet decided *Harkavy.* Indeed, before plaintiff's commitment, the New York State Supreme Court Appellate Division, First Department, in that case had endorsed the DOCS' ability to utilize MHL § 9. 27, finding that provision to be consonant with the petitioners' Fourteenth Amendment rights to due process. *Harkavy v. Consilvio,* 29 A.D.3d 221, 812 N.Y.S.2d 496 (1st Dep't 2006). In addition to the unsettled state of the law in New York, it appears that no federal court decision had been issued forecasting the ultimate finding in *Harkavy* before plaintiff's confinement to CNYPC. In fact, prior to *Harkavy,* the Second Circuit had generally approved of MHL § 9 .27 as meeting both substantive and procedural due process requirements. *See, e.g., Project Release v. Provost,* 722 F.2d 950, 972–975 (2d Cir.1983). Accordingly, I conclude that the parameters of plaintiff's constitutional right to due process were not clearly established at the time of his commitment and that, as a matter of law, it was objectively reasonable for defendants, as well as the DOCS, to rely on MHL § 9. 27 in committing plaintiff to CNYPC. I therefore recommend a finding that, to the extent that any of the defendants were involved in the decision to commit plaintiff to CNYPC on his parole release date, they are entitled to qualified immunity with respect to plaintiff's claims for violation of his Fourteenth Amendment rights to due process, in light of the fact that it was objectively reasonable for them to believe that they were acting in a manner that did not violate any of plaintiff's protected rights.

### D. *Eleventh Amendment*

**\*60  \*12** Although not specifically stated, plaintiff's claims in this action appear to be asserted against defendants both individually and in their official capacities as state employees. Complaint (Dkt. No. 1) U 3. Defendants contend that plaintiff's claims against them in their official capacities are subject to dismissal on the basis of the immunity that the Eleventh Amendment affords.

The Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief sought. *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 3057–58, 57 L.Ed.2d 1114 (1978). This absolute immunity, which states enjoy under the Eleventh

Amendment, extends both to state agencies and in favor of state officials sued for damages in their official capacities when the essence of the claim involved seeks recovery from the state as the real party in interest. [15] *Richards v. State of New York Appellate Div., Second Dep't,* 597 F.Supp. 689, 691 (E.D.N.Y.1984) (citing *Pugh and Cory v. White,* 457 U.S. 85, 89–91, 102 S.Ct. 2325, 2328–29, 72 L.Ed.2d 694 (1982)). To the extent that a state official is sued for damages in his official capacity the official is entitled to invoke the Eleventh Amendment immunity belonging to the state. *See Kentucky v. Graham,* 473 U.S. 159, 169, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985); *Hafer v. Melo,* 502 U.S. 21, 26, 112 S.Ct. 358, 361, 116 L.Ed.2d 301 (1991). Eleventh Amendment immunity does not extend, however, to employees who are sued in their personal or individual capacity. *Schwartz,* 518 F.Supp.2d at 570 (citing *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988)).

[15]    In a broader sense, this portion of defendants' motion implicates the sovereign immunity enjoyed by the state. As the Supreme Court has reaffirmed relatively recently, the sovereign immunity enjoyed by the states is deeply rooted, having been recognized in this country even prior to ratification of the Constitution, and is neither dependent upon nor defined by the Eleventh Amendment. *Northern Ins. Co. of New York v. Chatham County,* 547 U.S. 189, 193, 126 S.Ct. 1689, 1693, 164 L.Ed.2d 367 (2006).

Since plaintiff's damage claims against the named defendants in their official capacities are in reality claims against the State of New York, thus exemplifying those against which the Eleventh Amendment protects, they are subject to dismissal. *Daisernia v. State of New York,* 582 F.Supp. 792, 798–99 (N.D.N.Y.1984) (McCurn, J.). I therefore recommend that this portion of defendants' motion be granted, in part, and that all damage claims, except for those asserted against the defendants in their official capacities under the ADA, be dismissed. [16]

[16]    As will be seen, defendants' Eleventh Amendment argument relating to plaintiff's claims under the ADA against defendants in their official capacities are not so easily discounted. *See* pp. 38–43, post.

### E. *Failure to Provide Reasonable Accommodations Under the ADA*

Plaintiff asserts that defendants knew, or should have known, that he is legally blind and that their refusal to provide him with reasonable accommodations for this alleged disability was in contravention of the ADA. Lane now moves for summary judgment in his favor on this claim, apparently on the grounds that his legal blindness constitutes a disability as a matter of law and that he has sufficiently demonstrated defendants' denial of reasonable accommodation for this disability. Defendants respond that they are entitled to dismissal of this claim because plaintiff has failed to allege that his legal blindness substantially limits a major life activity and also has failed to prove that he was excluded from participation in, or denied benefits of, some service or program. Defendants argue further that the taking of plaintiff's cane was not motivated by discriminatory animus. Finally, defendants contend that plaintiffs' claims against them in their individual capacities are not permitted under the ADA and damages against them in their official capacities are barred by the Eleventh Amendment.

**\*61  \*13** The ADA provides that

> no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132 (1990). CNYPC, operated by the New York OMH, is considered a public entity for the purposes of the ADA, and as such is required to provide "reasonable modifications to rules, policies, or practices ..." *See* 42 U.S.C.A. § 12131(1)(B) & 42 U.S.C.A. § 12131(2). Public entities are not required to provide substantively different services to the disabled under the disability statutes, but instead must provide " 'reasonable accommodations' to enable 'meaningful access' to such services as may be provided, whether such services are adequate or not." *Wright v. Giuliani,* 230 F.3d 543, 548 (2d Cir.2000).

It is well established that under the ADA, suits against defendants in their individual capacities as state officials are barred. *Garcia v. S.U.N.Y. Health Sciences Ctr. of Brooklyn,* 280 F.3d 98, 107 (2d Cir.2001) (collecting cases).

Accordingly, I recommend dismissal of plaintiff's ADA claim to the extent that it seeks recovery of damages against defendants as individuals. The issue of whether defendants are immune in their official capacities is significantly more complicated.

**1.** *Eleventh Amendment: ADA Claims*

In *Henrietta D. v. Bloomberg,* **the Second Circuit held** that under *Ex Parte Young* an ADA plaintiff can assert a prospective claim for injunctive relief against a state official in his or her official capacity, as opposed to against the state directly. 331 F.3d 261, 287 (2d Cir.2003), *cert. denied.,* 541 U.S. 936, 124 S.Ct. 1658, 158 L.Ed.2d 356 (2004) (citing *Ex Parte Young,* 209 U.S. 123, 155–56, 28 S.Ct. 441, 452, 52 L.Ed. 714 (1908)). That court has not explicitly held likewise for ADA plaintiffs who seek money damages. Nonetheless, a request for monetary damages from state officials in their official capacities is the functional equivalent of a claim for damages directly from the State of New York, and Eleventh Amendment sovereign immunity therefore ordinarily protects a defendant in his or her official capacity to the same extent that it protects the State. *See, e.g., Garcia,* 280 F.3d at 107 **(citing** *inter alia, Will v. Mich. Dep't of State Police,* 491 U.S. 58,71, 109 S.Ct. 2304,2312, 105 L.Ed.2d 45 (1989)).

It is well settled under Eleventh Amendment jurisprudence that neither a state nor one of its agencies can be sued without either express or implied consent, or an express abrogation by Congress of the state's sovereign immunity. *See, e.g., Kilcullen v. NY. State Dep't of Labor,* 205 F.3d 77, 79 (2d Cir.2000), *implicitly overruled on other grounds by Bd. of Trustees of Univ. of Ala. v. Garrett,* 531 U.S. 356, 368, **121** S.Ct. 955, 965, 148 L.Ed.2d 866 (2001); *Hallett v. N.Y. State DOCS,* 109 F.Supp.2d 190, 197 (S.D.N.Y.2000) (citations omitted). In this respect, the Eleventh Amendment, while not directly controlling, confirms the broader, " 'background principle of sovereign immunity[.]' " *Garcia,* 280 F.3d at 107 (quoting *Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 72, 116 S.Ct. 1114, 1131, 134 L.Ed.2d 252 (1996)). When abrogating sovereign immunity, Congress must both unequivocally intend to do so and act pursuant to a valid grant of constitutional authority. *Garrett,* 531 U.S. at 363, 121 S.Ct. at 962 (citing, *inter alia, Seminole Tribe,* 517 U.S. at 54, 116 S.Ct. at 1122); *Garcia,* 280 F.3d at 108 (citations omitted). The pivotal question, in determining whether defendants are entitled to protection under the Eleventh Amendment when sued in their official capacities, is whether, and if so to what extent, that amendment protects the states from liability under Title II of the ADA. [17]

17    In making my analysis I have assumed, without deciding, that plaintiff's failure to include the state the OMH, and/or the CNYPC as a named defendant is not fatal to his claims.

**\*62  \*14** The question of whether the Eleventh Amendment bars ADA claims under Title II against a state is an unsettled question among the circuits. In *Garrett,* the Supreme Court held that Congress had failed to validly abrogate state sovereign immunity under Title I of the ADA. 531 U.S. at 374, 121 S.Ct. at 967–68. In doing so, the Court was careful to distinguish Title II from its analysis, inasmuch as the issue had not been briefed by the parties, but did note that the remedial scheme of Title II is very different from that of Title I. *Id.* at 360 n. 1, 121 S.Ct. at 960 n. 1. The courts appear to be divided as to whether Garrett should extend to Title II of the ADA, especially since *Pennsylvania Dep't of Corr. v. Yeskey*—which held that Title II of the ADA applies to prisons-had been decided in the term previous to *Garrett,* but did not address sovereign immunity. 524 U.S. 206, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998); *compare, e.g., Popovich v. Cuyahoga Cty. Ct. of Common Pleas,* 276 F.3d 808, 813–16 (6th Cir.2002) (holding that sovereign immunity validly abrogated by Congress as to the Due Process Clause), *cert. denied,* 537 U.S. 812, 123 S.Ct. 72 (2002), with *Alsbrook v. City of Manuelle,* 184 F.3d 999, 1007 (8th Cir.1999), *cert. dismissed* 529 U.S. 1001, 120 S.Ct. 1265, 146 L.Ed.2d 215 (2000) (finding that Congress exceeded authority by extending Title II of the ADA to the states and therefore did not validly abrogate sovereign immunity).

The Second Circuit has taken a slightly different approach than various other federal courts in addressing this question. In *Muller v. Costello,* decided before the Supreme Court issued its opinion in *Garrett,* the Second Circuit found that Congress had validly abrogated sovereign immunity within its authority under section five of the Fourteenth Amendment, subjecting states to potential monetary liability under the ADA. 18 187 F.3d 298, 310 (2d Cir.1999). More recently, however, in *Garcia v. S.U.N.Y. Health Sciences Ctr.,* the Second Circuit found that *Garrett* had "implicitly abrogated" its prior position that the states were not immune from ADA claims. 280 F.3d at 113 n. 3.

18    That section provides that "Congress shall have power to enforce, by appropriate legislation, the provisions of this article." U.S. Const. amend XIV, § 5.

In *Garcia,* the Second Circuit found that Congress could not validly abrogate sovereign immunity under the Commerce Clause, one of the two empowering provisions cited in support of its enactment of Title II. *Garcia,* 280 F.3d at 108. The circuit court went on to find, however, that Congress could exercise its authority under section five of the Fourteenth Amendment-the "sweep of congressional authority" allowing Congress to "enforce the [F]ourteenth [A]mendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities"-when enacting Title II of the ADA, as a whole, though it found the power to have been exceeded through enactment of Title II, since that provision conferred upon Congress the right to abrogate sovereign immunity and allow for private parties to sue non-consenting states for money damages. *Garcia,* 280 F.3d at 108–10.

**\*63  \*15** Turning to the specific question of whether Congress, through proper invocation of its section five powers, effectively abrogated sovereign immunity in the case of private damage suits under Title II, however, the Second Circuit found that the ADA's broad remedial scheme, borrowed from the Rehabilitation Act and Title VI of the Civil Rights Act of 1964, included a judicially implied private cause of action, thus allowing that court latitude to shape a remedy. *Id.* at 110–112. Specifically, in *Garcia* the Second Circuit concluded that Title II claims against the states for monetary damages and injunctive relief could be reconciled with the prohibitions of the Eleventh Amendment if permitted in limited circumstances-that is, in cases where a plaintiff establishes that a Title II violation was motivated by discriminatory animus or ill will based on disability. *Garcia,* 280 F.3d at 111; *see Doe v. Goord,* No. 04–CV–0570, 2004 WL 2829876, at \*15 (S.D.N.Y. Dec. 10, 2004); *Lighthall v. Vadlamudi,* No. 9:04–CV–0721, 2006 WL 721568, at \*18 (N.D.N.Y. Mar.17, 2006) (Mordue, C.J.). In other words, defendants' conduct must be "based on irrational prejudice or wholly lacking a legitimate government interest." *Garcia,* 280 F.3d at 111. Since I find defendants' are not immune from suit under the Eleventh Amendment in their official capacities for alleged violations of the ADA, it is necessary to evaluate the merits of plaintiff's claim under that provision.

## 2. *McDonnell Douglas* Analysis

The court in *Garcia* conceded that it may be a difficult burden for a plaintiff to establish that an ADA violation resulted from discrimination, or ill will, and held that a plaintiff can rely on the *McDonnell Douglas* burden-shifting technique,

or a motivating factor analysis under *Price Waterhouse,* to establish such a claim. *Garcia,* 280 F.3d at 112.

Under the *McDonnell Douglas* protocol, a plaintiff must first establish a *prima facie* case of discrimination. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–03, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 76 (2d Cir.2001) (citing *Reeves v. Sanderson Plumbing Prods. Inc.,* 530 U.S. 133, 142, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000)). Upon establishment of a *prima facie* case, the burden of production shifts to the defendant, who at that juncture must come forward and articulate a legitimate, non-discriminatory reason for the adverse action in issue. *McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. 1817, 36 L.Ed.2d 668; *Holtz,* 258 F.3d at 77 (quoting *James v. New York Racing Ass'n,* 233 F.3d 149, 154 (2d Cir.2000)); *Terry v. Ashcroft,* 336 F.3d 128, 138 (2d Cir.2003). Once the defendant has successfully shouldered this burden, the focus then reverts to the plaintiff, who must establish that the alleged, nondiscriminatory rationale offered did not genuinely prompt the adverse action, but instead is a mere pretext for discrimination. *McDonnell Douglas Corp.,* 411 U.S. at 804, 93 S.Ct. 1817, 36 L.Ed.2d 668; *Graham v. Long Island R.R.,* 230 F.3d 34, 43 (2d Cir.2000) (citing *Hargett v. Nat'l Westminster Bank, USA,* 78 F.3d 836, 839 (2d Cir.1996), *cert denied,* 519 U.S. 824, 117 S.Ct. 84, 136 L.Ed.2d 41 (1996)). While under the *McDonnell Douglas* paradigm the burden of production alternates back and forth between the parties, a plaintiff claiming intentional discrimination is tasked ultimately with establishing discrimination by a preponderance of the evidence. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); *Holcomb v. Iona College,* 521 F.3d 130, 138 (2d Cir.2008).

**\*64  \*16** Under *Price Waterhouse,* if the plaintiff can establish that the prohibited discrimination played "a motivating part" in the adverse action, the defendant must then demonstrate that he or she "would have made the same decision in the absence of discrimination." *Price Waterhouse v. Hopkins,* 490 U.S. 228, 252–53, 109 S.Ct. 1775, 1792, 104 L.Ed.2d 268 (1989). A party seeking the benefit of this defense bears the burden of establishing by a preponderance of the evidence that it would have taken the same action, irrespective of the plaintiff's disability. *See Bookman v. Merrill Lynch,* No. 02 CIV. 1108, 2009 WL 1360673, at \*10–16 (S.D.N.Y. May 14, 2009).

To state a valid violation of the ADA, a plaintiff must show "1) [he is a] 'qualified [individual]' with a disability; 2) that the defendants are subject to the ADA; and 3) that [plaintiff was] denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of plaintiff's disabilities." *Henrietta D. v. Bloomberg,* 331 F.3d at 272 (citing *Doe v. Pfrommer,* 148 F.3d 73, 82 (2d Cir.1998)).

**a. *Plaintiff's Disability***

A person is considered to have a disability if he or she has "a) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; B) a record of such an impairment; or C) [is] regarded as having such impairment." 42 U.S.C. § 12102(2). Major life activities include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating and working." 42 U .S.C. § 12102(2)(A).

In support of his motion, plaintiff has presented evidence of an eye examination performed on July 22, 2005, while Lane was incarcerated at Sullivan Correctional Facility, diagnosing him as having a prosthesis of the left eye and glaucoma and increasing myopia in the right eye. Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 57–4) Exh. B. Defendants admit their awareness of plaintiffs sight limitations, though they question his allegations regarding the severity of the vision impairment of his right eye. Notably, in and of itself, "monocular vision" is not a *per se* disability within the meaning of the ADA. *Hoehn v. Int'l Sec. Services & Investigations, Inc.,* 244 F.Supp.2d 159, 167 (W.D.N.Y.2002) (citing *Albertson's, Inc. v. Kirkingburg,* 527 U.S. 555, 556, 119 S.Ct. 2162, 2169, 144 L.Ed.2d 518 (1999). "[R]ather, whether monocular vision substantially limits a major life activity of a particular individual is to be determined on a case by case basis and in terms of the impairment's impact on the individual." *Id.; see also Ditullio v. Village of Massena,* 81 F.Supp.2d 397, 405 (N.D.N.Y.2000). To determine the particular impact of monocular vision upon a plaintiff, for purposes of the ADA disability calculus, the court should consider "1) the degree of visual acuity in the weaker eye; 2) the age at which the vision loss occurred; 3) the extent of the individual's compensating adjustments in visual techniques; and, 4) the ultimate scope of the restrictions on the individual's abilities." *Hoehn,* 244 F.Supp.2d at 167 (citing *Kirkingburg,* 527 U.S. at 566, 119 S.Ct. at 2169). Even though most people with monocular vision will meet the ADA'S definition of disability, they are still required to prove their loss is

substantial. *Id.; see also, Gibbs v. City of New York,* No. 02–CV–2424–LB, 2005 WL 497796, at *5 (S.D.N.Y.Jan.21, 2005). Moreover, the fact that one can be characterized as "legally blind" does not, as a matter of law, establish a disability within the meaning of the ADA. *See Rivera v. Apple Indus. Corp.,* 148 F .Supp.2d 202, 207, 213 (E.D.N.Y.2001); *Hoehn,* 244 F.Supp.2d at 162, 171; *EEOC v. United Parcel Serv., Inc.,* 306 F.3d 794, 799, 803 (9th Cir.2002).

**\*65  \*17** Plaintiff has failed to come forward with sufficient evidence to establish that he is disabled as a matter of law. While plaintiff states that, in addition to a left eye prosthesis, he has glaucoma and increasing myopia of the right eye, the evidence as to the actual restrictions that he suffers and whether such restrictions affect a major life activity is equivocal, at best. Plaintiff contends that he is unable to read without the use of a magnifier and cannot participate in recreation without sports goggles and ankle braces. Defendants, on the other hand, assert that while housed at CNYPC, plaintiff demonstrated no signs of difficulty relating to his ability to write, read, or use a calculator without any supplemental aids or services, and that he was able to fully participate in his treatment programs. Affording defendants the benefit of all inferences, it appears that material questions of fact exist as to whether plaintiff is disabled within the meaning of the ADA, thus precluding the entry of summary judgment in his favor on the ADA cause of action set forth in his complaint.

**b. *Plaintiffs Participation***

Even assuming that plaintiff sufficiently established that he suffers from a cognizable disability, his motion for summary judgment on his ADA claim nonetheless must fail. Plaintiff easily satisfies the second applicable requirement; since CNYPC and OMH are agencies of the State, defendants are required to adhere to the ADA. *See* 42 U.S.C. § 12131(1) (B). The third prong of the ADA analysis, however, entails analysis of whether Lane was denied the opportunity to participate in services, programs, or activities as a result of his alleged disability; again, this issue presents questions of fact not susceptible to resolution on the motion for summary judgment. Plaintiff argues that as a result of not receiving reasonable accommodations, he was unable to participate in recreation without his requested sport goggles and ankle braces, and he was unable to read until his family provided him with a magnifier. Tr. p. 62–63. Plaintiff also claims that after his mobility cane was taken upon admittance to CNYPC, he was never offered another means of assistance and instead was told to by defendant Coppola to "crawl or feel his way".

Lane Aff. (Dkt. No. 84–2) ¶ 6. In contrast, defendants contend that throughout plaintiff's stay at CNYPC, he demonstrated no signs of difficulty in his ability to write, read, or use a calculator without any supplemental aids or services and that he was able to fully participate in his treatment groups. Nowicki Aff. (Dkt. No. 79–5) ¶¶ 11, 12, 14. From these competing claims, it is readily apparent that questions of fact preclude a finding in favor of plaintiff on the issue of whether he was denied reasonable accommodations.

**c. *Discriminatory Animus***

If the plaintiff is able to establish a *prima facie* claim under the ADA at trial, the burden will shift to defendants to come forward with a legitimate non-discriminatory reason for their conduct. While denying their awareness that plaintiff required accommodations for his visual impairment, defendant Nowicki asserts that upon being admitted to CNYPC, plaintiff's mobility cane was confiscated for safety and security purposes, and that plaintiff was immediately offered a wheelchair or walker, both of which he refused. Nowicki Aff. (Dkt. No. 79–5) ¶¶ 7–8. Defendants contend further that plaintiffs records did not indicate that he experienced mobility problems, and that he indicated that he could read and write, a fact that became evident to them as result of Lane's active participation in the program. *Id.* at ¶¶ 9–12.

**\*66  \*18** Defendants have thus articulated legitimate nondiscriminatory reasons for their actions. In response, plaintiff has neither offered evidence of pretext, nor has he produced evidence of discriminatory animus. Indeed, plaintiffs complaint is devoid of any allegation that defendants actions were motivated by irrational discriminatory animus or ill will based upon his visual impairment, and Lane has produced no evidence that would support such a claim. *See Garcia,* 280 F.3d at 112.

In view of the foregoing, I recommend denial of plaintiff's motion for summary judgment on his ADA claim. And, based upon plaintiff's failure to produce any evidence of discriminatory animus, I further recommend that defendants' motion for summary judgment dismissing plaintiff's ADA claim against defendants in their official capacities be granted.

**F. *Fourteenth Amendment Substantive Due Process Claims***

Several claims alleged in plaintiff's complaint are predicated upon alleged violations of the Eighth Amendment, although plaintiff also makes reference to the Fourteenth Amendment

throughout his complaint. When plaintiff was released by the DOCS to CNYPC, he had served his prison term, subject to release on parole, and was no longer a prison inmate. The Eighth Amendment, prohibiting cruel and unusual punishment of those convicted of crimes, is therefore not applicable under the circumstances. *Youngberg v. Romeo,* 457 U.S. 307, 312, 102 S.Ct. 2452, 2456, 73 L.Ed.2d 28 (1982). Because plaintiff was not a prison inmate at the time of the alleged deprivation of his federal rights, any claim arising from his confinement must be asserted and evaluated under the Due Process Clause of the Fourteenth Amendment. *Dove v. City of New York,* No. 03–CV–5052, 2007 WL 805786, at * 7 (S.D.N.Y. March 15, 2007) (citing cases).

Patients who are involuntarily committed unquestionably are entitled to certain rights under the Fourteenth Amendment; as the Supreme Court has noted, "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed ... in unsafe conditions." *Youngberg,* 457 U.S. at 315–16, 102 S.Ct. at 2458. "The Supreme Court has explained that 'when the State takes a person into its custody and holds [her] there against [her] will, the Constitution imposes upon it a corresponding duty to assume responsibility for [her] safety and general well-being.' " *Beck v. Wilson,* 377 F.3d 884, 889 (8th Cir.2004) (quoting *DeShaney v. Winnebago Couty Dep't of Soc. Servs.,* 489 U.S. 189, 199–200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989)). Plaintiffs claims of failure to protect, excessive force, and medical indifference, all framed as arising under the Eighth Amendment, relate to allegedly unsafe conditions while he was involuntarily confined at CNYPC, and must be analyzed within the framework of the Fourteenth Amendment.

### 1. *Failure to Protect*

**\*67** The Second Circuit has yet to address the correct standard to be applied when evaluating a failure to protect claim arising out of an involuntary commitment, and there appears to be some uncertainty regarding the matter. The Supreme Court "established [in *Youngberg* ] that involuntarily committed mental patients have substantive due process rights, ... [and] ... held that only an official's decision that was a 'substantial departure from accepted professional judgment, practice or standards' would support a substantive due process claim brought by an involuntarily committed mental patient." *Vallen v. Carrol,* No. 02 Civ. 5666(PKC), 2005 WL 2296620, at * 8 (S.D.N.Y.Sept.20, 2005) (quoting *Youngberg,* 457 U.S. at 323). In *Vallen,* the court examined *Youngberg* and whether the substantial departure standard evolving from that

decision should be applied where the plaintiff, who was a patient involuntarily committed to the Mid–Hudson Forensic Psychiatric Facility, alleged that he was subjected to violence and that the defendants, security hospital treatment assistants, failed to prevent those incidents. Distinguishing *Youngberg,* the court stated that

> **\*19** [u]nlike the defendants in *Youngberg,* the defendants here are low-level staff members. The nature of such an employee immediately addressing patient-on-patient assault or theft differs significantly from higher-level decisions like patient placement and the adequacy of supervision. For the latter decisions, it is readily possible to apply a test based on professional judgment, practice or standards. In this case, professionals made none of the challenged decisions, and thus the "substantial departure" test has no applicability.

*Vallen,* 2005 WL 2296620, at *8. The court went on to acknowledge that the general approach to substantive due process claims asserted under section 1983 requires that a plaintiff show that the defendants' actions, taken under color of state law, involved "conduct intended to injure [plaintiff] in some way unjustified by [any] ... governmental interest and most likely rise to the conscience-shocking level". *Id.* (quoting *County of Sacramento v. Lewis,* 523 U.S. 833, 849, 118 S.Ct. 1708, 1718, 140 L.Ed.2d 1043 (1998)). Ultimately, however, the court suggested that this test would result in an unduly heavy burden being placed upon a plaintiff and also would be inconsistent with the state's central role in supervising and caring for the involuntarily committed. *Vallen,* 2005 WL 2296620, at *9. Instead, citing *Lewis* and analogizing the plaintiff's rights to those of pre-trial detainees, the court suggested its agreement with the "deliberate indifference" standard employed in such circumstances by the Eighth Circuit. *Id.* at *9 (citing *Moore v. Briggs,* 381 F.3d 771, 773 (8th Cir.2004)). [19]

> [19] While the court stated that it was "inclined to agree with the Eighth Circuit," it did not resolve the issue of the appropriate standard to be applied, finding in that case that "whether the defendants' actions are measured under the 'conscience shocking,' the 'substantial departure' or the 'deliberate indifference' standard, the result is the same...." *Vallen,* 2005 WL 2296620, at * 9.

In *Dove v. City of New York,* a claim similar to that raised by Lane was interposed by the plaintiff, another involuntarily committed individual, arising out of altercations

with other patients. Rejecting the applicability of the Eighth Amendment to the plaintiff's circumstances, the court likewise acknowledged the lack of certainty as to whether the claim against the defendants should be measured by a "substantial departure" or "deliberate indifference" standard. *Dove,* 2007 WL 805786, at *8. Citing *Vallen,* the court failed to reach the issue of which standard would apply, finding that under either no reasonable factfinder could conclude that defendants violated plaintiffs constitutional rights. *Id.*

**\*68** I tend to agree with the *Vallen* court's conclusion that the "standard of 'deliberate indifference' " best accommodates constitutional concerns in connection with section 1983 claims brought by involuntarily committed mental patients based on alleged failures to protect them in violation of their substantive due process rights.[20] *Vallen,* 2005 WL 2296620, at * 9. Deliberate indifference, under the Eighth Amendment, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970 1979, 128 L.Ed.2d 811 (1994); *Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (citing *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979); *Waldo v. Goord,* No. 97–CV–1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (same). "In *Lewis,* the Court equated deliberate indifference for substantive due process and Eighth Amendment purposes." *Moore,* 381 F.3d at 774 (citing lewis, 523 U.S. at 849–40, 118 S.Ct. 1708, 140 L.Ed.2d 1043).

20    Though endorsing *Vallen,* I respectfully disagree, to some extent, with the court's reasoning in that case. At its core the concept of due process is intended to protect against the arbitrary exercise of the powers of government. *Lewis,* 523 U.S. at 845, 118 S.Ct. at 1716. Determining whether the right to due process has been violated requires a balancing of an individual's interest in liberty against the state's asserted reasons for restraining individual liberty. *Youngberg,* 457 U.S. 320, 102 S.Ct. 2460. To this end, the Supreme Court has "spoken of the cognizable level of executive abuse of power as that which shocks the conscience." *Lewis,* 523 U.S. at 846, 118 S.Ct. at 1717. "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Id.* at. 849, 118 S.Ct. at 1718.

Negligence is "categorically beneath the threshold of constitutional due process." *Id.* Deliberately indifferent conduct may suffice depending on the context. *Id.* at 850, 118 S .Ct. at 1718. As the Lewis court explained,

[d]eliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking.

*Id.* Thus, as I interpret Supreme Court precedent, deliberate indifference is not a standard that differs from but falls within the concept of conscience-shocking when one considers the circumstances presented.

The Eighth Circuit's decision in *Moore v. Briggs* appears consistent with this understanding. In *Moore,* the involuntarily committed plaintiff alleged that the defendants had violated his right to substantive due process by failing to protect him from the sexual assaults of another patient. In addressing the plaintiff's claims, the Eighth Circuit did not specifically discuss the applicability of *Youngberg,* or engage in an analysis of the potentially applicable due process standards. *See generally, Moore v. Briggs,* 381 F.3d 771. Instead, the court recognized that "[a] substantive due process violation requires proof that a government official's conduct was conscience-shocking and violated one or more fundamental rights." *Moore,* 381 F.3d at 773. In addition, the court found that under the facts presented "the defendants acted under circumstances in which actual deliberation was practical ... [and] ... [t]herefore their conduct *may* shock the conscience of federal judges only if they acted with 'deliberate indifference.' " *Id.* (emphasis in original) (quoting *Lewis,* 523 U.S. at 851–52, 118 S.Ct. 1708, 1719, 140 L.Ed.2d 1043). In discussing the concept of deliberate indifference in Lewis, the Supreme Court noted that "in the custodial situation of a prisoner, forethought about an inmate's welfare is not only feasible but obligatory under a regime that incapacitates a prisoner

to exercise ordinary responsibility for his own welfare." *Lewis,* 523 U.S. at 851, 118 S.Ct. at 1719. Analogizing to *Youngberg,* the Court stated, "[t]here, we held that a severely retarded person could state a claim under § 1983 for a violation of substantive due process if the personnel at the mental institution where he was confined failed to exercise professional judgment when denying him training and habilitation. The combination of the patient's involuntary commitment and his total dependence on his custodians obliges the government to take thought and make reasonable provision for the patient's welfare." *Id.* at 852 n. 12, 118 S.Ct. 1719 n. 12 (internal citations omitted). In view of the foregoing, I would interpret *Youngberg narrowly,* not as identifying a separate standard to be applied when measuring due process violations, but instead addressing a concept applicable in circumstances involving professional decision-making regarding an involuntarily committed plaintiff who relies on such professionals for his or her well being, and one that aids in the determination of whether the conduct at issue rises to the level of conscience-shocking in that environment.

**\*20** As in *Vallen* and *Dove,* however, I find it unnecessary to resolve the issue of which standard may here be appropriate since under any of the potentially applicable standards plaintiff's claim of failure to protect must fail. Plaintiff's complaint describes two occasions on which he was allegedly assaulted or attacked by other patients during his commitment at the CNYPC. The first incident occurred on September 18, 2006, shortly after plaintiff was admitted. Complaint (Dkt. No.) p. 7. Lane concedes that he was first struck by a football and then became involved in an altercation with a fellow patient, as a result of which he claims to have suffered injury to his face, nose and jaw. Complaint (Dkt. No. 1) p. 7; Tr. pp. 27–33. Plaintiff also admits that he is unable to distinguish between the injuries that he received from being hit by the football and those resulting from the ensuing altercation. *See* Plaintiff's Response to Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 84). The only treatment that was required for plaintiff's resulting injuries was pain medication for his discomfort. According to plaintiff's CNYPC records, upon observing the altercation defendant Crociata attempted to intervene by getting between the two patients and preventing

further contact. Higgins Decl. (Dkt. No. 75–4) Exh. D, p. 114. Immediately after the other patient was escorted away from the area, Crociata approached plaintiff to see if he was hurt. *Id.* Plaintiff told Crociata that he had not been touched, and refused to let Crociata speak to him any further. *Id.* While plaintiff disputes telling Crociata that he was not touched, he does admit that after the incident Crociata approached him and asked him what had happened; Lane claims, however, that Crociata saw everything and states that he was angered by Crociata's question, apparently interpreting it as racist. Complaint (Dkt. No. 1) p. 7; *see also* Tr. pp. 31–32. Plaintiff also admits that Crociata saw him for his injuries, but alleges Crociata did not examine him. Tr. pp. 27–33.

**\*69** Significantly, plaintiff does not allege that he had any previous difficulties with the patient with whom he was involved in the altercation, or that the defendants had reason to know of the danger in exposing the two to each other. In fact, plaintiff states that he had "absolutely no" prior interaction with that patient. Tr. p. 28. Additionally, plaintiff has failed to allege that any other defendant had any involvement in this incident. Based on these facts, no reasonable factfinder could conclude that any of the defendants engaged in conduct that shocked the conscience, substantially departed from accepted professional judgment, practices or standards, or was deliberately indifferent to plaintiff's safety. Simply stated, the record discloses that the September 18, 2006 encounter stemmed from an unforeseen accident that escalated into an altercation and that CNYPC staff immediately intervened and took appropriate action to secure both individuals involved.

**\*21** The second alleged incident occurred somewhere in the beginning of October, when plaintiff claims he was "attacked" by another patient. Complaint (Dkt. No. 1) p. 9. Plaintiff does not identify a specific date or recount the circumstances surrounding the alleged attack, nor does he claim to have suffered any injury. The record suggests an incident occurred between plaintiff and another patient on October 3, 2006 in which he and the other patient "had words." Higgins Decl. (Dkt. No. 75–4) Exh. D, p. 214. There is no evidence in the record that plaintiff was physically touched or in any way injured as a result of this incident. To the contrary, plaintiff admits that the only incident in which he received physical injury occurred on September 18. Tr. p. 44.

With regard to the October instance, I find that plaintiff has failed to establish a sufficiently serious deprivation to show that he was subjected to an unreasonably unsafe condition and trigger the Fourteenth Amendment's protections.

In view of the foregoing, I find that plaintiff has failed to establish a Fourteenth Amendment claim for failure to protect and/or intervene and, accordingly, I recommend defendants' motion for summary judgment relating to this claim be granted.

### 2. *Medical Care*

"Courts have consistently held, in a variety of contexts, that the due process rights of persons in a nonpunitive detention are greater than the Eighth Amendment protections afforded to convicted prisoners." *Haitian Centers Council, Inc. v. Sale,* 823 F.Supp. 1028, 1043 (E.D.N.Y.1993) (citing cases); *Owens v. Colburn,* 860 F.Supp. 966, 974 (N.D.N.Y.1994), *aff'd* 60 F.3d 812 (2d Cir.1995) (citing cases). "Persons in nonpunitive detention have a right to 'reasonable medical care,' a standard demonstrably higher than the Eighth Amendment standard that protects prisoners: 'deliberate indifference to serious medical needs.' " *Owens,* 860 F.Supp. at 974 (quoting *Haitian Centers Council,* 823 F.Supp. at 1043–44). At a minimum, due process forbids conduct that is deliberately indifferent to one that is involuntarily committed. *Haitian Centers Council,* 823 F.Supp. at 1044.

**\*70** Plaintiff's medical indifference claim has as it genesis the now familiar September 18, 2006 incident. Plaintiff claims that after being struck by a football and subsequently attacked by a fellow patient on that date, he sought medical treatment from defendant Crociata; Lane also alleges that he suffered back pain as a result of the events of that day. Complaint (Dkt. No. 1) p. 7; Tr. pp. 27–33. As was previously noted, plaintiff was unable to distinguish the injuries sustained from being hit by the football from those allegedly resulting from the altercation, if any. Tr. pp. 29–30. Lane alleges that when defendant Crociata saw him, Crociata told him, "[t]here's nothing wrong with you" and failed to perform an actual examination. Complaint (Dkt. No. 1) p. 7.

Plaintiffs CNYPC records contradict plaintiffs version, revealing that Crociata approached plaintiff immediately after the altercation to see if he was hurt, at which time plaintiff told him "I wasn't touched," and refused to let Crociata speak to him any further. Higgins Decl. (Dkt. No. 79–4) Exh. D, p. 114. Later in the day, plaintiff apologized to Crociata for his behavior, and complained of general discomfort. *Id.* As a result, Crociata promptly prescribed 600 milligrams of Motrin for plaintiff's pain. *Id.* A follow-up note by Nurse Jane Helfert shows that after receiving the Motrin plaintiff slept through the night, and made no further complaints about his pain. *Id.* p. 115.

**\*22** Plaintiff himself acknowledges that he did not report his injuries to Crociata, never complained to anyone that his back was hurting, and did not request any sort of pain medication for his alleged injuries. Tr. pp. 32–33, 35–36. Plaintiff also concedes that he was provided with ibuprofen and other pain medication when requested, including the day after the altercation. Tr. p. 34. Moreover, plaintiff is unable to articulate what follow up treatment he believes was constitutionally required. [21] *Id.* at 38.

[21]   laintiff testified at his deposition that other than the particular day in question, whenever he asked for medical treatment it was provided, and "[i]n fact, I would give them credit, that their attentiveness to patients' conditions, medical conditions is good." Tr. p. 36.

Based upon these facts, I have determined that no reasonable factfinder could conclude that there was an unreasonable or deliberately indifferent "denial" or delay in treatment of plaintiff on September 18, 2006. I therefore recommend that defendants' motion to dismiss plaintiff's medical indifference claim be granted. [22]

[22]   Plaintiff further alleges in his complaint, upon information and belief, that defendant Crociata "deliberately falsified official state documents with regards to plaintiffs [sic] request for medical attention." Complaint (Dkt. No. 1) p. 7, 11. To create a factual issue, the complaint must be based on personal knowledge, not on "mere 'information and belief or hearsay." *Cabassa v. Gummerson,* No. 01–CV–1039, 2006 WL 1559215, at *2 (N.D.N.Y.Mar.30, 2006) (Lowe, M.J.). Since plaintiff's speculative allegation is not supported by any evidence, and indeed, contradicts his own testimony that he saw Crociata and did not request treatment, the court has no reason to doubt the authenticity of CNYPC records.

### 3. *Excessive Force*

Plaintiff claims that on September 22, 2006, as a result of his refusal to talk to defendant Nowicki, he was beaten and held in restraints and thereby subjected to excessive force. Complaint (Dkt. No. 1) p. 8. As with plaintiff's failure to protect claim, the proper framework for analysis of this claim is the Fourteenth, and not the Eighth, Amendment. *Youngberg,* 457 U.S. at 312, 102 S.Ct. at 2456. "It bears remembering ... that

not all bodily harm caused by a government actor is actionable as a constitutional violation." *West v. Whitehead,* No. 04–CV–9283, 2008 WL 4201130, at \* 14 (S.D.N.Y. Sept. 11, 2008) (citations omitted). "Only when bodily harm is caused by government action 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience,' will a constitutional violation result." *Id.* (quoting *Lombardi v. Whitman,* 485 F.3d 73, 81 (2d Cir.2007)).

**\*71** In the Second Circuit, it is recognized that individuals in the non-seizure, non-prisoner environment have a substantive due process right to be free from the use of excessive force by their custodians. *See Johnson v. Newburgh Enlarged School Dist.,* 239 F.3d 246, 253 (2d Cir.2001) (citing *Rodriguez v. Phillips,* 66 F.3d 470, 476 (2d Cir.1995)). Factors to be considered in examining excessive force claims include: "the need for the application of force, the relationship between the need and amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Id.* at 251–52 (quoting *Metzger v. Osbeck,* 841 F.2d 518, 520 (3d Cir.1988)). With respect to the last factor, the Second Circuit has explained that

> [i]f the force was 'maliciously or sadistically [employed] for the very purpose of causing harm in the absence of any legitimate government objective and it results in substantial emotional suffering or physical injury, the conduct is presumptively unconstitutional.... [M]alicious and sadistic abuses of government power that are intended only to oppress or to cause injury, and serve no legitimate purpose unquestionably shock the conscience ... [C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level.

**\*23** *Id.* at 252 (citations omitted). "Whether conduct rises to the level of unconstitutional excessive force depends on the totality of circumstances." *West,* 2008 WL 4201130, at \*15 (citing *Johnson,* 239 F.3d at 254). [23] This analysis was found applicable by the court in *West* to an excessive use of force claim asserted under section 1983 by a profoundly mentally retarded individual committed to a state-operated facility for developmentally disabled individuals. *West,* 2008 WL 4201130, at \*14–15.

[23]  Plaintiff claims that defendants violated 14 N.Y.C.R.R. § 27.7(a), a New York regulation regarding use of restraint and seclusion in institutional care. Review of this provision and the record before the court suggests that defendants fully complied with this regulatory provision. Even if they did not, however, "[a] violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983." *Cusamano v. Sobek,* 604 F.Supp.2d 416, 482 (N.D.N.Y.2009) (Suddaby, J.) (collecting cases).

Plaintiff claims that on September 22, 2006 he was called from the day room by Nowicki, who said that he wanted to talk to plaintiff in the side room. Tr. p. 45. Plaintiff responded by stating that he did not have anything to say to Nowicki, at which point, plaintiff claims, Nowicki directed the twenty treatment assistants who were standing there to "take him down." Tr. p. 46. Plaintiff claims that he was then kicked and struck about his body, placed in restraints and transported by gurney to some other location where he was kept without being given food for two to three days, except for a sausage sandwich; plaintiff admits being offered drinks but states that he refused. Tr. pp. 45–61.

According to defendants, on the day of the alleged incident plaintiff had been hostile toward staff and residents, threatened to start a riot, and refused counseling by Nowicki in the side room. Nowicki Aff. (Dkt. No. 79–5) ¶¶ 22–23. Plaintiff was recorded as saying "[d]on't try to take me to the side room or try to shoot me up, because when I come out of it, there will be trouble. That's a promise, not a threat." Higgins Decl. (Dkt. No. 79–4) Exh. D, p. 146. Because plaintiff attempted to return from the hallway to the day room, he was placed into a four point restraint for seven minutes, pursuant to doctor's orders, and transported to the side room "without injury or physical altercation". Nowicki Aff. (Dkt. No. 79–5) ¶¶ 24–25; Higgins Decl. (Dkt. No. 79–4), Exh. D, p. 146.

**\*72** Nowicki states that after being restrained plaintiff continued to make threats, and consistent with hospital policy, remained in the side room with one-to-one supervision from 1:00 p.m. September 22, 2006 until 9:30 a.m. on September 25, 2006, during which time he was provided food and a mattress, slept and ate, and attended to his own daily self-care activities. Nowicki Aff. (Dkt. No. 79–5) ¶¶ 24–29. Plaintiff's CNYPC records also indicate that plaintiff's activity was monitored at fifteen minute intervals and that plaintiff was provided meals, saw a psychiatrist and was permitted to meet with his parole officer. Higgins Decl. (Dkt. No. 79–4) Exh. D, pp. 146–80. The record also reveals, and plaintiff admits, that at various times over this three-day period Lane refused to interact with staff, and plaintiff acknowledges that the purpose

in putting him in isolation was behavior modification. Tr. pp 53–55, 60.

While the parties' versions of the events of September 22, 2006 vary, I do not find the differences material to the determination of this claim. Plaintiff does not dispute that he refused to go to the side room to speak with Nowicki, nor does he deny making threats in the day room. The decision to put plaintiff in a four point restraint was made by a physician in light of plaintiff's history, his serious threats, and his refusal to follow staff direction. Plaintiff does not claim to have been restrained for a period longer than that necessary to transport him. Plaintiff has produced no evidence that the force that was used was malicious or sadistic, for the very purpose of causing him harm.

**\*24** Although plaintiff generally alleges that he sustained injury to his back, shoulders and neck and was denied medical treatment as a result of the incident, plaintiff does not specifically identify any injury or treatment that was needed with specificity, and he does not allege that he has suffered any continuing problems. There is no evidence of any relevant injury noted in plaintiff's CNYPC records. The record indicates, and plaintiff admits, that within two hours of being placed in the side room, he was seen by a doctor, with whom he refused to speak. Significantly, plaintiff's allegation that he was denied medical treatment on that date directly contradicts his deposition testimony to the effect that the only time he was denied treatment was on September 18, 2006. Tr. p. 36.

Based upon the record now before the court, no reasonable factfinder could find defendant's conduct conscience-shocking. Rather, the record establishes that defendants were attempting in good faith to discipline plaintiff and restore order as a result of his failure to follow directions and his continuous threats to patients and staff at the facility. I therefore recommend that defendants' motion for summary judgment as to this claim be granted, and that plaintiff's excessive force claim be dismissed.[24]

[24]    To the extent that plaintiff also challenges the conditions experienced while in isolation, I find that such a claim would fall squarely within the test enunciated in *Youngberg*. The record shows that the decisions to place plaintiff in four point restraints, to isolate him and to release him were all made by a physician and effectuated in accordance with hospital policy. These decisions are entitled to deference, and are therefore presumptively valid.

*Youngberg,* 457 U.S. at 322–23, 102 S.Ct. at 2461–62. While plaintiff disputes being provided with regular meals, he admits being provided at least one meal and offered liquids, and he has failed to come forward with any evidence demonstrating that the conditions of his confinement were a substantial departure from accepted professional judgment, practice or standards. *Id.* at 323, 102 S.Ct. at 2462; *Zigmund v. Foster,* 106 F.Supp.2d 352, 361–62 (D.Conn.2000). Accordingly, any claim by plaintiff that he was denied due process by the conditions of his isolation should also be dismissed as a matter of law.

**G.** *First Amendment*

"The First Amendment Guarantees the right to 'petition the Government for a redress of grievances.' " *McKithen v. Brown,* 565 F.Supp.2d 440, 458 (E.D.N.Y.2008) (quoting U.S. Const. amend. I). Out of the Petition Clause of that amendment arises the right of access to courts, *City of New York v. Beretta U.S.A Corp.,* 524 F.3d 384, 397–98 (2d Cir.2008), *cert. denied* —— U.S. ——, 129 S.Ct. 1579, 173 L.Ed.2d 675 (2009), as well the right to petition for redress for grievances without retaliation. *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988).

**1.** *Access to the Courts*

 **\*73** Although not specifically stated in his complaint, defendants suggest that when liberally construed in light of his deposition testimony plaintiff's complaint makes a claim of denial of access to the courts.[25]

[25]    Plaintiff testified that prior to his family providing him a magnifier in midOctober he was unable to litigate and challenge his illegal commitment. Tr. p. 62.

Without question, an inmate's constitutional right to "meaningful" access to the courts is firmly established.[26] *Bounds v. Smith,* 430 U.S. 817, 823, 97 S.Ct. 1491, 1495, 52 L.Ed.2d 72 (1977) (citations and internal quotation marks omitted). "However, this right is not an abstract, freestanding right to a law library or legal assistance and cannot ground a Section 1983 claim without a showing of actual injury." *Collins v. Coord,* 438 F.Supp.2d 399, 415 (S.D.N.Y.2006) (quoting *Lewis v. Casey,* 518 U.S. 343, 351, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (internal quotations omitted). Thus, "[t]o survive a motion for summary judgment, plaintiff must

present evidence showing that he has suffered actual injury." *Jarecke v. Hensley,* No. 3:07–cv–1281, 2009 WL 2030394, at *9 (D.Conn. July 9, 2009) (citing *Lewis v. Casey,* 518 U.S. at 351–52). To prove an actual injury, a plaintiff must show that a non-frivolous legal claim was frustrated or impeded due to the actions of the defendants.[27] *Abdul–Matiyn,* 2008 WL 974409, at * 13.

[26]    Although plaintiff was not a prisoner but involuntarily committed at CNYPC at all times relevant to this claim, the right of access to court evolves from the First Amendment and thus the analysis is the same in either context. *See Lombardo v. Holanchock,* No. 07 Civ. 8674, 2008 WL 2543573, at *7 n. 6 (S.D.N.Y. June 25, 2008); *see also Samuels v. Stone,* No. 98 Civ. 776, 1999 WL 624549, at *4 (S.D.N.Y. Aug. 17, 1999).

[27]    In apparent recognition of some level of constraint necessarily imposed in institutional environments, courts have applied the standard applied to prison inmates to circumstances involving the involuntarily committed in claims relating to access to courts as well as retaliation. *See Lombardo,* 2008 WL 2543573, at * 6 n. 6; *Zigmund,* 106 F.supp.2d at 358.

**\*25** Plaintiff has failed to prove his claim that defendants' failure to provide him with a laptop computer with zoom text, a scanner and inkjet color printer, 7x magnifier, books on tape, high intensity lamp and 20/20 pens as requested in his letter to defendant Sawyer on October 13, 2006, resulted in his inability to pursue any legal action. *See* Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 57–4), Exh. C. In fact, plaintiff admits he was able to file all of the legal proceedings that he desired. Tr. p. 67. Moreover, as defendants explain in their motion for summary judgment, CNYPC patients are afforded access to the Mental Hygiene Legal Services ("MHLS"), which provides "legal services, advice and assistance, including representation, with regards to the resident's hospitalization." Dkt. No. 79–3, p. 12. Plaintiff admits that he was familiar with the services MHLS provides, and actually attempted to bring an action with the assistance of that agency, but was transferred from CNYPC before the proceeding could move forward. Tr. p. 10. Because there is no evidence that plaintiff suffered actual injury due to defendants' alleged interference with his access to the courts, I recommend that any claim by plaintiff that he was denied such access be dismissed.

## 2. *Retaliation*

In his complaint plaintiff alleges that defendants retaliated against him because he and his family complained to various governmental agencies and officials, and he insisted on filing criminal charges against another patient. Complaint (Dkt. No. 1) p. 11. "[C]riticism of governmental agencies is protected speech under the First Amendment." *Olesen v. Morgan,* No. 1:06–CV–959, 2008 WL 5157459, at *4 (N.D.N.Y.Dec.8, 2008) (quoting *Economou v. Butz,* 466 F.Supp. 1351, 1361 (S.D.N.Y.1979) (footnote omitted)). When adverse action is taken by governmental officials against a person being held in custody, motivated by his or her exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies. *See Franco,* 854 F.2d at 588–90.

**\*74** In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there exists a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001). If the plaintiff carries this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**\*26** Analysis of retaliation claims thus requires thoughtful consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two. When such claims, which are exceedingly case specific, are alleged in only conclusory fashion and are not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, a defendant is entitled to the entry of summary judgment dismissing plaintiffs retaliation claims. *Flaherty v. Coughlin,*

713 F.2d 10, 13 (2d Cir.1983), *overruled on other grounds,* *Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

The right to file a grievance and petition the government for redress is "among the most precious of the liberties safeguarded by the Bill of Rights." *Franco,* 854 F.2d at 589 (quoting *United Mine Workers v. Illinois State Bar Ass'n,* 389 U.S. 217, 222, 88 S.Ct. 353, 356, 19 L.Ed.2d 426 (1967)). Plaintiff therefore easily meets the first prong of the governing test by demonstrating that he engaged in protected activity.

It is in connection with the requirement that the two be linked that plaintiff's retaliation claim falls short. Plaintiff first claims that defendants retaliated against him by falsifying documents in order to have him removed from the facility. Complaint (Dkt. No. 1) p. 11. Lane has failed to offer proof, however, showing that any document was falsified by defendants with the intent to have plaintiff removed from CNYPC. As District Judge David N. Hurd recognized in his decision in *Barclay v. New York,* 477 F.Supp.2d 546 (N.D.N.Y.2007), in cases involving allegations of retaliation based on the filing of allegedly false misbehavior reports, "[t]he difficulty lies in establishing a retaliatory motive." *Barclay,* 477 F.Supp.2d at 558. More than conclusory allegations are required to survive a summary judgment motion; the "types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *Id.* (citations omitted); *see also Rivera v. Goord,* 119 F.Supp.2d 327, 339 (S.D.N.Y.2000).

 **\*75** Here, the evidence in the record overwhelmingly demonstrates that from the outset and repeatedly throughout his confinement at CNYPC, plaintiff voiced both his discontent with being placed at the facility and his desire to return to prison. There is ample evidence in the record demonstrating that while confined at CNYPC plaintiff was involved in more than one altercation and made repeated threats to the safety of staff and other patients, including threats to start a riot and to kill another patient; the event finally precipitating his removal was his threat to cut the throat of a treatment assistant. Conversely, there is no evidence in the record that suggests that any document authored by any defendant was false, let alone that falsification of such document was motivated by a desire to retaliate against the plaintiff for his written complaints to various governmental agencies. Moreover, the incident that caused

plaintiff's removal from CNYPC also formed the basis for the parole violation that precipitated plaintiffs return to prison, for which he was afforded a hearing, was represented by counsel, and was permitted to cross-examine witnesses and present his own evidence, and he was ultimately found guilty.

**\*27** The second incident that plaintiff attributes to retaliatory animus relates to his September 22–26, 2006 confinement in an isolated room after he insisted on filing criminal charges against a fellow patient who assaulted him. Complaint (Dkt. No. 1) p. 11. On this count, plaintiff fails to demonstrate that the alleged adverse action was prompted by protected conduct. Preliminarily, it should be noted that plaintiff has repeatedly complained that he was prevented from filing any criminal charges, yet admits that following the September 18, 2006 altercation he participated in mediation with the other patient, leading to resolution of the matter. Even assuming that plaintiff pursued criminal charges, his claim would fail as it is well established that "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Linda R.S. v. Richard D.,* 410 U.S. 614, 619, 93 S.Ct. 1146, 1149, 35 L.Ed.2d 536 (1973). Accordingly, plaintiff had no constitutionally protected right to file a criminal complaint. Finally, even if plaintiff had sufficiently established that he engaged in protected activity, he has failed to adduce any evidence demonstrating that his confinement in isolation was in any way related to his effort to pursue criminal charges in regard to the attack that occurred several days prior, or that it was maliciously motivated by a retaliatory animus.

Because plaintiff has failed to produce any evidence to support his retaliation claims, I recommend that this portion of defendants' motion for summary judgment be granted, and that those claims be dismissed.

### 3. *Investigation of Complaints*

Plaintiff's tenth cause of action purports to allege a claim for the acts or omissions of defendant Beebe in failing to investigate plaintiff's complaints regarding the conditions of confinement at the CNYPC. Complaint (Dkt. No. 1) p. 8, 12. Although the right to petition government is well established, there is no corresponding duty on the part of the government to act. *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 375 (N.D.N.Y.2003) (citations omitted), *aff'd* 83 Fed. Appx. 363 (2d Cir.2003); *Wolf v. Town of Mount Pleasant,* No. 06 Civ. 3864, 2009 WL 1468691, at \*6 (S.D.N .Y. April 27, 2009) (citing *Bernstein v. New York,* 591 F.Supp.2d 448, 460 (S.D.N.Y.2008)). Plaintiff has, therefore, failed to allege a cognizable claim. [28]

28    Moreover, the record belies plaintiff's assertion that defendant Beebe failed to properly investigate the complaints made by plaintiff and his wife relating to plaintiff's treatment while committed at CNYPC. Defendant Beebe was assigned to investigate the complaints made by plaintiff and either engaged in personal phone calls or exchanged voice mail messages with plaintiff's wife on October 1, 2006, October 23, 2006, November 1, 2006, November 3, 2006 and November 7, 2006. Defendants' Response to Request for Admissions (Dkt. No. 62–3) ¶¶ 8–9. The record also shows that Beebe's investigation included a personal visit to CNYPC on November 21, 2006. Higgins Decl. (Dkt. No. 79–4) Exh. E, pp. 32–33.

**\*76** I therefore recommend that all claims against defendant Beebe be dismissed.

### H. Personal Involvement

Defendants move to dismiss all claims asserted by Lane against defendants Carpinello and Sawyer based upon their lack of personal involvement in the allegedly offending conduct. At the outset, because the court has determined that plaintiff was not denied a constitutional right, his supervisory claims against Carpinello and Sawyer should be dismissed. See *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir.1983). Even if there were a cognizable claim, however, the claims against Carpinello are subject to dismissal based upon a lack of personal involvement.

**\*28** Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. See *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). A supervisor can be found to have personal involvement in a constitutional violation if the evidence shows:

> 1) the defendant participated directly in the alleged constitutional violation, 2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, 3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowing the continuance of such a policy or custom, 4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or 5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (1995) (quoting *Wright, 21 F.3d at 501*).

Plaintiffs claims against defendant Carpinello, Commissioner of the New York State OMH, and defendant Sawyer, the director of CNYPC, are premised exclusively upon their roles as supervisors. Plaintiff alleges that Carpinello was involved in the refusal of plaintiff's requests for accommodations under the ADA, refused to hire a disabilities rights coordinator, demonstrated deliberate indifference to his needs, failed to supervise employees at the facility, and instituted policies and procedures that she knew, or should have known, were unlawful. Complaint (Dkt. No. 1) pp. 9–12. For this claim plaintiff relies on a letter that he wrote to Carpinello in mid-October asking to be placed in protective custody and transferred from CNYPC. Complaint (Dkt. No. 1) p. 9. Plaintiff admits that he never received a response to his letter. Complaint (Dkt. No. 1) p. 9.

**\*77** Plaintiffs allegations against Sawyer are similar. On October 13, 2006 plaintiff sent defendant Sawyer a letter requesting certain accommodations under the ADA, including such things as a laptop computer, a magnifier and books on tape. Dkt. No. 57–4, Exh. C. Additionally, plaintiff alleges that Carpinello and Sawyer should have been aware of his complaints by virtue of the letters that he and his wife had written to various state agencies and public officials. The mere receipt of a letter of complaint alone, however, is insufficient to establish personal involvement and liability under section 1983. *Porter v. Goord,* No. 04–CV–0506F, 2009 WL 2386052, at \*5 (W.D.N.Y. July 20,

2009) (citations omitted); *Lyerly v. Phillips,* No. 04 Civ. 3904(PKC), 2005 WL 1802972, at *7 (S.D.N.Y. July 29, 2005) (Castel, J.) (citing *Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002)).[29]

[29]    Plaintiff's conclusory allegations that Carpinello and Sawyer were also made aware by repeated telephone calls are also insufficient. He fails to identify when and by whom such alleged telephone calls were made, whether he or someone on his behalf spoke to Carpinello or Sawyer, and if so, the substance of such alleged conversations.

**\*29** Plaintiff also claims that there existed an unwritten policy and custom of patient abuse and assault at CNYPC, which had been in place for many years. Yet, plaintiff has produced no evidence of instances of alleged assault or abuse of patients, aside from the incident on September 22, 2006, of which he now complains. In opposition to defendants' motion, Lane offers the affidavit of John Palombo (Dkt. No. 84–6), a former patient confined at CNYPC from July, 2006, until November of 2007. The Palombo affidavit, however, is fatally conclusory. Palombo states that he personally witnessed staff members attack and beat patients at CNYPC on a least six different occasions, but fails to identify with any specificity the dates on which such beatings allegedly occurred, the patients that were involved, or the circumstances surrounding the alleged beatings. *Id.* ¶ 13. Nor does Palombo allege that supervisors were notified or aware of the matter, or that complaints were made about these incidents. In fact, plaintiff has produced no evidence of any complaints of abuse made by or on behalf of patients, other than his own. In view of the foregoing, I conclude that the evidence in the record is insufficient to permit a reasonable juror to find the existence of an unwritten policy or custom of patient abuse at CNYPC. *See Upton v. County of Orange,* 315 F.Supp.2d 434, 447 (S.D.N.Y.2004).

For the foregoing reasons, I recommend that defendants' motion for summary judgment dismissing the claims against Carpinello and Sawyer for lack of personal involvement be granted.[30]

[30]    Although defendants do not move to dismiss the claims against defendant Barboza, Director of the SOTP, for lack of personal involvement, it appears that the only basis for plaintiff's claims against her result from her supervisory role. The sole allegations made by the plaintiff relating to defendant Barboza are that he wrote two separate

letters to her complaining of his circumstances at CNYPC. As noted above, these allegations, even if true, are insufficient to support liability against Barboza, *Porter,* 2009 WL 2386052, at \*5, and I find that all claims against her should be dismissed for lack of personal involvement.

### I. *Conspiracy*

Embedded within plaintiff's complaint, though not separately stated, is a conspiracy claim asserted under 42 U.S.C. §§ 1983 and 1985.[31] Defendants also seek dismissal of that claim.

[31]    Plaintiff's complaint additionally alleges violation of 42 U.S .C. § 1984. No such provision exists.

### 1. *Section 1983*

To sustain a conspiracy claim under 42 U.S.C. § 1983, a plaintiff must demonstrate that a defendant "acted in a wilful manner, culminating in an agreement, understanding or meeting of the minds, that violated the plaintiff's rights ... secured by the Constitution or the federal courts." *Malsh v. Austin,* 901 F.Supp. 757, 763 (S.D.N.Y.1995) (citations and internal quotation marks omitted). Conclusory, vague or general allegations of a conspiracy to deprive a person of constitutional rights do not state a claim for relief under section 1983. *See Sommer v. Dixon,* 709 F.2d 173, 175 (2d Cir.1983), (per curiam) *cert. denied,* 464 U.S. 857, 104 S.Ct. 177, 78 L.Ed.2d 158(1983). In order to support a claim of conspiracy to commit a civil rights violation, a plaintiff must establish the existence of such a deprivation; a claim of conspiracy, standing alone, is insufficient to support a finding of liability under section 1983. *Britt v. Garcia,* 457 F.3d 264, 269–70 (2d Cir.2006); *Leon v. Murphy,* 988 F.2d 303, 311 (2d Cir.1993) (collecting cases).

**\*78** Plaintiff's conspiracy claim, if existing at all, appears to rest entirely upon an e-mail from defendant Babula, a treatment assistant, to defendant Barboza, the director of the SOTP at CNYPC, dated October 20, 2006, which plaintiff construes as a concerted effort to have plaintiff's parole violated. Lane Aff. (Dkt. No. 84–2) Exh. C, p. 12. In the e-mail Babula expresses his concerns relating to plaintiff's continuing threatening conduct and goes on to say, "Sharon if there is a way to get this man violated, and you could do it, you need to ..." *Id.* While this e-mail reflects defendant Babula's safety concerns about plaintiff's continued presence at CNYPC, it is not sufficient to raise a question of fact

precluding summary judgment dismissing plaintiff's claim of conspiracy.

**\*30** I note that because I have not found that plaintiff's complaint states a sustainable claim for deprivation of a constitutional right, his conspiracy claim is likewise subject to dismissal for failure to state a cause of action. *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997). Moreover, plaintiff has offered only conclusory allegations that defendants acted in a wilful manner, culminating in an agreement, understanding or meeting of the minds, to violate plaintiffs rights, and for this reason as well his claim of conspiracy fails.

### 2. *Section 1985*

Plaintiffs complaint also alleges violation of 42 U.S.C. § 1985. To sustain a cause of action for conspiracy to violate civil rights under section 1985(3), a plaintiff must allege and demonstrate that defendants acted with racial or other class-based animus in conspiring to deprive the plaintiff of his or her equal protection of the laws, or of equal privileges and immunity secured by law. *United Brotherhood of Carpenters & Joiners, Local 610, AFL–CIO v. Scott,* 463 U.S. 825, 834–39, 103 S.Ct. 3352, 3359–61, 77 L.Ed.2d 1049 (1983); *Gagliardi v. Village of Pawling,* 18 F.3d 188, 194 (2d Cir.1994); *Gleason v. McBride,* 869 F.2d 688, 694 (2d Cir.1989); *Patterson v. County of Oneida,* No. 5:00–CV–1940, 2002 WL 31677033, at \*4 (N.D.N.Y.Oct.30, 2002) (Hurd, J.), *aff'd in relevant part,* 375 F.3d 206 (2d Cir.2004); *Benson v. United States,* 969 F.Supp. 1129, 1135–36 (N.D.Ill.1997) (citing, *inter alia, United Brotherhood,* 463 U.S. at 434–37); *see also LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412, 427 (2d Cir.1995). A plaintiff asserting a claim under section 1985(3) need not necessarily offer proof of an explicit agreement; a conspiracy can, in the alternative, be evidenced circumstantially, through a showing that the parties had a " 'tacit understanding to carry out the prohibited conduct.' " *LeBlanc–Sternberry,* 67 F.3d at 427 (quoting *United States v. Rubin,* 844 F.2d 979, 984 (2d Cir.1988)). This notwithstanding, in order to properly plead such a claim, a plaintiff must make more than "conclusory, vague, or general allegations of conspiracy." *Sommer v. Dixon,* 709 F.2d at 175; *Williams v. Reilly,* 743 F.Supp. 168, 173 (S.D.N.Y.1990) ( "[u]nsubstantiated, conclusory, vague or general allegations of a conspiracy to deprive constitutional rights are not enough to survive [even] a motion to dismiss"). "[D]iffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." *Ciambriello v. County of Nassau,* 292 F.3d 307, 325 (2d Cir.2002) (quoting

*Dwares v. City of New York,* 985 F.2d 94, 100 (2d Cir.1993)). Moreover, it is well settled that a plaintiff attempting to establish a claim under section 1985(3) must demonstrate that the defendant under consideration acted with class-based, invidiously discriminatory animus. *Bray v. Alexandria Women's Health Clinic,* 506U.S. 263, 266–68, 506 U.S. 263, 113 S.Ct. 753, 758–759, 122 L.Ed.2d 34 (1993).

**\*79 \*31** Plaintiff's claim of conspiracy under section 1985 fails for the same reasons that require dismissal of his conspiracy claim alleged under section 1983. Plaintiffs section 1985 claim is also subject to dismissal based upon the fact that plaintiff has produced no evidence of any class-based discriminatory animus.

In view of the foregoing, I recommend that defendants' motion as to plaintiff's conspiracy claims be granted, and that plaintiff's conspiracy claims be dismissed.[32]

> [32] Plaintiff's conspiracy claim, as alleged in his sixth cause of action, names Nowicki, Lucenti, Crociata, Menz, Coppola and Babula, all of whom were employed at the CNYPC. In a doctrine rooted in the conspiracy provision section one of the Sherman Antitrust Act, 15 U.S.C. § 1, and which, although developed in the context of business entities, since inception has been expanded to apply to business corporations and public entities as well, the intra-corporate conspiracy doctrine provides that with exceptions not now presented, an entity cannot conspire with one or more of its employees, acting within the scope of employment, and thus a conspiracy claim conceptually will not lie in such circumstances. *See, e.g., Everson v. New York City Transit Auth.,* 216 F.Supp.2d 71, 75–76 (E.D.N.Y.2002); *Griffin–Nolan v. Providence Washington Ins. Co.,* No. 5:05CV1453, 2005 WL 1460424, at \*10–11 (N.D.N.Y. June 20, 2005) (Scullin, C.J.). Plaintiff's conspiracy claim is thus also subject to dismissal on this basis.

### IV. *SUMMARY AND RECOMMENDATION*

Plaintiff asserts a variety of claims in his complaint relating to his involuntary commitment to CNYPC in September and October of 2006. Having carefully reviewed the extensive record before the court and considered both plaintiffs motion for partial summary judgment and defendants' cross motion for summary judgment, I find that defendants are entitled to qualified immunity with regard to plaintiff's claim that

he was committed to CNYPC in violation of his right to procedural due process[33] and that defendants are entitled to immunity under the Eleventh Amendment for all of plaintiff's claims against them in their official capacities and for alleged violations of the ADA in their individual capacities, and that such claims should therefore be dismissed. As to plaintiff's remaining claims under the ADA, I conclude that he has failed to prove any violation of his rights under Title II of that statute, and that these claims should also be dismissed on the merits, as a matter of law. In addition, I find that plaintiff cannot state a claim under the Eighth Amendment for conditions arising out of his confinement in CNYPC, and that he has failed to establish claims under the Fourteenth Amendment for failure to protect and/or intervene, medical indifference, or excessive use of force, and that these claims therefore are similarly subject to dismissal. Likewise, I have determined that plaintiff has failed to establish that he was denied access to the courts, that defendants' retaliated against him, or that he was otherwise denied his First Amendment rights, including by defendant Beebe's alleged failure to investigate, and accordingly recommend that all First Amendment claims asserted by Lane be dismissed. Because I find that plaintiff has failed to establish a constitutional violation or violation of the ADA, plaintiff's claims of conspiracy as well as those for supervisory liability against defendants Carpinello, Sawyer and Barboza are also subject to dismissal. Additionally, I find that plaintiff has failed to produce any evidence of a conspiracy, or of the personal involvement of Carpinello, Sawyer and Barboza, and therefore recommend dismissal of plaintiff's conspiracy claims and those against Carpinello, Sawyer and Barboza on this basis as well. Accordingly, it is hereby respectfully RECOMMENDED that plaintiffs motion for partial summary judgment (Dkt. No. 57) be DENIED, defendants' cross motion for summary judgment (Dkt. No. 79) be GRANTED, and plaintiff's complaint be DISMISSED in its entirety.

[33]  Because I have already concluded that plaintiff has failed to allege any other constitutional violations during plaintiff's commitment at CNYPC, I have declined to address the defense of qualified immunity with respect to plaintiff's remaining claims.

**\*80  \*32** NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); FedR.Civ.P. 6(a) and 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

2010 WL 3613806 Only the Westlaw citation is currently available. United States District Court, N.D. New York.

David McCHESNEY, Plaintiff,

v.

Michael HOGAN, Donald Sawyer, Dr. Terri Maxymillian, Jeffrey Norwicki, Bill Owens, Corey Connelly, Charmine Bill, Regina Anderson and the Treatment Team, Defendants.

Civil Action No. 9:08–CV–0563

(NAM/DEP). | Aug. 11, 2010.

**Attorneys and Law Firms**

David McChesney, Marcy, NY, pro se.

Hon. Andrew M. Cuomo, Office of Attorney General, State of New York, Dean J. Higgins, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

### *REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** Plaintiff David McChesney, a convicted sex offender who has been civilly committed to the Central New York Psychiatric Center ("CNYPC") or ("Center") for in-patient sex offender treatment, has commenced this action pursuant to 42 U.S.C. § 1983 claiming that he was deprived of his civil rights during the course of his confinement at the Center. In his complaint plaintiff recites three instances on which he was assaulted by fellow patients on two separate days, asserting that the attacks resulted from defendants' failure to properly protect him from harm in violation of his constitutional rights. Plaintiff's complaint seeks declaratory and injunctive relief, as well as awards of compensatory and punitive damages.

Currently pending before the court is a motion by the defendants seeking judgment dismissing plaintiff's claims against them, both on the merits and based upon the lack of any showing of their personal involvement in the constitutional violations alleged. For the reasons set forth below I recommend defendants' motion, which plaintiff has not opposed, be granted.

## I. *BACKGROUND* [1]

[1]     In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir.2003).

Plaintiff, a convicted sex offender, was involuntarily committed to the care and custody of the New York State Office of Mental Health ("OMH"), and designated to the CNYPC on or about December 6, 2007, pursuant to the mandates of the New York Mental Hygiene Law Article 10.[2] Complaint (Dkt. No. 1) ¶ 3; *see also McChesney v. Hogan*, No. 9:08–CV–1186 (NAM/DEP), Dkt. No. 23 at pp. 4–5.The Center is an adult psychiatric facility located in Marcy, New York, with a 210 bed maximum security inpatient capacity from which the 150 bed Sexual Offender Treatment Program ("SOTP") is operated. Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 34–1) ¶¶ 1–2.[3] During the times relevant to his claims, plaintiff was assigned to unit 304, located within a Motivation On Deck ("MOD") wing. Bill Decl. (Dkt. No. 34–8) ¶ 6. Residents are assigned to MOD units based upon a history of violence, threats of violence, or other chronic treatment interfering behaviors, and are treated in a setting which permits more intense containment and observation. Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 34–1) ¶ 19.

[2]     Enacted in 2007, Article 10 of the Mental Hygiene Law provides for civil commitment and treatment of certain individuals convicted of committing sex crimes, recognizing the danger that recidivistic offenders present when released into the community. *See* NY. Mental Hyg. Law § 10.01.

[3]     As will be seen, by failing to respond in opposition to defendants' motion, plaintiff is deemed to have admitted the facts set forth Defendants' Local Rule 7.1(a)(3) Statement. *See* pp. 8–9, *post.*

**\*81** On March 19, 2008 plaintiff became involved in an altercation with another patient at the Center.[4] Complaint (Dkt. No. 1) ¶¶ 15–17; Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 34–1) ¶¶ 20–27. The two were separated by staff members, and plaintiff was escorted to a side room. Complaint (Dkt. No. 1) ¶¶ 17–18. Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 34–1) ¶ 27. Prior to the incident, plaintiff had no prior difficulties with the fellow patient. Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 34–1) ¶ 28.

[4]     There exists some discrepancy in the record as to the date of the first incident. While plaintiff's complaint alleges that it occurred "[o]n or about March 23, 2008", see Complaint (Dkt. No. 1) ¶ 15, it appears more likely from defendants' submissions that it occurred on March 19, 2008. *See* Bill Decl. (Dkt. No. 34–8) ¶¶ 8–9; *see also* Higgins Decl. (Dkt. No. 34–9), Exh. A at p. 35 of 112.This potential discrepancy is meaningless for purposes of determining defendants' summary judgment motion.

Later that day plaintiff returned to the day room, where the earlier altercation had occurred, and while there was struck by another patient. Complaint (Dkt. No. 1) ¶¶ 19–21; Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 34–1) ¶¶ 30–39. The two patients were separated, and plaintiff was placed in a secure location from 4:00 p.m. until 10:00 p.m. for his own protection. Complaint (Dkt. No. 1) ¶ 22; Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 34–1) ¶ 40.

**\*2** A second, seemingly unrelated incident occurred on April 29, 2008 when plaintiff became embroiled in a verbal dispute with a fellow resident in charge of handing out extra packets of sugar for the evening meal. Complaint (Dkt. No. 1) ¶ 25; Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 34–1) ¶¶ 42–56. Although the oral confrontation subsided, the resident with whom plaintiff had words later came up from behind plaintiff and struck him in the back of the head, knocking him unconscious and requiring that he undergo emergency medical treatment at a local hospital. Complaint (Dkt. No. 1) ¶¶ 26–30. Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 34–1) ¶¶ 56–57.[5] As a result of the incident plaintiff suffers from residual affects of the head injury including head and neck pain and memory loss. Complaint (Dkt. No. 1) ¶¶ 31–32, 38–40.

[5]     The fellow patient who struck McChesney on the head was criminally prosecuted as a result of the

assault, leading to a conviction and a sentence of six months of incarceration. Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 34–1) ¶¶ 58–59.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on May 28, 2008. Dkt. No. 1. Named as defendants in plaintiff's complaint are Michael Hogan, Ph.D ., Commissioner of the New York OMH; Donald Sawyer PhD., the Executive Director of the CNYPC; Terri Maxymillian, a licensed doctoral psychologist and the directorof the SOTP; [6] Corey Connelly, the Chief of Security at the Center; Charmine Bill, R.N., a Registered Nurse and a treatment team leader at the CNYPC; William Owen, the Chief of Security at the CNYPC; and Regina Anderson, R.N., also a treatment team leader at the Center. [7] Complaint (Dkt. No. 1) ¶¶ 5–12; Defendants' Local Rule 7.1(a)(3) Statement ¶¶ 6–14. Plaintiff's complaint asserts a single cause of action, complaining of defendants' failure to protect him from harm while involuntarily detained at the Center. *See generally* Plaintiff's Complaint (Dkt. No. 1).

[6]    Defendant Maxyimillian has submitted a declaration in support of defendants' motion. Dkt. No. 34–7.That declaration, however, is unsigned and therefore has not been considered by the court. *See* Dkt. No. 34–7.

[7]    Plaintiff's complaint also names "the treatment team", which is neither an individual nor a recognized entity amenable to suit. See, *e.g., Hoisington v. Co. of Sullivan,* 55 F.Supp.2d 212, 214 (S.D.N.Y.1999) (Stating that under New York law a department of a municipal entity is merely a subdivision of the municipality, having no separate legal existence and is not amenable to suit) (citations omitted).

Following joinder of issue and the completion of discovery, which included the taking of plaintiff's deposition, on October 6, 2009 the defendants moved for summary judgment dismissing plaintiffs claims in their entirety. Dkt. No. 34.Despite passage of the October 26, 2009 deadline for responding, plaintiff has failed to file any papers in opposition to defendants' motion, which is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1) (B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Plaintiffs Failure to Oppose Defendants' Motion*

 *82  Before turning to the merits of plaintiff's claims, a threshold issue to be addressed is the legal significance, if any, of his failure to oppose defendants' summary judgment motion, and specifically whether that failure automatically entitles defendants to summary judgment dismissing plaintiffs complaint. This court's rules provide that

> [w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.

**3** N.D.N.Y.L.R. 7.1(b)(3). Undeniably, *pro se* plaintiffs are entitled to some measure of forbearance when defending against summary judgment motions. *See Jemzura v. Public Serv. Comm'n,* 961 F.Supp. 406, 415 (N.D.N.Y.1997) (McAvoy, C.J.) The deference owed to *pro se* litigants, however, does not extend to relieving them of the ramifications associated with Local Rule 7.1(b)(3). *Robinson v. Delgado,* No. 96–CV–169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J. & Hurd, M.J.); *Cotto v. Senkowski,* No. 95–CV–1733, 1997 WL 665551, at *1 (N.D.N.Y. Oct. 23, 1997) (Pooler, J. & Hurd, M.J.); *Wilmer v. Torian,* 980 F.Supp. 106, 106–07 (N.D.N.Y.1997) (Pooler, J. & Hurd, M.J.). [8] Accordingly, absent a showing of good cause defendants' unopposed summary judgment motion should be granted, if determined to be facially meritorious. *See Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 231–32 (N.D.N.Y.2000) (Scullin, C.J.); *Leach v. Dufrain,* 103 F.Supp.2d 542, 545–46 (N.D.N.Y.2000) (Kahn, J.).

[8]    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

It should also be noted that the plaintiffs failure to properly oppose defendants' summary judgment motion is not without further consequences. By failing to submit papers in opposition to their motion, plaintiff has left the facts set forth in defendants' Local Rule 7.1(a)(3) Statements unchallenged, thus permitting the court to deem facts set forth in the defendants' statement of material facts not in dispute to have been admitted based upon his failure to properly respond to that statement.[9] *See Elgamil v. Syracuse Univ.,* No. 99–CV–611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corrs.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)).

[9]    Local Rule 7.1(a)(3) provides that *"[t]he Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* See N.D.N. Y.L.R. 7.1(a)(3) (emphasis in original).

Based upon plaintiff's failure to oppose defendants' motion I recommend that the court review the motion for facial sufficiency, accepting defendants' assertions of facts as set forth in their Local Rule 7.1(a)(3) Statement as uncontroverted, and that the motion be granted if determined to be facially meritorious.[10]

[10]    Included within defendants' motion papers was a notice to plaintiff advising him of the consequences of failing to respond to their summary judgment motion, in compliance with Northern District of New York Local Rule 56. 2.

**B. *Summary Judgment Standard***

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 **S.Ct.** 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the

governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

**\*83  \*4** A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiff's are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620–21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

**C. *Merit's of Plaintiff's Claim***

The essence of plaintiff's claim is that the defendants failed to take appropriate measures to protect him from harm at the hands of the fellow patients who attacked him during the course of the two incidents at issue. In their motion, defendants maintain that no reasonable factfinder could conclude, when applying the requisite standard, that defendants violated plaintiff's constitutional rights during the course of those events.

Plaintiff's claim in this action purports to be brought under both the Eighth Amendment and the due process clause of the Fourteenth. The Eighth Amendment prohibits cruel and unusual punishment of those convicted of crimes. *Youngberg v. Romeo,* 457 U.S. 307, 312, 102 S.Ct. 2452, 2456, 73 L.Ed.2d 28 (1982). When plaintiff was released by the DOCS into the SOTP program at the Center, he had completed serving his prison term, subject to release on parole, and was no longer a prison inmate; as such, the Eighth Amendment is not applicable under the circumstances. *Id.* Plaintiff's claims are therefore subject to analysis under the due process clause of the Fourteenth Amendment. *Dove v. City of New York,* No. 03–CV–5052, 2007 WL 805786, at * 7 (S.D.N.Y. March 15, 2007) (citing cases).

**\*84  \*5** Patients who are involuntarily committed unquestionably are entitled to certain rights under the Fourteenth Amendment; as the Supreme Court has noted, "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed ... in unsafe conditions." *Youngberg,* 457 U.S. at 315–16, 102 S.Ct. at 2458. "The Supreme Court explained that 'when the State takes a person into its custody and holds [her] there against [her] will, the Constitution imposes upon it a corresponding duty to assume responsibility for [her] safety and general well-being.' " *Beck v. Wilson,* 377 F.3d 884, 889 (8th Cir.2004) (quoting *DeShaney v. Winnebago Couty Dep't of Soc. Servs.,* 489 U.S. 189, 199–200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989)). Plaintiff's claim of failure to protect, although framed as arising under the Eighth Amendment, relates to allegedly unsafe conditions encountered while he was involuntarily confined at CNYPC, and must be analyzed within the framework of the Fourteenth Amendment.

The Second Circuit has yet to articulate the proper standard to be applied when evaluating a failure to protect claim arising out of an involuntary commitment, and there appears to be some uncertainty regarding the matter. The Supreme Court "established [in *Youngberg* ] that involuntarily committed mental patients have substantive due process rights, ... [and] ... held that only an official's decision that was a 'substantial departure from accepted professional judgment, practice or standards' would support a substantive due process claim brought by an involuntarily committed mental patient." *Vallen v. Carrol,* No. 02 Civ. 5666(PKC), 2005 WL 2296620, at * 8 (S.D.N.Y.Sept.20, 2005) (quoting *Youngberg,* 457 U.S. at 323). In *Vallen,* the court examined *Youngberg* and whether the substantial departure standard evolving from that

decision should be applied where the plaintiff, who was a patient involuntarily committed to the Mid–Hudson Forensic Psychiatric Facility, alleged that he was subjected to violence and that the defendants, security hospital treatment assistants, failed to prevent those incidents. Distinguishing *Youngberg,* the court stated that

> [u]nlike the defendants in *Youngberg,* the defendants here are low-level staff members. The nature of such an employee immediately addressing patient-on-patient assault or theft differs significantly from higher-level decisions like patient placement and the adequacy of supervision. For the latter decisions, it is readily possible to apply a test based on professional judgment, practice or standards. In this case, professionals made none of the challenged decisions, and thus the "substantial departure" test has no applicability.

*Vallen,* 2005 WL 2296620, at \*8.

The court in *Vallen* went on to acknowledge that the general approach to substantive due process claims asserted under section 1983 requires that a plaintiff show that the defendants' actions, taken under color of state law, involved "conduct intended to injure [plaintiff] in some way unjustified by [any] ... governmental interest and most likely rise to the conscience-shocking level". 2005 WL 2296620, at \*8 (quoting *County of Sacramento v. Lewis,* 523 U.S. 833, 849, 118 S.Ct. 1708, 1718, 140 L.Ed.2d 1043 (1998)). Ultimately, however, the court suggested that this test would result in an unduly heavy burden being placed upon a plaintiff and also would be inconsistent with the state's central role in supervising and caring for the involuntarily committed. *Id.* at \*9. Instead, citing *Lewis* and analogizing the plaintiff's rights to those of pre-trial detainees, the court suggested its agreement with the "deliberate indifference" standard employed in such circumstances by the Eighth Circuit. [11] *Id.* at \*9 (citing *Moore v. Briggs,* 381 F.3d 771, 773 (8th Cir.2004)).

[11]    While the court stated that it was "inclined to agree with the Eighth Circuit," it did not resolve the issue of the appropriate standard to

be applied, finding in that case that "whether the defendants' actions are measured under the 'conscience shocking,' the 'substantial departure' or the 'deliberate indifference' standard, the result is the same...." *Vallen,* 2005 WL 2296620, at *9.

**\*85** **\*6** In *Dove v. City of New York,* a claim similar to that now raised by McChesney was interposed by the plaintiff, another involuntarily committed individual, arising out of altercations with other patients. Rejecting the applicability of the Eighth Amendment to the plaintiff's circumstances, the court likewise acknowledged the lack of certainty as to whether the claim against the defendants should be measured by a "substantial departure" or "deliberate indifference" standard. *Dove v. City of New York,* No. 03–CV–5052, 2007 WL 805786, at *8 (E.D.N.Y. Mar. 15, 2007). Citing *Vallen,* the court failed to reach the issue of which standard would apply, finding that under either no reasonable factfinder could conclude that defendants violated plaintiff's constitutional rights. *Id.*

I am inclined to agree with the *Vallen* court's conclusion that the "standard of 'deliberate indifference' " best accommodates the constitutional concerns implicated in connection with section 1983 claims brought by involuntarily committed mental patients based on alleged failures to protect them in violation of their substantive due process rights. [12] *Vallen,* 2005 WL 2296620, at * 9. Deliberate indifference, for purposes of the Eighth Amendment, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970 1979, 128 L.Ed.2d 811 (1994); *Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (citing *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979); *Waldo v. Goord,* No. 97–CV–1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (same). "In lewis, the Court equated deliberate indifference for substantive due process and Eighth Amendment purposes." *Moore,* 381 F.3d at 774 (citing *Lewis,* 523 U.S. at 849–40, 118 S.Ct. 1708, 140 L.Ed.2d 1043).

[12]    Though endorsing *Vallen,* I respectfully question the court's reasoning in that case. At its core the concept of due process is intended to protect against the arbitrary exercise of the powers of government. *Lewis,* 523 U.S. at 845, 118 S.Ct. at 1716. Determining whether the right to due process has been abridged requires a balancing of

an individual's interest in liberty against the state's asserted reasons for restraining individual liberty. *Youngberg,* 457 U.S. 320, 102 S.Ct. 2460.To this end, the Supreme Court has "spoken of the cognizable level of executive abuse of power as that which shocks the conscience." *Lewis,* 523 at 846, 118 S.Ct. at 1717. "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Id* . at 849, 118 S.Ct. at 1718. Negligence is "categorically beneath the threshold of constitutional due process." *Id.* Deliberately indifferent conduct may suffice depending on the context. *Id.* at 850, 118 S.Ct. at 1718. As the *Lewis* court explained,

[d]eliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking. *Id.* Thus, as I interpret Supreme Court precedent, deliberate indifference is not a standard that differs from but falls within the concept of conscience-shocking when one considers the circumstances presented.

The Eighth Circuit's decision in *Moore v. Briggs* appears consistent with this understanding. In *Moore,* the involuntarily committed plaintiff alleged that the defendants had violated his right to substantive due process by failing to protect him from the sexual assaults of another patient. In addressing the plaintiff's claims, the Eighth Circuit did not specifically discuss the applicability of *Youngberg,* or engage in an analysis of the potentially applicable due process standards. *See generally, Moore v. Briggs,* 381 F.3d 771. Instead, the court recognized that "[a] substantive due process violation requires proof that a government official's conduct was conscienceshocking and violated one or more fundamental rights." *Moore,* 381 F.3d at 773. In addition, the court found that under the facts presented "the defendants acted under circumstances in which actual deliberation was practical ... [and] ... [t]herefore their conduct *may* shock

the conscience of federal judges only if they acted with 'deliberate indifference.' " *Id.* (emphasis in original) (quoting *Lewis,* 523 U.S. at 851–52, 118 S.Ct. 1708, 1719, 140 L.Ed.2d 1043).

In discussing the concept of deliberate indifference in *Lewis,* the Supreme Court noted that "in the custodial situation of a prisoner, forethought about an inmate's welfare is not only feasible but obligatory under a regime that incapacitates a prisoner to exercise ordinary responsibility for his own welfare." *Lewis,* 523 U.S. at 851, 118 S.Ct. at 1719. Analogizing to *Youngberg,* the Court stated, "[t]here, we held that a severely retarded person could state a claim under § 1983 for a violation of substantive due process if the personnel at the mental institution where he was confined failed to exercise professional judgment when denying him training and habilitation. The combination of the patient's involuntary commitment and his total dependence on his custodians obliges the government to take thought and make reasonable provision for the patient's welfare." *Id.* at 852 n. 12, 118 S.Ct. 1719 n. 12 (internal citations omitted).

In view of the foregoing, I would interpret *Youngberg* narrowly, not as identifying a separate standard to be applied when measuring due process violations, but instead addressing a concept applicable in circumstances involving professional decision-making regarding an involuntarily committed plaintiff who relies on such professionals for his or her well being, and one that aids in the determination of whether the conduct at issue rises to the level of conscience eshocking in that environment.

As in *Vallen* and *Dove,* however, I find it unnecessary to resolve the issue of which standard may here be appropriate since under any of the potentially applicable standards plaintiff's claim of failure to protect must fail. Plaintiff's complaint describes two occasions on which he was allegedly assaulted or attacked by other patients while at the CNYPC. There is no evidence that prior to those incidents plaintiff complained with regard to either of the other civilly committed individuals involved. Nor is there

any indication in the record, including the extensive notes of plaintiff's daily treatment, of circumstances which should have alerted the defendants and others at the Center to the potential for danger. Accordingly, regardless of which standard is ultimately applied, there is no evidence in the record suggesting that any defendant knew of and disregarded a serious risk of harm to plaintiff, or that any defendant substantially departed from accepted practices or standards, and no reasonable factfinder could conclude that defendants' actions deprived plaintiff of a constitutionally-protected right. I therefore recommend dismissal of plaintiff's claims on the merits.

### D. *Personal Involvement*

**\*86** \*7 In their motion, defendants also assert that McChesney's claims against them are subject to dismissal based upon his failure to alleged their personal involvement in the claimed failure to protect him from harm.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

Many of the defendants named in plaintiff's complaint are nowhere referenced in the body, which contains the factual allegations giving rise to his claims. Certain of them appear to have been named exclusively based upon their supervisory capacities. A supervisor, however, cannot be liable for damages under section 1983 solely by virtue of being a supervisor; there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. Culpability on the part of a supervisory official for a civil rights violation can only be established where that individual 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal, has failed to remedy the wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490

F.3d 143, 152–53 (2d Cir.2007), *rev'd on other grounds sub now., Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *see also Richardson,* 347 F.3d at 435; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright,* 21 F.3d at 501.

The only named defendants against whom specific allegations of fact are made are defendants Bill, Owens, and Maxymillian. Plaintiff alleges that following the first incident, defendant Bill arrived on the scene and, after discussing the incident, sent him back into the day room where he was again assaulted, although by a different individual. Complaint (Dkt. No. 1) ¶ 19. Plaintiff further alleges that defendant Bill placed plaintiff's antagonist back in the same ward as plaintiff, although there is no allegation that any further incidents involving that person thereafter occurred. *Id.* ¶ 36. These allegations fail to suffice with regard to establishing defendant Bill's personal involvement in a failure to protect the plaintiff from harm.

**\*87** Defendant Terry Maxymillian is also specifically referenced in plaintiffs complaint, but only as having ordered defendant Bill to remove plaintiff from Ward 304 after the individual who had previously attacked him was reassigned there. *Id.* ¶ 47. This allegation does not form an integral part of plaintiffs failure to protect claims.

**\*8** The sole remaining defendant named in the body of plaintiffs complaint is defendant Owens who, it is alleged, was assigned to take photographs of the plaintiff following the first incident. Complaint (Dkt. No. 1) ¶ 23. Once again, this does not appear to implicate defendant Owens in any claimed failure to protect McChesney from harm.

It is true that, in a wholly conclusory fashion, plaintiff alleges at one point in his complaint that "[u]pon information and belief, Defendants knew or reasonably should have known, from the Single Detail Progress Notes in both [the second assailant's] and [the third attacker's] clinical records what each of them did to vulnerable people, as if the people were victims of prey." Complaint (Dkt. No. 1) ¶ 43. This is allegation, however, falls in the category of potentially shocking, but since it is lacks any factual support, it has no meaning. *Barr v. Abrams,* 810 F.2d 358, 363 (2d cir.1987).

Simply stated, plaintiff's complaint does not contain sufficient factual allegations establishing plausible claims of personal involvement in his failure to protect cause of action on the part of any of the defendants named in his complaint. I therefore recommend dismissal of plaintiff's claims against each of the defendants on this independent, alternative basis.

## IV. *SUMMARY AND RECOMMENDATION*

Plaintiff's complaint asserts that defendants failed to protect him from known harm while confined within the CNYPC to receive sex offender treatment. The record now before the court, however, contains no evidence from which a reasonable factfinder could conclude that the defendants knew or should have reasonably been aware of the exposure of plaintiff to danger, and that they were deliberately indifferent to that potential threat. The record also fails to establish a basis to conclude that any of the defendants in this case should be held personably liable for the constitutional deprivations alleged. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 34) be GRANTED, and that plaintiff's complaint in this action be dismissed in all respects, with leave to replead.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

2005 WL 2296620 Only the Westlaw citation is currently available. United States District Court, S.D. New York.

Barry Lee VALLEN Plaintiff,

v.

S.H.T.A. CARROL; S.H.T.A. Gantz; S.H.T.A Gonzales; S.H.T.A. Malfatone; S.H.T.A. Nelson; S.H.T.A. Leper; Dr. Beneb Ting; Senior S .H.T.A. John Doe; S.H.T.A. March; S.H.T.A. Adams; S.H.T.A. Brown; S.H .T.A. Jones; and Various S.H.T.A. John Does, Defendants.

No. 02 Civ. 5666(PKC). | Sept. 20, 2005.

### *MEMORANDUM AND ORDER*

**\*88** CASTEL, J.

**\*1** Plaintiff Barry Lee Vallen brings this action, pursuant to 42 U.S .C. § 1983, alleging that he was the victim of multiple patient-to-patient assaults and deprivations of property during the time that he resided at the Mid–Hudson Forensic Psychiatric Center ("Mid–Hudson"), a facility operated by an agency of the state of New York. In a Memorandum and Order dated September 2, 2004, I dismissed defendants New York State Office of Mental Health and Mid–Hudson on the basis of the state's constitutionally-based immunity from suit. *Vallen v. Mid–Hudson Forensic Office of Mental Health,* 2004 WL 1948756 (S.D.N.Y. Sept.2, 2004). I concluded that the Complaint set forth allegations sufficient to state claims against the individual defendants for deliberate indifference to confinement conditions that were seriously and dangerously unsafe. *Id.* at \*3. I held that plaintiff's claim did not arise under the Eighth Amendment because he was not serving a term of imprisonment pursuant to a conviction, but, generously construed, his *pro se* Complaint could be read as alleging that persons acting under color of state law had deprived him, as an involuntarily detained person, of rights protected by the Fourteenth Amendment. *Id.*

Discovery in this action is now closed. The defendants have moved for summary judgment dismissing the plaintiff's claims. For the reasons explained below, the defendants' motion is granted.

### *Background*

The following facts are taken from plaintiff's pleadings, his sworn deposition testimony or are otherwise not disputed. Where multiple inferences can be drawn from the facts, I have considered only the one most favorable to Mr. Vallen, the non-movant.

In 1984, the plaintiff was charged with two counts of second-degree murder in connection with the death of his parents. (Vallen Dep. at 169) Plaintiff pleaded not guilty by reason of mental illness or defect and was diagnosed as a paranoid-schizophrenic. (Vallen Dep. at 169–71) A Justice of the New York Supreme Court, Orange County, found that, at that point in time, the plaintiff suffered from a dangerous mental illness and ordered that he be committed to a psychiatric facility. (Vallen Dep. at 170) Subsequently, plaintiff was discharged to outpatient care on two occasions, but in each instance he

was later recommitted. (Vallen Dep. at 172–84) From April 18, 1997 through June 14, 2000, plaintiff was an inpatient at Mid–Hudson (Dickson Aff. ¶ 5)

In an order dated July 22, 2002, Chief Judge Michael B. Mukasey dismissed plaintiff's deprivation of property claim and ruled that the State of New York provided adequate post-deprivation remedies for the recovery of lost property. (July 22, 2002 Order at 3) He also ruled that the Complaint inadequately detailed the assault claims, and dismissed those claims without prejudice. (July 22, 2002 Order at 2, 4–5) Plaintiff filed an Amended Complaint ("AC") dated January 24, 2003.

The AC alleges that, during his three years of treatment at Mid–Hudson Forensic Psychiatric Facility, the plaintiff was subjected to violence and threats of violence, and that the individual defendants promoted or failed to prevent these incidents. The individual defendants were employed as security hospital treatment assistants ("SHTAs") who were responsible for assisting psychiatric patients in their day-today needs and activities. (DeLusso Aff. ¶¶ 2–3)

**\*89  \*2** Each of the incidents set forth in the AC are discussed below. Generally described, the plaintiff alleges that the defendants either encouraged or failed to intervene in violent attacks that other patients inflicted upon the plaintiff. According to the AC, the defendants were aware that various Mid–Hudson patients had violent histories, and placed these patients in close proximity to the plaintiff. On other occasions, the AC alleges that the defendants displayed pleasure at the attacks on plaintiff that allegedly took place. Plaintiff notes, by way of contrast, that since the year 2000 he has resided at a facility in Rochester, New York, and has never been threatened or assaulted.

Helpfully, as part of their motion papers, the defendants have organized the allegations set forth in the Complaint into sixteen distinct incidents or clusters of incidents. Solely for the purposes of facilitating evaluation and discussion of the incidents, I will refer to the sixteen incidents by the number and descriptive title employed in the defendants' motion papers. (Appendix to this Memorandum and Order) I do not in any way treat the defendants' submission as having any evidentiary quality to it.

### *Summary Judgment Standard*

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). It is the initial burden of a movant on a summary judgment motion to come forward with evidence on each material element of his claim or defense, demonstrating that he or she is entitled to relief. A fact is material if it "might affect the outcome of the suit under the governing law ..." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The evidence on each material element must be sufficient to entitle the movant to relief in its favor as a matter of law. *Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004).

When the moving party has met this initial burden and has asserted facts to demonstrate that the non-moving party's claim cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts asserted by the movant. Fed.R.Civ.P. 56(e). In raising a triable issue of fact, the nonmovant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.' " *Powell v. Nat'l Bd. of Med. Exam'rs,* 364 F.3d 79, 84 (2d Cir.2004) (quoting *Aslanidis v. United States Lines, Inc.,* 7 F.3d 1067, 1072 (2d Cir.1993)).

An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. Caution is particularly warranted when considering a summary judgment motion in a discrimination action, since direct evidence of discriminatory intent is rare, and often must be inferred. *Forsyth v. Fed'n Empl. & Guidance Serv.,* 409 F.3d 565, 569 (2d Cir.2005). The Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir.1995) (quotations and citations omitted); *accordMatsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In reviewing a motion for summary judgment, the court must scrutinize the record, and grant or deny summary judgment as the record warrants. SeeFed.R.Civ.P. 56(c). In the absence of any disputed material fact, summary judgment is appropriate. *Id.*

**\*90 \*3** The defendants have served the *prose* plaintiff with the notice explaining the manner in which a party may oppose summary judgment, as required by Local Rule 56.

2. I am mindful of the latitude afforded to a *prose* party opposing a summary judgment motion. See*Forsyth,* 409 F.3d at 570 ("special solicitude" owed to *prose* litigants opposing summary judgment); *Shabtai v. U.S. Dep't of Educ.,* 2003 WL 21983025, at \*5 (S.D.N.Y. Aug.20, 2003) (obligation to construe leniently *prose* opposition papers on a summary judgment motion). However, a party's *prose* status does not alter the obligation placed upon the party opposing summary judgment to come forward with evidence demonstrating that there is a genuine dispute regarding material fact. *Miller v. New York City Health & Hosp. Corp.,* 2004 WL 1907310, at \*9 (S.D.N.Y. Aug.25, 2004).

### Discussion

### 1. Statute of Limitations Defense

The applicable limitations period for Section 1983 actions is found in the state statute of limitations for personal injury actions. *Owens v. Okure,* 488 U.S. 235, 249–50, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989). "Accordingly ... New York's three-year statute of limitations for unspecified personal injury actions, New York Civil Practice Law and Rules § 214(5), governs section 1983 actions in New York." *Ormiston v. Nelson,* 117 F.3d 69, 71 (2d Cir.1997). The statute of limitations begins to accrue " 'when the plaintiff knows or has reason to know of the injury which is the basis of his action .' " *Id.* (quoting *Singleton v. City of New York,* 632 F.2d 185, 191 (2d Cir.1980)).

This action was filed in the *prose* office on December 10, 2001, although the Complaint was not formally accepted for filing until July 22, 2002. The timeliness of the Complaint for statute of limitations purposes is measured from the delivery to the *prose* office on December 10, 2001. See*Ortiz v. Cometta,* 867 F.2d 146 (2d Cir.1999); *Toliver v. Sullivan County,* 841 F.2d 41 (2d Cir.1988). It is undisputed that some of the events alleged in the AC occurred more than three years prior to such delivery, *i.e.* prior to December 10, 1998.

Here, plaintiff argues that he is entitled to tolling under New York law by reasons of insanity. Once the defendant demonstrates that the claim facially falls within the limitations period, the plaintiff, not the defendant, bears the burden of proof on tolling. See*Doe v. Holy See (State of Vatican City),* 17 A.D.3d 793, 794, 793 N.Y.S.2d 565 (3d Dep't 2005); *Assad v. City of New York,* 238 A.D.2d 456, 457, 656 N.Y.S.2d 669 (2d Dep't 1997).

CPLR 208 provides for tolling when "a person entitled to commence an action [was] under a disability because of

infancy or insanity at the time the cause of action accrues...." While the words of the statute, taken at face value, might appear to be broad enough to apply to any person suffering from a debilitating mental illness, the New York Court of Appeals has interpreted the statute more narrowly. *McCarthy v. Volkswagen of Am.,* 55 N.Y.2d 543, 450 N.Y.S.2d 457, 435 N.E.2d 1072 (1982). The *McCarthy* Court reviewed the legislative history of the provision and concluded that the legislature intended that CPLR 208 be "narrowly interpreted". *Id.* at 548, 450 N.Y.S.2d 457, 435 N.E.2d 1072.In the words of the Court: "we believe that the Legislature meant to extend the toll for insanity to only those individuals who are unable to protect their legal rights because of an over-all inability to function in society." *Id.* at 548–549, 450 N.Y.S.2d 457, 435 N.E.2d 1072.New York courts have consistently applied the *McCarthy* standard to claims of tolling by reason of insanity. *See, e.g.,Eberhard v. Elmira City School Dist.,* 6 A.D.3d 971, 973, 775 N.Y.S.2d 431 (3d Dep't 2004) (*McCarthy* standard not satisfied by claim of post-traumatic stress syndrome); *Burgos v. City of New York,* 294 A.D.2d 177, 178, 742 N.Y.S.2d 39 (1st Dep't 2002) ("The doctor's affirmation ... was vague and conclusory in asserting that plaintiff's 'dementia and psychotic disorder [are] due to multiple medical conditions [that] have existed for many years and are permanent,' and thus insufficient to raise an issue of fact" on CPLR 208 tolling under the *McCarthy* standard).

**\*91  \*4** The standard articulated in *McCarthy* has two components. First, the party must be "unable to protect [his] legal rights" and, second, the reason he is unable to protect his legal rights is "because of an over-all inability to function in society". I assume forthe purposes of this motion that, during the period for which plaintiff seeks tolling, he had "an over-all inability to function in society." In this regard, plaintiff has had several "retention hearings" that have resulted in findings that Vallen should remain in an institutional setting. (Vallen Decl. ¶ 1) However, I still must consider whether plaintiff has raised a triable issue of fact as to his ability to protect his legal rights during the period for which he seeks tolling.

As part of their summary judgment burden, the defendants have come forward with evidence of Vallen's direct, personal and vigorous pursuit of his legal rights injudicial proceedings instituted during the period for which he claims tolling. In November 1998, plaintiff commenced an action in the Court of Claims of the State of New York alleging that the state had been negligent in permitting seven inmate assaults on him over the course of one and one-half years. (Peeples Aff, Ex. C) He was then familiar with the necessity of timely

filing a claim, as evidenced by his handwritten complaint dated November 16, 1998, which recites as follows: "This claim is filed within 3 years after the claim accrued, as required by law." (Peeples Aff., Ex. C) [1] *Vallen v. State of New York,* Claim No. 100141 (N.Y.Ct.Cl. Sept. 1, 1999). He filed a second Court of Claims action in or around July 1999 alleging that the state had been negligent in permitting a patient identified as C.J. to initiate a physical attack. [2] (Peeples Aff. Ex. D) *Vallen v. State of New York,* Claim No. 100803 (N.Y.Ct.Cl. Apr. 17, 2001). Plaintiff filed a third Court of Claims action in July 1999, alleging that the state was negligent in permitting the theft of his personal property; in that action, he set forth a detailed list of each item of lost property and its value, including a "suit for court" ($279) and a pair of ostrich leather western boots ($350) (Peeples Aff. Ex. E) *Vallen v. State of New York,* Claim No. 100804 (N.Y.Ct.Cl. Apr. 17, 2001). Also in July 1999, he filed a Section 1983 action in this District alleging that his constitutional rights had been violated. (Peeples Aff. Ex. I) *Vallen v. Connelly,* 99 Civ. 9947(SAS). [3] In March 2000, plaintiff filed a fourth suit in the Court of Claims alleging that falsified claims had been levied against him. (Peeples Aff. Ex. F) *Vallen v. State of New York,* Claim No. 102160 (N.Y.Ct.Cl. Sept. 1, 2000). In toto, between November 1998 and March 2000, Vallen, proceeding *prose,* filed five separate lawsuits in two different fora in an effort to enforce and protect his legal rights. In two of the pleadings, he affirmatively expressed an understanding of the applicable statute of limitations. The 1999 federal court action evinces an awareness of a federal remedy and the procedural means to invoke it. *Cf.Cerami v. City of Rochester Sch. Dist.,* 82 N.Y.2d 809, 813, 604 N.Y.S.2d 543, 624 N.E.2d 680 (1993) (considering, inter alia, the numerous lawsuits filed by the party claiming toll in rejecting such a claim).

[1]    The same allegation is set forth in Vallen's 2000 state Court of Claims complaint. (Peeples Aff, Ex. F)

[2]    To protect their privacy, all Mid–Hudson patients other than the plaintiff will be identified via their initials.

[3]    *See also Vallen v. Connelly,* 36 Fed. Appx. 29 (2d Cir. June 11, 2002), *on remand,* 2004 WL 555698 (S.D.N.Y. Mar 19, 2004).

**\*92  \*5** In response to the defendants' evidence submitted on their summary judgment motion, plaintiff has been unable to raise a triable issue of fact as to his ability to protect his legal rights during the period for which he claims tolling.

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 313 of 370
O'dell v. Bill, Not Reported in F.Supp.3d (2015)
2015 WL 710544

The plaintiff has had a full opportunity to conduct discovery. In his papers in opposition to summary judgment, he has exhibited an understanding of the requirements of Rule 56, which were explained to him in the Local Rule 56. 2 Notice. Yet, nowhere does he address his ability or inability to protect his rights during the time he has been in a mental health facility. Indeed, rather than rebut the defendants' evidence, plaintiff notes that, during the period for which he seeks tolling, he "pressed charges and the patient C.J. was convicted and sent to Orange County jail." (Pro Se Affidavit in support to deny [sic] summary judgment) The closest he comes to responding to the defendant's argument is the assertion that he lost some or all of his lawsuits on the basis of "simple technicalities", thereby demonstrating that he was unable to protect his rights. (Pro Se Mot. to Den. Summ. J. at 1) But it does not follow that because other claims he asserted were dismissed on various grounds that, therefore, he was unable to assert the claims that he belatedly asserted in this action. He also asserts that the express reference to the statute of limitations in two of his filings "was only a mere statement I read in a book...." (Pro Se Mot. to Den. Summ. J. at 1) The source of his awareness of his rights is not relevant to this motion.

To the state employees who are named as individual defendants in plaintiffs Section 1983 claim, it is no small matter to allow a stale claim to stand when there is no basis in the record for tolling. These individuals would be required to defend themselves against allegations concerning events that occurred long ago brought by a plaintiff who has amply demonstrated his ability to file a lawsuit in a timely manner in other instances where he has felt aggrieved.

I conclude that the plaintiff has failed to raise a triable issue of fact on his claim that he was "unable to protect [his] legal rights" for the period commencing from November 18, 1998, the date of his first Court of Claims Complaint. On the issue of tolling, the plaintiff bore the burden of proof and, in response to defendant's motion, he failed to come forward with evidence sufficient to require a trial on this issue. *Holy See (State of Vatican City),* 17 A.D.3d at 794, 793 N.Y.S.2d 565; *Assad,* 238 A.D.2d at 457, 656 N.Y.S.2d 669. However, there remains the question of which incidents occurred more than three years prior to the commencement of this action, *i.e.* prior to December 10, 1998.

Plaintiff has stated that in the "first few months" after his May 18, 1997 assignment to Mid–Hudson, defendant Gonzales predicted that violence would be "coming [his] way." (Vallen Dep. at 216) This is Incident No. 1 in the Appendix.

According to the AC, during his first months at Mid–Hudson, defendant SHTA Carrol predicted that the plaintiff would have some accidents, defendant SHTA Malfatone was aware that patient John Doe No. 1 had violent tendencies, and defendant SHTA Gonzales failed to intervene during an assault that John Doe No. 1 made against the plaintiff. (AC at 3, 5, 8; Vallen Tr. at 216, 219–20) Additionally, on November 8, 1998, a patient identified in the AC as "Reshawn" physically attacked the plaintiff in front of defendant Gantz, who allegedly failed to intervene. (Complaint at 17) This is Incident No. 9 in the Appendix. One to two weeks later, defendant SHTA Gantz allegedly threatened and punched the plaintiff. (Vallen Dep. Tr. at 56–59) This is Incident No. 10 in the Appendix. Sometime between the Reshawn incident and the Gantz incident, Malfatone instructed the plaintiff to stop drinking from a water fountain, and knocked him to the ground. (Vallen Dep. Tr. at 230) This is Incident No. 13 in the Appendix.

**\*93 \*6** The plaintiff does not dispute that these incidents all occurred between May 18, 1997 and late November 1998. The three-year statute of limitations for these incidents accrued, and plaintiff's claims were thus time-barred, prior to the commencement of this action on December 10, 2001.[4] The defendants' summary judgment motion is granted as to Incident Nos. 1, 9, 10 and 13 set forth in the Appendix, and this portion of the plaintiff's action is dismissed. Though claims based upon these occurrences are barred by the statute of limitations, I will consider the underlying facts to the extent they are relevant to plaintiff's opposition to the other prongs of defendants' motion. *See Jute v. Hamilton Sanstrand Corp. .,* Docket No. 04–3927 (2d Cir. August 23, 2005) (considering such facts in the context of Title VII).

[4]     Assuming that the earliest of his claims accrued in May 1997 and was tolled under CPLR 208 from May 1997 to November 18, 1998, plaintiff had three years from November 18, 1998, *i.e.* until November 18, 2001 to assert the claims. He did not assert the claims prior to that date.

### 2. Lack of Showing of a Defendant's Personal Involvement

The defendants, each of whom is individually accused of having deprived plaintiff of constitutionally-protected rights, argue that certain of the plaintiff's claims should be dismissed because there is no evidence of personal involvement in the events giving rise to the asserted claims. "It is well settled in this Circuit that 'personal involvement of defendants in

alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)).

There are five ways in which a plaintiff may show the personal involvement of a defendant in a constitutional deprivation: (1) the defendant directly participated in the alleged constitutional violation, (2) the defendant, having been informed of a violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which constitutional violations occurred, or allowed the continuation of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed wrongful acts, or (5) the defendant displayed deliberate indifference to the inmates' rights by failing to act on information that unconstitutional acts were occurring. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). Liability may not be anchored in a theory of *respondeat superior. Collins v. City of Harker Heights,* 503 U.S. 115, 122, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). "The bare fact that [a defendant] occupies a high position in the [institutional] hierarchy is insufficient to sustain [a] claim." *Colon,* 58 F.3d at 874.

The defendants identify six separate incidents for which they claim that the plaintiff can set forth no facts that indicate personal involvement on the part of the various defendants. The plaintiff alleges that a Mid–Hudson patient, C.J., stabbed him with a pen near his eye while SHTA Nelson and John Doe defendants Nos. 2 and 3 were supposed to be supervising. (AC at 11–12) This is Incident No. 4 in the Appendix. SHTA Nelson was never served and is not a party to this action, and the plaintiff has been unable to identify John Does Nos. 2 and

**\*94** 3.[5] (Vallen Dep. Tr. at 106–07) As such, his claims arising from this incident (No. 4) are dismissed.

[5]  According to Donna DeLusso, director of Human Resources at Mid–Hudson, SHTA Nelson has not been employed by Mid–Hudson since his retirement on October 30, 1999. (DeLusso Aff. ¶ 4)

**\*7** The plaintiff alleges that in a separate incident, patient C.J. approached him, stabbed him near the eye, and attempted to gouge out his eye with his fingers. (AC at 14) This is Incident No. 5 in the Appendix. Plaintiff asserts that John Doe defendants Nos. 1, 2 and 3 observed this incident and failed to intervene. (AC at 14) However, the plaintiff is unable to identify John Does Nos. 1, 2, and 3. (Vallen Dep. Tr. at 120–

21) Because there is no evidence of personal involvement on the part of any defendant remaining in this action, plaintiff's claim arising from this incident (No. 5) is dismissed.

In a third incident involving patient C.J., plaintiff alleges that two Mid–Hudson employees permitted C.J. to assault him in a facility dining room. (AC at 10–11) This is Incident No. 6 in the Appendix. Plaintiff alleges that afterward, defendant Carrol laughed about the incident and expressed regret that he had not been present to observe the assault. (AC at 11) However, the plaintiff does not identify any employee who observed the assault, and the alleged after-the-fact laughter and comments of defendant Carrol, while callous and distasteful, do not rise to the level of a constitutional violation. *Cf. Moncrieffe v. Witbeck,* 2000 WL 949457, at *3 (N.D.N.Y. June 29, 2000) (allegation that corrections officer laughed at plaintiff does not state an Eighth Amendment claim). Plaintiff's claims arising out of this incident (No. 6) are dismissed.

Next, the plaintiff asserts that another Mid–Hudson patient, A.A., had a long history of attacking people, and that Mid–Hudson staff intentionally placed A.A. in the plaintiffs proximity. (AC at 15–16) This is Incident No. 7 in the Appendix. Plaintiff alleges that SHTA Nelson positioned A.A. close to the plaintiff, and that A.A. attacked him. (AC at 15–16) However, Nelson was not served in this action, and the plaintiff has identified no other Mid–Hudson employees who were involved in the incident. Because there are no facts in the record before me indicating that any defendant to this action was personally involved in or supervised A.A.'s attack, plaintiff's claim arising out of this incident (No. 7) is dismissed.

The plaintiff claims that SHTA March shouted at him and pushed him in a bathroom. (AC at 23) This is Incident No. 11 in the Appendix. However, March was not served in this action, and none of the defendants who are parties to this action were implicated in these events. Because there are no facts in the record before me indicating that any defendant to this action was personally involved in the attack, plaintiff's claim arising out of this incident (No. 11) is dismissed.

Lastly, defendants move for summary judgment seeking the dismissal of plaintiff's claims arising from three incidents loosely raised in the AC. Plaintiff alleged that another patient, N, kicked and punched him, and that staff members laughed because N. was an older man. (AC at 24–25) This is Incident No. 14 in the Appendix. In another incident, the plaintiff alleges that an unidentified staff member gave another patient

a key to plaintiff's locker, leading that patient to steal $35. (AC at 25) This is Incident No. 15 in the Appendix. In the third incident, the plaintiff alleges that patient B. punched him in a bathroom. (AC at 25) This is Incident No. 16 in the Appendix. However, the plaintiff has not identified by name any members of the Mid–Hudson staff who were involved in these incidents. As a result, all claims arising from these three incidents (Nos.14–16) are dismissed as to all defendants.

### 3. *Defendants' summary judgment Motion as to plaintiff's remaining claims*

 **\*95  \*8** Defendants move for summary judgment dismissing plaintiff's remaining claims and assert that, in response to their motion, plaintiff has come forward with no facts from which a reasonable fact-finder could conclude that that he was deprived of any rights under the Fourteenth Amendment. In *Youngberg v. Romeo,* 457 U.S. 307, 315–16, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Court concluded that an involuntarily committed person has substantive rights under the Due Process Clause of the Fourteenth Amendment to be free from unsafe conditions of confinement. The Court reasoned that "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed-who may not be punished at all-in unsafe conditions." *Id. See also DeShaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 199, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) ("[T]he substantive component of the Fourteenth Amendment's Due Process Clause requires the State to provide involuntarily committed mental patients with such services as are necessary to ensure their 'reasonable safety' from themselves and others.").

Although *Youngberg* established that involuntarily committed mental patients have substantive due process rights, the standard articulated in the opinion for adjudicating claims based on those rights does not control here. Like Mr. Vallen, the plaintiff in *Youngberg* had been involuntarily committed to a state institution-albeit one for mentally retarded individuals-and had experienced violent attacks from other residents while staying there. *See Youngberg,* 457 U.S. at 310. The plaintiff alleged that the institution's director and two supervisors had known, or should have known, that the plaintiff was suffering injuries and that they failed to institute appropriate preventive measures. *Id.* The Court held that only an official's decision that was a "substantial departure from accepted professional judgment, practice or standards" would support a substantive due process claim brought by an involuntarily committed mental patient. *Id.* at 323. This

standard reflected the Court's conclusion that a decision in this setting, "if made by a professional, is presumptively valid." *Id.* In defining its use of the term "professional", the Court appeared to include nonprofessionals acting under the direction of professional supervisors. *Id.* at 323 n. 30. Unlike the defendants in *Youngberg,* the defendants here are low-level staff members. The nature of such an employee immediately addressing patient-on-patient assault or theft differs significantly from higher-level decisions like patient placement and the adequacy of supervision. For the latter decisions, it is readily possible to apply a test based on professional judgment, practice or standards. In this case, professionals made none of the challenged decisions, and thus the "substantial departure" test has no applicability.

In addition, the general approach to substantive due process claims appears inappropriate in this case. Usually, in order to establish a substantive due process violation for purposes of Section 1983, a plaintiff must show that the defendant's actions taken under color of state law involved "conduct intended to injure [plaintiff] in some way unjustifiable by any government interest [and] ... most likely to rise to the conscience-shocking level." *County of Sacramento v. Lewis,* 523 U.S. 833, 849, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). However, for pretrial detainees protected by the Fourteenth Amendment, but not the Eighth Amendment, the Court has applied the lower standard of "deliberate indifference" to Section 1983 claims arising from state officials' inattention to their medical needs.[6] In *Lewis,* the Court reasoned:

[6]

> In the Eighth Amendment context, a "prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates" the inmate's constitutional protection. *Farmer v. Brennan,* 511 U.S. 825, 828, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Officials must take " 'reasonable measures to guarantee the safety of the inmates,' " including protection of inmates from other inmates' acts of violence. *Id.* at 832 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)). A failure-to-protect claim requires the plaintiff to satisfy both an objective test and a subjective test. The objective test requires that a deprivation must be "sufficiently serious," with a defendant's act or omission resulting in the denial of "the minimal civilized measure of life's necessities." *Id.* at 834 (citation omitted). To succeed on a deliberate indifference failure-to-protect claim, the plaintiff must also prove that a plaintiff was

"incarcerated under conditions posing a substantial risk of serious harm." *Id.* By contrast, the subjective considerations look to whether a defendant had a "sufficiently culpable state of mind," one that reflects deliberate indifference to an inmate's health or safety. *Id.* (quoting *Wilson v. Seiter,* 501 U.S. 294,297(1991)).

**\*96  \*9** "Since it may suffice for Eighth Amendment liability that prison officials were deliberately indifferent to the medical needs of their prisoners, it follows that such deliberately indifferent conduct must also be enough to satisfy the fault requirement for due process claims based on the medical needs of someone jailed while awaiting trial."

*Id.* at 850 (citations omitted). As in the case of pretrial detainees, the involuntary commitment of mentally ill individuals does not constitute punishment for purposes of the Eighth Amendment. *See DeShaney,* 489 U.S. at 199 ("[T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law.") (citations omitted). However, the Fourteenth Amendment still protects these individuals, including the plaintiff in this case. *See, e.g., Lombardo v. Stone,* 2001 WL 940559, *7 n. 7 (S.D.N.Y. Aug.20, 2001)* (rejecting the Eighth Amendment as a basis for claims of a patient at a psychiatric facility who had not been convicted of a crime and analyzing them instead under the Fourteenth Amendment). Moreover, the state's central role in supervising and caring for the involuntarily committed-like the pretrial detainees considered in *Lewis*-suggests that the conscience-shocking standard demands too much of such plaintiffs' substantive due process claims.

I am inclined to agree with the Eighth Circuit that the standard of "deliberate indifference" is the correct one for Section 1983 claims brought by involuntarily committed mental patients and based on alleged failures to protect them that violated their substantive due process rights. *See Moore v. Briggs,* 381 F.3d 771, 773 (8th Cir.2004). However, I do not need to reach the issue because whether the defendants' actions are measured under the "conscience-shocking", the "substantial departure" or the "deliberate indifference" standard, the result is the same: no reasonable fact-finder could conclude based upon the evidence, drawing all inferences in plaintiff's favor, that the defendants' conduct either shocked the conscience,

was deliberately indifferent or substantially departed from accepted professional judgment, practices or standards.

Defendants argue that four incidents (Nos.2, 3, 8, 12) set forth in the AC should be dismissed because there are no triable issues of fact that support plaintiff's claim. I address them each in turn.

First, the plaintiff asserts that defendant Jones and that SHTA John Does Nos. 1 and 2 permitted patient C.J. to circle the plaintiff, and that C.J. then punched the plaintiff in the face several times. (Vallen Dep. Tr. at 89–96; AC at 9–10) This was the first alleged assault that C.J. inflicted upon the plaintiff, and is designated as Incident No. 2 in the Appendix. The defendants assert that summary judgment is warranted because the plaintiff cannot point to any facts supporting a conclusion that defendant Jones had any advance knowledge of C. J.'s assault upon plaintiff or was deliberately indifferent to the assault once he observed it. The defendants point to Vallen's deposition testimony that Jones "flew out from behind the desk and threw [C.J.] to the ground or something" when he saw that C.J. was attacking the plaintiff. (Vallen Dep. Tr. at 96) There is no dispute that once an attack was underway, Jones actively intervened to stop a physical attack against the plaintiff. After intervening in the attack, Jones told the plaintiff that he saw C.J. "circling you, I knew he was going to do something, and then he did it." (Vallen Dep. Tr. at 95) While such a statement may be open to multiple inferences, this remark standing alone is insufficient to raise a triable issue of fact. Based on the plaintiff's own account, as soon as C.J. began the assault upon plaintiff, defendant Jones immediately intervened and restrained C.J. Defendant Jones's conduct was not indifferent to Vallen's fate but rather proactive and protective of him. Plaintiff's claim does not survive under any of the arguably applicable standards-conscience-shocking conduct, deliberate indifference or substantial departure from accepted judgment standards or practices. Defendants' motion for summary judgment as to this incident (No. 2) is therefore granted.

**\*97  \*10** Next, the defendants assert that summary judgment is appropriate for an incident in which defendant SHTA Leper told Mid–Hudson patient C.J. to enter a bathroom that the plaintiff was using because it would not bother the plaintiff. (AC at 16) This is Incident No. 8 in the Appendix. Defendants assert that summary judgment is appropriate because Leper did not infringe the plaintiff's constitutional rights when he suggested that C.J. enter the bathroom. (Def.'s Mem. 20–21) In opposition, the plaintiff asserts that C.J. posed a risk

of violence to him at that time, but he does not indicate that he endured any physical injury from C.J.'s presence. (Opp'n Decl. ¶ 8) However embarrassing this incident may have been to the plaintiff, it does not rise to the level of a Constitutional violation. *See, e.g., Rodriguez v. Ames,* 287 F.Supp.2d 213, 219–20 (W.D.N.Y.2003) (doctor was not deliberately indifferent to inmate's privacy rights when he conducted examination of inmate's bowel condition in prison cell because of lower privacy baseline in prison facilities); *Robinson v. Middaugh,* 1997 WL 567961, at *4 (N.D.N.Y. Sept.11, 1997) ("plaintiffs claims that he was made to shower, dry off with a pillow case, and his private parts exposed due to the wearing of a 'paper suit', and sleeping on an unsanitized mattress do not rise to the level of deliberate indifference or the wanton infliction of pain."). The deprivation implicated is not sufficiently serious and does not deprive him of the minimal civilized measure of life's necessities. *Cf.Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The defendant's motion is granted as to this incident (No. 8), and it is dismissed from this case.

Defendants move for summary judgment as to the plaintiff's claims concerning defendant SHTA Brown and Mid–Hudson patient F. This is Incident No. 12 in the Appendix. According to the plaintiff, F. commenced an attack on the plaintiff and began to kick him from behind. (AC at 24) At that point, according to the AC, "S.H.T.A. Brown jumped in to protect the patient who kicked me." (AC at 24) The AC does not assert that S.H.T.A. Brown was responsible for the attack, encouraged the attack, or had foreknowledge of the attack. To the contrary, the record and the allegations indicate only that once an attack was underway, defendant Brown attempted to restrain patient F. from attacking the plaintiff. In his deposition, the plaintiff volunteered that defendant Brown intervened when the plaintiff himself "started to go at [patient F.]." (Vallen Dep. Tr. at 229) Because the record does not support an inference that defendant Brown's conduct shocked the conscience, resulted from deliberate indifference or departed substantially from professional standards or practices, the defendants' motion for summary judgment is granted as to the incident (No. 12), and it is dismissed.

Finally, the defendants' motion for summary judgment is granted as to claims arising from an incident with Mid–Hudson patient S.W. This is Incident No. 3 in the Appendix. Defendants argue that the plaintiff can point to no admissible evidence from which a reasonable fact-finder could find in plaintiff's favor.' In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995); *seealsoGallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1223–24 (2d Cir.1994) ("[T]he moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case."). The plaintiff alleges that he was walking up the staircase when S.W. punched him in the face. (AC at 9–10; Vallen Dep. Tr. at 97–98) He asserts that defendant SHTA Malfatone was present. (Vallen Dep. Tr. at 98) However, there is nothing in the record that shows whether SHTA Malfatone observed the attack and failed to act or intervene, or whether Malfatone was indifferent to the plaintiff's health or safety. As a result, the defendants' summary judgment motion seeking the dismissal of plaintiff's claim based upon this incident (No. 3) is granted because plaintiff has failed to raise a triable issue of fact under any of the applicable standards.

### 4. *Qualified Immunity and Law of the Case*

**\*98  \*11** Because claims arising from these incidents are dismissed on other grounds, I do not consider the defendants' contention that defendants Carrol, Jones and Leper are entitled to qualified immunity. Similarly, I need not consider the defendants' contention that the law of the case bars plaintiff from continuing to pursue his lost property claim for the $35 stolen from his locker.

### *CONCLUSION*

The defendants' summary judgment motion is GRANTED. The Clerk is directed to enter judgment in favor of the defendants, and to dismiss this case.

SO ORDERED.

### *APPENDIX TO MEMORANDUM AND ORDER IN VALLEN V CARROL, 02 CIV. 5666(PKC)*

### 1. *Allegations Based on Events that Occurred During Plaintiffs First Few Months at Mid–Hudson Forensic*

SHTA Carrol told plaintiff that he was going to have some accidents. (AC at 3, 5) SHTA Gonzales told Plaintiff that violence was coming his way. (AC at 5) SHTA Gonzales heard patient John Doe # 1 threaten plaintiff, and stood by as patient John Doe # 1 hit plaintiff in the head. (AC at 5) SHTA Malfatone "and other S.H.T.A. staff were aware that this same patient, John Doe # 1, was violent, but laughed and did nothing when patient John Doe # 1 followed plaintiff to his

room and punched him. (AC at 8) The next morning, patient John Doe # 1 came up behind plaintiff at a sink and put a hair pick to his eyes and said that he wanted no more trouble out of plaintiff. (AC at 8) SHTA Gonzales told plaintiff to stop causing trouble. (AC at 8) These events (the "Initial Incidents") allegedly occurred within the first few months of plaintiff's arrival at Mid–Hudson Forensic-within a few months of April 8, 1997. (Vallen Dep. Tr. 216, 219–20)

**2. *The First Patient C.J. Allegation***

SHTA Jones and SHTAs John Doe # 1 and # 2 "let" patient C.J. "circle around" plaintiff until he got behind plaintiff. (AC at 9) Patient C.J. then punched plaintiff in the face and "tried to take [plaintiff's eye out." (AC at 9) Plaintiff does not know who John Doe # 1 and # 2 are. (Vallen Dep. Tr. 96) This was the first time patient C.J. had assaulted plaintiff. (Vallen dep. Tr. at 89–91, 95–96; AC at 9–10)

**3. *The Patient S.W. Allegation***

Patient S.W. punched plaintiff on a staircase, and SHTAs Malfatone and Nelson were there (the "S.W. Incident"). (AC at 9–10)

**4. *The Second Patient C.J. Allegation***

Patient C.J. was on assault precautions in the high observation area in the dayroom. SHTA Nelson and SHTAs John Doe # 2 and # 3 were watching the ward. Patient C.J. walked to where plaintiff was watching television, and stabbed plaintiff near his eye with a pen. (AC at 11–13) Plaintiff cannot identify SHTAs John Doe # 2 and # 3. (Vallen Dep. Tr. 106–07)

**5. *The Third Patient C.J. Allegation***

Patient C.J. took a pen and left the precaution area while SHTAs John Doe # 1, # 2 and # 3 were observing, walked to where plaintiff was seated watching television, stabbed plaintiff near the eye, and tried to gouge plaintiff's eye with his fingers. (AC at 14) Plaintiff cannot identify John Does # 1, # 2 or # 3. (Vallen Dep. Tr. 120–21)

**6. *The Fourth Patient C.J. Allegation***

**\*99  \*12** SHTAs John Doe # 1 and # 2 allowed patient C.J., who was on assault precautions, to leave his line in the dining room, and patient C.J. then assaulted plaintiff while plaintiff was carrying his tray. (AC at 10–11, Vallen Dep. Tr. at 101) Plaintiff cannot identify SHTAs John Doe # 1 or # 2. (Vallen Dep. Tr. at 101) An hour later, SHTA Carrol laughed and said he wished he had been present to watch the assault. (AC at 11)

**7. *The Patient A.A. Allegation***

Unidentified staff "indicated" that plaintiff was "a good target." (AC at 15) Patient A.A. was attacking people, and after SHTA Nelson placed patient A.A. in a chair a few feet from plaintiff, patient A.A. jumped from his chair and attacked plaintiff. (AC at 15–16)

**8. *The Allegation Against SHTA Leper***

Plaintiff was in the bathroom, and SHTA Leper told patient C.J. to go into the bathroom because it would not bother plaintiff if patient C.J. went in (the "Leper Bathroom Incident"). (AC at 16–17)

**9. *The "Reshawn" Allegation***

After SHTA Gantz had given plaintiff permission to do laundry, a patient whom plaintiff identifies as "Reshawn" pushed plaintiff in front of Gantz. (AC at 17) Reshawn then punched plaintiff in the mouth. (AC at 17–21) The blow split plaintiff's lip and broke one tooth and loosened another. (Vallen Dep. Tr. at 37–38) Plaintiff received fourteen stitches to his lip. (Vallen Dep. Tr. at 222–23) The Reshawn Incident occurred on November 8, 1998. (Vallen Dep. Tr. at 24; Peeples Aff, Exh. C, at 1)

**10. *The Gantz Bathroom Allegation***

SHTA Gantz threatened plaintiff and punched him in the chest in a Bathroom (AC at 21–22; Vallen Dep. Tr. at 56–59) The Gantz Bathroom Incident occurred a week or two after the Reshawn Incident, which occurred on November 8, 1998. Vallen Dep. Tr. at 24, 56–57; Peeples Aff, Exh. C, at 1)

**11. *The SHTA March Bathroom Allegation***

SHTA March came into the bathroom at the Canteen, screamed at plaintiff, and pushed plaintiff across a room. (AC at 23)

**12. *The SHTA Brown Allegation***

Patient F. kicked plaintiff from behind, and SHTA Brown jumped in to protect patient F. because plaintiff "started to go at" patient F. (AC at 24; Vallen Dep. Tr. at 229)

**13. *The SHTA Malfatone Water Allegation***

SHTA Malfatone told plaintiff to stop drinking water from a water fountain in the yard, and came over and knocked plaintiff to the ground. (AC at 24) The Malfatone Water

O'dell v. Bill, Not Reported in F.Supp.3d (2015)

2015 WL 710544

Incident occurred before the Reshawn Incident. (Vallen Dep. Tr. at 231–32)

### 14. *The Patient N. Allegation*

Patient N. kicked and punched plaintiff, and unidentified staff laughed because patient N. was an old man. (AC at 24–25) Plaintiff cannot identify the staff members. (AC at 24–25; Vallen Dep. Tr. at 233–35)

### 15. *The $35.00 Allegation*

An unidentified staff member gave the key to plaintiff's locker to another patient, who then took $35.00 in quarters from plaintiff's locker (the "$35.00 Incident"). (AC at 25) Plaintiff cannot identify the staff members. (AC at 25; Vallen Dep. Tr. at 235–39)

### 16. *The Patient B. Bathroom Allegation*

**\*100  \*13** Patient B. punched plaintiff in the bathroom, and plaintiff chased patient B. out of the bathroom. (AC at 25) Unidentified staff saw plaintiff chasing patient B, but did not see patient B. assault plaintiff in the bathroom. (AC at 25; Vallen Dep. Tr. at 238–39)

2012 WL 1995839 Only the Westlaw citation is currently available. United States District Court, N.D. New York.

Willie James YELDON, Plaintiff,

v.

Donald SAWYER, Director; James Morgan, Director; Maxmillian, Dr., Director; Bill Charmain, Treatment Leader;[1] Kumar Bahl, Dr., Physical; Brennan, T.A.; Fairbrother, T.A.; Espinosa, T.A.; Searcy, T.A.; Crocket, Nurse; Forstie; Frazier, T.A.; Fical, T.A.; Pirachia, T.A.;[2] Ashley, T.A.; McCann, T.A.; Leonard, T.A.; Parrish, T.A .; Gray, N.A.; Delmedico, N.A.; Brett Davis, T.A.; Hollenbeck, T.A.; Donna Nardozza, Nurse; Lauren Barrett, Nurse; Nurse Media,[3] Defendants.

[1]    The record before the Court indicates that the correct spelling of this Defendant's name is Charmaine Bill. *See* Dkt. No. 15–1, Notice of Appearance.

[2]    The correct spelling of this Defendant's name is Qasim Piracha. *See* Dkt. No. 15–1, Notice of Appearance.

[3]    The correct spelling of this Defendant's name is Marianne Madia. *See* Dkt. No. 15–1, Notice of Appearance.

Civ. No. 9:10–CV–266 (TJM/RFT). | April 26, 2012.

**Attorneys and Law Firms**

Willie James Yeldon, Marcy, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney General, Dean J. Higgins, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.[4]

[4]    Dean J. Higgins, Esq., has appeared on behalf of the Defendants, *except* Defendants McCann and Crocket, who have not been served. *See infra* Part II.B.

### *REPORT–RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

**\*1** *Pro se* Plaintiff Willie James Yeldon, who is currently confined at the Central New York Psychiatric Center, commenced this action pursuant to 42 U.S.C. § 1983, alleging that the Defendants used excessive force against him and failed to protect him from the use of such excessive force. Dkt. No. 1, Compl. Defendants now bring a Motion for Summary Judgment under Federal Rule of Civil Procedure 56. Dkt. Nos. 41 & 45. Plaintiff opposes the Motion Dkt. No. 47.For the reasons that follow, this Court recommends that Defendants' Motion be granted in part and denied in part.

### I. BACKGROUND

The following facts were derived mainly from the Defendants' Statement of Material Facts, submitted in accordance with this District's Local Rules of Practice, which was not specifically countered nor opposed by Plaintiff. *See* N.D.N.Y.L.R. 7.1(a)(3) (*"The Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* ) (emphasis in original).[5]

5

In his Opposition to the Defendants' Motion for Summary Judgment, Plaintiff includes a section entitled "Statement of Facts ." *See* Dkt. No. 47 at p. 3. However, this section appears to contest only the Defendants' Memorandum of Law and the legal conclusions drawn thereof; it does not, as Local Rule 7.1(a)(3) requires, mirror the movant's Statement by matching numbered paragraphs, or set forth specific references to the record where the material fact is alleged to have arisen. Even a liberal reading of Plaintiff's "Statement of Facts" does not provide this Court with any specific factual allegations Plaintiff is either offering or contesting.

In a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to "formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (a court is to read a *pro se* party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest"). This liberal standard, however, does not excuse a *pro se* litigant from following the procedural formalities of summary judgment. *Showers v. Eastmond,* 2001 WL 527484, at *2 (S.D.N.Y. May 16, 2001). The courts of the Northern District have adhered to a strict application of Local Rule 7.1(a)(3)'s requirement on summary judgment motions. *See Giguere v. Racicot,* 2002 WL 368534, at *2 (N.D.N.Y. Mar.1, 2002) (citing, *inter alia, Bundy Am. Corp. v. K–Z Rental Leasing, Inc.,* 2001 WL 237218, at *1 (N.D.N.Y. Mar.9, 2001)). Nothing in Rule 56 imposes an obligation on the Court to conduct an independent search and review of the record to find proof of a factual dispute. *Amnesty Am. v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002).

At all times relevant to the claims included in the Complaint, Plaintiff was under civil commitment and participating in the sexual offender treatment program at the Central New York Psychiatric Center ("CNYPC") located in Marcy, New York. Dkt. No. 41–2, Defs.' Statement Pursuant to Rule 7.1(a)(3) [hereinafter "Defs.' 7.1 Statement"], at ¶ 1. On November 18, 2009, Plaintiff was moved from Ward 305 to a holding ward side room in Ward 604 for disciplinary

reasons and was kept there until the other residents returned from recreational activities. *Id.* at ¶¶ 15–16.Plaintiff initially resisted his transport to the holding ward by refusing to move, but he eventually consented. SeeDkt. No. 45–1, Pl.'s Dep., at pp. 24–25.Plaintiff was very upset that he had to wait in this side room. Defs.' 7.1 Statement at ¶ 17.

**\*101** At approximately 6:30 p.m., Plaintiff was escorted back to Ward 305 by various Secure Care Treatment Assistants ("TA"), TAPiracha, and Nurse Madia. *Id.* at ¶ 18; Pl.'s Dep. at p. 28.0n the elevator, Plaintiff told Defendant Piracha that he "didn't want him in [Plaintiff's] face," and when they arrived on Ward 305, Defendant Madia told Plaintiff to go into the side room. Pl.'s Dep. at pp. 28–29; Defs.' 7.1 Statement at ¶ 19.

Plaintiff claims that when he was in the side room of Ward 305, Defendant TA Davis came into the side room and called in "all of the other [D]efendants ... [who] rushed in and threw [Plaintiff] to the floor, started kicking [him] and beating [him]." Pl.'s Dep. at p. 33; *see also* Defs.' 7.1 Statement at ¶ 22. Plaintiff claims this beating lasted about twenty minutes. Defs.' 7.1 Statement at ¶ 35.

Defendants submit evidence claiming that Plaintiff was very upset at his confinement in the side room on Ward 305 and was arguing with Defendant Piracha and loudly threatening the CNYPC staff. *Id.* at ¶¶ 21 & 25–26. After Piracha left the side room and stood in the hallway, out of Plaintiff's sight, Plaintiff started screaming, "I'm going to kill that little m-f-er" and attempted to push the door to the hallway open. Dkt. No. 41–16, Nicholas Hollenbeck Decl., dated Sept. 21, 2011, at ¶¶ 19–30. As Plaintiff "pointed to Piracha," and screamed, "I'm going to kill that m-f-er," he punched Defendant Hollenbeck in the left ear. *Id.* at ¶¶ 30–31; Defs.' 7.1 Statement at ¶ 30. Other TAs, including Defendant McCann, responded and grabbed Plaintiff and took him to the ground, but it "wasn't a hard takedown." Hollenbeck Decl. at ¶¶ 32–34 & 39; Defs.' 7.1 Statement at ¶¶ 31–33. Plaintiff struggled hard until he was placed in restraints on the bed in the room. Hollenbeck Decl. at ¶¶ 41–46.

**\*2** Conversely, Plaintiff testified that he did not punch nor hit any of the staff, and that he did not have any particular problem with Defendant Piracha, but rather that the Defendants gathered on this occasion as a "beat-up crew" to assault the Plaintiff. Pl's Dep. at pp. 34–35, 41 & 64.He claimed that he saw "all of the other defendants listed in [his][C]omplaint" in or around the side room on Ward 305. *Id.* at p. 39.He also claims that Defendant Madia

was the "boss," such that she would give TAs directions, and that Madia, Crocket, Forstie, Gray, and Delmedico were present but did not hit Plaintiff, and instead "looked the other way and let [the abuse] happen." *Id.* at pp. 36–37 & 42. In his deposition, Plaintiff specifically names Defendants Ashley, Brennan, Davis, Espinosa, Fairbrother, Fical, Frazier, Hollenbeck, Leonardi, Parrish, Piracha, Searcy, McCann, and Nardoza as participating in the attack. *Id* at pp. 43–46.He states that Charmaine Bill, Maxymillian, Morgan, and Sawyer were not present at the time of the assault, and that he sued them solely because of their supervisory roles. *See id.* at pp. 43–47.He did not know who Defendant Barrett was when asked during his deposition. *Id.* at p. 44.

**\*102** Lastly, Plaintiff claims that Defendant Dr. Bahl administered medication to him while he was in restraints. *Id.* at p. 47. However, Defendants submit evidence that Dr. Bahl did not see Plaintiff after he was transferred from Ward 604 back to Ward 305, nor did he have any role in Plaintiff's restraints or medication. *See* Dkt. No. 41–8, Kumar Bahl, M.D., Decl., dated Sept. 21, 2011. The evidence shows that Plaintiffs injuries were relatively minor. *See* Pl.'s Dep. at pp. 62–64 (describing headaches treated with pain medication, swelling and bruises that have gone away, and a treatment of ointment for abrasions on Plaintiffs legs); Defs.' 7.1 Statement at ¶ 36. Plaintiff refused any medical evaluation or treatment after he was released from his restraints, but wanted his "slightly swollen" left ear area and "superficial abrasions [that looked liked] scrapes as if from going up a ladder" on his right lower leg documented. *See* Dkt. No. 41–19, Stephanie Oldick Decl., dated Sept. 26, 2011.

## II. DISCUSSION

### A. Standard of Review

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *accord F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994). The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I. C. v. Giammettei,* 34 F.3d at 54 (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91

L.Ed.2d 265 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [ Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

**\*3** To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998)."[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994); *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). This liberal standard, however, does not excuse a *pro se* litigant from following the procedural formalities of summary judgment. *Showers v. Eastmond,* 2001 WL 527484, at \*2 (S.D.N.Y. May 16, 2001).

### B. Unserved Defendants

**\*103** Under Federal Rule of Civil Procedure 4(c)(1), the plaintiff is responsible for service of the summons and complaint for each defendant within a specified time period. Specifically, the plaintiff must effectuate service of process within 120 days of the filing of the complaint. FED. R. CIV. P. 4(m). [6] Failure to properly serve any defendant in accordance with the Federal Rules will result in the court, upon motion

or on its own initiative, dismissing the case without prejudice as to that defendant. *Id.*

6     Under the Local Rules for the Northern District of New York, a plaintiff must effectuate service within sixty (60) days. N.D.N.Y.L .R. 4.1(b).

In this case, there is no indication that Defendants Crocket or McCann have been properly served. *See* Dkt. Nos. 11, Summons Returned Unexecuted as to Crocket, McCann, & 29, Summons Again Returned Unexecuted as to Crocket. In a Letter–Motion and Notice of Appearance, Dean Higgins, Esq., Attorney for the Defendants, notified Plaintiff and this Court that Defendants McCann and Crocket-as well as Defendant Nardozza-"no longer work at the Central New York Psychiatric Center," and that their whereabouts were unknown. *See* Dkt. No. 15.

More than the required 120 days have passed since the complaint was filed herein. Further, the Discovery deadline in this litigation has expired as of June 19, 2011. Plaintiff has provided no explanation nor good cause for his failure to serve these Defendants. Under these circumstances, the claims against Defendants Crocket and McCann should be **dismissed** without prejudice to renew, pursuant to FED. R. CIV. P. 4(m).

### C. Excessive Force

**\*4** Plaintiff claims that on November 18, 2009, he was beaten, held in restraints, and administered medication against his will. Defendants maintain that only a modest amount of force was used to maintain order after Plaintiff attacked a TA, and thus they should be entitled to summary judgment.

As an initial matter, Plaintiff asserts that certain policies and restrictions imposed on him at the CNYPC amount to cruel and unusual punishment in violation of the Eighth Amendment. Plaintiff, however, was released by the New York State Department of Corrections and Community Supervision to CNYPC upon the completion of his prison term and thus is no longer a prison inmate. The Eighth Amendment, which prohibits the "cruel and unusual punishment of those convicted of crimes, is therefore not applicable under the circumstances." *Lane v. Carpinello,* 2009 WL 3074344, at * 18 (N.D.N.Y. Sept.24, 2009) (citing *Youngberg v. Romeo,* 457 U.S. 307, 312, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982)). This does not mean that a patient involuntarily committed for treatment is without constitutional protections; rather, "[i]f it is cruel and unusual

punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed ... in unsafe conditions." *Youngberg v. Romeo,* 457 U.S. at 315–16 (1982). [7] Plaintiff's claims predicated upon violations of the Eighth Amendment are instead analyzed and evaluated under the Due Process clause of the Fourteenth Amendment. *See Lane v. Carpinello,* 2009 WL 3074344, at * 18 & *22 (citing *Dove v. City of New York,* 2007 WL 805786, at *7 (S.D.N.Y. Mar.15, 2007) and *Johnson v. Newburgh Enlarged School Dist.,* 239 F.3d 246, 253 (2d Cir.2001) for the proposition that "individuals in the non-seizure, non-prisoner environment have a substantive due process right to be free from the use of excessive force by their custodians"). However, the Eighth and Fourteenth Amendment tests that apply to the claims of excessive force are essentially the same. *See United States v. Walsh,* 194 F.3d 37, 48 (2d Cir.1999) (citing *Hudson v. McMillian,* 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)).

7     While Plaintiff does not allege that the conditions at CNYPC are unsafe, the same rationale applies to his general Eighth Amendment claims of freedom from cruel and unusual punishment due to excessive force and a failure to protect. *See, e.g., Youngberg v. Romeo,* 457 U.S. at 316; *Dove v. City of New York,* 2007 WL 805786, at *7 (S.D.N.Y. Mar.15, 2007) ("However, because plaintiff was not a convicted prisoner at the time of the alleged deprivation of his federal rights, any claim arising from his confinement must be asserted under the Due Process Clause of the Fourteenth Amendment, rather than the provisions of the Eighth Amendment.")

**\*104** To determine whether an excessive force violation occurred, the "core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian,* 503 U.S. at 6–7 (quoted in *Davidson v. Flynn,* 32 F.3d 27, 29 (2d Cir.1994)). To validly assert an excessive force claim, the plaintiff must show (1) objectively, that the defendants' actions violated "contemporary standards of decency," and (2) subjectively, that the defendants acted wantonly and in bad faith. *Blyden v. Mancusi,* 186 F.3d 252, 262–63 (2d Cir.1999) (internal quotations and citations omitted). The Second Circuit has provided additional guidance in evaluating an excessive force claim in the non-prisoner environment, noting that the district court must consider

O'dell v. Bill, Not Reported in F.Supp.3d (2015)

2015 WL 710544

**\*5** the need for the application of force, the relationship between the need and amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.... [I]f the force was maliciously or sadistically [employed] for the very purpose of causing harm in the absence of any legitimate government objective and it results in substantial emotional suffering or physical injury, then the conduct is presumptively unconstitutional.... [M]alicious and sadistic abuses of government power that are intended only to oppress or to cause injury and serve no legitimate government purpose unquestionably shock the conscience.... [C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level.

*Johnson v. Newburgh Enlarged School Dist.,* 239 F.3d at 251–52 (internal quotation marks and citations omitted).

Here, the record shows two conflicting views of what transpired in the side room on Ward 305. Plaintiff claims that a "beat-up crew" consisting of Defendants Ashley, Brennan, Davis, Espinosa, Fairbrother, Fical, Frazier, Hollenbeck, Leonardi, Parrish, Piracha, Searcy, McCann and Nardoza threw Plaintiff on the floor, punched and kicked him for about twenty minutes. *See generally* Dkt. No. 45–1, Pl.'s Dep. He was then placed in restraints, and Defendant Bahl administered medication to him against his will. *Id.* at p. 47. Plaintiff claims his injuries consisted of a swollen ear and his shin being scraped. *Id.* at pp. 62–64; *see also* Dkt. No. 41–4, Ex. A, Investigative Report, at pp. 85–87 (photos taken of the Plaintiff's injuries). Defendants, on the other hand, submit considerable evidence that Plaintiff, agitated at being placed in the holding ward in Ward 604 during recreation time, verbally threatened the CNYPC staff, pushed open the door of the side room in Ward 305, shouted obscenities at Defendant Piracha, and punched Defendant Hollenbeck in the left ear. *See, e.g.,* Dkt. Nos. 41–10, Brett Davis Decl., dated Sept. 22, 2011; 41–16, Nicholas Hollenbeck Decl.; 41–19, Stephanie Oldick Decl.; & 41–21, Qasim Piracha Decl., dated Sept. 21, 2011. Further, many Defendants claim to have not been present on Ward 305 at the time Plaintiff was restrained. *See, e.g.,* Dkt. No. 41–8, Kumar Bahl, M.D., Decl., dated Sept. 21, 2011 (also stating he did not administer medication to Plaintiff); 41–12, Michael Fairbrother Decl., dated Sept. 21, 2011; & 41–22, Jason Searcy Decl., dated Sept. 25, 2011; *see also* Dkt. No. 41–23, Christopher Smith Decl., dated Sept. 22, 2011 (stating that he was on Ward 305 and "heard the commotion from the sideroom ... [but that Smith] remained where [he] was because there were enough staff with Resident Yeldon already and [he] was monitoring the dayroom"). Lastly, Defendants submit evidence that the abrasion on Plaintiff's left leg was self-inflicted and caused from picking a scab off. *See* Dkt. No. 41–15, Luis Hernandez, M .D., Decl., dated Sept. 21, 2011 (noting that Dr. Hernandez, who is not a Defendant in his action, examined Plaintiff while in restraints and did not find any injury, but later noticed red area on right shin that "appeared to be an old lesion that [Plaintiff] had picked the scab off").

**\*105  \*6** If the circumstances of Plaintiff's restraint were as Defendants' evidence states that they were, Plaintiff's claim should be dismissed on summary judgment as Defendants only used *de minimis* force for a limited period of time and only for the purpose of restoring order. However, if Plaintiff's sworn testimony in his deposition is to be believed, Defendants assaulted Plaintiff without any "reason, because [he] didn't do anything to them.... [Plaintiff] was complying with the rules." Pl.'s Dep. at p. 50.Despite Defendants' overwhelming evidence, a genuine issue of material fact exists as to whether "force was maliciously or sadistically [employed] for the very purpose of causing harm in the absence of any legitimate government objective." *Johnson v. Newburgh Enlarged School Dist.,* 239 F.3d at 251. These two versions of the event are best reconciled by a jury, rather than by this Court on a summary judgment review. *See, e.g., Robbins v. Aetna Life Ins. Co.,* 2006 WL 2589359, at \*10 (E.D.N.Y. Sept.8, 2006) ("In light of the conflicting ... evidence, the court finds that neither party has succeeded in eliminating any genuine issue of material fact, making summary judgment on the merits inappropriate."). Therefore, we recommend that Defendants' Motion for Summary Judgment be **denied** as it relates to Plaintiff's claim that Defendants Ashley, Brennan, Davis, Espinosa, Fairbrother, Fical, Frazier, Hollenbeck, Leonardi, Parrish, Piracha, Searcy, Nardoza, and Bahl used excessive force in the Ward 305 side room.

This Court additionally notes that Plaintiff also claims that Defendants Hollenbeck and Piracha kick, beat, punched, hit, and "sexually harassed" him while he was in the side room in Ward 604, before being brought down to Ward 305. *See* Dkt. No. 1, Compl., at ¶ 52. In his Deposition, however, Yeldon explicitly stated that no one placed their "hands on [Plaintiff] or assaulted [Plaintiff] ... until [he] returned back to 305 Ward." Pl.'s Dep. at pp. 31–32.Plaintiff provides this Court with no other evidence regarding this assault allegation

in Ward 604. Accordingly, because no issue of material fact exists such that a reasonable jury could find that Plaintiff was subjected to excessive force while he was in the side room of Ward 604, it is recommended that Defendants' Motion for Summary Judgment be **granted** as to any such claim.

### D. Failure to Protect

Plaintiff also brings claims against Defendants Madia, Crocket, Forstie, Gray, and Delmedico, the medical staff at CNYPC, for failing to protect Plaintiff during the incident in Ward 305, who he claims instead "looked the other way and let [the abuse] happen." *See* Pl.'s Dep. at pp. 36–37 & 42.

As with excessive force claims, claims of failure to protect by patients who are involuntarily committed are analyzed within the framework of the Fourteenth Amendment, instead of the Eighth Amendment. *See, e.g., Beck v. Wilson,* 377 F.3d 884, 889 (8th Cir.2004) ("The Supreme Court explained that 'when the State takes a person into its custody and holds [her] there against [her] will, the Constitution imposes upon it a corresponding duty to assume some responsibility for [her] safety and general well-being.' ") (quoting *DeShaney v. Winnebago Couty Dep't of Soc. Servs.,* 489 U.S. 189, 199– 200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) (alterations in original)). However, the "Second Circuit has yet to address the correct standard to be applied when evaluating a failure to protect claim arising out of an involuntary commitment, and there appears to be some uncertainty regarding the matter." *Lane v. Carpinello,* 2009 WL 3074344 at *18.

 ***106 *7** As the Supreme Court established in *Youngberg,* "involuntarily committed mental patients have substantive due process rights, .... [and] held that only an official's decision that was a 'substantial departure from accepted professional judgment, practice or standards' would support a substantive due process claim brought by an involuntarily committed mental patient." *Vallen v. Carrol,* 2005 WL 2296620, *8 (S.D.N.Y. Sept.20, 2005) (quoting *Youngberg v. Romeo,* 457 U.S. at 310). However, some courts in this district have held that the general approach to substantive due process claims asserted under *section 1983*, which requires that a plaintiff show that the defendants' actions involved "conduct intended to injure [plaintiff] in some way unjustified by [any] ... governmental interest and most likely rise to the conscience-shocking level," would result in an unduly heavy burden being placed upon a plaintiff who is under the care and control of the state. *Id.* at *8–*9. Analogizing the plaintiff's rights to those of a pretrial detainee, these courts have suggested their agreement with the "deliberate indifference"

standard employed in analyzing such circumstances. *See id.* at *9 (citing *County of Sacramento v. Lewis,* 523 U.S. 833, 849, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)).

We need not resolve this issue here, because whether the Defendants' actions are measured under the "conscience-shocking" and "substantial departure" standard or the "deliberate indifference" standard, the result is the same. The evidence posits two conflicting stories. If the Defendants' narrative and evidence is to be believed, Plaintiff was unruly, violent, and presented a danger to staff and to himself. In that situation, "failing to protect" Plaintiff from being restrained and administered medication would neither shock the conscience or consist of deliberate indifference towards Plaintiff's health or safety. However, if Plaintiff's answers in his Deposition are truthful, Defendants Madia, Crocket, Forstie, Gray, and Delmedico stood idle outside the Ward 305 side room while other CNYPC staff assaulted the Plaintiff, without provocation, for about twenty minutes. This action would violate both of the above-listed standards. The Court may not now, on a motion for summary judgment, "assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute [our] judgment for that of the jury." *Nimely v. City of New York,* 414 F.3d 381, 390 (2d Cir.2005) (quoting *LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412, 429 (2d Cir.1995). Therefore, as with Plaintiff's claims of excessive force, we recommend that Defendants' Motion for Summary Judgment on Plaintiff's failure to protect claims against Defendants Madia, Forstie, Gray, and Delmedico be **denied.**

### E. Personal Involvement

It is well settled that the personal involvement of a defendant is a prerequisite for the assessment of damages in a § 1983 action. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). Furthermore, the doctrine of respondeat superior is inapplicable to § 1983 claims. *See Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981) (internal citations omitted); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). Thus, a defendant may not be liable for damages simply by virtue of holding a supervisory position. *See, e .g., Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). Rather, the personal involvement of a supervisory defendant may be shown when:

 ***107 *8** (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a

policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d at 873. [8]

[8]    Several lower courts have struggled with the impact *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) had upon *Colon,* and specifically whether *Iqbal* calls into question certain prongs of the *Colon* five-part test for supervisory liability. *See Sash v. United States,* 674 F.Supp.2d 531, 543 (S.D.N.Y.2009) (collecting cases). Because the Second Circuit has not yet issued a decision settling this matter, *Colon* remains good law.

Defendants contest that Defendants Maxymillian, Sawyer, Bill, and Morgan were personally involved in any of Plaintiff's alleged constitutional violations; rather, they were included by virtue of their supervisory positions only. Dkt. No. 41–24, Defs.' Mem of Law, at p. 15.All evidence in the record agrees with that contention. In his deposition, Plaintiff explicitly states that he included these Defendants in his lawsuit because they were "the head person[s] of the program" but were not "directly involved in the assault." Pl .'s Dep. at pp. 43–47.Our review of the record undisputedly establishes that Plaintiff has failed to show any direct participation by Defendants Maxymillian, Sawyer, Bill, and Morgan in the alleged violations, that the Defendants' policies allowed the continuance of constitutional violations, or that the Defendants were negligent in their supervision of subordinates. Therefore, Defendants' Motion for Summary Judgment should be **granted** and Plaintiff's claims against Defendants Maxymillian, Sawyer, Bill, and Morgan should be **dismissed** for want of personal involvement.

Likewise, Defendant Barrett should be **dismissed** from this action. In his Complaint, Plaintiff claims that Barrett was also present during the assault on him, and that Barrett wrote a note on November 19, 2009, stating that Plaintiff had refused to take his insulin medication. Compl. at ¶¶ 45 & 54. However, Plaintiff made no allegations against Barrett at his Deposition. *See* Pl.'s Dep. at p. 43.Plaintiff has submitted no evidence that Defendant Barrett was involved in any wrongdoing in his

action, and accordingly, this Court recommends dismissal of any claims against him as lacking in personal involvement.

### F. Eleventh Amendment

Defendants also raise in their Motion for Summary Judgment dismissal of Plaintiff's claims made against them in their official capacity, pursuant to the Eleventh Amendment. *See* Defs.' Mem of Law at p. 6–7.

The Eleventh Amendment states, "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." Although by its terms, the amendment bars suit by citizens of one State against another State, the Supreme Court has held that such amendment similarly bars suits against a State by its own citizens. *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). "The Eleventh Amendment thus 'affirm[s] that the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III.' " *Richardson v. New York State Dep't of Corr. Servs.,* 180 F.3d 426, 447–48 (2d Cir.1999) (citing *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)). Thus, sovereign immunity provided for in the Eleventh Amendment prohibits suits against the State, including a state agency in federal court. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. at 98; *Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993); *Daisernia v. State of New York,* 582 F.Supp. 792, 796 (N.D.N.Y.1984). To the extent a state official is sued for damages in his official capacity, "such a suit is deemed to be a suit against the state, and the official is entitled to invoke the eleventh amendment immunity belonging to the state." *Rourke v. New York State Dep't. of Corr. Servs.,* 915 F.Supp. 525, 539 (N.D.N.Y.1995) (citing, *inter alia, Berman Enters., Inc. v. Jorling,* 3 F.3d 602, 606 (2d Cir.), *cert. denied,* 510 U.S. 1073, 114 S.Ct. 883, 127 L.Ed.2d 78 (1994)); *see also Mathie v. Fries,* 121 F.3d 808, 818 (2d Cir.1997) ("A claim against a government officer in his official capacity is, and should be treated as, a claim against the entity that employs the officer....").

**\*108    \*9** In appropriate circumstances, the jurisdictional bar of the Eleventh Amendment may immunize a state official acting in his or her official capacity. *See In re Deposit Ins. Agency,* 482 F.3d 612, 617 (2d Cir.2007) (citation mitted). However, under the doctrine of *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), a suit may proceed against a state official in his or her official capacity-notwithstanding

the Eleventh Amendment-when a plaintiff "(a) alleges an ongoing violation of federal law and (b) seeks relief properly characterized as prospective." *In re Deposit Ins. Agency,* 482 F.3d at 618 (quotations and citations omitted).

Here, Plaintiff seeks injunctive relief as well as compensatory damages against state employees. *See* Compl. at ¶ 55. Therefore, as state officials, Defendants cannot be sued in their official capacities in a claim for money damages. However, Plaintiff may seek monetary damages from them in their individual capacities. Further, Plaintiff may sue the Defendants for declaratory and injunctive relief in both their individual and official capacities because "official-capacity actions for prospective relief are not treated as actions against the State." *Cruz v. Gomez,* 202 F.3d 593, 595 n. 2 (2d Cir.2000) (quoting *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71 n. 10, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)). Accordingly, Defendants' Motion for Summary Judgment should be **granted** to the extent that Plaintiff asserts claims for monetary relief against them in their official capacities.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Summary Judgment (Dkt. No. 41) be **granted in part** and **denied in part** as follows:

1. Defendants McCann and Crocket should be **dismissed** from this action based upon Plaintiff's failure to effectuate service of process within 120 days of the filing of his Complaint, pursuant to Federal Rule of Civil Procedure 4(m); 2. To the extent asserted, Plaintiff's excessive force claims against Defendants Ashley, Brennan, Davis, Espinosa, Fairbrother, Fical, Frazier, Hollenbeck, Leonardi, Parrish, Piracha, Searcy, Nardoza, and Bahl, relating to an assault on Plaintiff in the CNYPC side room of Ward 305, should survive Defendants' Motion;

3. To the extent asserted, Plaintiff's excessive force claims against Defendants Hollenbeck and Piracha, relating to an assault on Plaintiff in the side room in Ward 604, should be **dismissed;**

4. To the extent asserted, Plaintiff's failure to protect claims against Defendants Madia, Forstie, Gray, and Delmedico, relating to an assault on Plaintiff in the CNYPC side room of Ward 305, should survive Defendants' Motion;

5. To the extent asserted, Defendants Maxymillian, Sawyer, Bill, Morgan, and Barrett should be **dismissed** from this action based upon Plaintiff's failure to assert their personal involvement in any wrongdoing;

6. All causes of action seeking monetary relief should be **dismissed,** pursuant to the Eleventh Amendment, insofar as they are stated against the Defendants in their official capacities; and it is further

**\*109 \*10 ORDERED,** that the Clerk of the Court update the Docket to reflect the correct spellings of the names of Defendants Charmaine Bill, Qasim Piracha, and Marianna Madia; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 710544

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 327 of 370

Joyner v. County of Cayuga, Not Reported in Fed. Supp. (2020)

2020 WL 1904088

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by    Broadwater v. County of Onondaga,    N.D.N.Y.,
March 11, 2024

2020 WL 1904088
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Michael JOYNER, Plaintiff,

v.

COUNTY OF CAYUGA; Cayuga County Sheriff's
Department; City of Auburn; Shawn I. Butler, Chief of
Auburn Police Department, as an Individual and in his
official capacity; Cayuga County District Attorney's
Office; Jon E. Budelmann, as an Individual and in
his capacity as District Attorney for Cayuga County;
and Anthony Spinelli, as an Individual and in his
capacity as an Auburn City Police Officer, Defendants.

5:20-CV-60 (MAD/TWD)
|
Signed 04/17/2020

**Attorneys and Law Firms**

OF COUNSEL: JARROD W. SMITH, ESQ., OFFICE OF
JARROD W. SMITH, 11 South Main Street, P.O. Box 173,
Jordan, New York 13080, Attorneys for Plaintiff.

OF COUNSEL: JEFFREY R. PARRY, ESQ., OFFICE OF
JEFFREY R. PARRY, 7030 East Genesee Street, Fayetteville,
New York 13066, Attorneys for Plaintiff.

OF COUNSEL: FRANK W. MILLER, ESQ., GIANCARLO
FACCIPONTE, ESQ., OFFICE OF FRANK W. MILLER,
6575 Kirkville Road, East Syracuse, New York 13057,
Attorneys for Defendants.

## MEMORANDUM-DECISION AND ORDER

Mae A. D'Agostino, U.S. District Judge:

## I. INTRODUCTION

*1 On or about February 18, 2020, Plaintiff filed a complaint
against Defendants City of Auburn, Shawn L. Butler, County
of Cayuga, Cayuga County District Attorney's Office, Jon
E. Budelmann, and Anthony Spinelli, asserting eight claims

pursuant to 42 U.S.C. §§ 1983 and 1988, and state law.
See Dkt. No. 5. Specifically, Plaintiff's complaint alleges the
following causes of action: (1) false arrest under the Fourth
and Fourteenth Amendments; (2) malicious prosecution
under the Fourth and Fourteenth Amendments; (3) negligent
failure to train or supervise; (4) state law false arrest; (5)
state law false imprisonment; (6) intentional and negligent
infliction of emotional distress under New York State law;
(7) negligence; and (8) deliberate indifference to medical care
under the Eighth Amendment. See Dkt. No. 5 at ¶¶ 40-114.
Currently before the Court is Defendants' motion to dismiss
the complaint in its entirety. See Dkt. No. 9.

## II. BACKGROUND

According to the complaint, on August 10, 2018, Plaintiff
was the passenger in a vehicle that was driven by 140 Wall
Street, allegedly in violation of an order of protection for
Linda Fitzsimmons and Lee Joyner, who both reside at that
address. See Dkt. No. 5 at ¶¶ 24-25. Plaintiff resides at 145
Wall Street, several houses down from 140 Wall Street, on the
opposite side of the street. See id. at ¶ 25. Plaintiff was not the
driver of the vehicle and had no control over how the driver
was delivering him to his home. See id.

On August 13, 2018, Plaintiff was arraigned on two felony
complaints charging him with two counts of Criminal
Contempt in the First Degree based on the alleged violation of
the order of protection. See id. at ¶ 22. At the conclusion of his
arraignment, Plaintiff was remanded to the Cayuga County
Jail. See id. Plaintiff claims that "Defendant police officer
lacked the requisite requirement of having probable cause to
arrest the Plaintiff; and did falsely arrest and imprison the
Plaintiff." Id. at ¶ 23.

On October 4, 2018, Defendant Jon E. Budelmann, in his
capacity as Cayuga County District Attorney, presented
Plaintiff's charges to a grand jury, which "No Billed" the case.
See id. at ¶ 26. At this point, Plaintiff was released from
custody. See id.

During the fifty-three days during which Plaintiff "was being
illegally imprisoned," he slipped and fell at the Cayuga
County Jail. See id. at ¶ 31. According to Plaintiff, on August
31, 2018, a water pipe burst at the Cayuga County Jail near
Plaintiff's cell while he was already locked in for the night
and sleeping. See id. at ¶ 32. Plaintiff was woken by a
bursting water pipe that was turned off by a Cayuga County

Case 5:24-cv-01237-DNH-MJK     Document 10     Filed 11/12/24     Page 328 of 370

Joyner v. County of Cayuga, Not Reported in Fed. Supp. (2020)

2020 WL 1904088

Correctional officer. *See id.* at ¶ 33. "The first burst of the water pipe [occurred] when the Cayuga County Correctional officer shut the water of" between "12:00 midnight and 2:00 a.m." *Id.* at ¶ 34. "Plaintiff was woken by a bursting water pipe; and observed and heard that the correctional officer was going to turn off the water and clean up the water spill. At that time, there was no water in Plaintiff's cell." *Id.*

**\*2** Unbeknownst to Plaintiff, water from the burst pipe went underneath his locked cell door "and flooded his room while he was in bed and asleep." *Id.* at ¶ 35. "At around 6:30 am-7:00 am, Plaintiff got out of his bed to use the toilet in his cell. Plaintiff slipped and fell on the wet floor of his cell. The water on the floor was all near the toilet in his cell. There was a huge puddle of water between Plaintiff's bunk and the toilet in his cell." *Id.* at ¶ 36. Plaintiff claims that he slipped and fell, hitting his head and neck on his bunk, and his lower back on the floor, causing severe injuries. *See id.* at ¶ 37. At the time that Plaintiff had fallen and injured himself, a second water leak had occurred in the pod in which he was being held. *See id.* at ¶ 38. Plaintiff claims that, as a result of the fall, he suffered a herniated disc in his neck and a lower lumbar strain. *See id.* at ¶ 39. Plaintiff also claims that he suffers from numbing of his toes and finger tips. *See id.*

### III. DISCUSSION

#### A. Standard of Review

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the party's claim for relief. *See Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007) (citation omitted). In considering the legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted). This presumption of truth, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleading, the court may consider documents that are "integral" to that pleading, even if they are neither physically attached to, nor incorporated by reference into, the pleading. *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002)).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," *see* Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief[,]' " *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (quotation omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *see id.* at 555 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.' ' " *Id.* (quoting [*Twombly*, 550 U.S.] at 557, 127 S. Ct. 1955). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly*, 550 U.S. at 558, or where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed[,]" *id.* at 570.

#### B. Documents Considered in Deciding Motion to Dismiss

In their reply to the motion to dismiss, Defendants submitted several documents in further support of their motion. *See* Dkt. No. 16-1. These documents include (1) the August 10, 2018 criminal complaint charging Plaintiff with Criminal Contempt in the First Degree, (2) the order of protection that Plaintiff allegedly violated, (3) the affidavit of Linda Fitzsimmons that formed the basis for Defendant's underlying criminal charge, and (4) the incident narrative report of Defendant Spinelli dated August 15, 2018 relating to the criminal complaint filed against Plaintiff. *See id.* at 1-6.

**\*3** In deciding a motion to dismiss for failure to state a claim, the court considers the complaint, materials incorporated into the complaint by reference, materials integral to the complaint, and facts that are capable of judicial notice. *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

In the present matter, the Court finds that these documents are not properly considered at the motion to dismiss stage. The Court acknowledges that there are cases in which courts have considered similar police records at the pleading stage. *See Betts v. Shearman*, No. 12-cv-3195, 2013 WL 311124, \*3 (S.D.N.Y. Jan. 24, 2013) (considering incident report and accusatory instrument that "provide[d] crucial details" about the plaintiff's prosecution), aff'd *on qualified immunity*

Joyner v. County of Cayuga, Not Reported in Fed. Supp. (2020)

2020 WL 1904088

*grounds*, 751 F.3d 78 (2d Cir. 2014); *cf. Obilo v. City Univ. of City of N.Y.*, No. 01-cv-5118, 2003 WL 1809471, *4 (E.D.N.Y. Apr. 7, 2003) (considering incident report and police complaint that the plaintiff had conceded were "implicitly" incorporated into his conspiracy allegations). The better view, however, adopted by a majority of courts in our Circuit, is that these kinds of police records are not "integral" to a false arrest complaint. *See Bejaoui v. City of New York*, No. 13-CV-5667, 2015 WL 1529633, *4–5 (E.D.N.Y. Mar. 31, 2015) (noting disagreement and declining to consider extrinsic police reports); *Alvarez v. Cty. of Orange*, 95 F. Supp. 3d 385, 394-95 (S.D.N.Y. 2015) (collecting cases). A document is not "integral" simply because its contents are highly relevant to a plaintiff's allegations, but only when it is clear that the plaintiff relied on the document in preparing his complaint. *See Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156-57 (2d Cir. 2006); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). Most typically, "the incorporated document is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason ... was not attached to the complaint." *Global Network Commc'ns*, 458 F.3d at 157. "It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document." *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006).

Here, there is "no indication in the record that plaintiff relied on these documents in drafting the complaint." *Allyn v. Rockland Cty.*, No. 12-cv-5022, 2013 WL 4038602, *4 (S.D.N.Y. July 30, 2013), *affirmed*, 646 Fed. Appx. 60 (2d Cir. 2016). To the contrary, Plaintiff relies on his own perceptions and recollections, while only making passing reference to the criminal complaint and order of protection. Furthermore, it is not beyond dispute that the police report and narrative are a truthful description of the police officer's basis to arrest Plaintiff. To accept the truth of the documents offered by Defendants at this stage would amount to a premature determination that the arresting officers and the alleged victim are more credible than Plaintiff. To make such a determination at this stage would not be appropriate, and therefore the Court will not consider the facts adduced in these documents. The Court will, however, take judicial notice of the existence of the criminal complaint, supporting affidavit, and order of protection. *See Williams v. City of New York*, No. 14-cv-5123, 2015 WL 4461716, *1 (S.D.N.Y. July 21, 2015) (noting that the court "may take judicial notice of the procedural history of plaintiff's criminal case, but not of the truth of the arresting officers' version of events"); *see also Ribaudo v. Desimone*,

No. 3:18-cv-1190, 2019 WL 1906269, *4 (M.D. Pa. Apr. 5, 2019) (holding that "even if judicial notice is taken of these documents, 'a court may take notice of such documents only to establish their existence and legal effect, or to determine what statements they contained ... not for the truth of the matters asserted' ") (quoting *Fine v. ESPN, Inc.*, 11 F. Supp. 3d 209, 223 (N.D.N.Y. 2014)) (other citation omitted).

## C. *Monell* and Supervisory Liability

 **\*4**  "Under the standards of *Monell v. Department of Social Services*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978), a municipality can be held liable under [42 U.S.C. § 1983] if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012). Liability under Section 1983 "is imposed on the municipality [only] when it has promulgated a custom or policy that violates federal law and, pursuant to that policy, a municipal actor has tortiously injured the plaintiff." *Askins v. Doe No. 1*, 727 F.3d 248, 253 (2d Cir. 2013). "Absent such a custom, policy, or usage, a municipality cannot be held liable on a *respondeat superior* basis for the tort of its employee." *Jones*, 691 F.3d at 80. Thus, for a municipality to be held liable under Section 1983 for the unconstitutional actions of its employees, "a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (internal quotation marks omitted).

"Supervisory liability is a concept distinct from municipal liability, and is 'imposed against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates.' " *Kucera v. Tkac*, No. 5:12-cv-264, 2013 WL 1414441, *4 (D. Vt. Apr. 8, 2013) (quoting *Odom v. Matteo*, 772 F. Supp. 2d 377, 403 (D. Conn. 2011)). Prior to the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Second Circuit required a plaintiff to allege one of the following categories for supervisory liability under § 1983:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 330 of 370

Joyner v. County of Cayuga, Not Reported in Fed. Supp. (2020)

2020 WL 1904088

custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [persons] by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

In order to succeed on his *Monell* and supervisory liability claims, a plaintiff must first "identify obvious and severe deficiencies" in the policies of the municipal and supervisory defendants and "show a causal relationship" between those deficiencies and his alleged deprivations. *Reynolds v. Giuliani*, 506 F.3d 183, 193 (2d Cir. 2007). However, to the extent that a plaintiff premises his claims on a failure to train or supervise, such failure "may constitute an official policy or custom [only] if the failure amounts to 'deliberate indifference' to the rights of those with whom the city employees interact." *Wray*, 490 F.3d at 195. Similarly, a supervisory defendant is liable only for the creation or continuation of policy that leads to a pattern of unconstitutional conduct or if he demonstrated deliberate indifference in failing to act on information that a pattern of unconstitutional conduct was occurring. *See Colon*, 58 F.3d at 873.

"To establish deliberate indifference a plaintiff must show that a policymaking official was aware of constitutional injury, or the risk of constitutional injury, but failed to take appropriate action to prevent or sanction violations of constitutional rights." *Jones*, 691 F.3d at 81.

A pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train [or supervise because] [w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen

a training program that will cause violations of constitutional rights.

**\*5** *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 409, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997)). "[W]hen city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Id.* at 61 (citation omitted).[1]

[1]    As discussed in more detail below, Plaintiff's complaint fails to set forth any facts sufficient to find either supervisory or municipal liability against any of the named Defendants for any of the listed causes of action.

### D. Cayuga County District Attorney's Office and Auburn Police Department

Plaintiff names the Cayuga County District Attorney's Office as a named Defendant in this case. The caselaw is clear, however, that a district attorney's office is not an entity subject to suit under 42 U.S.C. § 1983. *See Michels v. Greenwood Lake Police Dep't*, 387 F. Supp. 2d 361, 367 (S.D.N.Y. 2005) (citing cases); *Griffith v. Sadri*, No. 07-CV-4824, 2009 WL 2524961, *8 (E.D.N.Y. Aug. 14, 2009). Similarly, Plaintiff has listed the Auburn Police Department as an entity responsible for several of the alleged constitutional violations. *See* Dkt. No. 5 at ¶¶ 51-82. As with the District Attorney's Office, the Auburn Police Department (which is not listed as a Defendant in the caption of the complaint), the Court finds that it must be dismissed because a police department is not an independent, suable entity separate from the municipality in which the police department is located. *See Jenkins v. City of New York*, 478 F.3d 76, 93 (2d Cir. 2007) (citation omitted); *Krug v. City of Rennselaer*, 559 F. Supp. 2d 223, 247 (N.D.N.Y. 2008) (citing cases); *Koulkina v. City of New York*, 559 F. Supp. 2d 300, 315 (S.D.N.Y. 2008) (citing cases).

Accordingly, the Court dismisses Plaintiff's claims against the Cayuga County District Attorney's Office and the Auburn Police Department.

### E. False Arrest

In their motion to dismiss, Defendants contend that, based on Plaintiff's own allegations, probable cause was present

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 331 of 370

Joyner v. County of Cayuga, Not Reported in Fed. Supp. (2020)

2020 WL 1904088

to believe that he committed the offense for which he was
arrested. *See* Dkt. No. 9-1 at 14-16. Defendants claim that
Plaintiff "admits that he was charged with violating duly
issued orders of protection issued for Linda Fitzsimmons and
Lee Joyner, who reside at 140 Wall Street in the City of
Auburn. *See id.* at 15 (citing Dkt. No. 5 at ¶ 24). Defendants
further claim that Plaintiff "admits he was 'driven by' 140
Wall Street on August 10, 2018." *Id.* (citing Dkt. No. 5 at ¶
25). Defendants contend that the fact that Plaintiff claims that
he was not driving the vehicle "has no bearing on whether the
order of protection was reasonably deemed violated by police
authorities, and Plaintiff is careful not to deny that he was
in fact at 140 Wall Street on the date in question, which is *a
per se* violation of the order." *Id.* In response, Plaintiff argues
that since he "was arrested for traveling on a public road in
route to his own home and in violation of no Order, law or
ordinance and, as it cannot be denied that he was 'no billed'
by the Grand Jury, it would seem plausible to this writer that
any court would agree to the plausibility of Plaintiff's claims."
Dkt. No. 10 at 16.

**\*6** In assessing Fourth Amendment claims of false arrest
brought under Section 1983, courts generally look to the law
of the state in which the arrest is alleged to have occurred. *See
Russo v. City of Bridgeport*, 479 F.3d 196, 203 (2d Cir. 2007)
(citation omitted). To prevail on a false arrest claim under
New York law, a plaintiff has to prove the following: "(1) the
defendant intended to confine the plaintiff, (2) the plaintiff
was conscious of the confinement, (3) the plaintiff did not
consent to the confinement and (4) the confinement was not
otherwise privileged." *Singer v. Fulton Cnty. Sheriff*, 63 F.3d
110, 118 (2d Cir. 1995) (alteration and internal quotation
marks omitted) (quoting *Broughton v. State*, 37 N.Y.2d 451,
456, 373 N.Y.S.2d 87, 335 N.E.2d 310 (1975)); *see also
Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir.
2012) (outlining the elements of false arrest claims). "The
existence of probable cause to arrest constitutes justification
and 'is a complete defense to an action for false arrest.' "
*Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (quoting
*Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)); *see
also Ackerson*, 702 F.3d at 19-20 (citing *Weyant*, 101 F.3d at
852). "A police officer has probable cause for an arrest when
he has 'knowledge or reasonably trustworthy information
of facts and circumstances that are sufficient to warrant a
person of reasonable caution in the belief that the person
to be arrested has committed or is committing a crime[.]' "
*Swartz v. Insogna*, 704 F.3d 105, 111 (2d Cir. 2013) (quoting
*Weyant*, 101 F.3d at 852); *Gonzalez v. City of Schenectady*,
728 F.3d 149, 155 (2d Cir. 2013) (same). Such knowledge

or information can be based on information provided by an
eyewitness, unless the circumstances would raise a doubt as
to the eyewitness' veracity. *See Curley v. Vill. of Suffern*, 268
F.3d 65, 70 (2d Cir. 2001) (citing *Singer*, 63 F.3d at 119). The
question is whether the facts known to the arresting officer, at
the time of the arrest, objectively provided probable cause to
support the arrest. *See Gonzalez*, 728 F.3d at 155.

In the present matter, the Court finds that Defendants' motion
to dismiss Plaintiff's false arrest claim must be denied as to
Defendant Spinelli. The complaint sufficiently alleges, albeit
barely, that Defendant Spinelli lacked probable cause to arrest
Plaintiff for the crime of Criminal in the First Degree. Indeed,
it is unclear from the complaint whether Plaintiff's conduct
was, in fact, in violation of the order of protection. [2]

[2]    Although the Court is permitting this claim against
        Defendant Spinelli to survive, the Court has
        serious doubts about whether the claim would
        survive a properly supported motion for summary
        judgment. If the Court were to consider the
        contents of the criminal complaint, supporting
        affidavit, and Defendant Spinelli's narrative, the
        claim would undoubtedly be dismissed. This,
        however, highlights why the Court believes that
        it is inappropriate to rely on the contents of these
        documents at this stage. Without the benefit of
        discovery, Plaintiff has been unable to question
        the veracity of the statements contained in those
        documents. That being said, the criminal complaint
        and affidavits paint a much less sympathetic picture
        than the one set out in Plaintiff's complaint.

However, to the extent that Plaintiff attempts to assert a
false arrest claim against any other named Defendant, the
claim must be dismissed. Plaintiff's complaint is devoid
of any facts that would permit the Court to find that any
other Defendant was personally involved in the alleged false
arrest. Aside from conclusory allegations merely reciting
the underlying law, Plaintiff fails to include any facts that
plausibly allege the personal involvement of any municipal
or supervisory Defendant. For example, Plaintiff alleges that
"Defendant Butler, Defendant City and Defendant County
have created and tolerated an atmosphere of lawlessness, and
have developed and maintained long-standing, department-
wide customs, law enforcement related policies, procedures,
customs, practices, and/or failed to properly train and/or
supervise its officers in a manner amounting to deliberate
indifference to the constitutional rights of Plaintiff and of the

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 332 of 370

Joyner v. County of Cayuga, Not Reported in Fed. Supp. (2020)

2020 WL 1904088

public." Dkt. No. 78 at ¶ 78. While this allegation accurately reflects what is required to hold municipal and supervisory officials personally liable for the acts of other, the simple recitation of the relevant law is insufficient to withstand a motion to dismiss. Rather, Plaintiff was required to allege facts, specific to his case, demonstrating how these municipal and supervisory Defendants were personally involved in the alleged unconstitutional conduct, which he has failed to do. Simply put, the legal conclusions in Plaintiff's complaint, devoid of any supporting facts, fail to plausibly allege supervisory or municipal liability as to this claim.

**\*7** Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's false arrest claim as to Defendant Spinelli.

### F. Malicious Prosecution

In their motion to dismiss, Defendants argue that Plaintiff's malicious prosecution must be dismissed because the complaint fails to set forth facts plausibly alleging that the prosecution was initiated without probable cause or that any named Defendant acted with the requisite malice. *See* Dkt. No. 9-1 at 16-17. In response, Plaintiff states as follows: "As the plaintiff was arrested for traveling on a public road in route to his own home and in violation of no Order, law or ordinance, as it cannot be denied that he was 'no billed' by the Grand Jury and as he spent 53 days in jail for no reason whatsoever, it would seem plausible to this writer that any court would agree to the plausibility of Plaintiff's claims." Dkt. No. 10 at 17 (citing *Swierkiezicz v. Sorema*, 534 U.S. 506 (2002)). Plaintiff brings his malicious prosecution claim against the City of Auburn, Auburn Police Department, Cayuga County, and Defendant Butler. *See* Dkt. No. 5 at ¶¶ 51-82. While Plaintiff may be confident in the viability of his claim, this Court finds that Plaintiff has failed to plausibly allege facts supporting a claim for malicious prosecution.[3]

3    Throughout his response, Plaintiff repeatedly states that "the Court is respectfully reminded that it may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *See, e.g.*, Dkt. No. 10 at 17, 18 (citing *Hishon v. King & Spalding*, 467 U.S. 69, 73). Further, Plaintiff repeatedly contends that he "has no duty at this stage to prove his case." *Id.* These basic tenets are not in dispute. What Plaintiff fails to appreciate, however, is that a complaint must be supported by facts specific to his case,

not merely broad assertions of the relevant law poorly disguised as facts. For example, Plaintiff alleges that Defendants engaged in "extreme and outrageous conduct," but fails to explain how any of the conduct alleged could possibly be considered extreme and outrageous. Further, Plaintiff seems to be operating under the assumption that the Court is required to use its imagination to come up with a hypothetical set of facts that could have been pled that would render the claims plausible. *Iqbal* and *Twombly*, however, place no such burden on the Court. Rather, it is incumbent on the plaintiff to set forth the necessary facts specific to his or her case to render the asserted claims plausible.

To prevail on a Section 1983 claim for malicious prosecution, "a plaintiff must show a violation of his rights under the Fourth Amendment ... and must establish the elements of a malicious prosecution claim under state law." *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010) (citations omitted). Under New York law, a plaintiff must plausibly allege four elements to support a malicious prosecution claim: " '(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.' " *Id.* (quotation and other citations omitted); *see also Dufort v. City of New York*, 874 F.3d 338, 350 (2d Cir. 2017) (quotation omitted). Initiating a criminal proceeding against a person without probable cause, coupled with a deprivation of liberty, is a Fourth Amendment violation. *See Murphy v. Lynn*, 118 F.3d 938, 944-45 (2d Cir. 1997) (citation omitted).

**\*8** The Second Circuit has held that although "police officers do not generally "commence or continue" criminal proceedings against defendants, a claim for malicious prosecution can still be maintained against a police officer if the officer is found to 'play[ ] an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act.' " *Bermudez v. City of New York*, 790 F.3d 368, 377 (2d Cir. 2015) (quotations omitted). "This element might be satisfied by, for example, showing that an officer generated witness statements or was regularly in touch with the prosecutor regarding the case." *Id.* (citation omitted).

Recently, the New York Court of Appeals acknowledged that it has " 'never elaborated on how a plaintiff in a malicious prosecution case demonstrates that the defendant commenced or continued the underlying criminal proceeding.' " *Torres*

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 333 of 370

Joyner v. County of Cayuga, Not Reported in Fed. Supp. (2020)

2020 WL 1904088

*v. Jones*, 26 N.Y.3d 742, 760-61 (2016) (quotation omitted). "But, by suggesting that a defendant other than a public prosecutor may be liable for supplying false information to the prosecutor in substantial furtherance of a criminal action against the plaintiff, we have implicitly recognized that such conduct may, depending on the circumstances, constitute the commencement or continuation of the prosecution." *Id.* at 761 (citations omitted); *see also Colon v. City of New York*, 60 N.Y.2d 78, 82 (1983) (noting that proof establishing "that the police witnesses" have falsified evidence may create liability for malicious prosecution); *Hopkinson v. Lehigh Val. R.R. Co.*, 249 N.Y. 296, 300-01 (1928) (noting that the falsification of evidence and presentation of that evidence to the prosecutor can constitute commencement of a prosecution).

### 1. Initiation of Criminal Prosecution

In the present matter, the Court finds that Plaintiff's malicious prosecution claim must be dismissed. Initially, the Court finds that Plaintiff has failed to adequately allege that any named Defendant initiated that the prosecution against him. While Defendant Spinelli filed the criminal complaint against him, nothing in the complaint suggests his participation in Plaintiff's prosecution beyond that. Nearly all cases in which law enforcement officers were found to have initiated or continued a prosecution for purposes of a malicious prosecution claim involve officers who provided knowingly false and/or fabricated evidence to unwitting prosecutors. *See, e.g.*, *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997); *Ramos v. City of New York*, 285 A.D.2d 284, 299 (1st Dep't 2001). There is a rebuttable presumption that criminal proceedings are initiated by prosecutors, not arresting officers. *See Mitchell v. Victoria Home*, 434 F. Supp. 2d 219, 228 (S.D.N.Y. 2006) (citation omitted). "[I]n the absence of evidence that the police officer misled or pressured the official who could be expected to exercise independent judgment," a claim of malicious prosecution against the officer must fail. *See Townes v. City of New York*, 176 F.3d 138, 147 (2d Cir. 1999) (citations omitted).

Plaintiff's complaint is devoid of any allegations that Defendant Spinelli engaged in any of the conduct identified above that would permit the Court to find that Plaintiff plausibly alleged that any party other than the District Attorney initiated the prosecution against him. As such, the Court finds that Plaintiff's malicious prosecution claim is subject to dismissal.

### 2. Malice

Plaintiff's complaint is also devoid of any facts supporting an inference that the prosecution was instituted with malice. As Defendants correctly note, Plaintiff misconstrues the standard on a motion to dismiss. While Plaintiff is not required to "prove" that Defendants acted in a malicious manner to sustain his claim, he is certainly required to plead enough facts that would make such a conclusion plausible. Plaintiff's complaint fails to plead any facts that would support the inference that any named Defendant (or their employees) acted with the requisite malice to support a malicious prosecution claim. Rather, the complaint simply alleges that he was subjected to normal processes of law. The number of days that Plaintiff spent in jail is irrelevant to this consideration, as is the fact that he was "no billed" by the Grand Jury. Plaintiff does not allege that he had previous interactions with any of the named Defendants, or that his interactions with them during his arrest and subsequent prosecution would indicate a malicious intent. Finally, as to the supervisory and municipal Defendants, Plaintiff has failed to put forth any facts in support of this claim. Rather, the complaint contains nothing but legal conclusions without providing any basis for the Court to conclude that Plaintiff has plausibly alleged a malicious prosecution claim against these Defendants.

**\*9** Accordingly, the Court finds that Plaintiff's malicious prosecution claim is subject to dismissal on this alternative ground.

### 3. Prosecutorial Immunity

Prosecutors sued under 42 U.S.C. § 1983 enjoy absolute immunity " 'from claims for damages arising out of prosecutorial duties that are 'intimately associated with the judicial phase of the criminal process." ' " *Okongwu v. County of Erie*, No. 14CV832, 2017 WL 2686454, *3 (W.D.N.Y. June 22, 2017) (quoting *Doe v. Phillips*, 81 F.3d 1204, 1209 (2d Cir. 1996) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976))). The prosecutor enjoys this absolute immunity because he or she is acting in a quasi-judicial capacity. *See Okongwu v. County of Erie*, No. 14CV832, 2018 WL 1383233, *3 (W.D.N.Y. Mar. 19, 2018). The function performed by the prosecutor defines the scope of this immunity. *See Imbler*, 424 U.S. at 430; *Warney*, 587 F.3d at 121. Acts of advocacy before a court, or preparation to advocate, are absolutely immune, *Imbler*, 424 U.S. at 430-31; *see also Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993), while administrative duties or investigatory functions are not so immune, *Imbler*, 424 U.S. at 431 n.33; *Buckley*, 509 U.S. at 273; *Warney*, 587 F.3d at 121. "This protection encompasses

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 334 of 370

Joyner v. County of Cayuga, Not Reported in Fed. Supp. (2020)

2020 WL 1904088

'all of their activities that can fairly be characterized as closely associated with the conduct of litigation or potential litigation.' " *Peters*, 848 F. Supp. 2d at 385 (quoting *Barrett v. United States*, 798 F.2d 565, 571-72 (2d Cir. 1986)). As noted by the Second Circuit, "thus, to establish [absolute] immunity, the 'ultimate question' is 'whether the prosecutors have carried their burden of establishing that they were functioning as "advocates" when they engaged in the challenged conduct.' " *Warney*, 587 F.3d at 121 (quoting *Doe v. Phillips*, 81 F.3d 1204, 1209 (2d Cir. 1996)).

Absolute immunity extends from the initiation of a prosecution and presenting a case at trial, *Boria v. Hicks*, No. 5:17-CV-00486, 2017 WL 2983304, *4 (N.D.N.Y. June 14, 2017), through the decision to end it, *see Okongwu*, 2017 WL 2686454, at *4, as well as post-conviction defense of proceedings and the decision whether to vacate a conviction, *Warney*, 587 F.3d at 123; *Peters*, 848 F. Supp. 2d at 387. Absolute immunity applies in the preparation for the initiation of judicial proceedings, but not to the investigative or administrative duties of a prosecutor. *See Warney*, 587 F.3d at 122. In *Peters*, the court listed activities that are investigative or administrative that do not deserve absolute immunity, such as orchestrating a sting operation, authorizing wiretaps, coercing confidential informant to consent to a wire, releasing information to the media, assisting in the execution of a warrant, or supervising and interacting with law enforcement agents to acquire evidence. *See Peters*, 848 F. Supp. 2d at 386 (citing cases).

In the present matter, the Court finds that Defendant Budelmann, as Cayuga County District Attorney is entitled to absolute prosecutorial immunity. In the complaint, Plaintiff alleges that "[o]n October 4, 2018, Defendant district attorney presented Plaintiff's criminal charges to the Grand Jury of Cayuga County where the grand jury 'No Billed' the case; and Plaintiff was released from his illegal confinement at the Cayuga County Jail." Dkt. No. 5 at ¶¶ 26, 91. Further, Plaintiff claims that "Defendant district attorney knew at the time of Plaintiff's case being presented to the Grand Jury of Cayuga County that he would not prevail due to the lack of probable cause." *Id.* at ¶ 29. These allegations make clear that Defendant Budelmann has been sued relating to his role in presenting the case to the grand jury; conduct for which he is entitled to absolute prosecutorial immunity. *See Hill v. City of New York*, 45 F.3d 653, 661-62 (2d Cir. 1995) (holding that "that prosecutors are immune from § 1983 liability for their conduct before a grand jury") (citations omitted); *Bernard v. County of Suffolk*, 356 F.3d 495, 505 (2d

Cir. 2004) (citations omitted). Accordingly, Plaintiff's claim of malicious prosecution against Defendant Budelmann is subject to dismissal on this alternative ground.

**\*10** Finally, to the extent that Plaintiff seeks to impute the conduct of Defendant Budelmann to Cayuga County, the claim must necessarily be dismissed. The Second Circuit Court of Appeals has unequivocally held that "prosecutorial acts may not fairly be said to represent official policy of the County," because "[w]hen prosecuting a criminal matter, a district attorney in New York State, acting in a quasi-judicial capacity, represents the State not the county." *Baez v. Hennessy*, 853 F.2d 73 (2d Cir. 1988) (internal quotation omitted); *see also Doe v. Smith*, 704 F. Supp. 1177, 1184 (S.D.N.Y. 1988). Since Defendant Budelmann was acting on behalf of the State of New York, and not Cayuga County, any alleged misconduct on Defendant Budelmann's part cannot be imputed to Cayuga County.

### G. Negligent/Intentional Infliction of Emotional Distress

In his sixth cause of action, Plaintiff alleges claims of negligent and intentional infliction of emotional distress against Defendants Butler, Spinelli, and Budelmann. *See* Dkt. No. 5 at ¶¶ 96-98. Defendants contend these claims fail as a matter of law. *See* Dkt. No. 9-1 at 19-20.

As to the claim of negligent infliction of emotional distress, it is well settled that a " 'plaintiff seeking damages for an injury resulting from a wrongful arrest and detention may not recover under broad general principles of negligence ... but must proceed by way of the traditional remedies of false arrest and imprisonment.' " *Greenaway v. Cty. of Nassau*, 97 F. Supp. 3d 225, 239 (E.D.N.Y. 2015) (quoting *Secard v. Dep't of Soc. Servs. of Cnty. of Nassau*, 204 A.D.2d 445, 612 N.Y.S. 2d 167, 168 (2d Dep't 1994)). This is precisely what Plaintiff is attempting to do here. Tacking on a claim for negligent infliction of emotional distress without any other facts or assertions is insufficient under the relevant law. Moreover, even if this claim could be considered independent of Plaintiff's false arrest claim, it is still subject to dismissal because Plaintiff has not alleged any facts demonstrating that Defendants breached a duty owed to Plaintiff. As such, the Court grants Defendants' motion to dismiss as to Plaintiff's claim of negligent infliction of emotional distress.

As to the intentional infliction of emotional distress claim, it too must be dismissed. "Intentional infliction of emotional distress has four elements: '(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 335 of 370

Joyner v. County of Cayuga, Not Reported in Fed. Supp. (2020)

2020 WL 1904088

probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress.' " *Greenaway*, 97 F. Supp. 3d at 239-40 (quoting *Howell v. N.Y. Post Co., Inc.*, 81 N.Y.2d 115, 596 N.Y.S. 2d 350, 612 N.E. 2d 699, 702 (1993)). "The 'extreme and outrageous conduct' must 'go beyond all possible bounds of decency' and be 'atrocious, and utterly intolerable in a civilized community.' " *Id.* (quotation and other citation omitted).

Here, Plaintiff claims that Defendants Budelmann, Spinelli, and Butler engaged in "extreme and outrageous conduct, which intentionally and/or negligently caused severe emotional distress to Plaintiff." Dkt. No. 5 at ¶ 97. Notably absent from the complaint is any explanation what this "extreme and outrageous conduct" was. " 'Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Murphy v. American Home Products Corp.*, 58 N.Y.2d 293, 302 (1983) (quotation omitted). The threadbare facts alleged by Plaintiff, which include the fact that he was arrested and eventually released after the grand jury refused to indict, fall far short of this strict standard.

**\*11** Accordingly, the Court grants Defendants' motion to dismiss Plaintiff's claims for negligent and intentional infliction of emotional distress.

## H. Negligence
In his seventh cause of action, Plaintiff asserts a claim for negligence. *See* Dkt. No. 5 at ¶¶ 100-04. In this claim, Plaintiff argues that his arrest, Defendants' failure to "follow the criminal law of the State of New York," and Plaintiff's fifty-three days of incarceration, were the product of Defendants' negligence. *See id.*

"To prevail on a claim for negligence under New York law, a plaintiff must establish '(1) the existence of a duty on the defendant's part as to the plaintiff; (2) a breach of that duty; and (3) resultant injury to the plaintiff.' " *Frederique v. County of Nassau*, 168 F. Supp. 3d 455, 485 (E.D.N.Y. 2016) (quotation omitted). "However, '[u]nder New York law, harm predicated on an intentional act may not give rise to a claim of negligence.' " *Id.* (quotation and other citation omitted). Moreover, it is well settled that, "[u]nder New York law, a plaintiff may not recover under general negligence principles for a claim that law enforcement officers failed to exercise the

appropriate degree of care in effecting an arrest or initiating a prosecution." *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994) (citing *Boose v. City of Rochester*, 71 A.D.2d 59, 421 N.Y.S.2d 740, 743 (4th Dept. 1979)) (other citation omitted).

In the present matter, the Court finds that Plaintiff's negligence claim must be dismissed as it is simply redundant of Plaintiff's claims of false arrest, false imprisonment, and malicious prosecution. Accordingly, the Court grants Defendants' motion to dismiss as to this claim.

## I. Deliberate Indifference to Serious Medical Needs
In his eighth cause of action, Plaintiff claims that "Defendant Medical Staff and Defendant Cayuga County Sheriff's Department" were deliberately indifferent to his medical care and treatment after he was injured when a water pipe broke outside his cell on August 31, 2018. *See* Dkt. No. 5 at ¶¶ 105-14.

A pretrial detainee's claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight Amendment. *See Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (citations omitted). A pretrial detainee's claims are evaluated under the Due Process Clause because, " '[p]retrial detainees have not been convicted of a crime and thus 'may not be punished in any manner — neither cruelly and unusually nor otherwise.' " *Id.* (quotations omitted).

"A pretrial detainee may establish a § 1983 claim for allegedly unconstitutional conditions of confinement by showing that the officers acted with deliberate indifference to the challenged conditions." *Darnell*, 849 F.3d at 29 (citation omitted). "This means that a pretrial detainee must satisfy two prongs to prove a claim, an 'objective prong' showing that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process, and a 'subjective prong' — perhaps better classified as a *'mens rea* prong' or 'mental element prong' — showing that the officer acted with at least deliberate indifference to the challenged conditions." *Id.* "The reason that the term 'subjective prong' might be a misleading description is that, as discussed below, the Supreme Court has instructed that 'deliberate indifference' roughly means 'recklessness,' but 'recklessness' can be defined subjectively (what a person actually knew, and disregarded), or objectively (what a reasonable person knew, or should have known)." *Id.* (citing

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 336 of 370

Joyner v. County of Cayuga, Not Reported in Fed. Supp. (2020)

2020 WL 1904088

*Farmer v. Brennan*, 511 U.S. 825, 836-37, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)).

**\*12** Under both the Eighth and Fourteenth Amendments, to establish an objective deprivation, "the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health," which includes the risk of serious damage to "physical and mental soundness." *Id.* at 30 (citations omitted). "There is no 'static test' to determine whether a deprivation is sufficiently serious; instead, 'the conditions themselves must be evaluated in light of contemporary standards of decency.' " *Id.* (quoting *Blissett v. Coughlin*, 66 F.3d 531, 537 (2d Cir. 1995) (citing *Rhodes v. Chapman*, 452 U.S. 337, 346, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981))). For example, the Second Circuit has " 'held that prisoners may not be deprived of their basic human needs — *e.g.*, food, clothing, shelter, medical care, and reasonable safety — and they may not be exposed to conditions that pose an unreasonable risk of serious damage to [their] future health.' " *Id.* (quoting *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012)).

" '[C]onditions of confinement may be aggregated to rise to the level of a constitutional violation, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise.' " *Darnell*, 849 F.3d at 30 (quotations omitted). "Unsanitary conditions, especially when coupled with other mutually enforcing conditions, such as poor ventilation and lack of hygienic items (in particular, toilet paper), can rise to the level of an objective deprivation." *Id.* (citations omitted).

The second element of a conditions of confinement claim brought under the Due Process Clause of the Fourteenth Amendment is the defendant's "deliberate indifference" to any objectively serious condition of confinement. *See Darnell*, 849 F.3d at 32. Courts have traditionally referred to this second element as the "subjective prong." "But 'deliberate indifference,' which is roughly synonymous with 'recklessness,' can be defined either 'subjectively' in a criminal sense, or 'objectively' in a civil sense." *Id.* As such, the "subjective prong" might better be described as the "*mens rea* prong" or "mental element prong." *Id.*

Under the second prong of the deliberate indifference analysis, the Court must consider whether the defendants "acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though [they] knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35. Under this standard, the plaintiff "must prove that [the defendants] acted intentionally or recklessly, and not merely negligently.' " *Id.* at 36.

In the present matter, the Court finds that Plaintiff has failed to plausibly allege a claim of deliberate indifference under the Fourteenth Amendment. Initially, the Court notes that the "medical staff" at the Cayuga County Jail were not named as defendants in this action. Rule 10(a) requires a plaintiff to "name all the parties" in the Complaint. *See* Fed. R. Civ. P. 10(a). Although the naming of pseudonymous defendants is permissible where a plaintiff requires discovery to learn the true identities of the defendants, the plaintiff subsequently must amend the complaint to reflect the discovered identities and effect service on the named parties within the 120-day time period set forth in Rule 4(m). *See Petty v. Cty. of Franklin*, 478 F.3d 341, 345–46 (6th Cir. 2007).

Here, Plaintiff has not brought suit against any pseudonymous defendants, and only makes reference to these unidentified individuals in the body of the complaint. If Plaintiff had intended to sue then-unknown members of the medical staff at the jail, he should have brought suit against "John and/or Jane Doe" defendants, who could be identified through discovery. Upon obtaining their identities, Plaintiff would then be required to amend his complaint to reflect the Doe defendants' identities. *See Simmons v. District of Columbia*, 750 F. Supp. 2d 43, 45 (D.D.C. 2011) (holding that a plaintiff "may bring an action against unknown John Doe defendants, but plaintiff must substitute named defendants for those unknown defendants after the completion of discovery") (citations omitted); *see also Estate of Rosenberg by Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995) (holding that "[a]n action may proceed against a party whose name is unknown if the complaint makes allegations specific enough to permit the identity of the party to be ascertained after reasonable discovery"). Here, Plaintiff has not brought suit against unknown members of the medical staff at the Cayuga County Jail or providing any facts that would permit Defendants to assist in obtaining their identities. As such, the only potential deliberate indifference claim asserted in the complaint is a municipal liability claim against Defendant Cayuga County.

**\*13** In his complaint, Plaintiff has alleged that a water pipe burst outside his cell during the night, the water was turned off, and at some point during the night it pooled near his cell's

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 337 of 370

Joyner v. County of Cayuga, Not Reported in Fed. Supp. (2020)

2020 WL 1904088

toilet. *See* Dkt. No. 5 at ¶¶ 109-13. At sometime between 6:30 a.m. and 7:00 a.m., Plaintiff claims that he got out of bed to use the toilet in his cell and slipped and fell on the wet floor. *See id.* at ¶ 110. Plaintiff alleges that, when he fell, he hit his head and neck on his bunk and his lower back on the floor, causing severe injuries, including a herniated disc in his neck and lower lumbar strain. *See id.* at ¶¶ 111-13. Plaintiff claims that, "[a]fter the injury up and until Plaintiff was released on October 4, 2018[,] Plaintiff was denied medical treatment for his injuries that he suffered inclusive of medication and treatment from a physician." *Id.* at ¶ 114.

Initially, the Court notes that nothing in the complaint indicates that Plaintiff's alleged injury was caused by a municipal custom, policy, or usage, as is required to find a plausible claim against Defendant Cayuga County. Rather, Plaintiff claims that a water pipe leaked outside his cell during the night and that a "correctional officer ... turn[ed] off the water and clean[ed] up the water spill. At that time, there was no water in Plaintiff's cell." Dkt. No. 5 at ¶ 108. When the second pipe leaked, some water entered Plaintiff's cell, which caused Plaintiff to fall. *See id.* at ¶ 109. This isolated incident, involving a bursting water pipe, is woefully insufficient to plausibly allege municipal liability for Plaintiff's alleged injury. *See Connick*, 131 S. Ct. at 1360; *see also Plair v. City of New York*, 789 F. Supp. 2d 459, 470 (S.D.N.Y. 2011) ("[I]t is well established that a single incident does not give rise to an unlawful practice by subordinate officials so permanent and well-settled as to constitute custom or usage") (internal quotation marks omitted); *Giaccio v. City of New York*, 308 Fed. Appx. 470, 472 (2d Cir. 2009) (finding that allegations of, at most, four prior incidents of misconduct "falls far short of establishing a practice that is 'so persistent or widespread' as to justify the imposition of municipal liability") (internal quotation marks omitted).

Even assuming that Plaintiff had asserted this claim against an individually named Defendant, the claim would still be dismissed. To satisfy the second prong of a deliberate indifference claim, Plaintiff must plausibly allege facts suggesting that a defendant "acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though [they] knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35. At best, the facts set forth in the complaint describe negligence on the part of the correctional staff, which is insufficient to support a claim of deliberate indifference. *See id.* at 36.

Finally, to the extent that Plaintiff is basing his claim on the alleged deprivation of medical care after his accident, Plaintiff has failed to provide any factual basis in support of his conclusory assertion that he "was denied medical treatment for his injuries that he suffered inclusive of medication and treatment from a physician." Dkt. No. 5 at ¶ 114. The complaint fails to allege that he brought his alleged injuries to the attention of the correctional or medical staff at the Cayuga County jail (or even identify any such individual).

Based on the foregoing, the Court grants Defendants' motion to dismiss as to Plaintiff's deliberate indifference claim.

## IV. CONCLUSION

After carefully the entire record in this matter, parties' submissions and the applicable law, and for the reasons stated herein, the Court hereby

**\*14 ORDERS** that Defendants' motion to dismiss (Dkt. No. 9) is **GRANTED in part** and **DENIED in part**; [4] and the Court further

4        As a result of this Memorandum-Decision and Order, the only remaining claim is Plaintiff's false arrest claim against Defendant Spinelli.

**ORDERS** that Defendants City of Auburn, Butler, Cayuga County, Cayuga County District Attorney's Office, and Budelmann are **TERMINATED** as Defendants in this action; and the Court further

**ORDERS** that Defendants' letter motion a portion of the argument raised in their motion to dismiss (Dkt. No. 15) is **DENIED as moot**; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2020 WL 1904088

**Joyner v. County of Cayuga, Not Reported in Fed. Supp. (2020)**

2020 WL 1904088

---

**End of Document**                                      © 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

2012 WL 2569085
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Ronald MOYE, Plaintiff,
v.
The CITY OF NEW YORK; Sgt. Nelson Caban,
P.O. Paul Jeselon, P.O. Samuel Fontanez, P.O.
Edward Simonetti, P.O. Matthew Boorman, P.O.
Frank Papa, P.O. Tawaina O'Neal, P.O. Brennan;
P.O. John; and A.D.A. Dustin Chao, Defendants.

No. 11 Civ. 316(PGG).
|
July 3, 2012.

*MEMORANDUM OPINION & ORDER*

PAUL G. GARDEPHE, District Judge.

**\*1** Plaintiff Ronald Moye has brought claims against the
City of New York, former New York County Assistant
District Attorney Dustin Chao, and eight members of the New
York City Police Department ("NYPD") under 42 U.S.C.
§ 1983 and state law. Moye claims that Chao is liable for
damages under Section 1983 and state law for malicious
prosecution, abuse of process, denial of a fair trial, fabrication
of evidence, conspiracy "to inflict an unconstitutional injury,"
and intentional and negligent infliction of emotional distress.
(Am. Cmplt., Second, Third, Fourth, Fifth, Sixth, Seventh,
and Ninth Claims) Chao has moved to dismiss the Amended
Complaint on grounds of absolute immunity. For the reasons
stated below, Chao's motion to dismiss will be granted.

*BACKGROUND*

For purposes of deciding Defendant Chao's motion to dismiss,
the Court has assumed that the following facts presented in
the Amended Complaint are true.

**I. *MOYE'S ARREST***

On or about March 12, 2002, at approximately 8:00
p.m., NYPD officers Paul Jeselson and Tawaina O'Neal
were stationed on the rooftop of an apartment building

on the south side of West 118th Street near the corner
of Morningside Avenue conducting nighttime narcotics
surveillance. (Am.Cmplt.¶¶ 19, 22) Plaintiff's car was located
on the north side of West 118th Street, near Manhattan
Avenue. (*Id.* ¶ 21) Officer Jeselson claimed that he observed
Plaintiff "extend his hand from the driver's side window and
hand a small glassine" to another individual—later arrested
—who, in turn, handed it to an unapprehended customer. (*Id.*
¶ 20) The Defendant officers moved in and arrested Moye in
the vicinity of 352 West 118th Street. (Am.Cmplt.¶¶ 12, 25)

At the time of the arrest, and later at the 28th Precinct, the
officers searched Moye and his car and found United States
currency, both in Moye's possession and inside the vehicle.
(*Id.* ¶ 27) The Defendant officers unnecessarily grabbed
Moye, pushed him, and placed excessively tight handcuffs on
him (*id.* ¶ 30), causing him to suffer bruises to and numbness
in his wrists. (*Id.* ¶ 32)

Moye was indicted on March 22, 2002, for Criminal
Possession of a Controlled Substance in the Third Degree.
(Am. Cmplt. ¶ 35; Schwartz Decl., Ex. A) Plaintiff alleges that
the police officer defendants "conspired [to give] and gave
false testimony and intentionally placed false evidence before
the grand jury." [1] (Am.Cmplt.¶ 35)

[1]    The Amended Complaint does not disclose what
        false testimony or other false evidence was laid
        before the grand jury. Moreover, there is no
        suggestion that Chao was involved in presenting
        false testimony or false evidence to the grand jury.

**II. *MOYE'S FIRST TRIAL***

Moye's first trial began on January 14, 2003. (Schwartz Decl.,
Ex. B) A.D.A. Chao introduced photographs at trial which
he claimed showed the position of Plaintiff s car as it was
parked on West 118th Street. (Am.Cmplt.¶ 38) Chao, Officer
Jeselson, and Officer Papa were present when a District
Attorney's office photographer took these photos in June 2002
from the March 12, 2002 observation point. (*Id.* ¶¶ 41–42,
44) Although the photographs were intended to convey the
vantage point of the officers on the night of the arrest, they did
not replicate the "nighttime conditions." (*Id.* ¶ 45) According
to Moye, these photographs nonetheless showed that the
officers could not have seen Plaintiff extend his hand from
the driver's side window and pass a small glassine to another
individual, because the driver's side could not be seen from
the vantage point of the rooftop observation post, even with
binoculars. (*Id.* ¶¶ 46, 48) At trial, Officer Jeselson admitted

that "he was not able to see the driver's side of the vehicles in the photographs." (*Id.* ¶ 47) Jeselson nonetheless claimed that he had been able to see Moye's hand "during the nighttime observation." (*Id.* ¶ 39) The first trial ended in a mistrial, with the jury unable to reach a verdict. (*Id.* ¶ 49)

### III. *MOYE'S SECOND TRIAL*
**\*2** In February 2003, A.D.A. Chao, Officers Brennan and Jeselson, and D.A's Office photographer Nancy Badger returned to West 118th Street to take more photographs. (*Id.* ¶ 53) They repositioned the car on an angle in order to make it appear that the officers would have been able to see Moye's hand outside the driver's side window on the night of his arrest. (*Id.* ¶¶ 55–60) With the car positioned in this fashion, Jeselson and Chao instructed Badger to take photographs of Officer Brennan's hand outside the driver's side window in an effort to simulate what the officers would have seen that night. (*Id.* ¶¶ 60–61) Jeselson and Chao then had Brennan move the car back to a curbside position "where additional photographs [were] taken at a wide angle to falsely give the impression that the close-ups were merely enlargements of the vehicle parked along the curb." (*Id.* ¶ 63)

At Moye's second trial, Chao introduced these new photographs and elicited testimony from Jeselson in which he used the photographs to support his claim that he was able to see Moye's hand from the rooftop observation post. (*Id.* ¶¶ 66, 74) However, Badger testified that, in taking the new photographs, "the defendants moved the vehicle to an angle where the hand could be visible." Defendants then returned the vehicle to its curbside position and took additional photographs that "falsely give the impression that the close-ups were merely enlargements of the vehicle parked along the curb." (*Id.* ¶¶ 81–84)

In summation, Moye's lawyer argued that Jeselson had lied about his observations from the roof and the positioning of the car in the photographs introduced by the prosecution.

(*Id.* ¶ 85) In response, A.D.A. Chao argued that Officer Jeselson had no opportunity to frame the defendant, because Chao had been present at the observation post:

"[Defense counsel] spoke about people on that roof. It's in evidence. Officer Jeselson was on that roof, the photographer Laura Badger was on the roof, and I was on that roof. Now, if he is directing something improperly, that is Officer Jeselson, well, it's in front of me.

"And if he knew he was going to get away with it when I say that's the opportunity, you know [defense counsel] talked about a lot of people losing their jobs about perjuring themselves, about the integrity of Robert Morgenthau's office. Well, if Officer Jeselson thought he was going to get away with it—

"[DEFENSE counsel]: Mr. Chao is vouching for his witness.

"THE COURT: Overruled.

"[ADA] CHAO: If Officer Jeselson thought he was going to get away with it with me present, all that talk about firing, that should be me because I'm prosecuting this case, not Officer Jeselson.

"[DEFENSE counsel]: That's objectionable vouching for his witness.

"THE COURT: Overruled.

"[DEFENSE counsel]: Your Honor, he is making himself an unsworn witness for the credibility of his police officer.

**\*3** "THE COURT: Overruled.

"[ADA] CHAO: Ladies and gentlemen, Mr. Morgenthau should fire me if Officer Jeselson thinks he is going to be able to say that in court, lie to you, when the person who is standing right next to him on that roof is me. Well, that lies with me.

"So what's the explanation? If there's no motive, no opportunity for why Ms. Badger remembers it differently. Well, there's evidence that you heard the officer was on the roof. Evidence that you heard I was on the roof also. I have no other answer other than the fact that she is mistaken....

"[DEFENSE counsel]: He is vouching for his witness using the pronoun I.

"THE COURT: Members of the jury, you can accept his argument as to what happened on the roof. It's his argument based upon the evidence as he recalls it."

*People v. Move,* 52 A.D.3d 1, 5 (1st Dep't 2008); *see also* (Am. Cmplt. ¶¶ 87–92.

Moye was convicted at his second trial and sentenced to four-and-a-half to nine years' imprisonment. (Am.Cmplt.¶¶ 13–14)

2012 WL 2569085

## IV. *THE CHARGES AGAINST MOYE ARE DISMISSED*

On appeal, the First Department vacated the conviction in a 3–2 decision. *People v. Move,* 52 A.D.3d 1. The First Department found that "the prosecutor improperly vouched for his witness and interjected his personal integrity and the veracity of the District Attorney's office into his summation to support the credibility of Police Office Jeselson." *Id. at 6.* The New York Court of Appeals agreed that Chao had engaged in impermissible vouching for his witness, affirmed the reversal of the conviction, and remanded the case to Supreme Court. *People v. Move,* 12 N.Y.3d 743, 744 (2009). After remand, the New York County District Attorney's Office dismissed the case on October 21, 2009. (Am.Cmplt.¶¶ 16, 37)

## DISCUSSION

### I. *IMMUNITY*

Chao argues that the claims against him must be dismissed because his actions are protected by absolute immunity.[2]

[2]    Because Moye sues Defendant Chao in his individual capacity (Am .Cmplt.¶ 9), his claims are not barred by the Eleventh Amendment. *See Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993) ("To the extent that ... a [Section 1983] claim is asserted against a [state official] in his individual capacity, he may assert privileges of absolute or qualified immunity but may not assert immunity under the Eleventh Amendment.").

Section 1983 "purports to create a damages remedy against every state official for the violation of any person's federal constitutional or statutory rights." *Kalina v. Fletcher,* 522 U .S. 118, 123 (1997). In order to state a claim under Section 1983, a plaintiff must show that the conduct complained of was committed by a person or entity acting under color of state law, and that the conduct deprived a person of rights, privileges, or immunities secured by the Constitution. *Newton v. City of New York,* 566 F.Supp.2d 256, 269–70 (S.D.N.Y.2008) (citing *Palmieri v. Lynch,* 392 F.3d 73, 78 (2d Cir.2004)).

"Although section 1983 imposes liability upon every person who deprives another of a constitutional right under color of state law, the doctrines of absolute and qualified immunity shield prosecutors and law enforcement officers from liability related to their official acts." *Day v. Morgenthau,* 909 F.2d 75, 77 (2d Cir.1990). While Section 1983 does not explicitly provide for such immunity, the Supreme Court and Second Circuit have ruled that "Congress did not intend § 1983 to abrogate immunities 'well grounded in history and reason.' " *Pinaud v. Cnty. of Suffolk,* 52 F.3d 1139, 1147 (2d Cir.1995) (quoting *Buckley v. Fitzsimmons,* 509 U.S. 259, 268 (1993)).

**\*4** As the Second Circuit has explained:

Such immunities are of two types: absolute and qualified. *Buckley v. Fitzsimmons,* 509 U.S. 259, 268, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993). Absolute immunity is reserved for officials who perform "special functions" and deserve absolute protection from damages liability. Among these are prosecutors, and persons working under their direction, when they function as advocates for the state in circumstances "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman,* 424 U.S. at 430–31. *See also Hill v. City of New York,* 45 F.3d at 660 (extending absolute prosecutorial immunity to persons acting under the direction of prosecutors in performing functions closely tied to the judicial process).

By contrast, only qualified immunity applies to law enforcement officials, including prosecutors, when they perform investigative functions. *Buckley v. Fitzsimmons,* 509 U.S. at 273. ("When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other.") (internal quotation marks and citations omitted); *accord Zahrey v. Coffey,* 221 F.3d 342, 349 (2d Cir.2000).

*Bernard v. Cnty. of Suffolk,* 356 F.3d 495, 502–03 (2d Cir.2004).

Absolute immunity extends only so far as necessary to protect the judicial process. *Hill v. City of New York,* 45 F.3d 653, 660 (2d Cir.1995). Nonetheless,

[t]he doctrine of absolute prosecutorial immunity creates a formidable obstacle for a plaintiff seeking to maintain a civil rights action against a district attorney, as it provides that "prosecutors are absolutely immune from liability under § 1983 for their conduct in 'initiating a prosecution and in presenting the State's case,' insofar as that conduct is 'intimately associated with the judicial phase of the criminal process.' " *Burns v. Reed,* 500 U.S. 478, 486, 111

S.Ct. 1934, 1939, 114 L.Ed.2d 547 (1991) (quoting *Imbler,* 424 U.S. at 430–31, 96 S.Ct. at 995).

*Pinaud,* 52 F.3d at 1147. The Court addresses the parameters of absolute prosecutorial immunity below.

**A. *Legal Standard for Absolute Prosecutorial Immunity***
A prosecutor who, as here, is sued in his or her individual capacity, may assert absolute or qualified immunity as a defense. Courts may grant a Rule 12(b)(6) motion to dismiss on grounds of absolute immunity where the facts establishing the defense appear in the complaint. *Deronette v. City of New York,* No. 05 CV 5275(SJ), 2007 WL 951925, at *4 (E.D.N.Y. Mar. 27, 2007) (citing *Hill,* 45 F.3d at 663) (absolute immunity may be decided on a Rule 12(b)(6) motion where facts establishing the defense may be "gleaned from the complaint")). Moreover, district courts are encouraged to determine the applicability of an absolute immunity defense at the earliest appropriate stage, and preferably before discovery. [3] *Id.* (citing *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985)); *United States v. Colbert,* No. 87 Civ. 4789, 1991 WL 183376 at *4 (S.D.N.Y. Sept. 11, 1991). This approach is appropriate given that "absolute immunity defeats a suit at the outset, so long as the official's actions were within the scope of the immunity." *Imbler,* 424 U.S. at 419 n. 13. "[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Buckley,* 509 U.S. at 270 (1993) (citing *Burns,* 500 U.S. at 486).

[3]    District courts likewise evaluate the applicability of absolute immunity before assessing whether a plaintiff has sufficiently alleged a constitutional violation. *Pinaud,* 52 F.3d at 1148 n. 4 (citing *Buckley,* 509 U.S. at 261).

**\*5** Prosecutorial immunity to Section 1983 claims is grounded in the immunity to tort liability that prosecutors enjoy under the common law. *Flagler v. Trainor,* 663 F.3d 543, 546 (2d Cir.2011) That immunity arises from the "concern that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust." *Id.* (citing *Imbler,* 424 U.S. at 423). Immunity protects the proper functioning of the prosecutor's office by insulating the exercise of prosecutorial discretion. *Kalina,* 522 U.S. at 125. Prosecutors are therefore "absolutely immune from suit only when acting as advocates and when

their conduct involves the exercise of discretion." *Flagler,* 663 F.3d at 546 (citing *Kalina,* 522 U.S. at 127).

The Supreme Court addressed the question of absolute immunity for prosecutors in *Imbler,* where it held that prosecutors are entitled to absolute immunity for damage suits under Section 1983 for all acts "intimately associated with the judicial phase of the criminal process," including "initiating a prosecution and ... presenting the State's case [at trial]." *Imbler,* 424 U.S. at 430.

Later, in *Buckley,* 509 U.S. at 273, the Supreme Court considered whether the prosecutor defendants were entitled to absolute immunity for "investigative" work they performed well before seeking an indictment, involving an effort to connect the plaintiff to a bootprint left at a murder scene. Although the Court rejected the prosecutors' claim for absolute immunity, the Court cautioned that it had

> not retreated ... from the principle that acts undertaken by a prosecutor preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity. Those acts must include the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made.

*Buckley,* 509 U.S. at 273 (internal citations and quotations omitted).

Whether a prosecutor has absolute immunity for a particular act thus "depends principally on the nature of the function performed, not on the office itself." *Ying Jing Gan v. City of New York,* 996 F.2d 522, 530 (2d Cir.1993). "Such functions include the decision to bring charges against a defendant, presenting evidence to a grand jury, and the evaluation of evidence prior to trial." *Johnson v. City of New York,* No. 00 CIV 3626(SHS), 2000 WL 1335865, at *2 (S.D.N.Y. Sept. 15, 2000) (citing *Kalina,* 522 U.S. at 126). Furthermore, this "application of immunity is not limited to the duties a

prosecutor performs in the courtroom." *Dory v. Ryan,* 25 F.3d 81, 83 (2d Cir.1994) (citing *Buckley,* 509 U.S. at 272).

**\*6** "[A] district attorney is [not only] absolutely immune from civil liability for initiating a prosecution and presenting the case at trial," but also "immune for conduct in preparing for those functions; for example, evaluating and organizing evidence for presentation at trial or to a grand jury, or determining which offenses are to be charged." *Hill,* 45 F.3d at 661 (citations omitted). Prosecutorial immunity from Section 1983 damages liability is broadly defined, covering "virtually all acts, regardless of motivation, associated with [the prosecutor's] function as an advocate." *Dory,* 25 F.3d at 83. The Second Circuit has been "mindful of the Supreme Court's admonition that 'the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom.... Preparation, both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing, and evaluating of evidence.' " *Barbera v. Smith,* 836 F.2d 96, 100 (2d Cir.1987) (quoting *Imbler,* 424 U.S. at 431 n. 33); *see also Barrett v. United States,* 798 F.2d 565, 571 (2d Cir.1986) ("The absolute immunity accorded to government prosecutors encompasses not only their conduct of trials but all of their activities that can fairly be characterized as closely associated with the conduct of litigation or potential litigation....")

Because absolute immunity extends broadly to all acts committed by a prosecutor in his or her role as an advocate, it protects prosecutors against claims that they conspired to, or actually presented, fabricated evidence at trial:

> absolute immunity protects a prosecutor from § 1983 liability for virtually all acts, regardless of motivation, associated with his function as an advocate. This would even include ... allegedly conspiring to present false evidence at a criminal trial. The fact that such a conspiracy is certainly not something that is properly within the role of a prosecutor is immaterial, because "[t]he immunity attaches to his function, not to the manner in which he performed it." *Barrett v. United States,* 798 F.2d 565, 573 (2d Cir.1986); *see also Daloia v. Rose,* 849 F.2d 74, 75 (2d Cir.1988) (*per curiam* ) (holding ... that prosecutor was immune from § 1983 liability for knowingly presenting false testimony). As much as the idea of a prosecutor conspiring to falsify evidence [is disturbing] ... there is a greater societal goal in protecting the judicial process by preventing perpetual suits against prosecutors for the

performance of their duties. *See Imbler,* 424 U.S. at 426–428.

*Dory,* 25 F.3d at 83.[4]

---

[4]    By contrast, discretionary prosecutorial actions that are not "intimately associated with the judicial phase of the criminal process" are entitled only to qualified immunity. *See Buckley,* 509 U.S. at 270–75; *Burns,* 500 U.S. at 491–95. A prosecutor is "absolutely immune from liability under section 1983 [only] for acts 'within the scope of [their] duties in initiating and pursuing a criminal prosecution.' " *Day,* 909 F.2d at 77 (quoting *Imbler,* 424 U.S. at 410). Thus, when a prosecutor acts in an investigative or administrative capacity, absolute immunity is not available. *Hill,* 45 F.3d at 661. For example, immunity is not available when a prosecutor releases information or evidence to the media, *Buckley,* 509 U.S. at 276–78; authorizes or directs the use of wiretaps, *Powers v. Coe,* 728 F.2d 97, 103 (2d Cir.1984); or performs the functions normally performed by the police, such as assisting in the execution of a search or seizure. *See Buckley,* 509 U.S. at 273. The Supreme Court has also withheld absolute immunity for conduct unrelated to advocacy, such as giving legal advice, *Burns,* 500 U.S. at 492–96, or acting as a complaining witness. *Kalina,* 522 U.S. 118, 129–31; *see also Ying Jing Gan,* 996 F.2d at 533 (finding that prosecutor was not entitled to absolute immunity where he allegedly exposed a witness to retaliation and failed to provide adequate protection for the witness).

Although courts have declined to establish a bright-line test based on the stage of a criminal proceeding, "absolute prosecutorial immunity has generally been found in cases where some type of formal proceeding had been commenced or was being commenced by the conduct at issue." *Tabor v. New York City,* No. 11 CV 0195 FB, 2012 WL 603561, at \*4 (E.D.N.Y.2012) (citing *Barbera v. Smith,* 836 F.2d at 99. In contrast, where formal proceedings have not begun and the prosecutor is acting in an investigative capacity—such as by providing the police with legal advice on investigative techniques—qualified immunity generally applies. *Id.* While the Supreme Court has noted that a prosecutor is not absolutely immune for every action taken after probable cause has been established, *see Buckley,* 509 U.S. at 274 n. 5, "the Court's treatment of the issue demonstrates that

the existence of probable cause with respect to a particular suspect is a significant factor to be used in evaluating the advocatory nature of prosecutorial conduct." *Cousin v. Small,* 325 F.3d 627, 633 (5th Cir.2003); *accord Barbera,* 836 F.2d at 99 (noting "that in each of the cases we have reviewed where absolute immunity was upheld, some type of formal proceeding had been commenced or was being commenced by the challenged acts"); *see also DiBlasio v. Novello,* 344 F.3d 292, 300–01 (2d Cir.2003) ( "In assessing whether absolute immunity should attach to a prosecutor ... we have focused on the timing of the conduct at issue....") Thus, in interpreting *Buckley,* the Second Circuit has distinguished between "preparing for the presentation of an existing case," on the one hand, and attempting to "furnish evidence on which a prosecution could be based," on the other hand, with only the former entitling a prosecutor to absolute immunity. *Smith v. Garretto,* 147 F.3d 91, 94 (2d Cir.1998).

**\*7** In assessing a prosecutor's claim of absolute immunity, the court employs a "functional approach," *see, e.g., Burns,* 500 U.S. at 486, which looks to "the nature of the function performed, not the identity of the actor who performed it." *Forrester v. White,* 484 U.S. 219, 229 (1988); *see also Van de Kamp v. Goldstein,* 555 U.S. 335, 335–336 (2009) ("To decide whether absolute immunity attaches to a particular kind of prosecutorial activity, one must take account of ... 'functional' considerations"). The court must inquire whether the actions in question are part of a prosecutor's traditional function and whether they are closely associated with the judicial process. *Blouin v. Spitzer,* 356 F.3d 348, 357 (2d Cir.2004) (a court must examine the "nature of the function performed" in assessing whether absolute immunity will attach.); *Doe v. Phillips,* 81 F.3d 1204, 1209 (2d Cir.1996).

### B. *Analysis*

#### 1. *Malicious Prosecution, Abuse of Process*

To the extent that the Amended Complaint seeks to hold Chao liable for initiating the prosecution of Moye, absolute immunity is clearly applicable. *Shmueli v. City of New York,* 424 F.3d 231, 237 (2d Cir.2005) ("[T]he prosecutor is shielded from liability for damages for commencing and pursuing the prosecution, regardless of any allegations that his actions were undertaken with an improper state of mind or improper motive."); *see also Hill,* 45 F.3d at 660–61 (holding that prosecutors and those working under their direction are absolutely immune for claims relating to the initiation of a prosecution and for conduct before a grand jury). Plaintiff s

federal and state law claims alleging malicious prosecution and abuse of process will therefore be dismissed. [5]

[5]   Absolute immunity is a defense not only to Section 1983 claims but to related state law claims. *See Shmueli,* 424 F.3d at 238 (dismissing Section 1983 and related state law malicious prosecution claims); *Arum v. Miller,* 331 F.Supp.2d 99, 112 (E.D.N.Y.2004) (dismissing abuse of process and civil conspiracy claims on grounds of absolute prosecutorial immunity); *Imbler,* 424 U.S. at 424 (same principles require conferral of absolute immunity for damage claims against prosecutors under Section 1983 and state law).

#### 2. *Creation of Misleading Photographs, Conspiracy to Present False Evidence at Trial*

Moye alleges that Chao, in preparation for Moye's second trial, returned to West 118th Street and instructed Nancy Badger—the District Attorney's office photographer—to take photographs that inaccurately represented the position of Moye's car on the night of his arrest. Chao then presented these photographs at the second trial. (Am.Cmplt.¶¶ 38, 40, 50, 50–54, 66–67) Moye alleges that these photographs gave the false impression that the police in the observation post would have been able to see Moye's hand outside the driver's side window. (*Id.* ¶ 60) Moye further argues that absolute immunity does not extend to Chao's role in obtaining these allegedly misleading photographs, because obtaining such evidence is "not a traditional prosecutorial function" and was "done for the purpose of misleading the second jury." (Pltf. Opp. Br. at 10–11)

Prosecutors' absolute immunity applies "not just for presentation of testimony," however, but also to preparatory conduct "relating to their advocacy." *Dory,* 24 F.3d at 83. The Supreme Court and the Second Circuit have emphasized that ' "the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom.... Preparation, both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing, and evaluating of evidence.' " *Barbera,* 836 F.2d at 100 (quoting *Imbler,* 424 U.S. at 431 n. 33); *see also Barrett,* 798 F.2d at 571 ("The absolute immunity accorded to government prosecutors encompasses not only their conduct of trials but all of their activities that can fairly be characterized as closely associated with the conduct of litigation or potential litigation....").

**\*8** Chao obtained the photographs at issue after Moye's first trial and in preparation for Moye's second trial. Accordingly, his involvement in obtaining these photographs took place long after formal criminal proceedings had been commenced. *See Deskovic v. City of Peekskill,* Nos. 07–CV–8150 (KMK), 07–CV–9488 (KMK), 2009 WL 2475001, at \*10 (S.D.N.Y. Aug. 13, 2009) ("[i]n assessing how closely connected a prosecutor's conduct is to the judicial phase of the criminal process, the timing of the conduct is relevant") (citing *DiBlasio,* 344 F.3d at 300–01).

Furthermore, in directing that these new photographs be taken, Chao was performing in his role as a prosecutor preparing for trial: he sought to obtain these visual depictions of the crime scene in order to strengthen his case. (Am. Cmplt. ¶ 64 (purpose of second set of photographs was "to show that P.O. Jeselson could see a hand coming out of the car window on the date of plaintiff s arrest")). Although Chao was working with the police, he was acting within his role "as [an] advocate for the State." *Burns,* 500 U.S at 491. Courts have consistently found absolute immunity applicable where, as here, a Section 1983 plaintiff is relying on post-indictment misconduct by a prosecutor aimed at obtaining additional evidence to support pending charges at trial. *See, e.g., Deskovic,* 2009 WL 2475001, at \*5, \*11, \*13 (plaintiff contended that A.D.A. had, post-indictment, conspired to procure false scientific evidence that he later introduced at trial; granting A.D.A.'s motion to dismiss Section 1983 claims on absolute immunity grounds, because the A.D.A.'s alleged misconduct took place after indictment during the "judicial phase of the criminal process"); *Bertuglia v. City of New York,* No. 11 Civ. 2141(JGK), 2012 WL 906958, at \*21 (S.D.N.Y. Mar. 19, 2012) (granting motion to dismiss state law claims against A.D.A. defendant based on post-indictment evidence-gathering activities; absolute immunity applicable because "the Complaint does not allege facts that create a plausible inference that [the prosecutor] was not acting as an advocate seeking to strengthen her case against an indicted defendant"); *Zahrey v. City of New York,* No. 98–4546, 2009 WL 54495, at \*30–\*31 (S.D.N.Y. Jan. 7, 2009) (granting absolute immunity to A.D.A. alleged to have engaged in post-indictment effort to fabricate evidence); *KRL v. Moore,* 384 F.3d 1105 (9th Cir.2004) (granting A.D.A. absolute immunity for alleged misconduct related to his role in obtaining a post-indictment search warrant seeking evidence to corroborate pending charges); *Cousin v. Small,* 325 F.3d 627, 635 (5th Cir.2003) (granting absolute immunity to A.D.A. accused of fabricating evidence post-indictment; "at the time of [A.D.A.] Jordan's ...

conversations with Rowell, in which Jordan allegedly told Rowell to implicate Cousin falsely in the murder and coached him on how to testify, Jordan was acting as an advocate rather than as an investigator. The interview was intended to secure evidence that would be used in the presentation of the state's case at the pending trial of an already identified suspect, not to identify a suspect or establish probable cause. Jordan therefore is entitled to absolute immunity with respect to this claim."); *see also Peay v. Ajello,* 470 F.3d 65, 68 (2d Cir.2006) (affirming dismissal on absolute immunity grounds of Section 1983 claim brought against Assistant State's Attorney based on alleged conspiracy to present false evidence at trial); *Dory,* 25 F.3d at 83 ("absolute immunity protects a prosecutor from § 1983 liability for ... allegedly conspiring to present false evidence at a criminal trial").

**\*9** Because Chao is alleged to have obtained the misleading photographs post-indictment, in preparation for Moye's second trial, and in an effort to strengthen his case as the State's advocate, he is entitled to absolute immunity for this alleged misconduct.

### 3. *Misconduct at Trial*

Moye alleges that Chao elicited false testimony from Officer Jeselson at trial, that he buttressed Jeselson's false testimony through introduction of the misleading photographs, and that he then vouched for the truth of Jeselson's testimony in his summation.

A prosecutor's presentation of false evidence, or subornation of perjury at trial, is protected by absolute immunity. *Jones v. King,* No. 10 Civ. 0897(PKC), 2011 WL 4484360, at \*4 (S.D.N.Y. Sept. 28, 2011) ("The claim that [the prosecutor] 'conspir[ed] to present false evidence at a criminal trial' is barred.... The prosecutor enjoys absolute immunity 'despite allegations of his "knowing use of perjured testimony...." ' ") (citations omitted); *Bertuglia,* 2012 WL 906958, at \*23 (prosecutors are entitled to absolute immunity for allegations that they "coerced and harassed various witnesses into giving false testimony"); *Urrego v. United States,* No. 00 CV 1203(CBA), 2005 WL 1263291, at \*2 (E.D.N.Y.2005) ("It is settled law that when a prosecutor presents evidence to a grand jury and at trial he is acting as an advocate and entitled to absolute immunity on claims that the evidence presented was false."); *Johnson v. Scott,* No. CV–91–1467(CPS), 1993 WL 36131, at \*2 (E.D.N.Y. Feb. 5, 1993) (A.D.A. entitled to absolute immunity related to witness perjury, because this "concern[ed] ... the presentation of the State's case against the plaintiff"); *see Imbler,* 424 U.S. at

430–31 (granting prosecutors absolute immunity for their conduct "in presenting the State's case," including permitting a fingerprint expert to give false testimony, suppressing important evidence, and introducing a misleading artist's sketch into evidence.).

The analysis does not change because Plaintiff alleges a conspiracy to commit these acts. *Shmueli,* 424 F.3d at 237–38 ("principles [of absolute immunity] are not affected by allegations that improperly motivated prosecutions were commenced or continued pursuant to a conspiracy") (citing *Dory,* 25 F.3d at 83); *Bernard,* 356 F.3d at 503; *Hill,* 45 F.3d at 659 n. 2 (when the underlying activity at issue is covered by absolute immunity, the "plaintiff derives no benefit from alleging a conspiracy").

Plaintiff also argues that Chao acted outside his prosecutorial role when he vouched for Jeselson's testimony during summation. Because a prosecutor's summation is part of presenting the State's case, courts agree that a prosecutor's conduct during summation is protected by absolute immunity. *See Robinson v. Rome,* No. 11–CV–1411(NGG)(LB), 2011 WL 1541044, at *3 (E.D.N.Y.2011) (finding A.D.A.s immune from suit for claims related to, *inter alia,* an improper summation); *Johnson,* 1993 WL 36131, at *2 (granting absolute immunity to prosecutor where plaintiff alleged that A.D.A. "express[ed] to the jury her opinion as to the truth of the testimony of her witnesses during her summation").

**\*10** In sum, to the extent that Moye's claims against Chao are based on his conduct at trial, those claims are covered by absolute immunity.

* * * *

The Court concludes that Chao has absolute immunity for all of Moye's claims, whether based on federal or state law, and whether founded on theories of malicious prosecution, abuse of process, denial of a fair trial, fabricated evidence, conspiracy, or intentional or negligent infliction of emotional distress.

### *CONCLUSION*

Chao's motion to dismiss is GRANTED. The Clerk of the Court is directed to terminate the motion (Dkt. No. 23).

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 2569085

---

2000 WL 1335865

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

Martin JOHNSON, Plaintiff,

v.

THE CITY OF NEW YORK, Assistant District
Attorney Robert Henoch, Captain of Corrections Martin,
Corrections Officer Schmidt, Corrections Officer Brown
and Unidentified Correction Officers, Defendants.

No. 00CIV.3626(SHS).
|
Sept. 15, 2000.

OPINION AND ORDER

STEIN, D.J.

**\*1** Martin Johnson has brought this action pursuant to 42 U.S.C. § 1983 seeking monetary damages on the grounds that the defendants—the City of New York, an Assistant District Attorney, and certain Corrections Officers—violated his constitutional rights under the Fourth, Eighth and Fourteenth Amendments to the U.S. Constitution by failing to protect him from an attack by fellow inmates against whom he had arranged to testify. Johnson also asserts two tort claims. The Assistant District Attorney moves to dismiss the complaint as it pertains to him pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted and pursuant to Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction. For the following reasons, the motion is granted and the complaint is dismissed as to ADA Henoch.

BACKGROUND

The facts are taken from plaintiff's complaint and are assumed to be true for purpose of this motion. In May of 1998 Johnson was arrested for allegedly selling crack cocaine. Complaint at 4. Shortly after his arrest, he entered into a cooperation agreement with ADA Henoch to testify against several of his co-defendants. [1] *Id.* ADA Henoch allegedly "assured" plaintiff at that time that he "would protect him[ ]" from possible retaliation by his co-defendants. *Id.* Johnson claims that he was being held in Beacon, a housing area on Rikers Island, which was in "the same general area" as where the

people against whom he was to testify were held and that he alerted ADA Henoch of this fact. *Id.* ADA Henoch "explicitly assured [him] that he would be safe" and that "he would be placed in protective custody." *Id.* at 4–5. Plaintiff also alerted defendant Corrections Officers Martin, Schmidt, Brown and "Unidentified Correction Officers" to his danger. *Id.* at 5.

[1]    The complaint states that plaintiff entered into the cooperation agreement with ADA Henoch on June 18, 1999. Complaint at 4. Plaintiff's opposition, however, states the cooperation agreement was entered into in "June of 1998". Opposition at 2. In addition, plaintiff has recently sought—successfully—to amend the complaint to allege that the agreement was made in June of 1998. Accordingly, this Court will assume that plaintiff entered into the cooperation agreement with defendant in June, 1998.

On February 24, 1999, plaintiff was attacked by fellow inmates "who called him a snitch as they beat and kicked him." *Id.* As a result of the beating, Johnson suffered a fractured ankle, injuries to his head, neck and legs, and damage to his retina that required surgery. *Id.* ADA Henoch, after learning of the attack on plaintiff, "acknowledged [his] prior request for protection." *Id.*

As noted above, Johnson has filed this action against the City of New York, Correction Officers Martin, Schmidt, Brown, and ADA Henoch and the ADA has moved to dismiss the complaint on the grounds that it fails to state a constitutional claim for which relief may be granted and that he is entitled to either absolute or qualified prosecutorial immunity.

DISCUSSION

When reviewing a motion to dismiss, a court must accept as true the factual allegations of the complaint and must view the pleadings in the light most favorable to and draw all reasonable inferences in favor of the non-moving party. *See Jamison v. Dee,* 2000 WL 502871 (S.D.N.Y. April 27, 2000) (citing *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993)). Dismissal of the complaint is only proper when "it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46 (1957).

I. *Absolute Immunity*

**\*2** It is well-established that prosecutors are absolutely immune from suits for damages arising from actions which are "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman,* 424 U.S. 409, 430–31, 96 S.Ct. 984, 994–95, 47 L.Ed.2d 128 (1976); *see Buckley v. Fitzsimmons,* 509 U.S. 259, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993). Whether a prosecutor has absolute immunity "depends principally on the nature of the function performed, not on the office itself." *Ying Jing Gan v. City of New York,* 996 F.2d 522, 530 (2d Cir.1993). Such functions include the decision to bring charges against a defendant, *see Gan,* 996 F.2d at 530, presenting evidence to a grand jury, *see Barret v. United States,* 789 F.2d 565, 571–72 (2d Cir.1986), and the evaluation of evidence prior to trial. *See Kalina v. Fletcher,* 522 U.S. 118, 126, 118 S.Ct. 502, 139 L.Ed.2d 471 (1997). Absolute immunity is not available, however, when a prosecutor "undertakes conduct that is beyond the scope of his litigation-related duties." *Barbera v. Smith,* 836 F.2d 96, 99 (2d Cir.1987).

*Barbera v. Smith,* 836 F.2d 96, 100, is closely analogous to this action. In *Barbera,* the Second Circuit held that a prosecutor was not entitled to absolute immunity where he twice refused to provide a cooperating witness with police protection. *Id.* at 98. The witness had agreed to testify in return for a more lenient sentence and was murdered by a contract killer hired by the target of the prosecutor's investigation. *Id.* The Court found that "the government was still seeking evidence, including testimony from [the victim], that would enable it to prosecute ..." and that "this task [providing protection] was [not] so intimately associated with the judicial phase of the criminal process ..." as to entitle the prosecutor to absolute immunity. *Id.*

Here, as in *Barbera,* defendant's activities were not "so intimately associated with the judicial phase of the criminal process" as to entitle him to absolute immunity from suit. *See Gan,* 996 F.2d at 531 ("the claim that [the prosecutor] failed to protect [plaintiff] asserts conduct that plainly is not integral either to a decision of whether or not to institute a prosecution or to the conduct of judicial proceedings. Accordingly, if [defendant] is to be accorded immunity ... it can only be qualified immunity ."). Therefore absolute immunity is not available to the district attorney in this action.

## II. *Qualified Immunity*

In general, "the defense of qualified immunity cannot support the grant of a ... 12(b)(6) motion for failure to state a claim upon which relief can be granted." *Green v. Maraio,* 722

F.2d 1013, 1018 (2d Cir.1983). Qualified immunity is an affirmative defense that must be pleaded by the official claiming it. *See Satchell v. Dilworth,* 745 F.2d 781, 784 (2d Cir.1984) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 815, 102 S.Ct. 2727, 72 L.Ed .2d 396 (1982)). Dismissal for failure to state a claim is thus appropriate where the complaint itself presents the qualified immunity defense. *See, e.g., Green,* 722 F.2d at 1019. The United States Supreme Court has also held that "unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *See also Robison v. Via,* 821 F.2d 913, 920 (2d Cir.1987) (citing *Procunier v. Navarette,* 434 U.S. 555, 565 (1978) (prison officials entitled to dismissal of claims of violating prisoner's First and Fourteenth Amendment rights by interfering with mail where such rights had not been clearly established)). Even when viewed in the light most favorable to plaintiff and drawing all reasonable inferences in his favor, *Mills,* 12 F.3d at 1174, Johnson's allegations regarding the District Attorney do not state a violation of a clearly established constitutional right. Thus, dismissal pursuant to *Fed.R.Civ.P.* 12(b)(6) is appropriate. *See, e.g., Molinelli v. Tucker,* 901 F.2d 13, 16 (2d Cir.1990).

**\*3** Qualified immunity shields government actors performing discretionary functions from " 'liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." ' *Lennon v. Miller,* 66 F.3d 416, 420 (2nd Cir.1995) (quoting *Harlow,* 457 U.S. at 818.) To determine whether a right was clearly established at the time defendant acted, the Court must consider: "(1) whether the right in question was defined 'with reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful." *Gan,* 996 F.2d at 532 (quoting *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1992)).

The District Attorney claims that he is entitled to qualified immunity because, even if he had a constitutional duty to protect Johnson, it was not a clearly established duty. The Due Process Clause itself does not require the State to protect "the life, liberty, [or] property of its citizens against invasion by private actors." *Deshaney v. Winnebago County Dep't of Soc. Serves,* 489 U.S. 189, 195, 109 S.Ct. 998, 1002, 103 L.Ed.2d

2000 WL 1335865

249 (1989). Therefore, as a general rule, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197, 109 S.Ct. at 1004. The only judicially recognized exceptions to this rule are custodial relationships where "the State takes a person into its custody and holds him there against his will," *Id.* at 199–200, 109 S.Ct. at 1005 (the "special relationship" exception), or when the government affirmatively creates or increases the danger an individual is placed in. *See Dwares v. City of N.Y.,* 985 F.2d 94, 98–99 (2d Cir.1993) (the "state-created danger" exception).

Special relationships that have given rise to a governmental duty to protect against third-person attacks include "custodial relationships such as a prison and inmate or a mental institution and involuntarily committed patient, and the relationship between a social service agency and foster child." *Gan,* 996 F.2d at 532 (citing cases).

The Second Circuit has also recognized the state-created danger exception to *DeShaney's* general rule. *See Dwares,* 985 F.2d at 99 (police officers agreed in advance with members of a group to allow the group to assault the plaintiff, did not interfere during the beating and did not arrest those who assaulted the plaintiff); *Hemphill v. Schott,* 141 F.3d 412, 418 (2d Cir.1998) (arresting officers returned gun to robbery victim and drove him to the scene of suspect's arrest, where the victim shot the suspect); *see also Freeman v. Ferguson,* 911 F.2d 52, 54 (8th Cir.1990) (reversing dismissal on qualified immunity grounds against police chief who instructed subordinates to ignore victim's request for protection from her husband, who was the chief's friend).

**\*4** Johnson contends that the District Attorney's proffer of the cooperation agreement and assurance that he would protect plaintiff conferred upon the District Attorney a constitutional duty to protect Johnson. [2] Plaintiff claims that the prosecutor's duty to protect him was clearly established by *DeShaney* and by *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (prison officials may be held liable under Eighth Amendment for denying humane conditions of confinement only if they know that inmates face substantial risk of serious harm and disregard that risk by failing to take reasonable measures to abate it). However, neither *DeShaney* nor *Farmer* clearly establish the law regarding plaintiff's allegations. While the very action in question need not have been previously held unlawful for a constitutional right to be clearly established, *Duncan v. Kean,* 1995 WL 649931, \*3 (S.D.N.Y. Nov. 6, 1995)

(citing *Aveni v. Mottola,* 35 F.3d 680, 686 (2d Cir.1994)), it must be "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 639 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

2           Johnson does not specify whether he is claiming defendant Henoch owed a duty to protect him based on the special relationship or state-created danger exception to the *DeShaney* rule. For the purpose of this motion, both arguments will be addressed.

The Second Circuit has twice considered and rejected claims against prosecutors for failure to protect a witness from attack by a third party. *See Barbera,* 836 F.2d at 100–01; *Gan,* 996 F.2d at 533–34. In *Gan,* a panel of the Second Circuit wrote that

> "[p]laintiffs have not called to our attention any case before or since [*Barbera* ] ... in which the lodging of a complaint with law enforcement officials, or the complainant's compliance with a request to identify suspects, either singly or in combination, has been held (a) to create a relationship that gives the complaining witness a constitutional right to protection, or (b) to impose a corresponding duty on a prosecutor."

*Id.* at 533–34.

Here, as in *Gan,* plaintiff points to no case, and the Court is aware of none, where it has been held that a prosecutor's alleged promise to protect an inmate who agrees to testify creates a special relationship that gives rise to a constitutional right to protection from a third party. Nor is the Court aware of any decision which has held that the mere proffer of a cooperation agreement by a prosecutor so increases the danger to an inmate that it creates a constitutional duty for the prosecutor to protect the inmate from potential attacks by third persons. A *prison official's* willful failure to protect an inmate from another inmate's violent actions violates the Constitution if the officer was "deliberate[ly] indifferen[t] to the consequences of his conduct for those under his control

2000 WL 1335865

and dependent upon him," *Morales v. New York State Dep't of Corrections,* 842 F.2d 27, 30 (2d Cir.1988). However, no corresponding duty has been found to exist between an inmate and prosecutor.

Based on the limited caselaw in existence at the time of the alleged attack, and particularly because of the absence of any caselaw which holds that any state actor other than a prison official owes a duty to protect an inmate from another inmate's violent actions, it cannot be said that it was clearly established that defendant ADA Henoch had created or assumed a special relationship with Johnson imbuing him with a constitutional duty to protect him. Therefore, this Court "need not decide whether [it] would hold that these circumstances create such a right and corresponding duty, for in the absence of any such holdings and in the face of the general rule articulated in *DeShaney,* it could not have been clear to a reasonable prosecutor that his failure to provide protection ... would have violated [plaintiff's] rights under the Constitution." *Gan,* 996 F.2d at 534. Defendant Henoch is therefore entitled to qualified immunity.

### III. *The Pendent State Claims*

**\*5** The ADA's motion to dismiss plaintiff's pendent state law claims is likewise granted. The Court declines to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c)(3). Accordingly, the state law claims against ADA Henoch are dismissed without prejudice. *See United Mine Workers of America v. Gibbs,* 338 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Carnegie–Mellon University v. Cohill,* 484 U.S. 343, 350 n. 7, 98 L.Ed.2d 720 (1988); *Mayer v. Oil Field Systems Corp.,* 803 F.2d 749, 757 (2d Cir.1986).

### IV. *CONCLUSION*

For the reasons set forth above, the prosecutor's motion to dismiss is granted and the complaint is dismissed as against the assistant district attorney.

SO ORDERED:

**All Citations**

Not Reported in F.Supp.2d, 2000 WL 1335865

---

**End of Document**
© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 351 of 370

London v. Nassau County District Attorney's Office, Not Reported in Fed. Supp. (2020)

2020 WL 7699644

2020 WL 7699644
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Lennox LONDON, Plaintiff,

v.

NASSAU COUNTY DISTRICT ATTORNEY'S
OFFICE; A.D.A. Michelle Burke; D.A. Madeline
Singas; A.D.A. Nicole Aloise; First Precinct P.O.
Andrew Miranda, Shield #0498; Supervisor Lt. Kevin C.
Driscoll, #7447; First Squad Detectives: 1st Precinct Det.
Matthew Andoos, Det. Throo, Det. Michael Foranoce,
Det. Mazzie; Governor Andrew M. Cuomo; Nassau
County District Court; Hon. Judge Terence P. Murphy;
Hon. Judge Meryl J. Berkowitz; Legal Aid Society of
Nassau Couny, N.Y.; and Nancy Garber, Defendants.
Lennox London, Plaintiff,

v.

Nassau County District Attorney's Office; A.D.A.
Michelle Burke; D.A. Madeline Singas; A.D.A. Nicole
Aloise; First Precinct P.O. Andrew Miranda, Shield
#0498; Supervisor Lt. Kevin C. Driscoll, #7447;
First Squad Detectives: 1st Precinct Det. Matthew
Andoos, Det. Throo, Det. Michael Foranoce, Det.
Mazzie; Governor Andrew M. Cuomo; Nassau County
District Court; Hon. Judge Terence P. Murphy; Hon.
Judge Meryl J. Berkowitz; Legal Aid Society of
Nassau Couny, N.Y.; and Nancy Garber, Defendants.
Lennox London, Plaintiff,

v.

Nassau County District Attorney's Office; A.D.A.
Michelle Burke; D.A. Madeline Singas; A.D.A. Nicole
Aloise; First Precinct P.O. Andrew Miranda, Shield
#0498; Supervisor Lt. Kevin C. Driscoll, #7447;
First Squad Detectives: 1st Precinct Det. Matthew
Andoos, Det. Throo, Det. Michael Foranoce, Det.
Mazzie; Governor Andrew M. Cuomo; Nassau County
District Court; Hon. Judge Terence P. Murphy; Hon.
Judge Meryl J. Berkowitz; Legal Aid Society of
Nassau Couny, N.Y.; and Nancy Garber, Defendants.

20-CV-3988(JS)(AKT), 20-CV-3989(JS)
(AKT), 20-CV-3990(JS)(AKT)
|

Signed 12/28/2020

Attorneys and Law Firms

For Plaintiff: Lennox London, pro se, 20-A-1857, Downstate
Correctional Facility, 121 Red Schoolhouse Road, P.O. Box
F, Fishkill, New York 12524.

For Defendants: No appearances.

MEMORANDUM & ORDER

SEYBERT, District Judge:

**\*1** Before the Court are three civil rights Complaints filed
by incarcerated pro se plaintiff Lennox London ("Plaintiff")
pursuant to 42 U.S.C. § 1983 ("Section 1983"), together
with an application to proceed in forma pauperis for
each Complaint. For the reasons that follow, Plaintiff's
applications to proceed in forma pauperis are GRANTED
and the Complaints are CONSOLIDATED into the first filed
case, Case Number 20-CV-3988(JS)(AKT). The Complaints
assigned Case Numbers 20-CV-3989(JS)(AKT) and 20-
CV-3990(JS)(AKT) shall be CLOSED. All future filings
shall be made in Case Number 20-3988(JS)(AKT) only. In
addition, Plaintiff's Section 1983 claims are DISMISSED, as
set forth below, pursuant to 28 U.S.C. §§ 1915, 1915A.

PROCEDURAL BACKGROUND

In August 2020, Plaintiff filed three substantially similar
Complaints against the same Defendants. On August 21,
2020, Plaintiff filed two Section 1983 Complaints in this
Court against: the Nassau County District Attorney's Office,
A.D.A. Michelle Burke ("ADA Burke"), D.A. Madeline
Singas ("DA Singas"), A.D.A. Nicole Aloise ("ADA
Aloise"), First Precinct P.O. Andrew Miranda, Shield #0498
("PO Miranda"); Supervisor Lt. Kevin C. Driscoll, #7447
("Lt. Driscoll"); the following First Squad Detectives: 1st
Precinct Det. Matthew Andoos ("Det. Andoos"), Det. Throo
("Det. Throo"), Det. Michael Foranoce ("Det. Foranoce"),
Det. Mazzie ("Det. Mazzie"); Governor Andrew M. Cuomo
("Gov. Cuomo"), Nassau County District Court ("NC District
Court"), Hon. Judge Terence P. Murphy ("Judge Murphy"),
Hon. Judge Meryl J. Berkowitz ("Judge Berkowitz"), Legal
Aid Society Of Nassau County, N.Y. ("Legal Aid"), and
Nancy Garber ("Garber"; collectively, the "Defendants").
The Complaint assigned docket number 20-CV-3988 was

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 352 of 370

London v. Nassau County District Attorney's Office, Not Reported in Fed. Supp. (2020)

2020 WL 7699644

accompanied by an application to proceed in forma pauperis, but did not include the required Prisoner Litigation Authorization form ("PLRA"). (See 20-CV-3988, IFP Mot., D.E. 2.) Accordingly, by Notices of Deficiency dated August 26, 2020 and August 27, 2020, Plaintiff was instructed to complete and return the enclosed PLRA forms, which he did on September 3, 2020 and September 8, 2020. (PLRA, D.E. 8-9.)

The other August 21, 2020 Complaint was assigned Case Number 20-CV-3990 and, because Plaintiff had not paid the fee or filed an application to proceed in forma pauperis, by Notice of Deficiency dated August 27, 2020, Plaintiff was instructed to either remit the filing fee or file the enclosed application to proceed in forma pauperis and PLRA in order for his case to proceed. (D.E. 4.) On September 3, 2020, Plaintiff timely filed the PLRA (D.E. 6), and, on September 8, 2020, he filed an application to proceed in forma pauperis and another PLRA. (D.E. 7-8.)

On August 24, 2020, Plaintiff filed another Complaint, assigned Case Number 20-CV-3989, against the same Defendants. Because Plaintiff had not paid the fee or filed an application to proceed in forma pauperis, by Notice of Deficiency dated August 27, 2020, Plaintiff was instructed to either remit the filing fee or file the enclosed application to proceed in forma pauperis and PLRA in order for his case to proceed. (D.E. 4.) On September 8, 2020, Plaintiff timely filed an application to proceed in forma pauperis and PLRA. (D.E. 7-8.)

## THE COMPLAINTS [1]

[1] Excerpts from the Complaints are reproduced here exactly as they appear in the originals. Errors in spelling, punctuation, and grammar have not been corrected or noted.

**\*2** Each Complaint names the same Defendants and contains the same allegations and claims. Plaintiff challenges his on-going state court criminal prosecution and seeks, among other things, the dismissal of the indictment and his release from incarceration. According to Plaintiff, he had an on-going dispute with his neighbor and, on August 27, 2019, he argued with his neighbor about tree branches Plaintiff claims were thrown on his lawn. (Compls. at 4.) [2] Plaintiff alleges that his neighbor "shot at me before because he hates me, he said he never like me, so I shot to the ground to scare him

away." (Compls. at 4.) As a result, Plaintiff was arrested and charged with attempted murder in the second degree and criminal possession of a weapon in the second degree. (Compls. at 9.)

[2] When citing to the Complaints, the Court refers to the page numbers generated by the Court's Electronic Case Filing system (ECF).

Plaintiff complains that he was "overcharged by the ADA Michelle Burke and P.O. Andrew R. Miranda when I should not be charged with, my correct charges was attempted assault." (Compls. at 9.) According to Plaintiff, because no one was injured and, due to his mental illness, [3] the charges are improper. (Compls. at 4, 7, 9.)

[3] Plaintiff alleges that he suffers from mental illness, having been diagnosed with bi-polar disorder, schizophrenia, psychosis, depression, and anxiety. (Compls. at 7.)

Plaintiff also complains that he was pressured by PO Miranda, Lt. Driscoll, Det. Andoos, Det. Mazzie, Det. Foranoce, and Det. Throo to give a statement even though he asked for a lawyer. Plaintiff claims that the officers did not "read me my rights." (Compls. at 9-10.) However, after "a few hours in the Interrogation Arrest Room," Plaintiff "told them what happened after being pressured, scared, tired, [and] drained" and "then they read me my rights." (Compls. at 10.) Plaintiff alleges that PO Miranda "lied on the Grand Jury stand when the ADA Michelle Burke asked him if he read me my rights before questioning me and said yes." (Compls. at 10.)

Next, Plaintiff challenges the amount set as bail during his arraignments. According to Plaintiff, he was first arraigned on August 28, 2019, with bail being set at $250,000. (Compls. at 11.) Plaintiff alleges that he had a "2nd arraignment ... on September 24, 2019" where he was indicted on an additional fifteen counts and Judge Berkowitz set bail at either one-million dollars bond or half-a-million dollars cash. (Compls. at 11.) Plaintiff claims this bail is excessive and that his attorney, Garber, never told him about the second grand jury and waived his "right to testify without me knowing." (Compls. at 11.) According to Plaintiff, "I have a right to appear before a grand jury as a witness on my own behalf." (Compls. at 11.) Plaintiff also claims that ADA Burke failed to turn over unspecified exculpatory evidence. (Compls. at 13.)

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 353 of 370

London v. Nassau County District Attorney's Office, Not Reported in Fed. Supp. (2020)

2020 WL 7699644

Plaintiff also complains that his right to a speedy trial is being denied as a result of Governor Cuomo's suspension of "CPL 30.30, 240 the Speedy Trial Rights and the Automatic Disclosure file. I have rights that cannot be infringed upon and when Gov. Cuomo suspended Criminal Procedure Law he violated Due Process Law – the 14 th Amendment." (Compls. at 14-15.) According to Plaintiff, "[t]he COVID-19 Pandemic is not an exceptional circumstance to be used to justify suspending criminal procedure law." (Compls. at 21-22.)

Finally, Plaintiff complains that he is "vulnerable to the attack of the Coronavirus" because he is pre-diabetic and has underlying medical conditions, including tuberculosis, a weak immune system, and "breathing problems." (Compls. at 4, 8, 22-23.) However, ADA Aloise opposed his application for compassionate release, and it was denied by Judge Murphy. (Compls. at 23-24.) Plaintiff challenges that ruling, claiming that Judge Murphy and ADA Aloise "put themselves in the place of medical physicians putting plaintiff's life at risk by knowingly making a decision that was against top medical physicians that instructed the DOC and Jails to release underlined detainees with the illnesses that was vulnerable to the disease." (Compls. at 23.)

**\*3** For relief, Plaintiff seeks to have the indictments dismissed with prejudice and to be released from incarceration. Plaintiff also seeks to recover a damages award in the total sum of three-and-a-half-million dollars. (Compls. at 5, 29-30.)

DISCUSSION

I. In Forma Pauperis Applications

Upon review of Plaintiff's declarations in support of his applications to proceed in forma pauperis, the Court finds that Plaintiff is qualified by his financial status to commence this action without prepayment of the filing fees. See 28 U.S.C. § 1915(a)(1). Therefore, Plaintiff's requests to proceed in forma pauperis are GRANTED.

II. Consolidation

Under Federal Rule of Civil Procedure 42, "[i]f actions before the court involve a common question of law or fact, the court may: (1) join for hearing or trial any or all matters at issue in the actions; (2) consolidate the actions; or (3) issue any other orders to avoid unnecessary cost or delay." FED. R. CIV. P. 42(a). "The trial court has broad discretion to determine

whether consolidation is appropriate." Johnson v. Celotex Corp., 899 F.2d 1281, 1284-85 (2d Cir. 1990). Consolidation of cases with common questions of law or fact is favored "to avoid unnecessary costs or delay," Johnson, 899 F.2d at 1284, and to "expedite trial and eliminate unnecessary repetition and confusion," Devlin v. Transp. Commc'n Int'l Union, 175 F.3d 121, 130 (internal citations omitted).

"The Second Circuit has long adhered to the first-filed doctrine in deciding which case to dismiss where there are competing litigations. Where there are several competing lawsuits, the first suit should have priority, absent the showing of balance of convenience or special circumstances giving priority to the second." Kellen Co., Inc. v. Calphalon Corp., 54 F. Supp. 2d 218, 221 (S.D.N.Y. 1999) (internal quotation marks, alterations, and citations omitted); accord Adam v. Jacobs, 950 F.2d 89, 92 (2d Cir. 1991); First City Nat'l Bank & Trust Co. v. Simmons, 878 F.2d 76, 79 (2d Cir. 1989). The first-filed rule seeks to conserve judicial resources and avoid duplicative litigation. See Jacobs, 950 F.2d at 92; First City Nat'l Bank & Trust Co., 878 F.2d at 80; Kellen, 54 F. Supp. 2d at 221.

Here, Plaintiff's Complaints are largely repetitive and are nearly identical. Certainly, the Complaints involve common issues of law and fact. Accordingly, in the sound exercise of its discretion, the Court orders that Plaintiff's cases be CONSOLIDATED pursuant to Federal Rule of Civil Procedure 42 into the first filed case, Case Number 20-CV-3988(JS)(AKT). The Clerk of Court is DIRECTED to: (1) consolidate these actions; and (2) mark CLOSED cases assigned Case Numbers 20-CV-3989(JS)(AKT) and 20-CV-3990(JS)(AKT). Any future filings are to be docketed in **Case Number 20-CV-3988 only**.

III. Application of 28 U.S.C. § 1915

Section 1915 of Title 28 requires a district court to dismiss an in forma pauperis complaint if the action is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief. See 28 U.S.C. §§ 1915(e)(2) (B)(i)-(iii), 1915A(b). An action is frivolous as a matter of law when, inter alia, it is based on an "indisputably meritless legal theory" or when it "lacks an arguable basis in law ..., or [when] a dispositive defense clearly exists on the face of the complaint." Livingston v. Adirondack Beverage Co., 141 F.3d 434, 437 (2d Cir. 1998). The Court is required to dismiss the action as soon as it makes such a determination. See 28 U.S.C. § 1915A.

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 354 of 370

London v. Nassau County District Attorney's Office, Not Reported in Fed. Supp. (2020)

2020 WL 7699644

**\*4** Courts are obliged to construe the pleadings of a pro se plaintiff liberally. See Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008); McEachin v. McGuinnis, 357 F.3d 197, 200 (2d Cir. 2004). However, a complaint must plead sufficient facts to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (citations omitted). The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." Id. at 678; accord Wilson v. Merrill Lynch & Co., 671 F.3d 120, 128 (2d Cir. 2011). While " 'detailed factual allegations' " are not required, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555). With these standards in mind, the Court considers Plaintiff's claims below.

A. Claims Challenging the Charges in the Indictments
Plaintiff complains that the charges against him are improper. Although Plaintiff admits to firing a gun during an argument with his neighbor, he claims that the attempted murder charge and criminal possession of a weapon charge are excessive. Rather, Plaintiff believes that attempted assault would be the "correct charge." (Compls. at 9.) Such claims are frivolous.

The decision whether to charge, and what to charge, are solely within the discretion of the prosecution. See Barnett v. City of Yonkers, No. 15-CV-4013, 2020 WL 2539005, at \*5 (S.D.N.Y. May 19, 2020) (role of prosecutor includes " 'evaluating and organizing evidence for presentation at trial or to a grand jury, or determining which offenses are to be charged' ")(citing Hill v. City of N.Y., 45 F.3d 653, 661 (2d Cir. 1995)); see also United States v. Avenatti, 433 F. Supp. 3d 552, 561 (S.D.N.Y. 2020) (" '[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his [or her] discretion.' ") (quoting Bordenkircher v. Hayes, 434 U.S. 357, 364, 98 S. Ct. 663, 54 L. Ed. 2d 604 (1978)). Thus, Plaintiff's claims challenging the charges in the indictments are implausible and are DISMISSED WITH PREJUDICE pursuant to 28 U.S.C. §§ 1915(e)(2)(B), 1915A.

B. Claims Challenging the Amount Set as Bail
Plaintiff also challenges the amount set as bail during his arraignments. According to Plaintiff, he was first arraigned on August 28, 2019 and bail was set at $250,000. (Compls. at 11.) Plaintiff alleges that he had a "2nd arraignment ... on September 24, 2019" where he was indicted on an additional fifteen counts and bail was set at one million dollars bond or $500,000 cash. (Compls. at 11.) Plaintiff claims the bail set is excessive.

When bail is granted, the Eighth Amendment requires that it may not "impose restraints that are more than necessary to achieve the government's interest[,] ... [in] preventing risk of flight and danger to society or children." United States v. Polouizzi, 697 F. Supp. 2d 381, 390 (E.D.N.Y. 2010) (citing United States v. Salerno, 481 U.S. 739, 754 (1987)). "The Supreme Court has held that the term 'excessive' means 'grossly disproportional to the gravity of a defendant's offense.' " Barton v. New York, No. 17-CV-5326, 2018 WL 262836, at \*2 (E.D.N.Y. Jan. 2, 2018) (quoting United States v. Bajakajian, 524 U.S. 321, 334, 118 S. Ct. 2028, 2036 (1998)).

Here, Plaintiff claims that his bail was excessive because the charges against him were "legally insufficient." (Compls. at 11.) According to Plaintiff, the "evidence was insufficient, illegal, no proof of attempted murder." (Compls. at 11.) Plaintiff also alleges that the bail set at his second arraignment on September 24, 2019 was excessive because it was higher than the new Bail Reform Law that "took effect on Jan. 1st 2020. My bail should not be that high by the new Bail Reform Law." (Compls. at 12.) Although Plaintiff alleges that he was indicted on an additional fifteen counts, he does not include any additional information concerning those charges. (Compls. at 12.)

**\*5** Further, Plaintiff fails to allege facts supporting his conclusion that his bail was excessive. Rather, Plaintiff admits that he fired a gun during the argument with his neighbor "to scare him" which led to Plaintiff's arrest and indictment. (Compls. at 4.) Because Plaintiff has not alleged any facts tending to show that his bail was disproportional to the gravity of the offenses with which he was charged, he has failed to plead "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570; Iqbal, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). Moreover, Plaintiff's excessive bail claims are also

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 355 of 370

London v. Nassau County District Attorney's Office, Not Reported in Fed. Supp. (2020)

2020 WL 7699644

barred by absolute judicial immunity because the setting of bail is a judicial function that is entitled to absolute immunity. Franklin v. Warren Cty. D.A.'s Office, No. 08-CV-0801, 2009 WL 161314, at *5 (N.D.N.Y. Jan. 21, 2009) (absolute judicial immunity barred excessive bail claim against judge) (citing Young v. Selsky, 41 F.3d 47, 51 (2d Cir. 1994) (reciting that "[j]udges enjoy absolute immunity from personal liability for acts committed within their judicial jurisdiction")); see infra at 21-22. Therefore, Plaintiff's excessive bail claims are DISMISSED WITH PREJUDICE pursuant to 28 U.S.C. §§ 1915(e)(2)(B), 1915A.

C. Claims Challenging the Grand Jury Proceedings

Plaintiff also complains that his attorney, Garber, never told him about the second grand jury and waived his "right to testify without me knowing." (Compls. at 11.) According to Plaintiff, "I have a right to appear before a grand jury as a witness on my own behalf." (Compls. at 11.) This claim is a nonstarter. It is well-established that a plaintiff has no federal constitutional right to either attend or testify before a grand jury. United States v. Mandujano, 425 U.S. 564, 571-72, 96 S. Ct. 1768, 1774 (1976); Franklin v. Warren Cty. D.A.'s Office, No. 08-CV-801, 2009 WL 161314, at *2, *5 (N.D.N.Y. Jan. 21, 2009) ("[T]here is no federal constitutional right to testify before a grand jury, nor, for that matter, is there even a federal right to a grand jury in state criminal proceedings."); see also Barton, 2018 WL 262836, at 3.[4] While Plaintiff has a constitutional right as a defendant in a criminal proceeding to be present and testify at his criminal trial, he does not have a constitutional or federal right to be present or to testify at grand jury proceedings. Thus, Plaintiff has failed to state a claim under Section 1983 regarding his non-appearance before the grand jury because he has not alleged the violation of a constitutional or federal right. Moreover, to the extent he seeks to impose Section 1983 liability on Garber, such claim is implausible because she is not a state actor. See infra at 24-25. Accordingly, these claims are not plausible and, thus, DISMISSED WITH PREJUDICE pursuant to 28 U.S.C. § 1915(e)(2)(B), 1915A.

[4]    Under New York State law, a defendant has a right to testify before the grand jury as a witness on his own behalf if he has provided written notice of his request to the district attorney, see N.Y. Crim. Proc. Law § 190.50(5)(a) ("When a criminal charge against a person is being or is about to be or has been submitted to a grand jury, such person has a right to appear before such grand

jury as a witness in his own behalf if, prior to the filing of any indictment or any direction to file a prosecutor's information in the matter, he serves upon the district attorney of the county a written notice making such request and stating an address to which communications may be sent."). Here, Plaintiff brings his claims under Section 1983 and provides no facts that would give rise to a plausible state law claim even affording the pro se Complaints a liberal construction.

D. Claims Challenging the Interrogation

Plaintiff alleges that he was coerced by PO Miranda, Lt. Driscoll, Det. Andoos, Det. Throo, Det. Foranoce, and Det. Mazzie to give a statement without being read his Miranda Rights as required by Miranda v. Arizona, 384 U.S. 436, 467, 86 S. Ct. 1602 (1966). Plaintiff also claims that he was interrogated after he asked for a lawyer. (Compls. at 9-10.) These Section 1983 claims are implausible. See, e.g., Blond v. City of Schenectady, No. 10–CV–0598, 2010 WL 4316810, at *4 (N.D.N.Y. Oct. 26, 2010) ("A Section 1983 claim cannot stand solely on the basis of an alleged failure to administer Miranda warnings.").

*6    Insofar as Plaintiff alleges that he was not provided Miranda warnings before his interrogation,

> [t]his claim must be dismissed because the Second Circuit Court of Appeals has held that an alleged failure to provide Miranda warnings, standing alone, does not form the basis for liability under 42 U.S.C. § 1983. In reaching this conclusion, the Second Circuit reasoned that Miranda is a procedural safeguard as opposed to a right expressly set forth in the Fifth Amendment and that the remedy for a violation of Miranda is suppression of any un-Mirandized statements.

Johnson v. Bayerl, No. 04-CV-0370S, 2004 WL 2270804, at *2 (W.D.N.Y. Oct. 3, 2004) (citing Neighbour v. Covert, 68 F.3d 1508, 1510–11 (2d Cir. 1995) (citations omitted)); see also Chavez v. Martinez, 538 U.S. 760, 767, 123 S. Ct. 1994, 2001 (2003) (plurality opinion) ("The privilege against self-incrimination guaranteed by the

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 356 of 370
London v. Nassau County District Attorney's Office, Not Reported in Fed. Supp. (2020)
2020 WL 7699644

Fifth Amendment is a fundamental trial right of criminal defendants ... a constitutional violation occurs only at trial.") (internal quotation marks and citation omitted). Similarly, the questioning of Plaintiff after he allegedly requested counsel does not give rise to a plausible Section 1983 claim. Because Plaintiff is awaiting trial, "the remedy for a violation of the right against self-incrimination is 'the exclusion from evidence of any ensuing self-incriminating statements' and 'not a § 1983 action.' " Deshawn E. by Charlotte E. v. Safir, 156 F.3d 340, 346 (2d Cir. 1998) (quoting Neighbour v. Covert, 68 F.3d 1508, 1510–11 (2d Cir. 1995)). Accordingly, Plaintiff's Section 1983 claims challenging his interrogation are not plausible, see Faccio v. Eggleston, No. 10-CV-699, 2011 WL 3666588, at *5–6 (N.D.N.Y. Aug. 22, 2011), and are DISMISSED pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(i)-(ii), 1915A(b).

E. Claims Challenging the Suspension of the Speedy Trial Act

Plaintiff also complains that his right to a speedy trial is being denied as a result of Governor Cuomo's suspension of "CPL 30.30, 240 the Speedy Trial Rights and the Automatic Disclosure file. I have rights that cannot be infringed upon and when Gov. Cuomo suspended Criminal Procedure Law he violated Due Process Law – the 14th Amendment." (Compls. at 14-15.) As already noted, according to Plaintiff, "[t]he COVID-19 Pandemic is not an exceptional circumstance to be used to justify suspending criminal procedure law." (Compls. at 21-22.) This claim is implausible. "Although CPL § 30.30 is entitled a 'speedy trial' statute, the history of its adoption makes evident that it addresses only the problem of prosecutorial readiness, and is not a speedy trial statute in the constitutional sense." People v. Haneigh, 745 N.Y.S.2d 405, 408 (Sup. Ct. Kings Cty. 2002). Moreover, Plaintiff's claims seeking damages against Governor Cuomo fail for the additional reason that "[a] Section 1983 claim for damages against Governor Cuomo in his official capacity is barred by the Eleventh Amendment." Randolph v. Cuomo, No. 20-CV-4719, 2020 WL 6393015, at *4 (E.D.N.Y. Nov. 2, 2020) (citing Ford v. Reynolds, 316 F.3d 351, 354 (2d Cir. 2003) (the Eleventh Amendment "bars the award of money damages against state officials in their official capacities")). Accordingly, these claims are implausible and, therefore, DISMISSED pursuant to 28 U.S.C. §§ 1915(e)(2)(B), 1915A.

IV. Immunity

*7 Even if Plaintiff had alleged a viable claim against the state Defendants, Eleventh Amendment immunity bars Plaintiff's claims for damages against the State of New York and the individual state Defendants in their official capacities. See Will v. Mich. Dep't of State Police, 491 U.S. 58, 71, 109 S. Ct. 2304, 2312 (1989) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." (internal citation and citations omitted)). Similarly, Plaintiff's claims against the prosecutors and the judges are barred by absolute prosecutorial immunity and judicial immunity, respectively. Mireles v. Waco, 502 U.S. 9, 11-12, 112 S. Ct. 286, 288 (1991); see also Thomas v. Ramos, No. 20-CV-3422, 2020 WL 2192716, at *3 (S.D.N.Y. May 5, 2020). "[D]istrict courts are encouraged to determine the availability of an absolute immunity defense at the earliest appropriate stage, and preferably before discovery ... because an absolute immunity defeats a suit at the outset, so long as the official's actions were within the scope of the immunity." Deronette v. City of N.Y., No. 05-CV-5275, 2007 WL 951925, at *4 (E.D.N.Y. Mar. 27, 2007) (citations, alterations, and quotation marks omitted).

A. Sovereign Immunity

The Eleventh Amendment to the United States Constitution provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. As a result, a State is immune from suits in federal court brought by its own citizens. Soloviev v. Goldstein, 104 F. Supp. 3d 232, 243 (E.D.N.Y. 2015) (citations omitted). This immunity extends to "officers acting on behalf of the State" and "to state agencies as well." Soloviev, 104 F. Supp. 3d at 243 (citing Winokur v. Office of Court Admin., 190 F. Supp. 2d 444, 448 (E.D.N.Y. 2002); Emmons v. City Univ. of N.Y., 715 F. Supp. 2d 394, 406 (E.D.N.Y. 2010)). As such, Eleventh Amendment immunity requires dismissal of all of Plaintiff's Section 1983 claims seeking damages against the Nassau County District Attorney's Office, the Nassau County District Court, Governor Cuomo, DA Singas, ADA Burke, ADA Aloise, Judge Murphy, and Judge Berkowitz. Accordingly, Plaintiff's Section 1983 claims seeking damages against these Defendants are DISMISSED WITH PREJUDICE pursuant to 28 U.S.C. §§ 1915(e)(2)(B), 1915A.[5]

5       Although the Eleventh Amendment does not bar claims against the State seeking prospective

London v. Nassau County District Attorney's Office, Not Reported in Fed. Supp. (2020)

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 357 of 370

2020 WL 7699644

injunctive relief, see Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 73, 116 S. Ct. 1114 (1996), Plaintiff has not alleged a plausible claim seeking prospective injunctive relief for reasons set forth herein.

### B. Judicial Immunity

It is well-settled that "officials acting in a judicial capacity are entitled to absolute immunity against § 1983 actions, and this immunity acts as a complete shield to claims for money damages." Montero v. Travis, 171 F.3d 757, 760 (2d Cir. 1999); see also Mireles, 502 U.S. at 9-10 (1991) (citations omitted) ("[G]enerally, a judge is immune from a suit for money damages. Although unfairness and injustice to a litigant may result on occasion, 'it is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself.' "). This immunity applies to state court judges who are sued in federal court pursuant to 42 U.S.C. § 1983. See Pizzolato v. Baer, 551 F. Supp. 355, 356 (S.D.N.Y. 1982). "A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the clear absence of all jurisdiction." Stump v. Sparkman, 435 U.S. 349, 357 (1978).

**\*8** Here, Plaintiff's allegations regarding Judge Murphy and Judge Berkowitz relate to actions each took as a judge while presiding over Plaintiff's criminal proceedings that occurred in state court. (See generally Compls.) As a result, the claims against Judge Murphy and Judge Berkowitz are barred by absolute judicial immunity and are DISMISSED pursuant to 28 U.S.C. §§ 1915(e)(2), 1915A. See Mills v. Fischer, 645 F.3d 176, 177 (2d Cir. 2011) ("Any claim dismissed on the ground of absolute judicial immunity is 'frivolous' for purposes of [the IFP statute].").

### C. Prosecutorial Immunity

Plaintiff's Section 1983 claims against DA Singas, ADA Burke and ADA Aloise seeking money damages are barred by absolute prosecutorial immunity. It is well-established that prosecutors are entitled to absolute immunity from liability in suits seeking monetary damages for acts related to prosecutorial duties. See Burns v. Reed, 500 U.S. 478, 486, 111 S. Ct. 1934 (1991) ("[P]rosecutors are absolutely immune from liability under § 1983 for their conduct

in initiating a prosecution and in presenting the State's case...." (internal quotation marks and citation omitted)); Ogunkoya v. Monaghan, 913 F.3d 64, 67 (2d Cir. 2019) ("Absolute immunity protects a prosecutor not only from liability but also from suit.") (citation and quotation marks omitted). "Prosecutorial immunity from § 1983 liability is broadly defined, covering virtually all acts, regardless of motivation, associated with the prosecutor's function as an advocate." Kroemer v. Tantillo, 758 F. App'x 84, 86–87 (2d Cir. 2018). Here, the challenged conduct of DA Singas, ADA Burke, and ADA Aloise, i.e., preparing and presenting an indictment to the Grand Jury, unquestionably falls within the scope of their prosecutorial duties. See Ogunkoya, 913 F.3d at 71 ("The decision to initiate prosecution, what charges to bring, and how to perfect and consolidate those charges is a quintessential prosecutorial function.") (citing Imbler v. Pachtman, 424 U.S. 409, 431, 96 S. Ct. 984, 47 L. Ed. 2d 128 (1976)); see also Shmueli v. City of N.Y., 424 F.3d 231, 237 (2d Cir. 2005). Accordingly, DA Singas, ADA Burke, and ADA Aloise are entitled to absolute immunity with respect to Plaintiff's claims seeking monetary damages under Section 1983, and these claims are thus DISMISSED pursuant to 28 U.S.C. §§ 1915(e)(2)(B), 1915A(b).

### D. Claims Against Garber and Legal Aid

Generally, attorneys, whether with the Legal Aid Society, court-appointed or privately retained, are not state actors for purposes of § 1983. See Vermont v. Brillon, 556 U.S. 81, 129 S. Ct. 1283, 1291 (2009) (holding that "assigned counsel ordinarily is not considered a state actor"); Polk County v. Dodson, 454 U.S. 312, 325, 102 S. Ct. 445 (1981) ("[A] public defender does not act under color of state law when performing a lawyer's traditional functions as counsel to a defendant in a criminal proceeding.").

Because Garber and the Legal Aid Society of Nassau County are not state actors, and Plaintiff seeks to challenge the traditional functions of counsel to a defendant in a criminal proceeding, these Section 1983 claims are not plausible. See, e.g., Kirkland v. N.Y.S. Div. of Parole, No. 20-CV-8606, 2020 WL 6729119, at \*3 (S.D.N.Y. Nov. 13, 2020) (sua sponte dismissing Section 1983 claims against Legal Aid attorney). Accordingly, Plaintiff's claims against Garber and the Legal Aid Society are DISMISSED for failure to state a claim pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

### V. Abstention

2020 WL 7699644

**\*9** Apart from the deficiencies in Plaintiff's claims as set forth above, pursuant to Younger and its progeny, the Court must abstain from adjudicating his remaining claims seeking injunctive relief. [6] In Younger v. Harris, the Supreme Court concluded that although federal courts have the power to enjoin state criminal proceedings "when absolutely necessary for protection of constitutional rights ... this may not be done, except under extraordinary circumstances, where the danger of irreparable loss is both great and immediate." 401 U.S. 37, 45, 91 S. Ct. 746 (1971). In Sprint Communications, Inc. v. Jacobs, 571 U.S. 69, 134 S. Ct. 584 (2013), the Supreme Court clarified that Younger abstention is required in one of three types of state court proceedings:

> First, Younger preclude[s] federal intrusion into ongoing state criminal prosecutions. Second, certain civil enforcement proceedings warrant[ ] abstention. Finally, federal courts [must] refrain[ ] from interfering with pending civil proceedings involving certain orders uniquely in furtherance of the state courts' ability to perform their judicial functions.

571 U.S. 69, 78, 134 S. Ct. 584 (2013) (internal quotation marks and citations omitted); see also Lowell v. Vermont Dep't of Children & Families, No. 19-CV-3987, 2020 WL 7038598, at \*1 (2d Cir. Dec. 1, 2020) (affirming district court's application of Younger abstention).

[6] Plaintiff seeks the dismissal of the indictments and his release from incarceration in this Section 1983 civil rights case. (See generally Compls.) However, the Supreme Court has established that habeas relief is the exclusive remedy in federal court for a state prisoner seeking a release from custody. See Preiser v. Rodriguez, 411 U.S. 475, 500, 93 S. Ct. 1827, 1841 (1973) (holding that when a prisoner is challenging "the very fact or duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to immediate release or a speedier release from that imprisonment, his sole federal remedy is a writ of habeas corpus.")

Here, insofar as Plaintiff seeks to have this Court intervene in the on-going state court criminal proceedings against him, this Court must abstain. Dismissing the indictments and releasing Plaintiff from incarceration as sought by Plaintiff would surely constitute "federal intrusion into ongoing state criminal proceedings." Sprint Commc'ns, 571 U.S. at 70. Moreover, Plaintiff fails to allege any facts that would bring his case within any exception to the general requirement that the federal court abstain from intervening in, or enjoining, pending state court proceedings. Accordingly, the Court ABSTAINS from adjudicating Plaintiff's constitutional claims seeking injunctive relief regarding his pending criminal case.

<u>CONCLUSION</u>

For the reasons set forth above, Plaintiff's applications to proceed in forma pauperis are GRANTED, and the Complaints are CONSOLIDATED into the first filed case, Case Number 20-CV-3988(JS)(AKT). The Clerk of Court is DIRECTED to: (1) consolidate these actions; and (2) mark CLOSED the cases assigned Case Numbers 20-CV-3989(JS)(AKT) and 20-CV-3990(JS)(AKT). Any future filings are to be docketed in **Case Number 20-CV-3988 only**.

Plaintiff's claims seeking money damages are DISMISSED pursuant to 28 U.S.C. §§ 1915(e)(2)(B), 1915A(b). The Court ABSTAINS from intervening in Plaintiff's underlying state court criminal proceeding. Accordingly, Plaintiff's claims seeking injunctive relief are DISMISSED WITHOUT PREJUDICE. Additionally, the Court declines to exercise supplemental jurisdiction over any remaining state law claims in the Complaints, which are DISMISSED WITHOUT PREJUDICE, and may be refiled in state court.

**\*10** Pursuant to 28 U.S.C. § 1915(a)(3), the Court certifies that any appeal from this Order would not be taken in good faith; therefore, in forma pauperis status is DENIED for the purpose of any appeal. See Coppedge v. United States, 369 U.S. 438, 444-45, 82 S. Ct. 917, 8 L. Ed. 2d 21 (1962).

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 7699644

**London v. Nassau County District Attorney's Office, Not Reported in Fed. Supp. (2020)**

2020 WL 7699644

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 360 of 370
Walker v. CIBC Limited, Not Reported in Fed. Supp. (2021)
2021 WL 3518439

2021 WL 3518439
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Myrna Althia Alicia WALKER, Plaintiff,

v.

CIBC LIMITED, Defendant.

1:20-CV-1337 (TJM/CFH)
|
Signed 04/13/2021

**Attorneys and Law Firms**

Myrna Althia Alicia Walker, 841 Western Avenue, Apartment 2A, Albany, New York 12203, Plaintiff pro se.

### REPORT-RECOMMENDATION & ORDER

CHRISTIAN F. HUMMEL, UNITED STATES MAGISTRATE JUDGE

### I. In Forma Pauperis

 *1  Plaintiff pro se Myrna Althia Alicia Walker purported to commence this action on October 28, 2020, by submitting a complaint and application to proceed in forma pauperis ("IFP") in lieu of paying the Court's filing fee. See Dkt. No. 1 ("Compl."); Dkt. No. 2. On March 15, 2021, plaintiff submitted a supplement to her complaint. Dkt. No. 4. On April 6, 2021, plaintiff submitted an additional filing entitled "Emergency Petition for the Death Penalty Against Adethia Keshia Fitten and Others on the Principle Found in the Law of Necessity." Dkt. No. 5. On April 7, 2021, plaintiff submitted additional 86 pages to supplement to her complaint. Dkt. Nos. 6, 7. On April 8, 2021, plaintiff submitted additional exhibits and a letter requesting to file those exhibits under seal. Dkt. No. 8.

The Court has reviewed plaintiff's IFP application and determines that she financially qualifies to proceed IFP for purposes of filing only. [1]

[1]    Plaintiff is still financially responsible for any other fees or costs she may incur.

### II. Legal Standards

Section 1915(e) of Title 28 of the United States Code directs that, when a plaintiff seeks to proceed IFP, "the court shall dismiss the case at any time if the court determines that ... the action or appeal (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). It is a court's responsibility to determine that a plaintiff may properly maintain his complaint before permitting her to proceed with her action. As plaintiff is representing himself, the court must afford plaintiff special solicitude; thus, it is to consider her claims "liberally" and "interpret them 'to raise the strongest arguments that they suggest.' " Cold Stone Creamery, Inc. v. Gorman, 361 F. App'x 282, 286 (2d Cir. 2010) (summary order) (quoting Brownell v. Krom, 446 F.3d 305, 310 (2d Cir. 2006)).

Pleading guidelines are set forth in the Federal Rules of Civil Procedure. Specifically, Rule 8 provides that a pleading which sets forth a claim for relief shall contain, inter alia, "a short and plain statement of the claim showing that the pleader is entitled to relief." See FED. R. CIV. P. 8(a)(2). "The purpose ... is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable." Flores v. Graphtex, 189 F.R.D. 54, 54 (N.D.N.Y. 1999) (internal quotation marks and citations omitted). Rule 8 also requires the pleading to include:

(1) a short and plain statement of the grounds for the court's jurisdiction ...;

(2) a short and plain statement of the claim showing that the pleader is entitled to relief; and

(3) a demand for the relief sought ....

FED. R. CIV. P. 8(a). Although "[n]o technical form is required," the Federal Rules make clear that each allegation contained in the pleading "must be simple, concise, and direct." Id. at 8(d).

 *2  Further, Rule 10 of the Federal Rules provides in pertinent part that:

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 361 of 370

Walker v. CIBC Limited, Not Reported in Fed. Supp. (2021)

2021 WL 3518439

[a] party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances. A later pleading may refer by number to a paragraph in an earlier pleading. If doing so would promote clarity, each claim founded on a separate transaction or occurrence – and each defense other than a denial – must be stated in a separate count or defense.

FED. R. CIV. P. 10(b). This serves the purpose of "provid[ing] an easy mode of identification for referring to a particular paragraph in a prior pleading[.]" Flores, 189 F.R.D. at 54 (internal quotation marks and citations omitted). A complaint that fails to comply with the pleading requirements "presents far too a heavy burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of their claims." Gonzales v. Wing, 167 F.R.D. 352, 355 (N.D.N.Y. 1996). As the Second Circuit has held, "[w]hen a complaint does not comply with the requirement that it be short and plain, the court has the power, on its own initiative ... to dismiss the complaint." Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988) (citations omitted). However, "[d]ismissal ... is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." Id. (citations omitted). In such cases of dismissal, particularly when reviewing a pro se complaint, the court generally affords the plaintiff leave to amend the complaint. Simmons v. Abruzzo, 49 F.3d 83, 86-87 (2d Cir. 1995). A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted).

### III. Initial Review

### A. Plaintiff's Complaint

Plaintiff purports to bring this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000, et seq. On her form Title VII complaint, she indicates that defendant discriminated against her due to her race and color, religion, sex, and "my date of birth – Easter." Compl. at 2. Plaintiff further indicates, through checking the boxes on the form complaint, that defendant terminated her employment, failed to promote, engaged in unequal terms and conditions of employment, retaliated against her, and "forced prostitution; [i]dentity theft, which is used to do Bank frauds & Poisonings." Id.

Plaintiff's complaint, inclusive of exhibits, is 158 pages long. Dkt. No. 1. Included with the exhibits to the complaint is an Equal Employment Opportunity Commission ("EEOC") dismissal notice [2] noting that plaintiff's EEOC charge was not timely filed and the EEOC was closing its file. Dkt. No. 1-1. The remainder of the exhibits appended to the complaint appear to be an 80-page letter relating to apparent visa fraud that plaintiff sent to The US Department of Justice; the United States Department of Homeland Security, Immigration and Customs Enforcement; and the Federal Bureau of Investigation; as well as an incident report dated May 29, 2019, regarding an apparent rape of plaintiff. Dkt. No. 1-2 at 81-82.

[2]        It appears that the EEOC dismissal notice is dated September 10, 2020. Dkt. No. 1-1.

*3  The supplement plaintiff filed on March 15, 2021, is 112 pages long. Dkt. No. 4. The supplement appears to be filings from a complaint plaintiff had before Supreme Court, Rensselaer County against Unity House of Troy and Joseph Posa. Id. The "emergency motion," filed on April 4, 2021, is 22 pages long, with 70 additional pages of exhibits. Dkt. No. 5. These exhibits are (1) various transfer orders and orders of protection plaintiff either sought or obtained against various individuals in family court proceedings in different counties (dkt. no. 5-1); (2) a residential lease agreement from July 2018, for a property in Troy, New York, with landlord Joseph Posa (dkt. no. 5-2); (3) records from a proceeding before the Rensselaer County Supreme Court in a case captioned Myrna Althia Alicia Walker vs. "Change of Name" Heidi Elizabeth Zuach (dkt. no. 5-3); and (4) a lease agreement dated May 2, 2017, between Capital Group Management LLC and plaintiff for a property in Troy,

Walker v. CIBC Limited, Not Reported in Fed. Supp. (2021)

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 362 of 370

2021 WL 3518439

New York (dkt. no. 5-4). The submission filed on April 7, 2021, is 59 pages long and includes various orders of protection, a USPS tracking number report, a Unity House Domestic Violence Services Transitional Housing Program Handbook, a form from the Rensselaer County Department of Social Services, earnings statements, a New York State incident report from 2018, an eviction notice, a letter from the Unity House Transitional Housing program, a "notice" letter, and a "birth registration" form. Dkt. No. 6-6. The exhibits filed on April 7, 2021, appear to be letters plaintiff sent to the New York State Department of Labor, United States Department of Homeland Security, Immigration and Customs Enforcement, and the EEOC, apparently related to "pandemic unemployment compensation benefits." See dkt. no. 7.

Plaintiff's complaint discusses Allison Carolyn Rattray, the Corporate Secretary and Legal Counsel of defendant CIBC First Caribbean International Bank (Jamaica) Limited. Dkt. No. 1 at 3. Plaintiff contends that Ms. Rattray kills unidentified people "with her married name" and drinks plaintiff's blood. Id. Apparently, plaintiff contends that Ms. Rattray is or was her "employer" who "uses the drinking blood of the employee to kill the employing the employment agreement and the incomes paid by direct deposit as the consideration for the blood that is drank before the killings and the doomings if [sic] innocent persons." Id. at 4. Plaintiff also appears to suggest that Ms. Rattray and her husband, "Barrington Andrew Rattray, Senior Judge, The Commercial Division, The Supreme Court of Jamaica," force plaintiff to use "illegal psychotropic medicines," cocaine, and alcohol. Id. at 5. Plaintiff refers to an employment agreement she signed with Ms. Rattray in 1995 and appears to suggest that since that date, Ms. Rattray "has been stalking the Plaintiff inside her bedroom, bathroom mirror, on her cell phone from 1995 even until today October 20, 2020 even the bathroom stables has visual and audio devices inside of them." Id. at 6. The Complaint then appears to proceed to explain why Ms. Rattray and her various family members are carrying out unspecified killings. See generally Dkt. No. 1. Plaintiff further suggests that through her employment with defendant, both defendant and the Commercial Division of the Supreme Court of Jamaica

> has been using me as a sex doll; as sex services; as sex product also incorporating The University of the West Indies Hospital to do surgeries; using illegal force of The Jamaican

police; using the illegal Force of the Jamaican Army; using the illegal force of the Jamaican parliament to have men from any where have sex with The Plaintiff because The Plaintiff was born on the day the crucifixion was celebrated, that is Easter and Good Friday.

Id. at 13. Plaintiff asks the Court for

> an Injunction to stop, restrain and prevent Allison Carolyn Rattray (maiden name Smith), Corporate Secretary and Legal Counsel, CIBC FirstCarribean Jamaica; her husband, Barrington Andrew Rattray, Senior Judge, The Commercial Division, The Supreme Court of Jamaica, King Street, Kingston, Jamaica, West Indies Deryke Smith, her brother; Lacelles Smith retired lecturer The University of the West Indies, Jamaica, West Indies; and the Rhoda Ford children and others from practicing their religion in a way that results in the death or harm or injury of The Rights of The Plaintiff and or the mother of The Plaintiff and or the siblings of The Plaintiff; and or any member of The Public, which includes anyone in the global community.

Id. at 14.

As for plaintiff's causes of action, plaintiff lists:

> forced religion imposed on The Plaintiff whom is the employee by The Employer, CIBC Limited. The Forced Religion imposed on Myrna Althia Alicia Walker [ ] to kill innocent Persons. The daily murders of innocent Persons is used to supply the demands

2021 WL 3518439

of the global organ Donor list. The staff is Allison Carolyn Rattray.

**\*4** Dkt. No. 1 at 69. As for a second cause of action is

> employment discrimination – I chose a career path to be an Attorney-At-Law. Allison Carolyn Rattray (maiden name Smith) my (former) then manager at CIBC had be fired; told me that (1) I am not worthy to be an Attorney-at-Law because of my Race (2) I was not worthy to be in the same Profession as her. She has been defaming my character ever since.

Id. at 70. Third cause of action is listed as employment discrimination - compensation: denied increases in my salary verbally communicated to be by Ms. Cherlyn Blackman my Senior Manager of 3% in 2004; Denied Promotion communicated to be my Human Resources Regional Director, Jerime Cjnttihs-Bell; denied fringe benefits that accompanied my five (5) CIBC Achievers awards – my salary was split and part paid to my aunt." Id. In the prayer for relief, plaintiff requests:

> (1) an Injunction(s) for Criminal Indictment(s) of Allison Carolyn (Smith) Rattray, Corporate Secretary and Legal Counsel CIBC for her forced Prostitution of The Plaintiff and Others; (2)An Injunction to prevent and stop all Prostitution or abuse of The Plaintiff, (3) Restitution(s) by CIBC for lost Incomes and fringe benefits[; and] (4) Job Reference letter from CIBC and an apology and my land Title Deed.

Id. at 71.

**B. Analysis**

First, plaintiff's complaint fails to meet the pleading requirements of Rules 8 and 10. Her complaint does not present a short and plain statement of the claim showing that she is entitled to relief. FED. R. CIV. P. 8. Further, she does not present her claims in numbered paragraphs, limited to one "circumstance" per paragraph. FED. R. CIV. P. 10. Instead, her complaint is a lengthy, disjointed, difficult to follow narrative. Her complaint clearly "presents far too a heavy burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of their claims." Gonzales, 167 F.R.D. at 355.

Second, plaintiff's claims, insofar as she seeks to bring them under Title VII are (1) barred by the statute of limitations, and (2) fail to state a claim for employment discrimination in violation of Title VII.[3] To the extent plaintiff suggests that she was discriminated against in violation of Title VII insofar as she was told that she was inadequate due to her race or denied promised promotions because of her race, dkt. no. 1 at 70, even if plaintiff could provide additional factual support and clarification for the alleged discrimination, plaintiff provides that the alleged discrimination occurred as early as 1995 until 2004, and would be beyond the statute of limitations of Title VII. Indeed, plaintiff's entire employment with defendant occurred outside of the statute of limitations as she suggests that her employment began in January 1995 and that she was terminated in March 2009. Dkt. No. 1 at 52-53. Thus, the complained-of actions occurred more than 300 days prior to when plaintiff appears to have filed a complaint with the EEOC. See Gunning v. New York State Just. Ctr. for Prot. of People with Special Needs, No. 1:19-CV-1446 (GLS/CFH), 2020 WL 5203673, at \*3 (N.D.N.Y. Sept. 1, 2020) ("Title VII's statute of limitations bars claims based upon events that occurred more than 300 days prior to filing a charge of discrimination with a state or local employment agency, and, therefore, "[a] plaintiff may bring a claim under Title VII only for acts of discrimination that occurred within the statutory period set by 42 U.S.C. § 2000e–5(e)(1).") (quoting Patterson v. Cnty. of Oneida, 375 F.3d 206, 220 (2d Cir. 2004)). The undersigned notes that plaintiff does not indicate when she filed a complaint with the EEOC. However, she submits the EEOC's dismissal letter, dated September 10, 2020, which states that plaintiff did not timely file a complaint with the EEOC. Dkt. No. 1-1. As plaintiff likely filed her EEOC complaint in 2020,[4] appears to have been

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 364 of 370
Walker v. CIBC Limited, Not Reported in Fed. Supp. (2021)
2021 WL 3518439

last employed by defendant in 2009, and complains of alleged employment discrimination occurring as early as 1995, her filing of an EEOC complaint in 2020 is clearly more than 300 days after the alleged discrimination occurred. Thus, any cognizable Title VII claims arising out of her employment with defendant are barred by the statute of limitations.

3    A plaintiff establishes "a prima facie case of discrimination by showing that (1) he is a member of a protected class; (2) he is competent to perform the job or is performing his duties satisfactorily; (3) he suffered an adverse employment decision or action; and (4) the decision or action occurred under circumstances giving rise to an inference of discrimination based on his membership in the protected class." Dawson v. Bumble & Bumble, 398 F.3d 211, 216 (2d Cir. 2005) overruled on other grounds Zarda v. Altitude Express, Inc., 883 F.3d 100 (2d Cir. 2018).

4    As the EEOC dismissal notice is dated September 10, 2020, the Court makes the reasonable inference that plaintiff filed her EEOC complaint some time in 2020.

 *5  However, even if the statute of limitations was not an issue, plaintiff's claims still must fail because plaintiff's claims fail to state any cognizable legal claim under the United States Constitution, federal statute, or state law, and ultimately fails establish this Court's jurisdiction under federal question or diversity jurisdiction.[5] Plaintiff makes several disjointed, confusing claims about being sold as a prostitute against her will by defendant's employees and other nonparties, defendant's employees and others murdering innocent people, defendant's employees drinking plaintiff's blood, and being stalked and prostituted by various officials from Jamaica and employees of defendant's company. See generally dkt. nos. 1, 4, 6, 7. Plaintiff makes several allegations against her former supervisor, Ms. Rattray, and says the various physical wrongdoings Ms. Rattray committed against plaintiff were all due to "The employment agreement between The Plaintiff and CIBC FirstCarribean Jamaica." Dkt. No. 1 at 60-61. Although plaintiff's submissions seem to suggest that she was employed by defendant at some point in time, and that a supervisor told her she could not be a lawyer due to her race and denied promised salary increases for unclear reasons, nothing about the factual allegations pleadings suggest that she presents a valid employment discrimination claim under Title VII or any other statute.

5    Even if this Court were to assess this case as seeking to proceed under diversity jurisdiction pursuant to 28 U.S.C. § 1332(a), the plaintiff has also failed to set forth a cognizable state law claim. Scherer v. Equitable Life Assur. Soc'y of the United States, 347 F.3d 394, 397 (2d Cir. 2003) (quoting 28 U.S.C. § 1332(a)) (noting that diversity jurisdiction "confers original jurisdiction on the federal district courts with respect to 'all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between ... citizens of different States.' ").

The Court is at a loss as to how the allegations in the complaint relate to a valid employment discrimination claim or any valid legal claim. Plaintiff presents a difficult to comprehend series of allegations against various individuals – many of whose connections to her apparent former employer is difficult, if not impossible, to comprehend – who she alleges forced her into prostitution, performed plastic surgeries on her against her will, installed "spying devices" into plaintiff's body, forced her to undergo various injections, and involved plaintiff in murder scheme that is somehow related to her Easter birthday. See Dkt. No. 1 at 56-60. Plaintiff also sets forth unexplained allegations that appear to involve Ms. Rattray and others, such as "an abuse of a veteran of the United States Army by the said Allison Carolyn Rattray" (dkt. no. 1 at 54). Plaintiff submits dozens of pages of exhibits and supplements that appear to relate to cases filed in other courts, orders of protection obtained in other courts, unemployment insurance issues, police reports, and documents sent to various federal agencies. See dkt. nos. 4, 5, 6, 7. The relevance of this deluge of documents is entirely unclear.

Further, to the extent plaintiff requests injunctions (dkt. no. 1 at 71) to prevent defendant's employees from prostituting or harming plaintiff or seeks some kind of prosecution of defendant's employees for criminal conduct, this Court does not have authority to direct persons to cease engaging in illegal activity through a civil suit as it is not a law enforcement agency. It appears plaintiff is either seeking the criminal prosecution of an individual or individuals or a law enforcement investigation, which is beyond this Court's jurisdiction. See generally Linda R.S. v. Richard D., 410 U.S. 614, 619 (1973) ("[A] private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."); McFadden v. Ortiz, 5:12-CV-1244(MAD/ATB), 2013 WL 1789593 (N.D.N.Y. Apr. 26, 2013) (noting that there is no private right of action to enforce either state or federal criminal statutes).

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 365 of 370

Walker v. CIBC Limited, Not Reported in Fed. Supp. (2021)

2021 WL 3518439

Next, plaintiff files an "emergency motion" for the Death Penalty,[6] which appears to ask the United States Supreme Court to enforce the death penalty against various individuals who plaintiff contends engaged in "drug assisted surgeries on The Plaintiff herein to induce The Coronavirus ahead of the proposed mass vaccination of the US public, which is set for May 1, 2021[,]" implanting maggots into plaintiff's bones, releasing poisons into plaintiff's body, "install[ing] television" and "Netflix Television" into plaintiff's eye and spinal cord, "alter[ing]" plaintiff's "joints to make [her] walk in [sic] all four" to be "displayed as a naked dog on a lease [sic]," and other similar allegations. See Dkt. No. 5. As discussed above, this Court does not have the authority or jurisdiction to sua sponte impose the death penalty in a civil case nor can it seek the criminal prosecution of individuals or at the request of a plaintiff or decide the ultimate punishment if convicted after a criminal trial.

6      This "emergency motion" notes that it is presented to the United States Supreme Court, but contains a caption including this Court. It is unclear if this is a document plaintiff intends to submit before this Court, or before the United States Supreme Court. See dkt. no. 5.

**\*6** Generally, in cases involving pro se plaintiffs, a court should not dismiss a complaint without granting leave to amend "at least once" "when a liberal reading of the complaint gives any indication that a valid claim might be stated." Branum v. Clark, 927 F.2d 698, 704-05 (2d Cir. 1991). However, an opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000); see also Cortec Indus. Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). The Court, however, also has an overarching obligation to determine that a claim is not legally frivolous before permitting a pro se plaintiff's complaint to proceed. See, e.g., Fitzgerald v. First East Seventh St. Tenants Corp., 221 F.3d 362, 363 (2d Cir. 2000) (holding that a district court may sua sponte dismiss a frivolous complaint, notwithstanding the fact that the plaintiff paid the statutory filing fee). "Legal frivolity ... occurs where 'the claim is based on an indisputably meritless legal theory [such as] when either the claim lacks an arguable basis in law, or a dispositive defense clearly exists on the face of

the complaint.' " Aguilar v. United States, 99-MC-0304, 99-MC-0408, 1999 WL 1067841, at *2 (D. Conn. Nov. 8, 1999) (quoting Livingston v. Adirondack Beverage Co., 141 F.3d 434, 437 (2d Cir. 1998)); see also Neitzke v. Williams, 490 U.S. 319, 325 (1989) ("[D]ismissal is proper only if the legal theory ... or factual contentions lack an arguable basis."); Pino v. Ryan, 49 F.3d 51, 53 (2d Cir. 1995) ("[T]he decision that a complaint is based on an indisputably meritless legal theory for purposes of dismissal under section 1915(d), may be based upon a defense that appears on the face of the complaint."). Thus, although the Court must show special solicitude to pro se litigants, see Nance v. Kelly, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam), and is to exercise "extreme caution ... in ordering sua sponte dismissal of a pro se complaint before the adverse party has been served and both parties (but particularly the plaintiff) have had an opportunity to respond, ..." Anderson v. Coughlin, 700 F.2d 37, 41 (2d Cir. 1983) (internal citations omitted), the Court also has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed with an action in forma pauperis.

Even if, arguendo, the statute of limitations was not a jurisdictional bar and plaintiff had been able to establish this Court's jurisdiction, the undersigned would still recommend dismissal with prejudice on its initial review as plaintiff's complaint is "factually frivolous." See Bennett v. Mnuchin, 6:20-CV-243 (BKS/TWD), 2020 WL 1674068 (citing Denton v. Hernandez, 504 U.S. 25, 32-33 (1992)) (holding that a court may dismiss a factually frivolous claim when the allegations are "clearly baseless," including claims that "describe[e] fantastic or delusional scenarios."); Brown v. New York State Educ. Dept., 8:18-CV-169 (TJM/CFH), 2018 WL 1865547, at *2 (N.D.N.Y. Mar. 19, 2018) (dismissing pro se plaintiff's complaint with prejudice where "it is clear that no federal claim can be stated on these facts[.]"). Accordingly, the undersigned recommends dismissal with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(i) as any leave to amend would be clearly futile.

### IV. Conclusion

**WHEREFORE**, for the reasons set forth herein, it is hereby

**ORDERED**, that plaintiff's in forma pauperis application (dkt. no. 2) be granted for purposes of filing only; and it is

Case 5:24-cv-01237-DNH-MJK    Document 10    Filed 11/12/24    Page 366 of 370

Walker v. CIBC Limited, Not Reported in Fed. Supp. (2021)

2021 WL 3518439

**RECOMMENDED**, that plaintiff's complaint (dkt. no. 1) be **DISMISSED WITH PREJUDICE**; and it is further

**RECOMMENDED**, that plaintiff's "Emergency Motion for the Death Penalty" (dkt. no. 5) be **DISMISSED**; and it is further

**RECOMMENDED**, that plaintiff's letter motion to file exhibits under seal (dkt. no. 8) be **DISMISSED AS MOOT**.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1), plaintiff has FOURTEEN (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Sec'y of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); see also 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a). [7]

[7]    If you are proceeding pro se and are served with this Report-Recommendation & Order by mail, three (3) additional days will be added to the fourteen (14) day period, meaning that you have seventeen (17) days from the date the Report-Recommendation & Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(c).

**All Citations**

Not Reported in Fed. Supp., 2021 WL 3518439

---

End of Document                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 1789593
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Alexander McFADDEN, Plaintiff,
v.
Jose D. ORTIZ, Executive Officer Chase JP
Morgan Chase & Co., and James Simon, Manager
Chase JP Morgan Chase & Co., Defendants.

No. 5:12–CV–1244 (MAD/ATB).
|
April 26, 2013.

**Attorneys and Law Firms**

Alexander McFadden, Pine City, NY, pro se.

Jose D. Ortiz, Executive Officer for Chase JP Morgan Chase & Co., Houston, TX.

James Simon, Manager for Chase JP Morgan Chase & Co., New York, NY.

**MEMORANDUM–DECISION AND ORDER**

MAE A. D'AGOSTINO, District Judge.

### I. INTRODUCTION

**\*1** Plaintiff *pro se* Alexander McFadden ("McFadden"), an inmate at the Southport Correctional Facility ("SCF"), filed this action pursuant to 42 U.S.C. § 1983. In his complaint, Plaintiff appears to allege that Defendants, two executives of Chase JP Morgan Chase & Co. ("Chase"), violated his constitutional rights through conduct that, in some way, involved a bank account. *See* Dkt. No. 1 at ¶ 4.

On August 7, 2012, Magistrate Judge Andrew T. Baxter issued an Order and ReportRecommendation, recommending that the Court dismiss Plaintiff's complaint in its entirety with prejudice, pursuant to 28 U.S.C. § 1915(e)(2)(B)(i)-(ii). *See* Dkt. No. 5. Currently before the Court are Plaintiff's objections to Magistrate Judge Baxter's August 7, 2012 Order and ReportRecommendation.

### II. BACKGROUND

In his Order and Report–Recommendation dated August 7, 2012, Magistrate Judge Baxter recommended that Plaintiff's motion to proceed *in forma pauperis* ("IFP") should be denied by the Court and, upon review of the complaint, that this action be dismissed in its entirety with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(i)-(ii). *See* Dkt. No. 5 at 9. Further, Magistrate Judge Baxter recommended that if the Court approves his report, the Court should certify that any appeal from this matter will not be taken in good faith pursuant to 28 U.S.C. § 1915(a)(3). *See id.*

Regarding Plaintiff's complaint, Magistrate Judge Baxter's Order and ReportRecommendation recommends that because there is no indication that either Defendant acted under "color of state law," and because there are no allegations that either or both Defendants "conspired" with any state actors to bring this action under section 1983, Plaintiff's complaint should be dismissed. *See* Dkt. No. 5 at 5.

Regarding Plaintiff's claim that Defendants violated New York Penal Law by offering false documents for filing, tampering with public records, and falsifying business records, Magistrate Judge Baxter recommended that because there is no private right of action to enforce either state or federal criminal statutes, Plaintiff is barred from bringing a claim to enforce these provisions of the New York State Criminal Law. *See* Dkt. No. 5 at 6.

Accordingly, Magistrate Judge Baxter recommended this Court hold that, due to Plaintiff's failure to state a claim under 42 U.S.C. § 1983 upon which relief can be granted, combined with the courts inability to determine what venue might be appropriate, Plaintiff's motion for IFP should be denied, and Plaintiff's complaint should be dismissed in its entirety with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(i)-(ii). *See* Dkt. No. 5 at 9.

In his "objections" to Magistrate Judge Baxter's Order and Report–Recommendation, Plaintiff simply provides the Court with language from various cases discussing various types of objections and the Court's authority to review unpreserved errors. *See* Dkt. Nos. 14, 15.

### III. DISCUSSION

## A. Review of a magistrate judge's decision

**\*2** If a party files specific objections to a magistrate judge's report-recommendation, the district court performs a *"de novo* determination of those portions of the report of specified proposed findings or recommendations to which objections is made." 28 U.S.C. § 636(b)(1) (2006). However, if a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that were presented] to the magistrate judge," the court simply reviews those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, \*1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). At the conclusion of the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

## B. *In Forma Pauperis* application

In order for a plaintiff to proceed without payment of any fees, he must first meet the financial criteria for IFP status. *See* 28 U.S.C. § 1915(a)(1). The plaintiff must submit an affidavit, including a statement of all assets, establishing his inability to pay the filing fee of $350.00. *See id.* Here, Plaintiff submitted a standard IFP application form, but answered only some of the relevant questions. Furthermore, while Plaintiff is incarcerated and has filed a motion to proceed IFP, his application states that, in the past twelve months, he has had income from "[b]usiness, profession or other self employment," and has "millions of dollars" in "cash, checking or savings accounts." *See* Dkt. No. 2 at ¶¶ 3, 4. Plaintiff, however, does not answer the question that asks him to "describe the source of money and state the amount received and what you expect you will continue to receive ." *See id.* at ¶ 3. Plaintiff answers "yes" to the questions asking whether he owns "real estate, stocks, bonds, securities, other financial instruments, automobile or any other assets." *See id.* at ¶ 5. Once again, however, Plaintiff does not complete the question by describing the property and stating its value. *See id.* Lastly, the form indicates that Plaintiff only has $9.60 in his prison account, and that during the last six months prior to this application, the average balance in his prison account was $4.03. *See* Dkt. No. 2 at 2.

If Plaintiff's claims are true and he does in fact have millions of dollars and real estate or other valuable property, then he cannot meet the financial requirements for proceeding IFP. Generally, when plaintiff has failed to properly complete the IFP request, the court will deny IFP without prejudice and allow plaintiff to resubmit the form with proper information.

However, in this case, based upon the inadequacy of Plaintiff's responses, combined with his failure to state a plausible cause of action and the fact that amendment would be futile as discussed below, even if Plaintiff met the financial requirements for IFP, the Court would still find dismissal of this action to be proper.

## C. Sufficiency of the complaint

### 1. Legal Standard

**\*3** In addition to determining whether Plaintiff meets the financial criteria to proceed IFP, the court must also consider the sufficiency of the allegations set forth in the complaint in light of 28 U.S.C. § 1915, which provides that the court shall dismiss the case at any time if it determines that the action is (i) frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief. *See* 28 U.S.C. § 1915(e)(2)(B) (i)-(iii).

### 2. Application

### a. Color of state law

Plaintiff brings this complaint pursuant to 42 U.S.C. § 1983. *See* Dkt. No. 1. To state a claim under section 1983, a plaintiff must allege two elements: (1) the defendant acted under color of state law; and (2) as a result of the defendant's actions, the plaintiff suffered a deprivation of her rights or privileges as secured by the Constitution of the United States. *See Annis v. County of Westchester,* 136 F.3d 239, 245 (2d Cir.1998). Under extremely limited circumstances not alleged here, private actors, such as Defendant, may be held liable under section 1983. *See White v. Monarch Pharmaceuticals,* Inc., No. 08–CV–0430, 2009 WL 3068217, \*1 (2d Cir. Sept. 28, 2009); *see also Rendell—Baker v. Kohn,* 457 U.S. 830, 838–42 (1982). The law does not reach private conduct, no matter how "discriminatory or wrongful." *Annis,* 136 F.3d at 245 (quoting *Blum v. Yaretsky,* 457 U.S. 991, 1002 (1982)).

In the present matter, Plaintiff names two executives of Chase as Defendants. Along with being very difficult to determine what these Defendants allegedly did to Plaintiff, there is no indication that either Defendant acted under color of state law. Moreover, the complaint does not allege or suggest that Defendants conspired with a state actor to violate his constitutional rights. Further, Plaintiff does not allege any conduct attributable to either Defendant sufficient to establish

their personal involvement in any alleged constitutional deprivation. *See Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quotation and other citations omitted).

Based on the foregoing, the Court finds that Magistrate Judge Baxter correctly recommended that the Court should dismiss the complaint.

#### b. Criminal statutes

Plaintiff states in the "Causes of Action" section of his complaint that Defendants violated the New York Penal Law regarding falsifying business records, tampering with public records, and offering false documents for filing. *See* Dkt. No. 1 (citing N.Y. PENAL LAW §§ 175.10, 175.25, and 175.35). Even if this is true, however, there is no private right of action to enforce either state or federal criminal statutes. *See Abrahams v. Incorporated Village of Hempstead,* No. 08–CV–2584, 2009 WL 1560164, \*8 (E.D.N.Y. June 2, 2009) (holding that dismissal of civil suit for perjury was proper because there is no private right of action for perjury under New York Law). Therefore, even assuming, *arguendo,* that Defendants violated some criminal statutes, Plaintiff may not bring a claim based on those statutes to enforce New York Criminal Law.

**\*4** As such, Magistrate Judge Baxter correctly recommended the Court find that Plaintiff has failed to allege a plausible cause of action.

#### c. Venue

Venue in federal-question cases is generally determined by 28 U.S.C. § 1391(b) which provides that

> [a] civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, ... or (3) a judicial district in which any defendant may be found, if

> there is no district in which the action may otherwise be brought.

28 U.S.C. § 1391(b). In this case, one of the Defendants is listed with a Houston, Texas address, while the other Defendant is listed as having a New York City address. *See* Dkt. No. 1 at ¶¶ 3(a) and (3)(b). Thus, neither of the Defendants reside, or are located, in the Northern District of New York. Plaintiff is incarcerated at Southport Correctional Facility, located in the Western District of New York. Therefore, since both Plaintiff and one of the Defendants are New York residents, this case could clearly not be brought as a diversity action. Moreover, under Plaintiff's section 1983 claim, venue is not proper in the Northern District of New York. All Defendants do not reside in the same state, neither Defendant is located in this district, and the complaint does not allege any conduct that occurred in the Northern District of New York.

Under 28 U.S.C. § 1406, a district court faced with a case brought "laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a). The Second Circuit has suggested that "a district court should not dismiss for improper venue on its own motion except in extraordinary circumstances." *Concession Consultants, Inc. v. Mirisch,* 355 F.2d 369 (2d Cir.1966).

In the present matter, the Court finds and agrees with Judge Baxter's Order and ReportRecommendation that this case presents precisely the extraordinary circumstances making it proper for the Court to dismiss for improper venue *sua sponte.*

#### d. Leave to amend

When a *pro se* complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citations omitted). Of course, an opportunity to amend is not required where "[t]he problem with [the plaintiff's] cause of action is substantive" such that "better pleading will not cure it ." *Id.* (citation omitted); *see also Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993).

**\*5** Here, the Court agrees with Magistrate Judge Baxter that any attempt by Plaintiff to amend his complaint would be futile. As discussed, although Plaintiff alleges "due process violations," section 1983 does not permit such actions to be brought against private individuals absent some involvement by the state. Moreover, Plaintiff does not have the right to enforce New York State criminal statutes.

Based on the foregoing, the Court finds that Magistrate Judge Baxter correctly recommended that the Court should dismiss Plaintiff's complaint with prejudice.

### IV. CONCLUSION

After carefully considering Magistrate Judge Baxter's Order and Report–Recommendation, the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Baxter's August 7, 2012 Order and Report–Recommendation is **ADOPTED** in its entirety for the reasons stated therein; and the Court further **ORDERS** that Plaintiff's application to proceed *in forma pauperis* is **DENIED;** and the Court further

**ORDERS** that Plaintiff's complaint is **DISMISSED with prejudice** pursuant to 28 U.S.C. § 1915(e)(2)(B)(i)-(ii); and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve Plaintiff with a copy of this Memorandum–Decision and Order in accordance with Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 1789593

---

**End of Document**          © 2024 Thomson Reuters. No claim to original U.S. Government Works.